**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**HOBERT FREEL TACKETT, et al.,**

           **Plaintiffs,**                    **Case No. 2:07-cv-126**
                                             **JUDGE GREGORY L. FROST**
     **v.**                            **Magistrate Judge Norah McCann King**

**M&G POLYMERS USA, LLC, et al.,**

           **Defendants.**

**OPINION AND ORDER**

    This matter is before the Court for consideration of Defendants' motion for summary

judgment (ECF No. 133) and a memorandum in support (ECF No. 135),[1] Plaintiffs' memoranda

in opposition (ECF Nos. 141, 144), and Defendant's reply memorandum (ECF No. 151).  Also

before this Court are Plaintiffs' motion for reconsideration (ECF No. 154), Defendants'

memorandum in opposition (ECF No. 156), and Plaintiffs' reply memorandum (ECF No. 157).[2]

For the reasons that follow, the Court **GRANTS** the motion for reconsideration (ECF No. 154)

but **DENIES** the motion for summary judgment (ECF No. 133).

**I.  Background**

    This is a class action case in which the class–retirees, their spouses, and surviving

---

    [1]  Defendants filed multiple copies of their memorandum in support on the electronic
docket, one with each group of attachments filed.  (ECF Nos. 135, 136, 137, 138, 139.)  For ease
of reference, this Court shall refer only to the first memorandum in support filed.  (ECF No.
135.)

    [2]  All pinpoint references to documents filed on the electronic docket shall be to the
original page numbers of the document involved, not to the page number assigned by the
electronic filing system.

spouses or other dependents of individuals who worked for the named defendant company–assert

that although they have a right to lifetime retiree health care benefits, the company is requiring

them to pay for those benefits in violation of various collective bargaining agreement ("CBA")

provisions.[3]  Plaintiffs Hobert Freel Tackett, Woodrow K. Pyles, and Harland B. Conley are all

---

[3]  The parties have agreed on the class and subclasses involved, which are as follows:

Class:

All retired employees of M&G Polymers USA, LLC ("M&G") and/or its predecessor company, the Shell Chemical Company ("Shell"), who worked at the Point Pleasant Polyester Plant ("Plant") in Apple Grove, West Virginia and were represented by the USW or its predecessor  unions ("Union") in collective bargaining, and who retired or left service from the Plant having met the eligibility requirements for retiree health care benefits specified in the applicable collective bargaining agreements ("CBAs") and P&I Agreements, as well as the spouses and surviving spouses and other dependents of those retired former employees who also claim a right to such benefits, and the surviving spouses of Union-represented Plant employees who died while employed at the Plant who also claim a right to such benefits (the "Class").

Subclass 1: Members of the Class who retired, left service or died while employed at the Plant having met the eligibility requirements for retiree health care benefits specified in the P&I Agreement dated May 15, 1991 through May 15, 1994, as adopted by the CBA between Goodyear Tire & Rubber Company ("Goodyear") and the Union for the Plant effective November 6, 1991 through November 6, 1994, and as adopted by Shell, and their eligible surviving spouses and dependents.

Subclass 2: Members of the Class who retired, left service or died while employed at the Plant having met the eligibility requirements for retiree health care benefits specified in the P&I Agreement dated July 20, 1994 through July 20, 1997, as adopted by the CBA between Shell and the Union for the Plant effective November 6, 1994 through November 6, 1997, and their eligible spouses and dependents.

Subclass 3: Members of the Class who retired, left service or died while employed at the Plant having met the eligibility requirements for retiree health care benefits specified in the P&I Agreement dated May 9, 1997 through May 9, 2003, as adopted by the CBA between Shell and the Union for the Plant effective November 6, 1997 through November 6, 2000, and their eligible spouses and dependents.

Subclass 4: Members of the Class who retired, left service or died while employed

Ohio residents and retirees from the Point Pleasant Polyester Plant in Apple Grove, West Virginia.  They and similarly situated retirees belong to a labor union, Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC ("USW"), which represented (or at least one of its predecessor unions represented) them as employees of Defendant M&G Polymers USA, LLC ("M&G") (which bought the plant in 2000), or one of its predecessor companies, such as the Shell Chemical Company (which owned the plant from 1992 to 2000) and The Goodyear Tire & Rubber Company (which owned the plant until 1992).  Plaintiffs assert that the CBA provides vested retiree health care benefits as a result of the following language, which appeared in various agreements:

> Employees who retire on or after January 1, 1996 and who are eligible for and receiving a monthly pension under the 1993 Pension Plan . . . whose full years of attained age and full years of attained continuous service . . . at the time of retirement equals 95 or more points will receive a full Company contribution towards the cost of [health-care] benefits . . . .  Employees who have less than 95 points at the time of retirement will receive a reduced Company contribution.  The Company contribution will be reduced by 2% for every point less than 95.  Employees will be required to pay the balance of the health care contribution, as estimated by the Company annually in advance, for the [health care] benefits . . . .  Failure to pay the

---

at the Plant having met the eligibility requirements for retiree health care benefits specified in the P&I Agreement dated November 6, 2000 through November 6, 2003, as adopted by the CBA between M&G and the Union for the Plant effective November 6, 2000 through November 6, 2003 and applicable until August 8, 2005, and their eligible spouses and dependents.

Subclass 5: Members of the Class who retired, left service or died while employed at the Plant having met the eligibility requirements for retiree health care benefits specified in the CBA between M&G and the Union for the Plant effective August 9, 2005 through November 6, 2008 or any subsequent CBA between M&G and the Union for the Plant, and their eligible spouses and dependents.

(ECF No. 103, at 2-7.)

3

required medical contribution will result in cancellation of coverage.

In addition to a series of CBA's, a number of side letters are involved in this case. The Sixth Circuit has explained these documents as follows (although as discussed later, the description may not match facts subsequently presented in this litigation):

> A series of collective bargaining agreements has been in force at the Plant, with each typically lasting around three years before renegotiation. The first letter agreement, signed contemporaneously with the 1991-1994 collective bargaining agreement, was adopted "for purposes of conforming with the new Financial Accounting Standard Board (FASB) accounting requirement" that required accrual accounting of healthcare benefits. This new requirement hurt a company's balance sheet performance if the company had no cap on its health-care costs. While signed in 1991, the caps were not to take effect until July 1, 1997. Concurrent with the 1994-1997 collective bargaining agreement, another cap letter postponed the effective date of the caps to 2004.

*Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 483 n.1 (6th Cir. 2009).

Plaintiffs allege that on or about January 1, 2007, Defendant M&G acted contrary to the CBA by unilaterally modifying the health care benefits by shifting a large part of the health care costs onto the class members. The other named defendants are M&G-sponsored health plans through which the class members receive health care benefits: the M&G Comprehensive Medical Benefits Program for Employees and Their Dependents, the M&G Catastrophic Medical Plan, the M&G Medical Necessity Benefits Program of Hospital, Surgical, Medical, and Prescription Drug Benefits for Employees and Their Dependents, and the M&G Major Medical Benefits Plan.

Plaintiffs filed the instant action on behalf of the named retirees and their surviving spouses or dependents, as well as other similarly situated retirees and their surviving spouses or dependents, on February 9, 2007. (ECF No. 1.) Via their amended complaint, Plaintiffs originally asserted three claims: violation of labor agreements, actionable under Section 301 of

the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) (Count I); violation of

employee welfare benefit plan, actionable under Sections 502(a)(1)(B) and (a)(3) of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and

(a)(3) (Count II); and breach of fiduciary duty under Section 502(a)(3) of ERISA, 29 U.S.C. §

1132(a)(3) (Count III). (ECF No. 14 ¶¶ 26-31.)

Defendants previously filed a motion to dismiss the amended complaint (ECF No. 19),

and this Court granted that motion (ECF No. 63). On appeal, the Sixth Circuit Court of Appeals

affirmed the dismissal of the § 5023(a)(3) claim constituting Count III, but reversed and

remanded the remaining § 301 and § 502(a)(1)(B) claims (ECF No. 68). Defendants have now

filed a joint motion for summary judgment on Counts I and II. (ECF No. 133.) The parties have

completed briefing on the motion for summary judgment, which is ripe for disposition.

## II. Motion for Reconsideration

On January 11, 2011, Plaintiffs filed a motion for leave to file a sur-reply to Defendants'

summary judgment reply memorandum. (ECF No. 152.) The following day, this Court denied

that motion in an Order that read:

> This matter is before the Court for consideration of Plaintiffs' motion for
> leave to file a sur-reply. (ECF No. 152.) Plaintiffs do not proffer a sur-reply but
> instead ask this Court to permit the subsequent filing of such a supplemental
> memorandum without identifying the purported new arguments contained in the
> reply memorandum and by citing to irrelevant statistical analyses of the prior
> briefing. In light of the absence of a substantive justification for a sur-reply
> memorandum, the Court **DENIES** the motion for leave to file a sur-reply. (ECF No.
> 152.)

(ECF No. 153.) Thereafter, on January 24, 2011, Plaintiffs filed a motion asking this Court to

reconsider its denial of their prior motion. (ECF No. 154.)

In moving for reconsideration, Plaintiffs summarize this Court's January 12, 2011 Order

5

as denying leave to file "because Plaintiffs' [*sic*] did not proffer a sur-reply with their motion for leave."  (ECF No. 154, at 1.)  This slight characterization of the Court's reasoning ignores the fact that this Court faulted Plaintiffs for failing to identify any purported new arguments contained in the reply memorandum.  It also ignores the fact that the Court rejected Plaintiffs' prior rationale for obtaining leave to file, which was an odd statistical analysis of the parties' briefing.  Finally, Plaintiffs' characterization ignores the cause-and-effect rationale that the Court provided in its Order: because Plaintiffs failed to provide *a substantive justification* for filing a sur-reply memorandum, the Court denied the motion requesting such leave.  *See* S. D. Ohio Civ. R. 7.2(a)(2) ("No additional memoranda beyond those enumerated will be permitted except upon leave of court for good cause shown.").

In seeking reconsideration, Plaintiffs do not point to an error on the Court's part in the January 12, 2011 Order.  Rather, Plaintiffs attempt to explain the failure to proffer a sur-reply and suggest in summary fashion that new arguments, cases, and factual assertions present in the summary judgment reply memorandum justify the filing of a sur-reply.  The reconsideration motion is thus more appropriately characterized as a second motion for leave to file a sur-reply memorandum.  Defendants oppose the granting of such leave.  They argue that they made all of the suggested "new arguments" in their opening brief.  This opposition in turn generated an additional brief from Plaintiffs in support of their reconsideration/motion for leave.

This is hardly a major debate worth having given that the volume of the summary judgment briefing and evidence necessitating review in this case already present a factual dispute precluding summary judgment, essentially negating the cumulative effect of the sur-reply memorandum.  Although the sufficiency of "good cause" presented here is indeed perhaps

debatable, the Court recognizes grounds that the summary judgment briefing presents evolving or at least contingent arguments; the memoranda in opposition and the reply memorandum focus the issues in such a way that there is arguably good cause for permitting Plaintiffs to have the last word.

The Court therefore **GRANTS** the second motion for leave to file a sur-reply memorandum.  (ECF No. 154.)  The Clerk need not detach from the motion Plaintiffs' proffered sur-reply memorandum and file it separately on the electronic docket.  The Court has reviewed and considered the sur-reply memorandum, which can already be readily found by the court of appeals in the event of an appeal necessitating review of this portion of the relevant briefing.  (ECF No. 154-1.)

### III.  Motion for Summary Judgment

#### A.  Standard Involved

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.  *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A

genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law.' "  *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*,

477 U.S. at 251-52).

### B.  Analysis

This case is about whether the retirees (which shall encompass spouses and dependants

for ease of reference) have a vested right to lifetime, uncapped medical benefits.  The Sixth

Circuit has held that "[r]etiree health benefit plans . . . are welfare benefit plans; thus, vesting

only occurs if the parties so intended when they executed the applicable labor agreements."  *Noe

v. PolyOne Corp.*, 520 F.3d 548, 552 (6th Cir. 2008).  See also *Tackett*, 561 F.3d at 489.  The

presence or absence of such intent is critical here because, as the court of appeals has explained,

"[i]f the parties do not intend to vest the benefits, the former employer can modify the retiree

benefits without breaching a collective bargaining agreement."  *Tackett*, 561 F.3d at 489.  The

appellate court has also explained that "[a] court may find vested rights 'under a CBA even if the

intent to vest has not been explicitly set out in the agreement.' "  *Id.* (quoting *Maurer v. Joy

Technologies, Inc.*, 212 F.3d 907, 915 (6th Cir. 2000).

The Sixth Circuit has described the "broad analytical framework" that this Court must

apply to the vesting issue as follows:

> The seminal case for determining whether the parties to a CBA intended
> benefits to vest is *UAW v. Yard-Man*, 716 F.2d 1476, 1479 (6th Cir. 1983).  Under

*Yard-Man,* basic rules of contract interpretation apply, meaning that courts must first examine the CBA language for clear manifestations of an intent to vest. *Id.* Furthermore, each provision of the CBA is to be construed consistently with the entire CBA and "the relative positions and purposes of the parties." *Id.* The terms of the CBA should be interpreted so as to avoid illusory promises and superfluous provisions. *Id.* at 1480. Our decision in *Yard-Man* also explained that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Id.* at 1482. With regard to the "*Yard-Man* inference," later decisions of this court have clarified that *Yard-Man* does not create a legal presumption that retiree benefits are interminable. *Yolton*, 435 F.3d at 579. Rather, *Yard-Man* is properly understood as creating an inference only if the context and other available evidence indicate an intent to vest. *Id.*

> When an ambiguity exists in the provisions of the CBA, then resort to extrinsic evidence may be had to ascertain whether the parties intended for the benefits to vest. *Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 774 (6th Cir. 1999). If an examination of the available extrinsic evidence fails to conclusively resolve the issue and a question of intent remains, then summary judgment is improper. *Int'l Union, United Mine Workers of Am. v. Apogee Coal Co.*, 330 F.3d 740, 744 (6th Cir. 2003).

*Noe*, 520 F.3d at 552. The court of appeals has further clarified:

> Courts reviewing a collective bargaining agreement must also keep in mind the context of labor-management negotiations on retiree health-care benefits: "because retirement health care benefits are not mandatory or required to be included in an agreement, and because they are 'typically understood as a form of delayed compensation or reward for past services' it is unlikely that they would be 'left to the contingencies of future negotiations.' " *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 580 (6th Cir. 2006) (quoting *Yard-Man*, 716 F.2d at 1481-82).

*Tackett*, 561 F.3d at 489. Cognizant of these directions, the Court shall turn its attention to the various agreements and extrinsic evidence involved in the parties' dispute.

Defendants ask this Court to conclude again, as it did in the motion to dismiss context, that an unbroken chain of cap letter applicability exists. They posit that "the operative agreements unambiguously provide for caps on employer contributions to retiree health care benefits." (ECF No. 135, at 26.) The starting point in this purported chain begins in 1991.

9

The first cap letter indeed originated in that year.  James Kruse, the retired Goodyear employee responsible for human resources and labor relations (including collective bargaining over retiree benefits), indicates that the May 15, 1991 "Letter G" was part of the agreement incorporated into the Master P&I Agreement and that it applied to the Apple Grove plant.  Kruse also explains that Shell assumed the agreement obligations as a successor as part of its 1992 purchase of the plant.

Letter G provides both that a specific age-based cap limitation exists on the employer contributions for each employee who retires on or after May 1, 1991, and that retirees shall pay the benefits costs in excess of that capped amount.  The letter, signed by a representative of each side, then provides that no retired employee or surviving spouse shall be obligated to contribute for such excess health care cost until a specified future date.

Shell acquired the Apple Grove Plant in 1992 and, by virtue of the 1991 Apple Grove CBA, was bound by the CBA and its incorporated P&I agreements.  Defendants point to the declaration of Dale Wunder, Shell's Vice President of Human Resources who was assigned to the Apple Grove plant, as indicating that Shell had assumed the existing agreement obligations as a successor.  Wunder additionally indicates that although the parties agreed not to change the agreements from using "Goodyear" to using "Shell," the parties agreed that the 1994 and 1997 Goodyear agreements were applicable to the Apple Grove plant.  Notably, Wunder also indicates that Shell and the union specifically agreed that a July 20, 1994 "Letter G" to the 1994 P&I Agreement and a May 9, 1997 "Letter H" to the 1997 P&I Agreement applied to retirees from the Apple Grove plant.  This would mean that the caps therefore remained applicable, a point in dispute in this action.

10

In 2000, Shell sold the Apple Grove plant to M&G and, like Shell had with Goodyear, M&G assumed CBA and P&I Agreement obligations from Shell.  The extent of the assumed obligations is in dispute.  A declaration of Kimm Korber, M&G's Human Resources Director, indicates that M&G assumed the preexisting CBA and its obligations as a successor to Shell, that the union in fact asserted in negotiations that a January 1, 2001 "Letter H" applied and proposed first modifying its effective date and then deleting the letter from the CBA.  Plaintiffs view the proceedings differently.

A subsequent Letter of Understanding 2003-6, dated August 9, 2005, and made part of the current CBA (which controls the period from August 9, 2005 through November 6, 2008), permits implementation of above-cap contributions, but the issue is whether the document looks forward or indeed presents a memorialized understanding of existing if previously unimplemented agreements.  (ECF No. 136-14.)  This letter contemplates caps on employer contributions to retiree health benefits and provides that "premium cost sharing charged to retirees will be based on the amount by which total cost for all retiree insurances (medical, life, etc.) exceed the caps set forth in Letter H dated January 1, 2001."  (ECF No. 136-14, at 1.)  The letter also states that retirees would not be required to contribute to their premiums until January 1, 2006, and that the retiree premium contribution rates would become effective on that date.  The 2005-08 CBA included the Letter of Understanding 2003-6.

Defendants argue that the foregoing chain of events, particularly Letter of Understanding 2003-6 and the union's history of attempting to negotiate the effective date of caps and to eliminate the application of Letter H, point to the application of the caps to M&G and to no support for vesting.  Defendants posit that Letter of Understanding 2003-6 unambiguously

11

supports the unbroken application of caps to retirees (including preexisting retirees). That document explicitly references the prior 2001 cap letter and provides that "[r]etiree benefits" means "benefits for the Company's preexisting retirees." (ECF No. 136-14, at 1.)

Earlier in this litigation, this Court noted in a Rule 12 context that the M&G purchase agreement for the Apple Grove plant does not defeat the applicability of the cap letters. Plaintiffs point to a failure to incorporate expressly the cap letters in the purchase agreement. The issue is murky, although the parties' subsequent dealings as outlined in the negotiations perhaps reaffirmed the application of the caps to preexisting and subsequent retirees. Even if M&G meant to exclude these benefit obligations via the purchase agreement, the union and the company together may have affirmed the cap and benefit obligations so as to defeat the continued vitality of any argument for non-application.

What this could all mean is (1) that the retirees are entitled to an employer contribution toward health benefits, provided they pay their premium contributions, (2) that contribution-free health benefits do not exist here despite the fact that various agreements deferred the eventual collection of the retirees' contributions, and (3) that the company's right to terminate benefits for retirees' failure to contribute is implicit. Informing such potential conclusions is the controlling appellate authority from the prior appeal.

On appeal, the Sixth Circuit addressed the threshold issue of vesting. Citing the November 6, 2000 CBA language set forth above, the court of appeals made several critical points:

> First, the "full Company contribution" language suggests that the parties intended the employer to cover the full cost of health-care benefits for those employees meeting the age and term-of-service requirements. Keeping in mind the context of the labor-management negotiations identified in *Yard-Man,* we find it unlikely that Plaintiff

> USW would agree to language that ensures its members a "full Company contribution," if the company could unilaterally change the level of contribution. The CBA has no limitation on the amount of a company contribution and if the Defendants' argument were accepted, the company presumably could lower the contribution to zero without violating this language. Such a promise would be illusory.
>
> Second, the limiting language, "[e]mployees will be required to pay the balance of the health care contribution," follows the provision requiring contributions by those retirees who had not attained the requisite seniority points. From the placement of this language, we can reasonably infer that it did not apply to all retirees, but only to those retirees who had not attained the requisite seniority points.
>
> Third, the collective bargaining agreement tied eligibility for health-care benefits to pension benefits. This is another factor indicating that the parties intended the health care benefits to vest upon retirement.

*Tackett*, 561 F.3d at 490. On its face, such language appears to present a controlling interpretation of the CBA that proves dispositive of at least the vesting issue, if not the issue of capped versus uncapped benefits.

The next sentence of the court of appeals' opinion suggests that perhaps the Sixth Circuit was not handing down an opinion that proves dispositive outside the Rule 12 context. Following the third point, the *Tackett* panel stated that "[w]e hold that the Plaintiffs' Complaint presented a plausible claim that the parties intended to vest health-care benefits. Accordingly, we hold that the district court erred in granting the Defendants' Rule 12(b)(6) motion on the § 301 claim." *Id.* This language might cast the otherwise essentially conclusory language of the three points (noting that the appeals court did use some qualified language such as "suggests") into a qualified light and presents the issue of whether the Sixth Circuit was interpreting the language as a matter of law or simply saying that it presented a plausible claim for Rule 12(b)(6) purposes and that the vesting issue was left open upon remand. Defendants of course argue the latter.

This Court finds the answer to the vesting issue in the next portion of the appellate decision.  There, the *Tackett* panel moved from Count I, the § 301 claim, to Count II, the § 502(a)(1)(B) claim.  After outlining the considerations relevant to deciding the vesting issue, the Sixth Circuit stated that "[t]he determination above that *the parties intended health-care benefits to vest* carries over to the ERISA § 502(a)(1)(B) claim.  The Plaintiffs have therefore presented a plausible claim under ERISA § 501(a)(1)(B)." *Tackett*, 561 F.3d at 490 (emphasis added).  Notably, the court of appeals phrased its summary of its prior discussion as an unqualified declaration–"the parties intended health-care benefits to vest"–without linking that summary statement to a mere finding of a plausible claim.  By presenting the intended vesting as a fact leading to the result that Plaintiffs had presented a plausible claim, the appellate court pointedly issued a conclusion instead of merely recognizing a credible possibility.

In other words, had the Sixth Circuit said that based on the factual allegations that it must accept as true, it concludes that Plaintiffs have stated a plausible claim for Rule 12(b)(6) purposes, this Court would perhaps consider the vesting issue open on remand.  But what the court of appeals did was conclude that the parties intended vesting, which meant that Plaintiffs had of course stated a plausible claim, which meant that they should have survived the Rule 12(b)(6) attack.  The distinction is important; it is the difference between saying that the facts likely present a viable claim and saying that the facts do present a viable claim.

This Court therefore concludes that the Sixth Circuit has answered the threshold vesting issue.  Even assuming *arguendo* that the court of appeals did not intend to be dispositive on the issue and reasonably only intended to reach the issue of plausibility of the claim presented, however, the Court recognizes that there are no facts presented on remand that would defeat the

Sixth Circuit's conclusions, particularly the third point: that the CBA's linking eligibility for health care benefits to pension benefits indicates the parties' intent that health care benefits vested upon retirement.  Setting aside for the moment any analysis of what effect, if any, the cap letters have on the first two appellate points, the side agreements do not undercut the effect of this third appellate point.  *See Reese v. CNH America LLC*, 574 F.3d 315, 322 (6th Cir. 2009) (noting cases in which the tying of eligibility for pension benefits to eligibility for health-care benefits  "played a 'key' role in a vesting-of-health-benefits determination").

    In any event, either the Sixth Circuit meant to find vesting in a conclusive manner despite the Rule 12 context or it did not.  If it did not, the end result is still the same because, in light of the meaning of the CBA language, this Court must conclude that vesting occurred.  Whether the appellate path or this Court' own analysis leads to this conclusion is ultimately irrelevant.  What is significant is that the Sixth Circuit did not conclusively state the precise nature of the right to health care benefits that vested in light of the fact that the appellate panel left the door open for further related factual development and analysis on remand.  Thus, having concluded on a number of grounds that the case presents intended vesting of benefits, the Court turns to Defendants' argument that even if the retirees had a vested right to lifetime health care benefits, they have no right to *uncapped* benefits in perpetuity.  The question is not *did* vesting occur, but *what* vested.

    Relying on *Reese v. CNH America LLC*, 574 F.3d 315 (6th Cir. 2009), Defendants argue that the health care benefits agreement here conditions exercise of any vested right to benefits on satisfaction of the cost-sharing precondition.  In Defendants' words, "[e]ven assuming the successive P&I Agreements gave post-1991 retirees a right to lifetime health benefits . . ., the

evidence overwhelmingly establishes that this 'right' was expressly subject to and conditioned on the employer's agreement to fund those benefits only to a specified capped amount, with retirees responsible for paying amounts above the cap." (ECF No. 135, at 33.) This contention is correct and does not conflict with the law of the case.

The CBA creates vested benefits. This is beyond question. The first two appellate points reproduced above (*i.e.*, "full Company contribution" is undefined/CBA lacks company contribution limitation and created inference of select application of the limiting language) taken in isolation arguably suggest appellate factfinding of lifetime uncapped benefits. This would be a curious action by the court of appeals given the posture in which the case was before them, but Plaintiffs would have this Court credit the CBA language in such isolation to create a promise of fully paid health care benefits. In its appellate opinion, however, the court of appeals left untouched the open issue of any effect the side agreements had on the exercise or invocation of the vested benefits the CBA creates. This is the critical issue upon remand.

After summarizing (perhaps erroneously if hindsight and fuller presentation of relevant facts teach to the contrary) the cap letters and the postponement of the effect date of the caps, the Sixth Circuit stated that "[t]he import of this perpetual postponement and the applicability of these cap letters to the current parties are fact issues that must be resolved by the district court outside of the Rule 12(b)(1) determination." *Tackett*, 561 F.3d at 482 n.1. The applicability of the cap letters, an issue on which the court of appeals did not opine, does not change the effect of the CBA language insofar as the agreement still creates some form of vested benefits. But the Sixth Circuit expressly acknowledged that the side letter agreements can potentially inform the parties' dispute. The letters in fact could provide context regarding the available benefits plan.

16

If applicable, they would give meaning and depth to the CBA language that the court of appeals regarded in isolation.

At most, the side letter agreements do not speak to *whether* vesting took place, but rather to *what* vested.  Nothing in the CBA states that any vested benefits cannot be lost for failure to satisfy a contemporaneously bargained-for condition.  The letters and the history of the parties' dealings point to the fact that even the union may have thought that the cap issue was open for negotiation, which can only mean that the union may have thought caps applied (even if M&G's negotiator may have mistakenly believed the contrary).  What all this in turn means is that, as in *Reese*, the core issue in this case is ultimately not "did the benefits 'vest,' " but rather "what does vesting mean in this context."  *Reese*, 574 F.3d at 321.

*Reese* can help answer the extant question.  In that case, the Sixth Circuit addressed a CBA that did not require retirees to contribute toward the cost of the health care benefits.  *Id.* at 322.  Significantly, the court of appeals drew a distinction between vested rights and what those vested rights meant in their appropriate context, an approach that must inform today's summary judgment analysis.

In contrast to the benefits agreement at issue in *Reese*, the integrated whole of the benefits scheme *sub judice* might entitle a retiree *who pays his or her contribution* to lifetime health care benefits.  This Court is required to view the scheme in its entirety rather than accepting any approach that cherry-picks select agreement language or even select agreements.  Defendants' tracking of the evidence in its briefing posits that there has been continuity in the wholesale assumption of contractual obligations by each owner of the Apple Grove plant, an unbroken line of side agreements that provide contextual meaning to the language of the main

17

agreements, and main agreements that apply to the plant and its retirees either expressly or under a "me too" arrangement recognized by the relevant company and the union.  When the benefits scheme is viewed in the correct light, Defendants then reason, the right to the contingent benefits is clear provided a retiree satisfies the condition of making his or her contribution.  Such a plan is permissible, and the Sixth Circuit has in fact recognized the difference between fully funded, lifetime health care benefits and defined contribution health care benefits.  *Wood v. Detroit Diesel Corp.*, 607 F.3d 427, 432 (6th Cir. 2010).

Under Defendants' approach, the cap letters that extend beyond the CBA's and the parties' decade-plus history of dealing with the cap letters and contributions can suggest only that the CBA agreements can and do permit the company to require retiree contributions, even if the eventual due date for beginning to collect such contributions was kicked down the road again and again.  As extrinsic evidence reveals, (perhaps inapplicable) negotiations repeatedly involved the points of who pays how much and when.  It might fundamentally controvert the logic of the negotiation actions–actions taken over years, and which included the union's own negotiator recognizing the potential application of a cap letter–to conclude that the negotiated caps were a nullity or did not apply and that the vested right created here was to health care benefits paid forever by the company with no possible retiree contribution.[4]  Moreover, under

---

[4] There is an issue whether a representation during the 2000 CBA negotiations by David Dick, an attorney who represented M&G in those negotiations, that a cap letter did not apply to M&G presents a genuine issue of material fact precluding summary judgment.  This representation contrasted with the union's *own* position that Letter H *potentially applied* to M&G, a position that extended into subsequent years.  Defendants have offered an explanation for Dick's apparent confusion against which Plaintiffs have offered no evidence.  (ECF No. 136-10.)  The union took the position in negotiations that the cap issue was relevant, and union negotiator Ron Hoover recognized the potential applicability of the cap letter.  Whether Letter of Understanding 2003-6 reaffirms the cap letters' applicability and evinces the union's continued

this approach, the parties' actions might cast such evidence as the actuaries' opinions into a context of irrelevancy, with pattern and practice, or course of conduct, logically trumping any initially flawed or later-abandoned non-party analysis.

The end result of this analysis would be that Defendants are therefore entitled to summary judgment because the only coherent reading of the CBA provisions and the side agreements, considered as an integrated whole, would establish that the retirees are entitled only to lifetime, capped health care benefits that are subject for individualized termination should a retiree fail to make his or her contribution.  *Cf. Wood*, 607 F.3d at 431.  Some extrinsic evidence supports this reading of the benefits scheme; other evidence does not.

This case would then present a perhaps curious if permissible benefits arrangement in which lifetime benefits eventually required cost sharing.  The evidence would present an intent to vest only partially funded (*i.e.*, capped employer contributions for) lifetime health care benefits to retirees.  The cap would define or give meaning to the "full Company contribution" in the language of the CBA, with that contribution set by the relevant side agreement.  Moreover, the parties may have long contemplated the place of monthly premiums based on allocated costs in this scheme, even if the main CBA agreements are silent as to this issue.  To interpret then the

---

adherence to the belief that the cap letters applied depends in large part on to what the parties thought they were agreeing in Letter of Understanding 2003-6.  There may be a consistent pattern and practice of cap letter application that one side misstatement (that did not work its way into any agreement) does not subvert.  As Defendants note in their briefing, this consistency and the continued creation of applicable cap letters, as well as the plain language of the document itself, could render illogical the proposition that Letter of Understanding 2003-6 applies only to future retirees and not the retirees involved in this litigation.  But the ambiguous nature of Letter of Understanding 2003-6 necessitates looking to extrinsic evidence to give meaning to that document, which means that "stray" comments such as that by Dick take on renewed significance.

agreements as creating a per-retiree cost determination would be to impose an unreasonable and likely unworkable meaning on agreements that more readily and more logically support spreading allocated costs on a monthly basis.

The effect of such a benefits plan may be burdensome on retirees and even serve to push coverage outside the reach of select retirees, but these would be permissible if unfortunate consequences of the agreements reached provided the agreements present vested rights within a specific context that permits such consequences.  Retirees who pay their share would be entitled to lifetime health care benefits.  Retirees who did not pay their share would have no right to such benefits.  If this is the agreement that the parties reached, the binding agreement would prove dispositive of this case.  There would be no right to uncapped, lifetime health care benefits under § 301, and there would be no benefits due pursuant to § 502(a)(1)(B).

Numerous conflicts in the facts exist, however, which prevent this Court from concluding that the foregoing analytic chain is correct.  These factual disputes call into question the characterization of Letter of Understanding 2003-6 that Defendants promote.  Such dispute over the meaning of Letter of Understanding 2003-6–is it only a going forward document or a document that also speaks to and clarifies the meaning of prior agreements–is critical to the issues in this case.  Whether the document informs the CBA language that would create lifetime benefits is in fact perhaps the single most dispositive issue.  If Letter of Understanding 2003-6 memorializes a shared understanding of the parties as to what vested

Casting into doubt any conclusion that could be reached today as to the meaning of Letter of Understanding 2003-6 is that interpretation of much of the parties' dealings leading to that document necessitate weighing of the evidence, which is an impermissible endeavor on summary

20

judgment.  Plaintiffs point to the deposition testimony of M&G's Kimm Korber, and this testimony certainly suggests that M&G did not intend that which it now purports to have agreed to years ago.  It is equally notable that various other actors involved in years worth of negotiations on both sides of the dispute appeared uncertain, perhaps even to this day, of what agreements had been reached.  Plaintiffs have pointed to evidence involving M&G's counsel, actuaries, and human resources personnel that suggest that no one thought that there was a cost-sharing plan in place for Apple Grove retirees for years until it became advantageous to the company.  Multiple M&G actors appear at best uncertain of what benefits liabilities they assumed when they purchased the plant; some even expressed positions wholly adverse to cap applicability.  Similarly, union representatives appeared uncertain if not incorrect at times regarding the application or potential application of the cap letters to benefits.  Even odder is that few individuals seemed aware during the years of negotiations what comprised the agreements and whether the reproduction of material in booklets played a role in defining those agreements.

The factual history that the parties present could not be more different.  On one side, Defendants argue that an unbroken chain of cap letters informs CBA agreements resulting in at most lifetime health care benefits that are contingent on satisfaction of a cost-sharing arrangement.  On the other side, Plaintiffs present compelling evidence for after-the-fact company scrambling to find a way to impose application of cap letters as an unethical cost-savings measure that defies agreements the caps would now puncture.  Discerning the intent at work in the operative agreements necessitates identifying which agreements do in fact apply to the Apple Grove plant, and this task requires parsing the intent of the parties during the years involved.  If the cap letters did not apply and Defendants are conflating companies and

agreements, this Court is left with CBA language that would present a lifetime benefits scheme for qualifying retirees and beneficiaries without cost-sharing. But if the cap letters do apply, they would inform the meaning of the CBA "full Company contribution" language discussed in the first point of the court of appeals in its vesting discussion, reproduced above. This would in turn inform the second point recognized by the Sixth Circuit so that the placement of the employee contribution provision would then apply to both the retirees at and below the 95-point mark.

The ambiguous nature of the documents involved in this litigation leads by necessity to the consideration of extrinsic evidence. The Sixth Circuit has held that "[i]f an examination of the available extrinsic evidence fails to conclusively resolve the issue and a question of intent remains, then summary judgment is improper." *Noe*, 520 F.3d at 552. There is no conclusive resolution here because, necessarily resolving all inferences in favor of Plaintiffs, abundant questions of intent exist. Summary judgment is therefore improper.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiffs' motion for reconsideration (ECF No. 154) and **DENIES** Defendants' motion for summary judgment (ECF No. 133).

**IT IS SO ORDERED**.

       /s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE