**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**HOBERT FREEL TACKETT, et al.,**

              **Plaintiffs,**                          **Case No. 2:07-cv-126**
                                               **JUDGE GREGORY L. FROST**
     **v.**                                 **Magistrate Judge Norah McCann King**

**M&G POLYMERS USA, LLC, et al.,**

              **Defendants.**

**OPINION AND ORDER**

     This is a class action case in which Plaintiffs assert that Defendants have violated their right to lifetime contribution-free health care benefits. The matter came on for a bench trial in May 2011 on the issue of liability. For the reasons that follow, the Court finds in favor of those plaintiffs in Subclasses One through Four and against Defendants, but in favor of Defendants and against those plaintiffs in Subclass Five.

**I.**

**A. Background**

     The class (retirees, their spouses, and surviving spouses or other dependents of individuals who worked for the named defendant company) assert that although they have a right to lifetime retiree health care benefits, the company is requiring them to pay for those benefits in violation of various collective bargaining agreement ("CBA") provisions.[1] Plaintiffs Hobert

---

[1] The parties have agreed on the class and subclasses involved, which are as follows:

Class:

All retired employees of M&G Polymers USA, LLC ("M&G") and/or its predecessor

1

company, the Shell Chemical Company ("Shell"), who worked at the Point Pleasant Polyester Plant ("Plant") in Apple Grove, West Virginia and were represented by the USW or its predecessor unions ("Union") in collective bargaining, and who retired or left service from the Plant having met the eligibility requirements for retiree health care benefits specified in the applicable collective bargaining agreements ("CBAs") and P&I Agreements, as well as the spouses and surviving spouses and other dependents of those retired former employees who also claim a right to such benefits, and the surviving spouses of Union-represented Plant employees who died while employed at the Plant who also claim a right to such benefits (the "Class").

Subclass 1: Members of the Class who retired, left service or died while employed at the Plant having met the eligibility requirements for retiree health care benefits specified in the P&I Agreement dated May 15, 1991 through May 15, 1994, as adopted by the CBA between Goodyear Tire & Rubber Company ("Goodyear") and the Union for the Plant effective November 6, 1991 through November 6, 1994, and as adopted by Shell, and their eligible surviving spouses and dependents.

Subclass 2: Members of the Class who retired, left service or died while employed at the Plant having met the eligibility requirements for retiree health care benefits specified in the P&I Agreement dated July 20, 1994 through July 20, 1997, as adopted by the CBA between Shell and the Union for the Plant effective November 6, 1994 through November 6, 1997, and their eligible spouses and dependents.

Subclass 3: Members of the Class who retired, left service or died while employed at the Plant having met the eligibility requirements for retiree health care benefits specified in the P&I Agreement dated May 9, 1997 through May 9, 2003, as adopted by the CBA between Shell and the Union for the Plant effective November 6, 1997 through November 6, 2000, and their eligible spouses and dependents.

Subclass 4: Members of the Class who retired, left service or died while employed at the Plant having met the eligibility requirements for retiree health care benefits specified in the P&I Agreement dated November 6, 2000 through November 6, 2003, as adopted by the CBA between M&G and the Union for the Plant effective November 6, 2000 through November 6, 2003 and applicable until August 8, 2005, and their eligible spouses and dependents.

Subclass 5: Members of the Class who retired, left service or died while employed at the Plant having met the eligibility requirements for retiree health care benefits specified in the CBA between M&G and the Union for the Plant effective August 9, 2005 through November 6, 2008 or any subsequent CBA between M&G and the Union for the Plant, and their eligible spouses and dependents.

2

Freel Tackett, Woodrow K. Pyles, and Harland B. Conley are all Ohio residents and retirees

from the Point Pleasant Polyester Plant in Apple Grove, West Virginia.  They and similarly

situated retirees belong to a labor union, Plaintiff United Steel, Paper and Forestry, Rubber,

Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-

CLC ("USW"), which represented (or at least one of its predecessor unions represented) them as

employees of Defendant M&G Polymers USA, LLC ("M&G") (which bought the plant in 2000),

or one of its predecessor companies, such as the Shell Chemical Company (which owned the

plant from 1992 to 2000) and The Goodyear Tire & Rubber Company (which owned the plant

until 1992).  Plaintiffs' theory of the case is that the CBA provides vested retiree health care

benefits as a result of the following language, which appears in various agreements:

> Employees who retire on or after January 1, 1996 and who are eligible for and
> receiving a monthly pension under the 1993 Pension Plan . . . whose full years of
> attained age and full years of attained continuous service . . . at the time of retirement
> equals 95 or more points will receive a full Company contribution towards the cost
> of [health-care] benefits . . . .  Employees who have less than 95 points at the time
> of retirement will receive a reduced Company contribution.   The Company
> contribution will be reduced by 2% for every point less than 95.  Employees will be
> required to pay the balance of the health care contribution, as estimated by the
> Company annually in advance, for the [health care] benefits . . . .  Failure to pay the
> required medical contribution will result in cancellation of coverage.

> In addition to a series of main agreements, a number of side letters are involved in this

litigation.  The Sixth Circuit previously explained these documents as follows, before remanding

the action to this Court for additional factual development:

> A series of collective bargaining agreements has been in force at the Plant, with each
> typically lasting around three years before renegotiation.  The first letter agreement,
> signed contemporaneously with the 1991-1994 collective bargaining agreement, was
> adopted "for purposes of conforming with the new Financial Accounting Standard

(ECF No. 103, at 2-7.)

3

> Board (FASB) accounting requirement" that required accrual accounting of healthcare benefits.  This new requirement hurt a company's balance sheet performance if the company had no cap on its health-care costs.  While signed in 1991, the caps were not to take effect until July 1, 1997.  Concurrent with the 1994-1997 collective bargaining agreement, another cap letter postponed the effective date of the caps to 2004.

*Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 483 n.1 (6th Cir. 2009).

Plaintiffs claim that on or about January 1, 2007, Defendant M&G acted contrary to the agreements by unilaterally modifying the health care benefits by shifting a large part of the health care costs onto the class members.  The other named defendants are M&G-sponsored health plans through which the class members receive health care benefits:  the M&G Comprehensive Medical Benefits Program for Employees and Their Dependents, the M&G Catastrophic Medical Plan, the M&G Medical Necessity Benefits Program of Hospital, Surgical, Medical, and Prescription Drug Benefits for Employees and Their Dependents, and the M&G Major Medical Benefits Plan.

Plaintiffs filed the instant action on behalf of the named retirees and their surviving spouses or dependents, as well as other similarly situated retirees and their surviving spouses or dependents, on February 9, 2007.  (ECF No. 1.)  Via their amended complaint, Plaintiffs originally asserted three claims: violation of labor agreements, actionable under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) (Count I); violation of employee welfare benefit plan, actionable under Sections 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3) (Count II); and breach of fiduciary duty under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3) (Count III).  (ECF No. 14 ¶¶ 26-31.)

Defendants previously filed a motion to dismiss the amended complaint (ECF No. 19),

4

and this Court granted that motion (ECF No. 63).  On appeal, the Sixth Circuit Court of Appeals affirmed the dismissal of the § 502(a)(3) claim constituting Count III, but reversed and remanded the remaining Count I § 301 claim and Count II §§ 502(a)(1)(B) and (a)(3) claim (ECF No. 68). Defendants unsuccessfully sought summary judgment on Counts I and II, and the matter progressed to a bench trial held from May 9, 2011, to May 16, 2011.

### B. Agreed Facts

The Final Pretrial Order sets forth the parties' agreed facts, providing:

The following facts are established by admissions in the pleadings or by stipulation of counsel:

1. M&G Polymers USA, LLC ("M&G") is a producer of polymer and related chemical products with a facility located in Apple Grove, West Virginia ("the Apple Grove facility," also known as the "Point Pleasant Plant").

2. The Goodyear Tire & Rubber Company ("Goodyear") owned the Apple Grove facility until November 20, 1992, when Shell Chemical Company, an affiliate of Shell Oil Company ("Shell"), purchased it.

3. Production, laboratory, and maintenance employees at the Apple Grove facility are represented by the United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union, AFL-CIO ("USW") and its Local 644L.

4. Prior to 1995, production, laboratory, and maintenance employees at the Apple Grove facility were represented by the United Rubber Workers ("URW"). The URW merged with the USW in 1995.

5. Retiree Plaintiff Class Representatives H. Freel Tackett, Woodrow Pyles, and Harlan Conley (together with the Class members, the "Retiree Plaintiffs") were employed at the Apple Grove facility and were members of the collective bargaining unit represented by the Union.

6. Mr. Tackett retired on or about March 1, 1996. Mr. Pyles retired on or about January 1, 1996. Mr. Conley retired on or about August 1, 1998.

5

7.      On November 6, 1991, Goodyear and Local 644 of the URW entered into a collective bargaining agreement ("CBA") effective November 6, 1991 to November 6, 1994.

8.      On May 15, 1991, Goodyear and the URW and certain URW locals entered into a collectively bargained Pension, Insurance and Service Award Agreement effective May 15, 1991 to May 15, 1994 ("1991 Master P&I Agreement").

9.      The 1991 Master P&I Agreement between Goodyear and the URW and certain URW locals included a side letter, "Letter G," dated May 15, 1991, dealing with retiree medical benefits ("1991 Letter G").

10.     Goodyear created a Summary Plan Description ("SPD") that described the employee benefit programs applicable to hourly rated employees at the Apple Grove facility as of May 15, 1991.

11.     Goodyear and Shell entered into an agreement dated December 18, 1992, pertaining to the employment by Shell of certain employees of Goodyear at the Apple Grove Facility (the "Employee Agreement").

12.     On December 29, 1993, Shell formally adopted those Goodyear benefit plans that were previously in effect at Apple Grove for represented employees at the Apple Grove facility.

13.     On July 20, 1994, Goodyear and the URW and certain URW locals entered into a collectively bargained Pension, Insurance and Service Award Agreement effective July 20, 1994 to July 20, 1997 ("1994 Master P&I Agreement")."

14.     The 1994 Master P&I Agreement between Goodyear and the URW and certain URW locals contained a side letter, Letter G, dated July 20, 1994 ("1994 Letter G") dealing with retiree medical benefits.

15.     On November 6, 1994, Shell and Local 644 of the URW entered into a CBA effective November 6, 1994 to November 6, 1997.

16.     On May 9, 1997, Goodyear and the USW and certain USW locals entered into a collectively bargained Pension, Insurance and Service Award Agreement effective May 9, 1997 to May 9, 2003 ("1997 Goodyear Master P&I Agreement").

17.     The 1997 Goodyear Master P&I Agreement between Goodyear and the USW and certain USW locals included a side letter, Letter H,

dated May 9, 1997, dealing with retiree medical benefits ("1997 Letter H").

18.    On November 6, 1997, Shell and the USW and Local Union 644 entered into a CBA effective November 6, 1997 to November 6, 2000 ("1997 CBA").

19.    M&G purchased the Apple Grove facility from Shell effective June 1, 2000.

20.    In connection with the purchase, M&G and Shell entered into a Human Resources Agreement dated June 1, 2000 ("HR Agreement").

21.    In September 2000, M&G and the USW on behalf of Local 644L began bargaining for a potential extension of the 1997 CBA, which by its terms expired on November 6, 2000, and subsequently engaged in bargaining for a successor to the 1997 CBA.

22.    On November 6, 2000, M&G and the USW and Local Union 644L entered into a CBA effective November 6, 2000 through November 6, 2003 ("2000-2003 CBA").

23.    In September 2003, M&G and the USW on behalf of Local 644L commenced bargaining for a successor to the 2000-2003 CBA which was due to expire November 6, 2003. This bargaining encompassed more than 60 days of negotiations from September 2003 through August 2005 (the "2003-2005 Bargaining").

24.    On August 9, 2005, M&G and the USW on behalf of Local Union 644L reached agreement on a new CBA effective August 9, 2005 to November 5, 2008 ("2005 CBA").

25.    The 2005 CBA included LOU 2003-6, dealing with retiree medical benefits, which was signed by Union chief spokesperson Karen Shipley and Company representative Kimm A. Korber.

(ECF No. 165, at 4-6.)

**C. Trial Testimony**

In addition to introducing testimony via deposition transcripts, the parties presented live testimony by select witnesses. The Court briefly summarizes the key points of each such

7

witness' testimony below.

### 1. Woodrow Pyles

Retiree Woodrow Pyles was the first witness to testify.  Pyles testified that he had begun working at the Apple Grove facility on May 1, 1959.  In December 1992, Shell bought the plant from Goodyear, which Shell later sold to M&G.  He retired on January 1, 1996.  A union member, Pyles testified that he held a number of positions in the union, including that of union steward and that of liaison.  He stated that he would attend P&I conferences and would study the P&I booklet.  After a new pension and insurance agreement ("P&I agreement") had been reached, Pyles testified, the union would hold a conference to explain the changes.  He also testified that the local CBA governs working conditions and would be negotiated locally by the union.

Notably, Pyles testified several times that it is the local's position and unwritten policy that letters that are not printed in the booklet distributed to the local union members do not apply to the local union.  He stated that no cap letter applied to the Apple Grove agreements.  Although he had obtained a copy of Letter G at a conference regarding the 1991 agreement, Pyles testified, he did not distribute the letter to the local members because it was not part of the booklet.  Pyles explained that the summary plan description described the plan as non-contributory, with the company paying the entire cost of the plan.  He testified that he has not paid union dues since his retirement and that he never gave the union permission to represent him now.  Pyles also testified how he has paid the premium for himself and his spouse since its implementation, which he protested in a series of letters to M&G's Kimm Korber that he discussed.

### 2. Hobert Freel Tackett

Retiree Hobert Freel Tackett testified that he began working at the Apple Grove facility on February 7,1966, and retired from that facility on March 1, 1996.  He stated that he had held a number of local union positions, including president and vice-president, and was a member of the local bargaining unit.  Similar to Pyles, Tackett identified various agreements and testified that the CBA covers working conditions while the P&I agreement governs benefits.  He testified that he was never aware of any employer contribution limit or cap under the agreement and that he first saw a cap letter only after this litigation had commenced.  Tackett testified that he understood the applicable plans to provide retirees who had 95 points with contribution-free medical care for life; they had to pay only if they had less than 95 points.  He also testified that he did not believe that letters not printed in the booklet controlled retiree benefits.  Tackett stated that he relied on the booklet for medical and pension benefits information.  Similar to Pyles, Tackett testified that he had never granted anyone the right to bargain on his behalf since retired.

### 3. Ron Hoover

Ron Hoover testified next on behalf of Plaintiffs.  Hoover explained that prior to his retirement–he is now a union consultant–he worked for the international union with the primary responsibility of working with the master bargaining agreement.  He explained that a master bargaining agreement would be negotiated typically every three years, and after that agreement was secured, another agreement would be negotiated in an approach termed "pattern bargaining."  Locals would ratify the master agreement and then would negotiate supplemental agreements focused on their specific issues.  Not all locals were part of the Goodyear master bargaining, Hoover testified, and Local 644 was not.  Some locals not under the master agreement had "me too" agreements in which their own CBA language incorporated some or all

of the master agreement provisions.  Hoover testified that he believed that the Apple Grove plant

stood on its own.

Hoover stated that he was never the lead spokesman at the Apple Grove plant, that the

plant was not part of the master agreement, that he was not certain how they even got the pattern

agreement, and that he did not know for certain whether Apple Grove adopted the P&I insurance

agreement.  He also testified that he had never negotiated Local 644 agreements with Shell or

M&G.  He indicated that he had attended bargaining sessions where benefits had been discussed.

Hoover explained the 1991 cap letter as a union compromise to help Goodyear control or

minimize its liabilities; he explained that the letter was a way to avoid showing the extent of

projected liability for retiree medical benefits due to FASB considerations.  In other words,

Hoover explained, the cap letter was a mechanism by which a company could minimize numbers

to attract investors.  He explained how the letter worked and the importance of what he called the

"bite date," or the date on which retirees would have to actually begin contributions toward their

medical insurance.  Hoover emphasized the importance of always moving the bite date out so

that it could always be subject to further movement by negotiation.

According to Hoover, he has no knowledge that the Letter G cap letter was ever adopted

at the Apple Grove plant.  He explained that the letter was not part of the 1994 agreement

between Shell and Local 644.  Although he may have participated in 1997 negotiations, Hoover

testified, his role was to explain how the Goodyear master agreement worked.  Hoover stated

that he lacked the authority to bind Local 644 to anything and that only the head negotiator had

such authority.  He testified that he did not know whether the cap letter labeled as Letter H

automatically applied to M&G.  Thus, Hoover testified, when he spoke with Randy Moore, he

told Moore that if the cap letter applied, Moore should be certain to move the bite date out so that it did not impact retirees. Hoover also testified that he told Karen Shipley the same thing in 2003. Hoover disagreed with the contention that there was a link between the 95-point rule and the cap letter.

Hoover stated on cross-examination that by agreement not all letters were printed in the booklets. As an example, he explained that the 1991 Letter G was part of the master agreement even though it was not in the printed booklet. Hoover stated that a general understanding existed between the union and company representatives that the bite date would always be moved. He stated that the union never intended to have retirees pay a premium and that he understood that the company representatives could not say publically that there would never be retiree contributions because the accountants would then not certify the FASB statements.

Hoover explained that the Apple Grove plant appeared to be some sort of "me too." He stated that he could not identify well a marked-up copy of the 2000 agreement, and Hoover indicated that he could not say for a fact whether cap letters were part of the adopted agreement. Such letters were not printed in booklets, Hoover again explained. He testified that if the letter information was not presented to the local members, then the local representatives were not doing their jobs. Hoover also testified that a "me too" local could adopt the P&I agreement but not letters and again stated that he did not know what Local 644 had done. He stated that he did not know whether the letters were ever presented to the local members. Hoover did state that if the cap letters were not renewed, then they were gone. Hoover testified that he had been careful to never interpret the Apple Grove agreement for Local 644.

### 4. Randall Moore

11

Randall Moore is currently the Sub-District Director of the international union and was previously a staff representative.  He was assigned to Apple Grove negotiations in late summer 2000.  Moore testified that he relied on the local committee in these negotiations and explained that after he was unsuccessful at negotiating a two-year extension of the existing agreement, negotiations for a new P&I agreement continued.

Moore testified that based on his experience, the issue of retiree benefits is typically a subject of forward-looking negotiations in which future retirees' benefits are discussed, but existing retiree benefits remain fixed.  He stated several times that it was his understanding that Local 644 is a "me too" that accepted only parts of the "Big Rubber" master agreement.  Moore stated that, to his knowledge, Shell was not a part of the "Big Rubber" negotiations.

He also testified that the 1997 P&I agreement for the Apple Grove plant did not reference Letter H.  Moore stated that when local individuals such as Sam Stewart brought the cap letter to Moore's attention, Moore spoke to Hoover.  Hoover provided Moore with a copy of Letter H because the local committee did not have a copy, Moore testified, and Hoover explained that the cap letter is a FASB accounting letter.  Moore testified that Hoover never told him that Letter H applied and only suggested that Moore push back the contribution date if the letter were applicable to Apple Grove.  Moore also testified that he looked for and never found any document indicating that Letter H applied.

Moore stated that it was less than clear whether the cap letter applied.  He testified that the local committee proposed pushing the effective contribution date out, but that the company denied the proposal.  The company was also bewildered by Letter H, Moore explained, and on October 17, 2000, the company's chief negotiator, David Dick, responded to Moore's request for

written clarification by providing a document stating the company's position that Letter H did not apply.

Moore also testified that the Apple Grove booklet needed cleaned up because it contained provisions that did not apply to the local plant. He explained that the parties agreed to remove these provisions while abiding by the agreement they had reached. Thus, Moore testified, Letter H was removed, and the 2000 P&I agreement that resulted does not contain Letter H.

He stated that for a period of time, Karen Shipley had been assigned to Local 644 until he was reassigned back to the local. Shipley had asked Moore about Letter H during the subsequent negotiations between the local and M&G, he testified, and Moore explained that Letter H did not apply. Moore testified that he was confused when presented with Letter of Understanding 2003-6 because the union had not agreed to its contents or that Letter H applied. M&G's new chief negotiator, Robert Long, was given a copy of Dick's October 2000 disavowal of the cap letter's application, Moore testified, but this did not change M&G's position. Moore testified that he stated to M&G in negotiations that he lacked the authority to bargain away benefits for existing retirees.

Moore testified that negotiations over Letter of Understanding 2003-6 went nowhere. He enlisted the aid of the international union's attorney, but the result was still the same. Moore testified that the union saw the handwriting on the wall as to what M&G was going to do, and that when Shipley signed Letter of Understanding 2003-6 on August 9, 2005, it was a simple formality because her name was already on the company-provided signature line. Moore explained that the union knew that future retirees would be covered differently than existing retirees. Although the union contested the lawfulness of M&G's actions, Moore stated, the

13

company went ahead and implemented retiree contributions.

### 5. Karen Shipley

Karen Shipley is a staff representative for the international.  She testified that she was part of the 2003 Apple Grove negotiations and acted as the union's chief negotiator.  She therefore had the authority to bind the union, she explained, and that the local committee assists the chief negotiator.  After M&G's Long and Korber approached her with Letter H, Shipley spoke with Hoover.  The parties disagreed over whether the letter applied, she explained, and she states that she informed the company that the union could not bargain over existing retiree benefits, which was a permissive subject of bargaining.  The union disagreed that Letter H applied, Shipley testified, and took the position that given the company's disagreement, the letter should then be deleted.

Shipley testified that after offering to withdraw Letter of Understanding 2003-6, M&G reversed course and refused such withdrawal.  M&G then implemented its last, best, and final offer, she testified, which included Letter of Understanding 2003-6.  Shipley testified that the union never agreed to Letter of Understanding 2003-6 while she was negotiating.

### 6. Brian Wedge

Brian Wedge is currently on leave from the Apple Grove plant while he serves as a staff representative for the international.  He testified as to his involvement in numerous Local 644 negotiations in numerous union positions.  Throughout the ratification of these agreements, Wedge explained, no cap letters had ever been presented as part of the agreements to be ratified by local members.  He discussed the 1997 agreement negotiations specifically and testified that M&G had taken the position that it had separated from the master agreement.  M&G's Dick

stated that Shell had separated from the master agreement, Wedge testified, because Shell did not belong to the larger negotiating group responsible for that agreement.

In preparing for the 2000 negotiations, Wedge explained, he had heard of Letter H. Because he did not know whether the letter applied or what it was, Wedge testified, he spoke with Hoover and obtained a copy of the letter.  Wedge testified that Letter H was not part of the agreement with which they had started.  Since the time he began working at the Apple Grove plant in 1987, Wedge testified, such a cap letter had never been included in the booklets local members received.

Wedge testified that M&G took the position that the cap letter did not apply to M&G or Shell.  He also testified that the union regarded the October 2000 Dick document as conclusive. The parties proceeded to adopt the 1997 booklet with some changes, Wedge explained, and produced the actual P&I agreement at a later date.  Wedge testified that the parties knew they would have to remove content from the booklet that did not apply to Apple Grove.  He stated that this was why he had made a handwritten notation on a union copy of Letter H indicating that the letter was to be removed.  Wedge testified that the final copy of the P&I agreement distributed to union members did not contain Letter H.

When he was next part of the negotiating team in 2005, Wedge testified, the cap letter issue arose in conjunction with Letter of Understanding 2003-6.  He indicated that Moore had questioned the applicability of a cap letter, and Wedge testified that no retirees had agreed that the union could negotiate benefits on their behalf.  Wedge testified that the union attorney had informed the negotiators that the union had no right to bargain for the existing retirees.  He repeated that the union was not legally permitted to bargain on behalf of the retirees.  Wedge

15

testified that the company nonetheless implemented its plan and that retirees have suffered as a result. Some people, he explained, won't speak to him as a result.

On cross-examination, Wedge testified that the union proposed in 2000 negotiations to move the cap letter effective date of retiree contributions because there was uncertainty over whether the letter applied. He stated that the Dick letter on behalf of M&G resolved the issue and that by the end of negotiations, it was settled that Letter H did not apply.

Wedge also explained the inapplicability of the master agreement. He provided the example of when Moore asserted during negotiations that the master agreement's pension multipliers automatically applied and M&G responded by adopting the position that the master agreement did not control. Wedge also testified that the union was responsible for distributing for local ratification the agreement information. He indicated that there was never an agreement between the company and the union as to what would go into the booklet.

### 7. Kimm Korber

Defendants' first witness was Kimm Korber, M&G's Human Resources Director. Korber testified that he had been hired in 2001 as Human Resources Manager for the Apple Grove plant and that his duties had included general human resources work as well as labor responsibilities. He stated that he had first become aware of issues with the P&I Agreement in the 2000 negotiations. Korber testified that because the Letter H effective date for contributions was after the next negotiations, he assessed that the letter would be discussed in the 2003 negotiations.

During those negotiations, Korber testified, Shipley had told him that the retiree benefits was a permissive subject of bargaining, that the parties could not reach an impasse over this

16

issue, and that she was not interested in discussing the issue.  He indicated that Shipley had proposed deleting Letter H.  He also summarized the history of negotiations, stating that the union changed its position after it learned of Dick's October 2000 document.

Korber testified that he was not trained in benefits administration and that he has only a basic understanding of ERISA requirements.  He stated that M&G is the plan sponsor and the named fiduciary, the plan had never sent an ERISA notice to retirees of their being subject to the cap or of the possible termination of benefits.

Korber also testified regarding meeting with Rex Rousch.  He denied that Rousch told him that Letter H was a Goodyear document and not a Shell document, but stated that he obtained the letter from Rousch.  When presented with various exhibits, Korber indicated that Letter H had not been part of local booklets and could not point to where the 2000 CBA or P&I agreements adopted the Goodyear Letter H.

When questioned regarding the October 2000 Dick response that disavowed cap letter application, Korber testified that he had not discussed the document with Dick.  Korber stated that a chief negotiator has the authority to bind a company.  When asked whether the union could rely on Dick's response, Korber responded by discussing proposals.

Korber reviewed exhibits related to M&G's acquisition of the Apple Grove facility from Shell and various emails regarding Letter H.  He denied that it was left to counsel to determine the effective date of Letter H, but confirmed that he was part of the decision to apply a cap to all retirees.  Korber stated that this was not an actuary decision.  He disagreed with the position of Moore and Shipley that they did not have the authority to bargain for retirees, but stated that without Letter H, bargaining for retirees would be a permissive subject of bargaining.

17

Korber also testified regarding M&G's due diligence in the plant purchase.  He further stated that he was aware of Letter H in 2001, although he did not mention the application of caps in a strategy memorandum he wrote on M&G's benefits program.  This failure to mention Letter H continued throughout other documents and communications Korber sent involving benefits. In a July 12, 2004 email from Korber to Duane Lee, Korber testified, he did address Letter H, but he denied that this was the first time he sent Lee the letter.  Korber testified regarding subsequent emails that noted that Letter H may not be deemed enforceable to Apple Grove and that discussed the possible impact of Letter H.  He acknowledged his December 2005 email to Lee that concerned the topic of how much M&G would save if Letter H were applied to all retirees.  Korber also acknowledged subsequent emails that tracked the effect of the cap letters, which was that retirees were being dropped from the benefits plan.  In subsequent testimony, Korber did not disagree that over half of all retirees had died or been dropped from the benefits plan.  In another email that Korber acknowledged, he stated that most retirees look to the booklet for a guide to retirement health plans.

### 8. Robert Long

The final witness to testify was attorney Robert Long.  He explained that he routinely represents management in labor negotiations and that he has participated in between 200 and 300 negotiations.  One such negotiation was the Apple Grove bargaining that began in the fall of 2003.  He testified that during these negotiations, Shipley stated that the union was not willing to discuss retiree medical benefits and that it was a permissive subject of bargaining.  Long testified that generally speaking, retiree bargaining is a permissive, or non-mandatory, subject of bargaining and that a company and union can by mutual agreement enter into agreements on this

18

topic.  He later stated that the parties cannot modify vested benefits, but can modify non-vested benefits.

Long testified that following two union caucuses, the union returned to the table and mentioned Letter H, a cap letter, and that Sam Stewart had indicated that it was part of the binding agreement.  He stated that no union representative suggested that Letter of Understanding 2003-6 applied only to future retirees.  Long testified as to the circumstances surrounding his negotiation offer that, if the union took the position that Letter of Understanding 2003-6 implicated a permissive subject, then the company would withdraw it from the last, best, final offer.  He testified that the company ultimately rejected the union's proposal to delete Letter H.

Long also testified that he never did any research as to whether Letter C or Letter H applied, but instead simply accepted the propositions that Shell had adopted Goodyear letters and that M&G had assumed Shell's contractual obligations.  He had been told that M&G had a P&I book with Letters C and H in it.  Long testified that he may have seen the Dick response disavowing cap letter applicability, but he stated that he could not recall when.  He testified that he relied upon Korber to be the primary architect for P&I proposals and stated that he had never read the 2000 P&I agreement cover to cover and that he did not know whether Letter H was part of that agreement.  In subsequent testimony, Long stated that Stewart did not have the authority to bind the union, as opposed to Shipley, who held such authority.

## II.

The central issue in this litigation is whether Plaintiffs–the qualifying retirees, their spouses, and their dependants–have a vested right to lifetime, uncapped (or contribution-free) medical benefits.  Those plaintiffs in the first four subclasses do.  Those plaintiffs in the fifth subclass do not.

This Court begins its discussion with the threshold issue of vesting.  The Sixth Circuit has held that "[r]etiree health benefit plans . . . are welfare benefit plans; thus, vesting only occurs if the parties so intended when they executed the applicable labor agreements."  *Noe v. PolyOne Corp.*, 520 F.3d 548, 552 (6th Cir. 2008).  See also *Tackett*, 561 F.3d at 489.  The presence or absence of such intent is critical here because, as the court of appeals has explained, "[i]f the parties do not intend to vest the benefits, the former employer can modify the retiree benefits without breaching a collective bargaining agreement."  *Tackett*, 561 F.3d at 489.  The appellate court has also explained that "[a] court may find vested rights 'under a CBA even if the intent to vest has not been explicitly set out in the agreement.' "  *Id.* (quoting *Maurer v. Joy Technologies, Inc.*, 212 F.3d 907, 915 (6th Cir. 2000).

The Sixth Circuit has described the "broad analytical framework" that this Court must apply to the vesting issue as follows:

> The seminal case for determining whether the parties to a CBA intended benefits to vest is *UAW v. Yard-Man*, 716 F.2d 1476, 1479 (6th Cir. 1983).  Under *Yard-Man,* basic rules of contract interpretation apply, meaning that courts must first examine the CBA language for clear manifestations of an intent to vest.  *Id.* Furthermore, each provision of the CBA is to be construed consistently with the entire CBA and "the relative positions and purposes of the parties."  *Id.*  The terms of the CBA should be interpreted so as to avoid illusory promises and superfluous provisions.  *Id.* at 1480.  Our decision in *Yard-Man* also explained that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the

20

beneficiary remains a retiree." *Id.* at 1482. With regard to the "*Yard-Man* inference," later decisions of this court have clarified that *Yard-Man* does not create a legal presumption that retiree benefits are interminable. *Yolton*, 435 F.3d at 579. Rather, *Yard-Man* is properly understood as creating an inference only if the context and other available evidence indicate an intent to vest. *Id.*

When an ambiguity exists in the provisions of the CBA, then resort to extrinsic evidence may be had to ascertain whether the parties intended for the benefits to vest. *Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 774 (6th Cir. 1999). If an examination of the available extrinsic evidence fails to conclusively resolve the issue and a question of intent remains, then summary judgment is improper. *Int'l Union, United Mine Workers of Am. v. Apogee Coal Co.*, 330 F.3d 740, 744 (6th Cir. 2003).

*Noe*, 520 F.3d at 552. The court of appeals has further clarified:

Courts reviewing a collective bargaining agreement must also keep in mind the context of labor-management negotiations on retiree health-care benefits: "because retirement health care benefits are not mandatory or required to be included in an agreement, and because they are 'typically understood as a form of delayed compensation or reward for past services' it is unlikely that they would be 'left to the contingencies of future negotiations.' " *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 580 (6th Cir. 2006) (quoting *Yard-Man*, 716 F.2d at 1481-82).

*Tackett*, 561 F.3d at 489. Application of these directions to this case has led this Court to the conclusion that Plaintiffs obtained vested medical benefits.

This conclusions does not conflict with the Sixth Circuit's prior discussion of the issue of vesting. Citing the November 6, 2000 CBA language set forth above, the court of appeals previously made several critical points:

First, the "full Company contribution" language suggests that the parties intended the employer to cover the full cost of health-care benefits for those employees meeting the age and term-of-service requirements. Keeping in mind the context of the labor-management negotiations identified in *Yard-Man,* we find it unlikely that Plaintiff USW would agree to language that ensures its members a "full Company contribution," if the company could unilaterally change the level of contribution. The CBA has no limitation on the amount of a company contribution and if the Defendants' argument were accepted, the company presumably could lower the contribution to zero without violating this language. Such a promise would be illusory.

21

> Second, the limiting language, "[e]mployees will be required to pay the balance of the health care contribution," follows the provision requiring contributions by those retirees who had not attained the requisite seniority points. From the placement of this language, we can reasonably infer that it did not apply to all retirees, but only to those retirees who had not attained the requisite seniority points.

> Third, the collective bargaining agreement tied eligibility for health-care benefits to pension benefits.  This is another factor indicating that the parties intended the health care benefits to vest upon retirement.

*Tackett*, 561 F.3d at 490.  This Court previously noted that, on its face, the court of appeals' language appears to present a controlling interpretation of the CBA that proves dispositive of at least the vesting issue, if not the issue of capped versus uncapped benefits.

This Court has recognized, however, that the next sentence of the court of appeals' opinion suggests that perhaps the Sixth Circuit was not handing down an opinion that proves dispositive outside the Rule 12 context.  Following the third point, the *Tackett* panel stated that "[w]e hold that the Plaintiffs' Complaint presented a plausible claim that the parties intended to vest health-care benefits.  Accordingly, we hold that the district court erred in granting the Defendants' Rule 12(b)(6) motion on the § 301 claim." *Id.*  This language might cast the otherwise essentially conclusory language of the three points (noting that the appeals court did use some qualified language such as "suggests") into a qualified light and presents the issue of whether the Sixth Circuit was interpreting the language as a matter of law or simply saying that it presented a plausible claim for Rule 12(b)(6) purposes and that the vesting issue was left open upon remand.

This Court continues to find the answer to the vesting issue in the next portion of the appellate decision.  There, the *Tackett* panel moved from Count I, the § 301 claim, to Count II, the § 502(a)(1)(B) claim.  After outlining the considerations relevant to deciding the vesting

22

issue, the Sixth Circuit stated that "[t]he determination above that *the parties intended health-care benefits to vest* carries over to the ERISA § 502(a)(1)(B) claim.  The Plaintiffs have therefore presented a plausible claim under ERISA § 501(a)(1)(B)."  *Tackett*, 561 F.3d at 490 (emphasis added).  Notably, the court of appeals phrased its summary of its prior discussion as an unqualified declaration–"the parties intended health-care benefits to vest"–without linking that summary statement to a mere finding of a plausible claim.  By presenting the intended vesting as a fact leading to the result that Plaintiffs had presented a plausible claim, the appellate court pointedly issued a conclusion instead of merely recognizing a credible possibility.

In other words, had the Sixth Circuit said that based on the factual allegations that it must accept as true, it concludes that Plaintiffs have stated a plausible claim for Rule 12(b)(6) purposes, this Court would perhaps consider the vesting issue open on remand.  But what the court of appeals did was conclude that the parties intended vesting, which meant that Plaintiffs had of course stated a plausible claim, which meant that they should have survived the Rule 12(b)(6) attack.  The distinction is important; it is the difference between saying that the facts *likely* present a viable claim and saying that the facts *do* present a viable claim.  This Court therefore stands by its prior conclusion that the Sixth Circuit answered the threshold vesting issue.

Even if this Court is incorrect in its interpretation of the appellate precedent and the court of appeals did not intend to be dispositive on the issue and reasonably only intended to reach the issue of plausibility of the claim presented, the Court again recognizes that there are no facts that would defeat the same conclusions.  The linking of eligibility for health care benefits to pension benefits indicates the parties' intent that health care benefits vested upon retirement.  *See Reese*

23

*v. CNH America LLC*, 574 F.3d 315, 322 (6th Cir. 2009) (noting cases in which the tying of eligibility for pension benefits to eligibility for health-care benefits "played a 'key' role in a vesting-of-health-benefits determination").

Regardless of the analytic path, the end result is still the same because, in light of the meaning of the CBA language, this Court must conclude that vesting occurred. Whether the appellate path or this Court' own analysis leads to this conclusion is ultimately irrelevant. What is significant is that the Sixth Circuit did not conclusively state the precise nature of the right to health care benefits that vested in light of the fact that the appellate panel left the door open for further related factual development and analysis on remand. After summarizing the cap letters and the postponement of the effect date of the caps, the Sixth Circuit stated that "[t]he import of this perpetual postponement and the applicability of these cap letters to the current parties are fact issues that must be resolved by the district court outside of the Rule 12(b)(1) determination." *Tackett*, 561 F.3d at 482 n.1. Thus, as in *Reese*, the core issue in this case is ultimately not "did the benefits 'vest,' " but rather "what does vesting mean in this context." *Reese*, 574 F.3d at 321. The bench trial answered *what* vested.

What vested for those plaintiffs in Subclasses One through Four was a right to contribution-free lifetime health benefits. What vested for those plaintiffs in Subclass Five was a right to capped lifetime health benefits, contingent on the qualifying plaintiffs paying the above-cap premiums.

While disagreeing with the Court's vesting analysis, Defendants have taken the position that the health care benefits agreements condition exercise of any vested right to benefits on satisfaction of the cost-sharing precondition. Defendants' theory of the case is that there has

been continuity in the wholesale assumption of contractual obligations by each owner of the Apple Grove plant, an unbroken line of side agreements that provide contextual meaning to the language of the main agreements. They posit that the side agreements apply to the plant and its retirees either expressly or under a "me too" arrangement. Thus, Defendants reason, the right to the contingent benefits is clear provided a retiree satisfies the condition of making his or her contribution. This is a permissible scheme; a plan may contemplate fully funded, lifetime health care benefits *or* defined-contribution health care benefits. *Wood v. Detroit Diesel Corp.*, 607 F.3d 427, 432 (6th Cir. 2010). The scheme Defendants assert is not, however, the scheme that exists here.

The factual history that the parties present could not be more different. On one side, Defendants have presented largely dubious testimony to support the theory that an unbroken chain of cap letters informs agreements resulting in at most lifetime health care benefits that are contingent on satisfaction of a cost-sharing arrangement. On the other side, Plaintiffs have presented notably more compelling evidence that Defendants have engaged in after-the-fact company scrambling to find a way to impose unilaterally application of cap letters as a cost-savings measure that defies the agreements the caps puncture.

This Court has untangled which agreements do in fact apply to the Apple Grove plant and concludes that Defendants have conflated companies and agreements. The pre-August 5, 2005 side agreements to the master agreements do not apply to Apple Grove. Rather, the intent and effect of the applicable operative documents governing Subclasses One through Four present a lifetime benefits scheme for qualifying retirees and beneficiaries without the cost-sharing Defendants wrongly imposed. The cap letters were not part of these agreements, and even if

25

they were, they were wholly abandoned.

Thus, contrary to Defendants' assertions, there is no unbroken chain of cap letter applicability. The evidence indicates that Apple Grove is a partial "me too" plant, or a "me too, with exceptions" plant, with the ability to accept or reject such side agreements. The evidence also indicates that Local 644 rejected application of these unpublished agreements. Additionally, chief company negotiator Dick expressly rejected cap letter applicability, and when union negotiator Moore attempted to pull a master agreement's pension multipliers into the negotiation, M&G took the position that the master agreement did not control–a position that undercuts reliance on side agreements that the evidence indicates ultimately applied only to the master agreements.

The first cap letter at issue was in 1991. The evidence does not support that this letter was part of the P&I booklet adopted by Local 644. Testimony indicated that the booklets are prepared after the local's vote. There is no testimony that the agreement terms ratified by the local included cap letters, regardless of the subsequent booklet content. The testimony of Wedge, Moore, Hoover, Pyles, and Tackett indicates that the booklet as published set forth the total benefits agreement and that it was both permissible and the unwritten policy and practice of Local 644 to adhere to only that which was published in the booklet. Pyles did not testify to knowledge of a cap obtained from a summary plan description; rather, he testified that he did not know of the cap letter and consequently did not ratify it as part of the local agreement. Hoover made clear that a "me too" local could indeed decline to adopt the side agreement letters, and the testimony of Pyles of Tackett indicate that this was the unwritten policy and practice of Local 644. Even James Kruse, whose deposition testimony generally weighed against Plaintiffs in

26

many respects, recognized the divergent nature of the Apple Grove plant.  Absent cap letter incorporation into the local P&I agreement, Shell (and consequently, M&G) could not have assumed the cap letter agreement as a successor as part of its purchase of the plant.  There is no basis to conclude that the 1991 summary plan description was presented to local members; ==in any event, a summary cannot itself constitute the terms of the agreement for § 502(a)(1)(B) purposes==.  Additionally, as Joint Exhibit No. 2 reflects, the express incorporation of specified Goodyear agreements did not include all Goodyear side agreements, pointing to the conclusion that Shell never initially adopted a cap letter.

Neither the 1994 nor 1997 dealings implemented cap letter applicability to the Apple Grove facility.  Although deposition testimony by Dale Wunder supports adoption of Letter H in 1997, this conflicts with the Shell documentary evidence and the more credible testimony of Local 644 members as to what they saw, what they ratified, and how the local approached the incorporation issue.  The cap letters at issue were Goodyear cap letters that were not negotiated into the local P&I agreements.

The Court also notes expressly that the evidence concerning the 1997 agreement working copy is not the smoking guns Defendants contend.  Instead, as Plaintiffs accurately targeted during trial, this was a Goodyear agreement signed by Goodyear officials who were unable to sign for Shell.  The working copy cannot provide a logical basis for cap letter incorporation because when placed in context it is apparent that it was simply that: a copy of an agreement from which the parties could begin their work, with not all parts applicable to the relevant negotiating parties.

In 2000, when Shell sold the Apple Grove plant to M&G, M&G assumed CBA and P&I

agreement obligations from Shell.  The company's own accountants recognized the retiree benefits as involving no retiree contribution, and there was no booklet incorporation of the cap letter.

It is significant that even if there were at one point cap letter applicability for pre-August 5, 2005 retirees, the parties' dealings extinguished invocation of such retiree contributions.  At one point, the union took the position in negotiations that the cap issue was at least potentially relevant, and the union's negotiator recognized the potential applicability of the cap letter. Testimony explained the prophylactic context of Moore's actions and points to strategic maneuvering that removed any possibility of cap letter applicability.  M&G disavowed cap letter applications, the effective contribution date of the relevant hypothetically applicable cap letter expired, and the parties proceeded without the possibility retiree contributions for existing retirees.  Even assuming *arguendo* earlier cap letter applicability, the 2000 P&I agreement cut off any chain of cap letters.

Letter of Understanding 2003-6, dated August 9, 2005, and made part of the 2005-2008 agreement that applies to those plaintiffs in Subclass Five, permits implementation of above-cap retiree contributions.  The issue is whether that document looks only forward from August 9, 2005, or indeed presents a permissible, memorialized understanding of existing if previously unimplemented side agreements.  Defendants would have this Court accept the proposition that the parties continually kicked the can of retiree contributions down the road until it was no longer economically feasible for the company.  The evidence is to the contrary.

Letter of Understanding 2003-6 contemplates caps on employer contributions to retiree health benefits and provides that "premium cost sharing charged to retirees will be based on the

amount by which total cost for all retiree insurances (medical, life, etc.) exceed the caps set forth

in Letter H dated January 1, 2001." The unilaterally implemented letter also states that retirees

would not be required to contribute to their premiums until January 1, 2006, and that the retiree

premium contribution rates would become effective on that date. Defendants argue that Letter of

Understanding 2003-6 and the union's history of attempting to negotiate the effective date of

caps and to eliminate the application of Letter H point to the application of the caps to M&G.

Defendants posit that Letter of Understanding 2003-6 unambiguously supports the unbroken

application of caps to retirees (including preexisting retirees). That document explicitly

references the prior 2001 cap letter and provides that "[r]etiree benefits" means "benefits for the

Company's preexisting retirees." The trial testimony undercuts deeming Letter of

Understanding 2003-6 dispositive in Defendants' favor for pre-August 9, 2005 retirees, spouses,

and dependents.

      This Court concludes that Letter of Understanding 2003-6 does not rehabilitate broken or

reaffirm longstanding cap letter applicability in regard to those plaintiffs in Subclasses One

through Four. Despite Defendants' best efforts at rewriting history, the trial evidence places the

previously ambiguous Letter of Understanding 2003-6 into its proper context as a going-forward

document applicable to individuals in Subclass Five and not a document that also speaks to and

clarifies the meaning of the prior agreements governing Subclasses One though Four. The actual

context of Letter of Understanding 2003-6 does not include a shared intent to vest only partially

funded (*i.e.*, capped employer contributions for) lifetime health care benefits to retirees in the

first four subclasses. Rather, the document's context teaches this Court that application of Letter

of Understanding 2003-6 to the plaintiffs in the first four subclasses was a unilateral move by

M&G to unlawfully circumvent binding agreements to obtain economic advantages. The addition of Letter of Understanding 2003-6 to the 2005-2008 agreement changes the meaning of what constitutes a "full company contribution" from prior agreements so that the clause no longer means the full cost of health-care benefits for qualifying employees, but rather a capped company contribution to the health-care benefits.

To be certain, the parties' decade-plus history of dealing with the cap letters and contributions does not present a model of negotiating clarity, much less competence. On one side, the union's own negotiator once questioned cap letter application, and at least one if not more Local 644 individuals who lacked binding authority appeared not to understand what was involved in the negotiations and the agreements reached. The companies fare no better. During the 2000 CBA negotiations, attorney David Dick was the lead or chief negotiator for M&G and stated clearly and unequivocally that the cap letter did not apply. The testimony Defendants intend to explain away Dick's purported "confusion" is simply not credible.

Nor is the testimony of Long helpful in regard to applicability. The curiously under-informed Long expressly relied on Korber, whose testimony this Court found to be incredible time and again, in accepting cap letter applicability. Having had ample opportunity to observe the witness and to consider his testimony, this Court expressly rejects as simply not credible the testimony of Korber, M&G's Human Resources Director, which indicated that M&G had assumed cap letters as part of the preexisting obligations as a successor to Shell. Korber's actions, particularly his communications with the consultant actuaries for M&G, are not consistent with an individual or a company that knew or believed that any cap letter applied. It does not appear to this Court that Korber knew of Letter H until at least 2003, despite his

contention that he knew of the cap letter years earlier.  Additionally, M&G's own reporting of contribution-free retiree health care benefits (tracking Shell) contradicts the company's post-hoc position that the cap letters always applied and undercuts Korber's self-serving testimony.

In contrast to Korber's testimony, the Court found credible the testimony of Hoover and Moore, who together explained that confusion existed because various locals had different approaches.  Potential cap letter application does not equal actual application, and the Court finds that Local 644 never adopted cap letters prior to August 9, 2005, even if union leadership was uncertain about that position at times and had to check in with the home office for assistance during negotiations.

It is also notable that the union lacked the ability to negotiate the vested retiree benefits. Pyles and Tackett, for example, did not consent to the parties addressing this permissive subject of bargaining.  There is no evidence any retiree did.  But there is evidence that union negotiators such as Shipley routinely adopted the position that retiree contributions were not on the table. Only individual union members not in the know apparently believed that the cap letters applied, and they lacked authority to bind the union and the retirees.

As the Court has previously noted, the significant confusion by the parties is odd.  It appears that various individuals' efforts to circumvent clarity and full disclosure to the public of self-serving arrangements got a bit too clever for nearly all involved until even key actors were confused by what essentially hidden agreements applied in what context.  Goodyear master agreement shenanigans did not necessarily filter down to the me too with exceptions plant involved here, but the various actors in the history of the Apple Grove plant appear to have been rarely well informed.  This is no way to run a business or a union.  Companies should know what

31

they are buying (obligations and all), investors should know what company liabilities exist, unions at all levels should be clear on what they are negotiating, and retirees should know what agreements they are ratifying.

Plaintiffs have presented ample evidence involving M&G's counsel, actuaries, and human resources personnel that no one thought that there was a cost-sharing plan in place for Apple Grove retirees for years until it became advantageous to the company.  Multiple M&G actors appear at best uncertain of what benefits liabilities they assumed when they purchased the plant and another expressed a position wholly adverse to cap letter applicability.  Those who testified supporting cap letter applicability wholly lacked veracity.  Ultimately, this litigation presents a scenario in which a company faced with ballooning benefits costs uncovered a longshot means by which it could attempt to retroactively rewrite agreements to reduce costs–and then the company turned to actuaries to inform the purported scope of the cap letter, apparently basing the claimed scope on the amount of money that could be saved if the company prevailed.  This is unlawful.

The issue of liability that once appeared complicated during summary judgment proceedings became far more clear as a result of the trial.  And despite real conflicts in evidence, including each party's own at times contradictory evidence, the greater weight of the evidence favors Plaintiffs.  For example, the evidence indicates that Dick, the company's chief negotiator and someone with the clear authority to bind the company, rejected cap letter applicability.  The company attempts to insulate itself by dubiously disowning his comments and authority, while concurrently pointing to Long's testimony as supporting applicability.  Defendants cannot reject one of their negotiators as misinformed and turn to another uninformed negotiator to achieve the

continuity of applicability that they seek to prove.

In contrast, the evidence indicates that those with the authority to bind the union disputed cap letter applicability.  The company insists that the Court should credit instead those local members who lacked such binding authority.  The evidence indicates that there were no ERISA notices given here, that the retiree benefits issue was not a subject of bargaining, and that the retirees did not consent to negotiations on the issue.  The company asks this Court to ignore these facts.  The evidence indicates, however, that Defendants developed the contribution scheme as a self-serving response to economic realities and in contravention of the negotiations conducted and applicable agreement reached.  This is impermissible under the controlling law.

The plan participants' understanding of what they ratified reflects the benefits agreements reached.  This Court concludes: (1) the relevant agreements set forth a scheme in which the employer is responsible for covering the full cost of health-care benefits for those employees meeting the age and term-of-service requirements in Subclasses One through Four; (2) qualifying individuals in Subclasses One through Four are entitled for the company to cover the full cost of the health benefits, without these plaintiffs being required to pay premium contributions; (3) the contribution-free health benefits for individuals in Subclasses One through Four exist despite the fact that various inapplicable side agreements between other parties deferred the eventual collection of retiree contributions; (4) for the plaintiffs in Subclasses One through Four, Defendants have had no right to collect the premiums charged and have impermissibly terminated benefits for the failure to make such a contribution; and (5) the cap letter applied to Subclass Five, the members of which Defendants could permissibly require to make above-cap contributions.

Having determined both that vesting occurred and what vested, this Court is left with the issue of whether the scheme of permissible contributions governing Subclass Five is nonetheless unlawful in its execution.  The Subclass Five Plaintiffs claim that Defendants cannot charge the monthly contributions because they have the effect of forcing retirees out of the benefits plan. Defendants argue in turn that the monthly premiums are acceptable under the negotiated 2005-2008 agreement.  Defendants are correct.

The evidence supports that the 95-point agreement language does not preclude retiree contributions for those individuals qualifying for health benefits post-August 9, 2005.  The 95-point language itself would not preclude retiree contributions for pre-August 9, 2005 retirees; it is only the inapplicability of the cap letters prior to August 9, 2005 that defeats such a scheme here.

Korber testified that the contribution plan that M&G presented to the union involved monthly premiums, derived from the average above-cap cost, and he did not recall any objection to the monthly basis calculations other than counter-proposals.  The Court credits this testimony. Although Korber's testimony regarding the application of cap letters to all retirees was largely not credible, his essentially uncontradicted testimony regarding monthly premiums was more persuasive.  Korber explained how application of the methodology set forth in Letter H in conjunction with Letter of Understanding 2003-6 to the actual claims data produced the monthly-premium information provided to the retirees prior to the effective date of retiree contributions.  (Defs. Ex. 152.)

The Court understands Plaintiffs' frustration with the monthly costs, which will likely only increase as time passes and no doubt can impose a substantial burden on the affected

34

retirees.  Such monthly premiums are not a surprise.  Letter H speaks in terms of annual costs and averages, but the evidence indicates the understanding that the annual costs would be broken into monthly payments.  Hoover testified that monthly premiums were contemplated by Kruse under the Goodyear cap letters, the model for the cap letter governing Subclass Five.  Hoover also testified that he did not know how a health benefits premium would be paid otherwise and that such an approach made sense.  Such a monthly premium approach was incorporated into the union-M&G discussions over retiree contributions, with *both* sides making 2006 proposals involving monthly contributions.  The resulting approach is what became part of the 2005-2008 agreement, and the effects of that agreement are the results of the parties' negotiations. Defendants are thus within their contractual rights in imposing the monthly premiums imposed, however harsh the result may be.  Because the calculations and monthly premiums are in accord with the negotiated agreement for those plaintiffs in Subclass Five, Defendants are entitled to judgment on this subclass' claims.

**III.**

In light of the foregoing findings of fact and conclusions of law, the Court finds in favor of Plaintiffs in Subclasses One through Four and against Defendants on the issue of liability as described herein on Plaintiffs' Count I and II claims.  The Court finds in favor of Defendants and against Plaintiffs in Subclass Five on these claims.  This leaves the issue of damages, which the Court previously bifurcated from the liability issue.  (ECF No. 166.)  The Court shall schedule a telephone status conference to set a case schedule on the remaining issues in this litigation.

There being no just cause for delay, the Clerk shall enter judgment in accordance with this Opinion and Order.

**IT IS SO ORDERED**.

                                        /s/ Gregory L. Frost
                                    GREGORY L. FROST
                                    UNITED STATES DISTRICT JUDGE