UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

HOBERT FREEL TACKETT, ET AL.,  .

                        .      CASE NO. 2:07-CV-126

          PLAINTIFFS,  .

   VS.            .      COLUMBUS, OHIO

                        .      MAY 9, 2011

                        .

M&G POLYMERS USA, LLC, ET AL., .

                      .

         DEFENDANTS.  .

. . . . . . . . . . . . . .

**VOLUME I**
***TRANSCRIPT OF BENCH TRIAL PROCEEDINGS***
BEFORE THE HONORABLE GREGORY L. FROST
UNITED STATES DISTRICT JUDGE

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS:     DAVID M. COOK, ESQUIRE
                        JENNIE G. ARNOLD, ESQUIRE
                        LAURA L. FISCHER, ESQUIRE

FOR THE DEFENDANTS:     PHILIP MISCIMARRA, ESQUIRE
                        JOHN RICHARDS, ESQUIRE
                        DEBORAH S. DAVIDSON, ESQUIRE
                        CHRISTOPHER A. WEALS, ESQUIRE

- - -

DENISE ERRETT & SHAWNA EVANS, FEDERAL COURT REPORTERS
(614) 719-3029

```
1                    Monday Morning Session

2                      May 9, 2011

3                       9:00 a.m.

4                        - - -

5    IN OPEN COURT:

6            THE COURT:  Mr. Miller, will you call the case,

7    please?

8            COURTROOM DEPUTY CLERK:  Case Number C-2-07-126,

9    Hobert Freel Tackett, et al., versus M&G Polymers USA, LLC,

10   et al.

11           THE COURT:  Thank you, Mr. Miller.

12           Let the record reflect that counsel for the

13   plaintiffs, Mr. Cook, Ms. Arnold, and Ms. Fischer, are

14   present.  We have someone else there.

15           MR. COOK:  It's my paralegal, Dan Sponaugle, Your

16   Honor.  He's in charge of all these boxes.

17           THE COURT:  All right.  Good.  Good.  Then you can

18   leave.

19           Then, also, M&G Polymers -- well, plaintiffs' class

20   members, or some of plaintiffs' class members, are present.

21           On behalf of the defendant, M&G Polymers, I don't

22   know if there is an individual present who is representing

23   the company.

24           MR. MISCIMARRA:  Yes.  That would be Kimm Korber,

25   who is the Director of Human Resources.
```

```
 1          THE COURT:  Yes.

 2          And how do you spell your last name?

 3          MR. KORBER:  K-O-R-B-E-R.

 4          THE COURT:  B-E-R?

 5          MR. KORBER:  Yes, sir.

 6          THE COURT:  I remember reading that.  Yes.  Thank

 7     you, Mr. Korber.

 8          Also present is Philip Miscimarra, Miscimarra

 9     probably, Deborah Davidson, Christopher Weals and John

10     Richards representing the defendants in this matter.

11          Today's date is May 9, 2011, and we're here today

12     for the trial to the Court, a bench trial on the issues

13     involved in this matter.

14          Counsel for the plaintiff, are you prepared to

15     proceed?

16          MR. COOK:  We are, Your Honor.

17          THE COURT:  Defendants, are you prepared to proceed?

18          MR. MISCIMARRA:  We are, Your Honor.  We have a

19     number of housekeeping matters we thought we could address.

20     We could address those now, or we could address those prior

21     to a break.

22          THE COURT:  Let's do it now.

23          MR. MISCIMARRA:  Just a couple of things.  One, Your

24     Honor, is we found some missing pages in the electronic

25     version of exhibits.  We have a supplemental set that we
```

VOL. I                                                                           4

```
 1    could provide to the Court.

 2          THE COURT:  Give those to Mr. Miller.

 3          MR. MISCIMARRA:  For the record, I'll note that

 4    those in Defendants' Trial Exhibit 215, we've added missing

 5    page MIK-07704.  In Defendants' Trial Exhibit 222, we've

 6    added missing pages MIK-9113, -9114, and -9148.

 7          Your Honor, we'd make a motion to sequester

 8    witnesses at this time.

 9          THE COURT:  Any objection?

10          MR. COOK:  None.

11          THE COURT:  The motion for sequestration of

12    witnesses is granted.

13          Other than the parties to this action, if there is

14    anyone who is here and who intends or has been placed on

15    notice to be a witness to this matter will remove

16    themselves from the courtroom.  They will be required to

17    remain outside the courtroom.  They are not allowed to

18    discuss any of their testimony prior to or after their

19    testimony with anyone else.

20          Thank you.

21          MR. MISCIMARRA:  Your Honor, also there is a

22    question of how we will deal with the scheduling and

23    coordination concerning witnesses to be called.  And I just

24    raise the question of whether or not there will be any

25    exchange of information concerning what witnesses will be
```

```
 1    called in what order or on what days.  And I thought that
 2    would be an appropriate thing to raise at the outset of the
 3    trial.
 4              THE COURT:  Generally, the parties agree to advise
 5    opposing counsel of the witnesses for the next day, but
 6    that's entirely up to you, whether you wish to agree to
 7    that or not, but that's generally what happens.  Somewhere
 8    along the afternoon, counsel for the plaintiff would advise
 9    counsel for the defendant who they anticipate being called
10    the next morning or the next day.  And then, of course,
11    vice versa.  You would do the same for counsel for the
12    plaintiff.
13              I would suggest that you do it.  It generally makes
14    things run a little smoother.  Sometimes, however, there is
15    an issue on timing, or, you know, witnesses getting here
16    when they're supposed to.  Hopefully, we won't have too
17    much of that problem, but I would encourage counsel to do
18    so.
19              MR. COOK:  We're happy to do so.
20              THE COURT:  Good.  Thank you.
21              MR. MISCIMARRA:  As you know, Your Honor, we've had
22    a cooperative relationship.
23              THE COURT:  Yes.  I've been impressed with that.  I
24    really have.
25              MR. MISCIMARRA:  Two other things, Your Honor.
```

```
 1              THE COURT:  Let's see.  You said, when we started,
 2    you had two issues.  Now this is four.
 3              Okay.  Go ahead.
 4              MR. MISCIMARRA:  All right.  That's why I'm an
 5    attorney, because I'm not very good at math.
 6              THE COURT:  I know.
 7              MR. MISCIMARRA:  With respect to the handling of --
 8    I'll hit both of them as one question to save time.  With
 9    respect to the handling of exhibits, what's your preference
10    as far as moving each exhibit individually, or can one
11    assume, if there is no objection and it's introduced to a
12    witness, then it's in the record?
13              THE COURT:  Don't assume that.  Don't assume that.
14              MR. MISCIMARRA:  Okay.
15              THE COURT:  No.  Ask for the admission of the
16    exhibits either as you are using the exhibit or at the end,
17    either way.  Both myself and Mr. Miller keep track of each
18    exhibit that has been identified and/or admitted.  And
19    then, at the close of plaintiffs' case, and then at the
20    close of defendants' case, we'll review all those and
21    decide what it is that needs to be admitted that has not
22    yet been but has been identified.
23              MR. MISCIMARRA:  Thank you, Your Honor.
24              The only other question --
25              THE COURT:  And it's a trial to the Court.  So, you
```

 1    know, we can be somewhat liberal with regard to that, just

 2    so that we get it in at the end of the plaintiffs' case or

 3    the defendants' case.

 4         MR. MISCIMARRA:  And the treatment of transcript

 5    designations is the last question to raise.

 6         THE COURT:  Okay.  What do you want to know about

 7    that?

 8         MR. MISCIMARRA:  Well, we have -- I think both sides

 9    have designated some transcript testimony.  And during the

10    pretrial conference, we discussed whether the transcripts

11    would simply be submitted or whether they would be read

12    into the record.  From our perspective, it's acceptable to

13    us to simply submit the transcripts and then use them in

14    argument at closing or argument for a Rule 50 motion

15    perhaps.

16         THE COURT:  Counsel?

17         MR. COOK:  Acceptable as well.  We do not wish to

18    burden the time of the Court with reading deposition

19    transcripts, which you're capable of and probably will read

20    in the future in any event.

21         THE COURT:  I will read it.  I will promise you

22    that.

23         MR. COOK:  Yes.

24         THE COURT:  The only issue with reading it in the

25    courtroom is the snoring.  It generally gets pretty loud

```
 1    during the reading of a transcript.  So, --

 2              MR. COOK:  I understand.

 3              THE COURT:  Yeah.  So, why don't we just designate

 4    on the record what portions of the transcript you wish for

 5    the Court to read, and the Court will do so either during

 6    the trial, on the weekends, or after the trial.

 7              MR. MISCIMARRA:  The last matter, Your Honor, is I

 8    believe there is one witness who is present in the room.

 9              THE COURT:  Wait a minute.  Did you say the last

10    one?

11              MR. MISCIMARRA:  Well, this is actually new matter.

12              THE COURT:  I just want to make sure.

13              MR. MISCIMARRA:  This is a newly arisen matter.  I

14    believe that there is a witness, someone who will be a

15    witness, who is present in the room who I believe should be

16    excused.  Ron Hoover, who I've had the pleasure and

17    privilege of meeting, I think will be a witness and should

18    be excused because of the sequestration motion.

19              THE COURT:  Mr. Cook?

20              MR. COOK:  The United Steelworkers, one of the

21    plaintiffs in this case, USW, is a merged organization,

22    Your Honor.  It merged with the United Rubber Workers in

23    about 1995.

24              THE COURT:  Right.

25              MR. COOK:  Mr. Hoover was an official of the Rubber
```

1    Workers; later became the Director of the Rubber Plastics

2    Industrial Council for the USW.  He is here today as a

3    liaison between the transition between the two

4    organizations.

5          The United States Steelworkers, USW, is represented

6    by Mr. Brian Wedge, a former local president of Local 644

7    in Point Pleasant.  We wish that both of them be considered

8    representatives of the union, but if the Court wishes us to

9    designate but one, we will accept that.

10         THE COURT:  Only one.

11         MR. COOK:  Okay.

12         Ron, you're going to have to move.

13         MR. HOOVER:  Now?

14         THE COURT:  Yes, Mr. Hoover, you will have to remove

15    yourself.  Take no offense from that, will you?  Actually,

16    you should be tickled.

17         MR. HOOVER:  No.  I wanted to listen to this boring

18    stuff.

19         THE COURT:  Have a seat in the witness room or

20    wherever you wish.

21         (Whereupon, Mr. Hoover exited the courtroom.)

22         MR. COOK:  Your Honor, --

23         THE COURT:  Wait a minute.

24         Anything further?

25         MR. MISCIMARRA:  Nothing further, Your Honor.

```
 1              THE COURT:  Mr. Cook?

 2              MR. COOK:  It goes to the issue of scheduling, Your

 3     Honor, and it may be premature.

 4              Between the time we had the final pretrial

 5     conference and today, a valued friend, close friend of mine

 6     and colleague, has been named as a distinguished alumni of

 7     the University of Cincinnati McMicken College of Arts and

 8     Sciences, and he is to be honored this Friday at 7:00 p.m.

 9     I'm supposed to be seated as a guest of honor at his table.

10     And I would just request that, if the flow of the trial

11     permits, if there is any way that we could squeeze out a

12     few minutes early on Friday so I can dash down the highway

13     and avoid any state policemen --

14              THE COURT:  There's a ton of them between here and

15     there.  I know for sure.

16              MR. COOK:  Between here and Cincinnati.  So does my

17     driving record, Your Honor.

18              Obviously, we'll raise this issue again on Friday,

19     but if I could get out a little bit early to do that, it's

20     a signature honor for Mr. Altman, and I would like to be

21     there.

22              MR. MISCIMARRA:  No objection.

23              THE COURT:  Assuming that everything is going well,

24     we will do that.

25              MR. COOK:  Thank you.
```

```
 1          THE COURT:  And to be honest with you, if things

 2     don't look like they're going well, we'll go late in the

 3     evening on the other days, just to make sure we're on time.

 4          I will tell you, we have two weeks and two weeks

 5     only.

 6          MR. COOK:  Yes.

 7          THE COURT:  On the Monday after the two weeks, I've

 8     got another trial starting.  So, we've got to get it done.

 9     Well, either that or you start back again in July.

10          MR. COOK:  Thank you, Your Honor.

11          THE COURT:  And I don't think anybody wants to do

12     that.

13          MR. COOK:  Thank you, Your Honor.

14          MR. MISCIMARRA:  Thank you, Your Honor.

15          THE COURT:  All right.

16          All right then.  With those housekeeping matters

17     completed, Plaintiff, do you wish to present an opening

18     statement?

19          MR. COOK:  Yes, we do, Your Honor.

20          THE COURT:  You may proceed.

21          MR. COOK:  We are waiting for our Power Point

22     presentation to come on the screen.

23          THE COURT:  No problem.

24          COURTROOM DEPUTY CLERK:  You're going to display it

25     from your counsel's table?
```

```
 1                MS. FISCHER:  Yes.

 2                THE COURT:  Thank you.

 3                MR. COOK:  That way, she can change the slides.  I

 4     know Power Point has been around for about 20 years, Your

 5     Honor, but I'm kind of new to it.  So, I let the younger

 6     people direct me.

 7                THE COURT:  Mr. Cook, new or old, we always have

 8     problems with them.  So it doesn't matter.

 9                COURTROOM DEPUTY CLERK:  I've got it on.

10                THE COURT:  I don't have it.

11                MR. COOK:  A technical glitch.

12                Your Honor, while we're doing that, I want to note,

13     as the Court has observed, a number of members of the

14     class, of plaintiffs in the case, are present in the

15     courtroom.  They've traveled up here from southeast Ohio

16     and southwestern Pennsylvania, or, West Virginia.  They

17     pretty much fill the courtroom today.

18                I'm the outlier in our office.  I use Macintosh and

19     everybody else uses a Windows system.  So, I can't help.

20                THE COURT:  Take your time.  Don't worry about it.

21       (Whereupon, there was a brief interruption.)

22                THE COURT:  I can't believe all these guys came from

23     southeastern Ohio.

24                MR. COOK:  Came up in a van caravan.

25                THE COURT:  But it's turkey season, guys.  Why
```

1    aren't you down there hunting turkey?

2         MR. COOK:  Is that right?  Is it turkey season?

3         THE COURT:  Yes.  This is the last week.  I can't

4    believe you guys are up here.

5         UNIDENTIFIED GENTLEMAN:  Can't afford shotgun

6    shells.

7         THE COURT:  All right.  I'm not going to ask you

8    guys questions anymore.

9         Got it going?

10        Aren't you glad it's on the screen?

11        MS. FISCHER:  Well, it's not on my screen now, Your

12   Honor.

13        THE COURT:  What?

14        MS. FISCHER:  It's on this one, here, but it's not

15   actually on my laptop screen.

16        THE COURT:  Well, can you --

17        MS. FISCHER:  I can just --

18        THE COURT:  Yeah.  All right.

19        MS. FISCHER:  I'm savvy enough.

20        THE COURT:  Okay.

21        MS. FISCHER:  Thank you, Your Honor.

22        MR. COOK:  Thank you for your patience, Your Honor.

23        THE COURT:  No problem.

24        MR. COOK:  Here we go.

25        I'm reminded, Your Honor, of -- I've been doing this

```
 1   for 33 years, and I can remember the days when unions would

 2   negotiate a holiday for the opening day of deer hunting

 3   season.

 4           THE COURT:  Oh, yeah.  We close it down in Licking

 5   County.  We close down the schools and everything.

 6           MR. COOK:  Well, they either had to grant them a

 7   holiday, or nobody would show up.

 8           THE COURT:  Well, that was the problem.  It was a

 9   matter of accommodation, because no one was going to show

10   anyway.

11           MR. COOK:  Slide show?

12           THE COURT:  Are you okay now?

13           MS. FISCHER:  Yes.  Thank you, Your Honor.

14           MR. COOK:  We are.

15           Thank you, Your Honor, for your patience.

16                           - - -

17              PLAINTIFFS' OPENING STATEMENT

18                           - - -

19           MR. COOK:  Good morning, Your Honor.  I am David M.

20   Cook of Cook, Portune and Logothetis, LLC, in Cincinnati,

21   Ohio.  We're counsel for the plaintiff class and for the

22   USW, the union, successor union, which represented the

23   employees at the Point Pleasant Polyester Plant in Apple

24   Grove, West Virginia, in collective bargaining going back a

25   number of years.
```

1        With me today are Jennie G. Arnold of my office and

2    Laura Fischer, my associates, and Dan Sponaugle, our

3    paralegal, who will be in charge of these boxes and

4    exhibits.  Hopefully, we can use the electronic version.

5        Misters Tackett and Pyles, two of the class

6    representatives, are seated in the jury box.  And thank you

7    for your permission to allow that.

8        The first gentleman all the way to your right, my

9    left, is Mr. Freel Tackett.  And the gentleman seated next

10    to him is Woody Pyles.  The gentleman immediately to his

11    right is Brian Wedge, now staff representative of United

12    Steelworkers.  They represent a class of retired employees

13    of M&G Polymers and its predecessors who bring claims for

14    vested lifetime retiree health benefits with no

15    contributions by the retirees.

16        And we've already noted there a number of members of

17    the class in the courtroom today.  Today is their day, Your

18    Honor.  It's the day that these class members have waited

19    for since this case was filed in January of 2007 when M&G

20    Polymers implemented enormous premium contributions for the

21    retirees to retain their health coverage.

22        We recognize that, through the course of this

23    litigation, the Court has become quite familiar with the

24    facts of the case and the issues as well.  And we

25    understand that the order that you issued on summary

1    judgment has clarified a key issue in the case:  that the

2    retirees' benefits received by the members of the class are

3    vested lifetime benefits granted to them by the terms of

4    the contracts under which they worked and they retired.

5         In its decision denying summary judgment to

6    defendants, the Court noted the core issue in this case is

7    ultimately not, quote, did the benefits vest, close quote,

8    but, rather, what does "vesting" mean in this context.

9    Plaintiffs will address that issue in detail and at length

10   in the course of this trial.

11        Plaintiffs will prove during this trial that no caps

12   apply to the benefits in which the class vested.

13   Plaintiffs will prove that there has never existed at the

14   Point Pleasant Polyester Plant an unbroken chain of cap

15   letters which would allow the defendants to engage in the

16   conduct that it has taken towards the retirees.  And the

17   plaintiffs will prove that the language of the Pension,

18   Insurance and Services Agreement that grant these benefits

19   does not permit the imposition of contributions for

20   retirees who retired with 95 or more points.

21        In January, 2007, after an extended period of

22   discussions between the USW and M&G, M&G implemented caps

23   on the benefits retirees would receive, but they went

24   further and established and imposed what would later prove

25   to be exorbitant premiums, premiums the retirees would be

1    required to pay or they would be permanently removed from

2    the health coverage program.  These premiums, which for

3    2007 for pre-Medicare retirees amounted to over $850 per

4    household and nearly $150 for Medicare-eligible retirees,

5    had a devastating effect on the class.

6         Laura, let's show the Court -- there it is.  You can

7    see the monthly charges.  These charges are listed on the

8    chart on the screen in front of you, Your Honor, as they

9    were imposed as of January of each of the years listed.

10        As a direct result of these premiums, in 2007,

11   thirty-seven percent of the class dropped coverage.  For

12   this group, there is no more health coverage, even up to

13   the amount that they were vested in if a cap existed.  It's

14   gone.  Despite this fact, the Court has found that they

15   vested in some benefits, but the way that the company has

16   applied the letter, which we're going to talk about,

17   2003-6, as applied, even if it were to be retroactively in

18   effect, it divests the retirees of what this Court has

19   found are vested benefits.  To add insult to injury, at the

20   end of 2007, M&G issued a big never-mind and told the class

21   that they had been grossly overcharged for their premiums,

22   that in fact the actual amount due from each household was

23   much, much less, so much less that every retiree who paid

24   the premiums, those that maintained the coverage, were now

25   entitled to either a refund or a credit against the next

1    year's premiums.

2         Despite this experience, for 2007, M&G repeated the

3    process.  And as you can see here on the screen, at the

4    beginning of 2008, to maintain coverage, retirees

5    pre-Medicare eligible had to pay $732.21 per month.  If

6    they couldn't, they were permanently dropped from coverage

7    and divested of their vested benefits.  But at the end of

8    2008, M&G recalculated the figures and said, We made a

9    mistake; you actually only owed us $92.80 a month.  And

10   they were refunded $7,672.92 cents, per family, with

11   interest.  But that didn't mean anything to the families

12   who had to drop coverage and were now permanently divested

13   of their benefits.

14        This pattern has repeated itself every year since.

15   And, every year, more retirees drop out of the program.  We

16   will show during this trial that this effect on the class

17   has resulted in, today, over fifty percent of the class has

18   now dropped coverage and been divested of their benefits.

19        This is not nearly an unintended consequence of the

20   company's actions.  In fact, it appears to have been

21   remarked upon by the company's actuary, Mr. Duane Lee, as

22   good news.  An example is Plaintiffs' Exhibit 341, shown on

23   the screen, a 2008 e-mail from Mr. Lee to Robert Crooks and

24   Kimm Korber of M&G Polymers.  And as you see in here, they

25   talk about the effect of the number of families who have

1    dropped coverage, and they talk about the incredible cost

2    savings to the company.

3         So, not only was M&G enjoying significant cost

4    savings from applying a cap that did not exist and charging

5    these high, exorbitant premiums, M&G realized an even

6    greater cost and future liability savings by the very fact

7    that so many of the retiree class have been permanently

8    removed, permanently divested from their benefits and from

9    the program.  When these retirees drop coverage, M&G no

10   longer books any liability for these retirees on its

11   balance sheet.

12        I would like to talk a little bit about the impact

13   that this has had on the class, Your Honor.

14        Class representative Freel Tackett, seated in the

15   jury box, suffered a repeat heart attack this past year.

16   He lives in constant fear that his heart may give out yet

17   again.  Not only are his medical benefits essential for

18   maintaining his own health, but his wife, Sharon, requires

19   health care to treat diabetes.

20        Woody Pyles, Woodrow Pyles, seated also -- there is

21   a photograph of him on the screen -- recently learned that

22   his wife may have a hole in her heart.  Her health care is

23   more important now than ever, and I learned last night that

24   Mr. Pyles and Mrs. Pyles have been married for 55 years.

25        Both Freel Tackett and Woody Pyles regret that

VOL I 20

 1    because of the financial strain caused by the demand of

 2    these health care premiums, they cannot enjoy their

 3    retirement, and much of their pension has been absorbed in

 4    maintaining their coverage.

 5         Class representative Harlan Conley is not present

 6    with us today.  He is at the doctor, follow-up to back

 7    surgery.  He was effectively forced to drop coverage

 8    through M&G due to the size of these premium contributions.

 9    He's managed to acquire health care elsewhere, but

10    following his back surgery last year, he's been unable to

11    return to any form of active life-style.

12         Let's look at a photograph of Mr. Clendenen.

13         In the motion to dismiss process presented to this

14    Court early in the case, we submitted a declaration of Tim

15    Clendenen.  He is pictured on the screen.  Mr. Clendenen

16    retired from M&G in 2004 after having worked 30 years at

17    the Point Pleasant Polyester Plant.  I say that slowly

18    because that's a tongue twister.

19         THE COURT:  Yeah.

20         MR. COOK:  During his long tenure at the plant, Tim

21    was a member of Local 644, which represented the hourly

22    employees and him.  When he retired, he began receiving

23    health care from M&G.  And, initially, he was not required

24    to make any monthly payments to receive the benefits.  In

25    fact, no one was.  M&G did not require benefit

1    contributions from the time that it assumes responsibility

2    for the plant and the retirees in the year 2000 until

3    January of 2007.

4         In December, 2006, M&G notified Tim that he and his

5    wife, Sandra, would be required, for the first time, to pay

6    monthly premiums to continue to receive health coverage

7    under the company's plan.  M&G advise Tim and his wife that

8    they would be required to make a monthly payment of $856.22

9    if they did not want their coverage terminated.  But, Your

10   Honor, Tim could not afford to make this monthly payment.

11   After all, his monthly pension benefit, before taxes, was

12   $1220.  This monthly premium would virtually deplete his

13   entire monthly pension check.  If they paid the monthly

14   premium, Tim and his wife would have been able to afford

15   few other bills.  As a result, Tim did not pay M&G, and the

16   company terminated his health coverage effective February

17   19th, 2007.

18        He and his wife have both had a significant series

19   of serious medical conditions since that they have

20   struggled on a daily basis to maintain the ability to pay

21   for and to receive treatment.

22        Last of the class, I want to mention a couple, Bob

23   and Iva Sisson.  When he retired in 1998 -- and this is

24   before M&G bought the plant -- Bob Sisson had been promised

25   that he and his wife, Iva, would have insurance coverage

1    for the rest of their lives.  In February of 2007, M&G

2    notified Bob and Iva that, in order to keep their health

3    care, they, too, would have to pay $856.22.

4        Bob's pension amounted to $875.21 a month.  Because

5    surviving on $18.99 a month was simply not possible, Bob

6    and Iva had to drop their coverage; and, like so many other

7    of the class members, they were forced out of the plan and

8    permanently divested of their benefits by M&G.

9        Just months later, September of 2007, Iva was

10   diagnosed with ovarian cancer.  She has been treated,

11   first, in Gallipolis, Ohio, and then on to the James Cancer

12   Center in Columbus.  Ultimately, she began receiving

13   injections that cost $5,000 a piece for which she had no

14   coverage.  No insurance and the bills mounting, the medical

15   bills quickly grew to in excess of $150,000.  They were

16   forced to file for bankruptcy, and they could no longer

17   continue treatment in Gallipolis and had to come for all of

18   their treatment to the James Cancer Center here in

19   Columbus, more than a two-hour drive away.  Their credit

20   has been destroyed, their savings have been depleted, and

21   they struggle to maintain their health, and continue to

22   fight the urge to give up to this unbearing stress.

23        So, let's talk about what the plaintiffs' legal case

24   is and what the facts are going to show, Your Honor.

25        A simple summary of the plaintiffs' case is as

 1    follows:  There is no cap on retiree health care benefits

 2    that existed at Point Pleasant.  We will show that no

 3    unbroken chain existed and that no cap letters were ever

 4    adopted or made a part of the agreements at Point Pleasant.

 5         If the company were able to prove -- and we say they

 6    cannot -- that a cap existed, it could not and would not be

 7    applicable to all retirees retroactively.  And if a cap

 8    ever were applicable, contributions could not be charged on

 9    a monthly basis in such amounts as to force retirees out of

10    the plan.

11         The retiree health care benefits, Your Honor, were

12    fully vested lifetime benefits with no contributions.  The

13    plaintiff class and the USW and its Local 644 will show

14    that, pursuant to the collective bargaining agreements and

15    related pension and insurance agreements in place at Point

16    Pleasant, these retirees vested lifetime health care

17    benefits with no contributions.

18         While defendants maintain that cap letters limit

19    their liability to pay retiree health costs, no cap letter

20    was in place prior to Letter 2003-6, which was adopted by

21    the union in an agreement signed August 9th, 2005.  And

22    under the terms of Letter 2003-6, for those to whom it

23    applied, no contributions could be required until after a

24    period of discussion with the union.

25         The cap letters that M&G seeks to rely on were never

1    published, never given to any of the members of the class,

2    and never became part of any of the collective bargaining

3    agreements between Local 644 and either Shell, the

4    predecessor to M&G, or M&G.  This is significant from a

5    legal perspective, Your Honor, because, on the ERISA side

6    of this case, ERISA requires that a participant in a plan

7    receive written notice of the events and circumstances

8    under which benefits can be terminated, modified, or

9    eliminated.

10        The Letter H cap letter that the defendants rely on

11   as claiming an unbroken chain of a right to cap benefits

12   was never distributed to or published to the members of

13   this class.  On the ERISA side of the equation alone, it's

14   a violation for the company to assert that they can now

15   both apply the cap and apply it retroactively to people who

16   didn't retire with it, in effect, and were never given

17   notice of it.

18        Letter H is on the screen.  And I know it's a little

19   bit small, Your Honor, but, if you see, right at the very

20   top -- is there a way to zoom this?

21        THE COURT:  Probably not on the Power Point.

22        MR. COOK:  Okay.  I didn't think so.

23        At the very top, Your Honor, you will see it says

24   "Not to be printed in booklet."  That's significant.

25        Plaintiffs will show that the company's consistent

```
 1    conduct in maintaining contribution-free retiree health

 2    care at all times prior to 2007 combined with M&G's

 3    bargaining history and the calculations of its own

 4    Financial Accounting Standard 106 liability for retiree

 5    health costs demonstrate that health benefits were vested

 6    for life at no cost to the retirees.

 7            Caps on retiree health care benefits were not agreed

 8    to until at least Letter of Understanding 2003-6.  And

 9    those caps can only apply to persons retiring following the

10    effective dates of the process set forth in the cap letter.

11    Company contribution limits cannot be applied retroactively

12    to persons who retire without them in effect and who had

13    vested in those benefits.

14            Caps on retiree benefits are the big issue.  And the

15    cap limits, Your Honor, are annual limits, and they

16    cannot -- if they apply in any event, whichever subclass

17    that's been certified here, they cannot be applied monthly

18    in such a manner as to force people permanently out of the

19    plan.

20            You, the Court -- I'll refer to you as the Court;

21    "you" sounds too impersonal -- stated that --

22            THE COURT:  It's better than what most people call

23    me.

24            MR. COOK:  I'm sorry?

25            THE COURT:  It's better than what most people call
```

1    me.

2         MR. COOK:  Especially when you're a union lawyer,

3    Your Honor.

4         The CBA, Collective Bargaining Agreement, creates

5    vested benefits.  This is beyond question.  That's from

6    your opinion and order on the motion for summary judgment.

7         The Sixth Circuit and this Court have found that the

8    retirees' health care benefits at issue were vested.  In

9    its recent ruling, this Court explained that the CBA's

10   linking eligible for health care benefits to pension

11   benefits indicate the parties' intent that the health care

12   benefits vested upon retirement.  And then the Court went

13   further and stated as is shown on the screen.

14        What benefits were vested?  What benefits were

15   vested for life?  The answer is, the benefits are lifetime,

16   with no contribution.

17        Collectively bargained health care benefits are

18   governed by a set of legal principles that are fairly well

19   known in the Sixth Circuit, Your Honor.  The contracts in

20   effect upon retirement govern the benefits of the retirees,

21   and health benefits vested upon retirement cannot be

22   reduced by a later contract.

23        The Sixth Circuit decisions of Yolton vs. El Paso

24   Tennessee Pipeline and Maurer vs. Joy Technologies

25   establish that retiree rights are determined by the

```
 1    contract in effect at the time of retirement.  The Sixth

 2    Circuit determined in Yard-Man that the right of prior

 3    retirees to vested health care benefits cannot, as a matter

 4    of law, be diminished by a later contract entered into

 5    after they retire.

 6         The language and context of the promises of retiree

 7    health care benefits tied to retiree status and pension

 8    entitlement indicate lifetime coverage.  It is well

 9    established in the Sixth Circuit that tying retiree status

10    to pension benefits which are vested lifetime benefits to

11    health benefits reflects the intent to create vested

12    retiree lifetime benefits.

13         A long line of Sixth Circuit cases have established

14    that if the contract analysis does not resolve ambiguities

15    when looking at this issue, the court may consider

16    extrinsic evidence of the contracting parties' intent.

17         FAS cap letters or side cap letters may not alter

18    promises of vested benefits.  The existence of a FAS 106

19    cap letter which states that the company contributions will

20    be limited at some future date beyond the expiration date

21    of the contract does not trump the substantive vested

22    retiree benefit rights of those employees who retire under

23    the existing contract.

24         Yolton vs. El Paso Tennessee Pipeline held this.

25    And the initial decision in Reese vs. CNH America
```

1    determined that cap letters do not defeat claims for vested

2    retiree health insurance benefits.  The district court in

3    the initial decision in Reese, Your Honor, specifically

4    addressed that question.

5        If any cap had existed at Point Pleasant under

6    Goodyear, which originally owned this plant -- and it did

7    not -- that cap letter never transferred to Shell in 1992,

8    and plaintiffs will show that during the course of this

9    trial.

10        Shell, which owned the Apple Grove plant in Point

11    Pleasant from 1992 until 2000, knew and understood that the

12    obligation to retirees was to provide lifetime,

13    contribution- free retirement benefits.

14        Purchase documents demonstrate that cap letters did

15    not transfer from Shell to the next owner, M&G.  And this

16    is Joint Exhibit 15.  It's a page from the Shell purchase

17    agreement in 1992, and you can see here that Shell agreed

18    to provide benefits that are comparable to those provided

19    by Goodyear.

20        What we'll show during the course of this trial is

21    that the Point Pleasant Polyester Plant was a plant called

22    "me too with exceptions."  Goodyear and the United Rubber

23    Workers at the time engaged in what was called pattern

24    bargaining, where they would negotiate a Master Collective

25    Bargaining Agreement for a specific set of plants and local

1    unions, and that would be adopted by other rubber companies

2    and applied to their plants and their local unions.

3        Each of these rubber companies had a set of

4    facilities that were not making tires, but perhaps

5    components for tires, chemicals related to tires, or parts

6    and accessories that also related to the chemicals, the

7    processes, or some aspect of the automotive business.

8    Goodyear had such a plant.  It was in Apple Grove, West

9    Virginia, and that plant was what we call "me too with

10    exceptions."

11        The plants that were not part of the master

12    bargaining, Your Honor, could accept the master agreement

13    in toto, or they could adopt the overall concept of the

14    Collective Bargaining Agreement which governed the in-plant

15    working conditions, or/and they could adopt the Pension,

16    Insurance and Services Agreement which governed their

17    benefits.  They could also adopt the overall structure but

18    take exceptions to certain parts of those agreements.  And

19    that's what the Apple Grove facility did.  They were "me

20    too with exceptions."

21        Shell, when it was operating the facility,

22    established new pension and welfare plans, a complete break

23    from the benefits provided by Goodyear.  And it disavowed

24    all associations with Goodyear benefits.  The pension and

25    insurance booklet that was in place at Point Pleasant in

 1    this time was the complete P&I agreement.  This is the

 2    document that was in 1991.

 3        Plaintiffs will demonstrate that when questions

 4    arose as to the retirees' medical benefits this document

 5    and the successor adopted by Shell and ultimately by M&G

 6    became the sole point of reference.  That's critical,

 7    factually, to this case, Your Honor, because this does not

 8    contain Letter H.

 9        If you recall, Your Honor, Letter H is not to be

10    printed.  M&G purchased the Point Pleasant plant with

11    knowledge that full, company-funded, lifetime health

12    benefits were contractually required for retirees at no

13    cost.  As we noted a moment ago, the facts are going to

14    show, our witnesses will prove, that from 2000 to 2007 no

15    contributions were required.

16        The contractual documents assumed by M&G did not

17    include any cap or limit on retirees' benefits.  The

18    exhibit on the screen now, Joint Exhibit 7, is a document

19    from the purchase of the Point Pleasant plant by M&G in

20    2000.  It's a completion document.  The agreement for M&G's

21    acquisition of the plant evidences that M&G agreed to honor

22    the contract in place at Point Pleasant at the time of

23    purchase.  Among the documents are a human resources

24    agreement -- that's a document that's found at Bates No.

25    MGTackett 007165 -- and, importantly, a document called

```
 1      Schedule 2-B.

 2              We'd ask the Court, as this comes up in the trial,

 3      to pay careful attention to this document.  Schedule 2-B is

 4      a document where Shell transfers its collective bargaining

 5      agreements to M&G.  And in that schedule, it lists

 6      everything that's being transferred by Shell and accepted

 7      by M&G.  Nowhere in this document is Letter H listed.

 8      Under the doctrine of expressio unius est exclusio

 9      alterius, which I learned in law school 35 years ago, --

10              THE COURT:  And you never thought you'd have a

11      chance to use it again.

12              MR. COOK:  Never.  It's the first time in 35 years

13      I've said that in court.

14              -- it's clear that if you exclude something from a

15      list, you don't intend to include it.  And this purchase

16      agreement shows it wasn't part of the deal.

17              The application of the concept here demonstrates

18      that, by listing the specific letter agreements in Schedule

19      2-B, Letter H and any form of cap letters were specifically

20      excluded from transferring to M&G.  In fact, Your Honor,

21      M&G's own due diligence produced no evidence of cap

22      letters.

23              A court may rely on evidence of an employer's own

24      due diligence in purchasing a plant, including review by

25      the employer's own attorneys in assessing the intent of the
```

1      parties regarding retiree health benefits.

2            And there is a case called Bender versus Newell

3      Window Furnishings.  That's on the screen in this slide.

4            E-mails between M&G's HR Director, Mr. Kimm Korber,

5      present today, and his boss, a gentleman who worked in

6      Italy named Marco Toselli, show that, following due

7      diligence, no cap letters were produced.  And that's

8      Plaintiffs' Exhibit No. 183.

9            M&G was never party to a Point Pleasant contract

10     which included a letter incorporating Goodyear's P&I

11     agreements and Goodyear's cap letters.

12           The 1991 Letter A, which you're going to hear more

13     about during the course of the trial, Your Honor, applied

14     only for its terms and is ambiguous as to what was

15     incorporated from the 1991 Goodyear Master Agreement and

16     the covering letters that are mentioned in it.

17           In 1994, Shell, in its Point Pleasant contract, does

18     not incorporate the Goodyear P&I agreement.  It was

19     separate from Goodyear, and M&G understood that when it

20     later purchased the plant.

21           In 1997, the Shell Point Pleasant contract does not

22     incorporate the Goodyear P&I agreement.  It entered into

23     its own P&I agreement specifically applicable to the Apple

24     Grove plant.

25           The 2000 M&G Apple Grove agreement does not

1    incorporate a Goodyear P&I agreement.  Nowhere, will you

2    find that.

3         Additionally, the 2000 Letter A from the Goodyear

4    P&I agreement only addresses pensions, and it makes no

5    reference to medical insurance.

6         The extrinsic evidence will resolve an ambiguity in

7    plaintiffs' favor.  There was no unbroken chain of cap

8    letters.  Before 2003, the testimony is going to show that

9    M&G knew and understood that no cap letters applied to

10   Point Pleasant.  Retirees were entitled to lifetime health

11   benefits at no contribution because that's the way they

12   paid the benefits.  They operated with no cap letter in

13   place, and they first claimed that it was a strategic cost

14   saving matter in 2003 and 2004.

15        This Court acknowledged that plaintiffs had

16   presented in the summary judgment process compelling

17   evidence for after-the-fact company scrambling to find a

18   way to impose the application of cap letters as an

19   unethical cost savings measure that defies agreements the

20   caps would now puncture.  And that's what the evidence is

21   going to show.  Some of that is by designation in the

22   testimony of Actuary Duane Lee.  The rest will come out

23   during the course of the testimony.

24        This Court went on to say that if the cap letters

25   did not apply and defendants are conflating agreements, the

```
 1    Court is left with contract language that would present a

 2    lifetime benefit scheme for qualifying retirees and

 3    beneficiaries without cost sharing.  And that's what the

 4    evidence will show.

 5         Conflation, as used in this trial, is the process by

 6    which M&G attempts to associate itself with caps in effect

 7    under Goodyear master agreements.  But the evidence will

 8    show -- in fact, the evidence in the record before the

 9    Court on summary judgment shows -- that Goodyear and M&G

10    were never the same, and the Goodyear agreements were never

11    adopted by or applied to M&G's employees or retirees.

12         Plaintiffs will show evidence that M&G was

13    scrambling backwards to effect a cost savings cap letter

14    never agreed to.  And, to date, no cap letter prior to

15    Letter of Understanding LOU 2003-6 has ever been found to

16    exist where both the local union and the company are

17    signatories.

18         During 2000 bargaining, you're going to hear

19    evidence from several people, Your Honor, M&G specifically

20    denied, specifically denied, the existence of a cap letter.

21    Steelworker Representative Randy Moore will testify that

22    during 2000 negotiations M&G unequivocally established

23    Letter H was not a part of the agreement at issue.  And

24    David Dick, who will either testify for the defendants or

25    through deposition, will also testify that Letter H was not
```

1    in the agreement.  As a matter of fact, Exhibit 35, Joint

2    Exhibit 35 on the screen, is a specific written response to

3    the union's October 11th inquiry concerning the P&I

4    agreement.

5           And the second paragraph is instructive and, we

6    believe, virtually conclusive, Your Honor.  The

7    applicability of Letter H (FASB language?) to the P&I

8    agreement and to M&G is less than clear.  In fact, the

9    company believes it does not apply to M&G (or Shell

10   previously).  Retiree health benefit contributions are set

11   out on page 115 of our P&I agreement.   Letter H is not in

12   our agreement.

13          This was given by David Dick, chief spokesman/

14   official representative of M&G, to Mr. Randy Moore on Mr.

15   Moore's request for what was the status of Letter H in the

16   year 2000.

17          Letter H is not in our agreement.  The Letter H that

18   M&G would seek to apply is a 2001 Letter H adopted between

19   Goodyear and the United Steelworkers in January, 2001.  We

20   don't know how in this trial M&G is going to present

21   evidence that a later executed agreement between two

22   parties not sitting at the table in Point Pleasant could

23   somehow apply to the retirees of this plant who went out

24   the door in 1995.  We're waiting to see that evidence, and

25   we believe that this trial won't show any.

 1          M&G continued to operate under the fact that no cap

 2     letter applied until it began to consider caps as a cost

 3     savings measure in spite of the collectively bargained

 4     obligations.

 5          Plaintiffs' Exhibit 118 is a memorandum from Mr.

 6     Kimm Korber.  It says that projecting future benefit costs

 7     requires a number of factors be considered.  And it goes on

 8     to talk about ways for M&G to control retiree health care

 9     costs.

10          Your Honor, noticeably absent from this exhibit is

11     any mention of FAS caps, Letter H, or the right to limit

12     payments for retiree health coverage or require

13     contributions.

14          And the next series of slides go through how M&G, at

15     this time, at the time Exhibit 118 was presented,

16     envisioned the process of achieving cost savings in

17     retirees' health care.  And it did not include cap letters

18     or require premium contributions.

19          In the 2003 negotiations, the evidence will show

20     union negotiators again questioned the existence of any cap

21     letter.  And M&G again expressed no knowledge of such a cap

22     letter.  This lack of knowledge demonstrates that there was

23     certainly no unbroken chain of letters in place as M&G now

24     asserts.

25          Following the failed negotiations in 2003, M&G

1    crafted new strategies to eliminate vested retiree

2    benefits, scrambled backwards to wrongfully implement

3    cost-saving cuts to the health care program.

4         The 2003 negotiations ended in impasse.  And in

5    April of 2004, M&G Polymers unilaterally imposed terms and

6    conditions.  Among the unilateral terms imposed was Letter

7    2003-6.

8         Now, as the case law of this circuit shows, to

9    change a vested retiree benefit, health care benefit, at a

10    minimum, you have to have the agreement of the retirees.

11    In this instance, Your Honor, the evidence will show that

12    M&G couldn't even get the agreement of the union.  They

13    unilaterally imposed it.  It wasn't until August the 9th,

14    2005, that that letter, 2003-6, was executed and put in

15    place; and the letter itself, 2003-6, required a process of

16    discussion and evolution before any changes to the retiree

17    health care program could be implemented.

18         You will hear testimony from the steelworker

19    negotiator, Karen Shipley, concerning that impasse, Your

20    Honor.

21         Let's look at Plaintiffs' Exhibit 183.

22         When M&G began searching for a way to reduce its

23    retirees' health cost in 2004, it's own counsel warned M&G

24    that they did not have a unilateral right to change the

25    retiree plan designs and to do so would very likely create

1    expensive, protracted and tedious litigation.

2         Plaintiffs' Exhibit 196 shows that M&G knew that

3    there was no cap letter in place at Point Pleasant.

4    Otherwise, the cap would have merely been implemented, and

5    there was nothing to negotiate.

6         In February of 2005, M&G's attorney was working,

7    quote, to determine the date from which we could reasonably

8    assume Letter H was effective.  That doesn't show an

9    unbroken chain of cap letters.

10        The first cap letter applicable to Point Pleasant

11   was unilaterally implemented in 2004.  And until that time,

12   no cap letter had existed.  M&G's own actuarial and

13   accounting records demonstrate that M&G knew and understood

14   the requirements of lifetime health care benefits.  The

15   belated decision to claim that cap letters applied to the

16   Apple Grove retirees was made by executives, actuaries and

17   lawyers searching for ways to reduce M&G's accounting

18   liabilities.  The decision was not based on the agreement

19   or the intent of the parties.

20        The evidence will show that Actuary Duane Lee, of

21   Buck Consultants, who was charged with the requirement of

22   calculating M&G's FAS 106 liability, he calculated it

23   according to information provided to him by M&G; and at all

24   times prior to 2004, he calculated lifetime

25   contribution-free benefits.

1            Understand that under Sarbanes-Oxley, Your Honor,

2       these documents have to be signed off on by corporate

3       personnel in attesting to their truth.  So, for a period

4       2000 to 2004 and up to 2005, M&G was reporting to the

5       United States Government that these were lifetime benefits

6       with no contribution, and that's what their actuary said,

7       because he got the information directly from the company.

8            Joint Exhibit 7, which is a Shell document received

9       by the actuary when he assumed responsibility in the year

10      2000-2001 for calculating these liabilities, shows exactly

11      what the coverage was and what the contributions were.

12      Coverage:  Lifetime for retirees and spouses.  Down towards

13      the bottom, next line to the bottom:  Retiree

14      contributions, none.

15           Where is Letter H?  Where is the unbroken chain?

16      There is no unbroken chain.

17           Sixth Circuit authority regarding cap letters

18      supports a finding here that no caps were in place at Point

19      Pleasant.

20           I've got too many P's in this presentation.

21           The Sixth Circuit considered cap letters in Wood vs.

22      Detroit Diesel.  Detroit Diesel involved clearly agreed to

23      and executed cap letters.  Here, there is no such evidence.

24      Detroit Diesel demonstrated what does happen when a valid

25      cap letter is in place.  The company calculates the

1    limitation and its FAS 106 liability, and, quote, the

2    company substantially reduced the financial liability it

3    reported under FAS 106 on the basis of the cap agreements.

4        If those agreements had no binding effect, then this

5    was plainly deceptive accounting.  As explained above, no

6    creative reading of FAS 106's presumption rules could allow

7    the company to report capped future liabilities if retirees

8    were entitled to vested uncapped benefits.

9        Apply that principle here, Your Honor.  Plaintiffs

10    will show that Shell and M&G calculated fully paid lifetime

11    health benefits at no cost to the retirees in their FAS

12    accounting liability reports.  M&G made clear that FAS 106

13    reports as they reported them were fully paid lifetime

14    retiree health care benefits with no contribution under the

15    relevant contracts.

16        Now, Your Honor, I'm trying to be a good lawyer.  I

17    understand that the other side hasn't spoken yet and

18    they're going to tell you what their evidence is.  We do

19    not believe there will be any evidence of an unbroken

20    chain; but if this Court were to find the applicability of

21    cap letters to any of the subclasses before the Court

22    today, it's important to understand how those letters and

23    the benefits apply.

24        In the Sixth Circuit decision, and then again

25    addressed in your decision on summary judgment, the

1    question came up, under the Pension, Insurance and Services

2    Agreement, who could be required to pay a contribution:

3    those with 95 points who were to receive the full

4    contribution, or those with less than 95 points?

5         The evidence we will present will show that, if any

6    cap letter were to apply -- and it does not, but if it

7    were -- that contributions may only be required for those

8    persons who retired with less than 95 points.

9         The full company contribution language suggests that

10   the parties intended the employer to cover the full cost of

11   health care for those employees meeting the age and term of

12   service requirements.  The CBA has no limitation on the

13   amount of a company contributions --

14        THE COURT:  Slow down.

15        MR. COOK:  -- and if the defendants' argument were

16   accepted, the company presumably could lower the

17   contribution to zero without violating this language, and

18   such a promise would be illusory.

19        We believe that the way M&G Polymers, as the

20   evidence will show you, has applied any form of cap has

21   rendered the concept of a lifetime benefit illusory,

22   because they've done it so to divest people of a vested

23   benefit.

24        And finally, Your Honor, we come to the issue of

25   what can a union do to change or negotiate changes to

1    vested lifetime health benefits for retirees.  And the

2    answer is, in the Sixth Circuit, not much, if anything, and

3    never without their agreement.

4         Retiree benefits are a matter of permissive

5    bargaining.  Cleveland Electric Illuminating vs. Utility

6    Workers Union:  Only with retirees' permission may a union

7    and a company bargain those benefits.  Once the retiree

8    benefits are vested, retirees have contract rights under

9    the contract that may not be altered without their consent.

10        How can a cap letter not distributed to these

11   retirees when they were employees or to them when they

12   retired be, years later, used to reduce or eliminate their

13   benefits when they were never negotiated with the retirees?

14   And under Pittsburgh Plate Glass, that's not proper.

15   Indeed, it's illegal.

16        Sixth Circuit case law is outlined for you on the

17   screen, Your Honor.  We've provided the Court with a copy

18   of this presentation.

19        The bottom line is there simply is no exception to

20   the consent requirement regarding the permissive nature of

21   retiree benefits.  If a union wishes to arbitrate,

22   negotiate, or otherwise represent retiree interests related

23   to health care benefits, the union must obtain permission

24   from the retirees to do so.  M&G cannot prove that the

25   consent of the retirees was ever obtained in this case for

1     those persons who retired before the effective dates of

2     Letter 2003-6.

3          The rationale behind the requirement that a union

4     must gain retiree consent before representing retirees is

5     twofold:  to protect the retirees and to protect the

6     employer company.

7          As the Sixth Circuit reads in Cleveland Electric, if

8     the consent of retirees is not required before a union

9     arbitrates or negotiates on their behalf, those retirees

10    could unfairly lose their contractual rights and ERISA

11    rights and -- excuse me -- they could lose their

12    contractual rights, and ERISA rights as to their potential

13    claims against the company would disappear as well.

14    Similarly, the company is protected by requiring retirees'

15    consent, because, without that consent, an employer could

16    be bombarded with numerous individual retiree claims that

17    would not be subject to res judicata.  And that's a key

18    holding of Cleveland Electric.

19         Because the Steelworkers and Local 644 did not have

20    the authority to bargain on behalf of the retirees, Cap

21    Letter LOU 2003-6 cannot be retroactively applied to those

22    who retired prior to its effective date.

23         The Sixth Circuit previously addressed this in

24    Tackett.  Courts reviewing a collective bargaining

25    agreement must also keep in mind the context of labor

1    management negotiations on retiree health care benefits,

2    because retirement health benefits are not mandatory or

3    required to be included in an agreement.  And because they

4    are typically understood as a form of delayed compensation

5    or reward for past services, it is unlikely that they would

6    be left to the contingencies of future negotiations.  And

7    that quote is from Yolton vs. El Paso Tennessee Pipeline

8    Company.

9         The use of the word "mandatory" in an unprinted

10   letter never distributed alleged to apply to the Point

11   Pleasant retirees in no way manifests the retirees' consent

12   to have their vested retiree benefits bargained away.  And,

13   thus, the caps on retiree contributions cannot be

14   retroactively applied to them.

15        LOU 2003-6 is not a lawful basis for the imposition

16   of caps on past retirees.  As a matter of law, it cannot be

17   retroactively applied to affect those who retired before

18   the letter was in effect.  Factually, the language and

19   intent of LOU 2003-6 do not support an unlawful retroactive

20   application as the witnesses will testify.

21        And, finally, Your Honor, we talk about the method

22   that M&G has effected to divest these retirees of vested

23   benefits.  If any cap were applicable -- and we keep saying

24   it's not, but if it were and contributions could be

25   required, M&G's method of requiring and calculating

1    contributions requiring upfront payments do not comport

2    with the plain letter language of Letter H.

3         They have implemented the cap letters on retiree

4    health care in what can only be considered an

5    unconscionable manner.  For example, nowhere in Letter H do

6    you see anything that says they can apply a monthly amount,

7    require that payment, and, if you don't make it, you're out

8    permanently from the plan.  Even under the best reading in

9    favor of the company, you don't see that.

10        We think it's significant, Your Honor, that

11   divestment of these benefits for the retiree class is

12   permanent.  They can't get back in.  The only way they will

13   be allowed to return to the plan is if and when this Court

14   finds in plaintiffs' favor and orders that these caps be

15   removed, that the plaintiffs be made whole, and that all

16   those forced from the plan be returned.

17        We'll go more into the remedies sought in this case

18   as the case proceeds.  As we've noted, the Court granted a

19   motion for bifurcation.  In this case, we'll not deal with

20   the issue of damages.

21        Thank you for your time and for your attention this

22   morning, Your Honor.

23        THE COURT:  Thank you, Mr. Cook.

24        Mr. Miscimarra -- marra or mara?

25        MR. MISCIMARRA:  Miscimarra.

1          THE COURT:  I wasn't even close.

2          Mr. Miscimarra, then you may proceed with your

3     opening statement.

4          MR. MISCIMARRA:  Thank you, Your Honor.

5                         -  -  -

6          DEFENDANTS' OPENING STATEMENT

7                         -  -  -

8          MR. MISCIMARRA:  And, Your Honor, you've already

9     been introduced to me and to my co-counsel and to Mr.

10    Korber, although they are all important participants in the

11    trial today.

12         You know, there are some things, not many, but some

13    things mentioned by Mr. Cook in his opening that we can

14    agree with.  Medical benefits are important for retirees.

15    They're important for active employees.

16         There will be a great deal of evidence in this trial

17    about the costs associated with medical benefits, but the

18    evidence will also show this is not a case that totally

19    centers around who pays what costs.  Much of the focus of

20    M&G Polymers in addressing these issues has been to attempt

21    to improve the manner in which benefits are made available

22    to participants, including retirees.

23         The evidence will show the structure of these

24    medical benefit programs.  Putting aside costs and

25    contributions, the structure is a very important component,

1 as most people recognize now, both the quality of the

2 benefits provided and driving many of the costs.  And the

3 evidence will reveal that M&G, at just about every

4 juncture, addressed these benefit issues and tried to focus

5 not just on grabbing costs or grabbing contributions, but

6 M&G had a contractual relationship with this union, the

7 United Steelworkers.  It's an important union.  It's a

8 powerful union.  It's a union that has many resources.

9 It's a union whose members, when they were active

10 employees, vested their rights and benefits for the union

11 to make decisions.

12   And what the evidence will show here is that M&G's

13 efforts to propose changes -- M&G proposed benefit

14 reductions that the union rejected.  And M&G, the evidence

15 will show, was left with a contract that was entered into

16 with this union, and the union said "no" to every

17 reasonable alternative proposal that could have benefited

18 everybody in this room.

19   The union made a choice.  And you heard Mr. Cook

20 articulate the plaintiffs' position.  The union's choice

21 was to resist and reject every reasonable alternative in

22 favor of a position that these retirees have a vested

23 lifetime right to medical benefits without making any

24 contributions in any amount, ever.

25   So, that's the bet that the union party who Mr. Cook

```
 1    represents has made in this case.  And just about

 2    everything that Mr. Cook has complained about in his

 3    opening consisted of something that his client, the United

 4    Steelworkers, has agreed to and has put into a contract.

 5    These letters not being distributed, well, that's something

 6    that was agreed to by the United Steelworkers.  The fact

 7    that these letters have a methodology for how benefits and

 8    contributions are calculated, that's something that is done

 9    pursuant to an agreement that his client, the United

10    Steelworkers, has entered into.

11          One other thing in connection with this case -- and

12    I will just, as one example, mention Mr. Cook made

13    reference to what he said was a mistake by M&G in the

14    calculation of benefits.  What the evidence will show is,

15    there is a methodology -- and we will show you the letter

16    in the course of my opening -- on how these benefits and

17    how these costs and how these contributions are calculated.

18          And in four or five months of discussions that took

19    place between M&G and the union, this methodology was put

20    in front of the union.  And pursuant to the contract that

21    the union was party to, signed by 11 union representatives,

22    including the international president, Leo Gerard, pursuant

23    to that agreement there is a methodology that M&G has not

24    had the ability to deviate from because Mr. Cook's client,

25    the United Steelworkers, has rejected every alternative
```

1    proposal presented by M&G that would have resulted in lower

2    contributions for Mr. Cook's other clients, the retirees.

3        Now, with the Court's permission, we do have a

4    demonstrative aid that we would like to show in the course

5    of my opening.  And I will put it up on the screen in front

6    of everybody in the courtroom.

7        And, you know, I will note that many of the facts

8    Mr. Cook has gone through really are not in dispute.  The

9    time frame relevant to this case, if you look at the chart

10   that's up in front of you, really starts from 1991 to 2007.

11       And on the chart that Your Honor can see, we can see

12   that Goodyear owned the facility up through 1992.  There

13   was a transaction where Shell acquired the facility

14   beginning in late 1992.  And then the conveyance to M&G, or

15   M&G's acquisition, occurred in 2000.

16       We also have subclasses.  And you can see the

17   subclass commencement dates for various subclasses also

18   shown in the chart.  And just so you understand one other

19   aspect of this chart, there are certain years that are in

20   yellow, and those are years in which the prevailing

21   contract for Goodyear and/or Shell and/or M&G was up for

22   renegotiation, and there were contract negotiations.

23       The class members, all of them, retired from M&G's

24   polymer production facility located in Apple Grove, West

25   Virginia.  And throughout the entire period, the active

1    employees and retirees were represented first by the United

2    Rubber Workers; and then the United Rubber Workers, in

3    1995, became part of the United Steelworkers.

4         Mr. Cook's opening statement leaves no doubt about

5    what the plaintiffs claim in this case.  And the

6    plaintiffs' theory is not only that they are vested

7    benefits, but in terms of what the Court has characterized

8    as what vested, it's a claimed right which is a lifetime

9    guarantee that plan participants will make no contributions

10   ever in any amount.

11        Now, we would suggest, when looking at the evidence

12   in this case, Your Honor, there are three questions that

13   provide a framework that we believe can assist the Court in

14   trying to assess whether this extraordinary guarantee was

15   actually mutually understood and agreed upon by some

16   employer and the Rubber Workers or the Steelworkers.  And

17   here is the framework that we suggest:

18        1.  Where is such an agreement expressed, and what

19   does the agreement say?

20        2.  Precisely when was this type of extraordinary

21   commitment mutually agreed upon?

22        3.  Is the parties' conduct consistent with the

23   notion that retirees have been given, by mutual agreement,

24   a vested guarantee they will never pay contributions in any

25   amount at any time?

```
 1            Now, we would suggest that there is one thing that
 2    the plaintiffs should agree that is part of our opening
 3    statement.  And this is consistent with the cases.  The
 4    plaintiffs bear the burden of proof in this type of a case.
 5    Much of what Mr. Cook described in his opening about unions
 6    can't negotiate on behalf of retirees, unions can't engage
 7    in permissive bargaining without the consent of retirees,
 8    that is, flat out, 180 degrees opposite of what the law
 9    says.
10            In fact, when you have existing retiree benefits in
11    a case where the issue for the court to decide is whether
12    these benefits are vested or whether there is a vested
13    right to contribution-free benefits, Mr. Cook begs the
14    question because, if there is no vesting, then retiree
15    benefits for existing retirees are a completely
16    permissible -- it's a non-mandatory but a completely
17    permissible subject of bargaining.
18            The one other thing we would submit is, if the
19    evidence fails to establish that the plaintiffs have proven
20    the existence of a vested lifetime guarantee, no retiree
21    contributions ever in any amount, well, then you find
22    yourself at a different place on our chart.  And it's a
23    place where most retirees and where most employers find
24    themselves.  And it's where there are no guarantees for
25    anyone.  Retirees, in most cases, don't have vested
```

1    protection from making future contributions.  The Court can

2    take judicial notice that health benefit contributions are

3    hardly revolutionary in today's climate.  And in this

4    no-guarantee space, employers don't have any cap, any

5    prospective protection, against future increases in retiree

6    medical costs.

7         Now, we believe that, in this case, the evidence

8    will show, for the past 20 years, the Apple Grove facility

9    and all of these retirees have been moving in completely

10   the opposite direction of giving retirees lifetime

11   protection from making benefit contributions.  And the

12   preoccupation for the Apple Grove facility throughout the

13   last 20 years, especially from the period that's relevant

14   in this case, 1991 through the beginning of 2007, the focus

15   has been on employer protection.

16        These cap agreements have as their focus the

17   protection of employers.  And the specific protection --

18   you can see in this bottom space on our chart -- is the

19   employer protection afforded by these cap letters is that

20   the employers' costs will not exceed particular cap levels.

21        And one of the things that's important for the Court

22   to understand in how these agreements worked -- and I'll

23   show you the principal agreement that we believe is very

24   important in this case -- is, for many, many years, the

25   costs of employers were below these cap levels.  So, this

 1   commitment existed, these agreements existed, but when the

 2   costs were below the cap levels, there weren't going to be

 3   contributions paid.  And, of course, as Your Honor knows

 4   from the summary judgment briefing, these letters also had

 5   a deferred contribution commencement date, which also

 6   affected when contributions could commence.

 7        Now, with the Court's permission -- by the way, I've

 8   summarized the 1991 caps agreement which provided

 9   employers' costs are capped.  This is in the box on the

10   left.  Retirees were responsible for paying above capped

11   costs.  There was a deferred contribution commencement

12   date.

13        Ron Hoover, who is one of the Steelworker,

14   originally Rubber Worker, International representatives who

15   played a significant role in agreeing to this arrangement,

16   he refers to the contribution commencement date as the bite

17   date.

18        And there is a real awareness that these letters had

19   meaning.  And the union, because of that awareness, went to

20   great lengths to structure these agreements in a way where

21   the parties could have bargaining initially about them,

22   have bargaining again prior to the time that retiree

23   contributions would commence.  And the other thing about

24   these agreements that's significant, there is no expiration

25   date.

1          And with respect to the 1991 agreement, there is

2     something else that's very significant and we believe can't

3     reasonably be disputed by anybody.

4          In 1991, you can see that the Apple Grove facility

5     was owned by Goodyear Tire and Rubber Company.  Also, in

6     1991, Goodyear, we know, was party to a retiree medical

7     caps agreement which made retirees responsible for all

8     above-cap contributions.  And the caps agreement had other

9     provisions that were identified in the box.  But what was

10    conspicuously absent from the agreement is any expiration

11    date.

12         In using the reasoning that's utilized in many of

13    the retiree medical benefit cases that talk about vesting

14    or agreements of indefinite duration, you can see from this

15    agreement that protects employers and applies to retirees

16    many of the agreements' provisions, by design, were

17    intended to have application for a period after the

18    expiration of the contract containing the agreement.  These

19    agreements, on their four corners, are signed by company

20    and union representatives.  And there is no expiration date

21    in the 1991 caps agreement.

22         And what I would like to do, Your Honor, is very

23    quickly go to the actual agreement.  You can see the

24    language and the way this agreement actually functions.

25         If we take a look -- and this is Joint Exhibit 14,

1      Your Honor.  And, you know, I'll direct you to the first

2      paragraph, and we'll take these quickly, one paragraph at a

3      time.

4           If you take a look at the first paragraph, Paragraph

5      1 states that the company's costs will be limited to the

6      cap amounts.  And it says:  "For every employee who retires

7      on or after May 1st, 1991."

8           Just taking the 1991 cap agreement alone, Goodyear

9      owned the facility in 1991.  This agreement does not have

10     an expiration date.  This agreement says that anyone who

11     retires on or after May 1st, 1991, is responsible for

12     making contributions.  That description applies to every

13     single member of the retiree class in this case, every

14     single retiree class member, every single retiree subclass

15     member retired on or after May 1st, 1991.

16          So, we're in an area here where there is not any

17     discussion of lifetime vested benefits for retirees.  This

18     is an indefinite benefit for the employer which imposes a

19     contribution on every class member that is at issue in this

20     case.  And you can see it looking at this document that's

21     in front of you.  And the document was not only signed by

22     Mr. Cook's client, the United Steelworkers; the document

23     was signed by Goodyear, which at the time owned the Apple

24     Grove facility, which was where the retiree class members

25     worked as active employees.  Every single one of the

1    retiree class members retired after the time that this

2    agreement was entered into.

3         Now, if we go to the next paragraph, the next

4    paragraph talks in terms of the methodology for how the

5    costs will be calculated, and it actually imposes an

6    affirmative obligation on retirees to pay for above-cap

7    costs.

8         If we look at the third paragraph, the third

9    paragraph, this is what talks about the deferred retiree

10   contribution commencement date.  And this was contained in

11   a 1991 contract, but you can see that the retiree

12   contribution commencement date is established as July 1st,

13   1997.

14        If we end up taking a look at Paragraph 4, Your

15   Honor, this is where the methodology comes into play.  To

16   the extent that an employer is constrained by the

17   inflexibility of the other party to the agreement to apply

18   this agreement the way it's written, it says that the

19   average annual cost of health care benefits for each group

20   shall be determined by taking the total annual health care

21   payments made by the company for each group separately.

22   You take the total payments made by the company, and you

23   divide that amount by the number of retired employees,

24   including surviving spouses in such group, as of January of

25   each year.

1          Now, what M&G did, because it had no choice in this

2    case, is, it was party to this agreement and successive

3    agreements.

4          By the way, each successive agreement has on the

5    face of the agreement a notation under the signature line

6    to the left to this very agreement in 1991.  So, to the

7    extent that any employer was party to the subsequent

8    agreements, it certainly was no surprise to anyone that

9    there was an agreement that started in 1991, because it's

10   stated right on the agreement itself.

11         Now, the two other things about this methodology the

12   evidence will show that's important is, number one, these

13   costs have to be, and the numbers of participants have to

14   be, calculated as of January 1 of each year.

15         Now, because of the mechanics associated with

16   submitting health care claims, the total costs for the

17   preceding calendar year are not available on January 1.

18   So, what M&G discussed in the 14 meetings that took place

19   in 2006 with the Steelworkers is, the methodology that was

20   never the subject of dispute was that there would be a

21   12-month period, mid year to mid year, that would end up

22   being the basis for calculating contribution levels, and

23   there would be a true-up later in the year.

24         And I only mention this and take the time in an

25   opening to mention it because Mr. Cook referred to this as

1           a mistake.  This isn't a mistake.  This is something that

2           was bargained with his client, the United Steelworkers.

3           And it wasn't the subject of any dispute until this lawsuit

4           was filed, and then Mr. Cook started doing his job in

5           representing his clients.  But we're not talking here about

6           mistakes.  We're talking about issues that are contractual

7           as they apply to one of our clients, which is M&G Polymers.

8                   The one other thing about Paragraph 4, Your Honor,

9           is, I know that the Court has spent a great deal of time

10          talking about 95 points, people with 95 points

11          arrangements.  Look at what happens in this methodology in

12          terms of the equitable allocation of costs and

13          contributions.  There is no exclusion here for 95-point

14          retirees.

15                  So, how does this work?  If you take the 95-point

16          language and give it an analysis that we believe is

17          inappropriate and you say that 95-point retirees have a

18          lifetime vested right to vest in retiree benefits but then

19          you look at a cap agreement that's in the same agreement,

20          there is no exclusion for 95-point people.

21                  So, how does this work?  They're factored into the

22          costs, but then -- and there is no exclusion, by the way,

23          in the paragraph that deals with who pays the

24          contributions.

25                  If you take the interpretation that Mr. Cook would

1     ascribe to the 95-point provision in the pension and

2     insurance agreement which came into existence in 1994, it

3     renders absurd -- it actually does violence to the wording

4     of the 95-point language provision, and it does violence to

5     the entire structure and underpinnings of the cap letters

6     which exist in the same agreement and have continued to

7     exist in other agreements.

8          Now, if we go to the fifth paragraph, the fifth

9     paragraph deals with the agreement of the parties that

10    these benefits, at least the cap levels and certain other

11    things, for existing retirees would be considered a

12    mandatory subject of bargaining in all future negotiations.

13    And here is the way this works as it applies to this case:

14         In 1991, Goodyear owned the facility.  In 1991, none

15    of the plaintiff class members had retired.  So, in 1991,

16    the people who worked at Goodyear had yet to retire.  They

17    were active employees.  The union was fully empowered as

18    the exclusive representatives of the retiree class members

19    who were active employees to enter into an agreement like

20    this.

21         And, you know, you will see when the evidence is

22    presented in this case the union came into the bargaining

23    sessions when M&G just acquired the facility and said, This

24    is a mandatory subject of bargaining.

25         The evidence will show the union, in bargaining

1    sessions, has said, You know, we can strike over this.

2         We're talking about a powerful union.  A union has

3    significant resources, and the union that has, actually,

4    the most institutional memory in terms of continuity

5    concerning these agreements and this particular language

6    establishes, if it's viewed in context, that there was an

7    agreement that these were mandatory subjects of bargaining.

8    And, unlike the way this was characterized by Mr. Cook,

9    this is something that was entered into at a time when the

10   retirees were not retirees.  Therefore, this is something

11   that the union certainly had the ability to put into an

12   agreement.

13        Now, what I would like to do, Your Honor, is to go

14   back to the timeline and just spend a little more time

15   talking about how things progressed from 1991 to the

16   present time.  And, you know, one of the things that will

17   end up becoming evident is, if you look at the two

18   transactions that occurred and -- Your Honor, you've

19   already addressed this, I think, very effectively in your

20   decision denying the motion for summary judgment.  As you

21   might anticipate, there are some aspects of your decision

22   that I might quibble with.

23        THE COURT:  You think so?

24        MR. MISCIMARRA:  But the one thing that you really

25   got right is, when you're talking about an acquisition, you

VOL. I    61

```
 1    know, you can read the Supreme Court cases -- Burns, Howard
 2    Johnsons, these other cases -- you know, unions and
 3    employers are in control of their own destiny.  You know,
 4    you don't have the ability -- a collective bargaining
 5    relationship is not a chattel.  You can't just say, Here,
 6    it's yours, because we have a whole legal infrastructure
 7    that protects employees, protects unions, provides
 8    protection for employers, too.  And, so, there is
 9    certainly -- in this evidence, there will be some technical
10    evidence about what happened in connection with these
11    transactions; but, you know, apart from the technical
12    evidence that you will see, there is also going to be some
13    very, very practical evidence that we predict will
14    effectively dispose of any questions about what happened in
15    connection with these transactions.  And let me give you an
16    example.
17         If you take a look at when Shell acquired the Apple
18    Grove facility from Goodyear, this acquisition occurred in
19    1992.  At that time, the pre-existing Collective Bargaining
20    Agreement had almost two years left to run.
21         Now, there is not bargaining that takes place in
22    1992.  So, you don't have to think very hard and ask, well,
23    did Shell really assume the labor contract.
24         The evidence will show nobody went without benefits
25    for two years.  There are no retirees who are arguing that
```

1    they were denied two years of pension credit for the period

2    from 1992 to 1994, which is when the collective bargaining

3    negotiations took place.

4        You know, the plaintiffs' themselves -- this is

5    fascinating.  The plaintiffs argue in this case that Shell

6    and M&G are bound by, among other things, the 95-point

7    language, which appears only in the 1995 -- excuse me --

8    1994 Goodyear Pension and Insurance Agreement.

9        Even in 1994, the 1994 negotiations, Shell agreed --

10   and they had a conscious analysis -- Shell agreed to adopt

11   the Goodyear benefits structure.  And you'll see the

12   designated testimony of Dale Wunder, who will say, you

13   know, We had a very different benefit structure.

14       By the way, Ron Hoover, the Steelworker

15   International rep then with the Rubber Workers, he also

16   agrees.  He understood that Shell had very, very dissimilar

17   benefit programs from what was in place in Goodyear.  But

18   when they acquired this facility, Dale Wunder did an

19   analysis, and they decided, rather than try to integrate

20   the facility, they decided to continue to treat the Apple

21   Grove facility as a me-too adopter of the Goodyear master

22   agreement pattern.

23       And we asked Ron Hoover, and he said in his

24   deposition -- and I would presume he would say the same

25   thing today -- is, Would it have been a big deal if Shell

1    Chemical had come in and said, No, we're not going to keep

2    these benefits in place; we want a new benefit structure?

3           He said, That would have been a big deal.

4           When I asked Ron Hoover -- and I predict that he

5    will testify in a manner that's consistent with his

6    deposition -- Isn't it true, in a major transaction

7    involving the acquisition of a unionized facility, the

8    union's primarily concerned about three things:  one, will

9    people keep their jobs; two, will people keep their

10   benefits; and, three, will people, we, keep our collective

11   bargaining agreements in place and the union's

12   representatives' status.

13          I'll tell you there is not going to be any evidence

14   in this trial where any union representative was going to

15   Shell or M&G and saying, Don't adopt the pre-existing

16   contracts lock, stock and barrel.  But the anomaly in the

17   plaintiffs' theory in this case is, the only place you can

18   get support for their theory of vesting is the Goodyear

19   agreement that they say couldn't possibly have applied to

20   Shell or M&G.

21          It doesn't make sense.  The agreement either applied

22   or it didn't.  If it applied, maybe you get the 95-point

23   language, but you also get the cap agreements.  And you

24   can't have one without the other.

25          And I would say that the same thing is true, as

VOL. I                                                                   64

1    well, in the M&G acquisition.  And we've had evidence, both

2    with respect to Shell and with respect to M&G, which will

3    be presented in this trial, nobody went into the first set

4    of negotiations after the Shell acquisition and said, Let's

5    bargain from scratch.  We don't have an existing agreement.

6         The same thing with M&G.  That acquisition occurred

7    in the middle of 2000.  The contract wasn't up for

8    renegotiation until later that year.  A new agreement was

9    actually reached around November 1st.  And Randy Moore, who

10   was the union's chief spokesperson in that bargaining, will

11   say -- if he testifies in a manner that's consistent with

12   his deposition, he will say nobody went into that

13   bargaining saying we're going to scrap the book and start

14   all over again.

15        These contracts were adopted lock, stock and barrel.

16   There is no question about it, and the evidence will

17   establish that in the trial that's about to take place here

18   for the next two weeks.

19        Now, if we end up moving forward, in 1994, there was

20   a new caps agreement that was entered into, and it was

21   negotiated for the Apple Grove facility by Shell; but, as I

22   indicated before, the evidence will show that Shell chose,

23   consciously, to adopt the pattern established by the

24   Goodyear agreement.

25        In 1997, there is the next round of bargaining for

VOL J     65

1    the Apple Grove facility at Shell.  And you will see in the

2    designated transcript testimony of Dale Wunder that the

3    FASB letters were the topic of discussion.  You can see it

4    in notes that will be part of the record.

5          There is not any question here that these cap

6    letters were in play.  Dale Wunder testified that they were

7    present at the table, they were the subject of discussion

8    by the parties, and they were included in the resulting

9    agreements.

10         And the one thing that I will stop and note for just

11   a short while, Your Honor, is it's worth talking for just a

12   minute or two about what evidence there won't be in the

13   upcoming trial for the next two weeks.

14         There won't be any evidence that any union

15   representative at any time argued against Shell's adoption

16   or M&G's adoption of the pattern P & I benefit arrangements

17   lock, stock and barrel.  There will be no evidence that any

18   union representative entered into an agreement with Shell

19   or M&G repudiating the pre-existing cap arrangements.

20   There will be no evidence that any union representative at

21   Goodyear or Shell, at any time from 1991 until January 1st

22   2007, there will be no evidence that any union

23   representative ever told or announced in written form to

24   any retiree this huge win:  We took you in one set of

25   negotiations from having a commitment to pay above-cap

1    contributions to getting rid of that; and guess what you

2    now have?  You have a vested lifetime right to never pay

3    contributions in any amount, ever.

4         Now, what union, if they negotiated that type of

5    extraordinary commitment, would keep it a secret from the

6    people in this room?  The evidence will show it was kept

7    secret because that type of commitment was never entered

8    into.

9         Now, if we go forward and talk about what the

10   evidence will show in future years, the pattern that is

11   reflected in the events from 1991 to 2000 become even more

12   pronounced.  And the evidence will show -- and, Your Honor,

13   I know you're familiar with this from some of the summary

14   judgment briefing -- in every year, beginning in 2000,

15   representatives of the Steelworkers invoked and reaffirmed

16   the existence of the cap agreements.

17        And, you know, these agreements have shifting names.

18   They're sometimes called the cap agreement.  They were once

19   called Letter G.  Then they became Letter H.  In the 2000

20   bargaining, they were called the FASB letter.  And as it

21   turns out, in 2000, Randy Moore will testify, if he

22   testifies in a manner that's consistent with his

23   deposition, he will testify there were two local union

24   representatives:  Roger Moore and Sam Stewart, who told him

25   in the bargaining -- and this is bargaining which is the

```
 1     first time for Randy Moore and the first time for the

 2     outside labor lawyer, David Dick.  But Randy Moore's

 3     committee members say to him, There is this letter that

 4     applies to us.  Randy Moore described it as "it might apply

 5     to us," but that "might" was significant enough for Randy

 6     Moore to make a proposal across the table which was a

 7     verbal proposal, which he meant as oral proposal, but it's

 8     written down -- you can see it -- that talks about the cap

 9     letters, and the proposal is to extend the retiree

10     contribution commencement date.

11          And you'll hear evidence from the plaintiffs that,

12     well, these cap letters were never meant to take effect.

13     That is belied by the consistency with which the union, in

14     successive negotiations, took great care to affirmatively

15     negotiate amendments and adjustments, especially to the

16     bite date, the retiree contribution commencement date.

17          So, in 2000, we have these two local union

18     bargaining representatives who say this cap letter

19     agreement applies to M&G.  And we have a proposal across

20     the table.  And by the way, Randy Moore will testify, if he

21     testifies consistent with his testimony, the people who

22     know the most about what agreements apply to a unionized

23     facility like the Apple Grove plant are the local union

24     representatives, because they apply these benefit programs

25     day in and day out.
```

1            Now, the one thing that Mr. Cook neglected when he

2    talked about the written response that came forward by

3    David Dick -- and the evidence will show that there is a

4    little more at work in these negotiations -- number one,

5    David Dick is new to the relationship.  Randy Moore is new

6    to the relationship.  And, number two, Randy Moore has two

7    union committee members who actually tell him, This letter

8    applies to us.  He submits a proposal.  An oral proposal is

9    submitted on October 11, 2000.

10           On October 17th, Mr. Dick ends up sending this

11   response.  Now, this is not a proposal.  It's captioned

12   "Response."  And it's true, in Paragraph 2, he expresses

13   doubt as to whether the cap letter applies to M&G.  And he

14   says -- and then he expresses the belief, We don't think

15   that it does, nor did it apply to Shell previously.

16           Well, one thing we know right off the bat, which

17   will be consistent with the evidence to be produced in this

18   trial, we know it applied to Shell, because there is going

19   to be uncontroverted evidence that the cap letters were

20   applicable to Shell.  So, Mr. Dick made a mistake with

21   respect to Paragraph 2.

22           In the next paragraph, which I assume Mr. Cook

23   didn't direct your attention to because it wouldn't fit on

24   the screen, is, Mr. Dick says:  The important question is

25   what will our P&I agreement contain?

```
 1          And then, sure enough, what happens is, for the

 2     remainder of negotiations -- his response was dated October

 3     17th of 2000.  Bargaining continued up until November 1st.

 4     And the FASB letter continued to be the topic of discussion

 5     all the way through the end of negotiations.  And there is

 6     no resolution.

 7          Now, there was a company final offer.  You will see

 8     a Memorandum of Agreement.  None of it makes reference to

 9     any resolution of the FASB letter.  And then the company

10     will introduce a post-negotiation to-do list.  And on that

11     post- negotiation to-do list, which is dated in late 2000

12     and it carries over into 2001, there is an item that says:

13     FASB letter; move dates forward.

14          And if you move further forward, we have union

15     documentation that you will see and be able to hold in your

16     hand which establishes that the union representatives

17     themselves participated in meetings that had as their

18     object the formulation of a P&I agreement for M&G

19     specifically.  That's a process that went forward.  It went

20     forward through 2001.  It went forward into 2002.

21          You'll see union documentation of meetings that were

22     conducted with Mr. Korber where they're talking about the

23     P&I agreement and the FASB letter and then what happens at

24     the end of that process, which started with the bargaining.

25     And there was a conscious agreement that the P&I agreement
```

1    issues will be receiving further attention after the end of

2    negotiations as Mr. Korber is given -- and he started at

3    the company in January of 2001.  So, it's right after

4    negotiations.

5          Well, Mr. Korber has discussions with the union

6    representatives about the FASB letter and the P&I

7    Agreement.  And it turns out Mr. Korber gets -- he receives

8    a product which is a marked-up, written compilation put

9    together by union and company representatives working

10   together.  But the cover -- you could actually see Sam

11   Stewart's name on the top of the cover.  It was his working

12   copy, and it contains the cap agreement.

13         So, the suggestion that these agreements didn't

14   apply to Shell or didn't apply to M&G is going to be flatly

15   contradicted by evidence that comes from the union, itself,

16   in this case.

17         Now, one other thing that I will note is, the

18   bargaining after 1997 -- and I'll just note, Your Honor,

19   for purposes of our demonstrative exhibit here, these

20   little bars on top of the yellow and red kind of ownership

21   area, those represent times of negotiations or discussions

22   that are relevant to bargaining and to the P&I agreement

23   issues.

24         The next thing that we end up seeing, in 2001,

25   Goodyear ends up negotiating its own new caps agreement,

 1    which was dated in 2001.  And you can see that 2001 caps

 2    agreement doesn't get connected to M&G.  Then the

 3    bargaining commenced in 2003.  The Collective Bargaining

 4    Agreement at M&G that was entered into in 2000, it expired

 5    November 6th of 2003.

 6         Well, it turns out, in the 2003 bargaining, M&G has

 7    a replay.  The evidence will show a replay of what went on

 8    in the 2000 negotiations.  There is a new chief

 9    spokesperson, Karen Shipley, Karen Shipley who is a

10    Steelworker International representative.  And what

11    happened is, there was a bargaining session.  The union

12    took a caucus.  And Ms. Shipley will testify, assuming that

13    she testifies in a manner that's consistent with her

14    deposition, two local union representatives by the name of

15    Sam Stewart and Roger Sutphin told her, You know, this

16    agreement exists, this FASB letter; it applies to us.  And

17    to be fair, Ms. Shipley said, They said it might apply to

18    us.

19         And, so, from a caucus, the evidence will show they

20    called someone that they thought would know.  And the

21    person they called was Ron Hoover, who is the Steelworker

22    International rep who goes all the way back to 1991 in the

23    negotiation of these things.  Ron Hoover and Ms. Shipley

24    will testify, if they testify consistent with their

25    deposition testimony, Mr. Hoover first spoke to Roger

1    Sutphin.  Then he spoke to Sam Stewart.  Then he spoke to

2    Karen Shipley.  And he said, If you have this agreement,

3    you'd better move those dates back.

4         So, Karen Shipley went back into the bargaining, and

5    she made another proposal that's premised on "This letter

6    applies to you and you have to move these dates back."

7         And she was right about one thing:  this letter

8    applies to you.  And, so, they end up having a discussion

9    at the bargaining table in the round of bargaining that

10   started in 2003.

11        The bargaining continued into 2004.  And Ms. Shipley

12   made a new proposal.  In the course of 2004 bargaining, the

13   proposal was, We propose to delete Letter H.

14        Now, the defendants will argue in this case that you

15   can only delete a letter if it applies to the employer who

16   is being asked to delete it.  And, so, the company rejects

17   that proposal.  The company has a new agreement, which is

18   part of the final offer, LOU 2003-6.

19        LOU 2003-6 incorporates, on its face, by reference,

20   the 2001 caps agreement.  It also mentions the way that the

21   parties will move forward, and LOU 2003-6 clearly

22   applies -- and the evidence in the case will take you

23   through how that progressed -- it clearly applies to all

24   retirees.  No question about it.  And LOU 2003-6 ends up

25   being negotiated by Randy Moore, the international

1    representative who takes over as chief spokesperson in

2    2005.  And then LOU 2003-6, which explicitly makes

3    reference to the Goodyear 2001 caps agreement, it actually

4    is made part of the new collective bargaining agreement at

5    the Apple Grove facility which became effective in August

6    of 2005.

7         And that agreement, the LOU 2003-6, itself, was

8    signed by Steelworker International Representative Karen

9    Shipley, although Steelworker International Representative

10   Randy Moore arranged for the signature.  And the Collective

11   Bargaining Agreement was also signed by 11 Steelworker

12   International representatives or local representatives.

13        And the interesting thing about those signature

14   lines -- there are five interesting things.  One is, one of

15   the signatories is Leo Gerard, the International President

16   of the United Steel Workers of America, or now the United

17   Steelworkers; two, the evidence will show, when you flip to

18   the next page, there are four signatures that are

19   especially notable.  One is Randy Moore.  Another is Brian

20   Wedge.  Another is Sam Stewart.  Another is Roger Sutphin.

21   So, the agreement containing this new cap letter was signed

22   by the four union representatives who participated in the

23   2000 bargaining.

24        We believe, Your Honor, that the next series of

25   events, when you get into 2006, the letter that was agreed

1    to by the Steelworkers in August of 2005 provided for

2    retiree contributions to commence on January 1st, 2006, but

3    they were to be preceded by discussions that were to

4    involve an effort by M&G, working with the Steelworkers, to

5    try to work on plan design to drive overall costs lower,

6    which would reduce the costs that would have to be borne by

7    retirees, including the retirees sitting in this room.

8         As it turned out, M&G voluntarily agreed to defer

9    the commencement of contributions on 1-1 of '06, and M&G

10   agreed to defer those contributions until 1-1 of '07.  And

11   the evidence, by the way, will show the first M&G proposal

12   made in bargaining in '03 was for contributions to commence

13   in '04.

14        Bargaining went into '04, and M&G adjusted the date

15   when they implemented, in a lawful fashion, when they

16   implemented their final offer based on an impasse in

17   bargaining, the retiree medical proposal provided for

18   contributions to commence on 1-1 of '05.

19        At that point, the union asked, Would you be willing

20   to defer those contributions?  And M&G said, Yes.  So,

21   there was actually a deferral of contractions from 1-1 of

22   '04 to 1-1 of '05 that became 1-1 of '06.  And then M&G

23   agreed, at its initiative, to defer those contributions to

24   1-1 of '07.

25        And there will be evidence in this case about the

1    four or five months of discussions that took place in late

2    2006 preceding the commencement of retiree benefit

3    contributions.  And what the evidence will show is that the

4    Steelworker representatives went through 14 sessions

5    beginning in August, and Mr. Korber participated in those

6    sessions.  Another company witness, who is an outside

7    lawyer, Robert Long, will testify in this case.

8         And what happened in the Sessions 1, 2, 3, 4, up

9    through Sessions 9 or 10, is there was a very detailed

10   discussion about LOU 2003-6, how it worked, how the

11   methodology would be employed, what the company's costs

12   were, and how those would all be translated into retiree

13   contributions.  And the evidence will show, Your Honor,

14   that was all discussed not because this is all about costs

15   and getting contributions.  This was all discussed because

16   you had to see the whole picture in terms of where these

17   costs were so you could then have an intelligent discussion

18   about different types of plans.

19        There was even consideration given, the evidence

20   will show, to different providers.  And what happened is,

21   the discussions went forward nary a word from any

22   Steelworker representatives about why are we spending all

23   of this time; these people have a vested lifetime

24   guarantee; no contributions, ever, in any amount.  That

25   never came up.  There was never a dispute with respect to

```
 1        the methodology that was being adopted.

 2             The only thing that ended up coming out -- and, by

 3        the way, the notices that went to retirees, M&G was the

 4        party driving the process to say, We need to have some

 5        notices to retirees.  And the Steelworkers, who are

 6        represented by Mr. Cook, actually were slow to suggest

 7        notices should go out.  And then very late in the

 8        bargaining, some decision was made all of M&G's proposals

 9        concerning plan design changes, lower contributions for

10        retirees, the evidence will show they were all rejected.

11        And that's why we find ourselves in this trial dealing with

12        these issues which are important for everybody.  But they

13        are contractual obligations.  These are not things that M&G

14        has had the ability to make up as it went along.  And these

15        are issues, the evidence will show, that M&G has really

16        made an effort to do right by their union, to do right by

17        retirees, to do right by active employees.  And it's been,

18        obviously, a very difficult road to address these complex

19        issues.

20             The only thing that I will note, Your Honor, is

21        just, you know, in closing, first, if you put aside the

22        question of contributions, it is our position that the

23        evidence will show retirees did not have any vested right

24        to receive retiree medical benefits generally.  I won't

25        elaborate on our position with respect to that now.  I
```

 1    realize, Your Honor, that you've already addressed that.

 2         The only point I'll make is, we also believe the

 3    same evidence that we will present pertaining to the

 4    contribution issue will also, we think, in the final

 5    analysis, reveal that these are not vested benefits at all.

 6         Now, M&G has not taken any action to terminate

 7    benefits.  It's to M&G's credit that they have only focused

 8    on trying to come up with a balanced plan that has some

 9    basis of contributions that are reasonable considering the

10    difficult challenges that face the company and retirees.

11         The second thing I'll note is, you know, the

12    plaintiffs suggest that the Court should hold M&G to this

13    standard of absolute consistency.  And, you know, the

14    evidence will show that M&G has demonstrated in many ways

15    it's not looking -- it was never looking to deal in an

16    aggressive way with the existence of these cap agreements.

17    If M&G is put on trial for not taking the most aggressive

18    actuarial approach with respect to these benefits, they'll

19    probably have to plead guilty, because they didn't take --

20    as I've already explained, they didn't take an aggressive

21    approach with respect to any of these benefits.  And we

22    believe that the evidence will show, you know, what M&G

23    tried to do here is the right thing and to do it in a

24    careful way.

25         And some of the things that Mr. Cook alluded to, you

1    know, actuaries were not present at the bargaining table,

2    and what you will see is a company that actually,

3    pointedly, did not immediately launch in and try to reap

4    some enormous financial advantage from the existence of

5    these letters that they knew about all along.

6         And what will come out in the course of the trial

7    is, there is a very, very practical, a very practical

8    progression that took place.  M&G knew about these

9    agreements.  The agreements themselves had a deferred

10   retiree contribution commencement date.  M&G pushed that

11   date, voluntarily, further into the future.  And, then,

12   when these issues got to the point where retiree

13   contributions were going to commence, well, as would be

14   predictable, more focus started to be applied on how these

15   issues would work in practice.  And that was the driver,

16   not some sort of nefarious corporate plan to just make this

17   stuff up.

18        The last thing that I would suggest is, if you talk

19   about a model of absolute consistency, I won't repeat the

20   litany, but if the model is absolute consistency in your

21   treatment of this issue, then Mr. Cook's client, the United

22   Steelworkers, they can't meet that standard, for sure, and

23   they are the ones that had much greater knowledge and much

24   greater continuity.

25        And one of the things at the end of this trial that

1    we'll ask Your Honor to do is, when you go to the framework

2    that we think is going to be helpful to the Court, where is

3    this vested lifetime guarantee expressed, and what does it

4    say?  Precisely when was this extraordinary commitment

5    entered into?  And, third, is the parties' conduct

6    consistent with the notion that this extraordinary lifetime

7    guarantee was entered into?

8         Look at the Steelworkers on that last piece:

9    conduct.  You know, the evidence will show the

10   Steelworkers.  It's a large and powerful union.  It's a

11   union that does very difficult things and has a very

12   difficult charge.  And nobody in our trial will dispute

13   those things.  But by the same token, it would have been

14   very easy for somebody in the 18 years from 1991 to 2006 or

15   2007 from the United Steelworkers to author a letter, to

16   send out an announcement to retirees, to send out a letter

17   to M&G in 2000, 2001, 2002 that, hey, these are lifetime

18   vested benefits; all of these retirees have a vested

19   lifetime right to protection from contributions.

20        This evidence, the evidence to be presented in this

21   trial, will not contain something like that, we predict.

22   And in the final analysis, Your Honor, if that type of

23   extraordinary commitment existed, then we will ask the

24   Court to scrutinize very hard how it could be that these

25   union representatives would be actually spending all of

1    this time, making proposals about the cap letters,

2    suggesting they do apply, trying to protect themselves by

3    pushing out retiree contribution commencement dates.

4         All of this conduct, we suggest, will demonstrate

5    that it's completely inconsistent, in fact it's

6    irreconcilable with the notion that this powerful union had

7    previously negotiated a lifetime vested right for retirees

8    to get these benefits.  Especially, it's irreconcilable

9    with the notion that there was some mutually-agreed-upon

10   right to benefits without ever paying contributions in any

11   amount, ever.

12        We think that the evidence to be presented in this

13   case will be, you know, very substantial.  As you know,

14   Your Honor, in life, things are very -- they are rarely

15   one-sided.  Things are sometimes messy.  People sometimes

16   have incomplete information, but we believe that the

17   evidence will show, for many different reasons in many

18   different ways, for as important as these issues are, it

19   will be appropriate to enter judgment in favor of the

20   defendants.

21        And that concludes my opening statement.  Thank you

22   for your attention.

23        THE COURT:  Thank you, Mr. Miscimarra.

24        MR. MISCIMARRA:  Thank you.

25        THE COURT:  Generally speaking, we take a break

1    before this.  And I guess I didn't give everyone an idea of

2    what breaks are.

3          Normally, we take a break at 10:30, thereabouts, for

4    15 minutes.  We take a one-hour luncheon recess.  We take

5    two breaks in the afternoon of about ten or fifteen

6    minutes.  And it's important that we do it this morning

7    because of the coffee consumption this morning.  But then,

8    as I look around here, I'm thinking everybody is going to

9    rush to the bathroom, and we don't have enough bathrooms to

10   accommodate everybody.  So, maybe we ought to take a little

11   bit longer.

12         At least, this first break, let's take about 20

13   minutes.  Return back here at 11:30, and be prepared,

14   Plaintiff, to start with your first witness.

15         MR. COOK:  Thank you, Your Honor.

16         THE COURT:  Thank you.

17     (Whereupon, a recess was taken at 11:10 a.m., and the

18   proceedings reconvened at 11:30 a.m.)

19                        - - -

20   IN OPEN COURT:

21         THE COURT:  Plaintiff, your first witness, please,

22   Ms. Arnold.

23         MS. ARNOLD:  That's correct.  On behalf of the

24   plaintiffs, we would like to call our first witness,

25   Woodrow Pyles.

VOL. I        82

```
 1              THE COURT:  Come forward, please, Mr. Pyles.

 2              (Whereupon, the witness was sworn in by the

 3   Courtroom Deputy Clerk.)

 4              THE COURT:  Mr. Pyles, would you state your full

 5   name?  And spell your last name, please.

 6              THE WITNESS:  Woodrow Wesley Pyles.  P-, as in Paul,

 7   Y-, as in yellow, L-E-S.

 8              THE COURT:  Thank you, Mr. Pyles.  You may proceed

 9   on direct examination, Ms. Arnold.

10                            - - -

11                      WOODROW PYLES,

12   AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

13                            - - -

14                     DIRECT EXAMINATION

15   BY MS. ARNOLD:

16   Q.   Good morning.

17   A.   Good morning, Jennie.

18   Q.   Can you confirm for us this morning that you're a

19   plaintiff in this suit?

20   A.   That's correct.

21   Q.   All right.  And why are you here today on behalf of

22   this plaintiff class?

23   A.   I'm representing the class because of the imposition

24   of contributions that's been imposed upon us by M&G

25   Polymers and the removal of some of our benefits as well.
```

 1    Q.    Okay.  And you are a retiree of the Point Pleasant

 2    Polyester Plant?

 3    A.    That's correct.

 4    Q.    And currently, today, Woody, how old are you?

 5    A.    I'm 75, and building.

 6    Q.    When you hired in at the Point Pleasant Polyester

 7    Plant, who owned that facility?

 8    A.    Goodyear Tire and Rubber Company.

 9    Q.    Since then, there have been changes in ownership at

10    that facility?

11    A.    That's correct.

12    Q.    And approximately when have those occurred, and who

13    has that been?

14    A.    In December of 1992, Shell purchased the plant.  And

15    in 2000 -- I believe sometime in 2000 -- M&G purchased the

16    plant from Shell.

17    Q.    We're going to step back in history a little bit.

18    Will you tell me what your hire date was at the facility?

19    A.    May 1st, 1959.

20    Q.    Okay.  And when you hired in, what was your position?

21    A.    Chemical Operator.

22    Q.    What did you do in that role?

23    A.    Run the various parts of the plant, wherever your job

24    bidding would take you.

25    Q.    All right.  And you worked in that same position

```
 1    through your retirement?

 2    A.   That's correct.

 3    Q.   And when did that occur?

 4    A.   The time I was hired?

 5    Q.   No.  When was your retirement?

 6    A.   I'm sorry.  January 1, 1996.

 7    Q.   Okay.  And you retired from what company at that time?

 8    A.   Shell.

 9    Q.   Do you receive a pension from Shell today?

10    A.   No, I don't.

11    Q.   Who do you receive pension through today?

12    A.   From Goodyear and M&G Polymers.

13    Q.   All right.  During your tenure at the plant, were you

14    a union member?

15    A.   Yes.

16    Q.   Of what union?

17    A.   United Rubber Workers.

18    Q.   And did that union later change?

19    A.   Yes.  In '95, it changed to United Steelworkers.

20    Q.   You were a member of both unions?

21    A.   That's correct.

22    Q.   Can you tell us about any offices you held for either

23    of those unions?

24    A.   I'm sorry, ma'am.  That's incorrect.  I was a member

25    of the Rubber Workers.  Yes.
```

1    Q.    Were you ever a member of the Steelworkers?

2    A.    I'm not sure when the merger took place.

3    Q.    Okay.  But if that merger had taken place --

4    A.    If it had taken place, I would have been a member of

5    the Steelworkers, yes.

6    Q.    Can you tell us about the offices you held for your

7    union?

8    A.    I was Union Treasurer, a union steward.

9    Q.    What years, approximately, did you hold those

10   positions?

11   A.    I was Union Treasurer from sometime in '62, I believe,

12   until 1994.

13   Q.    And the steward?

14   A.    I'm not sure of those dates.  At various times, I

15   served as steward.

16   Q.    Okay.  Did you also hold another position related to

17   pension and insurance benefits?

18   A.    Pension and Workers Compensation Benefit

19   Representative.

20   Q.    Approximately what dates did you hold that position?

21   A.    I'm not sure of those dates.  I would say it covered a

22   20-year period leading up to my retirement.

23   Q.    Can you describe for us, generally, what your role was

24   in that position?

25   A.    I would be the liaison between the employees and the

1    company on the pension and benefits side, and I was the

2    representative for the employees who had Workers

3    Compensation claims.

4    Q.    Did you advise union members regarding their pension

5    and insurance benefits?

6    A.    Yes, whenever they had a problem.

7    Q.    In that role, where did you learn of the benefits that

8    applied at Point Pleasant?

9    A.    From attending the P&I conferences that the United

10   Rubber Workers had and studying the P&I benefits booklet

11   that we had.

12   Q.    You mentioned the P&I booklet.  Was that the

13   controlling document regarding your benefits at Point

14   Pleasant?

15   A.    Yes.

16   Q.    Let's move from that to talk about these conferences

17   you just told me about.  You mentioned a conference.  Can

18   you describe that for us?

19   A.    Well, at the conclusion of the ratification of the new

20   P&I agreement, the Rubber Workers would have P&I

21   conferences at a date after the ratification to inform us

22   of the changes that had been made, had been negotiated,

23   during those negotiations.

24   Q.    Okay.  These conferences specifically covered pension

25   and insurance issues?

```
 1    A.    Yes.
 2    Q.    Okay.  Let's step back away from this and talk about
 3    the documents that governed your working conditions in
 4    Point Pleasant.
 5    A.    Uh-huh.
 6    Q.    You've talked some about pension and insurance.  What
 7    other documents governed your conditions in your working
 8    environment?
 9    A.    The Local Union CBA.
10    Q.    Okay.  These were separate documents?
11    A.    Yes.
12    Q.    Okay.  What was governed or explained within the CBA?
13    A.    All the working conditions that we had in the plant:
14    wages, vacations, safety and health.
15    Q.    Were those terms negotiated locally at Point Pleasant?
16    A.    The Local CBA, yes.
17    Q.    Okay.  And this other document is the P&I booklet?
18    A.    Yes.
19    Q.    Was that negotiated locally at Point Pleasant?
20    A.    No.
21    Q.    How was that negotiated?
22    A.    By the pattern bargaining; master negotiations, as we
23    referred to it at times.
24    Q.    So, we could refer to that as master bargaining?
25    A.    That would be fine, yes.
```

1    Q.    Okay.  To then move back to your discussion of the

2    conference, who was present at these URW P&I conferences

3    that you've described for us?

4    A.    Each local that was in the pattern bargaining, or

5    master bargaining, they would have anywhere from one to

6    three representatives there.  All of the locals that had

7    "me too" letters would be there.  And the International

8    Union Benefits Coordinator and others would be there

9    explaining the changes that had taken place from the

10   previous negotiations.

11   Q.    Approximately how many people attended?

12   A.    I'm saying a hundred or more.

13   Q.    Do you know how many local unions participated

14   actively at the table at the master bargaining process?

15   A.    I believe there was ten at that time.

16   Q.    And those unions had their representatives at the P&I

17   conference?

18   A.    That's correct.

19   Q.    But there were other unions who had representatives

20   there as well?

21   A.    Not in the master negotiations.

22   Q.    But attending the conference?

23   A.    Attending the conference, yes.

24   Q.    You've indicated that changes in a new P&I were

25   generally the topic there?

1    A.    Yes.

2    Q.    Anything additional that was covered?

3    A.    Unless problems -- if locals were having problems or

4    certain issues, they may address them before the entire

5    group or individually with the local unions.

6    Q.    Was this an interactive process, or was this generally

7    a presentation on behalf of the URW, or how did this

8    proceed?

9    A.    It was a presentation by the URW Pension and Benefits

10   Department.

11   Q.    Was this an important part of what you did as a

12   pension and insurance representative?

13   A.    Yes, it was.

14   Q.    Were there other duties relative to your role as

15   Pension and Insurance Representative that we should discuss

16   today?

17   A.    I was the one to represent the local union members

18   when they had problems.

19   Q.    You helped members with benefits issues?

20   A.    Yes.

21   Q.    If questions arose regarding benefits issues, where

22   did you turn to to have your questions answered?

23   A.    To have my questions answered, I would contact the

24   International Union Benefits Coordinator.

25   Q.    And what documents did you turn to?

VOL. I          80

```
 1      A.     To the P&I booklet.

 2      Q.     Is it accurate that you had a large knowledge of the

 3      pension and insurance agreement at Point Pleasant?

 4      A.     Well, I was expected to have.  I'm not sure I did have

 5      at all times; but, yes, I was expected to have that

 6      knowledge.  And when I did not have the knowledge or

 7      understanding, I had the International to refer to to help

 8      with those problems that we had faced with the company.

 9      Q.     All right.  While you were employed at the Point

10      Pleasant Polyester Plant, were your benefits covered by the

11      pension and insurance booklet?

12      A.     Yes.

13      Q.     During that time, did your wife or dependents also

14      participate in the plan with you?

15      A.     Yes.

16      Q.     That continued during the time you were employed?

17      A.     Yes.

18      Q.     Have you maintained coverage in that employer provided

19      plan since your retirement?

20      A.     Yes, I have.

21      Q.     And do you have any dependents in that plan with you

22      currently?

23      A.     Yes.

24      Q.     Who is that?

25      A.     My spouse.
```

```
 1    Q.    And her name?

 2    A.    Julia.

 3    Q.    And do both you and Julia maintain coverage today?

 4    A.    Yes, we do.

 5    Q.    And what's the cost that you're paying for that

 6    coverage today?

 7    A.    I believe it's $452.01.

 8    Q.    At any time prior to 2007 --

 9          THE COURT:  Wait a minute.  Just for the purposes of

10    record, $452.01 per --

11          THE WITNESS:  Per month.

12          THE COURT:  All right.  Thank you.

13          MS. ARNOLD:  Thank you.

14    BY MS. ARNOLD:

15    Q.    We'll go ahead and move from that forward, and --

16    well, backward or forward, depending on how we want to look

17    at it, to 1991, and talk about some contract issues from

18    that time.

19    A.    Uh-huh.

20    Q.    I'll ask that you just take a look at these one at a

21    time as I address these with you.

22    A.    Okay.

23    Q.    First, let's take a look at this first document.  This

24    is Joint Exhibit 1.

25          MS. ARNOLD:  With a few of our witnesses who are
```

1    more comfortable looking at paper documents, we have

2    intended to provide those to those witnesses.

3            THE COURT:  Oh, sure.

4            THE WITNESS:  This appears to be the Local CBA

5    effective November 6, 1991.

6    BY MS. ARNOLD:

7    Q.   You recognize this document?

8    A.   Yes.

9    Q.   Was this the governing CBA in place in Point Pleasant?

10   A.   That's correct.

11   Q.   During the time this was in place, were you the

12   Pension and Insurance Representative at Point Pleasant?

13   A.   Yes.

14   Q.   If you can please turn with me in this document to

15   page 83.  That's 83 in the way the document is paginated.

16   A.   Would you repeat that page again, please?

17   Q.   Yeah.  I want to withdraw that.  Let's not turn to

18   page 83.  Excuse me.

19           Let's go ahead and turn to page 141.

20   A.   Yes, I have that.

21   Q.   Okay.  Take a moment and look at this document on page

22   141, please, and let me know when you've had a chance to

23   look at this.

24   A.   I recognize that, yes.

25   Q.   What do you recognize this to be?

VOL. I      93

1     A.    This Letter A incorporates -- this letter incorporates

2     the negotiated items in the pattern and master agreement

3     into our local union.

4     Q.    Did it incorporate that agreement lock, stock and

5     barrel?

6     A.    No.

7     Q.    Tell me what differences are noted here or what you

8     understand those differences to be.

9     A.    The differences in this document, in this normal

10    document that would be in a Local CBA, is that there was an

11    eleven-cent reduction in wages in order to obtain a pension

12    increase of whatever this document applies, three dollars,

13    to obtain that pension amount.

14    Q.    Was that a variance from the master P&I agreement?

15    A.    Yes.

16    Q.    Were there other differences in what was agreed to at

17    Point Pleasant and the master P&I agreement?

18    A.    In this situation, there was, yes.

19    Q.    What were those other differences?

20    A.    Letters that were not written in the P&I booklet, or

21    normally not, because our policy and position was, at the

22    local union, we didn't apply letters to the local union

23    that wasn't written in the booklet, --

24    Q.    Okay.

25    A.    -- CBA and the P&I agreement.

VOL. I     84

```
 1    Q.    Okay.  Let's go ahead and put that document aside.

 2    A.    (Witness complies.)

 3    Q.    Let's pick up the next document here.  This is

 4    Plaintiffs' Exhibit 4.  Take a moment to look at this.  And

 5    when you've had a chance, let me know.  I'll assure you

 6    that what is showing on the screen there should be the

 7    exact same document that you have there in your hand.

 8    A.    Uh-huh.  Yes.  This appears to be the P&I agreement

 9    that was negotiated between Rubber Workers and the Goodyear

10    Tire and Rubber Company in May, on May 15th, 1991, the

11    effective date.

12    Q.    Was this also the agreement in place in Point

13    Pleasant?

14    A.    Yes.

15    Q.    Did you refer to any other documents aside from this

16    book when administering benefits or assisting union members

17    regarding their benefits in Point Pleasant?

18    A.    No.

19    Q.    Let's take a look in this document, and turn to page

20    83.

21    A.    Okay.

22    Q.    At the bottom of page 83 -- let me know when you've

23    found that page.

24    A.    Bear with me, please.

25    Q.    Yeah.
```

1    A.    All right.  I have that page.

2    Q.    At the bottom of that page, there is a provision

3    titled "Employees Retired on Pension."

4    A.    Uh-huh.

5    Q.    Are you familiar with those provisions?

6    A.    Yes.

7    Q.    Take a moment and review that now, and then I'll ask

8    you a few questions.

9    A.    Okay.  I'm ready.

10   Q.    What do those provisions relate to, Woody?

11   A.    This explains the number of years that you had to

12   have, number of years or more years of continuous service

13   to receive a pension and receive benefits as described in

14   Exhibit B-1, meaning Comprehensive Medical Plan.  And it

15   describes, those who have less than ten years service, what

16   would apply.

17   Q.    So, the qualification for pension and benefits is

18   linked here?

19   A.    Yes.

20   Q.    Were these the controlling provisions regarding how a

21   person retiring from the Point Pleasant Plant qualified for

22   pension and benefits under this agreement?

23   A.    Would you repeat that, please?  I missed the first

24   part.

25   Q.    Were these the controlling provisions regarding how a

```
 1   person retiring from Point Pleasant --

 2   A.   Yes, years of service and age.

 3   Q.   And if those qualifications were met, a person then

 4   received both their pension and benefits?

 5   A.   That's true, as stated in this paragraph.

 6   Q.   Let's go ahead and turn to the back of this document,

 7   Woody.  If you look at page 239, we have a Letter No. 1

 8   here, correct?

 9   A.   I'm sorry.  I'm having trouble finding 239.

10        I have it.  I'm sorry.  Yes, I have it here.

11   Q.   All right.  And if you would just take a look from

12   that point through the end of the document and indicate to

13   me whether you see any letters that are identified by an

14   alphabetic letter rather than a number?

15   A.   I do not.

16   Q.   So, this document contains numbered letters?

17   A.   Yes, it does.

18   Q.   Does it contain any alphabetic lettered letters?

19   A.   Not on this letter or -- I would have to look through

20   the whole document.

21   Q.   Just flip through those final pages.

22   A.   All right.  I would be glad to.  It appears that all

23   are numbered letters.

24   Q.   Is there any Letter G that appears to be a part of

25   this agreement?
```

VOL. I 97

1    A.   No.

2    Q.   Any Letter H?

3    A.   No.

4    Q.   To your knowledge, was there any cap letter that was a

5    part of this agreement?

6         MR. WEALS:  Objection, Your Honor.  I think the

7    questions have been fairly leading thus far, and I've given

8    Ms. Arnold a little bit of leeway, but it seems at this

9    point she is really testifying for the witness.

10        THE COURT:  The last question was not leading.  The

11   objection is overruled.  The previous questions were, but

12   this one wasn't.

13        You may answer the question.

14        THE WITNESS:  Would you please repeat the question?

15   BY MS. ARNOLD:

16   Q.   Is there any cap letter that's a part of this

17   agreement?

18   A.   None that I seen.

19   Q.   Any FASB letter that's a part of this agreement?

20   A.   None that I seen.

21   Q.   Aside from what you see right here today and your

22   knowledge and role as Pension and Insurance Representative

23   during the period of '91 to '94, did you believe there to

24   be a cap letter or FASB letter that was contained within

25   this agreement?

```
 1    A.    Not in this agreement.

 2    Q.    Thank you.  Take a look at our next exhibit, please.

 3    That's Plaintiffs' 239.

 4          THE COURT:  239?

 5          MS. ARNOLD:  No.  I'm sorry.  It's Joint 14.

 6    BY MS. ARNOLD:

 7    Q.    Do you recognize this document, Woody?

 8    A.    Yes, I do.

 9    Q.    What do you recognize this document to be?

10    A.    It's a letter that's heading is, Letter G, not to be

11    printed in booklet, dated May 15, 1991.

12    Q.    Have you seen this letter before?

13    A.    Yes, I have.

14    Q.    When did you first see this letter?

15    A.    To the best of my recollection, after the negotiations

16    in 1991 at the P&I conference.

17    Q.    How did you come to see that letter at that time?

18    A.    It was in the information that was distributed to us

19    by the International Union.

20    Q.    Do you recall who specifically gave this to you?

21    A.    No.

22    Q.    Following that conference, what did you do with this

23    letter?

24    A.    I put it with my P&I information I normally keep

25    available.
```

VOL. I    99

```
 1    Q.   Did you distribute that to local union members?

 2    A.   No.

 3    Q.   Why did you take the action that you did at that time?

 4    A.   Because it was the position and policy of our local

 5    union that letters that were negotiated outside of the

 6    local CBA or the P&I booklets did not apply to our local

 7    union.

 8    Q.   Related to this, I want to ask you a couple of brief

 9    questions regarding your deposition testimony that you gave

10    in this case.

11    A.   Uh-huh.

12    Q.   You did give a deposition in this matter?

13    A.   That's correct.

14    Q.   Have you had the opportunity to review your deposition

15    testimony since giving that?

16    A.   Yes, I have.

17    Q.   I believe when you were showed either the letter or a

18    letter similar to this in your deposition you said you had

19    seen it as a Letter H?

20    A.   That's correct.

21    Q.   Had you also seen it as a Letter G?

22    A.   That's correct.

23    Q.   Did you see a letter similar to this at any time other

24    than when presented this letter at the P&I conference in

25    1991?
```

VOL. I    100

```
 1    A.   No.

 2    Q.   Let's put that aside.

 3         Can you tell me who Jim Kruse is?

 4         THE COURT:  I'm sorry.  What was the question?

 5         MS. ARNOLD:  Can you tell me who Jim Kruse is?

 6         THE WITNESS:  Jim Kruse works for Goodyear Tire and

 7    Rubber Company.  I've known him as Industrial Relations

 8    Manager and as Benefits Coordinator.

 9    BY MS. ARNOLD:

10    Q.   How did you come to know him?

11    A.   Probably the first time I seen Jim Kruse was sometime

12    at the plant.  He was there on various occasions, and I

13    would see him at the plant.

14    Q.   Are you aware that he's given a deposition in this

15    case?

16    A.   Yes, I am.

17    Q.   Okay.  I want to ask you a few questions about some

18    testimony that he gave in his deposition.

19         Mr. Kruse testified that you were part of a 1991

20    meeting where he explained that you were "me too'd" to a

21    company-wide agreement that included cap letters.  Do you

22    recall participating in any such agreement or in any such

23    meeting?

24    A.   No, I don't recall that.

25    Q.   He also testified that you asked a particular question
```

1    at a meeting held at the training center where you asked if

2    the contributions would ever trigger.  Do you recall asking

3    any such question?

4    A.    I do not.

5    Q.    Mr. Kruse testified that at the Point Pleasant

6    Polyester Plant you were the most knowledgeable person

7    there about the pension and insurance agreement.  Do you

8    agree with that?

9    A.    No, I don't agree with that, but I appreciate the

10   comment.

11   Q.    Would there have been anyone else at the Point

12   Pleasant Polyester Plant who would have been more

13   knowledgeable about the pension and insurance agreement?

14   A.    There is some presidents that probably would be on the

15   scale that I was on at times.

16   Q.    You did have large knowledge of the P&I agreement?

17   A.    I was expected to have the knowledge that was

18   necessary, yes.

19   Q.    And what did you believe regarding the application of

20   unprinted side letters at Point Pleasant?

21   A.    As I stated earlier in my testimony, our local union's

22   position and policy was that letters that were negotiated

23   by anyone else and was not part of our P&I booklet was not

24   applicable to our local union, whether they be in the CBA

25   or the P&I booklet.

VOL. I      102

1    Q.   Okay.  I'm going to bring you a few more documents,

2    and we'll treat these just as we have the last few.  If

3    you'll take a look at this first document here, this is

4    Joint Exhibit 4.

5    A.   It appears to be the 1994 Local Collective Bargaining

6    Agreement between Shell Chemical and United Rubber Workers

7    No. 644.

8    Q.   The last agreement we looked at was an agreement

9    between Goodyear and Local 644, correct?

10   A.   That's correct.

11   Q.   When did the change in ownership occur?

12   A.   December, 1992.

13   Q.   A transfer from Goodyear to Shell?

14   A.   That's correct.

15   Q.   Was this the governing CBA in Point Pleasant from 1994

16   to 1997?

17   A.   That's correct.

18   Q.   I would like to direct your attention to page 154 and

19   155 of this document.

20   A.   I see those documents.

21   Q.   Do you recognize the letter at page 154?

22   A.   Yes, I do.

23   Q.   What is that letter?

24   A.   It's the letter incorporating the benefits negotiated

25   by United Rubber Workers between United Rubber Workers and

```
 1    Goodyear.  It incorporates their P&I agreement into our
 2    agreement.
 3    Q.    Does this make any reference to Goodyear?
 4    A.    No.
 5    Q.    Towards the end of the first paragraph, there is a
 6    phrase beginning "The Benefit Plans."  Will you read that
 7    out loud for me, please?
 8    A.    Sure.  The benefit plans currently applicable to
 9    employees you represent at the Point Pleasant Polyester
10    Plant will be continued, comma, subject to the changes
11    shown in the attachments.
12    Q.    This last phrase, "subject to the changes shown in the
13    attachments," what does that mean?
14    A.    Anything attached to the Local CBA and the pension and
15    insurance.  The pension and insurance benefits, -- I'm
16    sorry -- not the CBA.  This letter is part of the CBA.
17    Q.    What did you understand this to mean?
18    A.    That the benefits as printed in the P&I booklets or
19    booklet would be applicable to the local union during the
20    life of this agreement.
21    Q.    Let's put that document aside.  Now take a look at
22    this next document.  This is Plaintiffs' 20.
23    A.    It appears to be the Pension and Insurance Service
24    Award Agreement effective July 20, 1994, between the
25    Goodyear Tire and Rubber Company and United Rubber, Cork,
```

1    Linoleum and Plastic Workers of America.

2    Q.   Was this a document in effect in Point Pleasant?

3    A.   Yes, to the best of my knowledge.

4    Q.   I'm going to direct you, within this document, to page

5    91, please.

6    A.   Would you repeat the page, please?

7    Q.   Ninety one.

8    A.   I have that page.

9    Q.   In the middle of this page, there is a paragraph that

10   begins "Notwithstanding the above."

11   A.   Yes.

12   Q.   Take a moment and review that paragraph, and then

13   we'll talk about that.

14   A.   Okay.

15   Q.   Tell me what's important about this paragraph or what

16   you find to be important about this paragraph.

17   A.   Well, it describes employees who retire on or after

18   January 1, 1996, are eligible for receiving a monthly

19   pension under the 1950 pension plans whose full years of

20   age and full years of attained continuous service at the

21   time of retirement equals 95 points, or more points, will

22   receive a full company contribution towards the cost of the

23   benefits described in this Exhibit B-1.

24        And it goes on to say, those who have less than 95

25   points, what would apply to them and the contributions they

 1    would be required to pay.

 2    Q.   Were these new provisions in the 1994 agreement?

 3    A.   I believe that's correct.

 4    Q.   So, how was it that a person earned their 95 points

 5    referenced here?

 6    A.   Well, there were two ways you could earn those 95

 7    points.  One was, you could have 30 years service,

 8    regardless of age.  And the other was that your age and

 9    years of service would equal 95 or more points.

10    Q.   And upon attainment of those points, what did a person

11    receive?

12    A.   The full pension and full benefits for the cost of the

13    medical benefits.

14    Q.   Did anyone with 95 points have to pay for their

15    medical benefits?

16    A.   Not according to the booklet, none that I am aware of.

17    Q.   Who did have to pay, according to this provision?

18    A.   Those who had less than the 95 points required.

19    Q.   I want to direct you towards the back of this booklet

20    again, Woody.  If you could turn to page 169.

21    A.   I have that document.

22    Q.   This is a Letter No. 1?

23    A.   That's correct.

24    Q.   Take a look and flip through the rest of the pages in

25    this document, and let me know if you see any letters here

1  identified by anything other than a numeral.

2  A.   I believe they're all numbered.

3  Q.   Do you see any lettered letters attached to this

4  agreement?

5  A.   No.

6  Q.   Any Letter G?

7  A.   None that I saw.

8  Q.   Or H?

9  A.   No.

10  Q.   In your knowledge of this agreement, was there any cap

11  letter that was included within this agreement?

12  A.   None that I saw.

13  Q.   Any FASB letter?

14  A.   No.

15  Q.   Was this the governing document at Point Pleasant?

16  A.   To the best of my knowledge, yes.

17  Q.   Earlier, we talked about provisions in the CBA that

18  said that the P&I agreement would be subject to any changes

19  shown in the attachments.  Do these attachments contain

20  anything about limits on company contributions for retiree

21  medical?

22  A.   None that I am aware of.

23  Q.   Let's put that document aside.  I'm just going to give

24  you a few more questions, and then we'll talk about the

25  possibility of taking a lunch break.  Okay?

```
 1    A.    Sounds good.
 2    Q.    If you'll take a look at this next document, --
 3          THE COURT:  Really?
 4    BY MS. ARNOLD:
 5    Q.    -- this is Plaintiffs' 26.  Do you recognize this
 6    document?
 7    A.    Yes, I do.
 8    Q.    What do you recognize this document to be?
 9    A.    That's Letter G, not to be printed in the booklet.
10    Q.    When did you first see this document?
11    A.    In 1991.
12    Q.    At that time, did it have the same date on it that
13    this document bears?
14    A.    No.
15    Q.    When did you first see a document like this bearing a
16    1994 date?
17    A.    I did not see a document in 1994.
18    Q.    So --
19    A.    This document, I'm talking about.
20    Q.    When would you have first seen this particular
21    document we're looking at?
22    A.    I don't recall seeing this document.
23    Q.    Okay.  Let's put that aside.
24          MS. ARNOLD:  Your Honor, this would be an
25    appropriate place for me to break if this is workable for
```

VOL. I    108

```
 1    you as a lunch break.  If not, I am willing and ready to

 2    proceed.

 3              THE COURT:  That will be fine.

 4              MR. COOK:  Thank you, Your Honor.

 5              THE COURT:  No problem.

 6              MR. COOK:  May I approach the bench with Mr.

 7    Miscimarra?

 8              THE COURT:  Sure.

 9              MR. COOK:  Can we take this off the record?

10              THE COURT:  We can.

11       (Whereupon, an off-the-record discussion was held at the

12    bench between the Court and Counsel.)

13    IN OPEN COURT:

14              THE COURT:  We're going to take a break for lunch.

15              Stay right there.

16              We're going to take a break for lunch.  We take one

17    hour for lunch.

18              Let me remind everyone in the gallery area and the

19    attorneys and everyone else, there has been a motion, and a

20    motion was granted, for a separation of witnesses.  You are

21    not to discuss the testimony of witnesses with anyone else.

22    And you folks are allowed in here, and I want you in here,

23    but I don't want you going out and talking to potential

24    witnesses about what may occur or what has occurred in

25    here.  You understand all that?
```

1        And the reason is obvious:  I don't want people

2    trying to change their testimony based upon what you folks

3    heard in here.  That's a simple rule, and it's a fair rule.

4    So, please, don't talk with anyone, at all, during the

5    breaks.

6        Let's take a one-hour luncheon recess.  Be back here

7    at a quarter after.

8        Thank you.

9        MR. COOK:  Thank you, Your Honor.

10       COURTROOM DEPUTY CLERK:  This court will stand in

11   recess.

12     (Whereupon, the lunch recess was taken at 12:16 p.m.)

13                       - - -

14

15

16

17

18

19

20

21

22

23

24

25

VOL. I    110

1                              MONDAY AFTERNOON SESSION

2                              MAY 9, 2011

3                              1:15 P.M.

4                                  - - -

5          THE COURT:  We were in the middle of the direct

6     testimony of Mr. Pyles.

7              Mr. Pyles, you understand you're still under oath.

8          THE WITNESS:  Yes, sir.

9          THE COURT:  You may continue, then, Ms. Arnold, with

10    your direct examination.

11         MS. ARNOLD:  Thank you, Your Honor.

12    BY MS. ARNOLD:

13    Q    Hi, Woody.

14    A    Good afternoon, Jenny.

15    Q    When we closed before lunch, we had been talking about

16    the 1994 CBA and pension and insurance agreement.  Can you

17    remind us, again, of what year you retired?

18    A    January 1st, 1996.

19    Q    So what was the governing document in control of your

20    benefits when you retired?

21    A    1994 P&I agreement.

22    Q    And this contained the 95 point provisions?

23    A    Yes.

24    Q    Can you tell us how you earned your 95 points?

25    A    Thirty years and age and -- years of service and my

1    age.  Either/or, or 30 years.

2    Q    Based on that, what did you know about the medical

3    benefits you would be provided in retirement at the time

4    you retired?

5    A    Full benefits, full costs paid by the employer.

6    Q    Let's talk some about your pension benefits now,

7    leaving medical aside and just looking at pension.  At the

8    time you retired, who did you receive your pension benefits

9    from?

10   A    Goodyear and Shell.

11   Q    And today, who do you receive those from?

12   A    Goodyear and M&G Polymers.

13   Q    Did you have questions about your pension benefits at

14   the time you retired?

15   A    Not about my benefits, no.

16   Q    Were there different elections available to you

17   regarding your pension benefits at the time you retired?

18   A    Yes, there was.

19   Q    Describe that to us, please.

20   A    There were five different elections you could make

21   concerning your benefits for your spouse upon your death.

22   Q    And how did you get information regarding those

23   possible elections?

24   A    From the P&I booklet, and a form provided by the

25   employer.

VOL. I    112

```
 1    Q    And on behalf of the employer, who provided those

 2    forms to you?

 3    A    Michael Harrington.

 4    Q    I'm going to bring you just a few documents for us to

 5    talk about.

 6         When you retired in 1996, was there any incentive plan

 7    relating to retirement at that time?

 8    A    Yes, there was.

 9    Q    Tell me about that.

10    A    The employer give us an incentive to retire, offered a

11    year's wages, plus our accrued pension and benefits.

12    Q    And you went out as a part of that plan?

13    A    Yes.

14    Q    Take a look at Plaintiff's 35, please.

15    A    Yes, I'm familiar with this document.

16    Q    Is this a document you received?

17    A    Yes.

18    Q    What does this document relate to?

19    A    It tells how many individuals elected to take the

20    voluntary severance program and the various things that

21    applied.

22    Q    Were you one of those persons?

23    A    Yes, I was.

24    Q    In the final paragraph on this page, it directs you to

25    ask questions regarding this program to Mike Harrington; is
```

1    that right?

2    A    That's correct.

3    Q    Did you have any questions for Mr. Harrington that

4    were specific to your pension benefits?

5    A    No.

6    Q    Did you work with Mr. Harrington or consult with him

7    in completing your elections relating the spousal benefits

8    you described to us?

9    A    No.

10   Q    But he provided documents to you?

11   A    He provided the documents for me to make the election.

12   Q    Okay.

13        Let's put that document aside.  And next take a look

14   at Plaintiff's 36.

15        Is this a document you recognize, Woody?

16   A    Yes.

17   Q    What is this?

18   A    This is a document associated with the special

19   severance program that I had elected.

20   Q    On the front page, this document describes itself as a

21   Summary Plan Description; is that correct?

22   A    That's correct.

23   Q    Taking a look at the first paragraph on this page,

24   let's look at the last sentence.  Could you read that out

25   loud for us, please?

VOL. I    114

```
 1    A    This plan is noncontributory and its entire cost will

 2    be paid by the company.

 3    Q    Let's put that aside.

 4         Now that we've talked some just about the pension

 5    benefits, I want to ask you some questions about medical

 6    benefits.

 7         Did you have any questions about your medical benefits

 8    at the time of your retirement?

 9    A    I did not have any personally, but there was one

10    question that I was concerned about that the medical

11    necessities program, which ended in April 19, 1997, would,

12    in fact, it continue on for those who elected that program

13    when they retired in '96?

14    Q    Who did you ask that question of?

15    A    I believe it was Mr. Harrington.

16    Q    What response did you get?

17    A    Yes.

18    Q    Yes what?

19    A    Yes, they would continue the medical necessities

20    program for those who elected that program when they

21    retired.

22    Q    For whom was that program ending?

23    A    The active employees.

24    Q    Take a look at Plaintiff's 226 beside you.  Is this

25    your handwriting, Woody?
```

1    A    Yes, it is.

2    Q    Describe to me what this document is.

3    A    This document lists medical coverage, life insurance,

4    special Medicare benefits and the application forms that we

5    would receive concerning our pension and automatic deposit,

6    if you chose to.  And then the question about the medical

7    necessities program continuing after April 1997 for those

8    who retired in '96, or thereafter, until April 19th, '97.

9    Q    Is this the response to the question that you posed?

10    A    Yes, it is.  And the response is yes, as written on

11    this document.

12    Q    Were you provided any documents relating to the

13    medical benefits you would have in retirement?

14    A    The P&I Agreement as written.

15    Q    Were you referred to any documents additional to that?

16    A    No.

17    Q    You've told us that you had some questions about the

18    medical necessity plan.  Can you tell me what medical

19    plans, generally, were available at the time of your

20    retirement?

21    A    Medical necessities program, comprehensive program,

22    catastrophic program.

23    Q    And in simple terms, what were the differences between

24    those plans?

25    A    The medical necessities plan was what we referred to

1    as the Cadillac plan.

2         The comprehensive plan had a matching savings fund,

3    which you didn't have under medical necessities.  That's

4    how it became the Cadillac plan because it had better

5    coverage.

6         But then the comprehensive -- the comprehensive

7    offered savings -- matching savings.

8    Q    And the third plan, the catastrophic plan?

9    A    I don't know all the details about the catastrophic

10   plan.  I would be speculating.

11   Q    All right.  Were you ever offered an incentive to

12   change from medical necessity to other coverage?

13   A    Yes, I was, annually.

14   Q    What was that incentive?

15   A    The matching savings fund in the comprehensive plan.

16   Q    Did you switch?

17   A    No.

18   Q    Why was that?

19   A    Because I was already in the Cadillac plan.  That's a

20   self-made Cadillac description.

21   Q    When we look at the benefits -- you can set that

22   document aside, Woody.

23   A    Thank you.

24   Q    When we look at the benefits and the benefit

25   structures in place at Pt. Pleasant, how was information

VOL. I    117

1    regarding those benefits disseminated to union members?

2    A    By a P&I booklet that was distributed after three

3    years' negotiations was completed.  And it was distributed

4    to each employee, to the best of my recollection.

5    Q    How was it dispersed?

6    A    By management.

7    Q    At the plant?

8    A    At the plant.

9    Q    Was it mailed?

10   A    No.

11   Q    Okay.

12   A    To the best of my recollection.

13   Q    All right.  Were there ever meetings regarding

14   benefits that were in place?

15   A    There were meetings after the -- I returned from the

16   P&I conference to explain the changes in the plan.  There

17   was no meetings by the company or the union that I can

18   recall just for that purpose, to educate people about the

19   P&I Agreement.

20   Q    So what's the difference between -- there were some

21   meetings after you returned from the P&I conference; is

22   that right?

23   A    At a regular membership meeting, the changes that took

24   place, I was the benefit representative that would inform

25   the members of the changes.

VOL. I   118

```
 1    Q    At a general union meeting?

 2    A    At a general union meeting that would appear in the

 3    P&I booklet when it was printed.

 4    Q    Okay.  Thanks.

 5         In addition to this, were there SPDs -- and when I say

 6    SPDs, I mean Summary Plan Descriptions.  Were there SPDs

 7    that were distributed as well?

 8    A    That's correct.

 9         I'm sorry, not distributed, mailed to our residence.

10    Q    You recall receiving those?

11    A    Yes, I did.

12    Q    How often do you recall receiving those?

13    A    I think at my deposition, I indicated maybe three

14    years.  But it was annually.

15    Q    In what format did you receive those?

16    A    By mail.

17    Q    I'd like for you to take a look at Plaintiff's

18    Exhibit 2.  Go ahead and take a look at the first two pages

19    of that.

20    A    All right.

21    Q    Is this a document you recognize?

22    A    No.

23    Q    What does this document purport to be?

24    A    A Summary Plan Description required by the ERISA Act

25    in 1974 as amended.
```

```
1    Q    Do you believe you ever received this document?

2    A    I've never received this document in this form.

3    Q    How do you know that?

4    A    Because all the documents that I received that were

5    SPDs, or summary plan descriptions, were by mail and they

6    were either by -- would be one, two letters, four at the

7    most.  And I never did receive anything in the mail in this

8    entirety, either by mail or distributed at the plant.

9    Q    You said one or two letters or four at the most, do

10   you mean pages when you say letters?

11   A    Pages, yes, I'm sorry.  Yeah, pages.

12   Q    So you did not receive this document?

13   A    To the best of my knowledge, I never received this

14   document.

15   Q    Nonetheless, turn to page 72 of this document with me,

16   and take a look at this, please.

17   A    All right.

18   Q    In the center of this page, there is an area titled

19   limit on company costs for retiree medical plan.

20   A    Yes.

21        THE COURT:  Excuse me a second.  What page are we

22   looking at?

23        MS. ARNOLD:  Seventy-two.

24        THE COURT:  Thank you.

25
```

VOL. I - 120

```
 1    BY MS. ARNOLD:

 2    Q    Did you receive a document by mail that contained this

 3    language?

 4    A    Not that I'm aware.

 5    Q    Do you believe this language would have caught your

 6    attention had you received this?

 7    A    I'm sure it would have, yes.

 8    Q    Do you recall any discussion or questions from other

 9    union members regarding a document like this?

10    A    No.

11    Q    Let's turn back to the beginning of this document to

12    page 2.

13    A    All right.

14    Q    The page is titled Foreward.  Would you read out loud

15    the middle paragraph there for us, please.

16    A    What page are you referring to?  I'm sorry.

17    Q    The second page where at the top it says Foreward.

18    Just the back side of the cover sheet.

19    A    All right.

20    Q    Would you read that middle paragraph out loud for us,

21    please.

22    A    The benefits are described in everyday language in

23    this booklet.  The complete formal plans are set forth in

24    the pension insurance and service award agreement effective

25    May 15, 1991, a copy of which has been distributed to you.
```

VOL. I   121

```
 1    Q    What was distributed to you that it's referring to

 2    here?

 3    A    If it was referring being distributed on plant site, I

 4    didn't receive it.  Nor did I receive it in the mail.

 5    Q    Does this reference your pension and insurance

 6    agreement?

 7              MR. MISCIMARRA:  Objection, leading, Your Honor.

 8              THE COURT:  Well, it's close, but the objection is

 9    sustained.

10    BY MS. ARNOLD:

11    Q    This references formal plans distributed to you.  What

12    documents did you receive that explained your pension and

13    insurance benefits to you?

14    A    The P&I printed booklet provided by the employer,

15    handed out by the employer.

16    Q    Anything additional to that?

17    A    No.

18    Q    Did that booklet contain the type of language that we

19    just looked at on page 72, limiting company costs for

20    retiree medical plan?

21    A    No.

22    Q    Let's put that aside.

23         You've explained to us that you receive pension

24    benefits currently from both M&G and Goodyear, correct?

25    A    That's correct.
```

VOL. I    122

```
 1      Q    When you first retired, however, I believe you

 2      testified that you received your benefits from Goodyear and

 3      Shell?

 4      A    That's correct.

 5      Q    When did you cease to receive pension benefits from

 6      Shell and begin receiving benefits from M&G?

 7      A    After M&G purchased the plant from Shell Chemical.

 8      Q    Approximately when was that?

 9      A    Midyear 2000, I think.  I wasn't in the plant, of

10      course, but that's my understanding.

11      Q    And at that time, when your pension benefits

12      transferred, did your medical benefits transfer as well?

13      A    Yes.

14      Q    What were you paying for those benefits at that time?

15      A    Nothing.

16      Q    What entitled you to those benefits at that time?

17      A    The P&I booklet.

18      Q    Was your status as a pensioner directly related to

19      your receipt of those benefits?

20      A    Yes.

21      Q    Between your retirement in 2007, was there any -- ever

22      any lapse in your benefits?

23      A    No.

24      Q    Any discontinuation in benefits?

25      A    No.
```

VOL. I 123

```
 1    Q    Was there a change in provider related to your

 2    benefits?

 3    A    Yes.

 4    Q    But did your benefits cease at that time?

 5    A    No.

 6    Q    We discussed your medical necessity plan earlier,

 7    correct?

 8    A    Yes.

 9    Q    Has there ever been a threat to discontinue the

10    medical necessity plan for retirees?

11    A    Yes, I believe this document and form dated

12    December 15th, 2006, became a threat to my medical

13    necessities benefits.

14    Q    Are you looking now at Joint Exhibit 39?

15    A    That's correct.

16    Q    Following your receipt of this letter, did any

17    discontinuation in your medical necessity benefits occur?

18    A    No.

19    Q    You can put that aside.  Leave the documents aside for

20    now.  Thanks.

21         At the time you retired, were you a union member?

22    A    No.

23    Q    At -- the day before you retired, were you a union

24    member?

25    A    Yes, the day before I retired I was, yes.
```

```
1     Q     Did your membership continue beyond your retirement?

2     A     No.

3     Q     Have you paid union dues since you retired?

4     A     No.

5     Q     Have you given anyone the right to bargain for you in

6     retirement?

7     A     No.

8     Q     Have you granted anyone permission to bargain on your

9     behalf as a retiree?

10    A     No.

11    Q     You do not work for M&G today, correct?

12    A     That's correct.

13    Q     During the time that you worked at Goodyear and at

14    Shell, did you ever strike?

15    A     Yes.

16    Q     Tell me about that.

17    A     At the time I went to work in '59, after we were

18    organized, we had several strikes; '72 being the longest

19    strike that we incurred.

20    Q     What was the cause of those strikes?

21    A     Wages and benefits, working conditions.

22    Q     And you --

23    A     Benefits that were listed under the local CBA.

24    Q     And you withheld your labor at that time?

25    A     That's correct.
```

VOL I   125

1    Q    As a retiree, do you have any labor to withhold?

2    A    No.

3    Q    During the time that you were on strike, if you can

4    recall back, did your benefits continue during the terms of

5    your strike?

6    A    Yes, they did.

7    Q    Moving forward to some more recent stuff, you've told

8    us that you continue to maintain your health coverage

9    through M&G today?

10   A    That's correct.

11   Q    And remind us again what the total is that you pay

12   monthly now?

13   A    452.01 I believe is the correct figure, to the best of

14   my recollection.

15   Q    When were you first informed that you would have to

16   pay for your medical benefits?

17   A    I believe the middle of December 2006.

18   Q    Take a look beside you at Joint Exhibit 36.  Do you

19   recognize this?

20   A    Yes, I do.

21   Q    What is this?

22   A    It's a letter informing us of the -- we're going to

23   be -- we will be required to pay a monthly premium for our

24   medical coverage and benefits.

25   Q    Was this your first notification regarding that?

```
 1    A    I believe that's correct.

 2    Q    And at this time, what does this letter tell you your

 3    monthly charge would be?

 4    A    $144.44.

 5    Q    And there were others who were charged a different

 6    rate?

 7    A    Yes, there were.

 8    Q    And what was that rate?

 9    A    As this letter states, $856.22.

10    Q    How did you qualify for the lower rate?

11    A    I was a Medicare recipient.

12    Q    Let's put that document aside.

13         And beside you, if you'll go ahead and pick up

14    Plaintiff's 268.  Do you recognize this document?

15    A    Yes, I do.

16    Q    Describe this to me, please.

17    A    This is a letter that I sent to M&G Polymers dated to

18    Mr. Kimm Korber, human resources manager, dated

19    January 15th, 2007.

20         Do you wish me to read the letter?

21    Q    No.

22    A    It's a letter that I sent them protesting the

23    imposition of the medical premiums monthly.

24    Q    Why was it that you protested that?

25    A    Because I felt it was inappropriate for them to do so.
```

1    Q    Why is that?

2    A    Because I had accrued my pension under the 95 point

3    plan, and that allowed me to have accrued benefits as well,

4    without costs -- as it says, full costs paid by the

5    company, with 95 points.

6    Q    Let's set that document aside.  Since you received the

7    first notification that we looked at regarding your

8    benefits, have your charges increased since that time?

9    A    Oh, yes.

10   Q    How, then, approximately or generally have you

11   received notification regarding your rates?

12   A    Annually.

13   Q    Let's take a look at the document to your left titled

14   Plaintiff's 279.

15   A    Okay.

16   Q    Take a look at this for a moment.

17   A    Yes, I'm aware of this document.

18   Q    Did you receive this document?

19   A    Yes, I did.

20   Q    This was sent at the end of 2008.  And what does it

21   inform you is going to change about your rates for 2009?

22   A    Effective 2009, my rate would increase to $350.29.

23   Q    Prior to that --

24   A    Monthly.

25   Q    Prior to that, during 2008, do you recall what your

VOL I   128

1    contribution was that you were paying at that time?

2    A    268.18, I believe.

3    Q    Have you ever received refunds from M&G for premiums

4    or contributions that you've paid for your medical care?

5    A    Yes, I have.

6    Q    Tell us about that.

7    A    As this letter states, I would be eligible for a

8    refund of $1,347.60.

9    Q    Is that the only refund you've received?

10   A    No.

11   Q    Do you recall how many other times refunds have been

12   provided?

13   A    I believe one other time I received a refund.

14   Q    Why was a refund due to you at the end of 2008?

15   A    Because it was an overpayment for the previous year.

16   Q    Were there options for you regarding how you could

17   accept that payment, that refund?

18   A    Yes, there was.

19   Q    What were the options?

20   A    I could take it in a lump sum payment or use it as a

21   credit toward my monthly payments.

22   Q    Which did you choose to do?

23   A    Lump sum payment.

24   Q    Why was that?

25   A    Because I had already given them enough money.  I

1    wanted my money back when they offered it to me.

2    Q    At the same time that this refund was offered, was

3    there also an increase in premiums?

4    A    Yes.

5    Q    How did you make sense of that?

6    A    It was difficult, very difficult.

7    Q    Let's take a look at the second page of this document.

8    Actually, it's the third page of this document.  Does this

9    appear to be a letter that was sent to pre-65 retirees?

10   A    Yes, it does.

11   Q    When I say pre-65, I mean persons who were not yet 65

12   years of age.

13   A    Post-Medicare.  Or pre-Medicare, I'm sorry.

14        Yes, it is.

15   Q    Looking at this middle section on that page in the

16   box, what was the refund due to those persons?

17   A    Much more than mine.  As a matter of fact, it was

18   $7,672.92 plus interest.

19   Q    And at the same time they received that refund, their

20   rates were increased as well?

21   A    I have to review the document, ma'am, before I answer

22   that question.

23        I believe that -- yes, it was increased to $824.77

24   according to this document.

25   Q    Okay.  We can put that aside.

1          Take a look now at the next document, Plaintiff's 297.

2     Is this a document you received?

3     A    That's correct.

4     Q    Describe this document to us, please.

5     A    This is a document dated December 27, 2010, informing

6     me on January 1st, 2011, that my monthly premium would

7     increase to $452.01 per month.

8     Q    Let's put that aside.  That's the rate you continue to

9     pay today, correct?

10    A    That's correct.

11    Q    And you're aware of others who are paying more for

12    their coverage than you are?

13    A    That's correct.

14    Q    Let's take a look at Plaintiff's 298.  Taking a look

15    at the middle of this document, the language contained

16    within the box --

17    A    Okay.

18    Q    -- does this appear to describe the rates for those

19    persons who are pre-65?

20    A    Yes, it does.

21    Q    And what rate are they paying in 2011?

22    A    $957.92.

23    Q    Let's put that aside.

24         At the time you retired, did you anticipate that you

25    would have to pay for your retiree medical coverage?

```
 1    A    No, not at all.

 2    Q    What did you anticipate regarding your retiree medical

 3    coverage?

 4    A    That based upon the P&I Agreement language that the

 5    company would pay the full cost towards the medical

 6    benefits provided.

 7    Q    Can you tell me about the hardship it's caused to you

 8    to have to pay these contributions?

 9    A    Well, it's pretty well changed your style of living.

10    You know, you get a pension, you think, well, I've got my

11    pension now, so you adjust to that level of income.  You

12    have no way of increasing your income without going out and

13    getting a job on the side.  And when I retired, I made a

14    decision I didn't want to look back, so that meant I

15    wouldn't choose to go back to work.

16         But instead of getting a hundred percent of my

17    pension, now I get 75 percent of it.

18    Q    Has this made retirement different than what you

19    expected?

20    A    Very different.

21    Q    In what ways?

22    A    Well, I owned a 2007 car shortly after I retired, and

23    I'm still driving it.  There's one example.

24         And my pension has been reduced by the amount that --

25    $452 a month out of the small pension I'm already getting.
```

1    That's the things that affected me personally.

2    Q    In light of this, why have you chosen to maintain your

3    coverage through M&G?

4    A    Fortunately I'm able to pay that premium, at a

5    hardship, of course.  And it's the best plan that you can

6    have.  You can't buy a plan like I've got and some of us

7    have today for that cost.  So I chose to stay in it.  I was

8    one of the fortunate ones.

9    Q    Why is this medical coverage important to you?

10   A    Because that's what I thought I had for the remainder

11   of my retirement, until death, premium free.  So that's

12   changed my lifestyle completely -- not completely but quite

13   a bit.

14   Q    Have you or your wife Julia had any recent health

15   concerns?

16   A    Oh, yes.

17   Q    Can you tell me about that?

18   A    She had a hole in her heart, which the doctor says is

19   a genetic thing, but it could be a serious matter.

20   Q    Is your coverage more important to you now than ever?

21   A    Oh, yes.

22        What would you do without it in a situation where you

23   have astronomical medical expenses?

24   Q    What do you wish to obtain through this lawsuit,

25   Woody?

1    A    To be made whole for all costs that's involved and

2    maintain this coverage and be made whole for all benefits

3    that we had at the day we retired because the employer has

4    changed some of those benefits for some people.  I'm,

5    fortunately, in the plan that they haven't changed yet or

6    are threatening to change, so I would like to be made

7    whole, as all the class members would, for all that the

8    company has done to our lifestyle in imposing this premium

9    on us.

10         MS. ARNOLD:  I have nothing further in direct.

11         Regarding the discussion we had this morning

12    regarding the introduction of exhibits, do you prefer that

13    I move now to have those admitted?

14         THE COURT:  I don't prefer anything.  It's up to

15    you.  Whatever you wish.

16         MS. ARNOLD:  We'll go ahead and make that motion to

17    admit all of the documents that we've discussed.

18         THE COURT:  All of them?

19         MS. ARNOLD:  Yes.

20         THE COURT:  Any objection to any specific ones?

21         MR. MISCIMARRA:  No, objections, Your Honor.

22         THE COURT:  Let me read them off for the record.

23    Plaintiff's Exhibits 2, 4, 20, 26, 35, 36, 226, 268, 279,

24    297 and 298 will be admitted without objection.

25         Joint Exhibits 1, 4, 14, 36 and 39 will be admitted

```
 1    without objection.
 2                          - - -
 3       Plaintiff's Exhibit Nos. 2, 4, 20, 26, 35, 36, 226, 268,
 4    279, 298 were received into evidence and made a part of the
 5    record.
 6                          - - -
 7       Joint Exhibit Nos. 1, 4, 14, 36, 39298 were received into
 8    evidence and made a part of the record.
 9                          - - -
10           THE COURT:  Mr. Miller, is that correct?
11           THE DEPUTY CLERK:  That's what I have.
12           THE COURT:  Thank you.
13           Cross-examination, then.
14           Cross-examination, Mr. Weals.
15           MR. WEALS:  Thank you, Your Honor.
16                          - - -
17                      CROSS-EXAMINATION
18    BY MR. WEALS:
19    Q    Good afternoon, Mr. Pyles.  How are you?
20    A    Good afternoon.
21    Q    You know me.  I'm Chris Weals, one of the lawyers for
22    the defendants.
23           Now, Mr. Pyles, is it your testimony today that you
24    never received the exhibit that's been marked as the
25    Plaintiff's Exhibit No. 2?  Can you grab ahold of that?  Do
```

1    you have that there?  That's the Summary Plan Description.

2    A    What number?  Two?

3         Yes, I have that document.

4    Q    So you gave some testimony about this, Mr. Pyles, and

5    I believe you testified on direct examination that you

6    never received this document.  Is that your testimony?

7    A    That's my testimony.

8    Q    Now, you recall, don't you, Mr. Pyles, that I took

9    your deposition in this matter back in October of 2009?  Do

10   you recall that?

11   A    Yes, I do.

12   Q    And that took place at the offices of Vorys Sater

13   right up the street not far from here?

14   A    That's correct.

15   Q    And Mr. Pyles, you may see from this document, it's

16   marked as Plaintiff's Exhibit 2, but it also has an EX2 on

17   the top, your copy, and that's because it was Exhibit No. 2

18   in your deposition.  Do you see that?

19   A    I see that, yes.

20   Q    And I asked you some questions about this document

21   during your deposition, didn't I, Mr. Pyles?

22   A    I don't recall.

23   Q    Let me read back to you, if you could pull up page 71

24   of Mr. Pyles' deposition.  Here, we've marked Deposition

25   Exhibit No. 2, which is the same document you have in front

1    of you.  I think we've agreed to that.

2        And I asked you if you could take a look at the second

3    document in the notebook which was Exhibit No. 2.  Exhibit

4    No. 2, Mr. Pyles, is a document that has Goodyear's logo on

5    it entitled insurance medical pension disability income and

6    supplemental unemployment benefits for hourly rated

7    employees of the Pt. Pleasant plant in effect as of May 15,

8    1991.

9        And you agree that's the same document we're looking

10   at here, correct?

11   A    I would assume, yes.

12   Q    And I asked you, I believe that you -- well, let me

13   ask you this:  Do you recall receiving this document?  And

14   you said no.

15       And I asked you additional questions.  During this

16   period, 1991, you were serving at that time as benefits

17   representative, is that correct?  And you said that's

18   correct.

19       I asked you the following question:  If you look at

20   the second page of the document in the third paragraph,

21   this booklet is the summary plan description required by

22   the Employee Retirement Income Security Act of 1974 as

23   amended, ERISA.  Do you see that?

24       Answer:  Yes, sir.

25       Question:  Are you familiar with what a Summary Plan

```
 1   Description is?

 2        Answer:  Yes, sir.

 3        Question:  Having looked at that language again, do

 4   you recall receiving this particular document that has been

 5   described as the summary plan description?

 6        And your answer was:  If it was issued, I received it.

 7        And wasn't that your answer, Mr. Pyles?

 8   A    That's what's before me on the screen, yes.

 9   Q    Now, in addition, you provided some answers to

10   interrogatories in this case, didn't you, Mr. Pyles?

11   A    Yes, I did.

12        MR. WEALS:  And with the Court's permission, may I

13   hand the witness a notebook with some documents in it?

14        THE COURT:  Sure.

15        MR. WEALS:  Thank you.

16   BY MR. WEALS:

17   Q    Now, Plaintiff's Exhibit No. 286, these are -- and if

18   you take a look at the document, Mr. Pyles, I believe this

19   was marked in your deposition as well -- you would agree

20   that these are the answers that you gave to the

21   interrogatories in this case?

22        THE COURT:  You're making reference to Plaintiff's

23   Exhibit 286?

24        MR. WEALS:  Yes, Your Honor.

25        THE COURT:  Okay.  Thank you.
```

1   BY MR. WEALS:

2   Q    If you turn to page 5 of this document, Mr. Pyles,

3   there is a question and then there's an answer.  And then

4   there's a reference to some documents that have the WWP.

5   And that's Woodrow Wesley Pyles, correct?

6   A    That's correct.

7   Q    And the WWP refers to the documents that you produced

8   in this lawsuit, isn't it?

9   A    I would assume, yes.

10  Q    So looking at this now, these are the answers to the

11  interrogatories that you provided in this case?

12  A    Do we have a -- yes.

13  Q    Let's look at -- let's look at number 11 which begins

14  at the bottom of page 8, if you would.

15      And it says:  State whether you ever received a

16  Summary Plan Description for the plan, and if so:  A, state

17  the date on which you received such summary plan

18  description; B, describe in detail the manner in which you

19  received such Summary Plan Description; and C, state

20  whether you still have any such documents.

21      And this is the answer that you gave, isn't it,

22  Mr. Pyles:  Summary Plan Descriptions were received

23  beginning in 1991 by mail every three years.  See 1991

24  Goodyear SPD attached and identified as WWP 2579 through

25  WWP 2674.

1        Now, these are the answers that you gave, the sworn
2    answers to interrogatories in this case, correct?
3    A    If this is that document, yes.
4    Q    And, in fact, I asked you about this very question
5    during your deposition.  Do you recall that?
6    A    No, I don't, sir.
7    Q    Let's look at page 93 of your deposition transcript
8    beginning at the bottom.  We're referring here on the
9    deposition to Plaintiff's Exhibit --
10   A    I'm confused, sir.  Page 93, where?
11   Q    It's up on your screen, if you will.  I apologize,
12   Mr. Pyles.  I switched over from paper to the screen.
13        So the question is:  So the question number 11 -- and
14   that's question number 11 that we were just talking about,
15   right, Mr. Pyles?  That's the same one that I just read for
16   the Court, and your answer.
17        So question number 11, Mr. Pyles, let me read it into
18   the record.
19        And then I read it into the record and I read your
20   answer into the record.
21        And I asked you:  So you think you said earlier today
22   that you thought they came out annually, the SPDs.  Does
23   every three years sound right?
24        Your answer was:  Yes, that's what is required by law.
25   Whatever was required by law, that's what they did.

1    Question:  I'm just trying to get what you remember,
2    not what was required by law.
3    Do you remember if you got them every three or every
4    three -- every year or every three years?
5    Answer:  Probably three years is correct but I don't
6    know what the law says.
7    Question:  It indicates see 1991 Goodyear SPD attached
8    and identified as WWP 2579 through WWP 2674.  Although we
9    didn't have it marked here today, it sounds like you did
10   have a copy of the Summary Plan Description.
11   And your answer was:  Correct.
12   Isn't that what you said in your deposition under
13   oath?
14   A    I don't know where you're at, sir, on the --
15   Q    I'm sorry.
16   A    You were going so fast, Mr. Weals, that I can't keep
17   up with you.  I'm sorry, but I can't.
18   Q    That's all right.  I'm sorry that I read too fast for
19   you.
20   I'm on page 94 of the deposition.
21   A    Do I have that document in front of me, sir?
22   Q    It's on the screen.  If you would like a copy of the
23   deposition itself, we can --
24   A    Well, if you go a little slower, I might stay up with
25   you.

```
 1    Q     All right.

 2    A     If you would, please.

 3    Q     Not a problem.

 4          So I'm starting here with:  And your answer was --

 5          THE COURT:  Wait a minute.  Make reference to the

 6    line number.

 7          MR. WEALS:  I'm sorry.

 8    BY MR. WEALS:

 9    Q     Page 94, line number 5, Mr. Pyles.

10    A     I see that.

11    Q     And your answer was:  Summary Plan Descriptions were

12    received beginning in 1991 by mail every three years.  So I

13    think you said earlier today that you thought they came out

14    annually.  Does every three years sound right?

15    A     No.  Annually, sir.

16    Q     Your answer was:  Yes, that's what is required by law.

17    Whatever is required by law, that's what they did.

18          And I asked you the following question on line 13:

19    I'm just trying to get what you remember, not what was

20    required by law.

21          Do you remember if you got them every three or

22    every -- every year or every three years?

23          Answer:  Probably three years is correct.  But I don't

24    know what the law says.

25          Now here is the important part, on line 19, question,
```

```
1    it indicates in your response to the interrogatories:  See

2    1991 Goodyear SPD attached and identified as -- and there's

3    some document numbers which I read earlier.

4         Although we didn't have that marked here today, it

5    sounds like you did have a copy of the Summary Plan

6    Description.

7         And your answer was:  Correct.

8         Isn't that right?

9    A    That's what it says on the document before me, sir.

10   Q    Now, Mr. Pyles, before we took the lunch break,

11   Ms. Arnold asked you some questions about the 1991 -- I'm

12   sorry, Letter A to the 1991 Collective Bargaining

13   Agreement.  Do you remember that?

14   A    (Nods head.)

15   Q    And that was Joint Exhibit No. 1.  Do you still have

16   Joint Exhibit No. 1 with you?

17   A    Yes, I do.

18   Q    And in particular, Ms. Arnold directed you to page 141

19   of that document.

20   A    That's correct.

21   Q    I'll give you a second if you want to turn to that.

22        Do you have it?

23   A    That's correct.

24   Q    And page 141, I think we agree, is entitled Letter A;

25   is that right?
```

```
 1    A    That's correct.

 2    Q    Now, the second paragraph of this letter, on page 141,

 3    you testified, I believe, and correct me if I'm wrong, that

 4    this letter incorporated the Master P&I Agreement between

 5    Goodyear and the United Rubber Workers; is that correct?

 6    A    That's correct.

 7    Q    And then if you turn over to the next page, it says

 8    that it incorporates the pension insurance and service

 9    agreement, including the covering letters under the same

10    date, will be applied to the employees covered by this

11    agreement with the exception -- do you see that language in

12    the first paragraph on the top of page 142?

13    A    I see that, yes.

14    Q    With the exception of Letter 7, Letter 8, and further

15    Letter 21 and Letter 22 will be applied in the following

16    manner at the Pt. Pleasant plant.  Do you see that

17    language?

18    A    Yes, I do.

19    Q    Now, then there's several paragraphs that talk about

20    the pension multiplier.  You see that, that's number one?

21    A    I see that.

22    Q    And how in paragraph number 2, how the pension

23    multiplier is going to be paid for?

24    A    Yes.

25    Q    So, Mr. Pyles, there's no exception here in Letter A
```

```
 1   to unpublished letters in the P&I Agreement, is there?

 2   A    Would you rephrase the question, please?

 3   Q    Well, you would agree that there is a list of

 4   exceptions here.  There is exception of Letter 7, Letter 8,

 5   and then 21 and 22?

 6   A    That's correct.

 7   Q    There's no exception as to unpublished letters in the

 8   P&I Agreement, is there?

 9   A    None that I see in this document.

10   Q    And there's no reference here that Letter G is an

11   exception to Letter A?

12   A    None I that see, sir.

13   Q    Now, let's look at Joint Exhibit No. 4, if you would.

14   That's the 1994 Shell Local 644 Collective Bargaining

15   Agreement.  Do you have that?

16   A    That's correct.

17   Q    And Ms. Arnold, I believe, also directed you to Letter

18   A in this document which appears at page 154.  Could you

19   take a moment and turn to page 154?

20   A    Uh-huh.  I have that document in front of me.

21   Q    Now, this document also, I think you testified on

22   direct examination, incorporates the benefits negotiated

23   between Goodyear and the United Rubber Workers.  Would you

24   agree with that?

25   A    Would you say -- who were the companies you say?
```

VOL. I - 145

1    Q    Let me ask it this way.  Would you agree that this

2    language incorporates the Master P&I Agreement?

3    A    Yes.

4    Q    And by the way, Mr. Pyles, are you aware of any 1994

5    Shell P&I Agreement?

6    A    For medical benefits?

7    Q    Correct.

8    A    No, I'm not.

9    Q    The only one that existed in 1994 was the Goodyear

10   P&I, correct?

11   A    I can't answer that definitely because I was not

12   actively employed at that time.

13   Q    All right.  Fair enough.

14   A    Can I correct that statement?  I was actively employed

15   but I was on medical leave.

16   Q    When did you go out on medical leave, Mr. Pyles?

17   A    I believe it was July 7th of '94.

18   Q    Now, Mr. Pyles, let me -- why don't you pull up a copy

19   of Plaintiff's Exhibit No. 26, if you still have that, and

20   that's the 1994 Letter G.

21   A    Would you give me that number, again, please.

22   Q    Plaintiff's Exhibit No. 26.  I have an extra copy, if

23   you need it.

24   A    I have that document here.

25   Q    Okay.  Great.  Thank you.

1    Now, Mr. Pyles, just so I understand, your testimony

2    earlier is that you received this document, which is the

3    1994 -- I'm sorry.

4         MR. WEALS:  Can I have just a moment, Your Honor?

5         THE COURT:  Sure.

6    BY MR. WEALS:

7    Q    I'm sorry.  I need Joint Exhibit 14.  I apologize,

8    Mr. Pyles.

9    A    I have that document.

10   Q    Now, that's the one I wanted.  That's the Letter G

11   dated May 15, 1991.

12   A    That's correct.

13   Q    And Ms. Arnold asked you about that earlier today,

14   correct?

15   A    Yes.

16   Q    And you testified, I believe, that you received this

17   document at the 1991 P&I conference; is that right?

18   A    To the best of my recollection.

19   Q    And you then put that document with your -- I think

20   you said with your P&I materials?

21   A    Correct.

22   Q    Did I get that right?

23   A    Correct.

24   Q    Now, you didn't produce a copy of that Letter G in

25   this case, did you, Mr. Pyles?

1    A    I don't recall doing that, no.

2    Q    And do you still have it?

3    A    No.

4    Q    Now -- and I also understand your testimony is that

5    you did not show this to any members of the local union; is

6    that right?

7    A    To the best of my recollection, I don't recall.  It

8    could have been to the president, perhaps.  I'm not -- I

9    can't say for sure.  But I don't recall showing it to

10    anyone or giving him a copy.

11    Q    So you got the letter, you put it with your P&I

12    materials, but as far as you recall, you didn't share it

13    with the rest of the union members?

14    A    I don't recall sharing it, no.

15    Q    And I think you made reference, Mr. Pyles, to a policy

16    or practice of the local that unpublished letters were not

17    applicable at the local level.  Is that what you said?

18    A    Something to that, yes.

19    Q    Something to that effect.

20         And do you remember making any reference to that

21    during your deposition, Mr. Pyles?

22    A    I don't recall, sir.

23    Q    And this policy and practice of the local union, is

24    this written down somewhere?

25    A    Unwritten policy.

VOL I 148

1    Q    It's an unwritten policy.  Okay.

2    A    That's correct.

3    Q    So that means it's not in the local union charter?

4    A    That's correct.

5    Q    And it's --

6    A    I'm sorry, sir.

7    Q    Go ahead.

8    A    I wouldn't say it's not in the local union charter.

9    I'm not aware whether it is or not.  I just know it's not a

10   written policy, per se.

11   Q    So that means it wouldn't be in any Collective

12   Bargaining Agreement either?

13   A    Not that I'm aware.

14   Q    Is it your testimony that this unwritten policy

15   applies to unpublished letters that were part of the

16   Collective Bargaining Agreement?

17   A    Rephrase that question.

18   Q    Let me ask you a few questions before that.

19        Are you aware that there were also unpublished letters

20   that went along with the local Collective Bargaining

21   Agreement?

22   A    No.

23   Q    So do you know whether the unwritten policy that you

24   make reference to that unpublished letters did not apply at

25   the local level, whether that applied to the CBA too?

1    A    Yes.

2    Q    It did?

3         MR. WEALS:  I have no further questions, Your Honor.

4         THE COURT:  Just a second.

5         MR. WEALS:  Your Honor, I think I misspoke.  I would

6    like to, to the extent that there were any new documents, I

7    believe the only one was Plaintiff's Exhibit 286.

8         THE COURT:  Answers to interrogatories identified by

9    Pyles, any objection to the admission of 286, counsel for

10   plaintiff?

11        MS. ARNOLD:  None.

12        THE COURT:  Thank you.  286 will be admitted without

13   objection.

14                        - - -

15     Plaintiff's Exhibit No. 286 was received into evidence

16   and made a part of the record.

17                        - - -

18        THE COURT:  And still just a second, please.

19        MR. WEALS:  That's all, Your Honor.  Thank you.

20        THE COURT:  Redirect, if any?

21        MS. ARNOLD:  Yes.

22        THE COURT:  You may proceed, then, Ms. Arnold.

23

24

25

VOL. I 150

```
 1                        - - -

 2                  REDIRECT EXAMINATION

 3    BY MS. ARNOLD:

 4    Q    You can set that large binder aside, Woody.

 5    A    Thank you.

 6    Q    I want to revisit your deposition testimony, Woody.

 7    A    Uh-huh.

 8    Q    You received some questions during cross-examination

 9    related to the 1991 SPD we talked about earlier.

10    A    That's correct.

11    Q    And you were shown documents indicating that you did

12    provide that document during the discovery process?

13    A    That document being?

14    Q    The 1991 SPD.

15    A    Yes, I provided that document.

16    Q    So that document did come into your possession at some

17    time?

18    A    I don't have the document in front of me.  I'd rather

19    not answer until I see the document that you're referring

20    to.

21    Q    Okay.  We're talking about Plaintiff's Exhibit 2, I

22    believe.

23    A    Exhibit 2?

24    Q    Yeah.

25    A    Yes, I have it.
```

VOL. I   151

```
 1    Q    And what Mr. Weals addressed during his
 2    cross-examination is that a document similar or identical
 3    to this was provided by you during the discovery process.
 4    A    It was not provided by me.
 5    Q    The documents that we just looked at regarding your
 6    answers to interrogatories indicated that you did have a
 7    document similar to this.  Do you recall that?
 8    A    No, I do not.
 9    Q    Do you know how such a document would have came into
10    your possession?
11    A    I don't know how I would have received it.
12    Q    Is it possible that any documents came into your
13    possession later in time than when they might have been
14    distributed at the plant?
15         MR. WEALS:  Objection, leading.
16         THE COURT:  Sustained.
17    BY MS. ARNOLD:
18    Q    Do you know of any way you could have came to possess
19    this other than by a distribution by the plant?
20    A    No, and I wasn't given this document in distribution
21    from the plant.  I know that for a fact.
22    Q    Let's take a look at page 96 of your deposition.
23    We're showing you a small page there, Woody.  So 96 is up
24    in the top right.
25    A    Uh-huh.
```

1    Q    You were asked questions in your deposition regarding

2    page 72 of the Summary Plan Description.  Cross-referencing

3    this now to Plaintiff's Exhibit 2 which you hold in your

4    hand, will you take a look at page 72 in that document?

5    A    Yes, I have that document.

6    Q    Do you recognize the language contained within that

7    page?

8    A    This appears to be a FASB letter requiring the company

9    to -- on the balance sheet to add the liabilities for

10   future retirees benefits.

11   Q    Do you recall receiving a document that contained that

12   language?

13   A    No, I didn't receive that document.

14   Q    Do you recall ever receiving language such as that in

15   a Summary Plan Description?

16   A    Maybe some -- some of this language may be in the

17   Letter G, I'm not sure.  But in this context as written

18   here --

19   Q    I've asked you specifically about a Summary Plan

20   Description.

21   A    I don't remember getting that, no.

22   Q    Did you receive any language such as that in a Summary

23   Plan Description?

24   A    I don't recall receiving it, no.

25   Q    Mr. Weals also asked you about the exceptions to the

1    1994 CBA's Letter A.  We don't need to take a look at that

2    again.

3         In addition to those exceptions, he discussed with you

4    the union policy not to honor unprinted letters, correct?

5    A    That's correct.

6    Q    What unprinted letters were you aware of, Woody?

7    A    Letter G that I received in '91.

8    Q    Were you aware of other unprinted side letters?

9    A    My understanding is there is a letter that evolved

10   after I had retired that wasn't in the booklet.

11   Q    You've heard about this since your retirement?

12   A    It became Letter H, I think, after Letter G.

13   Q    While you were an active union member and while you

14   were the pension insurance representative, were you aware

15   of other unprinted side letters?

16   A    No.

17   Q    Do you believe that the local union intended to accept

18   unprinted side letters as part of their agreement?

19        MR. WEALS:  Objection, lack of foundation.

20        THE COURT:  No, as a union member, union rep and

21   union treasurer, he may answer it.

22        THE WITNESS:  Would you ask the question, again,

23   please?

24   BY MS. ARNOLD:

25   Q    In your roles as an active union member and as a

1    representative of the union, do you know if the union

2    intended to accept unprinted side letters to agreements?

3    A    No.  That was not our policy.

4    Q    And you've told us that you were not aware of any

5    unprinted side letters other than this Letter G that you've

6    seen?

7    A    That's the only letter that I'm aware of.

8    Q    Do you know how it would have been possible for the

9    union to assent to letters that they were unaware of?

10   A    Pretty hard to do if you don't have something to

11   accept or reject.

12   Q    Okay.  Mr. Weals asked you if you had produced a copy

13   of the 1991 Letter G as a part of this suit.  And you

14   indicated that you did not believe so.

15        You told us that you filed -- or that you put the 1991

16   Letter G that you received with your pension and insurance

17   materials?

18   A    To the best of my recollection, yes.

19   Q    Did you retain those materials when you retired?

20   A    No.

21        MS. ARNOLD:  Just a moment, Your Honor.

22        I have nothing further.

23        THE COURT:  Mr. Weals, anything further on recross?

24        MR. WEALS:  Nothing, Your Honor.

25        THE COURT:  Mr. Pyles, you may step down.  Remember,

```
 1    Mr. Pyles, you're not to discuss your testimony with
 2    anyone.  Do you understand that?
 3              THE WITNESS:  Yes, sir.
 4              THE COURT:  Thank you.
 5              Well, this might be a good time to take a short
 6    break.  Let's take about a ten minute recess.
 7              (Recess taken from 2:26 to 2:40.)
 8              MR. COOK:  Your Honor, as a preliminary matter, I
 9    neglected to mention that class representative Harlan
10    Conley has joined us in the courtroom.  He came after lunch
11    and he's seated in the jury box.
12              THE COURT:  That's fine.  Thank you.  We just need
13    to wait a second on Mr. Miller.  He'll be right back.
14              Ms. Arnold, your next witness, please.
15              MS. ARNOLD:  Yes, plaintiffs call Freel Tackett.
16              THE COURT:  Mr. Tackett, if you'll come forward,
17    please.
18       (Witness sworn.)
19              THE COURT:  Mr. Tackett, would you state your full
20    name and you probably better spell your first and last
21    name.
22              THE WITNESS:  Hobert Freel Tackett.
23              THE COURT:  I mean your middle name, then.  You go
24    by Freel, do you not?
25              THE WITNESS:  Yes, I do.
```

```
 1                THE COURT:  Spell Freel.

 2                THE WITNESS:  F-R-E-E-L.

 3                THE COURT:  Thank you.  And your last name, spell

 4      it, please.

 5                THE WITNESS:  T-A-C-K-E-T-T.

 6                THE COURT:  Thank you.

 7                You may proceed on direct examination, Ms. Arnold.

 8                           - - -

 9                      HOBERT FREEL TACKETT

10      Called as a witness on behalf of the Plaintiff, being first

11      duly sworn, testified as follows:

12                       DIRECT EXAMINATION

13      BY MS. ARNOLD:

14      Q    Freel, you're a plaintiff in this lawsuit that we're

15      here about today?

16      A    Yes, ma'am.

17      Q    Can you tell me why you're here as a part of this

18      suit?

19      A    Well, I was selected by the group to be one of the

20      representatives.

21      Q    And what do you hope to obtain through this suit?

22      A    Pardon?

23      Q    What do you hope to obtain through this lawsuit?

24      A    Well, I hope to regain our free medical benefits which

25      M&G has been charging us for.
```

1    Q    You were an employee at the Pt. Pleasant polyester

2    plant; is that right?

3    A    Yes.

4    Q    When did you begin work there?

5    A    February 7th, 1966.

6    Q    And what position did you hire into?

7    A    Just as a chemical operator.

8    Q    What did you do in that job?

9    A    At that time, just whatever job was available as a new

10   employee.

11   Q    Did you continue in that role until the time of your

12   retirement?

13   A    No.  I had different bid jobs.  I worked control room

14   for a while.  I worked in packaging for a while, and then I

15   bid out to the warehouse which was shipping and

16   warehousing.

17   Q    During the time that you worked at the plant, was

18   there a change in ownership there?

19   A    Yes, there was.

20   Q    Tell me about that.

21   A    Changed from Goodyear Tire & Rubber to Shell Chemical.

22   Q    And did you retire from Shell?

23   A    Yes, I did.

24   Q    When did you retire, Freel?

25   A    My retirement date was March 1, 1966.

VOL. I 158

1    Q    I know you're trying to speak into the microphone, if

2    you could try to keep your voice up just a little bit more

3    and speak a little more directly, we'd appreciate it.

4    A    I'll move a little closer to it.

5    Q    Can you revisit your retirement date for us as well,

6    please, and tell me what date you retired on?

7    A    March 1, 1966.

8    Q    You're telling me 1966 is when you retired?

9    A    March 1, 1996.

10   Q    That sounds a little better, Freel.

11        During the time that you worked at the plant, were you

12   a union member?

13   A    Yes.

14   Q    Of what union?

15   A    United Rubber Workers.

16   Q    And did that become a different union?

17   A    It became United Steelworkers.

18   Q    Did you hold any positions in that union?

19   A    Yes.  I held several positions.  I held -- for the

20   start, I held shop steward, then I went to the executive

21   board, then I went to the third member of the bargaining

22   committee, then to vice president, and then to president of

23   the local.

24   Q    That's a lot of positions.

25   A    Those are several years.

1    Q    When did you cease to hold any offices within the

2    union, approximately?

3    A    It was probably mid-1980's.

4    Q    And what was the last position that you held?

5    A    President.

6    Q    And why did you cease to hold that office?

7    A    Well, I felt I had put my time in, and it was starting

8    to get to me a little bit, and I just got tired of it and

9    resigned.

10   Q    Did you continue to be an active member of the union

11   after you ceased being an officer?

12   A    Yes.

13   Q    Freel, are you a married man today?

14   A    Pardon?

15   Q    Are you a married man?

16   A    Yes; soon be 53 years.

17   Q    Congratulations.

18   A    Thank you.

19   Q    What's your wife's name?

20   A    Sharon.

21   Q    While you worked at the plant, were both you and

22   Sharon covered under the medical benefits provided there?

23   A    Yes.

24   Q    Did you both continue to participate in that plan

25   after you retired?

VOL. I    160

```
 1    A    Yes.

 2    Q    Have you maintained that coverage since your

 3    retirement?

 4    A    The coverage has stayed the same.

 5    Q    Okay.  And you still have that coverage?

 6    A    Yes.

 7    Q    When you first retired, who provided those benefits to

 8    you?

 9    A    Shell Chemical.

10    Q    And who provides those to you today?

11    A    M&G Polymers.

12    Q    Approximately when did that change occur?

13    A    I think it was around 2000 when M&G bought Shell.

14    Q    Did you pay anything for those benefits at the time

15    you retired?

16    A    No, I did not.

17    Q    Do you pay anything for them today?

18    A    Yes, I do.

19    Q    What do you pay for them today, Freel?

20    A    $452.01 a month.

21    Q    When did you begin to be charged for your retiree

22    medical coverage?

23    A    January 1 of 2007.

24    Q    At any time prior to that, did you pay for your

25    medical coverage?
```

VOL. I  161

```
 1    A    No, I did not.

 2    Q    Okay.

 3         MS. ARNOLD:  Your Honor, if I may?

 4         THE COURT:  You may.

 5  BY MS. ARNOLD:

 6    Q    We'll just take a look at these one at a time.  If

 7  you'll go ahead and take a look at the document there.

 8  It's Joint Exhibit 1.

 9    A    Okay.

10    Q    Do you recognize this document?

11    A    Yes.  It's the agreement between Goodyear Tire &

12  Rubber polyester plant and local number 644.

13    Q    What agreement is this?

14    A    This is the 1991 agreement.

15    Q    Is this the collective bargaining agreement?

16    A    Yes, it is.

17    Q    If we call that a CBA --

18    A    CBA.

19    Q    Was this the CBA that covered the terms of your

20  employment at Goodyear from 1991 to 1994?

21    A    Yes, it was.

22    Q    Okay.  You can set that aside.

23         If you'll now take a look at the next document,

24  Plaintiff's No. 4.

25    A    Okay.
```

1    Q    Take a look at this, and let me know if you recognize

2    this document.

3         THE COURT:  I think you referred to it as

4    Plaintiff's Exhibit 4.  Oh, it is Plaintiff's Exhibit 4,

5    isn't it?

6         THE WITNESS:  This looks like the pension,

7    insurance, P&I agreement of 1991.

8    BY MS. ARNOLD:

9    Q    What does this agreement cover, Freel?

10   A    It covers our pension and insurance, medical

11   insurance, pension.

12   Q    Was this the document that applied at Pt. Pleasant?

13   A    Yes, it was.

14   Q    Were there any other documents regarding your Pt.

15   Pleasant polyester plant benefits?

16   A    None that I know of.

17   Q    If you'll take a look at this document and turn to the

18   back of it.

19   A    Okay.

20   Q    Excuse me.  I'm looking at the wrong document, Freel.

21   Let me catch up to you.

22        Can you take a look at page 239?

23   A    Okay.

24   Q    At this point, there is a series of letters; is that

25   right?

VOL. I   163

```
 1    A    Right.

 2    Q    How are those letters titled?

 3    A    Letter number 1, letter number 2.

 4    Q    Do they continue to be titled with numbers throughout

 5    that pagination series?

 6    A    I didn't look at all of them, but the ones I've looked

 7    at, they're numbered in order.

 8    Q    Do you see any letters titled with an alphabetic

 9    letter?

10    A    No, ma'am.

11    Q    You don't recognize a Letter G in this document?

12    A    I don't see any in it.

13    Q    During the term of the 1991 to 1994 agreement, were

14    you aware of any Letter G?

15    A    No, I was not.

16    Q    Were you aware of any limits on company contributions

17    for retiree medical coverage?

18    A    No.

19    Q    Let's set that document aside.

20         If you'll take a look at this next document.  This is

21    Joint Exhibit 14.

22    A    Okay.

23    Q    Have you seen this document before?

24    A    Yes, I have.

25    Q    When did you first see this document?
```

VOL. I   164

```
 1    A    I saw it after the lawsuit was filed, after they

 2    started charging us for medical benefits.

 3    Q    So sometime since 2007?

 4    A    Correct.

 5    Q    At any time prior to that, had you seen this letter?

 6    A    No, I had not.

 7    Q    At any time prior to you -- to the time at which you

 8    were charged medical benefits, did you have any knowledge

 9    of any company limits on contributions for your retiree

10    medical care?

11    A    No, I didn't.

12    Q    Let's put that document aside.

13         We've just looked at documents covering the period

14    from 1991 to 1994.  Did the company change ownership during

15    that time?

16    A    I believe it was in late 1991 that Shell bought out

17    Goodyear.

18    Q    You continued to be employed at the plant at that

19    time?

20    A    Correct.

21    Q    We'll just go through these one at a time now.  If you

22    go ahead and take a look at this first document.  Let me

23    know if you recognize this.  This is Joint Exhibit 4.

24    A    It looks like it's a CBA of Shell Chemical and Local

25    644 dated 1994.
```

1    Q    What terms were controlled by the collective

2    bargaining agreement?  What did this cover at Pt. Pleasant?

3    A    It covers our working conditions, our vacation pay,

4    our holidays, and that's probably about it.

5    Q    Does it cover your benefits?

6    A    No.

7    Q    What document relates to your benefits?

8    A    P&I agreement.

9    Q    Okay.  Does this appear to be the CBA that was in

10   place at Pt. Pleasant in 1994?

11   A    Yes.

12   Q    Okay.  Go ahead and set that aside.

13        The next document is Plaintiff's 20.  If you could

14   take a look at this document.

15   A    Okay.

16   Q    Do you recognize this document, Freel?

17   A    Yes, I do.

18   Q    What is this document?

19   A    It's a P&I agreement effective July the 20th, 1994.

20   Q    And you told us earlier that you retired in 1996; is

21   that right?

22   A    Uh-huh.

23   Q    So you retired under this agreement?

24   A    Yes, I did.

25   Q    Okay.  Take a look with me, please, at page 91 of this

1  document.

2  A    Okay.

3  Q    There's a paragraph here that begins notwithstanding

4  the above.  Take a moment to read that paragraph, and when

5  you're through with that, let me know.

6  A    Okay.

7  Q    What does this paragraph mean to you?  What do you

8  understand from this paragraph?

9  A    It tells me if an employee retires with 95 points, he

10  gets full medical benefits, company paid medical benefits

11  for life.

12  Q    Pursuant to this paragraph, was there anyone who would

13  not get fully paid medical benefits in retirement?

14  A    If they didn't -- their age and their service didn't

15  add up to 95 points, they would have to pay a percentage of

16  their medical costs.

17  Q    And explain to me how a person earns 95 points.

18  A    By age and years service.  One point for age and one

19  for service, years of service.

20  Q    Okay.  If we take a look at the back of this document,

21  Freel.

22  A    Let me elaborate just a little bit.  With 30 years

23  service, you automatically got the 95 points.

24  Q    That's in the sentence directly following this

25  paragraph that begins notwithstanding the above, that's the

1   next sentence?

2   A    Right.

3   Q    Thanks.

4        If you turn to page 169, there is a letter here titled

5   Letter No. 1.

6   A    Okay.

7   Q    Just flip through the rest of the document from there

8   on out and let me know if you see any letters here that are

9   titled with anything other than a number.

10  A    No.

11  Q    Any Letter G?

12  A    No.

13  Q    During the term of this agreement, were you aware of

14  any company cap on contributions for retiree medical?

15  A    No, I was not.

16  Q    You can put that aside and pick up the next document,

17  please.  It's Plaintiff's 26.

18  A    Okay.

19  Q    Do you recognize this document?

20  A    Yes, I've seen it.

21  Q    When did you first see this document?

22  A    After the court case was filed.

23  Q    So sometime since 2007?

24  A    That's correct.

25  Q    While you were an employee at Pt. Pleasant, did you

```
 1    ever see this letter?

 2    A    No, I did not.

 3    Q    Did you ever see a letter like this?

 4    A    No, I did not.

 5    Q    Did you believe that there were unprinted letters that

 6    would control your medical benefits in retirement?

 7    A    No.

 8    Q    Put that aside, please.  We talked earlier about 95

 9    point provisions.

10    A    Right.

11    Q    How many points did you have when you retired, Freel?

12    A    When I left the plant, I didn't have the 95 points.

13    Q    And at the time of your retirement?

14    A    At my retirement, March 1, I had the 95 points.

15    Q    Let's talk about your benefits in retirement right now

16    that were your pension benefits, not your medical benefits.

17    A    Okay.

18    Q    When you retired, what did you know about your pension

19    benefits, Freel?

20    A    We knew how much we would get per month per year of

21    service and we had options on how we would take it, if

22    we -- we could take a reduction in our monthly benefits and

23    leave a portion to our spouse if we died before she did.

24    Q    Did anyone explain those options to you?

25    A    They wasn't explained as much as they were printed out
```

VOL. I   169

```
 1    and you could read and see what the options were.
 2    Q     How did you receive those printouts?
 3    A     I think Mike Harrington gave them to me.
 4    Q     After looking at those, did you have any inquiries
 5    regarding that?
 6    A     No, it pretty well explained itself.
 7    Q     At the time of your retirement, what did you
 8    understand about your medical benefits in retirement?
 9    A     I thought I had them paid for life.
10    Q     Did you ask anyone questions about that?
11    A     No, I didn't.
12    Q     Why not?
13    A     I had it in the contract book.  I thought that was
14    good enough.
15    Q     You just referred to Mike Harrington as having
16    provided these documents to you; is that right?
17    A     Right.
18    Q     Can you tell me who he was?
19    A     I don't know what his title was, but he was in
20    personnel.
21    Q     And he assisted you with your retirement issues?
22    A     I think he's the one that took care of most of the
23    paperwork that we had to sign and such to take the buyout.
24    Q     Was he a company employee?
25    A     Yes, he was.
```

VOL. I    170

1    Q    Was he a union employee -- was he a part of the union?

2    A    I don't know whether he ever was part of the union --

3    a union employee or not, but at that time, he was a company

4    employee.

5    Q    Okay.  You've told us that the handouts explained your

6    pension elections and you've told us that you didn't ask

7    questions about your medical benefits.

8    A    Right.

9    Q    Were there other questions that you asked at the time

10    of your retirement?

11    A    No, none that I recall.

12    Q    Do you recall, at the time of your retirement, what

13    medical benefits were available to you?

14    A    The medical necessities and I supposed I would have

15    been eligible to switch to comprehension if I had selected,

16    but I didn't.

17    Q    Has your medical necessities plan continued in your

18    retirement?

19    A    Yes, it has.

20    Q    Was there an incentive offered to you regarding any

21    change in medical plans?

22    A    When I retired?

23    Q    At any time prior to your retirement.

24    A    That was incentive to join the comprehensive matching

25    funds, it's like 401(k).

1    Q    And did you accept that incentive?

2    A    No.

3    Q    Why not?

4    A    I just thought the medical necessities plan was much

5    better.  It wouldn't pay to switch.

6    Q    Regarding the benefits that were available to you

7    while you were at the plant, meaning those benefits that

8    we've discussed thus far, how did you receive information

9    about those benefits, Freel?

10   A    Through my P&I booklet.

11   Q    Did you ever attend meetings about your benefits?

12   A    No, not really.

13   Q    Why not?

14   A    I thought I could read it and understand the book as

15   well as anybody could explain it to me.

16   Q    In addition to the booklet, were there other documents

17   that you received telling you about your benefits?

18   A    I had one document that I think I gave you a copy of,

19   was showing you the difference between the comprehensive

20   and the major medical.

21   Q    I believe that's a document that we discuss at your

22   deposition?

23   A    Yeah.

24   Q    If I say SPDs, do you recognize that as meaning

25   Summary Plan Descriptions?

```
 1    A    Yes.

 2    Q    Do you recall receiving SPDs while you were employed

 3    at the plant?

 4    A    Not that I recall ever receiving one.

 5    Q    Do you recall receiving them since you've left the

 6    plant and been a retiree?

 7    A    No.

 8    Q    You've not received those in the mail?

 9    A    No.

10    Q    Let's take a look at Plaintiff's Exhibit 2 that's

11    beside you.

12    A    Okay.

13    Q    Take a look at the first two pages of this and let me

14    know if you recognize this document.

15    A    Yes, I recognize it.

16    Q    How do you recognize this document?

17    A    I saw it at my deposition.

18    Q    This document's dated 1991; is that correct?

19    A    Yes, it is.

20    Q    Do you recall receiving a document like this in that

21    time frame?

22    A    No, I did not.

23    Q    Do you believe you would recall receiving this if you

24    had?

25    A    Well, I think I would.
```

1    Q    Why is that?

2    A    Well, I pretty much watch what I receive from the

3    company.

4    Q    Let's take a look at page 72 of this document.

5    A    Okay.

6    Q    There is a section here that's titled limit on company

7    costs for retiree medical plans.  Just take a moment and

8    look at that and then I'll ask you a few questions.

9    A    On what, now?  What was you wanting me to look at now?

10   Q    This section titled limit on company costs for retiree

11   medical plan.

12   A    I'm sorry.  I'm on page 71.  No wonder I can't see it.

13   Q    Seventy-two.

14   A    It's just putting a limit on what the company would

15   pay on medical benefits.

16   Q    Do you recall receiving a document that contained that

17   type of language?

18   A    No, I did not.

19   Q    Did you receive a document that contained this

20   language specifically that we're looking at?

21   A    No, I did not.

22   Q    Let's flip back to the beginning of this document and

23   take a look at the second page, just the back side of the

24   cover page.

25       Take a look at that middle paragraph there.  Read that

1    out loud for me, please.

2    A    The benefits are described in everyday language in

3    this booklet.  The complete formal plans are set forth in

4    the pension, insurance, and service award agreement

5    effective May 15, 1991, a copy of which has been

6    distributed to you.

7    Q    What was distributed to you, Freel?

8    A    Nothing.

9    Q    What did you receive about your -- or what did you

10   receive regarding your benefits in the 1991 period?

11   A    The only thing I would have received would have been

12   the regular small P&I booklet.

13   Q    And did that control your benefits?

14   A    Yes, it did.

15   Q    Let's put that document aside.

16        I apologize, Freel, but I don't recall whether you've

17   told me about this today or whether Woody did, so I'm going

18   to reask it.

19        From whom do you receive your pension benefits today?

20   A    M&G Polymers.  And Goodyear.

21   Q    From the time you retired through 2007, did you

22   continue to receive medical benefits?

23   A    Yes.

24   Q    And those benefits were at no charge?

25   A    That's right.

```
 1    Q    Do you receive benefits today?

 2    A    Yes, I do.

 3    Q    Who do you receive them from today?

 4    A    M&G Polymers.

 5    Q    Has there been any discontinuation in your benefits

 6    since you retired?

 7    A    No, there hasn't.

 8    Q    Just a few more documents for you.

 9         If you'll take a look at this document titled

10    Plaintiff's 188.

11    A    Okay.

12    Q    Take a moment to review this.

13    A    Okay.

14    Q    Does this document describe a change in providers of

15    your medical care?

16    A    Yes.  This is changing from United Health Care to

17    Aetna.

18    Q    Did that indeed occur?

19    A    Pardon?

20    Q    Did that change --

21    A    Yes.

22    Q    That change did occur?

23    A    It did.

24    Q    And your medical necessity continued at that time?

25    A    Yes, they did.
```

1    Q    Okay.  Let's set that document aside.  Just leave

2    those there for a while.  We'll get back to them.

3         Prior to your retirement, you were a union member?

4    A    Yes.

5    Q    Have you been a union member since your retirement?

6    A    No.

7    Q    Have you paid any union dues since your retirement?

8    A    No.

9    Q    Have you granted anyone the right to bargain for you

10   in your retirement?

11   A    No.

12   Q    Can you tell me if you ever participated in a strike

13   while you were an employee at Pt. Pleasant?

14   A    Yes, I did.

15   Q    How many times, Freel?

16   A    Three.

17   Q    Generally, what were the natures -- what was the

18   nature of the disputes that led to those strikes?

19   A    Mostly wages and working conditions.

20   Q    How long did those strikes last?

21   A    I think the first one lasted around a month, and the

22   next two lasted near six months each.

23   Q    If you recall, did your medical benefits continue

24   during those strikes?

25   A    Yes.

VOL. I    177

```
 1      Q    As a retiree, Freel, do you have any labor to

 2  withhold?

 3      A    No.

 4      Q    And you've given -- have you given any permission for

 5  anyone to bargain on your behalf?

 6      A    No.

 7      Q    Let's move forward and talk about the contributions

 8  that you've been paying for your coverage.

 9           Do you recall when you first learned that a

10  contribution would be charged for your medical benefits?

11      A    It would have been in December of 2006.

12      Q    Take a look beside you at a document titled Joint

13  Exhibit 36, please.  Do you recognize this?

14      A    Yes.

15      Q    What is this document?

16      A    It's telling us what they're going to charge us for

17  medical benefits per month.

18      Q    And at this time, what were you charged per month?

19      A    144.44 per month.

20      Q    And there were others who were charged more?

21      A    The ones that wasn't Medicare eligible, 856.22 per

22  month.

23      Q    Did you pay your contributions at that time?

24      A    Yes, I did.

25      Q    Why did you do so?
```

```
 1    A    Well, to keep the -- my insurance active.

 2    Q    If you'll take a look at the next exhibit, please.

 3    It's Plaintiff's 261.

 4    A    Okay.

 5    Q    Do you recognize this document?

 6    A    Yes.

 7    Q    Did you receive this document?

 8    A    Yes, I did.

 9    Q    And what's the nature of this document?

10    A    About the same as the other one.  It's just saying

11    that they're going to charge us 144.44 for Medicare

12    eligible and 856.22 for ones that's not Medicare eligible.

13    Q    Okay.  Let's put that aside, Freel.

14         Since that first communication, has the charge for

15    your medical care increased?

16    A    Yes, it increased the first time, even 2007 it went up

17    in September.  And then it held that same price through

18    2008, and then it's gone up yearly since.

19    Q    Let's take a look at the document beside you titled

20    Plaintiff's 279.

21    A    Okay.

22    Q    Do you recognize this document?

23    A    Yes, I do.

24    Q    Did you receive this document?

25    A    Yes, I did.
```

VOL. I   179

```
1    Q    Okay.  At the time of this communication,
2    December 22nd, 2008, you were informed that your
3    contribution for 2009 would be how much per month?
4    A    350.29 per month.
5    Q    Have you ever received refunds of contributions you've
6    paid?
7    A    Yes, I have.
8    Q    Why is it that your money has been refunded?
9    A    They overcharged us.
10   Q    Do you know why that is?
11   A    Don't know how to figure it, I guess.
12   Q    Does this letter also reference a refund?  Let me
13   direct your attention to the middle of this page in the
14   box.  At this time, were you informed you would be
15   receiving a refund?
16   A    Pardon?
17   Q    When you received this letter, were you informed you
18   would be receiving a refund?
19   A    Yes.
20   Q    What was the amount of that?
21   A    1,347.60, plus interest.
22   Q    And you've just told us that at this same time you
23   were informed of a rate increase?
24   A    That's right.
25   Q    Do you know why you would be refunded money at the
```

```
 1    same time your rates were increased?

 2    A    About the same answer:  They didn't know how to

 3    figure.

 4    Q    Have you been able to make sense of that?

 5    A    No, I haven't.

 6    Q    Let's put that document aside.  The next one they have

 7    here is Plaintiff's 282.

 8    A    Okay.

 9    Q    This document is addressed to you, correct?

10    A    That's right.

11    Q    Do you recall receiving this document?

12    A    Yes, I do.

13    Q    Does this document relate to the same refund we

14    discussed before?

15    A    Yes.

16    Q    Did you have options relating to this refund?

17    A    Yes.  I could take it as a lump sum or let it apply to

18    my premiums I had to pay for 2009.

19    Q    And what did you choose to do?

20    A    I took a lump sum.

21    Q    Why is that?

22    A    They had had enough of my money, and I didn't trust

23    them to handle it no more.

24    Q    Let's put that document aside.  The next one I want to

25    look at is 297.  I suspect you may have just picked up 298;
```

1    is that right?

2        Let's pick up 297.  This is Plaintiff's 297.  Take a

3    look at this and let me know if you recognize it.

4    A    Yes.

5    Q    Did you receive this document?

6    A    Yes, I did.

7    Q    What does it inform you of?

8    A    It's informing me to -- I've been paying 450.12, and

9    it was going up to 452.01 per month.

10   Q    Is that the rate you pay currently?

11   A    Yes, it is.

12   Q    Let's put that aside.  Are you aware of persons who

13   are paying more than you for your coverage?

14   A    Pardon?

15   Q    Are you aware of persons who are paying more than you

16   for their coverage?

17   A    I understand the ones that's not Medicare eligible is

18   paying a lot more.

19   Q    Let's take a look at Plaintiff's 298.

20   A    Okay.

21   Q    Does this appear to be a letter addressed to those

22   retirees?

23   A    Yes.

24   Q    And what amount are they being charged for their

25   monthly coverage?

```
 1    A     It looks like here 957.92 per month.

 2    Q     Okay.  Let's set that aside.

 3          We've talked some about the charges that you have

 4    paid.  They started at about $144 per month, now it's 542?

 5    A     Right.

 6    Q     At the time of your retirement, did you ever

 7    anticipate that you would be making these payments?

 8    A     No.

 9    Q     Why not?

10    A     I thought we were covered by the contract, and the

11    contract said we would get medical benefits for life.

12    Q     Did you ever receive any information to give you any

13    indication that there would be any difference in your

14    retirement?

15    A     No, not until the December 2006.

16    Q     Has this made retirement different than you

17    anticipated?

18    A     Yes, it does.

19    Q     Tell me how.

20    A     Well, you don't have the money to spend that you had.

21    Me and my wife used to take a two- to three-week vacation

22    every year, but we haven't taken one since 2006.  And other

23    things that we could do that we can't now.

24    Q     In the midst of that, why have you chosen to maintain

25    your coverage?
```

```
 1    A    Well, hoping to win this case, and the prescription
 2    drugs.
 3    Q    Have you had any particular health concerns in the
 4    last few years, Freel?
 5    A    Yes, I've had three heart attacks.
 6    Q    When was your most recent heart attack?
 7    A    January.
 8    Q    Does that make your coverage particularly important to
 9    you?
10    A    Yes, it does.
11    Q    And your wife Sharon, does she have health concerns?
12    A    She is a diabetic and she also has some heart
13    problems.
14    Q    Do you know what you would do if you didn't have this
15    coverage, Freel?
16    A    Be bankrupt.
17    Q    What do you wish to obtain through this lawsuit,
18    Freel?
19    A    Pardon?
20    Q    What do you wish to obtain through this lawsuit,
21    Freel?
22    A    Get our medical benefits back the way they was when I
23    retired.
24         MS. ARNOLD:  Just one moment, Your Honor.
25         I would move, please, that we admit any new exhibits
```

1    covered with Mr. Tackett.

2         THE COURT:  New exhibits covered are 188, 261, 282,

3    and then, I believe 26.  188 describing changes in

4    providers on August 25, '04, dated August 25, '04; 261 is

5    12-15-06 contribution letter; 282 is 2-2-09 letter about

6    adjusted contributions; and then the Joint Exhibit 26 is

7    12-8-06 contributions letter.

8         Any objection to the admission of those, counsel for

9    defense, Mr. Richards?

10         MR. RICHARDS:  No objection, Your Honor.

11         THE COURT:  Plaintiff's Exhibits 181, 261, 282 will

12    be admitted without objection.  Joint Exhibit 26 will be

13    admitted without objection.

14         Mr. Miller, is that correct?

15         THE DEPUTY CLERK:  Your Honor, I thought it was

16    Plaintiff's 26, which was already admitted earlier.  I

17    didn't have Joint Exhibit 26.

18         THE COURT:  Oh, was it?

19         MS. ARNOLD:  Yes.  I don't believe we referenced a

20    Joint Exhibit 26.

21         THE COURT:  Well, then, let me take that out.  So

22    26, Letter G.

23         MS. ARNOLD:  That's a 1994 Letter G.

24         THE COURT:  Right.  It's already been admitted.  So,

25    again, for the purposes of the record, they're all

```
 1        Plaintiff's Exhibits, 181, 262, and 282; is that correct?

 2            MS. ARNOLD:  I believe so, Your Honor.  Thank you.

 3            THE COURT:  Mr. Richards, with that addendum, is

 4    that -- any objection?

 5            MR. RICHARDS:  No objection, Your Honor.

 6            THE COURT:  Thank you.  They will be admitted

 7    without objection.

 8            Thank you, Mr. Miller.

 9                              - - -

10      Plaintiff's Exhibit Nos. 181, 262, 282 were received into

11    evidence and made a part of the record.

12                              - - -

13            THE COURT:  Cross-examination, Mr. Richards.

14                              - - -

15                       CROSS-EXAMINATION

16    BY MR. RICHARDS:

17    Q    Good afternoon, Mr. Tackett.

18    A    Hello.

19    Q    How are you?

20    A    Fine.

21    Q    I'm John Richards, I'm one of the lawyers for the

22    defendants and I'm just going to be asking you a couple

23    follow-up questions.  Okay?

24    A    Okay.

25    Q    Mr. Tackett, when you were employed by the company,
```

1    you sat in on three negotiations over new bargaining

2    agreements between the local union and the company?

3    A    Yes, I did.

4    Q    And in those negotiations, one of them you were a

5    third member of the bargaining committee, another you were

6    vice president, and the last one you were the president?

7    A    Correct.

8    Q    And during those three negotiations, Mr. Tackett,

9    there was never any bargaining over medical benefits?

10   A    No, there wasn't.

11   Q    And that is because the benefits themselves were

12   negotiated in a P&I agreement on a company-wide basis?

13   A    Yes.

14   Q    And, Mr. Tackett, you also testified that you retired

15   under the 1994 P&I agreement?

16   A    Correct.

17   Q    Isn't it also true, Mr. Tackett, that the 1994 P&I

18   agreement governed your retiree medical benefits?

19   A    Yes.

20   Q    And you also testified, Mr. Tackett, that nothing else

21   besides the P&I agreement would cover your pension and

22   insurance benefits, correct?

23   A    Correct.

24   Q    Mr. Tackett, isn't it also true that when you were

25   employed, you had different benefit plans under the P&I

VOL. I         187

1    agreement from which you could select?

2    A    Yes.

3    Q    And, in fact, you had testified, Mr. Tackett, that you

4    chose to remain in the medical necessity plan while you

5    were employed?

6    A    That's right.

7    Q    And you also testified that you currently receive

8    retiree medical benefits under the medical necessity plan?

9    A    Yes.

10   Q    And with each P&I agreement that was negotiated, there

11   were changes to the medical necessities plan, correct?

12   A    Yes.

13   Q    And at the time you retired, was it your belief that

14   the company and the union had the right to negotiate

15   changes to medical benefits?

16   A    Yes.  But 1994 was the last negotiations on medical

17   necessities benefits.  It was never negotiated after that.

18   Q    And you retired in March of 1996, correct?

19   A    Correct.

20   Q    And at that time, Mr. Tackett, did you understand that

21   the medical necessity plan was no longer going to be

22   available to active employees?

23   A    Yes, I did.

24   Q    So it's true that after a certain date in April of

25   1997, the medical necessity plan was only available to

```
 1    retirees?

 2    A    To retirees that had retired under that plan.

 3    Q    Prior to 19 -- prior to that date?

 4    A    Right.

 5    Q    So isn't it also true, Mr. Tackett, that the union and

 6    the company could negotiate changes to the medical

 7    necessity plan for retirees?

 8    A    The union could not negotiate for retirees.

 9    Q    But, in fact, the company and the union did negotiate

10    changes for retirees, didn't they, Mr. Tackett?

11    A    Not that I know of.

12         MR. RICHARDS:  Your Honor, do I have permission to

13    show the witness a document?

14         THE COURT:  Sure.

15    BY MR. RICHARDS:

16    Q    I'd like to refer the witness to the document that was

17    previously introduced as Plaintiff's Exhibit 188.

18         THE COURT:  188 has been admitted without objection.

19    You may proceed.

20    BY MR. RICHARDS:

21    Q    Just so I'm clear, Mr. Tackett, this is a letter that

22    you produced to defense counsel that was sent to you from

23    M&G Polymers dated August 25th, 2004, and marked by your

24    counsel in the bottom right-hand corner of this document as

25    HFT 1016; is that correct?
```

```
 1    A     That's correct.

 2    Q     And you received this letter, right?

 3    A     Yes, I did.

 4    Q     Did you read it, Mr. Tackett?

 5    A     Yes, I did.

 6    Q     And you testified that this document tells you that

 7    there was a change in carrier for your medical necessity

 8    plan from United Health Care to Aetna?

 9    A     There was a change in carrier but not a change in the

10    insurance, just a change in the carrier.

11    Q     But not a change in choice?

12    A     That's right.

13    Q     And this document also refers to changes in plan

14    design and benefits for the medical necessity plan,

15    correct?

16    A     I don't believe so.

17    Q     Mr. Tackett, let me read you the second sentence of

18    this document.  We'll blow it up on the screen.  My eyes

19    are bad.

20          For a variety of reasons, it has required additional

21    time to review and approve the amended medical necessity

22    medical benefit program design and refine how benefits were

23    to be processed by Aetna for this particular program.

24          So this letter, Mr. Tackett, refers to requiring

25    additional time to review and approve the amended medical
```

VOL. I    180

1    necessity plan; isn't that right?

2    A    That's right.

3    Q    If we could scroll down, please, to the third

4    paragraph.

5        If you look at the third paragraph, Mr. Tackett, it

6    states:  In the meantime, we have attached to this letter a

7    brief outline summarizing certain design features and

8    benefits provided under the amended medical necessity

9    program as administered by Aetna.

10       If you flip to the next page, Mr. Tackett, there is an

11   attachment entitled medical necessity plan design.

12       Mr. Tackett, did you review this attachment entitled

13   medical necessity plan design?

14   A    I probably did, but I don't recall.

15   Q    Do you mind reviewing it, please, for a second now?

16   A    Okay.

17       Well, without looking at the medical necessities plan,

18   it looks to me about the same as what we had in the book.

19   Q    Would you say that this document summarizes certain

20   changes to the medical necessity plan?

21   A    That's what I'm saying, I don't see where the changes

22   are, unless I had a book to look at these different options

23   here.

24   Q    Mr. Tackett, isn't it also correct that you had

25   testified that when the company made changes to the medical

VOL. I   181

1    necessity plan during your retirement, if those changes

2    didn't hurt you, you just overlooked them or forgot about

3    them?

4           MS. ARNOLD:  Objection.

5           THE COURT:  Basis?

6           MS. ARNOLD:  I believe he's referring to evidence

7    not in testimony.

8           MR. RICHARDS:  I'm just referring to his deposition

9    testimony, Your Honor.  It's already part of the record.

10   I'm happy to introduce it.

11          THE COURT:  It's not part of the record yet unless

12   you've agreed to it.  I don't know if it's been -- as far

13   as the trial record, no.

14   BY MR. RICHARDS:

15   Q    Mr. Tackett, you recall you gave a deposition in this

16   case, correct?

17   A    Yes.

18   Q    And that deposition was in October of 2009,

19   approximately?

20   A    Whatever date it was.

21   Q    And have you had the opportunity to review your

22   deposition before today?

23   A    Yes.

24   Q    And it's also true, when you took this deposition, you

25   were sworn under oath?

VOL. I    182

1    A    Yes.

2    Q    And that's the same oath you took today?

3    A    Yes.

4    Q    And after -- when you took your deposition, you

5    reviewed it and then made sure it was accurate and then

6    signed it, correct?

7    A    Yes.

8    Q    If you would, please, bring up Mr. Tackett's

9    deposition, page 28, line 17.

10        Mr. Tackett, during your deposition, I had asked you

11   the following questions and you gave the following answers:

12   On page 28, line 17 -- and you can also see it on the

13   screen.  It says -- actually.  Excuse me.  Let's scroll

14   up -- we'll start on 28, 17.  Question:  Okay, did you have

15   any concerns about the fact that the company could make

16   these changes to the plan?

17        MS. ARNOLD:  I'll restate my objection to this

18   question at this time.

19        THE COURT:  Overruled.

20   BY MR. RICHARDS:

21   Q    Answer:  It all depended on what the changes were.  If

22   the minor changes didn't hurt us, we just overlooked them,

23   forgot about them.  If it was something big, like what we

24   are confronted with now, yes, we had a lot of concerns.

25        Mr. Tackett, isn't it possible that the attachment

1    entitled medical necessity plan design are, in fact, an

2    example of some of those changes to the medical necessity

3    plan that you may have just overlooked or forgot about?

4         MS. ARNOLD:  Objection, asked and answered.

5         THE COURT:  Well, it was asked but I don't think it

6    was answered.  The objection is overruled.

7         THE WITNESS:  The deductible is the same as it was

8    from the beginning:  175 individual, 350 for family.

9    BY MR. RICHARDS:

10   Q    Let me ask the question just one more time, Mr.

11   Tackett.

12   A    This deductible, $175 annually per individual, 350 per

13   family, was on major med.  That's the same as it always

14   was.

15   Q    But is it possible, Mr. Tackett, that the entire

16   document that you're looking at, that some of these are, in

17   fact, changes to the retiree medical necessity plan?

18   A    Well, like I say, unless I had the other plan to look

19   at, I couldn't tell you what changes, really.

20   Q    But you agree that if the changes didn't hurt you, you

21   would overlook or forget about them.  That was your

22   testimony?

23   A    That's what I said in the deposition, yes.

24        MR. RICHARDS:  No further questions, Your Honor.

25        THE COURT:  Thank you.

VOL. I - 184

```
 1         MR. RICHARDS:  We would just want to introduce into

 2    the record Mr. Tackett's deposition testimony.

 3         THE COURT:  You mean that portion of Mr. Tackett's

 4    deposition testimony?  Is that what you're asking?

 5         MR. RICHARDS:  Yes, I think I'm fine, Your Honor.

 6         THE COURT:  Well, I don't think you need to since

 7    it's already on the record that he admitted it.  So it

 8    would just be superfluous.

 9         MR. RICHARDS:  Thank you.

10         THE COURT:  Redirect, then, if any, Ms. Arnold?

11         MS. ARNOLD:  Briefly, Your Honor.

12                        -  -  -

13                  REDIRECT EXAMINATION

14    BY MS. ARNOLD:

15    Q    Freel, do you continue to hold a document titled

16    Plaintiff's 188 in your hand?

17    A    Yes.

18    Q    Tell me what the date is on this document, please?

19    A    August 25th, 2004.

20    Q    This date is well past your retirement, correct?

21    A    Right.

22    Q    Are you aware of the result of 2003 bargaining between

23    M&G and USW?

24    A    No.

25    Q    Have you learned that there was an impasse following
```

 1    2003 bargaining?

 2    A    Yes, I've heard of that.

 3    Q    Are you aware that there were terms implemented by the

 4    company following that impasse?

 5         MR. RICHARDS:  Objection, Your Honor.  This is

 6    beyond the scope of the cross-examination.

 7         THE COURT:  Overruled.

 8         THE WITNESS:  What was the question?

 9    BY MS. ARNOLD:

10    Q    Are you aware that there were terms implemented by the

11    company following the impasse at the end of the 2003

12    bargaining session?

13    A    No.

14    Q    Is it possible that this document relates to terms

15    implemented by the company rather than any terms that were

16    accepted by your union?

17         THE COURT:  Just a second.  His answer, last answer

18    was no.  So he doesn't know.

19         MS. ARNOLD:  I have nothing further.

20         THE COURT:  Thank you.

21         Anything further, Mr. Richards, on recross?

22         MR. RICHARDS:  No, Your Honor.

23         THE COURT:  Is this witness excused, counsel for

24    plaintiff?  I mean if he wants to leave any time.

25         MS. ARNOLD:  Yes.

VOL. I   186

```
1          THE COURT:  All right.  Thank you.
2          Mr. Tackett, you may step down.  You're free to
3    leave.  You may stay if you wish, you may leave if you
4    wish, but you're not to discuss your testimony with anyone
5    in accordance with our rules.  Do you understand?
6          THE WITNESS:  I understand.
7          THE COURT:  Before you stand up, every witness does
8    this, push that microphone a little bit out of the way.
9    There you go.  Thank you.
10         Well, I said we would have two breaks in the
11   afternoon.  If I'm to go along with that, I have to get you
12   a break right now.  Let's just say one quick break.  Please
13   return back here no later than four o'clock and we'll get
14   started then.
15         MR. COOK:  That will give us time to get Mr. Hoover
16   in here.
17         THE COURT:  Good.
18     (Recess taken from 3:46 to 4:00.)
19         THE COURT:  Mr. Cook, your next witness, please.
20         MR. COOK:  Thank you, Your Honor.  The plaintiffs
21   call Ron Hoover.
22         THE COURT:  Thank you.
23         (Witness sworn.)
24
25
```

```
 1                        - - -

 2                     RON HOOVER

 3   Called as a witness on behalf of the Plaintiff, being first

 4   duly sworn, testified as follows:

 5                  DIRECT EXAMINATION

 6   BY MR. COOK:

 7   Q    Good afternoon, Mr. Hoover.

 8            THE COURT:  Mr. Hoover, would you state your full

 9   name and spell your last name for the record.

10            THE WITNESS:  Ron Hoover, H-O-O-V-E-R.

11            THE COURT:  Thank you.  Now you may proceed,

12   Mr. Cook.

13            MR. COOK:  Thank you, sir.

14   BY MR. COOK:

15   Q    Mr. Hoover, are you employed or retired?

16   A    I'm retired from the United Steelworkers.

17   Q    Where do you live right now?

18   A    Wabash, Indiana.

19   Q    How long have you lived over there?

20   A    Eighteen months.

21   Q    You said you retired from the United Steelworkers?

22   A    Yes, sir.

23   Q    How long did you work for them?

24   A    I worked for them from 1995, when the rubber workers

25   merged with the Steelworkers, until June 2009 when I
```

1     retired.

2     Q    How old are you now, sir?

3     A    Pardon?

4     Q    How old are you now?

5     A    Seventy.

6     Q    And what date did you retire?

7     A    June 1st, 2009.

8     Q    While you were with the rubber workers and the

9     Steelworkers, did you have specific responsibilities?

10    A    Yes, I did.

11    Q    What were those?

12    A    Well, they were varied, but my primary responsibility

13    was working with the local unions that were in the Goodyear

14    master bargaining group.

15    Q    Let's go back in time in your career and talk about

16    how you came to be responsible for assisting locals of the

17    United Rubber Workers and United Steelworkers that were in

18    the Goodyear Master Bargaining Agreement.

19    A    Okay.

20    Q    Did you once work for Goodyear?

21    A    I went to work for Goodyear in 1964 in Topeka, Kansas,

22    as a mechanic machine repairman.

23    Q    How long did you work for Goodyear?

24    A    I worked for Goodyear until January 1995 when I

25    retired from Goodyear, although a good part of that time, I

1    was on leave of absence and working for either the local

2    union or the international union.

3    Q    What positions, if any, with the local union did you

4    hold and what local union was that?

5    A    It was Local 307 of the United Rubber Workers.  I was

6    a shift steward, served on various committees.  I was a

7    division chairman beginning in 1971.  I represented the

8    maintenance division and processing grievances and

9    negotiating local agreements.

10   Q    Was Local 307 of the United Rubber Workers part of the

11   Goodyear master contract?

12   A    Yes, it was.  And I was elected to a position on the

13   master bargaining committee in 1977.

14   Q    And I want to hang on for just a minute to talk about

15   the master bargaining concept.  I want to have you walk

16   through with the Court how you came to be on rubber worker

17   staff.  Let's move forward.  How long did you stay at the

18   Topeka plant?

19   A    Well, I served as policy committee member for three

20   years, and then I had -- I got beat in the local union

21   elections and I was a shift steward for three years and

22   then I was elected president of Local 307.  I served two

23   terms, then president of the rubber workers, Mike Stone,

24   appointed me to the international staff.

25          THE COURT:  Mr. Hoover, I think the question was:

VOL. I    200

1    How long were you at the Topeka plant.

2         THE WITNESS:  Sorry.  At the Topeka plant, as I was

3    going to say, until September of '89 when I went to work

4    for Mike Stone.

5    BY MR. COOK:

6    Q    So what happened in September of '89?

7    A    I was appointed to the international staff.

8    Q    What was your job on the international staff?

9    A    Well, I was labeled an organizer, but was told the

10   reason they put me on was I had a lot of experience with

11   Goodyear master bargaining, and they wanted me to assist

12   the -- Joe Johnston, the international vice president who

13   was at that point in time assigned to coordinate Goodyear.

14   Q    Had you participated in master contract negotiations

15   prior to 1989?

16   A    Yes, I participated in every master bargaining from

17   the -- that occurred from 1977 to 2006 with the exception

18   of the 1982 master bargaining.

19   Q    What duties did you hold as assistant to Vice

20   President Johnston at the URW?

21   A    The URW had a slot they called backup coordinator.

22   The coordinator, as the name implied, coordinated the local

23   unions and their activities with Goodyear.  The backup

24   coordinator did what the coordinator told him to do.

25   Q    That's what you did?

```
 1    A    I kind of picked up the pieces and did everything for

 2    Joe who was a Goodrich man and was familiar with the

 3    Goodyear system.

 4    Q    So were there meetings that involved Goodyear and

 5    affiliated unions in the Goodyear master agreement?

 6    A    Yes.

 7    Q    What did you do at those meetings?

 8    A    Pardon?

 9    Q    What role did you have at those meetings?

10    A    Typically, Joe sat at the table and officially chaired

11    the meeting, but I led most of the discussion on behalf of

12    the local unions and the international.

13    Q    What is the URW Goodyear policy committee?

14    A    The URW used the term policy committee to designate

15    the various national bargaining teams.

16    Q    And so there was a Goodyear team?

17    A    Yes.

18    Q    Was there a Goodrich team?

19    A    Yes, there was a Goodrich team at that time and a

20    Uniroyal team and a Firestone team.  It comprised what we

21    called the big four.

22    Q    Well, where are the big four today?

23    A    Pardon?

24    Q    Where are the big four today?

25    A    Well, Firestone is now Bridgestone Firestone and still
```

1    part of the big three.  Uniroyal and Michelin bought and

2    combined Uniroyal and Goodrich.  So that's Uniroyal

3    Goodrich team.  And the Goodyear team is still in place.

4    Q    Did you take any other positions in the URW after you

5    became the backup coordinator?

6    A    Yes.  I, along with being the backup coordinator, I

7    serviced local unions and did some organizing.  But,

8    eventually, the Goodyear coordinator at the time, Orville

9    Davis, passed away in June of 1993, and then international

10   president Kim Cost appointed me to the position of

11   coordinator.

12   Q    How did your duties change, sir?

13   A    Well, then, I was responsible for coordinating all the

14   meetings, various strategies, bargaining plans, et cetera,

15   of the Goodyear local unions that were involved in the

16   master bargain.

17   Q    Sometime after you assumed the position or became the

18   coordinator, did the URW merge with another union?

19   A    The URW merged with the United Steelworkers of America

20   then in July of 1995.

21   Q    Did that effect you in any way, change your duties or

22   responsibilities?

23   A    Somewhat.  I continued to coordinate, did most of the

24   work I'd done previously.  But then president George Becker

25   of the Steelworkers appointed a Goodyear chairman, and that

1    was always the vice president of administration, Richard

2    Davis at the time, and Richard was the spokesman at the

3    table during negotiations, and I kind of backed him up, but

4    did most of the meetings between negotiations, sometimes

5    with him present, sometimes without him.

6    Q    Well, you've mentioned master contract and master

7    negotiations.  If you will, Mr. Hoover, explain for the

8    Court how the concept of master contract or master

9    negotiations occurred with, first, the big four rubber and

10   tire companies, and finally the big three?

11   A    Well, the URW, in the '30s, I believe, attempted --

12   Q    1930s?

13   A    1930s.

14        -- attempted to bring all of the local unions of a

15   particular company under a common master agreement.  They

16   were successful in many cases, and in some, they weren't.

17   But that's how the policy committees or the master

18   bargaining committees were formed.

19        In most companies, not all local unions were in the

20   master bargaining group.

21   Q    How often would master bargaining occur?

22   A    Typically every three years.

23   Q    Where would you meet?

24   A    Goodyear met in -- typically, in Cincinnati, had met

25   in Dayton, met occasionally in Cleveland.

1    Q    What would happen at master bargaining?

2    A    Well, you'd sit down with all the local unions that

3    were part of the master agreement and negotiate a master

4    agreement with the company you represented.  Typically,

5    there would be a period of bargaining among all of the big

6    four, or all of the big three, and then we would meet and,

7    as a group, select a target company, and then go to that

8    company and secure an agreement.

9         And then once that agreement was ratified, go to the

10   other master agreement companies, secure the same pattern

11   setting agreement.  And once that was concluded, then

12   set -- various representatives and organizations would, as

13   contracts came open, they would attempt to secure the

14   pattern in those locations.

15   Q    Is this what is known in the industry as pattern

16   bargaining?

17   A    Yes.

18   Q    And who pioneered that model, do you remember?

19   A    We, the URW, did a lot of things similar to the auto

20   workers, and the auto workers always did pattern

21   bargaining.  Now, I'm not certain who pioneered it.

22   Q    But the model was one that you might recognize from

23   the auto industry?

24   A    Yes, sir.

25   Q    Now, you said that there would be local unions covered

VOL. I    205

 1    under this master agreement.  Let's take Goodyear:  You

 2    were the coordinator?

 3    A    Yes, sir.

 4    Q    Which local unions at Goodyear facilities were, in

 5    fact, part of the master bargaining policy committee?

 6    A    Do you want them by local union number or --

 7    Q    Location.  If you can remember.

 8    A    And it varied by time because some plants closed.

 9    But, initially, there was Local 2 in Akron, Ohio, who did

10    tires.  Local 12 in Gadsden, Alabama, G-A-D-S-D-E-N, a tire

11    plant.

12         Local 200 in Saint Marys, Ohio, who was a -- they did

13    things like tank treads for the military and hay rolls for

14    hay machines and dock bumpers.  We typically referred to

15    them as non-tire locals.

16         Local 286 in Lincoln, Nebraska, which produced belts

17    and hoses.

18         Local 307, my home local, in Topeka, Kansas, which

19    produced tires, passenger, truck, tractor and earth mover

20    at that time.

21         Local 831 in Danville, Virginia, which produced

22    over-the-road semi-tractor tires and aircraft tires.

23         Local 878 in Union City, Tennessee, which produced

24    passenger tires.

25         And Local 904, in Sun Prairie, Wisconsin, which

VOL. I          206

```
 1     produced brake and air conditioning hoses for the auto
 2     industry.
 3     Q     And that's it?
 4     A     I think so.
 5     Q     What about Local 644 in Apple Grove, West Virginia?
 6     A     644 in Apple Grove or Pt. Pleasant, as I referred to
 7     it, was never in the master agreement.
 8     Q     Let's talk about the locals who were in the master
 9     agreement.
10     A     Okay.
11     Q     How would it go about that they would agree to or
12     adopt what had been negotiated at the table with Goodyear?
13     How was that process -- how did that process occur?
14     A     Well, they were with us.  We met with Goodyear.  We
15     hammered out an agreement.  The committee voted to approve
16     it.  And if it was approved, arrangements were made to take
17     it home to ratify it with the various memberships.
18     Q     Were there also local agreements?
19     A     Yes.  In the Goodyear system, there was a master
20     agreement and then you negotiated a local or supplementary
21     agreement, as it was sometimes called.  And the money
22     provisions of the master agreement were not made effective
23     until the local agreement was ratified, which kind of kept
24     everyone's feet to the fire.  So you would go home, ratify
25     the master, do your local issues and ratify it in the
```

1    Goodyear system.

2    Q    So even inside the master pattern bargaining group,

3    you still had to go back and deal with local issues at the

4    local plant?

5    A    Yes.  Things like distribution of overtime hours, some

6    seniority issues, because the plants differed so much.  You

7    know, the system for making hoses is far different from

8    tires, for instance.

9    Q    And I imagine making earth moving tires is different

10    than passenger tires?

11    A    Yes, sir.

12    Q    Well, if you printed these agreements up, did they

13    look differently or are they all in one big book?

14    A    The local unions -- in Goodyear, we referred to the

15    working agreement as a Collective Bargaining Agreement,

16    typically.

17    Q    Okay.

18    A    The Collective Bargaining Agreements, as the locals

19    got done with their local negotiations, supplementary

20    negotiations, then they sat down and kind of slotted their

21    local provisions in a master agreement booklet.  And they

22    were different from local to local.  They all had the same

23    master agreement provisions in them, but they would have

24    their local provisions also.

25        And, typically, those books, the type in the books,

1    the master would be black type, and the local provisions

2    would be either a green or a blue type.

3    Q    So you could tell the difference between the two if

4    you opened the book and looked at it?

5    A    Yes, sir, and if you're familiar with how it worked.

6    Q    Now, there are other rubber companies that were

7    organized and represented by the URW other than the big

8    four; is that right?

9    A    Yes, sir.

10   Q    How would they become part of the pattern or would

11   they become part of the pattern?

12   A    Well, as a union, we felt it was our job to establish

13   the pattern everywhere we could because that leveled the

14   playing field with the companies.

15        But, as an example, the Gates Tire & Rubber Company

16   was never in master bargaining.  When their agreements

17   became open, then the representative that was assigned to

18   them had -- we had research materials and everything

19   explaining the master agreement, and he'd go to that

20   location, work with the local union and the company and

21   attempt to establish a pattern.

22   Q    How many independent rubber companies were there

23   during the heyday of the URW and the USW?

24   A    I couldn't testify exactly, but at one point, there

25   were over 500 local unions.  I would say there were at

VOL. I    209

1    least 200 different companies.

2    Q    Do you know how many remain today, sir?

3    A    Maybe 60.

4    Q    Now, did Goodyear, when it negotiated this master

5    agreement, did that automatically apply to every plant that

6    was owned and operated by Goodyear?

7    A    No.

8    Q    Which ones did it apply to and which ones didn't it

9    apply to?

10   A    The master agreement applied only to the locals

11   involved in master bargaining.

12   Q    Let me ask you a different question.  Were all of the

13   Goodyear plants tire and rubber plants?

14   A    Oh, no.

15   Q    How were they organized?  I mean, internally inside

16   the company as opposed to union.

17   A    Well, there were what I referred to as the non-tire

18   plants, and some of those were in master bargaining and

19   some were not.  They had a chemical division.  They had a

20   fabric division.  I think that was it.

21   Q    And did the pattern agreement, the master bargaining

22   agreement that you negotiated, automatically apply to the

23   chemical and the fabric plants?

24   A    No, not to my knowledge.

25   Q    How would the union handle trying to achieve the

1     pattern, or something close to the pattern, at those

2     facilities?

3     A    Well, as I said, you go in and sit down and bargain

4     it.  Now, some of those agreements had what we referred to

5     as various me-too provisions.

6          THE COURT:  Mr. Hoover, let me stop you right there.

7     You said some of those agreements.

8          THE WITNESS:  Some of the non-Goodyear locations

9     that were not in the master bargaining had me-too

10    agreements.

11    BY MR. COOK:

12    Q    So what was a me-too agreement?  What does that mean?

13    A    Typically, it was a paragraph in the contract -- in

14    their local contract that specified how some or all of the

15    newly bargained master provisions would apply to that

16    location.

17    Q    Did you ever have any local union plants that would be

18    me-too, but not all me-too, maybe exceptions?

19    A    Yeah.

20    Q    Let's talk about Goodyear and its chemical division.

21    Did the Goodyear chemical division include a polyester

22    plant known as the Pt. Pleasant Polyester Plant in Apple

23    Grove, West Virginia?

24    A    To be entirely honest, after reading some of the

25    depositions, I believe that plant stood on its own.  I

1    might have previously said it was in the chemical division,

2    but it's my understanding it stood on its own.

3    Q    So it might not have even been part of the chemical --

4    A    Right.  It was a polyester plant, as I understand it.

5    Q    And polyester is a little bit different than the rest

6    of the products; is that correct?

7    A    Yes.

8    Q    Well, you've talked about something you called the

9    CBA.  How did these master agreements break down?  I didn't

10   hear you saying anything about pensions or benefits.  How

11   was that handled in the master contract?

12   A    Let me talk after 1964.

13   Q    Well, I think the Judge will let us go back to at

14   least that far.

15   A    Prior to that, it was a little bit different.

16   Q    We don't want to know prior.

17   A    After 1964, we had the Collective Bargaining

18   Agreement, the working agreement.  We also, at the same

19   time, renegotiated the provisions of the Pension, Insurance

20   and Service Award Agreement.

21   Q    Service award?

22   A    -- agreement, yes.  That's the way it was titled in

23   Goodyear.  And the SUB agreement, the Supplemental

24   Unemployment Benefits agreements.

25   Q    Three different documents?

```
 1    A    Yes, sir.

 2    Q    Okay.

 3    A    Three different booklets.  And we renewed them at the

 4    same time that we renewed the Collective Bargaining

 5    Agreement.

 6    Q    Now, let's go back to the me-too concept, and let's

 7    talk about -- take a non-big four tire company like Kelly

 8    Springfield.  Was Kelly Springfield part of the pattern

 9    bargaining?

10    A    No.  Well, Kelly Springfield was not part of the big

11    four bargaining agreement.  Kelly Springfield was owned by

12    Goodyear.  During that bargaining era, we had three Kelly

13    Springfield locals, one in Cumberland, Maryland; one in

14    Freeport, Illinois; one in Tyler, Texas; and - I stand

15    corrected - another one, one in North Carolina.

16    Q    I like it when my witnesses correct themselves then

17    they can't be corrected on cross-examination for that.  So

18    thanks.

19         So there were four Kelly Springfield.  But even though

20    they were owned by Goodyear, did they automatically become

21    covered by the master agreement?

22    A    They all had me-too provisions in their contracts that

23    were similar but individualistic as well.  They were all a

24    little different.

25    Q    So, if you were a me-too facility, did you follow the
```

```
 1    same timing as the master pattern agreement or did you

 2    adopt it in a different time frame?

 3    A    Typically, the me-too -- the Kelly Springfield me-too

 4    locals got the changes in the Pension, Insurance and

 5    Service Award Agreement, the SUB agreement, and let me

 6    correct myself, the general wage agreement, at the same

 7    time that the master locals did.

 8    Q    But they had to do it as a me-too?

 9    A    Yes.

10    Q    Well, you've said that the Apple Grove facility stood

11    alone.  So it wasn't part of Kelly Springfield, right?

12    A    No.

13    Q    It wasn't part of Goodyear master bargaining?

14    A    No.

15    Q    Did you ever go down and negotiate at the Apple Grove

16    facility?

17    A    No.

18    Q    You were never the lead spokesman?

19    A    No.

20    Q    But you did participate in some bargaining sessions?

21    A    Very limited.  I, typically, went down as a -- I'd say

22    a history guy for local -- the local union and company

23    both.

24    Q    When did you first gain any understanding or knowledge

25    of the contract or the contracts at the Pt. Pleasant
```

1  facility?

2  A    Probably in late 1993, early 1994, when we were

3  preparing for the '94 negotiations.

4  Q    Did you know an insurance representative from the

5  local union down there named Woody Pyles?

6  A    Of course.

7  Q    Do you recognize him here today?

8  A    Yes, sir.

9  Q    And what was your contact and relationship with

10  Mr. Pyles?

11  A    I think I met Woody in the overall policy committee

12  meeting that involved all of the URW locals in early '94.

13  It's possible I might have worked with him by phone on

14  benefit issues prior to that.  I'm not certain.

15  Q    So if, as the insurance and benefits representative,

16  if he had an issue while they were owned by Goodyear, for

17  example, he might have called you?

18  A    Yes.  Typically, I was the union's contact for those

19  type issues.

20  Q    Just to make sure the Court's clear, when you use the

21  word typically, Mr. Hoover, do you do that because what

22  you're telling the Court may not apply in every instance

23  and in every location?

24  A    Yes.

25  Q    Now, you testified just a minute ago that Pt. Pleasant

1    was not part of the master bargaining, not part of the

2    pattern.  Do you know from your own personal knowledge

3    whether the local union --

4    A    Excuse me.  Did I testify it wasn't part of the

5    pattern?

6    Q    I thought you did.

7         THE COURT:  His only testimony was that Kelly

8    Springfield wasn't part of the pattern.

9    BY MR. COOK:

10   Q    Okay.  Was the Pt. Pleasant plant part of the pattern?

11   A    I think they got the pattern but I'm not sure how.

12   Q    Why don't you know how?

13   A    It's very difficult to thoroughly understand and

14   remember all the provisions of the various agreements.  And

15   so unless there was a special need to understand 644's

16   relationship with Goodyear, I wouldn't have bothered with

17   it.

18   Q    So you were not regularly the lead spokesman or the

19   point person for the union in the local sets of

20   negotiations?

21   A    No, sir.  Not in 644.

22   Q    Do you know of your own personal knowledge whether the

23   Local Union 644 ever actually adopted, say, the Master Wage

24   Agreement, the CBA you called it?

25   A    No, I don't.

VOL. I      216

```
 1    Q    Do you know if they adopted the Pension, Insurance and
 2    Service Award Agreement?
 3    A    I'm going to answer I think they did, but I'm not
 4    certain.
 5    Q    What would cause the local officers' insurance rep
 6    like Mr. Pyles to call you for assistance on benefits
 7    issues?
 8    A    Well, it could be a variety of reasons.  Typically, I
 9    think their insurance provisions looked like the master
10    provisions.  And benefits were processed in the benefits
11    department in Goodyear on East Market Street.  The same
12    people processed 644 benefits that processed master
13    benefits.  So, if there was a question on a pension or
14    something not being approved, I knew the people in Akron
15    who made that decision.  So, if Woody had a problem, he
16    might call me and say, Ron, can you help me with this, I
17    think the company is wrong, here are the facts.
18         That was typically the way those went.  Or it could
19    have been a question on prescription drugs or hospital
20    visits.
21    Q    Thank you.
22         Mr. Hoover, did you ever negotiate either the CBAs or
23    the Pension, Insurance, Service Award Agreements between
24    Local 644 and Shell Chemical?
25    A    No.
```

VOL. I    217

```
 1     Q     Did you ever negotiate either the CBA or the pension,
 2     insurance, and service award agreement between Local 644
 3     and M&G Polymers?
 4     A     No.
 5     Q     Did you attend some bargaining sessions where benefits
 6     issues were on the table or being discussed in collective
 7     bargaining with either Shell or M&G?
 8     A     Yes.  And I believe it was M&G, but...
 9     Q     Did you ever take any notes of those sessions you
10     attended?
11     A     I was infamous for not taking notes.
12     Q     Now, inside -- let's talk about what you call the wage
13     agreement and working conditions agreement, the CBA.  Are
14     you familiar with something called Letter A?
15     A     No.
16          MR. COOK:  Could we pull up Joint Exhibit 1, please?
17     BY MR. COOK:
18     Q     That should be appearing on your screen, sir.  If we
19     could turn to Letter A -- and that will be at the back of
20     the document.  It's at page 141 of Joint Exhibit 1.
21     A     I see it.
22     Q     Does this refresh your recollection?
23     A     Let me read it.
24     Q     Please do.
25     A     Okay.  Go to the next page, please.
```

```
 1    Q    Now --

 2    A    Just a minute.

 3    Q    I'm sorry.  I thought -- you can't scroll.

 4    A    I don't think so.

 5         I'm somewhat familiar with the concept, at least.  I

 6    don't know that I've seen this letter before.

 7    Q    And this letter specifically applied to which plant or

 8    which facility?

 9         MR. MISCAMARRA:  Objection, lack of foundation.

10         THE COURT:  I'm not sure -- unless you can lay a

11    foundation, I'm not sure he's familiar enough.

12         MR. COOK:  Well, the document speaks for itself.  It

13    specifically references Local 644 and Pt. Pleasant.

14    BY MR. COOK:

15    Q    Mr. Hoover, did you have a letter of this type that

16    became a part of the master agreement contracts, a Letter A

17    incorporating different side letters or other terms and

18    conditions into the agreements?

19    A    Not that I remember.

20    Q    Well, are you familiar with something called cap

21    letters?

22    A    Yes.

23    Q    What are cap letters?  If that's a term of art used by

24    the rubber workers, perhaps that's how you referred to

25    them.
```

```
 1     A     We typically referred to them as the FASB letters

 2     and/or cap.  It's interchangeable.

 3     Q     Could you describe those for the Court, please?

 4     A     We agreed to the first one --

 5     Q     Go ahead, please.

 6     A     -- in the 1991 master negotiations when Goodyear came

 7     to us and told us they had a problem and, without our help,

 8     it would severely hamstring the company from a financial

 9     point of view.

10     Q     Were you present in the negotiation when this

11     discussion occurred?

12     A     Yeah, in 1994, I was -- 1991, I was coordinator.  No,

13     I'm sorry.  In 1991, I was backup coordinator to Thurston

14     Smith.

15     Q     But you were at the table?

16     A     Yes.

17     Q     Just in terms of sum and substance, do you recall what

18     Goodyear explained to the URW the need for these letters

19     was?

20           MR. MISCAMARRA:  Objection, hearsay.

21           MR. COOK:  I'm not asking him to quote anybody.  I'm

22     asking him what the discussion was generally, the purpose.

23           MR. MISCAMARRA:  May I respond?

24           THE COURT:  You may.

25           MR. MISCAMARRA:  If it's being offered, Your Honor,
```

1    for the truth of the matter, if it's being asserted, it's

2    hearsay.

3        THE COURT:  It is hearsay, regardless of your

4    characterization of it.  The objection is sustained.

5    BY MR. COOK:

6    Q    Did the union agree to any of these letters?

7    A    We agreed to a cap letter in 1991.

8    Q    Did you have a specific intent when you agreed, that

9    you expressed to the company?

10   A    We did the letter, and we told them we were doing it

11   to help them control or minimize the effect on their annual

12   report by avoiding showing all of the projected liability

13   for retiree medical benefits.

14       And that was our only purpose was to help them, I'd

15   say, mitigate the effect of the accounting change that FASB

16   brought.

17   Q    Well, was this an accounting process or an actual

18   transfer of cost to retirees?

19   A    It was all accounting.  FAS designed a rule that said

20   all companies had to show their projected liability on the

21   bottom line for retiree health care benefits.  And when you

22   take that and you project it out -- and at that time, I

23   believe it was 13 percent a year increase -- it showed a

24   tremendous hit on their bottom line which started

25   affecting, you know, what people thought of the viability

1    of the company.

2         And without people investing in your Goodyear Tire &

3    Rubber Company, the union was in trouble.

4    Q    Who were the chief negotiators for Goodyear in the

5    negotiations over any FASB letters or cap letters in 1991?

6    A    Company?

7    Q    For the company.

8    A    The headman in master negotiations was F.C. Tully, who

9    I believe was vice president of worldwide human resources.

10   So the buck stopped with Frank.  But Martin L. Clevenger,

11   better known as Bud -- and Bud Clevenger and Jim Kruse did

12   all the hands-on negotiating with the policy committee and

13   the P&I committee on benefit issues, including the cap

14   letter.

15   Q    Let's look --

16   A    And they had a treasury guy named Duane Smith that had

17   some limited participation.

18   Q    But Jim Kruse became the person after Mr. Clevenger

19   left?

20   A    Yes, sir.

21   Q    Do you know about when that was?

22   A    Bud was in the '91 bargain and he was not in the '94

23   bargain.  I believe maybe Mr. Clevenger retired around the

24   beginning of 1992.

25   Q    If we would please pull up Joint Exhibit 14.  Do you

VOL. I    222

1    recognize Joint Exhibit 14, sir?

2    A    I'm just seeing the first paragraph, but it appears to

3    be the 1991 FASB letter.

4    Q    Is this the letter that was proffered to the URW in

5    the '91 Pension, Insurance and Service Award negotiations?

6    A    I'm sorry.  I was reading.

7    Q    Please continue to read.

8         Was this letter offered to the union in the 1991 PIS –

9    Pension, Insurance, Service Award – negotiations?

10   A    A form of this letter was.  There were several changes

11   made before it was agreed to.

12   Q    And looking at this letter, it says at the top, not to

13   be printed in booklet.  Do you see that, sir?

14   A    Yes, sir.

15   Q    Who proposed it not be printed in the booklet?

16   A    I'm not certain.  I believe the company.

17   Q    Let's talk to the Court about how this letter was

18   intended to operate.  If you'll go down and walk the Court

19   through the different paragraphs of the letter and what was

20   negotiated and how it was to apply, please.

21   A    Okay.  Paragraph one limited the company's obligation

22   for pre-Medicare retirees -- at that time, those under age

23   65 -- at $10,500 annually and for Medicare eligible

24   retirees to $4,200 annually, including surviving spouses

25   over age 65.

```
 1              And this was done on a household basis.

 2              Paragraph two says if the average annual cost exceeds

 3      those numbers for the group, or groups, the excess cost is

 4      distributed in the following year as projected to the

 5      retirees as a group.

 6              Paragraph three contains what I refer to as the bite

 7      date, and that says that no retiree or surviving spouse is

 8      obligated to contribute under paragraph two prior to

 9      July 1st, 1997.

10      Q    What's the significance of that date?  This is a 1991

11      contract and you said that there were three-year

12      agreements.  Why is this set all the way out to 1997?

13      A    Well, the company committed to us that they would

14      always move the date out to avoid the provision taking

15      effect or the provision biting, as I refer to it.

16              We wanted time to negotiate and move the date, you

17      know, before it would become effective and that was one of

18      our big concerns.

19      Q    And so how many negotiations would occur before that

20      bite date would be implemented?

21      A    There would be two, the 1994 negotiations, which would

22      occur in April of 1994; and the 1997 negotiations, which

23      would occur in April of 1997.

24      Q    And what about paragraph four?

25      A    That's just methodology for determining the excess
```

1    amount.

2         Paragraph five is something that wasn't in the first

3    pass or letter from the company, and the union insisted on.

4    We were aware of what I think is referred to as a

5    Pittsburgh Plate Glass decision that said that you couldn't

6    bargain the impasse over retiree health care benefits.  We

7    wanted to be certain that we could.

8         We were cautious, timid, and, frankly, pretty

9    concerned about this.

10   Q    So do you have direct personal knowledge of whether

11   this Letter G was ever adopted at the Pt. Pleasant

12   Polyester plant by Local 644?

13   A    No, I don't.

14   Q    Did you ever see any document come up to the union

15   indicating it had been agreed to or adopted by that local?

16   A    Not to my knowledge, no.

17   Q    You said Shell Chemical did not participate in master

18   bargaining?

19   A    No, they did not.

20   Q    So you don't know whether they adopted this letter as

21   part of their bargaining, or the Master P&I Agreement,

22   either way, do you?

23   A    No.

24   Q    And M&G Polymers, were they part of the master

25   agreement?

VOL. I    225

```
 1    A    No.

 2    Q    Was Letter G a subject of bargaining in 1994 in the

 3    Goodyear negotiations?

 4    A    Yes.

 5    Q    And what bargaining occurred over Letter G at that

 6    time?

 7    A    Well, we would have attempted to extend the date.  I

 8    believe maybe the amount on the pre-retiree, pre-Medicare

 9    retirees may have changed.  I don't remember exactly.

10    Q    Let me see if I can refresh your recollection, sir.

11    May we see Plaintiff's Exhibit 26, please.

12         This is a letter dated July 20th, 1994, addressed to

13    Mr. Ron Hoover entitled Letter G.  Do you recognize this?

14    A    Yeah, scroll it up, please.

15         Yeah, we changed the 10,500 to 11,700, and we moved

16    the bite date one year from July 1st, 1997, to July 1st,

17    1998.

18         And I think that's all the changes, but scroll it up,

19    please.

20         That appears to be the only changes.

21    Q    Did you sign this letter?

22    A    I believe I did, yes.

23    Q    Do you know if this version of Letter G was, in fact,

24    adopted by Local 644 and Shell Chemical?

25    A    No, I do not.
```

1    Q    Did you ever see any document come to the United

2    Rubber Workers or subsequently the United Steelworkers

3    indicating that Letter G had been adopted?

4    A    No; not to my knowledge, no.

5    Q    Sir, was Letter G printed in the master Pension,

6    Insurance and Service Award Agreement?

7    A    It was printed in the original

8    eight-and-a-half-by-eleven document.  It was not printed in

9    the small pension, insurance, and service award booklet.

10    Q    What's the difference between those two documents?

11    A    Well, the eight and a half by eleven was pretty bulky

12    for people to use so we produced a booklet.  And,

13    basically, the only difference -- everything was in the

14    booklet that was in the eight and a half by eleven but the

15    not-to-be-printed letters.

16    Q    How many not-to-be-printed letters were there?

17    A    I'm not certain.  I think, then, G was the last of the

18    letters, so it would be about seven.

19    Q    Let's look at -- we're going to kind of change gears

20    here a little bit, Mr. Hoover.  Let's look at Joint Exhibit

21    42, please.

22    A    Okay.

23    Q    Would you review that, please, and tell me if you can

24    recognize and identify the document?

25    A    Yes, I can.

```
 1                THE COURT:  You say 42?

 2                MR. COOK:  Joint Exhibit 42.

 3                THE COURT:  Thank you.

 4      BY MR. COOK:

 5      Q     What is this document, sir?

 6      A     This was a document that's typically prepared by the

 7      company with some union input, and reviewed and approved by

 8      the union.  And it was attached -- this particular one was

 9      attached to the back of the 1991 eight and a half by eleven

10      Pension, Insurance, and Service Award Agreement.

11      Q     If we could scroll down on that, please.  Did you

12      assist in the preparation of this document?

13      A     I'm not certain.  I know I would have approved it.

14      Q     If you continue to scroll down, we'll see if -- just

15      want to see if you recognize if there's any reference to

16      Letter G or FASB caps.

17      A     Well --

18      Q     I see a letter number 4, letter number 9, continuing

19      on numerically.

20      A     Letter G.

21      Q     What does it say about Letter G?

22      A     New letter which limits past retirement medical

23      benefits funding as a result of Financial Accounting

24      Standards Board, or FASB.

25      Q     Does that say post instead of past?
```

1    A      Yeah, it says past.

2    Q      But is that a typo?

3    A      In my opinion, yes.

4    Q      Now, do you know of your own personal knowledge or

5    through anything you've learned through being the Goodyear

6    coordinator whether this document was ever sent to Pt.

7    Pleasant plant and specifically to Local 644?

8    A      I have no personal knowledge it was sent to 644.

9    Q      Did anyone at Local 644 ever call and ask you to

10   discuss or explain the content of this document, Joint

11   Exhibit 42?

12   A      Not that I recall.

13   Q      Now, let's talk about the structure of the pension,

14   insurance, and services award agreement.  I see references

15   in this summary to Exhibit B1, Exhibit C1.  What was

16   Exhibit B1 to the pension, insurance, and service award

17   agreement?

18   A      Exhibit B1 was commonly referred to by the parties as

19   a medical necessities agreement, which covered medical,

20   hospitalization, doctor, prescription drugs, et cetera, et

21   cetera.  And it was the old what we called the first dollar

22   plan.  If you were hospitalized under this plan, the plan

23   paid it a hundred percent.

24          In 1985, if you want me to continue, we negotiated a

25   comprehensive plan that was an 85/15 plan with an upfront

1    deductible and it had accompanying matching 401(k) that

2    went with it.

3    Q    Now, is that Exhibit C?  Exhibit C is the

4    comprehensive plan?

5    A    Yes.

6    Q    And Exhibit B is the medical necessities plan?

7    A    Yes.

8    Q    So they're different kind of plan structures.  Is that

9    what this is all about?

10   A    Yes.

11   Q    How did these plans and these exhibits have anything

12   to do with retirees?

13   A    Well, a retiree carried in the retirement the

14   benefits -- you chose one or the other of these benefit

15   plans.  For instance, in -- to begin plan year 1995,

16   following the '94 negotiations, if you retired during the

17   term of that agreement, you carried those benefits into

18   retirement, either medical necessity or comprehensive,

19   whichever you had chosen.

20   Q    So did you have to reach a certain status as an

21   employee to be eligible for these health benefits when you

22   retired?

23   A    You had to reach normal disability or early retirement

24   status.  You had to have a certain amount of years of

25   service and/or age --

```
1    Q    And was that --
2    A    -- to qualify for a pension.  And, typically, if you
3    qualified for a pension, other than a deferred vested
4    pension, with an exception of over age 60, but, generally
5    speaking, if you qualified for a pension other than a
6    deferred vested pension, you got the medical with it.
7    Q    Were the medical benefits tied to receipt of the
8    pension benefits?
9    A    Yes.
10   Q    And is there a point system at play here?
11   A    In 1994, we negotiated the 95 point system.
12   Q    What is that 95 point system, Mr. Hoover?
13   A    It was a system where you used your age and your
14   service combined, and certain add-ons, and if you retired
15   with 95 or more points, there was no premium for medical
16   benefits.
17   Q    When would a premium apply to a retiree?
18   A    If you had less than 95 points, you paid two percent
19   of the cost of providing those benefits for every point you
20   were shy of 95.
21   Q    Were there any circumstances set forth in the PIS
22   agreement that allowed the company, Goodyear in this
23   instance, to charge premiums to people who retired with 95
24   or more points?
25   A    No.
```

1    Q    Let's look at Joint Exhibit 17, please.  Would you

2    please look at this document and tell us if you can

3    identify it, sir?

4    A    It appears to be the 1994 pension, insurance, and

5    service award agreement, the eight and a half by eleven

6    form.

7    Q    And, if you go down to pages 1778 to 1779 -- and those

8    are the Bates numbers.  And so the Bates numbers in the

9    bottom right hand, it will say MIK-1778 and 1779.  Do you

10   recognize that document, sir?

11   A    I recognize what appears to be Letter G.

12   Q    Is this addressed to you?

13   A    Yes, sir.

14   Q    If we could scroll down, please, did you sign this?

15   A    I did.

16   Q    Do you know whether this was negotiated between Local

17   644 and Shell in 1994?

18   A    This letter wasn't.

19   Q    This letter was not?

20   A    No.  Because it was Mr. Warren of Goodyear is on the

21   signature line.  No one from -- did you say Shell?

22   Q    Shell.

23   A    No one from Shell is there.

24   Q    No signature for Shell on that line?

25   A    No.

```
 1    Q    What happens if a local was not part of the master
 2    agreement?  Would a Letter G automatically apply even if
 3    the local union accepted the rest of the PIS, pension,
 4    insurance, service award agreement?
 5    A    I don't know.
 6    Q    You don't know.  Why is that?
 7    A    I don't know what the local and Shell bargained.
 8    Q    So you're saying that it's not an automatic thing; is
 9    that right?
10    A    Yes.
11    Q    Let's look at --
12    A    Unless they're -- unless they had a me-too provision
13    that said it was.
14    Q    And the me-too provision would have to provide that,
15    specifically, that adopted the entire agreement?
16    A    I'm sure it would, yes.
17    Q    Did you ever see a me-too letter or provision between
18    Local 644 and Shell Chemical?
19    A    No.
20    Q    Did you ever see a me-too provision or agreement
21    between Local 644 and M&G Polymers?
22    A    No.
23    Q    May we look at Plaintiff's Exhibit 41, please.
24         Do you recognize this document, sir?
25    A    Letter H which replaces Letter G.  It's a 1997
```

1    version.

2    Q    Who is Richard Davis?

3    A    Richard Davis, as I testified earlier, he was the

4    chairman of the Goodyear group.  He was vice president of

5    administration of the United Steelworkers of America at

6    that time.

7    Q    Where and when was this Letter H negotiated?

8    A    It was negotiated in Cincinnati in 1997.  It would

9    have been approximately April.

10    Q    And who -- with what company was it negotiated?

11    A    Goodyear Tire & Rubber Company.

12    Q    Did Shell Chemical participate in that 1997

13    bargaining?

14    A    No.

15    Q    And did Local 644 have a representative present at the

16    master negotiations in 1997?

17    A    No.

18    Q    Now, what happened to this letter?  Did it change, in

19    any respect -- other than being called Letter H, did it

20    change in any respect from Letter G?

21    A    Well, scroll back to the first page and let me look at

22    it.  The numbers didn't change.

23    Q    The numbers being the amounts?

24    A    Yes, did not change.  The date went to May 1st, 1997.

25    Q    For retirees after that date?

1    A    Yes.  And the bite date went to July 1st, 2004.

2    Q    So would this letter have applied to anyone who

3    retired March 1st, 1996?

4    A    Yes.

5    Q    But it says it's effective for people who retire after

6    May 1st, 1997?

7    A    I stand corrected.  It doesn't apply.

8    Q    And what happened to the bite date?

9    A    It moved to July 1st, 2004.

10   Q    That's seven years out, correct, from the date of this

11   letter?

12   A    Yeah.  Well, in 1997, we had a short strike.  We ended

13   up agreeing to a six-year agreement with a reopener

14   provision with interest arbitration if we couldn't reach

15   agreement on certain select items.  And so we moved the

16   date out past that since we couldn't -- since we couldn't

17   strike in 2000, we wanted to move the date out beyond the

18   2003 bargain.

19   Q    Did you ever participate in or become aware of

20   negotiations between Local 644 and Shell Chemical to adopt

21   Letter H as you see on the screen before you?

22   A    No.

23   Q    Do you know, Mr. Hoover, did Shell Chemical and Local

24   644 have their own set of negotiations in 1997?

25   A    I don't know that for a fact.  I assume they did, yes.

1    Q    You may have attended some sessions in 1997 with

2    those?

3    A    Probably did.

4    Q    Let's look at Plaintiff's Exhibit 24, please.

5         What is this document?  Do you recognize it?  Can you

6    identify it for the Court, please?

7    A    It's a supplemental Pension, Insurance and Service

8    Award Agreement for the term of the 1994 agreement.

9         MR. COOK:  Your Honor, I just wanted to note it's a

10   little after five o'clock.  My direct examination of this

11   witness will take anywhere from 30 to 35 more minutes.  I

12   can stop or I can continue and complete it today.

13        THE COURT:  Mr. Hoover, can you come back tomorrow?

14   Maybe that's the more important question.

15        THE WITNESS:  I'm at your --

16        THE COURT:  Really.  I never had anybody say that to

17   me.  I appreciate that.

18        Well, then, thank you, Mr. Hoover.  Let's stop for

19   the evening.

20        THE WITNESS:  Okay.

21        THE COURT:  Mr. Hoover, let me explain, before you

22   step down.  First of all, move the microphone out of your

23   way before you step down.  Second, you're not to discuss

24   your testimony with anyone.  Do you understand that?

25        THE WITNESS:  Yes, sir.

```
 1              THE COURT:  You may step down.  Thank you.

 2              I was looking at my calendar.  We can get started

 3    probably a little earlier on tomorrow, Tuesday, if you guys

 4    are able to.  I'm sorry, I use the guys word a lot.  You

 5    guys and girls, you ladies and men.  I don't know.

 6              We can get started just a little earlier if anybody

 7    wants to do that.  Everybody was here this morning so early

 8    that I thought, well, why didn't we start at 7:30.

 9              MR. COOK:  You got here at 7:30?

10              THE COURT:  No.  If everybody wants to start

11    around 8:30, I think we can maybe get some more testimony

12    in.

13              MR. COOK:  That's good for us.

14              MR. MISCAMARRA:  Fine, Your Honor.

15              THE COURT:  Let's start at 8:30 tomorrow morning.  I

16    will note, I have a twelve o'clock criminal matter.  So

17    we'll have to stop right at twelve o'clock to take a change

18    of plea.

19              So we'll take the luncheon recess from 12:00 to 1:00

20    regardless of where we are in testimony.

21              MR. MISCAMARRA:  Your Honor, there's one thing.  At

22    the conclusion of my opening, I had meant to offer the

23    Court a copy of the demonstrative exhibit that we used in

24    the opening, if that would be helpful.

25              THE COURT:  That would be helpful.  I thought both
```

1    demonstrative documents were good and were helpful.

2          MR. COOK:  We have submitted a copy of our

3    PowerPoint to the Clerk.

4          THE COURT:  I already got it.  I saw it.  He

5    submitted it to me.

6          Okay.  Anything else?

7          MR. MISCAMARRA:  We'll have a discussion of the

8    witnesses for tomorrow.

9          THE COURT:  Yes.  Why don't you guys work that out.

10         Mr. Cook, with regard to the personal issues,

11   whatever you need.

12         MR. COOK:  Right now, Your Honor, I'm waiting to

13   hear back.

14         THE COURT:  I understand.  Whatever you need to do,

15   we'll work around it.

16         All right.  Thank you.  Have a good evening.

17     (Proceedings concluded at 5:05 p.m.)

18                          - - -

19

20

21

22

23

24

25

```
 1                          – – –

 2                    INDEX OF EXHIBITS

 3                          – – –

 4      PLAINTIFF'S:                MARKED        RECEIVED

 5    2                                             134
      4                                             134
 6    20                                            134
      26                                            134
 7    35                                            134
      36                                            134
 8    181                                           185
      226                                           134
 9    262                                           185
      268                                           134
10    279                                           134
      282                                           185
11    286                                           149
      297                                           134
12    298                                           134

13      JOINT:

14    1                                             134
      4                                             134
15    14                                            134
      36                                            134
16    39                                            134

17                          – – –

18                    WITNESS INDEX

19                          – – –

20      WITNESSES          DIRECT  CROSS  REDIRECT  RECROSS

21      PLAINTIFF'S:

22    Woodrow Pyles            82    134    150
      Hobert Freel Tackett    156    185    194
23    Ron Hoover              197

24

25
```

1                    C E R T I F I C A T E

2

3            We, Shawna J. Evans and Denise Errett, do hereby

4       certify that the foregoing is a true and correct transcript

5       of the proceedings before the Honorable Gregory L. Frost,

6       Judge, in the United States District Court, Southern

7       District of Ohio, Eastern Division, on the date indicated,

8       reported by us in shorthand and transcribed by us or under

9       our supervision.

10

11

12                              s/Denise Errett
                                Denise Errett, RMR, FCRR
13                              Official Federal Court Reporter

14

15                              s/Shawna J. Evans
                                Shawna J. Evans, RMR
16                              Official Federal Court Reporter

17

18

19

20

21

22

23

24

25