1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF OHIO

3                 EASTERN DIVISION

4  HOBERT FREEL TACKETT, ET AL.,  .

                            .     CASE NO. 2:07-CV-126

5             PLAINTIFFS,   .

          VS.              .     COLUMBUS, OHIO

6                         .     MAY 13, 2011

                         .

7  M&G POLYMERS USA, LLC, ET AL., .

                       .

8            DEFENDANTS.   .

9  . . . . . . . . . . . . . .

10                  **VOLUME V**

          ***TRANSCRIPT OF BENCH TRIAL PROCEEDINGS***

        BEFORE THE HONORABLE GREGORY L. FROST

11          UNITED STATES DISTRICT JUDGE

12

13  APPEARANCES OF COUNSEL:

14  FOR THE PLAINTIFFS:     DAVID M. COOK, ESQUIRE

                       JENNIE G. ARNOLD, ESQUIRE

15                  LAURA L. FISCHER, ESQUIRE

16  FOR THE DEFENDANTS:     PHILIP MISCIMARRA, ESQUIRE

                       JOHN RICHARDS, ESQUIRE

17                  DEBORAH S. DAVIDSON, ESQUIRE

                       CHRISTOPHER A. WEALS, ESQUIRE

18

19

20                             - - -

21

22

23     DENISE ERRETT & SHAWNA EVANS, FEDERAL COURT REPORTERS

               (614) 719-3029

24

25

```
 1                   Friday Morning Session

 2                      May 13, 2011

 3                       7:50 a.m.

 4                        - - -

 5   IN OPEN COURT:

 6            THE COURT:  All right.  This is Friday, the 13th --

 7   maybe that's the issue, Friday, the 13th -- 2011.  It's the

 8   fifth day of Tackett vs. M&G Polymers.

 9            Yesterday evening, on May 12th, we concluded the

10   testimony of Brian Wedge.  There was a deposition

11   designation of testimony on Lee, and possibly others, that

12   was reserved.  The parties agreed to the stipulations

13   contained in the Final Pretrial Statement with Joint

14   Exhibits 2, 3, and 7, or at least it was recognized that

15   that stipulation has been filed.

16            And then I was advised that there are some exhibits

17   from the Lee deposition that the plaintiffs wish to admit,

18   and those were noted.  The deposition designations were

19   provided to me.  And, last night, I went over the

20   deposition designations.  I went over the objections to the

21   designations, and I went over the exhibits.

22            This afternoon, I will fall asleep, but we need

23   to -- well, a couple of things.  I don't know how to do

24   this.  I guess maybe we'll just go through them as we go.

25            We can go over the objections to the designated
```

1    portions of Mr. Lee's deposition and get those out of the

2    way if you wish to do that now, and that probably will be

3    the first thing of business, or first order of business,

4    before we proceed to the asked introduction of exhibits.

5    Does that sound -- yes, ma'am.

6         MS. DAVIDSON:  Your Honor, we're willing to accept

7    whatever rulings the Court is prepared to make with respect

8    to any objections that we asserted with respect to the

9    designated testimony and the designated exhibits.  We don't

10   have anything to add beyond what we submitted to the Court

11   already.

12        THE COURT:  Well, that's good.  But having said

13   that, we still need to go through those objections that you

14   have made.

15        What you're saying is, you don't have any new ones

16   to make; is that correct?

17        MS. DAVIDSON:  And that we're prepared to accept the

18   Court's ruling on whatever objections we stated here

19   without making additional argument.

20        THE COURT:  Oh, you make it a lot easier.  Why

21   haven't you been in this, that seat, earlier?

22        All right.  Then I'll go through them.

23        Page 6, Lines 1 through 14, I agree that it is

24   irrelevant, and I think that was whether Mr. Lee had

25   previously been deposed.

1          Page 6, Lines 1 through 14 are deleted.

2          I agree that we need to expand on page 7, Lines 5

3   through 8, Lines 5.

4          I agree we need to expand page 23, Line 16 through

5   24, and 24, Line 7, through 25, Line 2.

6          The objection to foundation on the testimony on page

7   25, Lines 3 through 20, that objection is denied.

8          Page 27, Lines 3, through page 30, Lines 3, well,

9   specifically -- I'm sorry.  Specifically, it's page 27,

10  Lines 8 through 10, in the Deposition Exhibit 237, Trial

11  Exhibit Plaintiffs' 60.  Any objection to that part of the

12  deposition or to the trial exhibit is overruled.

13         With regard to the foundation objection on page 28,

14  Lines 9 through 18, in the Deposition Exhibit 238, which is

15  Trial Exhibit Plaintiffs' 59, those objections are denied.

16         With regard to the foundation objection on page 32,

17  Lines 8 through 12, it's denied.

18         With regard to the hearsay exception, or the hearsay

19  objection, and I guess it's page 33, Line 1, through 33,

20  Line 13, it was not offered for the truth of the matter

21  asserted.  And, so, that hearsay objection is denied.

22         On page 48, Lines 13, through page 50, Line 2, in

23  Deposition Exhibit 247, this Court finds that Mr. Lee could

24  speak to the generalities as he does in that instance.

25  And, so, that is denied.

1          MR. COOK:  Your Honor, was there a plaintiffs' trial

2     exhibit associated with that?

3          THE COURT:  Oh!  Plaintiffs' Trial Exhibit 71, yes.

4          MR. COOK:  Thank you.

5          THE COURT:  With regard to the foundation,

6     speculation and hearsay objections on page 59, Lines 18,

7     through 61, the Deposition Exhibit 253, Trial Exhibit

8     Plaintiffs' 127 -- oh, it's -- I'm sorry.  It's page 59,

9     Lines 18, through page 61, Lines 11.  The objection is

10    sustained, but only as to page 61, Lines 3 through 11,

11    which will be deleted.

12         On the objection to page 66, Lines 17, through page

13    67, Line 6 -- oh, yeah.  He twice recharacterized -- well,

14    Mr. Cook twice recharacterized it as his best recollection,

15    and it was adopted, then, by Mr. Lee.  And, so, that

16    objection is overruled.

17         MS. DAVIDSON:  Your Honor, on the prior

18    designations, there had been an objection, also, to

19    Deposition Exhibit 253, Trial Exhibit P-127.

20         THE COURT:  Yes.  As to all of those objections, the

21    only thing I'm granting is the objection to page 61, Lines

22    3 through 11.  Okay?

23         MS. DAVIDSON:  Yes.

24         THE COURT:  With regard to the speculation objection

25    on page 68, Lines 7, through page 69, Line 3, the objection

 1     is overruled.  It's, again, a recollection issue, but it is

 2     not speculation.

 3          With regard to the foundation objection to page 73,

 4     Line 9, through page 74, Line 4, and the Deposition Exhibit

 5     261, this Court finds that Mr. Lee had general expertise in

 6     the area and was permitted to testify as he did.  That

 7     objection is denied, or overruled, and any objection to the

 8     trial exhibit, also.

 9          We're going to come back to these trial exhibits,

10     but I'll try to go through them as we take them up on these

11     objections, also.

12          With regard to the foundation/lack of personal

13     knowledge/hearsay/relevance objections -- I don't know why

14     we didn't get in more rules of evidence on that one -- page

15     80, Line 7, through page 83, Line 25, and Deposition

16     Exhibit 265 and Trial Exhibit Plaintiffs' 182, that is

17     granted, but only as to page 80, Line 7, through page 83 --

18     oh, that's granted, page 80, Line 7, through page 83, Line

19     25, except for Line 16 through 20 on page 83, which will be

20     permitted.

21          Have I made that too complicated?  I'm sorry if I

22     have.

23          With regard to the speculation objection on page 84,

24     Line 1, to page 85, Line 12, that is granted.

25          MS. FISCHER:  Your Honor.

1          THE COURT:  Yes.

2          MS. FISCHER:  Excuse me.  I'm sorry.  Could you go

3     back to -- we didn't catch that when you asked if it became

4     too complicated.  Sorry.

5          Thank you, Your Honor.

6          THE COURT:  Okay.  Well, page 80, Line 7, through

7     page 83, Line 25, the objection is granted, but with the

8     exception of Line 16 through 20 on page 83, which will come

9     in.

10          MS. FISCHER:  Your Honor, may we have just a moment?

11          THE COURT:  Sure.

12          MS. FISCHER:  Thank you.

13          THE COURT:  I understand.

14          MS. FISCHER:  Okay.  Thank you, Your Honor.

15          THE COURT:  All right.

16          My law clerk advises me that, when I was referring

17     to page 33, Line 1, through page 33, Line 13, I indicated

18     that the hearsay objection was not well taken, and neither

19     is the foundation objection.  So, it comes in.  I didn't

20     mention the foundation objection.

21          All right.  With regard to the speculation objection

22     on page 84, Line 1, through page 85, Line 12, that

23     speculation objection is granted as to page 85, Line 7

24     through 9, only.

25          With regard to the speculation objection to page 85,

1    Lines 14, through page 86, Lines 11, that is granted, but

2    only as to page 86, Line 7 through 11.

3         As to the foundation/speculation objection on page

4    92, Line 4, through 92, Line 13, that's granted.  And the

5    Court will not consider page 92, Lines 4 through 13.  So,

6    granted in part.  Page 92, Lines 4 through 13, come out.

7         I'm going to get back to the trial exhibits and

8    deposition exhibits.

9         As to the foundation/lack of personal knowledge on

10   page 92, Lines 14, through 95, Line 16, the Deposition

11   Exhibit 269, which is Trial Exhibit Plaintiffs' Exhibit

12   197, that's denied.

13        With regard to the foundation objection to page 97,

14   Lines 15, through page 98, Line 11, that's denied and

15   overruled.

16        There is a hearsay objection made with respect to

17   the third sentence of text of the Deposition Exhibit 273,

18   which is Trial Exhibit Plaintiffs' 195.  That's overruled.

19   It falls within a business records exception.

20        There is a relevance objection to page 100, Line 17,

21   through page 102, Line 14.  I noted, "Who cares?"  But, no,

22   that's not -- that's not a proper ruling.  I grant that.

23   This has to do, if I recall -- but it's cleaned up later,

24   but this has to do with the issue of the redacted portion,

25   and it gets itself cleared up later.  But as to that

1    specific objection, I grant it.

2          There is a foundation objection, lack of personal

3    knowledge objection to page 103, Line 5, through page 103,

4    Line 22.  Page 103, Lines 5 through 15, is denied, but page

5    103, Line 16 through 22, is granted as speculation.

6          Foundation objection on page 103, Line 16, through

7    103, Line 22.  That is granted, and the Court will not

8    consider that testimony.

9          There is a foundation objection and legal conclusion

10   objection on page 105, Line 2, through 105, Line 5.  I

11   granted that objection.

12         There is a foundation objection and confusion/

13   argumentative on page 106, Line 1, through page 109, Line

14   17.  That's denied.

15         I think there is a typo here on the next one.  There

16   was a foundation objection on page 111, and it says "Line

17   24."  It actually should be "Line 23."  Minor, but I think

18   it needs to be noted.  So, page 111, Line 23, through page

19   112, Line 6, that foundation objection is denied.

20         There is a foundation and legal conclusion objection

21   to page 115, Line 17, through page 116, Line 17.  That's

22   denied.  The Court agrees that the defendant -- or, I'm

23   sorry -- that the witness cannot opine on whether there was

24   a plan change, but I don't believe he does that at that

25   juncture.

1      On page 116, Line 21, through page 117, Line 4,

2  there is a speculation objection.  That's denied.

3      Another speculation objection to page 118, Line 11,

4  through page 119, Line 2.  There is some speculation there.

5  It's partially granted.  I will not consider page 118,

6  Lines 19 through 25, and 119, Lines 1 and 2.

7      There is a speculation and hearsay objection to page

8  123, Line 12, through page 123, Line 20.  That is correct.

9  It is hearsay.  That is granted.

10      There is a speculation objection to page 123, Line

11  21, through page 124, Line 10.  That objection is denied.

12      There is a foundation objection to page 127, Line 4

13  through Line 24.  That's denied.

14      There is a speculation objection to page 130, Line

15  21, through page 131, Line 13.  That is granted, in part,

16  as to page 130 -- no.  It must be 131, Lines 1 through 4.

17      There is a foundation/lack of personal

18  knowledge/hearsay objection to page 131, Lines 23, through

19  page 138, Lines 12, in a Deposition Exhibit 285, which is

20  Trial Exhibit Plaintiffs' 312.  That's granted in part.

21  The Court will not consider any of those lines designated

22  with the exception of page 134, Lines 23 through 25, and

23  Page 135, 1 through 11.

24      MS. FISCHER:  Your Honor, will that include the

25  exhibit?

```
1              THE COURT:  I'm going to get to the exhibit.  But on
2     Plaintiffs' Exhibit 312 --
3              MS. FISCHER:  Thank you.
4              THE COURT:  Oh, 312?  We're going to get to that.  I
5     have an issue on that one, to tell you the truth.
6              MS. FISCHER:  Thank you, Your Honor.
7              THE COURT:  Okay.
8              There is a speculation objection to page 145, Lines
9     21, through Page 146, Line 6.  That's denied.
10             There is a speculation objection to page 147, Line
11    22, through page 148, Line 12.  That's denied.
12             There is a hearsay objection to page 153, Line 9,
13    through page 153, Line 17, in a deposition.  And as it
14    relates to Deposition Exhibit 295, Trial Exhibit
15    Plaintiffs' 255, that's denied.
16             There is a relevance and foundation objection to
17    page 161, Line 3, through 163, Line 24.  That's denied.
18             All right.  Now, with regard to the exhibits
19    themselves -- now I can't read my writing.  This is getting
20    later, I think, in the night.
21             Plaintiffs' Exhibit Number 30 -- oh, let me just ask
22    a foundation question, and this is probably going to apply
23    to both sides at some point in time -- I don't know -- if
24    you intend to introduce depositions yourself.  So, pick
25    your words carefully when I ask this question.
```

```
 1          Portions of this deposition were not designated but
 2     the exhibits were identified in some of the portions of the
 3     deposition that were not designated.  Okay?  So, as it
 4     technically stands, there is no testimony concerning the
 5     deposition exhibits that were identified in the
 6     nondesignated portion of the transcript.  Do you see what
 7     I'm saying?
 8          We can agree to designate those portions of the
 9     transcript now as it relates specifically to the exhibits.
10     I recognize that some of the exhibits have already been
11     admitted.  I also recognize that some of the exhibits can
12     probably be admitted in different ways or manners, but I
13     don't know how you guys want to do it.
14          I'll be honest with you.  In 28 years, I don't think
15     this has ever come up, and, so, I didn't know how to handle
16     it.
17          Mr. Cook?
18          MR. COOK:  May I have a moment to confer?
19          THE COURT:  Sure.
20          (Whereupon, there was a brief interruption.)
21          MR. COOK:  Your Honor, we have a question.  Will
22     this be considered on a deposition-by-deposition basis, or
23     one rule applies across the board?
24          THE COURT:  Well, if you're going to ask for one
25     rule and I grant it, then it's only fair that I apply it to
```

1    the next -- to their depositions.  So, I would kind of like

2    to apply it across the board.

3            MS. FISCHER:  Sorry, Your Honor.  Can we ask, do you

4    know -- do you have --

5            THE COURT:  I know exactly which ones they are.

6            MS. FISCHER:  I like you, Your Honor.  You're

7    reading my mind.

8            Could you let us know which ones they are, so we

9    might make a proper decision, or request, rather?

10           Thank you.

11           THE COURT:  Sure.  What I can do is, as we go

12   through them, I have it designated which ones are not

13   designated, which ones are not identified in designated

14   transcript testimony.  Then, I guess, you can make a

15   decision that way.  I mean, that's how I figured we were

16   going to have to do it, but -- all right.

17           Plaintiffs' Exhibit Number 307 --

18           First of all, I guess I should set the stage.

19           I have already admitted, on the record, 307, which

20   was a copy of the Financial Accounting Standard No. 106.

21           I have already introduced, or admitted, Plaintiffs'

22   Exhibit 308, the Financial Accounting Standard 158, I

23   believe.  And we did that before I found out that we were

24   going to have all these others.

25           So, we will start, then, with Plaintiffs' Exhibit

1    72.

2          Plaintiffs' Exhibit 72 is Deposition Exhibit 236.

3    It's a letter from Pricewaterhouse -- I think her name is

4    Bald -- to Shell and Jim Russom, dated 11/15/99.  There is

5    a request that it be admitted.  It is, without a doubt,

6    hearsay.  The question is, does it fall within one of the

7    exceptions to hearsay.  And, try as I might, I could not

8    find a business record or other exception that it might

9    fall within.

10          The admission of Plaintiffs' Exhibit 72, at this

11   time, is denied.

12          Plaintiffs' Exhibit 60, which is Deposition Exhibit

13   237, a fax cover sheet, that's not part of the designated

14   portion of the transcript, and I would refer you to page

15   25.

16          So -- you're looking at me.

17          MS. FISCHER:  I'm sorry.  We're just --

18          THE COURT:  You have a quizzical look on your face.

19          MS. FISCHER:  We're having a little bit of

20   confusion, Your Honor.  Could you repeat about Plaintiffs'

21   60?

22          THE COURT:  Yes.

23          MS. FISCHER:  Thank you, Your Honor.

24          THE COURT:  Plaintiffs' 60 is what's been purported

25   to be a fax cover sheet.  All right?  You're asking for the

1    admission of Plaintiffs' Exhibit 60, which is referred as

2    Deposition 237, and it is on page 25, the reference, and it

3    begins at Line 21, which is not a part of the designated

4    transcript.

5         THE COURT:  Laura?

6         I'm sorry.  I shouldn't be so informal.

7         MS. FISCHER:  That's okay, Your Honor.  That is my

8    name.

9         THE COURT:  Well, --

10        MS. FISCHER:  As to Plaintiffs' Exhibit 60, we would

11   argue that it does demonstrate that PricewaterhouseCoopers

12   was directly communicating with Buck Consultants.  And the

13   import of that is that for Plaintiffs' Exhibit 72, which

14   you've denied at this time, we believe it establishes

15   foundation for purposes of admitting 72 because those

16   assumptions sent to Buck came from PricewaterhouseCoopers.

17        THE COURT:  I understand that.

18        MS. FISCHER:  Those assumptions were necessary for

19   the true-up analysis, which I believe you probably read

20   about in the deposition as well, Your Honor.

21        THE COURT:  I really don't have any problem with the

22   statement you just said.  The question is, how do we get it

23   in since it's not a designated portion of the transcript?

24   You're asking that I reopen the designated portion, I

25   guess?

1    MS. FISCHER:  We are, Your Honor.  And for that

2    matter, we could go through these one by one if you wish,

3    if the Court so desires.

4        I do believe that we're going to ask that all of

5    Duane Lee's -- all of the necessary designations be made to

6    get those exhibits in.

7        THE COURT:  I see.

8        MS. FISCHER:  For the Court's convenience, we do

9    believe a fair amount of these are going to be used again

10   by the next two witnesses.

11       THE COURT:  I actually thought that myself when I

12   was going through them.  I figured that's what, a lot of

13   this, was going to happen.

14       MS. FISCHER:  But, Your Honor, we did want to go

15   ahead and get them in under Duane Lee.

16       THE COURT:  So, you're setting the stage for a

17   general rule.

18       The general rule, Ms. Davidson, is that they would

19   like to expand the record beyond that which has been

20   designated previously to include any testimony that

21   identifies and forms the basis for a possible admission.

22       Any objection?

23       MS. DAVIDSON:  May I have a moment?

24       THE COURT:  Sure.

25       (Whereupon, there was a brief interruption.)

1          THE COURT:  And be careful what you ask for, because

2     it might come back to haunt you.

3          MS. DAVIDSON:  Understood.

4          Your Honor, we object, because the plaintiffs had

5     the opportunity, when they made their initial designations

6     and again when they received our counter-designations and

7     our objections to their original designations, to make sure

8     that whatever testimony corresponded to the exhibits that

9     they sought to admit would be appropriately designated to

10    lay the foundation for those exhibits.

11         THE COURT:  Ms. Davidson, would you agree that, if

12    that designated portion of the transcript is not admitted,

13    that there is nothing in the record that would permit a

14    foundation and, therefore, an admission, at least on most

15    of this?

16         MS. DAVIDSON:  Correct.

17         THE COURT:  That's the way I looked at it.

18         Plaintiffs' Exhibit 60 -- first of all, the Court

19    will not expand the record as requested by counsel for the

20    plaintiffs.  We can't do it this late date and be fair to

21    everybody.

22         So, Plaintiffs' Exhibit 60, which was Deposition

23    Exhibit 237, the admission of that is denied.

24         Plaintiffs' Exhibit 62, which is Deposition Exhibit

25    239, is a December 17, 1999, letter to -- oh, boy.  You

1      told me how to pronounce this yesterday.

2           MR. COOK:  Marco Ghisolfi.

3           THE COURT:  Ghisolfi.  Letter to Ghisolfi from Lee.

4      Talks about lifetime benefits.  Plaintiffs' Exhibit 62 -- I

5      made another note to myself -- is admitted.

6           Plaintiffs' Exhibit 63 -- well, you know, I haven't

7      given you an opportunity to -- Ms. Davidson, do you wish

8      to -- if you wish to object to any of these specifically,

9      why don't you just tell me as we go.

10          MS. DAVIDSON:  We'll do that.

11          THE COURT:  Is that okay?

12          All right.  Plaintiffs' Exhibit 63, which is

13     Deposition Exhibit 240, again, that's not part of the

14     designated transcript.  Sixty three is denied.

15          Plaintiffs' Exhibit 68, which is Deposition Exhibit

16     241, a January 3, 2000, letter to Marco from Lee and

17     Jarrett, talks about lifetime benefits, that is admitted.

18          Plaintiffs' Exhibit 309, which is Deposition Exhibit

19     242, that's an October 19, '06, Proposal No. 2.  That's not

20     part of the designated transcript.  See page 39.  It's

21     denied.

22          Plaintiffs' Exhibit 117, which is an October 19,

23     2006, Union Modified Proposal No. 2, that's denied as not

24     being part of the designated transcript.

25          MR. COOK:  Your Honor, which number was that?

```
 1              THE COURT:  That's Plaintiffs' Exhibit 117.

 2              MR. COOK:  I have 117 as a true-up analysis summary.

 3

 4              THE COURT:  Well, it's on page 39.  Hold on a

 5     second.

 6              Okay.  You are correct.  It is referred to as a

 7     true-up analysis.

 8              I think, when I looked at it on the computer --

 9     well, let's call it a true-up analysis.  It's still not

10     admitted, because it's not part of the designated

11     transcript.

12              Plaintiffs' Exhibit 100, Deposition Exhibit 244, the

13     Benefits Plan for M&G Summary, again, not part of the

14     designated transcript.

15              Plaintiffs' Exhibit 118, Deposition Exhibit 245,

16     Benefits Strategy for M&G, that's not part of the

17     designated transcript.  And I could refer you to the pages.

18     I wrote them down, but that would be page 42.

19              Plaintiffs' Exhibit 71, which is Deposition Exhibit

20     247, it's a March 3, 2000, e-mail from Thompson-Haas,

21     summary of 3/1, 2000, meeting.  Lee had no recollection of

22     the e-mail or the meeting.  So, as far as the foundation

23     for its admission, it's lacking.  That is denied.

24              Plaintiffs' Exhibit 106, Deposition 248, a letter

25     from Lee to Crooks at M&G, dated April 27, 2001, that's
```

1    admitted.

2         Plaintiffs' Exhibit 108, Deposition Exhibit 250, a

3    May 2, 2001, letter from Lee to Crooks and M&G in regard to

4    FAS 106 disclosure as of 12/31, 2000.  That's admitted.

5         Plaintiffs' Exhibit 114, Deposition Exhibit 251,

6    that has to be denied as not part of the designated portion

7    of the transcript.  And I would refer you to page 54 on

8    that one.

9         Plaintiffs' Exhibit 121, Deposition Exhibit 252, a

10   February 20, 2002, letter from Lee to Crooks at M&G

11   referring to the FAS 106 disclosures of 12/31/01, that's

12   admitted.

13        Plaintiffs' Exhibit 127, Deposition Exhibit 253, a

14   6/3/02 e-mail from Haas to Lee and Korber, with a June 7,

15   2002, meeting outline, that's admitted.

16        Oh, I remember this one.

17        On page 61, there was a discussion off the record.

18   And during that discussion off the record, what I have to

19   assume is Deposition Exhibit 254, which is Plaintiffs'

20   Exhibit 128, was identified there off the record.  It

21   really isn't identified in the transcript, but I know

22   that's what we're talking about when I read the transcript.

23   So, it really begins at page 61, Line 15, on the discussion

24   concerning this Plaintiffs' Exhibit 128, Deposition Exhibit

25   254, and I admit it.

1          Plaintiffs' Exhibit 129, Deposition Exhibit 255,

2    June 17, 2002, e-mail from Lee to McCormick, confirming

3    acceptance of proposal to do work, that's admitted.

4          Plaintiffs' Exhibit 130, Deposition 256, e-mail from

5    Lee to Crooks, October 21, 2002, Updated Medical Expense

6    Estimate, that's admitted.

7          Plaintiffs' Exhibit 131, Deposition Exhibit 257,

8    letter from Lee to Crooks at M&G, dated 12/10/02, initial

9    actuarial valuation of post-retirement benefits, that's

10   admitted.

11         Plaintiffs' Exhibit 133, Deposition Exhibit 258,

12   1/24/03 letter from Crooks to Lee in regard to the FAS 106

13   disclosures as of 12/31/02, that's admitted.

14         Plaintiffs' Exhibit 147, Deposition Exhibit 259, a

15   November 13, 2003, e-mail from Lee to Crooks and Korber

16   involving the 2004 OPEB forecast, is admitted.

17         Plaintiffs' Exhibit 169, Deposition Exhibit 260,

18   Summary of OPEB Results as of 12/31/03, is admitted.

19         Plaintiffs' Exhibit 310, Deposition Exhibit 261 --

20   that's the IAS, International Accounting Standards, IAS 19

21   compared to FAS, is admitted.

22         Plaintiffs' Exhibit 122, Deposition 262, a February

23   20, 2002, letter from Lee to Crooks involving FAS 106 as of

24   12/31/01, is admitted.

25         Plaintiffs' Exhibit 175, Deposition Exhibit 263,

VOL. IV    22

1    it's a January 23rd, '04, through January 26, '04, series

2    of e-mails between Lee and Crooks.  That's admitted.

3        There is Plaintiffs' Exhibit 177, Deposition Exhibit

4    264, a January 29, '04, letter from Lee to Crooks in regard

5    to FAS 106 disclosure as of December 31, '03.  That's

6    admitted.

7        There is Plaintiffs' Exhibit 182, Deposition Exhibit

8    265, a May 17, 2004, letter from McCormick to Crooks --

9    well, it's addressed to Cooks, but I assume it's Crooks;

10   that was a misspelling -- in regard to the retiree medical

11   meeting that Lee attended.  That's admitted.

12       Plaintiffs' Exhibit 184, which is Deposition Exhibit

13   266, a June 1, 2004, fax from Korber to Lee transmitting

14   2000 P&I agreement with what is referred to as relevant

15   pages, that is admitted.

16       Plaintiffs' Exhibit 186, Deposition Exhibit 267, a

17   July 12, 2004, e-mail from Lee to Mindy Hubbard at M&G

18   involving costing scenarios, that is admitted.

19       Plaintiffs' Exhibit 187, Deposition Exhibit 268, the

20   FAS 106 analysis dated July 21, '04, is admitted.

21       Plaintiffs' Exhibit 197, which is Deposition Exhibit

22   269, that's a May 9, 1997, letter -- oh, Letter H and K --

23   is admitted.  H, that exhibit, has already been admitted,

24   but I don't know that K was, and this is a dual-page

25   exhibit.

1          Then Plaintiffs' Exhibit 311, Deposition Exhibit

2     270, again, has already been admitted, but just for the

3     purposes of this record, I'll admit it.  It's the January

4     1, 2001, Letter H.

5          Plaintiffs' Exhibit 190, Deposition Exhibit 271, the

6     November 10, 2004, e-mail from Lee to Korber involving 2005

7     cash budget estimates, is admitted.

8          Plaintiffs' Exhibit 189, Deposition Exhibit 272,

9     that's not part of the designated transcript, and I would

10    refer you to page 99.  That's denied.

11         Plaintiffs' Exhibit 195, Deposition Exhibit 273, a

12    February 9, 2005, e-mail from Lee to Crooks and Korber

13    regarding 2004 expenses, -- and this is the part that was

14    redacted as privileged -- it's admitted.

15         Plaintiffs' Exhibit 198, Deposition Exhibit 274, I

16    believe it's a March 3, 2005, letter from Lee to Crooks

17    involving the 2004 expenses and December 31, 2004, OPEB

18    disclosure, admitted.

19         Plaintiffs' Exhibit 199, which is Deposition Exhibit

20    275, an e-mail from Lee to Crooks dated March 14, 2005,

21    involving a 2004 OPEB disclosure, is admitted.

22         Plaintiffs' Exhibit 200, which is Deposition Exhibit

23    276, an e-mail from Lee to Crooks dated March 15, 2005,

24    with an updated December 31, 2004, OPEB, is admitted.

25         Plaintiffs' Exhibit 201, Deposition Exhibit 277, a

1    March 18, 2005, e-mail from Lee to Crooks with updated

2    December 31, '04, OPEB disclosures, is admitted.

3         Plaintiffs' Exhibit 208, Deposition Exhibit 278, a

4    March 18, 2005, e-mail from Lee to Korber and Crooks

5    involving FAS 106 expense component, that's admitted.

6         Plaintiffs' Exhibit 216 is Deposition Exhibit 279.

7    That's a September 26, 2005, e-mail from Lee to Crooks in

8    regards to the 2006 budget.  That's admitted.

9         Plaintiffs' Exhibit 217, Deposition Exhibit 280,

10   that's a September 27, 2005, e-mail from Lee to Korber and

11   Crooks involving Letter H.  That's admitted.

12        Plaintiffs' Exhibit 218, which is Deposition Exhibit

13   281, a November 4, 2005, e-mail from Lee to Crooks and

14   Korber involving preliminary 2005 OPEB results, is

15   admitted.

16        Plaintiffs' Exhibit 219, which is Deposition Exhibit

17   282, a March 8, 2005, e-mail from Lee to Crooks and Korber

18   involving three scenario projection results, that's

19   admitted.

20        Plaintiffs' Exhibit 220, Deposition Exhibit 283, a

21   November 10, 2005, e-mail from Lee to Crooks and Korber

22   showing projections, that's admitted.

23        Plaintiffs' Exhibit 223, Deposition Exhibit 284,

24   that's a December 20, 2005, e-mail from Lee to Korber and

25   Crooks.  And I think it involves OPEB savings.  I can't

1    read -- it may be earnings.  But that's admitted.

2         Plaintiffs' Exhibit 312, Document 285, OPEB

3    discussion guide, the problem with this is, Lee does not

4    recall it.  He may have been on leave during the period of

5    time that this was admitted.  He admits that it is a

6    business record of the company and that he, if he were

7    there, was responsible for its production.  He goes on to

8    identify various portions of it.

9         MS. FISCHER:  Your Honor, --

10        THE COURT:  Yes.

11        MS. FISCHER:  -- regarding this exhibit, we would

12   offer that Lee was a 30(b)(6) witness --

13        THE COURT:  Right.

14        MS. FISCHER:  -- on behalf of Buck Consultants.

15        THE COURT:  All right.  That might take care of my

16   problem.

17        MS. FISCHER:  Okay.

18        THE COURT:  You're offering him as a -- well,

19   explain it for the record.

20        MS. FISCHER:  We had subpoenaed him on behalf of

21   Buck Consultants in addition to the reports that Buck

22   produced.  So, for that purpose, he's not only their

23   actuary, but also custodian of records as far as for

24   purposes of bringing those documents in for purposes of

25   deposition.

1        THE COURT:  Yes.  And I recognized, at the end of

2    the deposition, there was a follow-up by Mr. Cook

3    concerning the records and so forth.

4        Ms. Davidson?

5        MS. DAVIDSON:  Your Honor, if we could have a couple

6    of moments to check, I don't recall the subpoena for Mr.

7    Lee's deposition being a 30(b)(6) subpoena.

8        THE COURT:  Well, that could be, too.  I don't know.

9        We can come back to this one.

10       MS. FISCHER:  Your Honor, --

11       THE COURT:  Yes.

12       MS. FISCHER:  -- I'd only request that -- this is

13   going to pertain to a few others, some that I wanted to

14   revisit as well.  If you wish, I could try to locate the

15   subpoena so that we could --

16       THE COURT:  Okay.  I don't even wish to be here this

17   morning.  So, don't ask me what I wish.  You may get an

18   answer you don't want.

19       MS. FISCHER:  Would it be helpful, Your Honor, if I

20   pulled the subpoena up?

21       THE COURT:  Well, it probably will be if she is

22   going to object to what you just said.  That would probably

23   be helpful, but you made some other statement that I didn't

24   understand.  When you stood up, you initially said -- you

25   said something to do with other exhibits?  Is that what you

1    said?

2         MS. FISCHER:  I believe that this issue is going to

3    come up with other exhibits, Your Honor.

4         THE COURT:  Well, I tell you what:  Let's come back

5    to it, because I'm -- I may need to review, again, the

6    testimony concerning Plaintiffs' Exhibit 312.  It's in

7    the -- I will have to tell you that my initial thought was

8    that it should be admitted, but hold on a second.

9         Okay.  For my designation, and anyone else's, it --

10   the discussion concerning Plaintiffs' Exhibit 312,

11   Deposition Exhibit 285, begins on page 131 at Line 23.

12   We'll come back to it.

13        Plaintiffs' Exhibit 61 is Deposition Exhibit 286.

14   That's the December 16, 1999, letter to Kanji from Lee and

15   Jarrett involving what was referred to as Project Sunkist

16   and Company ABC, which turns out to be Shell, if I recall.

17   That's admitted.

18        Plaintiffs' Exhibit 112, Deposition Exhibit 287,

19   which is a September 10, 2001, letter from Lee to Korber

20   involving the FAS 106 valuation, is admitted.

21        Plaintiffs' Exhibit 116 is Deposition Exhibit 288.

22   That's not part of the designated transcript.  It refers to

23   an 11/15/01 e-mail from Lee to Korber.  That is denied

24   admission.

25        Plaintiffs' Exhibit 134, Deposition Exhibit 289, a

1    July 15, '03, e-mail from Korber to Jarrett, that's not

2    part of the designated transcript.

3         For the previous one, if you need reference, it's

4    page 142.  And, for this one, the reference is page 144.

5         Plaintiffs' Exhibit 196, Deposition Exhibit 290, a

6    2/9/05 e-mail from Lee to Crooks and Korber involving 2004

7    expenses, -- this is the unredacted version, same as 195,

8    but it's without the redaction -- that will be admitted.

9         Plaintiffs' Exhibit 265, which is Document Number

10   291, a 2-8-07 from e-mail from Jarrett to Milani, that's

11   not in the designated portion and is denied.  Reference is

12   made to page 146.

13        Plaintiffs' Exhibit 228, Deposition Exhibit 292, a

14   February 27, 2006, e-mail from Lee to Crooks and Korber

15   dated December 31, 2005, involving OPEB disclosures, is

16   admitted.

17        Plaintiffs' Exhibit 240, Deposition Exhibit 293,

18   October 3, 2006, e-mail from Lee to Crooks and Korber

19   involving 2005/2006 OPEB results, is admitted.

20        Plaintiffs' Exhibit 241, Deposition Exhibit 294, an

21   October 12, 2006, e-mail from Lee to Crooks and Korber

22   involving 2007 OPEB forecast, is admitted.

23        Plaintiffs' Exhibit 255, which is Deposition Exhibit

24   295, a December 5, 2006, e-mail from Lee to Crooks and

25   Toselli involving preliminary 2006 OPEB results, is

1    admitted.

2           Plaintiffs' Exhibit 272, Deposition Exhibit 296, is

3    the draft IAS information.  That has to be denied because

4    it's not in the designated portion of the transcript.  See

5    page 154.

6           Plaintiffs' Exhibit 269, Deposition Exhibit 297, a

7    January 18, 2007, e-mail from Lee to Crooks and Korber,

8    that has to be denied because it's not in the designated

9    portion of the transcript.  And see page 155.

10          Plaintiffs' Exhibit 266, Deposition Exhibit 298, a

11   12/27/10 adjustments to premium contributions letter,

12   that's not in the designated portion of the transcripts and

13   has to be denied.  Page 156 is your reference.

14          Plaintiffs' Exhibit 313, Deposition Exhibit 299,

15   OPEB plan and IAS 19 adjustment, is not in the designated

16   portion of the transcript.  It is denied.  Reference can be

17   made to page 157.

18          Plaintiffs' Exhibit 342, Deposition Exhibit 302,

19   January 1, 2009, actuarial valuations is denied for not

20   being in the designated portions of the transcripts, and

21   reference is made to page 165.

22          Plaintiffs' Exhibit 280, Deposition Exhibit 300, is

23   a February 2, 2009, e-mail from Lee to Crooks, a request

24   for information.  That is admitted.

25          Plaintiffs' Exhibit 292, Deposition Exhibit 301, a

1    February 17, 2010, letter, to Crooks from Lee involving FAS

2    106 for December 31, '09, is admitted.

3         That, I believe, takes care of all of the requested

4    admissions.  And except for Plaintiff's Exhibit 312,

5    Deposition Exhibit 285, which we can come back -- which we

6    can -- yes, Ms. Davidson.

7         MS. DAVIDSON:  Your Honor, we've looked back at the

8    subpoena that was issued in connection with Mr. Lee's

9    deposition, and it was issued to him individually.  It was

10   not a 30(b)(6) subpoena.

11        THE COURT:  Okay.

12        MS. FISCHER:  Your Honor, we looked that up, as

13   well, and we did note that it was not a 30(b)(6).  However,

14   it was not issued to Duane Lee individually.  It was issued

15   to Duane Lee and Buck Consultants.  He appeared on behalf

16   of Buck Consultants and produced the documents pursuant to

17   the subpoena duces tecum on behalf of Buck Consultants.

18        MS. DAVIDSON:  Your Honor, it was actually issued to

19   Duane Lee, comma, Principal Consulting Actuary Buck

20   Consultants.  They never noticed Buck Consultants as a

21   party for the deposition.

22        MR. COOK:  Can we have a moment, Your Honor?

23        THE COURT:  You can.  And, actually, you can have

24   more than a moment, because I'm going to take a short

25   break.

 1          MS. FISCHER:  Thank you, Your Honor.

 2          THE COURT:  I have to get some more coffee.

 3          Let's take about a five-minute break.

 4          (Whereupon, a recess was taken at 8:57 a.m., and the

 5     proceedings reconvened at 9:15 a.m.)

 6                              - - -

 7     IN OPEN COURT:

 8          THE COURT:  Does anyone wish to further elaborate or

 9     discuss Plaintiffs' Exhibit 312, Deposition Exhibit 285?

10     Anything further?

11          MS. FISCHER:  I actually believe probably both

12     parties want to address this, Your Honor.

13          THE COURT:  Okay.

14          MS. FISCHER:  With permission, could we discuss

15     briefly, in general, the fact that Duane Lee, in

16     plaintiffs' perspective, was representing Buck Consultants

17     with document production and with respect to his

18     deposition?  And, if I may, I would request that Mr. Miller

19     allow us to pull up on the screen the notice of deposition,

20     the subpoena duces tecum, and some exchanges regarding

21     this.

22          Your Honor, displayed on the screen now is what was

23     Depo Exhibit 232 at Duane Lee's deposition.  You'll notice

24     that the Notice of Deposition says:  Plaintiff class will

25     take the oral deposition of Duane P. Lee, representative

1      for Buck Consultants.

2            Your Honor, this document is Deposition Exhibit 233,

3      which was introduced and identified at Mr. Lee's

4      deposition.  It's the subpoena duces tecum.

5            You'll notice the address line, Your Honor, is Duane

6      P. Lee -- obviously, of Buck Consultants -- and Buck

7      Consultants.

8            And, finally, Your Honor, we would direct you to two

9      exchanges between our office and defense counsel regarding

10     the Buck Consultants documents that were produced pursuant

11     to the subpoena duces tecum, which were then used at Duane

12     Lee's deposition.

13           THE COURT:  I've read it.

14           MS. FISCHER:  And I'm just going to go ahead and

15     click on this one, Your Honor, as well, for your review.

16           THE COURT:  All right.

17           Okay.

18           MS. FISCHER:  So, Your Honor, we would just submit

19     that Duane Lee was acting on behalf of Buck Consultants and

20     in his role as the actuary for M&G, and that exhibits --

21     Plaintiff Exhibit 72, 106 and 312 be admitted as business

22     records.

23           Thank you, Your Honor.

24           MS. DAVIDSON:  Your Honor, may I respond?

25           THE COURT:  You may.

1           MS. DAVIDSON:  Well, the fact that the subpoena for

2    documents was issued both to Duane Lee, individually, and

3    to Buck Consultants, that does not convert the subpoena for

4    Mr. Lee's testimony into a 30(b)(6) deposition.

5           The notice that accompanied the subpoena to Mr. Lee

6    did not designate that it was pursuant to Rule 30(b)(6),

7    which requires not only that the notice designate that --

8    that the individual be there in a representative capacity,

9    but also that it describe with reasonable particularity the

10   matters for examination, which we don't have in the Notice

11   of Deposition to Duane Lee.

12          With respect to the business records -- oh, and,

13   also, you know, the plaintiffs did issue a 30(b)(6)

14   deposition to Shell in this case, which demonstrates that

15   they understand the difference between an individual

16   deposition notice and a 30(b)(6) deposition notice.

17          With respect to the business records exception,

18   because Mr. Lee was testifying there as an individual, he

19   was not able, in a corporate capacity, to identify and lay

20   a foundation for those documents.  And the business records

21   exception requires, it still requires that the documents be

22   authenticated by a person with knowledge.  And that's the

23   issue that we had with several of these exhibits:  that Mr.

24   Lee didn't have knowledge and wasn't able to testify as to

25   corporate knowledge.

```
 1                THE COURT:  Thank you, Ms. Davidson.

 2           Ms. Fischer, --

 3           MS. FISCHER:  Yes, Your Honor --

 4           THE COURT:  -- you made reference to two other

 5      exhibits, 72 and what else?

 6           MS. FISCHER:  106, Your Honor.

 7           THE COURT:  We're talking about Plaintiffs' Exhibit

 8      106, Deposition Exhibit --

 9           MS. FISCHER:  I'm sorry, Your Honor.  I was

10      mistaken.

11           THE COURT:  Okay.  Good.  Good.  I thought I was.

12           MS. FISCHER:  No.  I'm sorry.

13           THE COURT:  All right.  Which other one would you be

14      referring to?

15           MS. FISCHER:  72 and 312, Your Honor.

16           THE COURT:  Okay.  And 312?

17           MS. FISCHER:  Yes.

18           THE COURT:  The request to admit Plaintiffs' Exhibit

19      72 and Plaintiffs' Exhibit 312 is denied.

20           I can't convert this into a 30(b)(6) deposition

21      based upon the documents that were presented here by Ms.

22      Fischer.  And Mr. Lee, throughout his deposition,

23      testified, in several instances, as a 30(b)(6) witness, but

24      I can't convert it as it applies to these two specific

25      objections.
```

1          And with regard to 312, anyway -- well, not

2     anyway -- additionally, Mr. Lee, his testimony, was just

3     that he has no independent recollection of that document.

4     So, if it's not a 30(b)(6) deposition and if Mr. Lee has

5     absolutely no recollection of it, although he did testify

6     to certain portions of it, but when -- just when he was

7     referred to certain portions, but he was more than clear

8     that he had no recollection of that document whatsoever.

9          Plaintiffs' Exhibit 312 is denied admission, as is

10    and as was previously stated, Plaintiffs' Exhibit 72.

11         All right.  Now, having admitted those exhibits that

12    the Court finds are admissible, Mr. Cook, Ms. Arnold or Ms.

13    Fischer, do you rest, subject to rebuttal?

14         MR. COOK:  Yes, Your Honor.

15         THE COURT:  Thank you.

16         Mr. Miscimarra, do you wish to make a motion?

17         MR. MISCIMARRA:  Yes, Your Honor.

18         Your Honor, defendants, at this point, move for

19    judgment as a matter of law pursuant to Rule 52.  You know,

20    unlike the standard applicable to summary judgment, the

21    Court now, for the first time, can properly evaluate all of

22    the evidence admitted so far in this case without

23    interpreting it in a light most favorable to one party or

24    the other.

25         Now, the plaintiffs' claims in this case center

1    around an alleged mutual agreement on the part of a company

2    and the union representatives to give retirees, one, a

3    vested lifetime right to post-retirement medical benefits,

4    and, two, a vested lifetime guarantee they would not pay

5    post-retirement contributions, ever, in any amount.

6         We've already suggested to the Court a three-part

7    framework that we believe is helpful to the Court when

8    evaluating the evidence in this case.  That framework

9    consists, first, where is any alleged agreement to confer

10   the vested rights alleged to exist by the plaintiffs, and

11   what does such an agreement say?

12        Secondly, precisely when was this alleged vested

13   rights agreement entered into?

14        And, third and most importantly, is the conduct of

15   union representatives consistent with the notion that the

16   union and some employer at some time mutually agreed to

17   give the retiree class members a vested lifetime right to

18   post-retirement medical benefits and a vested lifetime

19   guarantee that retirees would never pay any type of

20   contributions for those benefits?

21        We submit that the evidence presented so far as part

22   of the plaintiffs' case is simply not sufficient to prove

23   the existence of any vested rights or unlawful conduct or

24   any entitlement to any recovery or remedy by the class and

25   subclass members.

1          For these reasons, defendants, at this time, move

2    for judgment as a matter of law pursuant to Rule 52.

3          Thank you, Your Honor.

4          THE COURT:  Thank you, Mr. Miscimarra.

5          Any response?

6          MR. COOK:  Yes, Your Honor.

7          THE COURT:  You may proceed, Mr. Cook.

8          MR. COOK:  I compliment him on his brevity.  In this

9    instance, I will not be so brief.

10          Your Honor, under the Rules of Civil Procedure we

11    have to operate, what Mr. Miscimarra has done is move for

12    judgment on partial findings under Rule 52(c).  That rule

13    reads that if a party has been fully heard on an issue

14    during a nonjury trial and the court finds against the

15    party on that issue, the court may enter judgment against

16    the party on a claim or defense that under the controlling

17    law can be maintained or defeated only with a favorable

18    finding on that issue.  The court may, however, decline to

19    render any judgment until the close of the evidence.  A

20    judgment on partial findings must be supported by findings

21    of fact and conclusions of law as required by Rule 52(a).

22          The evidence presented in plaintiffs' case in chief,

23    Your Honor, clearly shows, first, that plaintiffs' vested

24    with lifetime retiree health benefits under the terms of

25    the pension and insurance agreements in effect at the time

1      they retired under the 95-point rule for persons retiring

2      in 1994 and later and under the terms of the Goodyear

3      Pension and Insurance Agreement for those retiring between

4      1992 and 1994.

5          For those persons who retired under Shell and M&G,

6      the 95-point rule was contained, and it guarantees them a

7      full contribution, which this Court has found in its motion

8      for summary judgment decision, to create a vested right

9      because that full contribution is directly linked to their

10     receipt of pension benefits.  We believe that disposes of

11     the issue.  All of that evidence, those records, and that

12     testimony is before the Court.

13         And the plaintiff class of retirees who we're

14     speaking about -- but the union also speaks in support of

15     its contract, contracts -- the Sixth Circuit and this Court

16     have found that retiree health care benefits at issue were

17     vested, and we believe that that's been taken care of in

18     the decision.

19         So, the question that Mr. Miscimarra raises is, what

20     was vested.  What was vested were lifetime benefits, a full

21     company contribution.  The language at issue in the

22     respective pension and insurance agreements applies a

23     contribution requirement only to persons with less than 95

24     points.  That was directly demonstrated by the testimony of

25     Ron Hoover.  He was present at the table.  He negotiated

1   those benefits.  He clearly stated that a contribution may

2   be required only if you have less than 95 points.

3        That then brings into question the caps.  Were there

4   caps on these benefits?

5        Reviewing the testimony of Mr. Hoover, Your Honor,

6   you see what the pattern bargaining, the master bargaining,

7   was and how that would, or could, filter down to the

8   parties here.  Mr. Hoover testified that he would forward

9   the completed eight-and-a-half-by-11 Pension and Insurance

10  Agreement with unprinted letters, but he had no knowledge

11  or ability to testify that it was in fact adopted at the

12  Point Pleasant plant, because they were not part of master

13  bargaining and they did not negotiate for that agreement.

14       There is no evidence in the record presented by the

15  defendants -- and it's been shown to not exist to date by

16  the plaintiffs -- of the Point Pleasant plant incorporating

17  verbatim, including unprinted letters, the terms of the

18  pension insurance agreement.

19       In the terms that Mr. Hoover used, Your Honor, this

20  plant was "me, too" with exceptions.  What was distributed

21  to the employees was what was adopted at the plant.  And

22  that was the five-by-seven booklet.  The booklet, as the

23  testimony has consistently shown from the testimony of Mr.

24  Woody Pyles to Freel Tackett to Randy Moore, Karen Shipley,

25  and Brian Wedge, that booklet never contained any letter

1    that would cap the liability or require contributions, not

2    a Letter G, and not a Letter H.

3        That raises issues under ERISA of whether the

4    participants were sufficiently on notice of the

5    circumstances under which their benefits could be

6    terminated or modified without their knowledge or consent.

7    And we believe that the terms of the plan have been

8    violated by this change, and that evidence has been shown

9    in the testimony that's been presented.

10       Until Letter 2003-6 came into being, there was no

11   cap letter in place.  Plaintiffs do not, nor will they

12   attempt to, deny that as of August 9, 2005, Letter 2003-6

13   did put into effect the prospect of contributions by

14   retirees, but it could only be effective for persons who

15   retired after its effective date.

16       There is nothing in Letter 2003-6, standing alone,

17   even its attempted incorporation of the 2001 Letter H from

18   the Goodyear agreement, that would apply its terms

19   retroactively to persons who retired from 1992 to the date

20   of its effective implementation.

21       There has been shown no unbroken chain of cap

22   letters, not in this case.  We have proved that, in fact,

23   the cap letters did not apply to this plant.  Specifically,

24   the evidence, elicited through Mr. Moore and ultimately

25   confirmed by Mr. Wedge, that in the year 2000, having

1    assumed the pension and insurance responsibilities and

2    agreement from Shell, David Dick, the chief spokesperson

3    for M&G Polymers, was repeatedly asked about their position

4    on Letter H.  And he responded with the October 17th, 2000,

5    document that's been before the Court on multiple occasions

6    in the testimony specifically disavowing the applicability

7    of cap letters, FASB letters, Letter H to M&G Polymers.

8         Now, again I point out that that was something that

9    they inherited from Shell.  If Shell didn't have it, they

10   disavowed it.  It doesn't go into effect until 2005 if

11   that's the actual date because the Letter 2003-6 has an

12   effective date later.

13        We believe that the October 17th, 2000, letter from

14   David Dick to Randy Moore and the Steelworkers is

15   definitive and conclusive with respect to both what Shell

16   passed on to M&G and what M&G adopted and applied.

17        As you see in the testimony, which you're all too

18   familiar with now at this point, Your Honor, of Duane Lee,

19   no one even informed the actuaries until July of 2004 that

20   there was a Letter H.  The result of that, shown in the

21   testimony of Duane Lee, is that M&G Polymers filed a series

22   of formal, required government disclosures that never

23   reported a cap on liability.

24        And Mr. Lee took the assumptions that were used by

25   Shell and applied those.  He confirmed the assumptions from

1       Mr. Korber without complaint, without objection.  And he

2       consistently communicated with the chief financial officer

3       of the plant, Robert Crooks.

4            None of them corrected his assumptions that the

5       benefits to be provided were lifetime with no contribution.

6       And the result was, the FAS 106 disclosures made by M&G

7       Polymers supported that assumption and that fact.  Letter H

8       did not apply.

9            Letter 2003-6, by its attempted incorporation of a

10      2001 Letter H entered into between Goodyear and the United

11      Steelworkers, is an impermissible bootstrap.  Saying it

12      doesn't make it so.  And in this instance, that's what

13      they've done.

14           Mr. Korber was present, and although I know he

15      hasn't testified yet, the testimony from Brian Wedge that

16      you heard yesterday was that Mr. Korber was present and

17      part of the process of shepherding through completion of

18      the 2000 Pension and Insurance Agreement.  But that booklet

19      does not contain Letter H, not in any form, not the 1997

20      Letter H and not the 2001 Letter H.  And the actual

21      document was not completed until after the 2001 Letter H

22      was issued.  That's further evidence that it did not exist

23      as part of the agreement between these parties.

24           We believe the evidence clearly shows the 95-point

25      system was in place, the employees were entitled to a full

1    contribution, and that no cap letters apply to divest them

2    of that right.

3          And that then leads us to the legal question.

4          If you accept our argument, Your Honor, that there

5    was no Letter G and no Letter H, there was no agreed-upon

6    cap on retirees' health care benefits until the effective

7    date of implementation of Letter 2003-6, there was no

8    authority for the United Steelworkers or the United Rubber

9    Workers, before them, to bargain anything with respect to

10   current retirees.  The law of the Sixth Circuit is very

11   clear.

12         So, in this case, Your Honor, not only do we have

13   facts which demonstrate a vested benefit with no

14   contribution that's not been divested by any act of a

15   letter or a side letter or some unwritten agreement, but we

16   have a lack of legal authority for the Steelworkers to

17   enter into an agreement or the Rubber Workers to enter into

18   an agreement which would divest them of the vested benefit

19   that they left the plant with when they retired.

20         Retirees must consent for a union to negotiate

21   permissive subjects of bargaining.  You heard the testimony

22   of Mr. Tackett and Mr. Pyles that they never granted that

23   permission to the Rubber Workers or the Steelworkers after

24   them.  You heard the testimony of Mr. Moore and Mr. Wedge

25   and Ms. Shipley that none of them had the authority.

```
 1          They may not be lawyers.  I don't know if they do

 2    have college degrees, but they have a lot of experience and

 3    tremendous amount of training in collective bargaining.

 4    And each of them, Your Honor, was absolutely clear that

 5    they knew they lacked the authority to bargain.

 6          And, so, the discussions that were revealed to the

 7    Court through their testimony showed that, in each

 8    instance, they said "If this letter applies."  And there

 9    was never any evidence that it applied because the pension

10    and insurance booklets did not contain it.  And the pension

11    and insurance booklets, Your Honor, is what was distributed

12    to the members, to the people who retired.

13          For those reasons, Your Honor, we believe that the

14    motion should be denied.

15          Thank you.

16          THE COURT:  Thank you, Mr. Cook.

17          Well, it's not very often that I have a Rule 52

18    motion being made, because it's not very often I have a

19    trial to the court.  So, I had to go back and look it up,

20    myself, to be honest with you.  And I did.  And I was

21    hoping you folks would be on the right page, and you were.

22    I should have known that you would be.

23          The language that I'm going to rely on, although, in

24    a way, I don't like to rely on it, but I'm going to rely on

25    it in this case for now, is the language in 52(c) that
```

```
1     indicates that the court may, however, decline to render

2     any judgment until the close of the evidence.  And that is

3     the case here.

4           The Court declines to render any judgment until the

5     close of the evidence in this case.

6           All right.  Now, we can begin with the defendants'

7     presentation of testimony.  And I guess we're about on time

8     as to what everybody anticipated.

9           Is everybody ready, or do you need a short break?

10          MR. WEALS:  We're ready, Your Honor.

11          THE COURT:  Everybody is ready?  Well, then, let's

12    get started.

13          MR. WEALS:  Your Honor, the defense calls Kimm

14    Korber as its first witness.

15          THE COURT:  Thank you.

16          Mr. Korber, if you'll come forward, please.

17          (Whereupon, the witness was sworn in by the

18    Courtroom Deputy Clerk.)

19          THE COURT:  Mr. Korber, would you state your full

20    name?  And spell your last name for the record, please.

21          THE WITNESS:  Yes.  My name is Kimm, K-I-M-M.  Last

22    name, Korber, K-O-R-B-E-R.

23          THE COURT:  And Kimm is not short for anything?

24          THE WITNESS:  No.  That's my full name.

25          THE COURT:  That's your full name?  All right.
```

```
 1                        - - -

 2                 KIMM KORBER,

 3   AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

 4                        - - -

 5                 DIRECT EXAMINATION

 6   BY MR. WEALS:

 7   Q.   Good morning, Mr. Korber.

 8        THE COURT:  Yes, Mr. Weals, you may proceed on

 9   direct examination.

10        MR. WEALS:  Thank you, Your Honor.

11   BY MR. WEALS:

12   Q.   Good morning.  Mr. Korber, what's your current job?

13   A.   I'm the Human Resources Director for M&G Polymers USA.

14   Q.   How long have you had that job?

15   A.   Since approximately 2003.

16   Q.   And prior to being Human Resources Director, what

17   position did you hold with M&G?

18   A.   I was hired in 2001 to be the HR Manager for the Apple

19   Grove Plant.

20   Q.   When in 2001?

21   A.   January 15th of 2001.

22   Q.   And, Mr. Korber, very briefly, what is your education?

23   A.   Undergraduate at Penn State University, master's

24   degree in labor relations.

25   Q.   And how long have you been in the human resources
```

 1    field?

 2    A.    Twenty plus years.

 3    Q.    And prior to coming to M&G in January of 2001, had you

 4    work at any companies where the employees were represented

 5    by a labor union?

 6    A.    I did.

 7    Q.    And for how many years, approximately?

 8    A.    Probably at least half of my professional career.

 9    Q.    And what were your responsibilities as Human Resources

10    Manager at M&G when you were hired in in January of 2001?

11         THE COURT:  Let me go back a second.  Did you say

12    Penn State?

13         THE WITNESS:  Yes, sir, I did, Your Honor.

14         THE COURT:  And you're a Bearcat.

15         MR. COOK:  Your Honor, I attended Indiana University

16    as an undergraduate.

17         THE COURT:  Okay.  That's worse.  All right.  Just

18    wanted to make sure we're all on the same footing here.

19         All right.  Thank you.  Proceed, Mr. Weals.

20    BY MR. WEALS:

21    Q.    Go ahead.  I believe I asked you what your

22    responsibilities were as Human Resources Manager.

23    A.    When I was first hired in, there were a number of

24    salaried employees at the Apple Grove Plant, as well as

25    people in the bargaining unit.  And, so, I would have

1    general HR responsibility as well as labor relations

2    responsibility as it related to the bargaining unit.

3    Q.    At the time that you were hired in January, 2001, what

4    was the status of the labor agreements with respect to the

5    Apple Grove or Point Pleasant facility where you worked?

6    A.    When I came in, I was aware that there had been a

7    negotiation with respect to a new collective bargaining

8    agreement that had been done -- I think it started sometime

9    in the fall of 2000.  And then, in addition to that, there

10   was also a Pension service -- Insurance and Service Award

11   Agreement that had open issues associated with it.

12   Q.    And what were these open issues regarding the -- and

13   that's the P&I Agreement --

14   A.    Yes.

15   Q.    -- that you referred to?

16   A.    Yes.  That's what most people refer to as the P&I

17   Agreement or the P&I booklet.

18   Q.    What were these open issues?

19   A.    As I recall, there were a number of things.  Some of

20   them were related to the collective bargaining agreement.

21   But, you know, there were things like the FMLA policy.

22   There was a drug policy.  There were things that were

23   associated with what was at that time presented to me as a

24   FASB issue.

25   Q.    And how did you become aware of these open issues on

1    the P&I?

2    A.   There were a couple of the staff that were there

3    before I had arrived who had been involved.  And one of

4    them, Rex Roush, had sat down with me and presented to me a

5    list of what these open items were.

6    Q.   And can you remind the Court -- I believe Mr. Roush's

7    name has come up before.  What was his position?

8    A.   At the time, he was a senior human resources

9    representative.

10   Q.   And is he now deceased?

11   A.   He is.

12        MR. WEALS:  If you could pull up Defendants' Exhibit

13   52, please.

14        I have, Your Honor, provided Mr. Korber with a very

15   large notebook.  That's --

16        THE COURT:  That's one of my problems, Mr. Korber.

17   I was the one that designed that seat, and I didn't do it

18   well.  I'm sorry.

19        Defendants' Exhibit 52, you say?

20        MR. WEALS:  Yes, Your Honor.

21   BY MR. WEALS:

22   Q.   Do you recognize this document, Mr. Korber?

23   A.   Let me look here real quick.

24        I do.

25   Q.   And what is it?

1    A.    This was a copy of an e-mail that Rex Roush had shared

2    with me.  And attached to this was the list that, as I

3    understood, was originally created probably beginning

4    November 16th of 2000 about follow-up items from the 2000

5    negotiations.

6    Q.    And if you'd go back to the first page, Mr. Korber, it

7    indicates it's an e-mail, actually, from Pam Cook to Rex

8    Roush, but it has your name on it.  Could you explain that,

9    please?

10   A.    Yes.  What had happened is, Rex would have presented

11   this to me at some point, and I would have printed it out.

12   Q.    So, going to the second page -- and when did you first

13   see this e-mail and this attachment?

14   A.    It was the same day, because I had -- I was living in

15   Parkersburg, West Virginia, which was about an hour and a

16   half away from the plant.  I tended to work late.  So, we

17   probably had a meeting sometime after this was transmitted.

18   Q.    And, again, if you could go back to the date of the

19   e-mail.

20   A.    February 27 of 2001.

21   Q.    Do you recall when it was that you met with -- I'm

22   sorry.  You said you received this from Mr. Roush?

23   A.    Yes.

24   Q.    Okay.  And did you have a discussion with Mr. Roush?

25   A.    Yes, we did.

1    Q.   Okay.  Now, if you could turn to the third page of

2    this document, Item No. 18, could you identify that,

3    please?

4    A.   Yes.  Item No. 18 says:  FASBY, F-A-S-B-Y, date change

5    in P&I agreement.  Parenthetical.  There is a reference to

6    Rex.  And then it says:  "Cindy Jones working."

7    Q.   And do you know what Item No. 18 refers to?

8    A.   I didn't at the time, but I do now.

9    Q.   And who is Cindy Jones?

10   A.   Cindy Jones was an attorney at Steptoe & Johnson who

11   had worked with Dave Dick.

12   Q.   And what was her area of expertise?

13   A.   She was an ERISA attorney.

14   Q.   And at this point in time, had you seen anything

15   called the FASB letter?

16   A.   No.  This was the first time I had been aware of what

17   this was in terms of at least there was something called

18   FASB related to the P&I Agreement.

19   Q.   And, so, just so I understand, when did you receive

20   the e-mail and the attachment from Mr. Roush?

21   A.   This would have been February 27th of 2001.

22   Q.   Which is the same date as the e-mail?

23   A.   Yes, sir.

24   Q.   And did you discuss the matter with Mr. Roush?

25   A.   We did.  We went through the list of items.

1    Q.    And did you take notes during that meeting, Mr.

2    Korber?

3    A.    I did.

4    Q.    Okay.  And was it your normal practice to take notes

5    in meetings with your human resources staff?

6    A.    If there was something significant, yes.

7    Q.    And was it your custom to take notes during the

8    meeting, or sometime afterwards?

9    A.    Yeah.  I would most typically take contemporaneous

10   notes from those meetings, because it was helpful to be

11   able to review and make sure I had understood correctly.

12        MR. WEALS:  If you could pull up Defendants' Exhibit

13   276.

14   BY MR. WEALS:

15   Q.    Mr. Korber, I believe that's in the other notebook

16   binder.

17   A.    All right.

18   Q.    Oh, it's in Volume I.  I'm sorry.

19   A.    That's still in the back.  All right.

20   Q.    Could you identify this document, please?

21   A.    Yes.  These are my notes from my meeting with Mr.

22   Roush.

23   Q.    On what date?

24   A.    February 27th of 2001.

25   Q.    Now, is there any reference in these notes to the

 1   FASB, or FASBY, letter, F-A-S-B-Y or F-A-S-B?

 2   A.   Yes.  About halfway down the page, there is a -- sort

 3   of as I delineate the various items, there is a reference

 4   to the P&I Agreement and the attorney at Steptoe & Johnson.

 5   Then a little further down, about two-thirds of the way

 6   down the page, I have a reference to P&I Agreement, FASBY.

 7   Q.   And what appears next to it after "FASBY," question

 8   mark?

 9   A.   The name Cindy Jones.

10   Q.   Now, you mentioned before, Mr. Korber, the P&I

11   Agreement.  What was your understanding of the P&I

12   Agreement that was in place in Apple Grove at the time that

13   you were hired in January of 2001?

14   A.   Well, when I arrived, there was -- at that time, the

15   P&I agreement had not been published, but there was a

16   booklet that I had been given that was the same booklet

17   that had "Shell Chemical" on it.  It was a 1997-to-2003 P&I

18   Agreement.

19   Q.   And you mentioned before, and we saw, a document

20   referring to the open issues.  What was being done to

21   address these open issues with respect to the P&I?

22   A.   Well, pretty typically, after a labor negotiation, I

23   mean, there are a number of open items.  So, one of the

24   things very typical for the parties to do is to get

25   together -- usually it might be with the International

 1    representatives; could be with the local representatives --

 2    and discuss how we're going to bring closure to those

 3    particular items.

 4    Q.   And do you know, in particular, what was being done by

 5    the union and the company to address these issues?

 6    A.   Well, certainly relative to the FASB letter, one of

 7    the things that was done was that Rex Roush and Sam Stewart

 8    and, I believe, Roger Sutphin, they were going to get

 9    together and work through the open issues and talk about

10    some of these items that were part of the P&I Agreement and

11    what would ultimately be published in the P&I booklet.

12    Q.   And could you remind the Court -- Mr. Stewart -- what

13    was his position?

14    A.   When I arrived, Mr. Stewart was the president of Local

15    644.

16    Q.   And how about Mr. Sutphin?

17    A.   He was, I believe, the Secretary-Treasurer of 644.

18    Q.   You mentioned about the P&I booklet.  It does indicate

19    here Cindy Jones, FASBY.  What was being done with regard

20    to FASBY letter?

21    A.   Well, at that point in time, I think David Dick had

22    asked Cindy to take a look at some of that and get back

23    some information.

24         MR. COOK:  Objection.  Hearsay.

25         THE COURT:  Response?

```
1              MR. WEALS:  We're offering it only to show what Mr.

2     Korber was told, not for the truth of the matter asserted.

3              THE COURT:  Objection is sustained.  It is hearsay.

4     BY MR. WEALS:

5     Q.   Let me rephrase the question.  Do you know -- what was

6     your understanding of what was being done with respect to

7     following up on the FASBY letter?

8     A.   Well, the company and the union were certainly taking

9     actions to follow up.  So, on the company's side, we were

10    getting additional information.  I assume, on the union's

11    side, they were seeking additional information as well.

12    Q.   And what was the outcome of the work being done by the

13    company and the union with regard to the P&I?

14    A.   Well, with regard to the P&I booklet, one of the

15    things that I'd asked Rex to do and to follow up on was to

16    meet with Roger and Sam and to go through the document and

17    to provide what should be part of the agreement there at

18    the Apple Grove plant.

19    Q.   And at some point, did you see a document that was the

20    product of what they were doing?

21    A.   Yes, I did.

22    Q.   And when was that?

23    A.   That was probably sometime in July of 2001.

24    Q.   And where did you get it, or how did you come to get

25    it?
```

VOL. V    56

```
 1    A.    Once Rex had met with the local union officials and
 2    they had walked through that, he had actually compiled a
 3    document and had brought it to me.  And we sat down and
 4    reviewed it.
 5    Q.    Could you describe that document that Mr. Roush --
 6    A.    It was a document that really -- it really had three
 7    parts to it.  There was a copy of the 1997 P&I booklet that
 8    was marked up with changes that came out of the 2000
 9    negotiation.  But in addition to that, there were a couple
10    of sections, additional sections, to it.  There was a
11    section that contained what were these booklets, or
12    letters, not to be printed in the booklet.  And there also
13    was a summary of at least the 1997 P&I changes.
14          MR. WEALS:  Could you pull up Defendants' Exhibit
15    48, please?
16          Your Honor, this document has already been admitted,
17    I believe, in Mr. Hoover's deposition, without the
18    markings.  Defendants' Exhibit 48 is being offered with the
19    markings as the version that Mr. Korber received.
20    BY MR. WEALS:
21    Q.    Mr. Korber, could you turn to Defendants' Exhibit 48?
22    A.    One second.
23          THE COURT:  Well, let me ask you something, Mr.
24    Weals.  I have 47 as a marked-up document of P&I Agreement
25    dated 11/6, 2000; and then it looks like maybe,
```

1    specifically, page 288, which was identified by Mr. Hoover.

2    This isn't any different than that, is it?

3            MR. WEALS:  Your Honor, I believe that this document

4    has some additional pages, which I will discuss with the

5    witness.

6            THE COURT:  All right.  You may proceed.

7    BY MR. WEALS:

8    Q.   Mr. Korber, could you identify Defendants' Exhibit 48,

9    please?

10   A.   Yes.  This is the document that Mr. Roush had brought

11   to me.

12   Q.   And when was that, again?

13   A.   I believe that was in July of 2001.

14   Q.   And looking at the first page, do you know whose

15   handwriting this is?

16   A.   Yeah.  I believe this is probably handwriting that's

17   from Sam --

18           MR. COOK:  Objection.  He's speculating.  He

19   believes it probably is.

20           MR. WEALS:  Your Honor, he's testifying as to what

21   his understanding and belief is as to --

22           THE COURT:  If he knows, he can say.  If he doesn't

23   know, he can't.  It's that simple.

24           THE WITNESS:  Some of the handwriting is clearly Rex

25   Roush's.  Some others might be Sam Stewart and Roger

```
 1    Sutphin.
 2             MR. COOK:  Object to the "Sam Stewart and Roger
 3    Sutphin."
 4             THE COURT:  Sustained.
 5    BY MR. WEALS:
 6    Q.   With regard to the handwriting on the first page, do
 7    you know whose handwriting that is?
 8    A.   Where the dates are marked at, that appears to be Mr.
 9    Roush's.
10    Q.   And what was your understanding of what this document
11    is?
12    A.   What this document was was the end work product, if
13    you will, between the discussions that Rex had with Sam and
14    Roger concerning the P&I Agreement, what was negotiated in
15    2000 and what was going to become the P&I Agreement for the
16    M&G Polymers facility at Apple Grove.
17    Q.   Mr. Korber, if you could go to the end of Defendants'
18    Exhibit 48 and look at the page that's been marked
19    MGTACKETT 026693.
20    A.   All right.  I have that.
21    Q.   And what is this, Mr. Korber?
22    A.   This was a letter that was not to be printed in the
23    booklet.  It was a Letter H dated May, the 9th, 1997.
24    Q.   And was this document part of the, or, was this letter
25    part of the document that Mr. Roush gave to you?
```

1    A.    Yes, it was.

2    Q.    Now, if you could turn back a few pages to MGTACKETT

3    26706 and tell me what that is, please.

4    A.    Yeah.  This was a summary of the 1997 Pension,

5    Insurance and Service Award Agreement changes.

6    Q.    And this document consists of several pages.  Is there

7    any reference in this to the Letter H, or the FASB letter?

8    A.    There is on what's marked as MGTACKETT 026711, Item

9    39.  It says:  "Letter H.  Provide that no retired employee

10   or surviving spouse shall be obligated to contribute for

11   excess health care cost until July 1, 2004.  Also provides

12   that this item shall be considered a proper subject for

13   re-opener discussions."

14   Q.    Now, if you could turn back to Letter H, which is

15   26693.

16   A.    All right.

17   Q.    Now, Mr. Korber, I believe when you described this

18   document you made reference to the "Not to be printed in

19   booklet" at the top?

20   A.    Yes.

21   Q.    Did you come to have an understanding of what that

22   language meant?

23   A.    Yes, I did.

24   Q.    And how did you come to learn that?

25   A.    Well, that was really through a number of discussions

1    that I had.  But, in principle, one of the conversations I

2    had at a point along the time when I first came onboard was

3    to talk with Mr. Stewart.

4    Q.   And Mr. Stewart's position at the time?

5    A.   He was the local union president.

6    Q.   And when did this discussion with Mr. Stewart take

7    place?

8    A.   It was probably a year after I first sat down with Rex

9    and went over this document.

10   Q.   And where did this discussion take place?

11   A.   It was in my office.

12   Q.   Can you tell me what Mr. Stewart said?

13   A.   Yeah.  In essence, as we were going through this, I

14   wanted to -- I was concerned as to what we were going to

15   print and put out for the employees.  And, so, I wanted to

16   understand, from his point of view, what was the issue with

17   and why was this matter where you say "not to be printed in

18   booklet" -- it wasn't something that was unusual, but I

19   wanted to understand his reasons for it.

20   Q.   And when you say it wasn't unusual, what do you mean

21   by that?

22   A.   Well, in my experience, I've worked under labor

23   agreements where there are things that aren't printed in

24   contract books, but they still have effect between the

25   parties.

```
 1   Q.   And what did Mr. Stewart say with regard, if anything,
 2   with regard to the unpublished nature of this?
 3   A.   He was -- it was pretty clear.  He had indicated to me
 4   he had had a conversation with Ron Hoover and that Ron
 5   Hoover said there is a reason it says not to be printed in
 6   the booklet, and, therefore, what was going to be printed
 7   as our P&I Agreement should not contain this.
 8   Q.   And what was that reason?
 9   A.   In essence, it was just simply that -- there wasn't
10   any more explanation than that.  It's simply not to be
11   printed in the booklet.  That was the position that he
12   understood that the International union was taking.
13   Q.   And you referenced this meeting took place
14   approximately a year after your discussion with Mr. Roush.
15   Did you take notes at that meeting?
16   A.   I did.
17        MR. WEALS:  Okay.  If we could pull up Defendants'
18   Exhibit 276, please, and go to page MGTACKETT 26750.
19        MR. COOK:  I'm sorry.  Exhibit which?
20        MR. WEALS:  276.
21        MR. COOK:  Okay.
22   BY MR. WEALS:
23   Q.   And, Mr. Korber, could you identify -- once you get to
24   that page, let me know when you're there.
25   A.   All right.  I'm there.
```

1    Q.    Could you identify this for me, please?

2          MR. COOK:  Your Honor, I wanted to interpose an

3    objection.  It does not appear that the witness'

4    recollection has been exhausted prior to reference to this.

5    And the purpose of this is a recollection recorded.  We're

6    not offering it.  So, I'm not sure exactly how he's

7    proceeding where the witness is testifying directly from

8    the document, as opposed to his personal recollection.

9          THE COURT:  Mr. Weals?

10         MR. WEALS:  Your Honor, I think we've already laid a

11   proper foundation that these notes were kept in the regular

12   course of business.  It was his regular practice to keep

13   such notes.  And he's already authenticated them as his own

14   writing.

15         I think he's permitted to testify as have many union

16   witnesses regarding their own notes.

17         THE COURT:  Objection is overruled.

18   BY MR. WEALS:

19   Q.    Just to return, Mr. Korber, these are notes of your

20   meeting with Mr. Stewart, and were these notes taken on

21   July 15th of 2002?

22   A.    July --

23   Q.    -- 15th -- I'm sorry -- 2002.

24   A.    Make sure I have the right --

25   Q.    We're on page 26750?

1    A.    750.  Okay.

2         All right.  Yes, July 15, 2002.

3    Q.    Now, you've already described to me a discussion you

4    had with Mr. Stewart concerning the published and

5    unpublished letters.  Is there a reference in your notes to

6    that?

7    A.    Let me review these briefly, but I believe so, because

8    that was part of our discussion.  Yes, about -- I don't

9    know -- again, two-thirds down the list, I ask, "Why

10   publish 2000 P&I?"

11        We talked about that.  Then there is additional notes

12   that talk about there are published and unpublished

13   letters.  My query is, "Why?"

14        And my understanding from that conversation was that

15   it was a Goodyear thing; there are side letters just like

16   there were in the Collective Bargaining Agreement.  There

17   were these letters.  And the P&I Agreement, Mr. Stewart had

18   told me he'd contacted Ron Hoover, who at that time, I

19   understood, was involved with what was called the RPIC, the

20   Rubber Plastics Industry Council, and that the letters that

21   were published in the booklet were to stay published; the

22   letters that were marked "Not to be printed" were not to be

23   published in the booklet.

24   Q.    Now, as of July 15th of 2002 when you met with Mr.

25   Stewart, was there a new, or, what was the state of the P&I

1    booklet?

2    A.    Well, in 2002, the booklet -- there were still

3    discussions going on with the parties in terms of trying to

4    get the data finalized so we could actually finally publish

5    the booklet.

6    Q.    And when was it ultimately published?

7    A.    If I recall correctly, it was finally published

8    probably late first quarter of 2003.

9    Q.    The P&I booklet that was ultimately published, did it

10   contain the unpublished letters?

11   A.    What was put into the booklet, no.  That was the

12   direction that I had gotten from Sam Stewart, that those

13   letters were not to be printed in the booklet.

14   Q.    That was going to be my question.  Why?  Why weren't

15   they?

16   A.    Because -- well, here, the HR Manager, we're going

17   through -- you know, we're coming up on a negotiation, and

18   a negotiation had just been finished.  I'm trying to, you

19   know, frankly, establish good working relationships with

20   various union officials.  And, you know, if I'm hearing

21   from a local union president who is telling me he's talking

22   to people in Pittsburgh and they've said that that letter

23   is not to be printed in the booklet, I had no reason to

24   challenge that.

25   Q.    Okay.

1          MR. WEALS:  Your Honor, at this time, I move the

2     admission of Defendants' Exhibit 48 and Defendants' Exhibit

3     276, but only the pages that were referred to by Mr.

4     Korber, which would be MGTACKETT 26714 through -16, and

5     26750 through -51.

6          THE COURT:  Mr. Cook, do you wish to respond?

7          MR. COOK:  Yes.  We object to both documents.

8     Deposition Exhibit 48 is -- if we could pull that up for a

9     moment, please -- did I say "Deposition"?  Defendants'

10    Exhibit 48 --

11         THE COURT:  You did.

12         MR. COOK:  -- is not sufficiently authenticated as

13    being an actual document that was created and produced by

14    Mr. Stewart, because the only -- the only writing that

15    could be identified on this is that of Roger Sutphin's.

16         We object to 276 for the basis stated in our

17    previous objection that this is a recollection recorded and

18    it's being offered by the party seeking the recollection,

19    not the party who would seek to use it as a prior

20    inconsistent statement.

21         THE COURT:  Mr. Weals?

22         MR. WEALS:  Your Honor, with regard to Defendants'

23    Exhibit 48, I believe that Mr. Korber has sufficiently

24    authenticated the document as one that he received from Mr.

25    Roush in approximately July of 2001, and he has testified

1    as to the contents of that document and was able to

2    identify the handwriting on the cover as that of Mr. Roush.

3         THE COURT:  Forty eight will be admitted over

4    objection.

5         With regard to 276 --

6         MR. WEALS:  Your Honor, I believe you've already

7    addressed this issue in your prior ruling.  The foundation

8    has been laid that these were Mr. Korber's contemporaneous

9    notes which he kept in the regular course of business.  It

10   was his practice to keep such notes, and he certainly is a

11   person with knowledge, and they were taken

12   contemporaneously.

13        THE COURT:  Two seventy six will be admitted over

14   objection.  But I did not get the page numbers.

15        MR. WEALS:  Your Honor, the page numbers were 26714

16   through -16 and 26750 through -51.

17        THE COURT:  Thank you.

18   BY MR. WEALS:

19   Q.   Now, Mr. Korber, as part of your testimony already, we

20   have alluded to something called Letter H, and there has

21   been considerable discussion about Letter H's in the course

22   of this trial.  When did you first see Letter H?

23   A.   I think the first time I saw Letter H was, I'm going

24   to say, perhaps March or April of 2001.  I was looking

25   at -- well, what's in here is the May 9th, 1997, version of

```
1    Letter H.

2    Q.   And how you come to see a copy of Letter H?

3    A.   My recollection is either that Rex Roush had provided

4    that to me, or I may have received a copy of it from Cindy

5    Jones.

6    Q.   And Cindy Jones, again, she is an attorney?

7    A.   She was an attorney at Steptoe & Johnson.

8    Q.   Now, Mr. Korber, you were hired in January of 2001.

9    At some point did you become aware that M&G Polymers had

10   actuaries who were working for the company?

11   A.   I did.

12   Q.   And one of their jobs was to calculate the retiree

13   medical liabilities?

14   A.   Yes, among other things.

15   Q.   And who were those actuaries?

16   A.   Well, they were -- David Jarrett and Duane Lee were

17   probably the two people that I was most familiar with.

18   Q.   Who did they work for?

19   A.   Buck Consultants.

20   Q.   When did you first provide Letter H to Buck

21   Consultants?

22   A.   My recollection is, the first time I provided that to

23   Duane Lee was either December of 2003 or January of 2004,

24   but that was a January 1, 2001, version of Letter H.

25   Q.   So, the Letter H that we saw as part of Defendants'
```

1    Exhibit No. 48, that's the 1997?

2    A.    Correct, yes.

3    Q.    And so I understand, the version of Letter H that you

4    provided to Mr. Lee or to Buck in late 2003, early 2004,

5    was which version?

6    A.    It would have been dated January 1st of 2001.

7    Q.    So, Mr. Korber, since you said that you had first seen

8    Letter H sometime in early 2001 and then it was -- there

9    was a Letter H provided to Buck in late 2003 or early 2004,

10   why was there such a long time between when you first saw

11   it and when you sent it to Buck?

12   A.    Well, when I first had seen the Letter H, it was dated

13   May 9th of 1997.  You know, I looked through it.  You know,

14   it had a future date in it of July 1, 2004.  So, you know,

15   my assessment at the time was that this was a labor

16   agreement letter, that it had a future date when these

17   things would kick in.  And, certainly, between when I saw

18   this in 2004, there was going to be a contract negotiation,

19   and presumably before July 1, 2004, under this letter,

20   there would have to be further conversations between the

21   company and the union about the letter.

22   Q.    Speaking of those contract negotiations, Mr. Korber,

23   what was the term of the collective bargaining agreement

24   that was in place when you were hired?

25   A.    When I was hired, it was there from November 6th of

1  2000 and ended November 5, 2003.

2  Q.   So, when were negotiations to begin for a new

3  collective bargaining agreement?

4  A.   In the fall of 2003.

5  Q.   Now, in preparation for -- I assume that there was

6  some preparation done for the bargaining?

7  A.   Oh, yes.

8  Q.   And when did that preparation begin?

9  A.   Truthfully, that preparation probably began sometime

10 late spring/early summer of 2003.

11 Q.   And what issues was M&G looking at going into the 2003

12 negotiations?

13 A.   Well, there were a number of concerns for the plant.

14 There were some concerns about what was going to happen

15 with some of our customers and some of the units in the

16 plant.  So, there were things having to do with seniority.

17 There were, I guess what I'll call non-economic issues that

18 we wanted to try to address under the contracts.  And in

19 addition to that, there were economic issues, among which

20 was medical insurance.

21 Q.   And what, specifically, were you looking at with

22 regard to medical insurance?

23 A.   Well, there were two things, in particular, we were

24 concerned with.  One had to do with plan design issues.  We

25 knew that some of the plans that we had were, I guess what

1    I'll refer to as a bit out-of-date in terms of their

2    design.  That was some of the feedback we were getting from

3    insurance carriers as we were looking for quotes.  And some

4    of the plan designs we had were difficult, let's say, to

5    process for claims.

6         The other thing that we were looking at, based on

7    surveys and other things that we had done as part of our

8    preparation, was the fact that we need to address

9    contributions and employees and others sharing in the cost

10   of these plans.

11   Q.   And when did the negotiations begin, the 2003 contract

12   negotiation?

13   A.   Mid -- mid-September of 2003.

14   Q.   Did the issue of retiree medical come up at some

15   point?

16   A.   Yes, it did.

17   Q.   And when was that?

18   A.   By the time we -- we started in September.  You know,

19   we worked our way through most of the non-economic things,

20   I'm going to say, by early to mid November.  So, I would

21   say, in mid November, we started to get into the economic

22   issues, and this is -- was probably the first time we

23   started talking about plan designs and costs and proposals

24   related to those things.

25   Q.   Did the company make any proposals?

 1    A.    We did.

 2    Q.    Specifically regarding retiree medical?

 3    A.    Yes.  We had conversation with the union across the

 4    table, and we'd put together a written proposal that

 5    indicated we want to sit down and talk about plan design

 6    and cost sharing, as well as ideas for how we could

 7    potentially save money for both retirees and the company,

 8    and even the union, for that matter.

 9    Q.    When was that proposal made that you were just

10    discussing?

11    A.    I believe it was sometime in the second half of

12    November of 2003.

13            MR. WEALS:  If you could pull up Plaintiffs' Exhibit

14    152, which, I believe, the same as Defendants' Exhibit 71.

15            Plaintiffs' Exhibit 152 has already been admitted, I

16    believe, Your Honor.

17            THE COURT:  It has.

18    BY MR. WEALS:

19    Q.    And could you tell me what this document is Mr.

20    Korber?

21    A.    Yes.  If you could scroll -- yeah.  That would be

22    helpful if you could scroll down, please.

23    Q.    It is in your notebook as Defendants' Exhibit 71.

24    A.    I was going to try to avoid flipping back and forth

25    here, but all right.

1    Q.   If you would like to look at the screen, that's fine,

2    too.

3    A.   Okay.  Yes.  This is the proposal -- in fact, this has

4    my handwriting at the top of it.  We presented this to the

5    union on November 23, of 2003, at 12:47 p.m.  And part of

6    what this letter addresses is that we said we want to sit

7    down and talk about retiree benefits and ultimately talk

8    about things like cost sharing and plan design, things that

9    would be related to, hopefully, getting to an agreement.

10        MR. WEALS:  Could you go back to the top of the

11   document, please?

12        THE WITNESS:  Yes, sir.

13   BY MR. WEALS:

14   Q.   Mr. Korber, you made reference -- is that your

15   handwriting in the upper right-hand corner?

16   A.   It is.

17   Q.   And could you just tell me what your practice was

18   concerning proposals of this nature?

19   A.   Normally, if it was a proposal that I had, if we put

20   it across the table, I would typically write, if something

21   was presented, the date and time it was presented.  If we

22   received something, I would write that it was received,

23   date and time.

24   Q.   The letter, or document, is entitled "Proposed Letter

25   of Agreement Regarding Company Economic #4 as Related to

1    Retirees Under the Medical Necessity Benefits Program."

2    Does this letter relate solely to the Medical Necessity

3    Program?

4    A.    Give me a moment to read, here, just a second.  I

5    believe that the reference to Medical Necessity may be a

6    typo.  This really talks about retiree benefits.

7    Q.    I'm sorry?  You said a typo?

8    A.    Yeah, I believe so, because this makes reference to

9    retiree benefits more generally.

10   Q.    And not looking at the document, but just from your

11   recollection, Mr. Korber, what was the company proposing to

12   do in this first retiree medical proposal?

13   A.    Well, what we wanted to do, we were trying to deal

14   with -- at the table, we wanted, certainly, to deal with

15   active employee plan design issues and other things.  So,

16   we suggested we come back to the subject of retiree

17   benefits after we got the main issues cleared off the

18   table.

19   Q.    Was this particular proposal made on November 23,

20   2003, accepted by the union?

21   A.    Well, in the sense that they said they were going to

22   take a look at it and come back and respond to it, yes.

23   Q.    And were there further discussions made -- sorry --

24   further proposals made by the company concerning retiree

25   medical?

1    A.    There were.

2    Q.    And when did those occur?

3    A.    If I remember right, we -- we had this session in

4    November.  It was probably early -- early December that we

5    came back with additional proposals.

6    Q.    And what was the nature of those proposals?

7    A.    I think we were presenting more, more detail on plan

8    designs to the union for them to consider with respect to

9    active and retired employees.

10         MR. WEALS:  If you could pull up Exhibit Number 76,

11   please, Defendants' Exhibit 76.  Excuse me.

12   BY MR. WEALS:

13   Q.    Mr. Korber, Defendants' Exhibit 76, could you identify

14   this document, please?

15   A.    Yeah.  The first part of it is a cover sheet.  This

16   was -- so, this was a proposal that was put together.  It

17   was presented 12/5/03 and presented at 8:30 a.m.  And, so,

18   it goes through and lists a number of proposals that were

19   in this area, let's say of the P&I Agreement, where it

20   talks about, for example, revise contributory life

21   insurance rate schedule as attached, TA'd.

22         That was an indication that the company and union

23   reached a tentative agreement on those particular items.

24   And this sort of was a way to transmit to the union in one

25   package what the current state was of the company's

1    proposal.

2    Q.   You said, Mr. Korber, that this was presented on

3    December 5 of 2003.  How do you know that?

4    A.   At the bottom, it says:  "Presented 12/5/03."

5         MR. WEALS:  Could we scroll down the page, please?

6    BY MR. WEALS:

7    Q.   And did the proposal consist only of the single page,

8    Mr. Korber?

9    A.   No.  As I think I mentioned, this was a cover sheet.

10   And behind this were the documents backing up these

11   particular individual proposals.

12   Q.   Going back to the first page, Mr. Korber, were any of

13   these proposals being made related to retirees?

14   A.   Yes, they were.  What we had talked about at the table

15   was, you know, within the P&I Agreement, the plan design --

16   well, I should maybe take a step back.

17   Q.   Could you just identify for me which of the proposals

18   on this page that are referenced on this page relate to

19   retirees?

20   A.   It will be Item 4 and Item 5.

21   Q.   And just with regard to these two items, what was the

22   company proposing to do here?

23   A.   Well, with respect to Item 4, what we had said was, we

24   wanted to go to a standard, sort of a standard design from

25   Aetna.  And that would apply to the active employees, but

1    that would also then apply to employees in the

2    Comprehensive and Catastrophic Retiree Medical options.

3        And then, in Item 5, we said that we wanted to address

4    medical, the people who were enrolled in the Medical

5    Necessity Plan option under a separate letter.

6    Q.   There's been testimony thus far in the trial, Mr.

7    Korber, about these different medical plans.  And could you

8    just explain to me were retirees enrolled in the

9    Comprehensive, Catastrophic and Medical Necessity?

10   A.   At this particular time, yes.  Those were the three

11   options that were out there available for people who were

12   retired.

13   Q.   And were all of those options available for active

14   employees, as well?

15   A.   No, they were not.

16   Q.   And what options were available for actives?

17   A.   For the active employees, it was really the

18   Comprehensive or Catastrophic Medical Plan option.  In

19   Medical Necessity, that was a group of individuals who they

20   had retired, and I think the last time anybody could enroll

21   in that plan was back in August of 1997.

22   Q.   Now, so, it appears that there were a series of

23   proposals made on December 5th.  What was the union's

24   response to the company's proposals?

25   A.   Well, again, as before, they had indicated -- other

1    than where we'd tentatively agreed, they were going to go

2    back and take a look and then respond to us.

3    Q.   And did they respond?

4    A.   Yes, they did.

5    Q.   And when was that?

6    A.   I believe that was probably a week later, December

7    12th.

8    Q.   And what was their response?

9    A.   Well, the initial response was that there was no

10   interest in addressing retiree medical issues, because they

11   viewed it as a permissive subject.

12   Q.   And was that statement made at the bargaining table?

13   A.   It was.

14   Q.   By whom?

15   A.   Karen Shipley, who was the International staff rep.

16   Q.   And when you say "a permissive subject," what does

17   that mean to you as a human resources professional?

18   A.   From a labor relations standpoint, what that means is

19   that the parties on both sides can elect to have a

20   discussion about it, but it's not something the parties can

21   agree to reach impasse over.

22         MR. WEALS:  Your Honor, at this point, I would like

23   to move into evidence Defendants' Exhibit 76.

24         MR. COOK:  No objection.

25         THE COURT:  Seventy six will be admitted without

1    objection.

2    BY MR. WEALS:

3    Q.   So, Mr. Korber, you were describing to me some

4    statements that were made by Ms. Shipley.  And I believe

5    you said the date of that was what?

6    A.   About a week later.  So, it was probably sometime

7    around December 12th of 2003.

8         MR. WEALS:  And let me pull up Defendants' Exhibit

9    79, if you would, please.

10   BY MR. WEALS:

11   Q.   Mr. Korber, do you recognize this document?

12   A.   I do.

13   Q.   And what is it?

14   A.   These are the notes that we would have from bargaining

15   sessions.  So, these are the notes, if you will, from the

16   bargaining session that took place on December 12, 2003.

17   So, this was Bargaining Session No. 34.  And we were in

18   Charleston, West Virginia, at the time, at the Embassy

19   Suites.  And the meeting started at 3:05 p.m.  It also

20   lists who was in attendance for the union and for the

21   company.

22   Q.   When you say these are the notes, whose notes are

23   they?

24   A.   This is actually a compilation of notes.  Typically

25   what we did is, people took contemporaneous notes at the

1    table.  We didn't type these notes at the table, but they

2    were later put together to reflect the discussions that had

3    taken place between the parties.

4    Q.   And when you say "we," who are you speaking of?

5    A.   Well --

6    Q.   In other words, are these joint notes of the company

7    and the union?

8    A.   No, these are not joint notes of the company and the

9    union.

10   Q.   Whose notes are they?

11   A.   These are really the company's notes.

12   Q.   All right.  And what was your practice with regard to

13   taking notes?

14   A.   Well, typically, we had somebody who was designated as

15   a note-taker.  And in addition to that, depending on

16   whether I was speaking or not, I would take notes at

17   bargaining sessions.

18   Q.   And then what would happen with those notes?

19   A.   Those notes were given to the person who was our

20   note-taker, and they would use those to then prepare these

21   typed notes.

22   Q.   Okay.  And would you review those?

23   A.   If there was -- if there was something that our minute

24   taker, you know, wanted clarification on or to confirm what

25   was in my notes, for example, yes, they would ask me, but I

1    didn't typically review the notes every day.

2    Q.   Okay.  And what was the purpose of this, of these,

3    bargaining notes?

4    A.   Well, the purpose of these is to be able to go back.

5    Sometimes, in labor negotiations, if you have to go back

6    and try to understand what the parties had discussed or

7    agreed to at a particular point in time, it's helpful to be

8    able to refer back to such documents.

9    Q.   Now, on Defense Exhibit 79, if you could look at page

10   19217, and is there a discussion on this page regarding the

11   matters that you previously testified about concerning

12   statements by Ms. Shipley?

13   A.   Yes, there are.

14   Q.   And could you direct me to that?

15   A.   I think in particular --

16        MR. COOK:  Objection, Your Honor.  Same objection as

17   previously.  I think this is even worse, because they're a

18   compilation of notes.  They're not any one individual's.

19   He didn't take them.  He didn't type them.  Now he's going

20   to read something from the notes that he's not been asked

21   about in his own personal recollection.

22        MR. WEALS:  Your Honor, I believe that he has

23   testified about it on his own recollection regarding

24   statements that were made at the bargaining.  He's also

25   described the manner in which the notes were prepared; the

 1    purpose of the notes is to maintain a record of the

 2    proceedings; and it was done under his supervision.  And

 3    he's knowledgeable about the contents of the notes.

 4         THE COURT:  Ms. Fischer, would you pull up

 5    Plaintiffs' Exhibit 110, please?

 6         MS. FISCHER:  One ten, Your Honor?

 7         THE COURT:  Yes.

 8         Now, Mr. Cook, if you don't want me to admit these

 9    notes, then I won't -- I'll go back and revisit Plaintiffs'

10    Exhibit 110 and all the other notes that we have admitted

11    in that regard.

12         MR. COOK:  Your Honor, I understand your point.  And

13    --

14         THE COURT:  You do?

15         MR. COOK:  I don't want to belabor this.  I think

16    the difference is that Mr. Moore was questioned about notes

17    that he wrote in his handwriting.  And he was questioned

18    about them after exhausting his recollection.

19         THE COURT:  Okay.  So, the difference is typed and

20    handwritten?

21         MR. COOK:  Again, the notes that Mr. Korber is

22    testifying from are not his notes.

23         THE COURT:  No, no.  They are the company's notes.

24         MR. COOK:  Correct.

25         THE COURT:  That's what he testified to.

```
 1            MR. COOK:  I understand.

 2            THE COURT:  The objection is overruled.

 3            I just want to get through this once and for all,

 4     Mr. Cook.

 5            MR. COOK:  The point is taken, and I will remove

 6     that from my repertoire.

 7            THE COURT:  Okay.  Thank you.

 8            Seventy nine -- oh!  You haven't asked for the

 9     admission yet.  You're just referring to it?

10            MR. WEALS:  That's right.  And I believe, where I

11     was, Your Honor, is whether he --

12            THE COURT:  Page 19, 217.

13            MR. WEALS:  That's correct.  If he could refer me to

14     the section of the notes where the exchange with Ms. --

15     BY MR. WEALS:

16     Q.   And just to identify, please, Mr. Korber, who is KK?

17     A.   That would be myself.

18     Q.   KS is --

19     A.   Karen Shipley.

20     Q.   All right.  And where is the discussion regarding the

21     permissive subject?

22     A.    If you could scroll down, please, and if you could

23     continue to scroll down.

24     Q.   You have the handwritten notes in front of you, as

25     well, I believe.
```

1    A.    Yes.

2    Q.    I'm sorry.  Not the handwritten notes.  The same

3    document is in front of you.

4    A.    I'm sorry.  I'll refer to this.

5          Well, I think it's really after the union takes their

6    caucus at 3:20.  So, if you come down -- so, basically, at

7    this point, you know, we had talked about our --

8    Q.    If you could just listen to my question again, Mr.

9    Korber.

10   A.    All right.

11   Q.    Is there anything in the notes about the discussion

12   with Ms. Shipley or the statements you make concerning the

13   permissive subject?  That was my question.

14   A.    Yes.  I believe she said we weren't even going to

15   agree to talk about this.

16   Q.    My question is, is there a reference in the notes to

17   that?

18   A.    Yes, I believe after the union caucus at 3:20.

19   Q.    All right.

20         MR. WEALS:  If you could scroll down, please.

21         THE WITNESS:  Where Karen Shipley is saying "not

22   agreeing to even discuss this about medical necessity group

23   either."

24   BY MR. WEALS:

25   Q.    Could you just tell us where you are here, please?

1    A.    Just that first line right under the caucus at 3:20.

2         MR. WEALS:  If you could scroll back up.

3    BY MR. WEALS:

4    Q.    Let me just -- if I could refer you to the tenth line

5    down on the document.

6    A.    Okay.

7    Q.    I'm sorry.  The eighth line down on the document.

8    A.    Okay.  Well, yeah.  There is a note here where it's

9    Karen Shipley who is saying:  "Just for the record, letter

10   dated 11/23 you gave us, you know anytime you bring up

11   discussion on retirees, it is permissive, we're not

12   interested in this letter, there is one in the P&I book

13   now.  Not interested in discussing now."

14   Q.    So, the union's lack of interest in discussing this

15   matter of the letter dated 11/23 -- and what is that

16   letter, again, Mr. Korber?

17   A.    Well, this would have been our proposal with respect

18   to retiree medical benefits.

19   Q.    That's one we already looked at, correct?

20   A.    Yes, it is.

21   Q.    And did the union's position continue to be that they

22   were not interested in discussing this?

23   A.    Well, they took that position, and then they called a

24   caucus.  And as I was mentioning, they again reaffirmed

25   they weren't interested in talking about this subject.  And

 1    then there was -- if I recall correctly, there was another

 2    caucus that followed.  And then Ms. Shipley came in and had

 3    a different point of view.

 4    Q.   And what was that point of view?

 5    A.   Basically, that the union, herself, and the

 6    representatives that were at the bargaining, they had a

 7    conversation and came back and asked us a number of

 8    questions about a FASB letter and indicated to us that they

 9    were going to present something to us.

10    Q.   Did Ms. Shipley say anything more regarding this

11    letter?

12    A.   I believe she did on the 13th, but let me look through

13    the notes again.

14    Q.   Is there a reference in the company's notes on the

15    12th to the FASB letter?

16    A.   Yeah.  It would be -- it's on what would be page 3 of

17    the notes.  It was right after the union caucus at 3:40.

18    Q.   And that's page 19218 of the exhibit?

19    A.   Yes, it is.

20         MR. COOK:  What's the page, again, please?

21         THE COURT:  What was it?

22    BY MR. WEALS:

23    Q.   19218.  And could you just direct us to where that

24    exchange is?

25    A.   It's about the fourth line down, or -- I'm sorry --

1    the third line down.  And Karen Shipley asked:  "Are you

2    aware of the FASB letter?"

3         I responded:  "There are a lot of FASB letters."

4         Sam Stewart said:  "The Letter H?"

5         I asked:  "Subject?"

6         And then Sam said it had to do with retiree insurance

7    cost.  It states from such-and-such a date, retiree is

8    responsible for paying part of their insurance.

9    Q.   If you could slow down if you're reading, please?

10   A.   I'm sorry.

11        He says:  "It is not in any book.  Discussed in last

12   negotiations, think it is there until 2004.  From the

13   Rubber Workers.  Some letters they didn't put in the P&I.

14   Venegas had a copy, Bussa has a copy."

15        And then I queried if it says retirees have to

16   contribute.

17        And Mr. Stewart said, "After 1/2004."

18        I took that to mean January 1, 2004.

19   Q.   "SS" refers to Sam Stewart?

20   A.   Yes.

21   Q.   Who is Mr. Venegas?  Who is referenced in this?

22   A.   Mr. Venegas was the HR Resources Manager for Shell

23   Chemical Company at the Apple Grove facility prior to M&G's

24   acquisition of it.

25        MR. WEALS:  Your Honor, at this time, I would like

1    to move in evidence Defendants' Exhibit 79.  And my

2    assistant, or my co-counsel, Mr. Torres, informs me that I

3    have failed to move to admit Defendants' Exhibit 52.  So, I

4    would like to do that at this time as well.

5          THE COURT:  That is correct.  Fifty two is a

6    February 27, 2001, e-mail from Roush to Korber regarding

7    follow-up items from 2000 negotiations, identified by

8    Korber.

9          Any objection?

10          MR. COOK:  Not on that one, Your Honor.

11          THE COURT:  Hold on just a second.

12          MR. WEALS:  I take it not with regard to the other

13    one, as well?

14          MR. COOK:  I've noted my objections.  They've been

15    overruled.  So, I'm not going to renew them with respect --

16          THE COURT:  That's a good way of doing that.

17          MR. COOK:  -- to 79.

18          THE COURT:  Just a second.  It might be a

19    deprivation of sleep, but I can't get this computer to work

20    today.

21          Fifty two will be admitted without objection.

22          Seventy nine will be admitted over previously stated

23    objection.

24          You may proceed.

25    BY MR. WEALS:

1    Q.   Now, during the discussion on December 12th that we

2    were just referring to, were you provided with a copy of

3    the letter that Ms. Shipley referenced?

4    A.   I believe they had committed that they were going to

5    provide us a copy of the letter.

6    Q.   And did they do that?

7    A.   I believe, the next day.

8    Q.   Okay.  And the next day was what?

9    A.   The 13th of December of '03.

10   Q.   And let me show you Defendants' Exhibit 85.

11        And, Mr. Korber, can you identify this document?

12   A.   Yes.  This is a Letter H that's dated January 1, 2001.

13   It has my notes at the top of this:  "Presented 12/13/03,

14   1:58 p.m."

15   Q.   Is this the letter that Ms. Shipley or the union

16   provided to you on December 13th of 2003?

17   A.   Yes, it is.

18   Q.   Now, you identified the handwriting in the upper

19   right-hand corner as yours.  How about the number 5?  Is

20   that your handwriting?

21   A.   That, I don't recognize.

22   Q.   And the date of this letter, Mr. Korber?

23   A.   The date of the letter is January 1, 2001.

24   Q.   Now, at the time that Ms. Shipley presented this

25   letter to you on December 13th, 2003, did she say anything?

1    A.   My recollection is that Ms. Shipley, when she

2    presented this to us, had commented that she had had

3    conversation with Ron Hoover and that he had indicated that

4    the letter applied.

5         MR. COOK:  Objection.  Hearsay.  He uses the words

6    "he indicated" or "he said."

7              THE COURT:  I understand.

8              MR. WEALS:  Can I reframe the question, Your Honor?

9              THE COURT:  You may.

10   BY MR. WEALS:

11   Q.   If you could, just please tell me what Ms. Shipley

12   said to you, without referring to any conversations she may

13   have had with other people?

14   A.   She presented this letter and said it applied to M&G

15   Polymers and their relationship with Local 644.

16   Q.   Did she say anything else about the letter?

17   A.   That it was a -- obviously, there were some things in

18   here that were a subject of bargaining.  She moved to

19   extend the dates on this letter to six months out from -- I

20   believe what she was proposing was six months out from the

21   July 1, 2004, date.

22   Q.   And --

23   A.   Or January 1, 2004.

24   Q.   And who else was present on behalf of the union at

25   this particular session on December 13th?

1   A.   Sam Stewart would have been there.  Rex Roush -- I'm

2   sorry.  Sam Stewart would have been there.  Roger Sutphin

3   would have been there.  The local union president at the

4   time was Albert Yester.  He would have been there.  Otto

5   Allen Lee would have been there.  Joe Harris would have

6   been there.

7   Q.   And did anyone from the local union say anything with

8   regard to this letter?

9   A.   I believe Mr. Stewart had made a comment that this was

10  something that came forward from Goodyear.

11  Q.   Now, according to the Letter H that you were provided

12  on December 13th of 2003 by Ms. Shipley, when would retiree

13  contributions begin?

14  A.   In accordance with this, they would begin January 1,

15  2004.

16  Q.   Now, after the discussion on the 13th concerning this

17  letter or the presentation of this letter, what happened

18  next with regard to the bargaining?

19  A.   Well, the 13th was the last day that we bargained in

20  2003.  The next time the parties got together was in

21  January of 2004.

22  Q.   And at this point in time, how many bargaining

23  sessions had there been?

24  A.   I would say there had to -- there certainly was in

25  excess of 30 by the time we got to December 13th of '03.

1   Q.   And did the company make any proposals on December the

2   13th?

3   A.   We did.  We had -- we were hoping to get to an

4   agreement.  At this point, we're about a month past the

5   expiration of our contract.  We knew that the plant was

6   faced with some pretty significant issues.  So, we had

7   indicated to the union that we really were hoping to get an

8   agreement ratified before December 25th, and we had put

9   together what at that time was our Last, Best, Final Offer

10  to the union and advanced that to them on December 13th.

11  Q.   Was any part --

12          THE COURT:  Mr. Korber, every once in awhile, you

13  have a tendency to kind of drift off at the end of your

14  sentence.

15          THE WITNESS:  I apologize.

16          THE COURT:  And, so, Last and Best Offer was

17  presented on December 13th; did you say?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Okay.

20  BY MR. WEALS:

21  Q.   And was any part of that Last, Best and Final Offer

22  related to medical benefits?

23  A.   It was.  There was -- at that point in time, part of

24  that package proposal included a letter having to do with

25  retiree medical benefits.

```
 1            MR. WEALS:  If you could pull up, please,
 2    Defendants' Exhibit 73.
 3            Your Honor, before I get to that, I would like to
 4    move Defendants' Exhibit 85 in evidence, which is --
 5            THE COURT:  Eighty five is the 1/1/01 Letter H
 6    provided, according to Mr. Korber, by Shipley.  Any
 7    objection?
 8            MR. COOK:  No objection.
 9            THE COURT:  Thank you.
10            Eighty five will be admitted without objection.
11    BY MR. WEALS:
12    Q.   Mr. Korber, what's this document that's in front of
13    you, Defendants' Exhibit 73?
14    A.   This was from our earlier proposal that we had
15    presented on the 23rd of November.  And based on the
16    additional information that had come forward, we had now
17    revised our proposal.  And, so, this was still a letter
18    dated November 23rd, 2003.  But we had now styled it in the
19    form of saying it was a Letter of Understanding 2003-6 that
20    had to do with retiree health care benefits.
21    Q.   And how do you know that this was the proposal on
22    December 13th?
23    A.   In the footer -- it's a little hard for me to read
24    from here; but, in the footer, you'll see that it has,
25    Document Run Date 12/13/03 at 5:00 p.m.  It updated the
```

```
 1   proposals through 12/7/03.

 2   Q.   And how many pages was this particular letter?

 3   A.   It's probably at least two pages, or three.

 4   Q.   And I notice, at the bottom, there is a page in this

 5   case, 111 of 123.  Could you explain that?

 6   A.   Yeah.  What we were doing at the time when we were

 7   advancing proposals, we actually had put together a

 8   complete collective bargaining agreement.  So, rather than

 9   pass individual proposals back and forth across the table,

10   which can sometimes be rather messy to deal with, we were

11   actually -- as we were making changes, we were putting them

12   into, you know, what could ultimately then be, literally,

13   the labor agreement.

14         THE COURT:  CBA or P&I?

15         THE WITNESS:  CBA.  The CBA.

16         THE COURT:  All right.

17         MR. WEALS:  Your Honor, I would like to move

18   Defendants' Exhibit 73 in evidence.

19         THE COURT:  Any --

20         MR. WEALS:  It consists of a three-page document.

21         THE COURT:  Yeah.  It's already in evidence.

22         MR. COOK:  It duplicates --

23         THE COURT:  Well, originally, it was admitted as a

24   result of Shipley identifying it.

25         MR. COOK:  Yes.
```

```
 1              MR. WEALS:  Can you give me the -- because there are
 2       several versions of this, can I just make sure that it's
 3       the same document?
 4              THE COURT:  I can't tell you that.
 5              MR. WEALS:  Can you give me the exhibit number?
 6              MS. FISCHER:  It's Defendant 73.  We used yours.
 7              MR. WEALS:  You did?
 8              I apologize for that, Your Honor.
 9              THE COURT:  That's all right.
10              MR. WEALS:  I appreciate your having done that for
11       me.
12              MR. COOK:  Saving you time.
13       BY MR. WEALS:
14       Q.   Mr. Korber, I think you said that December 13th was
15       the last negotiations in 2003.  When did negotiations
16       continue, if they did?
17       A.   We had gotten back together with the union -- I
18       believe it was in early January of 2004.
19       Q.   And did the company make any further proposals
20       concerning retiree medical benefits?
21       A.   We did.  We did.  We certainly had gone a little
22       further.  And by the time we got into February of '04, we
23       advanced an updated proposal.
24              MR. WEALS:  And if you could pull up Defendants'
25       Exhibit 309, please.
```

1    BY MR. WEALS:

2    Q.    And do you recognize this document, Mr. Korber?

3    A.    If you could scroll down to the bottom, please, that

4    would be -- yes.

5         This would have been Letter of Understanding 2003-6.

6    It would have been updated as of February 6, 2004, at 5:00

7    p.m.

8    Q.    And, again, what was the date this was presented to

9    the union?

10   A.    It was either presented on February 6th of '04 or

11   February 7th of '04.

12   Q.    Now, had there been changes made to this letter from

13   the prior version that we had seen?

14   A.    I believe there had been, yes.

15   Q.    Now, Mr. Korber, if you scroll down -- if you could

16   scroll down through this document, I think you have a hard

17   copy of it, as well, available to you, Defendants' Exhibit

18   309.  It's in the second volume of your notebook.

19   A.    There it is.  All right.  I have it.

20   Q.    And, Mr. Korber, is there a reference of this proposed

21   letter to a contribution commencement date for health care

22   benefit premiums?

23   A.    Yes.  In the second paragraph, about midway through,

24   we talk about the January 1, 2001, Letter H.  We say:  In

25   addition, retirees will not be required to make any

1    contribution toward cost of health care benefit premiums

2    until January 1, 2005.

3    Q.   And when it refers to retirees, who does that mean,

4    just to be clear?

5    A.   Well, this letter -- I don't think there was any

6    question that we were talking about all preexisting

7    retirees as well as future retirees.

8    Q.   And, in that regard, did the union at any time

9    indicate that this Letter LOU 2003-6 pertained only to

10   future retirees?

11   A.   No.

12           MR. WEALS:  Could I have a moment, Your Honor?

13           THE COURT:  Sure.

14           (Whereupon, there was a brief interruption.)

15           MR. WEALS:  Your Honor, I would like to move the

16   admission of Defendants' Exhibit 309.

17           THE COURT:  Any objection to the admission of the, I

18   guess, amended LOU 2003-6 as presented in February, '04?

19           MR. COOK:  None.

20           THE COURT:  Thank you.

21           Three oh nine will be admitted without objection.

22   BY MR. WEALS:

23   Q.   Were there further negotiations after November -- I'm

24   sorry -- February 6th or 7th, 2004?

25   A.   There were.

1    Q.    And how long did bargaining continue?

2    A.    We -- there was a break after -- I believe it was

3    February 9th of '04.  We got back with the union mid-March

4    of 2004.

5    Q.    And were the parties able to reach an agreement?

6    A.    No.  We had not been able to reach an agreement at

7    that point.

8    Q.    And in labor relations parlance, what occurred?

9    A.    Well, as of -- frankly, the company and the union had

10   bargained.  We had had heard a number of times about --

11   there was flexibility, there was movement, but it was

12   obvious we got to a point where there wasn't going to be

13   any additional movement for the parties to get to an

14   agreement.  So, the company actually declared impasse on

15   February 9th, 2004.

16   Q.    You did say that you got back together with the union.

17   And when was that?

18   A.    I believe it was in mid-March of 2004.

19   Q.    And were there any further discussions at that session

20   on retiree medical?

21   A.    There were, yes.

22   Q.    And what were they?

23   A.    I believe it was on the 18th of March.  One of the

24   things that Ms. Shipley had done was, she had come to us,

25   and she actually advanced a proposal to delete Letter H.

1       MR. WEALS:  If you could pull up Defendants' Exhibit

2   110, which I understand has already been admitted as

3   Plaintiffs' Exhibit 180.

4       THE COURT:  I'm sure that's right, but let me check.

5       Right.

6   BY MR. WEALS:

7   Q.   Could you tell the Court what this document is?

8   A.   Yes.  This was the proposal that Ms. Shipley had

9   presented to the company across the table.  And, in

10  essence, it said the union proposal concerning Letter H of

11  P&I Agreement, the union proposes deleting Letter H and the

12  company to not require any contributions for retirees for

13  medical insurance.

14      MR. WEALS:  Could you go to full page mode, please?

15  BY MR. WEALS:

16  Q.   And what was the company's response, Mr. Korber?

17  A.   Well, I mean, at that point, we were a little

18  surprised since, you know, Ms. Shipley had been -- had told

19  us, initially, that the whole subject of retiree medical

20  insurance was a permissive subject, took a pretty strong

21  stand on it, then came back, told us that, after further

22  information that she had received, that, in fact, this was

23  a subject that was proper for the parties to discuss.  And

24  we had gotten to an impasse.  We had advanced proposals.

25  The union had responded to those.  And, so, we get to March

1    18th, and now I'm being handed a proposal that said,

2    Everything we just talked, to you about, we propose

3    deleting out of our agreement.

4    Q.   And following the session on March 18th where this

5    proposal was presented by the union, were there further

6    negotiations in this round?

7    A.   Yes.  We still -- at that point, we had not had an

8    agreement.  That was one of our objectives, obviously, was

9    to try to get to an agreement.  And the next time the

10   parties got together was about a year later.

11   Q.   And did the company, in fact, declare that there was

12   an impasse?

13   A.   We did.

14   Q.   And what did the company do at that point?

15   A.   Well, after we had declared an impasse, we had sent a

16   letter to Ms. Shipley, who was the union's chief

17   spokesperson, indicating to her that we were moving forward

18   to implement certain portions of our Last, Best, Final

19   Offer.  And we also had given her a sort of, if you will, a

20   schedule that said, Here are other parts of that Last,

21   Best, Final Offer that we were going to implement and the

22   dates on which we proposed to implement them.

23        MR. WEALS:  If you could pull up, please, Joint

24   Exhibit 12, please.

25   BY MR. WEALS:

1    Q.   And, Mr. Korber, is this the letter that you were just

2    referring to?

3    A.   Yes, it is.

4    Q.   And were there any references in this letter to the

5    LOU 2003-6 that we were discussing a minute ago?

6    A.   There were.

7    Q.   And where is that?

8    A.   I believe the first one is going to be on the second

9    page of this document.  So, at the top, there is a bullet

10   point.  Maybe we can go back to the first page, and I can

11   put the context of it there.

12        So, if you would scroll down.  So, we say -- we are

13   now on the second paragraph.

14        "We are now forwarding this letter to advise you of

15   the company's implementation of other elements..."

16   Q.   Could you slow down when you're reading, please, for

17   the court reporter's benefit?

18   A.   I'm sorry.  Okay.

19        "We are now forwarding this letter to advise you of

20   the company's implementation of other elements of our Last,

21   Best and Final Offer as noted below."

22        And then we set off a series of bullet points, which

23   continues on to the second page, one of which is listed as

24   Letter of Understanding 2003-6.

25   Q.   Are there any other references?

1    A.   Yes, there are.  If you come down, we talk about

2    the -- sorry.  You need to come up just a little bit on

3    this document.

4         So, we also talk about Aetna Medical PPO plan design

5    changes, prescription drug plan changes, Aetna medical

6    premiums, employee and retiree contributions.

7         And then, if you scroll down, there is some additional

8    references to this as well.

9         So, as you come down, agreement reference; Letter of

10   Understanding 2003-6; anticipated effective date, January

11   1, 2005.

12        And, in addition, there's also reference to that the

13   medical premiums for employees and retirees:  September 1,

14   2004, for active employees; January 1, 2005, for retirees.

15   Q.   And that January 1, 2005, date refers to what?

16   A.   This would be the contribution commencement date.

17   This is when we would expect that people would begin making

18   contributions.

19   Q.   And that is set forth in LOU 2003-6?

20   A.   It is.

21   Q.   Now, were retirees required to begin making

22   contributions on 1/1/05?

23   A.   Actually, we had deferred that date.

24   Q.   And why did you do that?

25   A.   The union had actually made a request of us to defer

```
 1    it from 1/1/05.  We agreed to do that on a temporary basis.

 2    Q.    When did the union make that request?

 3    A.    I believe it was in December of 2004.

 4    Q.    And was that orally or in writing, Mr. Korber?

 5    A.    Initially, I got a request from Roger Sutphin that we

 6    do that.  And then I had sent a letter to Ms. Shipley

 7    telling her that we were prepared to do that.

 8    Q.    Do you remember when that letter was?

 9    A.    I think it was right, sort of, just before the

10    holidays, in December.

11    Q.    Of what year?

12    A.    Of 2004.

13         MR. WEALS:  If you could pull up Joint Exhibit 32,

14    please.

15         Could I have just a moment, Your Honor?

16         THE COURT:  Yes.

17         (Whereupon, there was a brief interruption.)

18         MR. COOK:  Your Honor, --

19         THE COURT:  Yeah.

20         MR. COOK:  -- may I speak on behalf of my associate

21    and request a short break?

22         THE COURT:  Are we talking about the one who is

23    pregnant and has to go to the bathroom all the time?

24         MR. COOK:  Well, I don't want to single anyone out.

25         THE COURT:  Well, you're not.
```

```
 1              All right.  Let's take a short recess of about ten

 2      or 15 minutes.  Well, let's say 15 minutes.

 3              (Whereupon, a recess was taken at 11:02 a.m., and

 4      the proceedings reconvened at 11:20 a.m.)

 5                                - - -

 6      IN OPEN COURT:

 7              THE COURT:  Mr. Weals, you may continue on direct

 8      examination of Mr. Korber.

 9              MR. WEALS:  Thank you, Your Honor.

10              And we have had a request that Mr. Korber speak a

11      little more closely to the mic.

12              THE WITNESS:  All right.  I'll try to do that.

13              MR. WEALS:  Some people are having difficulty

14      hearing you in the back of the court.

15              Thank you.

16      BY MR. WEALS:

17      Q.   Mr. Korber, we were on Joint Exhibit No. 32, which I

18      believe you identified already as a letter from yourself to

19      Ms. Shipley.  And I think the subject that we were

20      discussing was the effective date of the retiree

21      contributions.  Is that referenced in this letter?

22      A.   Yes.  There were a number of things referenced in this

23      letter, but I believe I had communicated to Ms. Shipley we

24      were willing to temporarily defer the commencement date for

25      contributions.
```

1    Q.   Could you direct us to where that is in the letter?

2         MR. WEALS:  Keep scrolling.  I think it's a two-page

3    letter.

4         THE WITNESS:  Yes.  I believe it's on the second

5    page.

6         And if you could go down a little further, please,

7    the paragraph that starts out:  Third, pursuant request and

8    as discussed with Roger Sutphin on December 14th, we will

9    temporarily postpone implementation of any planned January

10   1, 2005, changes in retiree medical benefit programs, and

11   then parenthetically, Medical Necessity, Comprehensive and

12   Catastrophic, as contemplated by Letter of Understanding

13   2003-6 and the surrounding discussions during our previous

14   bargaining sessions.

15        MR. WEALS:  Your Honor, at this time, I would like

16   to move in evidence Joint Exhibit 12 and Joint Exhibit 32.

17        MR. COOK:  Your Honor, 32, we believe, has been

18   admitted.

19        THE COURT:  Thirty two has been admitted via

20   Shipley.  Twelve is the implementation notice and schedule

21   identified by Korber.

22        Any objection?

23        MR. COOK:  Your Honor, that's a duplicate of a

24   document that was previously admitted under Ms. Shipley, as

25   well.

```
 1            THE COURT:  Well, I know it was at least identified

 2    under Ms. Shipley, but I couldn't find where it had been

 3    identified, or --

 4            MR. COOK:  No objection.

 5            THE COURT:  Okay.  Twelve will be admitted without

 6    objection.

 7    BY MR. WEALS:

 8    Q.   Did bargaining with the local and with the

 9    Steelworkers resume at some point?

10    A.   Yes, it did.

11    Q.   And when was that?

12    A.   That began in April of 2005.

13    Q.   Who was involved, on the company's side, in those

14    negotiations?

15    A.   On the company's side, there was myself, Pam Cook.

16    Bob Long, at some point, had gotten involved back in the

17    process.  And I believe Jeff Shea was with us for a portion

18    of that, as well.

19    Q.   And Mr. Shea was who?

20    A.   He was the site manager for the Apple Grove facility.

21    Q.   And how about on the union side?  Who was involved in

22    these discussions beginning in April of 2005?

23    A.   Randy Moore was the International staff rep.  Mr.

24    Wedge had become the president of Local 644 at that point.

25    The vice-president of the union, Joe Harris, was involved.
```

1    And Sam Stewart was back with us in '05.  And I believe, at

2    least for a portion of the 2005 bargaining, Mr. Sutphin was

3    there.

4    Q.   When you say "back with us," what do you mean by that?

5    A.   Meaning they had been present in the 2003 bargaining

6    previously.

7    Q.   Who had been?

8    A.   Sam Stewart and Roger Sutphin.

9    Q.   And how about Mr. Moore and Mr. Wedge?  Had they been

10   involved in the 2003/2004 negotiations?

11   A.   Not until April of 2005.

12   Q.   Had they ever been involved in negotiations with the

13   company?

14   A.   My understanding is that they had been in 2000, yes.

15   Q.   Was the subject of retiree medical discussed in the

16   negotiations that began in April of 2005?

17   A.   Yes, it was.

18   Q.   And could you just briefly tell me what occurred with

19   regard to retiree medical?

20   A.   Yeah.  We had -- as I'd mentioned, the last bargaining

21   we had before April of '05, the parties had gotten together

22   in March of '04.  Randy Moore had joined us.  Mr. Wedge had

23   joined us.  And, you know, at the first meeting, one of the

24   things that seemed to me to be important to do was to sit

25   down and make sure that we were all on the same page in

1    terms of where we were starting from with respect to the

2    conversations that had taken place.  And one of those

3    subjects was to have a conversation about Letter of

4    Understanding 2003-6.

5    Q.   And when was that first bargaining session?

6    A.   I believe it was April the 8th of 2005.

7    Q.   And could you tell me what you recall having been

8    discussed on that date, April 8th?

9    A.   Well, with respect to Letter of Understanding 2003-6,

10   my recollection is that, you know, I had walked through

11   what had happened in bargaining previously and had

12   indicated that, you know, we still had some issues we

13   wanted to address with respect to plan design.  And, again,

14   our intent was, hopefully, to get to an agreement on that

15   issue and other things.

16        MR. WEALS:  If you could pull up Defendants' Exhibit

17   122, please.

18   BY MR. WEALS

19   Q.   Mr. Korber, could you just tell me what these are?

20   A.   These, again, are notes from a bargaining session that

21   took place on April the 8th of '05.  And we're now meeting

22   in Teays Valley, West Virginia.  It was Bargaining Session

23   No. 51, it identifies who was present for the union and who

24   was present for the company.

25   Q.   And was there any discussion at this April 8th, 2005,

1    meeting regarding Letter H?

2    A.   I believe there was.

3    Q.   And could you direct me to the portion of your notes

4    that discusses that?

5    A.   All right.  If you'll continue to scroll down, please.

6    Q.   These notes are relatively long.  If I could direct

7    you to a particular page, which is 23079, it might speed

8    things up.

9    A.   All right.

10   Q.   If you could identify who RM is, please?

11   A.   That was Randy Moore.

12        So, yeah, it looks like, just if you'll scroll up a

13   little bit more, please, just above where that was

14   marked -- scroll up, if you would.  It's probably, on the

15   next page, it starts.

16        Okay.  So, --

17   Q.   I just want you to direct me now to the portions of

18   the discussion about Letter H.

19   A.   Okay.  So, we started to have a conversation about the

20   retiree medical.  So, if you go to the next page, there is

21   a comment that I'm making.  Just before this letter, we

22   discussed Letter H recognized that -- I think there is a

23   typo in here where I'm saying it's a permissive subject,

24   because it's actually a mandatory subject by the agreement.

25        Mr. Moore asked me if this was for employees going

```
1    forward.  And I had talked about the fact that the plan

2    designs -- this was part of LOU 2003-6.  So, plan designs,

3    cost-saving measures, other things, these were --

4              THE COURT:  Whoa!  Whoa!  Whoa!

5              THE WITNESS:  I'm sorry.

6              THE COURT:  Not only can I not hear you, now you're

7    going --

8              THE WITNESS:  A hundred miles an hour.

9              THE COURT:  -- a hundred miles a minute.

10             Every time you start to read something, you have a

11   tendency to speed up.  So, please speak into the microphone

12   and slow down.

13             THE WITNESS:  Okay.

14   BY MR. WEALS:

15   Q.   Without looking at the notes, what do you recall

16   telling the union and what did they say in response

17   concerning Letter H when it came up?

18   A.   We had a discussion about what had transpired, which

19   was that Letter H had come up in our bargaining, that we

20   had been presented a copy of that.  And then Randy Moore

21   had talked about a recollection that he had from the 2000

22   bargaining.  We discussed that a little bit.  And I had --

23   I had indicated that, you know, this was something that had

24   come forward and that it was still part of -- obviously,

25   something that was up for discussion between the parties in
```

1    terms of what we were going to do with retiree medical.

2    Q.   And what was the union's -- what position did you

3    express with regard to Letter H?

4    A.   That it was applicable.

5    Q.   Now, there is -- if you go down, partially, on the

6    page, there is a passage that begins "KK:  Think it does."

7    A.   Yes.

8    Q.   And what are you referring to there in that passage?

9    A.   Well, this is going back to the matter of Letter H,

10   because there was a response that I was making.  It said:

11   I believe Letter H does apply.  And then there was, based

12   on the information that I had learned since, you know,

13   coming onboard at M&G, there was actually this binder that

14   Ron Hoover had brought down for both the local union and

15   the company.  And in that binder was where Letter H was

16   from May 9, 1997.

17   Q.   And how did you know about this binder?

18   A.   Mr. Roush ultimately had provided it to me.

19   Q.   And have you seen this binder?

20   A.   I have.

21   Q.   And what does it contain?

22   A.   It contains an agreement that encompasses from 1997 to

23   2003.  So, there's the parts of it that would be put into

24   the booklet.  In addition to that, there is a series of

25   letters that are also to be included in the booklet.  And

1    then there is a series of letters that are marked to not be

2    printed in the booklet.

3    Q.   And what was your understanding of when Mr. Hoover

4    provided this binder?

5    A.   My understanding of it was that had happened sometime

6    in 1999 or maybe early 2000.

7    Q.   And he provided it to whom?

8    A.   I believe he had provided it to Dave Venegas, who was

9    the HR manager at Shell Chemical at the time.

10        MR. WEALS:  Your Honor, I would like to move in

11   evidence Defendants' Exhibit 122, which is the notes of the

12   April 8th, 2005, bargaining session.

13        THE COURT:  Any objection other than that which has

14   been previously stated?

15        MR. COOK:  I'll just preserve my other objection,

16   same.  We'll move on.

17        Thank you.

18        THE COURT:  Thank you.  One twenty two will be

19   admitted over objection previously stated.

20   BY MR. WEALS:

21   Q.   Okay.  Following this initial meeting on April 8th of

22   2005, there were additional bargaining sessions?

23   A.   Yes.  There were probably, I'm going to say, somewhere

24   on the order of between ten and 15 additional bargaining

25   sessions.

1    Q.    And did any of those discussions include retiree

2    medical?

3    A.    Yes, they did.

4    Q.    And could you just tell me what was discussed during

5    negotiations on that subject?

6    A.    In summary, in the 2005 negotiations, we were

7    certainly looking at Letter of Understanding 2003-6.  We

8    talked about the plan designs that were contained within

9    that document.  We had certain proposals from insurance

10   providers.  The union had gone back -- I believe it was to

11   the Steelworkers Health and Welfare Fund -- and were

12   getting quotes for both the active employees and the

13   retired employees.  We looked at that.

14         We had some additional discussion.  And by the time we

15   got to July/early August, basically, the parties hadn't

16   changed anything in LOU 2003-6 except for we were making

17   reference to the United Steelworkers of America, and we had

18   been informed by the union that that should now say "United

19   Steelworkers," and we changed the dates.

20   Q.    And when you say "changed the dates," what are you

21   referring to?

22   A.    We changed the -- I guess I should lean forward.  We

23   changed the contribution commencement dates.

24   Q.    And remind us what the date had been in the LOU

25   2003-6.

1    A.    The date originally had been January 1, 2005.  And

2    through discussion between the parties, we agreed to move

3    it to January 1, 2006.

4    Q.    Now, you made reference to July, 2005.

5         MR. WEALS:  If you could pull up Defendants' Exhibit

6    124, please.

7    BY MR. WEALS

8    Q.    And this looks something like prior documents we've

9    seen, but could you identify this, please, for the Court?

10   A.    Yes.  This would have been a copy of what we were

11   calling LOU 2003-6, or Letter of Understanding 2003-6, and

12   this would have been the status of that, let's say, as of

13   July 15th of '05.  We indicated to the union that we were

14   going to need to discuss dates on 8/1/05 in part to

15   recognize the upcoming Medicare Part D deadline.

16   Q.    And what does this document reflect?  There appear to

17   be some edits made to it.

18   A.    Yeah.  What this document would have reflected were

19   the changes that had been made, at least as of that date,

20   by the parties to Letter of Understanding 2003-6.

21   Q.    And what were those changes?

22   A.    Well, as I mentioned, there was some changes in

23   reference to the Steelworkers official title.  And we

24   changed the dates where we said we were going to actually

25   begin discussions to ascertain costs for retirees.  But,

1    ultimately, probably the most significant thing was pushing

2    out the contribution commencement date to January 1, 2006.

3    Q.   And where does that appear in this document?

4    A.   You're going to have to scroll down.

5         Please continue scrolling.

6         It's going to be what would be the fourth line from

7    the bottom, over to the right, where it says:  "In

8    addition, retirees..."

9    Q.   Slow down, please.

10   A.   Sorry.

11        "In addition, retirees will not be required to make

12   any contribution toward the cost of health care benefit

13   premiums until January 1" -- a strike-through of '05 -- "in

14   2006."

15   Q.   And why was that change made?

16   A.   That was made based on a discussion between the

17   parties in the bargaining as to when we thought it would be

18   appropriate for retirees to begin making contributions

19   toward the above-cap costs.

20   Q.   Was that something that the company had sought?

21   A.   Well, certainly, it was a part of the discussion that

22   we had.  Again, there is -- just before this highlighted

23   text, you'll notice that there is a reference in there to

24   Letter H, dated January 1, 2001.  This was the letter that

25   we had been presented by the union and were told that it

```
 1    applied.  And in March, the union had proposed to remove

 2    that.  We didn't agree to that proposal.  And now the

 3    parties were back to the table to continue our discussions

 4    about this.

 5    Q.   And so I'm clear, was the union provided with a copy

 6    of this particular document, Defendants' Exhibit 124?

 7    A.   Yes, they were.  As I mentioned before, this

 8    particular document -- as we exchanged documents with the

 9    union, this was part of what would basically be a complete

10    CBA so, as changes were made, the union and the company

11    both could go through, see where the changes were, and

12    understand what that would look like, eventually, in the

13    printed agreement.

14         MR. WEALS:  Your Honor, I move for the admission of

15    Defendants' Exhibit 124.

16         MR. COOK:  No objection.

17         THE COURT:  One twenty four will be admitted without

18    objection.

19    BY MR. WEALS

20    Q.   Mr. Korber, were the company and the union ultimately

21    able to reach an agreement?

22    A.   Yes, we were.

23    Q.   And when did that occur?

24    A.   I believe we had made all of the changes in the

25    contract by August 1 of '05.  And my understanding from Mr.
```

1    Wedge was that that had been taken out to the membership,

2    presented for ratification, and that it had been ratified,

3    I believe, on August the 9th of 2005.

4         MR. WEALS:  If you could pull up Joint Exhibit 13,

5    please.  And this document has already been admitted, a

6    copy of the August 9th, 2005, Collective Bargaining

7    Agreement.

8    BY MR. WEALS:

9    Q.   And is this the agreement that was ratified as you

10   just indicated?

11   A.   Yes.

12        MR. WEALS:  And if you could turn to page 6202 in

13   this document.  If you'd go to full page, please.

14   BY MR. WEALS:

15   Q.   What is this, Mr. Korber?

16   A.   This would be Letter of Understanding 2003-6, Retiree

17   Health Care Benefits.  This was the result of additional

18   talks between the company and the union in 2005.

19        And I believe, if we go to the next page and if we

20   scroll down, as you'll see, that bears my signature, and

21   also the signature of Karen Shipley, from the Steelworkers.

22   Q.   Now, Mr. Korber, there's been testimony given in this

23   case by Mr. Moore concerning LOU 2003-6 and the final

24   agreement.  And were you here for that testimony?

25   A.   I was.

1    Q.   And do you understand Mr. Moore to be suggesting that

2    LOU 2003-6 was never agreed to?

3    A.   I believe that's what he was saying, yes.

4    Q.   What's your response to that?

5    A.   I find that to be preposterous.

6    Q.   And why is that?

7         MR. COOK:  Your Honor, we're going to object.  We

8    believe that to be a very large mischaracterization of Mr.

9    Moore's testimony.

10        THE COURT:  Well, I'll have to admit, I don't recall

11   it that way.  And you're looking at me, Oh, oh!  Why do I

12   recall it.

13        MR. WEALS:  That's all right, Your Honor.  I'll

14   withdraw the question.

15        THE COURT:  All right.  Good.  I really don't recall

16   Mr. Moore's testimony being that.

17        MR. WEALS:  I withdraw the question.

18        THE COURT:  I tell you what, we've never had an

19   approach to the bench all during this trial.  Let's try

20   that once.  Well, we did have one approach.

21        We're off the record unless the parties wish it on

22   the record at a later time.

23        (Whereupon, a discussion was held at the bench,

24   between the Court and Counsel, off the record.)

25   IN OPEN COURT:

1        THE COURT:  All right.

2        Mr. Weals, you may proceed, now that we've had the

3   discussion here at the bench.

4   BY MR. WEALS:

5   Q.   Now, Mr. Korber, you've directed us to some language

6   in this letter concerning the date for the commencement of

7   retiree premium contributions.  I believe you also made

8   reference to a date for a meeting, or something like that.

9   Can you just elaborate on that?

10  A.   Yeah.

11       One of the things that were important to the parties

12  as we were talking about this was that we should sit down

13  and do a number of things that we thought were very

14  important to the changes we were talking about with respect

15  to retirees.  One of those was to certainly further discuss

16  plan designs and the impact on that.

17       We also said that there were things that we thought we

18  could do that, from a cost-savings standpoint and other

19  things, that would be helpful for all of the individuals

20  involved.  I mean, obviously, you know, from the

21  perspective of the company, there were savings involved.

22  From the perspective of the retirees, you know, by

23  utilizing different plan features, there could be less

24  out-of-pocket expense for them.  And for the union, I would

25  think they would be interested in having an employer who

1    was economically viable.

2    Q.   Was there a reference in the Letter of Understanding

3    2003-6 that made reference to the parties meeting to

4    discuss some of these issues?

5    A.   Yes, there is.

6    Q.   And when was that date?

7    A.   I believe at that point we said it was going to be

8    September 30th of 2005.

9    Q.   And did those discussions occur beginning on that

10   date?

11   A.   No, they did not.

12   Q.   And why not?

13   A.   Well, in part, the union had not gotten back to us

14   with the signatures on the agreement until it was either

15   late November/early December of 2005.

16   Q.   And when did the discussions begin on the subjects

17   that were described in this Letter of Understanding?

18   A.   We actually had begun those discussions in August of

19   2006.

20   Q.   And just so I understand, under LOU 2003-6, as part of

21   the ratified agreement, what were the parties agreeing to

22   discuss?

23   A.   Well, what we were agreeing to discuss -- there were a

24   number of things we agreed to discuss.  One was, we said we

25   would come back and talk about how we were going to

1    ascertain costs.

2         Another thing we talked about, which is very integral

3    to that, was to have further discussion about what we were

4    going to do with the Medical Necessity Plan.  That was one

5    of the things that had been left off the table for further

6    discussion.  And we were going to come back and talk about,

7    again, this issue of how could we implement savings.

8    Q.   And when did the discussions occur, or begin?  Sorry.

9    A.   The discussions began, I want to say, like, August

10   22nd of 2006.

11   Q.   Who was the lead spokesperson for the union in those

12   discussions?

13   A.   Mr. Wedge.

14   Q.   And what was your understanding of Mr. Wedge's

15   authority?

16   A.   There actually had been a rather extensive discussion

17   about that, but Mr. Wedge -- my understanding is he came to

18   the table with the full authority to enter into an

19   agreement with the company.

20   Q.   And prior to these discussions beginning in August of

21   2006, were there any information requests made by the

22   union?

23   A.   I believe there were, yes.

24   Q.   And what was the company's response?

25   A.   We would respond to those information requests.  So,

1    to the extent that the union asked for information about

2    health care claims, plan designs, those sorts of things,

3    that would have been very normal for the union to do and

4    very typical for us to respond back.

5    Q.    And did the union, in fact, ask for medical claims

6    information?

7    A.    They did.

8    Q.    And did the company provide it?

9    A.    We did.

10   Q.    Mr. Korber, let me direct you to Defendants' Exhibit

11   138.  If you could identify this, please.

12   A.    Yes.  This is a transmittal letter that I'd put

13   together, directed to Mr. Wedge on August 16 of 2006.  And

14   that contained information that was necessary for us to

15   have the upcoming conversations on retiree medical.

16   Q.    Was this before the discussions had begun?

17   A.    It was.

18   Q.    And what was the purpose of sending this letter, Mr.

19   Korber?

20   A.    Well, there were a couple of things.  In addition to

21   transmitting some of the information that was going to be

22   important for the union to have, I also wanted to reaffirm

23   what the understanding was between the parties as we were

24   sitting down to then have talks under a Letter of

25   Understanding 2003-6.

1   Q.   And how did you do that?

2   A.   Well, I -- in my letter, I sort of laid out the

3   history, and I provided copies of all of the prior versions

4   of Letter G and H going back to 1991 that involved these

5   matters.

6   Q.   And was there any other information that was provided

7   to the union along with this letter?

8   A.   I can review it briefly and see if there is something

9   additional.

10  Q.   Why don't you do that.

11  A.   Well, as I mentioned, this transmitted -- we gave them

12  some information about claims, and we had redacted Social

13  Security numbers and those sorts of things.  But, again, it

14  sort of reaffirms what the understandings were between the

15  parties.

16  Q.   And then, in the second paragraph, it refers to, in

17  the next few days, we anticipate supplementing the attached

18  Aetna claims information.  Was that done?

19  A.   Yes, it was.

20  Q.   What types of claims information was provided?  I'm

21  sorry.  Before that, who was Aetna, just so we know?

22  A.   Aetna was -- at that point in time, they were the

23  medical insurance provider.

24  Q.   And when you say "medical insurance," were they

25  actually insuring the plan?

1    A.   Well, the M&G plan is self insured.  So, they

2    basically provide the claims processing and that type of

3    activity.

4    Q.   Okay.  So, the claims information that was provided

5    after this letter to Mr. Wedge, what did that include, just

6    generally?

7    A.   Generally, it was retiree claims information.  So, it

8    had to do with medical, Rx, and other things that would

9    have been processed under any of the Aetna plans.

10   Q.   When you say "Rx," what's that refer to?

11   A.   I'm sorry.  Prescription drugs.

12   Q.   So, there was prescription drug claims information for

13   the population?

14   A.   Yes, for the retirees.

15   Q.   And when was the first meeting on the retiree medical

16   issues?

17   A.   I believe that was August 22nd of 2006.

18        MR. WEALS:  Your Honor, before I move on, I would

19   like to move the admission of Defendants' Exhibit 138.

20        THE COURT:  Any objection?

21        MR. COOK:  No objection.

22        THE COURT:  Defendants' Exhibit 138 will be admitted

23   without objection.

24   BY MR. WEALS:

25   Q.   I'm sorry.  Could you repeat?  The first session was

1     when?

2     A.   I believe it was August 22nd of 2006.

3     Q.   And who functioned as the union's spokesperson at this

4     meeting?

5     A.   Mr. Wedge.

6     Q.   And did he continue to play that role?

7     A.   He did for a period of time until Mr. Moore joined us.

8     Q.   And what happened at this first bargaining session

9     or -- I'm sorry -- this first discussion meeting?

10    A.   First discussion?  Well, as before, you know, the

11    parties had not -- after the LOU 2003-6, after that had

12    been ratified, the parties had not been together to talk

13    about some of these things.  So, one of the things I wanted

14    to do was, again, to review in some detail, you know, where

15    we were at as we were going to begin our talks so that the

16    parties would be on the same page; if there were, you know,

17    any issues that we needed to get out on the table out

18    front, that we could do that.

19          MR. WEALS:  If you could pull up Defendants' Exhibit

20    143, please.

21    BY MR. WEALS:

22    Q.   And, Mr. Korber, are these the company's notes of the

23    session on August 22nd, 2006?

24    A.   Yes.

25    Q.   And you were just referring to some discussion about

1    the history.  Where is that?

2    A.   If you can scroll down, I'm sure we have that.

3         If you could continue scrolling.  I'm just trying to

4    make sure we can --

5         Go ahead.  Please continue.

6         All right.  I'm sorry.  The way that was jumping

7    around, I'm -- could you go back to the full page?

8         Okay.  And if you could go down to the next page.

9         So, here, at the top, I'm talking.  And we go through,

10   and we have a discussion of where the parties had been.

11   So, we presented LOU 2003-6.

12   Q.   So, the discussion that you're referring to in your

13   testimony begins with "KK" and continues down for that

14   entire paragraph?

15   A.   Yes, it is.

16   Q.   And then, at the end of that, it says:  "Roger, Joe,

17   is there anything I said that wasn't accurate?"

18        Who is Roger?

19   A.   Roger would have been Roger Sutphin, who had

20   participated in the bargaining in 2003 and '04 and at least

21   for part of '05.

22   Q.   And Joe is --

23   A.   Joe Harris at this point was the vice-president of the

24   union, but he had also participated as what they call the

25   third member of the negotiations committee in 2003 and '04

1  and '05.

2  Q.    Okay.  So, you had gone through this history of what

3  had happened.  "Roger, Joe, is there anything I said that

4  wasn't accurate?"

5       And what was their response?

6  A.    Roger said, "No."

7       And Mr. Harris said:  "That's how it went down."

8  Q.    Now, did the company make any --

9       MR. WEALS:  I would like to, Your Honor, go ahead

10  and move this exhibit in evidence.

11       THE COURT:  Any objection to the admission of

12  Defendants' Exhibit 143?

13       MR. COOK:  Same as previously noted.

14       THE COURT:  Thank you.

15       Over objection, 143 will be admitted.

16  BY MR. WEALS:

17  Q.    Mr. Korber, this was the first session of these

18  discussions on retiree medical.  Did the company make any

19  proposals?

20  A.    We had -- on that first day, we had given the union an

21  overview, a roadmap, if you will, of where we intended to

22  go with the discussions, at least from our perspective.

23       MR. WEALS:  If you could pull up Defendants' Exhibit

24  145, please.

25  BY MR. WEALS

1    Q.   And is this the document that you were just referring

2    to, Mr. Korber?

3    A.   Yes, it is.

4    Q.   So, I think, as you described it, this was an overview

5    of the proposals.  Was this a proposal itself?

6    A.   No.  This was -- the intent, again, as I'd mentioned

7    before, was to make sure that the parties on both sides

8    clearly understood where we were, what we were setting

9    forward to accomplish, and to make sure that, if you will,

10   we were on the same page as we begin.

11        So, this was a summary.  This is my writing at the top

12   for Bargaining Session No. 1, 8/22/06, at 4:48 p.m.  And we

13   listed what it was that we intended to talk with the union

14   about under Letter of Understanding 2003-6.

15   Q.   And among other things, there were changes discussing,

16   or proposing, changes to certain of the plans; is that

17   correct?

18   A.   Yes.  We were going to be talking about some of the

19   plan designs.  We talked about making these changes

20   effective January 1 of '07.

21        We were introducing some thoughts we had at that point

22   about some possibilities that would be options for retirees

23   that would be helpful in terms of plan design and other

24   considerations.

25   Q.   These plan design changes, who would these impact?

1    A.   They would impact the existing retirees.

2         MR. WEALS:  Your Honor, I would like to move

3    Defendants' Exhibit 145 in evidence.

4         MR. COOK:  May I voir dire, please?

5         THE COURT:  You may.

6                        - - -

7              VOIR DIRE EXAMINATION

8    BY MR. COOK:

9    Q.   Mr. Korber, is it your contention that you distributed

10   this to the union?

11   A.   I believe we did, yes.

12   Q.   You did, or you did not?

13   A.   I believe we did.

14   Q.   You believe you did, but you don't know, or you don't

15   recall?

16   A.   Well, if we said "Date:  8/22/06 at 4:48," I believe

17   that would have gone across the table to the union.

18        MR. COOK:  I object.  He has not stated a clear

19   recollection of having distributed it to the union.

20        THE COURT:  Do you wish to further voir dire, or

21   further --

22        MR. WEALS:  Your Honor, I think he's stated that, if

23   that was his notation on it, then it did go across the

24   table.

25        THE COURT:  The summary proposal presented on August

1    22, '06, marked as Defendants' Exhibit 145 will be

2    admitted, over objection.

3          (END OF VOIR DIRE.)

4    BY MR. WEALS:

5    Q.   And when was the next bargaining -- rather, meeting --

6    concerning these retiree medical issues?

7    A.   I believe, following that meeting, there was a

8    discussion that we had about ground rules.  And then

9    following that, we got back to the table, if you will, and

10   had discussions about some of the particular things related

11   to ascertaining the costs.

12   Q.   And when did that occur?

13   A.   I believe that was in early September of '06.

14   Q.   And was anything provided to the union concerning this

15   issue of costs?

16   A.   Yes.

17   Q.   And what was that?

18   A.   We'd actually put together -- so that we could be

19   looking at a document and understanding, if you will, kind

20   of the mechanics of it, we were putting together a document

21   that laid out what the above-cap contributions would be

22   based on actual claims data that we had.

23          MR. WEALS:  If you could pull up, please,

24   Defendants' Exhibit 152.

25   BY MR. WEALS

1    Q.    If you could identify this, please, Mr. Korber.

2    A.    Yeah.  This was a document from September 9, 2006.  It

3    was presented at 9:10 a.m.  And this was, if you will, sort

4    of a transmittal sheet that was on top of the document, but

5    it explained what it was that we were providing to the

6    union and a bit about why we were providing it.

7    Q.    And was there an attachment to this?

8    A.    Yes.

9          MR. WEALS:  If you could go to that, and if you

10   could blow that up a little bit, if we could, please.

11   BY MR. WEALS

12   Q.    Could you just explain to us what this attachment is?

13   A.    Yeah.  What this attachment does is, it is a part of

14   Letter of Understanding 2003-6.  Part of the agreement we

15   had at that point with the union was that the parties will

16   meet to ascertain what the costs are that retirees were

17   then going to have to start to contribute towards.

18         So, what this document did was to take the sort of --

19   I'll call it methodology -- laid out in Letter H where you

20   have retirees who are above 65, below 65.  And then we look

21   at actual data.  We talk about who the number of retirees

22   are.  We break down all of the various costs that are

23   involved as part of our agreement.

24         And then if you can scroll a little bit -- I guess you

25   would be scrolling to the left -- it shows you what those

1    above-cap contributions would be, which would be this far

2    right column.

3    Q.   And the calculation period, over here on the left, Mr.

4    Korber, --

5    A.   Uh-huh.

6    Q.   -- that appears to be -- again, what was the date of

7    this particular handout that was given to the union?

8    A.   This particular document was provided to the union on

9    September 9th of 2006.

10   Q.   And there are references here to calculation period.

11   And I can't read that very well, but can you tell me what

12   those are?

13   A.   Yeah.  There were really two that we had available at

14   that point in time.  One was for the 12 months of costs

15   that ran from January 1 to December 31, 2005.  So, actual

16   12 calendar year months.  And then the next piece of that

17   was to go ahead so we could again compare and see if there

18   were any differences, again, on a 12-month basis.  We took

19   a calculated period from May 1, 2005, to April 30th, 2006.

20   And --

21   Q.   So, --

22   A.   I'm sorry.

23   Q.   -- was the company projecting future medical claims

24   costs here?

25   A.   No.  This was actual claims.  So, we knew what the

1    costs were.

2    Q.   And why did you use that actual claims cost?

3    A.   Well, two things.  I mean, number one, I think when we

4    were going through this that, you know, we wanted to be

5    sure that what we were actually asking retirees to

6    contribute against was based on actual costs that the

7    company had already incurred.

8        So, this wasn't a matter of guessing at what the costs

9    would be at some future point.  This actually looked at

10    what the costs were, what the company had already paid,

11    and, therefore, what was that amount above the cap.

12    Q.   And did you say there were two things?

13    A.   I'm sorry?

14    Q.   I'm sorry.  I thought you said there were two reasons.

15        THE COURT:  You started out by saying there were two

16    reasons, basically.  And you identified one.

17        THE WITNESS:  Okay.  I'm trying to remember where I

18    was going, Your Honor.

19    BY MR. WEALS:

20    Q.   Let me ask you again, was there any other reason that

21    you were using this actual cost data?

22    A.   Well, certainly to be able to present to the union

23    what the costs were going to be and to talk about -- well,

24    I guess there really were a couple of things we were going

25    to talk about:  one, that these costs were going to be done

1    on a monthly basis; and, two, you know, we were hoping that

2    would encourage some discussion about plan design changes,

3    because, hopefully, we could lower what these costs would

4    be.

5    Q.   So, in the far right-hand column, there is "Average

6    Above-Cap Cost."  So, I understand, is that a monthly cost?

7    A.   It is.

8    Q.   And then there are different ones for the two groups

9    of retirees?

10   A.   Yes, that's correct.

11   Q.   Now, if you could scroll down, there is a note that

12   appears at the bottom.  It's very hard to read.  It's the

13   very last item.

14   A.   Yes.  Yeah, it is hard to read.

15   Q.   Extremely.

16        MR. WEALS:  Can you make that even bigger?

17        Okay.

18   BY MR. WEALS:

19   Q.   All right.  And since this is so hard to read, could

20   you read that, Mr. Korber, but slowly?

21   A.   Yes.  It says:  "Note:  If prior calendar year's costs

22   are not available as of January 1, we would suggest

23   calculating the monthly above-cap contribution rates based

24   on the most recent 12 months for which data is available

25   with appropriate adjustment of monthly contribution rates

 1    later in the same year when the prior calendar year's costs

 2    become available."

 3    Q.   And does that reference to what we were just

 4    discussing, these calculation periods?

 5    A.   Yes.  The notion was that we could look at costs that

 6    had been incurred, identify what those above-cap costs

 7    were, but then, as we got a full 12 months' data for the

 8    prior year, then we would come back and adjust those.  And

 9    that could adjust up or down.  It could stay the same.

10    Q.   Was there any discussion at this session or subsequent

11    sessions concerning this proposal and the attachment that

12    you're looking at?

13    A.   Yeah.  We certainly had presented that to the union.

14    I had walked through this in some detail with the

15    committee.  They had indicated they were going to go back

16    and look at it, but I don't recall that there was any

17    objection to what we were presenting here in terms of how

18    those were to be calculated on a monthly basis or this

19    notion of some adjustment subsequently.

20    Q.   Did the company make other proposals on this same

21    date?

22    A.   I believe we did.

23    Q.   Okay.

24         MR. WEALS:  If you could pull up Defendants' Exhibit

25    153, please.

```
 1    BY MR. WEALS:

 2    Q.   And what is this document, Mr. Korber?

 3    A.   What this document was -- and I'll go back, just a

 4    minute, to that summary of proposals -- one of the things

 5    we had said we were going to present to the union was a

 6    proposal that had to do with MAPD or PFF.

 7    Q.   And what do those stand for?  If you don't know the

 8    acronym, what is it referring to?

 9    A.   Well, basically, these are Medicare Advantage Plans.

10    Q.   What's a Medicare Advantage Plan?

11    A.   They basically were plans for individuals who -- for

12    retirees who would have been Medicare eligible, this

13    offered an option that they could have that we believe

14    would allow them to actually have coverage and keep it

15    below the caps.

16    Q.   Just so I understand, for Medicare-eligible retirees,

17    how does the insurer, or the company's, coverage work in

18    relation to Medicare?

19    A.   Well, normally when somebody is Medicare eligible,

20    Medicare becomes the primary insurance provider.  And then

21    this would really be a supplemental insurance that provides

22    a greater benefit than Medicare would otherwise provide.

23    Q.   And would this be in lieu of one of the other retiree

24    plans that were available?

25    A.   It could be for somebody who is Medicare eligible,
```

1    yes.

2    Q.   And what was the union's response to this particular

3    proposal?

4    A.   Well, as I recall, when we first presented this on the

5    9th, you know, Mr. Wedge had indicated to me that he wanted

6    to review that.  I believe he was going to meet with his

7    committee and do whatever it was on the union's side that

8    they would do to review such things.  And, ultimately, he

9    came back and agreed to a tentative agreement, which

10   happened on October 4th of '06 at 11 -- I believe that's

11   25.  And then his initials, BW, appear and my initials, KK,

12   appear.

13   Q.   So, that indicates that there was a tentative

14   agreement on that date to this proposal?

15   A.   Yes.  After it had proposed on the 9th, Mr. Wedge, you

16   know, basically had it for a month, reviewed it, and came

17   back and agreed, tentatively, to this proposal.

18   Q.   And who would have been affected by the introduction

19   of the Medicare Advantage program?

20   A.   It would have been any of the preexisting retirees who

21   were Medicare eligible, and then future retirees who would

22   be in that same condition.

23        MR. WEALS:  At this time, Your Honor, I would like

24   to move for the admission of Defendants' Exhibit 152 and

25   153.

```
 1              THE COURT:  Any objection?

 2              MR. COOK:  None.

 3     BY MR. WEALS:

 4     Q.   Now, we've looked at the company's proposals, Mr. --

 5              THE COURT:  How about I go ahead and put them in

 6     evidence before you start?

 7              MR. WEALS:  I apologize.

 8              THE COURT:  One fifty two and 153 will be admitted

 9     without objection.

10              Now you may proceed.

11              MR. WEALS:  Thank you, Your Honor.

12     BY MR. WEALS:

13     Q.   Now, Mr. Korber, we've looked at some company

14     proposals during these 2006 discussions on retiree medical.

15     Were there any union proposals made?

16     A.   Yes, there were.

17     Q.   And when was that done?

18     A.   I believe that really started in October.  So, there

19     were proposals that were advanced by the union in October

20     and November.

21     Q.   And what proposals did the union make?

22     A.   Well, let me go back and correct something.  I think

23     there may have been a proposal that they advanced even as

24     early as in September, maybe following our meeting on the

25     9th.  But, in essence, what the proposals they were
```

1    advancing had to do with were in response to LOU 2003-6,

2    what we were going to do with Medical Necessity.  They were

3    talking about plan design changes that they wanted to see

4    us consider.

5          MR. WEALS:  And if you could pull up Defendants'

6    Exhibit 163, please.

7    BY MR. WEALS:

8    Q.   And Mr. Korber, what is this document?

9    A.   Well, this would have been one of the Steelworkers'

10   proposals that would have been presented on September 14th

11   of 2006.  And the handwriting in the upper right-hand

12   corner, that's my handwriting indicating that the union had

13   presented this to us at 11:36 a.m. on the 14th.

14   Q.   Could you just read that first paragraph, please, Mr.

15   Korber, slowly?

16   A.   "In accordance to LOU 2003-6, the Union submits the

17   following proposal for discussion and consideration as an

18   alternative suggestion, to the Company's (Proposal 1(B),

19   09.09.2006, for future cost containment to active retirees'

20   Medical Plans."

21   Q.   And what did you understand "active retirees" to mean?

22   A.   Meaning preexisting or current retirees.

23   Q.   And what was the company's response to this proposal?

24   A.   We took it back and looked at it.  And I believe we

25   had some discussion across the table with the union about

```
 1    it.

 2    Q.    And did you ultimately agree to it?

 3    A.    I don't believe in this form, no.

 4          MR. WEALS:  Your Honor, at this point, I move the

 5    admission of Defendants' Exhibit 163.

 6          THE COURT:  Any objection?

 7          MR. COOK:  No objection.

 8    BY MR. WEALS:

 9    Q.    Did the union make --

10          THE COURT:  One sixty three will be admitted without

11    objection.

12          You may proceed.

13    BY MR. WEALS:

14    Q.    Were there further union proposals during these

15    discussions in the fall of 2006?

16    A.    Yes, there were.

17    Q.    Let me show you Defendants' Exhibit 180.

18          And what is this, Mr. Korber?

19    A.    This would have been a proposal presented by the

20    Steelworkers.  We had received it on October 20th, of '06,

21    at 11:20 a.m.  It was a modification of the prior proposal

22    we looked at, I believe, from September 14th of '06.

23    Q.    And according to the first numbered item, this

24    proposal would apply to whom?

25    A.    It would apply to all current and future retirees and
```

1    surviving spouses.

2    Q.    And with regard to the second paragraph, what do you

3    understand that reference to be?

4    A.    Well, the union was basically saying that, you know,

5    with Letter H, dated January 1,2001 -- so, to me, that was

6    pretty much recognizing that current and future retirees

7    who elect the Catastrophic plan, they were proposing that

8    they wouldn't be required to make a monthly contribution.

9    Q.    Would or would not?

10   A.    Would not be required.

11        MR. WEALS:  Your Honor, at this time, I'd move in

12   evidence Defendants' Exhibit 180.

13        THE COURT:  Any objection to the admission of

14   Defendants' Exhibit 180?

15        MR. COOK:  No objection.

16        THE COURT:  Defendants' Exhibit 180 will be admitted

17   without objection.

18   BY MR. WEALS:

19   Q.    Just a couple more things here, Mr. Korber, with

20   regard to the -- we've looked at a couple.  Were there

21   additional union proposals during these discussions?

22   A.    Yes, there were.

23   Q.    And, specifically, what do you recall happening after

24   the 10/20/06 modified proposal?

25   A.    Again, we had more discussion with the union about

1    their proposal.  I believe we had advanced a

2    counter-proposal.  And then the union had come back yet

3    with another modified proposal that was more detailed than

4    the one we just looked at.

5    Q.   And when was that?

6    A.   That, I believe, was early November of 2006.

7         MR. WEALS:  Let me pull up Defendants' Exhibit 186.

8         THE COURT:  One eighty six?  All right.

9    BY MR. WEALS:

10   Q.   And, Mr. Korber, what is this?

11   A.   This would have been one of the union proposals with

12   respect to retiree medical.  Again, this would have to do

13   with both current and future retirees.

14   Q.   And if you could scroll through, this was a multiple

15   page document?

16   A.   I believe it was.

17   Q.   And what was the union proposing to do here?

18   A.   Well, among other things, they were proposing to

19   terminate the Retiree Medical Necessity Plan.  That was one

20   of the things that we had suggested as a possible

21   alternative that we could look at.  So, they came back and

22   said, Let's propose to do that.

23        They had indicated that, you know, they were thinking

24   we wouldn't actually have a contribution commencement date

25   until January 1 of 2007.  And then they set forward some

1    ideas about plan designs.  In addition to that, they made

2    some proposals that had to do with the modification of

3    Letter H.  And I believe there may have been some language

4    in here about further modifying some other agreements.

5    Q.   Now, the reference to the termination of the Retiree

6    Medical Necessity Plan, where is that?

7    A.   It's in Paragraph 1.

8    Q.   So, this was a union proposal, correct?

9    A.   Yes.  They had come back and presented that as one of

10   their thoughts.

11         MR. WEALS:  Your Honor, I move in evidence

12   Defendants' Exhibit 186.

13         THE COURT:  Any objection?

14         MR. COOK:  No objection, Your Honor.

15         THE COURT:  Defendants' Exhibit 186 will be admitted

16   without objection.

17         MR. WEALS:  If you could pull up Defendants' Exhibit

18   199, please.

19   BY MR. WEALS:

20   Q.   Mr. Korber, I believe there was some testimony earlier

21   in the trial concerning this particular item.  And could

22   you just tell me what it is?

23   A.   Yes.  This was actually a union proposal that had been

24   made to the company on November 13th of 2006.

25         What the union had done was to take a company proposal

 1    that originally had been made on the 8th, November 8th of

 2    2006.  And they had made markups.  Attached to this was a

 3    plan design with respect to Comprehensive, hourly.  And so

 4    you can see where -- it's hard to see on this copy.  They'd

 5    made some markups in that plan design.

 6         And then on the first sheet that you had showed me,

 7    the union was coming back and suggesting fixed-dollar

 8    contribution amounts on a monthly basis for people who were

 9    Medicare eligible and not Medicare eligible.

10    Q.   And your understanding was -- and this was provided by

11    the union, to you, across the table?

12    A.   It was.

13    Q.   And your understanding is that -- was this in lieu of

14    a contribution based on the caps?

15    A.   What they were presenting at that time was the idea

16    that, maybe in 2007 and 2008, we could fix these amounts,

17    and then see where we went with respect to above-cap costs

18    in the future.

19    Q.   And the contributions that are being proposed here by

20    the union would be based on what?

21    A.   It --

22    Q.   I'm sorry.  Would be at what interval?

23    A.   Well, it would be monthly, is what they were

24    proposing.

25         MR. WEALS:  Your Honor, I want to move Defendants'

```
 1    Exhibit 199 in evidence.

 2          THE COURT:  Any objection?

 3          MR. COOK:  No objection.

 4    BY MR. WEALS:

 5    Q.   Now, were there further meetings, Mr. Korber --

 6          THE COURT:  One ninety nine will be admitted without

 7    objection, having not been identified, earlier, by Moore,

 8    but now identified by Korber.

 9          You may proceed.

10          MR. WEALS:  Thank you, Your Honor.  Eventually, I

11    won't do that.

12          THE COURT:  No.  That's okay.  Slow learner.

13    BY MR. WEALS:

14    Q.   Mr. Korber, we were just looking at a proposal that

15    was made by the union, I believe, on the 13th of November,

16    2006.  And were there further meetings regarding retiree

17    medical?

18    A.   My recollection is that, yes, there were.

19    Q.   And when did that occur?  Or when did the next meeting

20    occur?

21    A.   I believe the next meeting was probably November 30th

22    of 2006.

23    Q.   And you had described to me, earlier, individuals who

24    had been involved in the negotiations or discussions.  Were

25    there any new players?
```

VOL. V   145

1    A.   Yes.   There was an individual from the Steelworkers

2    International by the name of Jeanette Stump, who had at

3    that point joined the bargaining.

4    Q.   And what was your understanding of her role?

5    A.   It was presented to me that she was a benefits

6    technician, who was from their Pittsburgh headquarters, to

7    provide, I guess, guidance to the union on these matters.

8    Q.   Tell me what happened at this session on November

9    30th.

10   A.   My recollection is we -- you know, we thought that we

11   were getting close to an agreement.   We had provided

12   information to the union about that.   But when we actually

13   got into the discussion, it became apparent that, suddenly,

14   everything we had talked about in 2006 and what we'd agreed

15   to in 2005, the union was trying to repudiate.

16   Q.   What do you mean by that, Mr. Korber?

17   A.   Well, for the first time, Mr. Moore mentioned that,

18   you know, he always thought Letter H was an accounting

19   letter.   And then he indicated that, you know, he had this

20   memorandum from Dave Dick.   And I had asked him to provide

21   me a copy of it.   That was the first time I had been

22   presented with that from Mr. Moore or Mr. Wedge, who had

23   been in 2000.   So, I was pretty shocked.

24   Q.   So, that had never come up before?

25   A.   Never been mentioned to me until November 30th of

1    2006.

2    Q.   So, there was some discussion.  Any proposals made by

3    the company at this point?

4    A.   Yeah.  One of the things we hoped to be able to do was

5    to, at least, you know, try to get something salvaged, if

6    you will, the possibility of moving forward with some plan

7    designs and some of the changes.  So, we actually presented

8    a proposal.  It was late in the day on November 30th, 2006.

9         MR. WEALS:  Could you pull up Defendants' Exhibit

10   213, please?

11   BY MR. WEALS:

12   Q.   And if you could identify this for me, Mr. Korber?

13   A.   Yes.  This was the company proposal.  This is my

14   writing at the top of it.  We presented this at 5:32 p.m.

15   on November 30th of 2006.  And we -- in this proposal, we

16   were setting forward the things we were proposing to do

17   with respect to the Medical Necessity Plan, the

18   Comprehensive Plan, the Catastrophic Plan.

19   Q.   And what were you proposing to do concerning retiree

20   above-cap contributions?

21   A.   One of the things we were trying to do in an effort

22   to, hopefully, get to an agreement, we took the concept, if

23   you will, from the union about putting a -- I'll call it

24   sort of a fixed-dollar amount that retirees would pay for a

25   period of time, and we identified what those rates were in

1    this proposal and said that for, in essence, for a one-year

2    period, this would be the rates that would be paid.  We had

3    hoped that, by putting the plan designs into place and

4    doing some other things that would be helpful, that we

5    would actually be able to get these costs to start to come

6    down, you know, hopefully below the caps, but, if not,

7    significantly lower than they were.

8    Q.    And what was the union's response to this proposal?

9    A.    Well, I didn't actually get an immediate response,

10   other than them exiting the building, so to speak.

11   Eventually, I did get a response.

12   Q.    In what form did that take?

13   A.    A letter.

14   Q.    From --

15   A.    -- Mr. Moore.

16         MR. WEALS:  And if you could pull up Joint Exhibit

17   37, please.

18   BY MR. WEALS:

19   Q.    Mr. Korber, is this a letter that you were just

20   referring to?

21   A.    It is.

22         MR. WEALS:  And if you could scroll down.

23   BY MR. WEALS:

24   Q.    And the first paragraph indicates what?

25   A.    That this was the union's response to the company's

1      proposal on November 30 of 2006 as to retiree health

2      insurance benefits.

3      Q.    And what were they doing?

4      A.    Well, in my opinion, a complete back-pedal on this.

5      Q.    In terms of the proposal, itself, I mean, was this an

6      acceptance?

7      A.    No.  I would say that they weren't accepting it.

8      Q.    In fact, they said that right there; didn't they?

9      A.    Yes, that's right.

10     Q.    Now, a previous exhibit was a proposal that you made

11     on November 30th of 2006.  And then there is a letter from

12     Mr. Moore on December 13th of 2006.  At this point, had the

13     retirees been advised that there was going to be

14     contributions required as of 1/1/07?

15     A.    Yes, there had been.  One of the things that we'd

16     discussed throughout the bargaining in 2006 was the

17     importance of advising retirees about these changes and how

18     that would affect them.  So, by the time this letter went

19     out, I had, basically, sent a letter -- I believe it was on

20     December 1st of 2006 -- to the retirees explaining that

21     there was going to be the commencement of these caps, and

22     gave them a copy of the Letter of Understanding 2003-6.

23          MR. WEALS:  Your Honor, if I could have just a

24     moment, I may be able to wrap this up before lunch with

25     just a few more questions.

         1          THE COURT:  You're going to wrap this up before

         2     lunch, because I'm not breaking until you're done.

         3          MR. WEALS:  Well, in that case, let me continue.

         4          If I could just have a moment to speak with my

         5     counsel?

         6          THE COURT:  Sure.

         7          (Whereupon, there was a brief interruption.)

         8          MR. WEALS:  Your Honor, I believe that Joint Exhibit

         9     37 is already in evidence.

        10          THE COURT:  It is.

        11          MR. WEALS:  I would like to move for the admission

        12     of Defendants' Exhibit 213.

        13          MR. COOK:  No objection.

        14          THE COURT:  Two thirteen will be admitted without

        15     objection.

        16     BY MR. WEALS:

        17     Q.   Mr. Korber, there had been a meeting with the union on

        18     November 30th.  Was there a subsequent meeting with the

        19     union?

        20     A.   There was a meeting here in Columbus, Ohio, on

        21     December 5th of '06, if I recall correctly.

        22     Q.   Were you in attendance there?

        23     A.   I was.

        24          THE COURT:  I'm sorry.  What date?

        25          THE WITNESS:  December 5th, 2006, Your Honor.

1          THE COURT:  Thank you.

2     BY MR. WEALS:

3     Q.   Who was there on behalf of the Steelworkers?

4     A.   There was Joe Stuligross, who was the Assistant

5     General Counsel for the Steelworkers.  Randy Moore was

6     there.  Mr. Wedge was there.  I believe Joe Harris was

7     there.  Jeanette Stump was there.  I don't recall if Ms.

8     Shipley was present or not.

9     Q.   And had Mr. Stuligross, who was the Assistant General

10    Counsel for the Steelworkers, had he been at any prior

11    meetings?

12    A.   No.

13         THE COURT:  By the way, I don't think we've ever,

14    for the benefit of the court reporter, spelled Stuligross.

15         THE WITNESS:  It's S-T-U-L-I-G-R-O-S-S.

16         THE COURT:  So, Denise, you already had it, didn't

17    you?

18         COURT REPORTER:  Yes, sir.

19         MR. WEALS:  One step ahead of us.

20         THE COURT:  Always.

21    BY MR. WEALS:

22    Q.   And who had requested this meeting on December 5th in

23    Columbus?

24    A.   Jeanette Stump had.

25    Q.   And she was with the International, correct?

1    A.    Yes, she was.

2    Q.    And, briefly, if you could just tell me what happened

3    at this meeting.

4    A.    The meeting -- Ms. Stump had indicated that the

5    Steelworkers Legal Department, you know, wanted to meet and

6    discuss matters related to LOU 2003-6 and Letter H.  So,

7    when we got to the meeting, there was this -- there was a

8    discussion that was led by Mr. Stuligross.

9    Q.    And following this meeting on December 5th, there had

10   been -- well, what happened on -- let me just ask you what

11   happened on January 1st, 2007.

12   A.    As I had indicated in the letter to retirees, the

13   above-cap contribution commencement date had begun.  And,

14   so, now, above-cap costs were due.

15   Q.    And if you could describe for us how the company

16   determined the monthly amount of these contributions.

17   A.    Well, as we had talked through that exhibit before, we

18   looked at the actual costs that had been incurred in the

19   prior year.  And then using the, if you will, the

20   methodology that was laid out in Letter H and what's put

21   forward in LOU 2003-6, we went ahead and we calculated out

22   what those contributions were.  And we had provided that

23   information in the form of communications to the retirees.

24   Q.    Now, Mr. Korber, there was some testimony by some of

25   the class representatives concerning the fluctuations in

1    the amount of the contribution year over year.

2    A.    Uh-huh.

3    Q.    What is that attributable to?

4    A.    Well, one of the things, certainly, can be the

5    fluctuations in the claims.  So, as we're doing this where

6    we're going through one where you have actual data and then

7    you're doing this sort of calculated 12-month period, there

8    can be variations in that.

9         Another thing that can be significant is the

10   difference in the number of retirees -- it varied --

11   because one of the things that we're having to contend with

12   through Letter H is that, the number of retirees you use to

13   determine those average monthly costs, that's fixed as of

14   January 1 of each year.  So, as that population changes,

15   those numbers can change pretty significantly.

16             MR. WEALS:  If I could have a moment, Your Honor?

17             THE COURT:  Sure.

18      (Whereupon, there was a brief interruption.)

19             MR. WEALS:  Your Honor, I have no more questions for

20   Mr. Korber.

21             THE COURT:  Thank you.

22             Let's take a luncheon recess.  I have 12 -- I don't

23   know -- 25.  Let's return back here at 1:30.

24             I've been asked to make an announcement.  On

25   Fridays, the cafeteria is closed, and there is nothing

     1    there.  I was trying to explain as opposed to what was

     2    there before, but I -- no.

     3              MR. COOK:  No comment on that.

     4              THE COURT:  So, don't try to go to the deli and get

     5    anything, loosely referred to as "deli."

     6              All right.  I'll see you at 1:30.

     7       (Whereupon, the lunch recess was taken at 12:26 p.m.)

     8                            -  -  -

     9

    10

    11

    12

    13

    14

    15

    16

    17

    18

    19

    20

    21

    22

    23

    24

    25

```
 1                          FRIDAY AFTERNOON SESSION

 2                          MAY 13, 2011

 3                          1:30 P.M.

 4                              - - -

 5            THE COURT:  Before the luncheon recess, we completed

 6       the direct examination of Mr. Korber.

 7            Mr. Cook, you may proceed with cross-examination of

 8       Mr. Korber at this time.

 9            MR. COOK:  Thank you very much.

10                              - - -

11                          CROSS-EXAMINATION

12       BY MR. COOK:

13       Q    Good afternoon, Mr. Korber.  I think we've only met

14       briefly on one or two occasions, perhaps at your deposition

15       for a few moments.

16       A    I think maybe at the mediation, sir.

17       Q    The mediation?

18            Mr. Korber, I understand you hold a master's degree in

19       labor relations?

20       A    I do.

21       Q    Are you a certified employee benefits specialist?

22       A    I'm not.

23       Q    Do you have a background or training and education in

24       administration of employee benefit plans?

25       A    Only by experience.
```

1    Q    And what is that experience, sir?

2    A    Typically, as a human resources representative, you

3    deal with people, individuals, that come in; there may be

4    responsibilities that I have --

5    Q    Now I'm having trouble hearing you.

6    A    I'm sorry.  As a human resources representative, there

7    are times you get involved with certain plan issues where

8    you may be assisting employees, so in that sense, but

9    otherwise, no.

10   Q    Do you have a basic understanding of certain

11   requirements under ERISA such as what an SPD is?

12   A    I would say yes.

13   Q    And you understand that a Summary Plan Description is

14   the primary document, or one primary document, by which

15   employees who participate in an employee benefit plan are

16   told about what the requirements and the rules are that

17   govern their plan; is that right?

18   A    I think that's a fair statement.

19   Q    So who was the plan sponsor for the M&G Polymers USA

20   health plans?

21   A    M&G Polymers USA.

22   Q    Who is the named fiduciary?

23   A    I believe it's M&G Polymers USA.

24   Q    It's not you?

25   A    I don't believe so.

1   Q    Mr. Korber, on what date prior to December 13th, 2006,

2   did the plan sponsor of the M&G Polymers USA health plans

3   at the Point Pleasant plant notify the retiree plan

4   participants that their health benefits were subject to a

5   cap?

6   A    I believe that would have been the communication sent

7   on December 1 of 2006.

8   Q    December 1, 2006?

9   A    Yes, sir.

10  Q    So we can agree that on no date prior to that did

11  Mr. Pyles, who retired in 1996 -- from 1996 to 2006, M&G

12  never sent him notice that his benefits were subject to a

13  cap?

14  A    The earliest M&G could have sent him notice would have

15  been when they came into ownership of the plant in 2000.

16  Q    So between 2000 and 2006, did they send Mr. Pyles or

17  Mr. Tackett or any of the members of the class such a

18  notice?

19  A    Not that I'm aware of.

20  Q    And on what date, between 2000 and 2006, did M&G

21  Polymers, as the plan sponsor and named fiduciary, send

22  these retirees an official or formal notice that their

23  benefits were subject to termination for failure to pay a

24  contribution?

25  A    I'm not aware of there being any notice.

1    Q    There was none, was there?

2    A    Not that I'm aware of.

3    Q    At any time between 2000 and 2006 -- well, I'll be

4    fair, Mr. Korber.

5         Between January of 2001, when you came in, and then

6    December 31st, 2006, did you consult with counsel for M&G

7    concerning the ERISA notice requirements for such

8    contribution requirements to the retirees?

9    A    At some point, yes.

10   Q    Does M&G today contain -- contend that distribution of

11   a pension and insurance booklet, which does not contain a

12   cap letter or any letter dealing with contributions,

13   satisfies ERISA's notice requirements?

14        MR. WEALS:  Objection to the extent he's asking the

15   witness to opine about what complies with ERISA.  It

16   clearly calls for a legal conclusion.

17        THE COURT:  I would have agreed with you until he

18   answered the second question.  The objection is overruled.

19        THE WITNESS:  Could you repeat your question, sir?

20   BY MR. COOK:

21   Q    Does M&G Polymers contend today that distribution of a

22   pension insurance booklet which does not contain a letter

23   defining contribution caps by the company, or a

24   contribution requirement by the retiree, satisfies ERISA's

25   notice requirements?

1    A    I'd have to review the requirements to know.

2    Q    So you don't know?

3    A    As I sit here today, no.

4    Q    But we do agree that no such notice was given?

5    A    Yes.

6    Q    If we could pull up Plaintiffs' Exhibit 271, please.

7    This is a February 23rd, 2000, letter.  It says draft only,

8    to Mark F. Underwood, and I believe the author is Kimm

9    Korber, that's you.  Do you recognize this?

10   A    If you scroll down.

11        I recognize it as a draft, yes.

12   Q    Well, that's my question, Mr. Korber.  Did you ever

13   send this document to Mr. Underwood?

14   A    I don't recall.  I assume I wouldn't have drafted it

15   if I didn't intend to send it.

16   Q    Okay.  That's fair.

17        This is apparently on behalf of Floyd Sayre,

18   represented by Mr. Underwood.  And you were responding to

19   questions from Mr. Underwood; is that right?

20   A    I was; it appears, yes.

21   Q    Let's look at Item No. 3, 1997 Pension, Insurance and

22   Service Award or, paren, P&I, close paren, Agreement.  It

23   reads:  Because the benefits provided to plan participants

24   have historically been subject to collective bargaining,

25   the P&I Agreement provides information concerning various

1    benefit plans, not just the active and retiree medical

2    plans resulting from bargaining between the Steelworkers

3    and the company in 1997, the Shell Chemical Company.  The

4    attached agreement is what the parties agreed to distribute

5    to bargaining unit employees, et cetera, and would have

6    been available to Mr. Sayre before his retirement on

7    January 1st, 1999.

8         Was that the 1997 Pension and Insurance Award booklet

9    between Shell Chemical and Local 644 of the United

10   Steelworkers?

11   A    In terms of what was made available to the employees,

12   I'm sure it was.

13   Q    Paragraph four on the back of the document that I'm

14   holding, or the next page on the screen, 2000 Pension,

15   Insurance and Service Award or, paren, P&I, closed paren,

16   Agreement.  This is a copy of the successor P&I Agreement

17   that was available to bargaining unit employees, et cetera,

18   as a result of the negotiations culminating in the

19   November 6, 2000, Collective Bargaining Agreement between

20   M&G Polymers USA and the Steelworkers.  Please note that

21   while the Steelworkers ratified a successor labor agreement

22   for the period August 9th, 2005, through August 5, 2008 --

23        THE COURT:  Just a second.  For the period August 9,

24   2005 through, you said, August --

25        MR. COOK:  I'm sorry, November 5, 2008.  Thank you.

 1    It's a little blurry on my copy, Your Honor.

 2    BY MR. COOK:

 3    Q    -- certain matters remain unresolved with respect to

 4    the 2005 P&I Agreement and, therefore, the most current

 5    published P&I Agreement is the 2000 P&I Agreement.

 6         Did I read that correctly?

 7    A    I believe what you have highlighted is what it says.

 8    Q    And the P&I Agreement that you referenced in this

 9    letter is the 2000 P&I booklet, correct?  The eight and a

10    half, eleven, spiral bound on the left side?

11    A    I believe so.

12    Q    And you testified earlier today that that document

13    distributed to the employees did not contain Letter H,

14    correct?

15    A    Correct.  This is what the Steelworkers wanted.

16    Q    I didn't ask you what the Steelworkers wanted.  I

17    asked you if it contained Letter H?

18    A    There was a letter that wasn't published in that

19    booklet, yes.

20    Q    Did the booklet contain Letter H or not, Mr. Korber?

21    A    No.

22    Q    Thank you.

23         I want to try to clean up a couple things, almost like

24    housekeeping, Mr. Korber.

25         If we could have Plaintiffs' Exhibit 269 brought up on

1    the screen, please.

2         MR. COOK:  Some of these exhibits, Your Honor, are

3    going to die a slow death.

4         THE COURT:  Well, let's hope they do before I do.

5         MR. COOK:  I think we can get a couple of these in

6    because they're to or from Mr. Korber.

7    BY MR. COOK:

8    Q    Mr. Korber, this is a -- do you see that document?

9    A    I do.

10   Q    This is a multi-page document, Plaintiffs' Exhibit

11   269, from Mr. Duane P. Lee to Robert Crooks, copied to Kimm

12   Korber.  It's dated January 18, 2007.  Subject is M&G

13   Polymers December 31, 2006, OPEB disclosure.  Do you see

14   that?

15   A    I do.

16   Q    Did you receive a copy of this?

17   A    If I'm listed on the CC line, I'm sure I would have.

18   Q    And the pages that follow the e-mail, were those the

19   attachment?

20   A    I'm not seeing the attachment at this point.

21   Q    There's a little symbol in the text that shows an

22   Excel spreadsheet.

23   A    Yes, I do see that.

24   Q    And then Exhibit A appears to be -- and Exhibit B, and

25   Exhibit C appear to be the attachments?

```
1    A    I would assume that's correct.

2    Q    All right.  Thank you very much.

3         MR. COOK:  We move the admission of Plaintiff's

4    Exhibit 269.

5         THE COURT:  I deserve this, don't I?  Because I

6    didn't let it in before and so I'm going to have a bunch of

7    these, aren't I?

8         MR. COOK:  Only three.

9         THE COURT:  Any objection to the 1-18-2007 e-mail

10   from Lee to Korber?

11        MR. WEALS:  No objection.

12        MR. COOK:  We also move the admission of Plaintiffs'

13   271.

14        THE COURT:  271 draft dated 2-23-07 responding to

15   Attorney Underwood; any objection?

16        MR. WEALS:  No objection.

17        THE COURT:  271 will be admitted without objection.

18   Thank you.

19        MR. COOK:  May we please pull up Plaintiffs'

20   Exhibit 312.

21   BY MR. COOK:

22   Q    Do you see this Plaintiffs' Exhibit 312?

23   A    It says M&G Polymers OPEB discussion guide.

24   Q    And scrolling down a little bit.  It's a Buck

25   Consultants' document, apparently.
```

1      Did you attend a meeting between representatives of

2      M&G Polymers and actuaries or representatives of Buck

3      Consultants where this OPEB discussion guide was reviewed

4      between the two parties?

5      A    Looking at this, no, I don't have a recollection of

6      that.

7      Q    During the period 2005 and 2006, when the actuarial

8      assumptions for the FAS 106 calculations were being

9      reviewed with Duane Lee, did you attend such a meeting?

10     A    There would have been a number of discussions, but I

11     don't know that this is a document I would have necessarily

12     reviewed.

13     Q    You don't recall seeing this document?

14     A    Not without anything additional to it.

15          MR. COOK:  We will not move the admission of that

16     document.

17          THE COURT:  Thank you.

18     BY MR. COOK:

19     Q    Let's look at Plaintiffs' Exhibit 313, 3-1-3.

20          This is a M&G Polymers OPEB plan description of IAS 19

21     adjustment.  Have you seen this document before, either

22     from the actuaries or internally at M&G Polymers?

23     A    Well, this is page 13 of the document.  If I could see

24     the whole document, I might be able to address that.

25     Q    Unfortunately, this is how it was produced to us in

1    discovery.

2    A    Is there an additional -- no.  It's one of one.

3    Q    This is a one-page document.

4    A    Looking at it, Mr. Cook, no, I don't recollect this.

5    Q    So you don't recollect communications or

6    correspondence with Buck Consultants concerning the effect

7    of factoring in the cap provisions to the FAS 106 and the

8    IAS 19 calculations?

9    A    This particular document, no, sir.

10        MR. COOK:  We will not offer that.

11   BY MR. COOK:

12   Q    May we look at Plaintiffs' Exhibit 342.

13        MR. COOK:  Your Honor, I miscounted.  This is number

14   four, and the last.

15        THE COURT:  All right.

16   BY MR. COOK:

17   Q    Do you recognize Exhibit 342?  It's a report on

18   actuarial valuation of the M&G Polymers postretirement

19   medical and life plans prepared as of January 1, 2009, on

20   Buck Consultants' letterhead, stationery?

21   A    It appears to be a report but I'm not sure I've

22   personally looked at that.

23   Q    If you turn to the first page.  It's a transmittal

24   letter.  Robert D. Crooks controller, did Mr. Crooks share

25   this document with you at any time?

```
 1    A     Not that I recall.
 2    Q     Did you, at any time during the course of your
 3    handling HR functions at Point Pleasant, receive copies of
 4    the FAS 106 actuarial reports?
 5    A     I may have from time to time, but at this point in
 6    2008, I was actually involved with Chemtex more than I was
 7    M&G Polymers.
 8    Q     So you have no recollection of having received or seen
 9    a copy of this?
10    A     No, sir.
11    Q     Do you have any recollection of communication with
12    Mr. Crooks about either the document or the subject matter
13    of the report?
14    A     No.
15    Q     Thank you.
16         MR. COOK:  We'll not offer that document.
17    BY MR. COOK:
18    Q     Mr. Korber, I wanted to ask you about your testimony
19    earlier this morning where you said that you learned of a
20    Letter H from Sam Stewart; is that correct?
21    A     In terms of -- are you referring to my first time?
22    Q     Your first time.
23    A     Well, that really came through a meeting with
24    Mr. Rousch.
25    Q     And where did Mr. Rousch get the letter, or the
```

1    information concerning the letter?

2    A    There were a list of action items from the 2000

3    negotiations.

4    Q    At the time you had the meeting with Mr. Rousch, did

5    you actually see a copy of the letter?

6    A    No, I did not.

7    Q    Do you remember the first time you actually did see

8    it?

9    A    My best recollection is March, maybe March or April

10    following that meeting.

11    Q    Did Mr. Rousch tell you that the document that he had

12    gotten or he had seen was a Goodyear document and not a

13    Shell document?

14    A    In terms of the meeting in February, my understanding

15    was the topic had come up at the negotiations.  That was

16    all I knew about it at that point, that there was a FASB

17    letter.

18    Q    Had you ever heard that term before – FASB – at that

19    point?

20    A    Not the way it was spelled in that document.  I

21    certainly didn't recognize that.

22    Q    F-A-S-B or F-A-S-B-Y?

23    A    F-A-S-B-Y.

24    Q    And the next time that you had any conversation about

25    that was July of that year?

```
 1    A     No; no.

 2    Q     When was the next time after March or April of 2001?

 3    A     After March or April?

 4    Q     Yes, after March or April, when was the next time?

 5    A     The next time that I recall, as I sit here, was

 6    probably in July with Rex Rousch.

 7    Q     Was Mr. Stewart present at that time?

 8    A     No, I don't believe he was.

 9    Q     Well, I'm asking, Mr. Korber, because I'm a little

10    curious as to why, when this subject came up at the table

11    in the 2003 negotiations, you asked Mrs. Shipley to get you

12    a copy of Letter H if Mr. Rousch had one and discussed it

13    with you as early as March or April of 2001?

14    A     I don't think that's anything extraordinary in

15    negotiations where parties are talking.  And if you're not

16    sure exactly what the other side is, let's say, holding in

17    their hand or what they may be looking at, it's not unusual

18    to ask somebody to provide you a copy of something.

19    Q     But, Mr. Korber, leading up to these negotiations, you

20    identified a number of key issues that were objectives M&G

21    sought to attain in bargaining, did you not?

22    A     I did.

23    Q     Among them was reduction of your health costs?

24    A     Well, certainly looking at the health care costs, plan

25    design issues, contributions, yes, those were all things
```

1    that were of concern.

2    Q    And your testimony this morning indicated that you

3    were looking at both retirees and actives, correct?

4    A    That was one of the things we were considering, yes.

5    Q    Wouldn't Letter H be the first place you would go if

6    you're looking to reduce costs for retirees?  It has the

7    cap right there in the letter.

8    A    Well, if I had certainty of what the union was going

9    to do in the upcoming negotiations, I might have.

10   Q    But isn't it logical, sir, that if containing health

11   costs was a primary goal, and retirees' health insurance

12   was part of that health cost factor, and the company had a

13   letter which it now claims authorized it to control those

14   costs, isn't it logical they would have put that on the

15   table in the 2003 negotiations?

16   A    Well, if it has a future date of July 1, 2004, and

17   you're hoping to get a contract closed by November of 2003,

18   I'm not sure that it would have made sense for the company

19   to advance a proposal about that.

20   Q    So you're going to sandbag the union and just spring

21   it on them after the contract is agreed to?

22   A    No, I also believe part of what I said this morning

23   was, in addition to the conversations that would have to

24   take place in 2003, that letter would certainly require the

25   parties to sit down and have some discussion.  If you asked

1    me what, you know, was I thinking at the time, my thinking

2    at the time was, if we can get to a closure on the

3    agreements we had in 2003, as we got into 2004, there would

4    be at least six months that we could sit down and have

5    those conversations and decide how to act on that.

6    Q    I find that curious, Mr. Korber, because you claim to

7    have received that letter December 12th, 2003, and by

8    December 13th, 2003, you had modified your proposal on

9    Letter of Understanding 2003-6 to incorporate it.  So

10   within 24 hours of receiving it, sir, did you not put it

11   right into your proposal on retiree health care?

12   A    I put the letter that was dated January 1 of 2001 into

13   the proposal.  The letter that I had been aware of before

14   that was a May 9, 1997 Letter H.

15   Q    And what was the difference between the two?

16   A    Well, one of the obvious differences was the letter I

17   was looking at said those contributions wouldn't kick in

18   until the first of July 2004.  The one that Mrs. Shipley

19   presented to me and said that the Steelworkers said applied

20   to us actually had a January 1, 2004 commencement date.  So

21   it was six months earlier than what I was anticipating.

22   Q    And it's your testimony today that that six months

23   made enough difference that you would immediately alter a

24   major health care cost containment proposal to incorporate

25   the different letter?

1    A    At that point, I was anticipating the union might have

2    made a proposal about Letter H based on the history between

3    the parties.

4    Q    Now, the Letter H that you received from Mrs. Shipley

5    was between which parties?

6    A    If I recall correctly, it was between Goodyear and the

7    Steelworkers.

8    Q    Goodyear and the Steelworkers, correct?

9    A    Yes.

10   Q    And by what document was that letter incorporated --

11   specific document was that letter incorporated into the M&G

12   Polymers USW agreement?

13   A    At what point, sir?

14   Q    At any point in time.

15   A    Well, at the time of the 2003 bargaining when

16   Mrs. Shipley, again, presented this and said that she had

17   gotten this from Pittsburgh and after this conversation

18   that happened across the table, and based on everything

19   that I had heard since I arrived in 2001, I wasn't

20   surprised that that letter was between Goodyear and the

21   Steelworkers.  And it was presented to me as being

22   applicable to the agreement and the negotiations that I was

23   involved in.

24   Q    Presented to you by whom?

25   A    Mrs. Shipley.

1    Q    Didn't in fact Mrs. Shipley say "if this applies"?

2    A    That's not my recollection.

3    Q    That's not your recollection?

4    A    That's not my recollection.

5    Q    Did you go back at any point, December 12,

6    December 13th, 2003, and attempt to go through the historic

7    records of M&G Polymers, going back to Shell, going back to

8    Goodyear, and try to find a document that incorporated that

9    letter or any of its predecessors?

10   A    The only predecessor letter I had at the time I was

11   sitting there in 2003 was based on the document that Rex

12   had provided me that he had reviewed with Sam Stewart, and

13   it contained a May 9th, 1997, Letter H.

14   Q    And that Sam Stewart letter were additional documents

15   that were appended to the back of a previously printed five

16   by seven spiral bound booklet, correct?

17   A    That was a work product that Rex and Sam had prepared

18   as to discuss what had come out of the 2000 negotiation and

19   what was part of I guess I'll call the full or complete P&I

20   Agreement between the parties.

21   Q    Would the -- could we bring up Joint Exhibit 1,

22   please?

23        Joint Exhibit 1, Mr. Korber, is the agreement between

24   Goodyear Tire and Rubber, Point Pleasant Polyester Plant

25   and Local Number 644 effective November 6th, 1991.

```
 1          Have you ever seen this document before?

 2     A    I'm sure I have.

 3     Q    Okay.  Let's turn to page 141 of the document, which

 4     is MGTackett 004259.

 5          On page 141 of the Joint Exhibit 1 is a letter of

 6     intent, Letter A, June 27th, 1991, addressed to Mr. Don

 7     Rollins, United Rubber Workers of America, Local 644.

 8          And let's go down, if we may, to the next pages.  It

 9     continues all the way down to page 143, and it's from a

10     J.M. Roberts, manager industrial relations.  Do you see

11     that?

12     A    I do.

13     Q    Now, let's go back up to 141.  The second paragraph

14     reads:  It is recognized by the parties that for the

15     duration of this agreement all the terms and conditions of

16     the Pension, Insurance and Service Award Agreement of

17     May 15, 1991, as from time to time amended, between the

18     Goodyear Tire and Rubber Company and the United Rubber

19     Workers - continue down, please - including the covering

20     letters under the same date, will be applied to the

21     employees covered by this agreement with the exception of

22     Letter 7, Letter 8, and further Letter 21 and Letter 22

23     will be applied in the following manner at the Point

24     Pleasant Plant.

25          Mr. Korber, I read this as a specific document
```

     1    incorporating the terms of the Goodyear Master P&I

     2    Agreement into the Local 644 agreement.  Do you agree or

     3    disagree with me?

     4    A    Well, I certainly wasn't involved in their bargaining,

     5    but I would say that seems to be a reasonable read of that

     6    letter.

     7    Q    Now, I'd like the witness to be shown Joint Exhibit 5.

     8    This is the Pension, Insurance and Service Award Agreement

     9    effective May 9, 1997, between Shell Chemical, Point

    10    Pleasant Polyester Plant and Local Union 644.

    11         Have you had an opportunity to ever see this document

    12    before?

    13    A    Yes, I had.

    14    Q    And sir, does this document contain a version or a

    15    copy of Letter H?

    16    A    This would have been, as I understand it, the booklet

    17    that would have been provided to employees and, no, there

    18    wouldn't have been a letter in there that wasn't to be

    19    printed in the booklet put in the booklet.

    20    Q    But since you weren't part of the Goodyear

    21    negotiations, master negotiations in 1997, you don't know

    22    about the circumstances that Letter H would or would not be

    23    put into this booklet or any other one?

    24         MR. WEALS:  Objection, Your Honor.  I believe this

    25    agreement is with Shell, not with Goodyear.

1          MR. COOK:  But it's the Goodyear letter that we're

2     discussing.

3          THE COURT:  It was a Goodyear letter.  The objection

4     is overruled.  You may answer the question.

5          THE WITNESS:  I was going to say this -- again,

6     without looking through the whole document, it certainly

7     appears to be the document that I had reviewed with Rex

8     that Rex had talked with the local officials about and,

9     ultimately, I had talked with Sam Stewart about.

10    BY MR. COOK:

11    Q    Let's look at Joint Exhibit 9, please.  This is the --

12    what's been termed in these proceedings and by the parties

13    as the CBA, or the labor agreement between M&G Polymers and

14    Local 644L, effective November 6th, 2000.  Do you recognize

15    this document?

16    A    It appears to be the front cover of that document,

17    yes.

18    Q    Let me hand you my copy of this document, and I will

19    show it to Mr. Weals.  It will be a little easier for you

20    to look at.

21    A    Probably so, sir.

22    Q    Is that the document that we've identified?

23    A    I was pausing to understand what the question was.

24    Q    I wanted you to identify if that is, in fact, the

25    Collective Bargaining Agreement, the 2000 M&G Polymers,

```
1       Local 644L CBA?

2       A    It appears to be, yes.

3       Q    Mr. Korber, I'm going to ask you to take your time,

4    and I want you to show the Court where in that document M&G

5    Polymers and the Steelworkers adopted a Goodyear Letter H

6    to be effective for retirees or employees of the Point

7    Pleasant Polyester Plant.

8       A    Well, since it wasn't to be printed in any booklet, I

9    wouldn't expect to find it in this CBA.

10      Q    I'm not asking you to find the letter itself.  I'm

11   asking you to show me a page or a provision or a clause

12   adopting such a letter.

13      A    Well, I would say that, again, based on my

14   conversation with Rex Rousch and Sam Stewart, what was

15   presented to me when I came on board --

16           THE COURT:  Mr. Korber, answer the question.

17           THE WITNESS:  I'm trying to.

18           If you're asking me is there an explicit document in

19   this CBA, no.

20           THE COURT:  He asked for a page or a provision

21   adopting such a letter.

22   BY MR. COOK:

23      Q    Is there such a page, provision or clause?

24      A    I don't believe so.

25      Q    Thank you.
```

1          Now I'm going to hand you Plaintiffs' Exhibit 99, the

2     2000 Pension, Insurance and Service Award Agreement between

3     M&G Polymers and Local 644 of the United Steelworkers.  And

4     I'll take the other one back.

5          Are you familiar with this document, sir?

6     A    Yes.

7     Q    This is the 2000 P&I Agreement that's been the subject

8     of testimony in this proceeding?

9     A    This is the booklet that was printed and distributed

10    to employees, yes.

11    Q    Would you please show the Court where in that document

12    there is a page, a clause, a provision, which incorporates

13    a Goodyear cap or FASB limitation letter?

14    A    It wouldn't be printed in this booklet.

15    Q    Thank you.

16         If we could look at --

17         MR. COOK:  If you will bear with me.  I was going to

18    use a plaintiff designation when it's, in fact, a defendant

19    exhibit.

20         THE COURT:  That's okay.

21    BY MR. COOK:

22    Q    I'd ask you to pull up on the screen Defendants'

23    Exhibit 276.  It's also Plaintiffs' 363.

24         THE COURT:  Defendants' Exhibit 266?

25         MR. COOK:  Yes.  276.  I'm sorry.

```
 1              THE COURT:  And you said it was also what?
 2              MR. COOK:  It's also Plaintiff's Exhibit 363, but
 3     it's been admitted as a defendants' exhibit, or certain
 4     pages have.
 5              THE COURT:  Yeah.  Okay.
 6     BY MR. COOK:
 7     Q    Do you have this document in front of you, sir?
 8     A    I do.
 9     Q    Okay.  Let's turn to the third page of the document.
10              THE COURT:  Can we hold off for a second?  Just one
11     second, please.
12              I'm sorry.  Proceed.
13     BY MR. COOK:
14     Q    If you would turn to the third page of the document
15     and that's MGTackett 026716.  Do you see that page, sir?
16     A    I do.
17     Q    Look at the very bottom of the page, there is a little
18     asterisk.  I read the note following the asterisk to be
19     2003 negotiations planning for benefits, and you have a
20     little arrow, Dave Dick -- is that counsel?
21     A    Yes.
22     Q    You recognized at the time you were making these notes
23     that Mr. Dick had been counsel to M&G Polymers in the 2000
24     negotiations?
25     A    Yes, that was my understanding.
```

1    Q    And you testified on your direct examination,

2    Mr. Korber, that there had been some conversations about a

3    FASB letter, correct?

4    A    Yes.

5    Q    When did you contact Mr. Dick to get his take on the

6    situation?

7    A    That was probably subsequent to my discussion with

8    Mr. Rousch in February.

9    Q    Probably or did it occur at all?

10   A    I would say it occurred.

11   Q    Is it your position today that the October 17th, 2000,

12   memo from David Dick to the Steelworkers saying that Letter

13   H does not apply was not a part of your bargaining records?

14   A    Not that I found at the time, no.

15   Q    You never saw that before it was given to you by Randy

16   Moore?

17   A    The first time I heard about that was on

18   November 30th, yes, sir.

19   Q    And Mr. Dick never identified it for you?

20   A    No.

21   Q    And your conversations with Mr. Dick concerning

22   bargaining only, because I understand he's an attorney --

23   in your conversations with him concerning bargaining,

24   Mr. Korber, did he and you have any exchanges concerning a

25   FASB letter, Letter H, or the cap letter?

 1           MR. WEALS:  Objection, Your Honor.  I think this

 2      still potentially goes into areas of attorney/client

 3      privilege.  Merely because it relates to bargaining doesn't

 4      mean it's not legal advice.

 5           THE COURT:  It's overruled.  I would have a lot more

 6      problems with this if this were a trial to a jury.  But if

 7      I hear something, we'll just disregard it.  But right now,

 8      I don't think that's the case.

 9           MR. COOK:  Thank you, Your Honor.

10      BY MR. COOK:

11      Q    I want to be clear, Mr. Korber.  I want to know what

12      your exchange, if any, was with Mr. Dick concerning the

13      history and relation by him of events during bargaining

14      where he -- without any legal opinion or advice that he may

15      have rendered or given you in your conversation?

16      A    Well, as I recall at the time, I would have asked him

17      for some information about the bargaining because he had

18      been the company's chief spokesperson.  I'm sorry, he had

19      been the company's chief spokesperson, and as best I can

20      recollect, what he described to me relative to this issue

21      was that, in bargaining, this had been brought up by the

22      union, they had wanted to push dates out into the future.

23      There was dialogue about sort of what this was.  Neither

24      party apparently at the table had people who were familiar

25      with it.  And that, ultimately, as I understood it at the

1    time, that the issue had just dropped off the table.  That

2    was his description to me probably back, again, sometime

3    subsequent to February 2001.

4    Q    And he didn't mention to you that it dropped off the

5    table because he had given the union a memo saying it

6    didn't apply?

7    A    No, he referred me to Cindy Jones.

8    Q    Now, you serve as the chief spokesman in negotiations

9    for the companies that you work for, sometimes?

10   A    For some sessions on some subjects, yes.

11   Q    And when you do so, sir, are you vested with the

12   authority to bind the company?

13   A    That's one of the things you're supposed to come to

14   the bargaining table with.

15   Q    And, if you then speak with that authority to the

16   union, are they entitled, Mr. Korber, to take your

17   statements to the bank?

18   A    If I'm advancing a proposal, if I'm prepared to accept

19   a proposal, yes; table talk, not necessarily.

20   Q    And if you advance a memorandum on a point that's been

21   raised during the negotiations, specifically addressing it,

22   is the union entitled to rely on it?

23   A    Based on what I know and what I saw of that note --

24   Q    No, I'm not asking about that note.  I'm asking about

25   as a general proposition.

1    A    As a general proposition, my practice would be I would

2    put together a formal proposal and give it to the union.

3    And I would be prepared to sign off on that, so it would

4    bear my signature.

5    Q    So the chief spokesman for the company making that

6    formal representation to the union, the union is entitled

7    to rely on it, aren't they?

8    A    If I've made that kind of a proposal, as you've seen

9    some of the proposals we've had here, yes.

10   Q    Thank you.

11       I really don't want this to be in any way personal; I

12   just want to make sure the record is clear, Mr. Korber.  At

13   some time during a discussion with Mr. Lee and actuaries at

14   Buck Consultants over the applicability of Letter H, was

15   there an attorney involved in those discussions named

16   Philip Miscimarra?

17   A    Yes.

18   Q    I don't want to know what he talked about.  I just

19   wanted to know was he part of the conversation?

20   A    At one point, yes.

21   Q    And -- okay.  Thank you.

22       Now, I'd like you to look at -- I'm going to hand you

23   a copy.  It will be easier this way.

24   A    I appreciate that, sir.

25   Q    Plaintiffs' Exhibit 100.  We don't have the same

```
1    resources and I don't have a notebook for you.  I just have

2    a bunch of individual documents.

3         Plaintiffs' Exhibit 100, sir, do you recognize this

4    document?

5    A    May I have a moment to look at it?

6    Q    Please.

7    A    I've seen something similar to this, but I don't

8    recognize this particular document, no.

9    Q    This document, Mr. Korber, is a page-by-page analysis

10   of the benefit plans and basic benefit plan design for

11   various represented PET employees in the U.S.; is that

12   correct?

13   A    Well, that's what it purports to say, but I'm confused

14   by some of the references in here where it talks about

15   things prior to M&G's acquisition of the plant.

16   Q    Have you previously been asked if you had seen this

17   before in your deposition?

18   A    I believe I had been, yes.

19   Q    And did you testify in your deposition that you

20   believed you had seen this before?

21   A    I don't believe I had said that.

22   Q    What do you think you said?

23   A    I think I had said something to the effect that some

24   of these plans, particularly for the nonrepresented, looked

25   familiar.  But some of these references in here to the
```

1    represented -- I mean, frankly, some of these things, I

2    believe, were addressed in the bargaining in 2000, so I

3    would have expected these would have changed.

4    Q    Okay.  Thank you.

5         I'm now going to hand you Joint Exhibit 7.  No --

6    actually, yes.  I'm going to hand you Joint Exhibit 7.

7    A    Let me exchange this one with you.

8    Q    Thank you.

9    A    Thank you, sir.

10   Q    This document has been admitted into evidence as a

11   document, a business record in support of stipulated facts.

12   Do you recognize this document, sir, the – my Italian

13   lesson for the afternoon, Your Honor – *M&G Finanziaria*

14   *Industriale*, completion of acquisition of Shell Oil Company

15   PET Business Completion Documents, 1st June 2000.

16   A    I wasn't there at this point in time but I do

17   recognize the document.

18   Q    Is this a record that was maintained by your

19   organization following the acquisition of the Point

20   Pleasant Polyester plant?

21   A    I believe it was.

22   Q    Let's look at page 007246, 007246.

23   A    All right.  That's Schedule 2B?

24   Q    Schedule 2B.  Is this, sir, a list of the Collective

25   Bargaining Agreements that were in effect with the Shell

1    Chemical facility at Point Pleasant?

2    A    It references Shell polyesters, but I believe this is

3    reference to the CBA, the Pension, Insurance, and Service

4    Award Agreement, yes.

5    Q    Because it references Local 644, correct?

6    A    Yes, that would be one of the things I would look to.

7    Q    And item two little I's, Pension, Insurance, and

8    Service Award Agreement between Shell Chemical Company,

9    Point Pleasant and Local 644, United Steelworkers of

10   America?

11   A    I see that.

12   Q    Do you see under the third little I, a listing of

13   letters, letters of agreement and letters of understanding?

14   A    I do.

15   Q    Is a Letter G or a Letter H listed anywhere on that

16   page?

17   A    I do not see that listed under, I guess, little iii.

18   Q    Let's look at page 007279, almost the last page of the

19   document.

20   A    All right.  I have that in front of me.

21   Q    This is Exhibit Roman Numeral 5, V, Shell Oil Company

22   Chemical Divestiture, Point Pleasant Union Plan, Actuarial

23   Assumptions.  Do you see that, sir?

24   A    Yes.

25   Q    What does it say next to the word "coverage"?

1    A    Lifetime for retirees and spouses.

2    Q    Going down to retiree contributions, the next to last

3    line, what does it say next to retiree contributions?

4    A    It says "none."

5    Q    I'm going to hand you a copy of Plaintiffs'

6    Exhibit 227, which is your declaration in support of the

7    motion for summary judgment.

8        MR. COOK:  Did I say 227 or 277?  It's 277.

9        THE COURT:  Thank you.

10        MR. COOK:  Thank you.

11   BY MR. COOK:

12   Q    Do you recognize this document, Mr. Korber?

13   A    Yes.

14   Q    And am I correct, sir, if you turn in the document

15   to -- it's going to be stamped at the top with an

16   electronic filing stamp of the United States District

17   Court, it's going to say Document 37-6, page 1 of 36.

18   A    I have that here.

19   Q    Is that the same schedule 2B as we just identified?

20   This is document 37-6.

21        MR. COOK:  We understand that according -- I think

22   Mr. Miller mentioned this earlier.  In the summary judgment

23   filings, Your Honor, some documents were so voluminous that

24   they had to be broken into pieces, and this document was

25   filed as 37-5 and 37-6.

```
 1              THE COURT:  I understand.

 2    BY MR. COOK:

 3    Q    Is that the same schedule of Collective Bargaining

 4    Agreements we just referenced in Plaintiffs' Exhibit -- or

 5    Joint Exhibit 7?

 6    A    It appears to be.

 7              MR. COOK:  Excuse me just one moment, Your Honor.

 8              THE COURT:  Sure.

 9    BY MR. COOK:

10    Q    Mr. Korber, tell the Court and help clarify for me

11    again when you first notified the actuaries for M&G of

12    Letter H that you said applied to the retirees.

13    A    I'm sorry.  Could you repeat the question?

14    Q    When did you first notify the actuaries, Buck

15    Consultants, of Letter H which you said applied to the

16    retirees?

17    A    I believe that was either December -- sometime in

18    December 2003, January, early January 2004.

19    Q    That corresponds pretty closely to when you had the

20    exchange with Mrs. Shipley, doesn't it?

21    A    It does.

22    Q    And did there ensue between you, Mr. Crooks, and Duane

23    Lee of Buck Consultants a discussion or dialogue concerning

24    when that would become effective for calculation of FAS 106

25    liabilities?
```

```
 1    A    Yes.

 2    Q    Was some of the discussion of having it apply simply

 3    to persons who retired after January 1st, 2004?

 4    A    If I recall correctly, I believe so.  There was some

 5    analysis that, obviously, we wanted to do based on this new

 6    document that Mrs. Shipley had introduced.

 7    Q    And, then, as the dialogue continued, M&G Polymers

 8    called in counsel, correct?

 9    A    Among other things that we were looking at, yes.

10    Q    And, ultimately, was it left to counsel to determine

11    which group of retirees this letter would apply to?

12    A    No.

13         MR. COOK:  Can we please call up Plaintiffs'

14    Exhibit 196?

15         THE COURT:  196?

16         MR. COOK:  196, Your Honor.

17    BY MR. COOK:

18    Q    Mr. Korber, Plaintiff's Exhibit 196 is a February 9th,

19    2005, e-mail from Duane Lee to Robert Cooks copied to you.

20    Did you receive a copy of this, sir?

21    A    I'm sure I did since I was CCed on it.

22    Q    Do you see the second paragraph of that e-mail?

23    A    The one starts out "early in 2004"?

24    Q    Yes.

25    A    I do.
```

1    Q    I'm going to read it into the record and tell me if

2    I'm reading this wrong.

3         Early in 2004, we determined the 2004 expense to be

4    $4,428,227 after recognition of the Medicare part D

5    subsidy.  Later in the year, it was discovered that, quote,

6    Letter H, closed quote, existed.  In effect, Letter H

7    limits the liability of the company by recognizing a

8    retiree medical cap.  Retirees would be required to pay all

9    costs in excess of this cap.  Under the capped scenario,

10   the FAS 106 expense would reduce to $2,776,655 if we could

11   recognize it as of January 1, 2004.  However, based on the

12   meeting we had in our offices with you, Kimm, Marco, and

13   the attorney, the attorney was going to determine the date

14   from which we could reasonable assume Letter H was

15   effective.

16        Did I read that correctly?

17   A    That's what Mr. Lee's note says.

18   Q    And does that refresh your recollection?

19   A    No.  Because that's Mr. Lee's description of some

20   things.

21   Q    So you're saying that it was not left to the attorney

22   to determine the effective date?

23   A    No, that was left to the company.

24   Q    Do you understand the difference between a FAS 106

25   liability and a FAS 106 expense?

```
 1    A    I'm certain I've had discussions with the actuaries

 2    about it, but since I'm not an actuary, I couldn't tell you

 3    I'm an expert on that, no.

 4    Q    In fact, is the FAS 106 liability a projection of all

 5    future prospective payments to persons entitled to benefits

 6    under a program or a plan, and the expense is the actual

 7    projected cost for those liabilities in a given period?

 8    A    I believe that's a fair statement.

 9    Q    So, for 2004, the 2004 expense before Letter H was

10    estimated to be $4,428,227, right?

11    A    That's what Mr. Lee is indicating, yes.

12    Q    And the recognition of Letter H brought that down by

13    almost $1.7 million, correct?

14    A    Yes.

15    Q    That was just on the expense side.  Am I right?

16    A    I believe that's correct.

17    Q    And you see the fourth paragraph:  Your year-end

18    accrued expense would then be $26,483,702, paren, the

19    12-31-2003 balance, plus the 2004 expense of $4,105,372

20    less net benefit payments for 2004, correct?

21    A    I see that statement, yes.

22    Q    And the $26 million number is the projected future

23    liability.  Am I accurate?

24    A    I believe that's correct.

25
```

```
 1          MR. COOK:  One moment, Your Honor.  I almost used a

 2    deposition exhibit number and I don't want to do that.

 3          THE COURT:  I've got them all here, as it might not

 4    surprise you, if you need to cross-reference.

 5          MR. COOK:  This is Plaintiffs' Exhibit 255.

 6          Can we see Plaintiffs' 255?

 7    BY MR. COOK:

 8    Q    This is a December 5th, 2006, e-mail from Duane Lee to

 9    Robert Crooks and others.  You're not copied on this.  Did

10    you receive a copy of this?

11    A    If I wasn't copied, then I wouldn't likely have

12    received a copy of it.

13    Q    In your deposition -- can we call up his deposition,

14    please?  Turn to page 231.

15          Page 231, please.

16          On page 231 of your deposition, sir, were you asked by

17    Ms. Renate Klass, then representing United Steelworkers --

18    A    I'm sorry.  I'm trying to see what line you're on.

19    Q    I'm going to tell you.

20          MR. WEALS:  Could you give me a moment, Your Honor,

21    while I grab a hard copy of it so I can read it, too?

22    BY MR. COOK:

23    Q    Beginning at line 14 you were asked by Ms. Klass,

24    Mr. Korber, did Mr. Crooks ever advise you of this

25    December 5th, 2006 memo, from Duane Lee?  And you
```

1    testified:  He may have.  I don't know.

2        Is that your testimony today, you did not see it or he

3    may have not shown it to you?

4    A    Well, I would say if you're asking me if I had seen a

5    copy of that e-mail, if I wasn't CCed on it, I might not

6    have seen a copy of that e-mail and I don't know that

7    Mr. Crooks advised me of that.

8    Q    Did you come to understand -- regardless of the

9    exhibit, regardless of this exhibit, did you come to

10   understand at some point that Mr. Lee, as the actuary for

11   M&G, was going to apply Letter H to all retirees regardless

12   of the date of their retirement?

13   A    I think at some point, yes.

14   Q    Was he instructed to do so by M&G?

15   A    I believe so, yes.

16   Q    And what was the basis of applying this retroactively

17   to persons who retired, say, in 1993?

18   A    It would have come through an analysis from actuaries,

19   auditors and others as to whether or not we could take that

20   interpretation of the documents.

21   Q    And were you part of that analysis?

22   A    In different parts of it, yes.

23   Q    And was there a specific document reference, an

24   agreement or a piece of paper that they relied on this

25   process?

1    A    Well, certainly Letter of Understanding 2003-6 was one

2    of the things that was important to us, as well as the

3    reference to Letter H from January 1, 2001.

4    Q    And that was a reference to a 2001 Letter H, correct?

5    A    Yes.

6    Q    Can we pull that letter up, please, the 2001 Letter H?

7         It's been introduced several times.  I'm just not sure

8    what letter we want to use.

9              THE COURT:  102.

10             MR. COOK:  Plaintiffs' 102.  Thank you, sir.

11             THE COURT:  I'm here to help.

12   BY MR. COOK:

13   Q    If we could scroll down just a little bit so we can

14   see.

15        Let's stop right there.

16        Mr. Korber, this is the 2001 Letter H which I believe

17   your testimony indicates was referenced in Letter of

18   Understanding 2003-6; is that correct?

19   A    That's correct.

20   Q    Paragraph one reads:  The average annual company

21   contributions to be paid for all health care benefits per

22   retired employee, paren, including their surviving spouse,

23   closed paren, who retires on or after May 1st, 2000.  Do

24   you see that?

25   A    I do.

1    Q    Is it your testimony today that this sentence

2    authorized you to apply the letter to 1993 retirees?

3    A    No.  What I'm saying is the Letter of Understanding

4    2003-6, as we bargained it and had it ratified, it talks

5    about all existing retirees and future retirees.

6    Q    And Mr. Moore and Mrs. Shipley both told you that

7    they, as steelworker representatives, didn't have authority

8    to bargain for existing retirees, didn't they?

9    A    I would disagree with that.

10   Q    What part do you disagree with, sir?

11   A    That they said they didn't have the authority to

12   bargain.  If they did that, I guess my question would be,

13   why would they have advanced proposals?

14            THE COURT:  You don't ask questions.

15            THE WITNESS:  You're right.  I'm sorry, Your Honor.

16   BY MR. COOK:

17   Q    So Mrs. Shipley, before the whole exchange about

18   Letter H, her immediate reaction was, can't talk to you

19   about existing retirees, that's permissive; is that

20   correct?

21   A    As we advanced proposal, yes, she indicated that.

22   Q    Am I correct, Mr. Korber, that without Letter H,

23   bargaining for existing retirees is, in fact, a permissive

24   subject of bargaining?

25   A    At that time, I would say yes.

1    Q     At the time M&G purchased -- if you know this, you may

2    not.  At the time M&G purchased the Shell Chemical Plant at

3    Point Pleasant, did they engage in due diligence as to what

4    obligations were being assumed?

5    A     That would be, I would think, part of the normal

6    practice for that type of transaction.

7    Q     And, as part of that due diligence, was a

8    determination of the retiree medical liability one issue

9    considered in the due diligence?

10   A     I'm sure they were looking at those and other matters.

11   Q     Now, in the time frame of 1999 to 2000, did M&G retain

12   the services or assistance of Buck Consultants, Arthur

13   Anderson and John L. Wortham & Son in connection with due

14   diligence concerning acquisition of employee benefits

15   obligations?

16   A     I wasn't there '99 or 2000, but that became my

17   understanding.

18   Q     I'm going to read you from your deposition, sir,

19   line 1, page 124 -- 124, through line 8.

20         You were asked this question by Ms. Klass:  In the

21   time frame of 1999 and 2000, according to the research you

22   did for this memo - and she's referencing another

23   document - M&G retained the services or assistance, if you

24   want to put it that way, of Buck Consultants, Arthur

25   Anderson and John L. Wortham & Son in connection with

1    employee benefits, right?

2        And did you give the answer:  At different points in

3    time in the period you described, yes.

4    A    Yes, that became my understanding.

5    Q    Are you aware, Mr. Korber, that as a result of that

6    due diligence between the years 2000 and 2004, M&G Polymers

7    reported FAS 106 liability that assumed no retiree

8    contribution and lifetime benefits?

9    A    I'm not an accountant or actuary, but I believe that's

10   probably correct.

11   Q    Were you involved in a process related to the

12   acquisition of the Shell Chemical Plant in Point Pleasant

13   by M&G Polymers called a true-up?

14   A    I believe I was at some point, yes.

15   Q    And a true-up was the process of calculating a

16   specific number, or set of numbers, for employee benefits

17   liability and then the sales figures were going to be

18   adjusted accordingly?

19   A    I believe that's accurate.

20   Q    I'm going to hand you Plaintiffs' Exhibit 116 and ask

21   if you'll look at that, please.

22       Plaintiffs' 116 is a multipage document consisting of

23   several e-mails dated November 15th, 2001, from Duane Lee

24   to Kimm Korber.

25       The second e-mail is from you to Mr. Lee; is that

1    correct?

2    A    It appears that way, yes.

3    Q    If you'll look at the third page of the document,

4    MGTackett 026917.  Do you see that, sir?

5    A    I do.

6    Q    This is from you to Duane Lee and it's dated

7    Wednesday, November 14th, 2001.  And the subject matter is

8    PwC Assumptions for true-up.  Who is PwC?

9    A    I believe that's a reference to

10    PricewaterhouseCoopers.

11    Q    And what was their role or function in assumptions for

12    the true-up?

13    A    My understanding of it was that is who Shell used to

14    give them actuarial assumptions for that transaction.

15    Q    All right.  So looking at your message to Mr. Lee, you

16    talk about the 95 point contribution; is that correct?

17    A    In part of this letter, yes.

18    Q    In the third paragraph --

19    A    Yes.

20    Q    -- you say:  As we discussed before, on the salary

21    side, there is a reduced company contribution for medical

22    insurance premiums based on years of service.  For 30 years

23    of service or more, the company pays the full premium.  On

24    the hourly side, if someone retires with 30 years of

25    service, they will automatically get the benefit of

 1    company-paid medical insurance premiums.   Correct?

 2    A     That's what this says.

 3    Q     And then you go on to describe what happens to someone

 4    with less than 95 points and how the contribution is

 5    calculated?

 6    A     That's what this says, yes.

 7    Q     Is there any reference in here to a cap?

 8    A     No, not at this point.  It wasn't July 1 of 2004 yet.

 9    Q     That's my -- you're exchanging information with the

10    actuary.  He's going to do a true-up analysis for the sales

11    acquisition to make sure that the numbers are correct and

12    you don't mention a cap letter?

13    A     No, sir, I didn't.

14    Q     Let me hand you Plaintiffs' Exhibit 309.

15          Do you recognize this document, sir?

16    A     No, I do not.

17    Q     This was not prepared by you or your staff?

18    A     I know it wasn't prepared by me.

19    Q     Is this an actuarial document that was shared with you

20    or your staff?

21    A     I really have no idea.

22          MR. COOK:  Thank you.  We will not offer that.

23    BY MR. COOK:

24    Q     I'm going to hand you Joint Exhibit 38.  Joint

25    Exhibit 38 has been previously admitted.  It's a

1    December 14th, 2006, letter to you from -- I was thinking

2    of the other way around.

3         This has not been admitted.  This is a December 14th,

4    2006, letter to Joe Stuligross from you regarding a 1997

5    Pension, Insurance, and Service Award Agreement.  Did you

6    write this or author this letter?

7    A    I did, sir.

8    Q    Is this your signature?

9    A    It is.

10   Q    You say:  As a follow-up to our discussions at the

11   offices of Littler Mendleson in Columbus, Ohio, on

12   December 5, 2006, and pursuant to your request, attached

13   you will find a copy of the complete 1997 Pension,

14   Insurance, and Service Award Agreement, paren, or the P&I

15   Agreement, close paren.

16        Is that correct?

17   A    That's what the letter says.

18   Q    And is the complete 1997 P&I Agreement that you sent

19   along with this letter, the Goodyear P&I Agreement or the

20   Shell and Local 644 P&I Agreement?

21   A    It was the agreement that Mr. Hoover had provided, as

22   I understand it; it's both the Shell Chemical Company HR

23   manager David Negusse, and the local union.

24   Q    And it was the Goodyear agreement?

25   A    I believe that's right.

1    Q    But it was not the 1997 Shell P&I Agreement, was it?

2    A    If my memory is correct, no.

3    Q    I'm going to hand you Plaintiffs' Exhibit 118.  Do you

4    recognize this document, sir?

5    A    I do.

6    Q    What is this document?

7    A    This was a document that I had prepared, which at the

8    time was really intended to be a very general overview of

9    some thoughts about things we might do with respect to

10   benefit strategy for employees in the U.S.

11   Q    And do you know approximately when you prepared it?

12   A    I believe this was -- well, it certainly would have

13   been sometime between the time I was hired and I'm going to

14   say June 1 of 2001.

15   Q    And June 1 of 2001?

16   A    Yes.

17   Q    So your contention, then, is that you prepared this

18   before you had any personal knowledge of Letter H?

19   A    I was aware of Letter H probably before June 1,

20   assuming that's the date.  But --

21   Q    But you don't mention Letter H in this benefit

22   strategy, do you?

23   A    No, I don't.

24   Q    Who did this document go to, sir?

25   A    This document went to Giorgio Pivetta.

```
 1    Q    Giorgio Pivetta?  He was whom?

 2    A    He was the global HR director for M&G.

 3    Q    Based in Milan, Italy?

 4    A    Yes, he was.

 5    Q    I'll put my Italian hat on: Milano.

 6         This was a roadmap, correct, to how to get some of

 7    your employee benefits costs under control?

 8    A    I wouldn't characterize it as a roadmap.  When I first

 9    came on board, there were a number of things that were

10    going on for M&G.  One of the things I was asked to do was

11    to comment on benefits.

12    Q    And one of the things that you had done during this

13    same time period was meet with Rex Rousch where he

14    mentioned that there is this FASB cap letter, correct?

15    A    Yes.

16    Q    I'm going to hand you Defendants' Exhibit 59.

17         MR. COOK:  Excuse me, Your Honor, if I may have a

18    moment.

19         THE COURT:  Sure.

20         MR. COOK:  I'm going to hold this for a moment, Your

21    Honor.

22    BY MR. COOK:

23    Q    Let's go back to the previous exhibit.

24         THE COURT:  Plaintiffs' Exhibit 118?

25         MR. COOK:  Yes.
```

```
 1    BY MR. COOK:

 2    Q    And let's scroll down on the page you're on, please,

 3    and let's find the Bates reference.  This is MGTackett

 4    003339.

 5         Do you see the paragraph that begins with the word

 6    "third"?

 7    A    I do.

 8    Q    And that paragraph references the hourly retiree

 9    population is rather large vis-à-vis the number of active

10    employees?

11    A    It does.

12    Q    And you say that retirees use the hourly health care

13    programs heavily, correct?

14    A    I do.

15    Q    Let's scroll down to the next page, please.  Did you

16    predict or offer the opinion in this document that getting

17    health care costs under control, including retiree health

18    care costs, would likely be a strike issue for the United

19    Steelworkers?

20    A    I did.

21    Q    And in the paragraph above that where it says

22    "second," the second sentence of that paragraph.

23    A    I'm there.

24    Q    Do you say, quote, the majority of the benefit

25    programs available to these employees are provided fully at
```

1    the expense of the company, comma, I period, E period

2    comma, the employee does not assume any portion of the

3    premiums, as is the case with programs provided to salaried

4    employees.

5         You go on to say, the pension and insurance agreement

6    from 1997 secures the benefits provided to the hourly

7    employees, and this agreement is not up for negotiation

8    until 2003.

9         Do you say that?

10   A    I do.

11   Q    But it was, in fact, negotiated in the year 2000?

12   A    Yes, after I had arrived, the next negotiation would

13   have been 2003.

14   Q    No, no.  The P&I Agreement that's referenced here was,

15   in fact, negotiated in the year 2000?

16   A    There were changes negotiated, yes.

17   Q    A new agreement was reached, correct?

18   A    You could say that, yes.

19   Q    Now let's look at Defendants' Exhibit 59.  This is a

20   April 4th, 2002, e-mail from Kimm Korber to Sam Stewart,

21   copy to Robert Crooks.  Did you author and send this

22   e-mail?

23   A    I did.

24   Q    Without reading it, is the topic or the subject matter

25   the reasons for delay in printing the P&I booklet?

```
1    A    Yeah, there were questions about the P&I booklet, when

2    we were going to get it distributed.

3    Q    And you referenced that Steptoe and Johnson is waiting

4    for a response from the IRS on the GUST, capital G-U-S-T,

5    amendments to the pension plan, correct?

6    A    Yes.

7    Q    You don't make any mention of a Letter H or any FASB

8    letter in this e-mail, do you?

9    A    No, I don't.

10        MR. COOK:  Your Honor, may we take a five-minute

11   break?

12        THE COURT:  That's a good idea.

13        Mr. Cook, I'm cognizant again of your Friday

14   schedule.

15        MR. COOK:  Your Honor, it is what it is.

16        THE COURT:  All right.  Okay.  Let's take actually

17   about seven minutes.

18    (Recess taken from 3:02 to 3:15.)

19        THE COURT:  You may continue with cross-examination

20   of Mr. Korber, Mr. Cook.

21        And Mr. Korber, you understand you're still under

22   oath.

23        THE WITNESS:  Yes, Your Honor.

24        THE COURT:  Thank you.  You may proceed.

25
```

```
 1    BY MR. COOK:

 2    Q    I'm going to hand you Plaintiffs' Exhibit 127.  This

 3    is a June 3rd, 2002, e-mail from Audrey Thompson-Haas,

 4    H-A-A-S, to you and others, including Duane Lee, indicating

 5    attached is a discussion for our June 7, 2002, meeting.

 6    Apparently it's forwarded from a Peter McCormick.  Do you

 7    know who Peter McCormick is?

 8    A    I do.

 9    Q    Who is he?

10    A    He is one of the principals for Buck Consultants in

11    their Pittsburgh office.

12    Q    And are the attached two pages an outline of a

13    discussion for a meeting to be held June 7th, 2002?

14    A    They appear to be.

15    Q    If you look down here on the second page of the

16    document, midway down there is a bullet that says OPEB 2002

17    actuarial valuation?

18    A    I see that.

19    Q    Is the second or third bullet underneath that one data

20    requirements?

21    A    It is.

22    Q    Who was responsible for supplying data and information

23    on retirees' medical issues to the actuaries so the

24    actuaries could calculate FAS 106 liability?

25    A    At this point in time, I mean, typically Duane would
```

1    have contacted me for census data.

2         THE COURT:  Wait a minute.  The record would not be

3    complete if you simply say "Duane."

4         THE WITNESS:  I'm sorry.  Mr. Lee.  Duane Lee.

5         MR. COOK:  I'm sorry.  I do the same thing.

6         THE COURT:  Everybody is probably used to that in

7    this case.

8    BY MR. COOK:

9    Q    Census data as well as data on Collective Bargaining

10   Agreements?

11   A    Yes.  If there were things, he made direct inquiries

12   to myself or Mr. Crooks would be pretty typical.

13   Q    And an actuary can only report on the information

14   that's supplied to them, correct?

15   A    Yes.  They have to make certain assumptions.

16   Q    Let me hand you Plaintiffs' Exhibit 128.  This is a

17   June 14th, 2002, letter to you, Kimm Korber, from Duane Lee

18   regarding the FAS 106 valuation; is that correct?

19   A    It appears to be, yes.

20   Q    Is this a follow-up to the meeting held June 7th,

21   2002, in Pittsburgh?

22   A    It appears to be.

23   Q    And what follows, sir, is a list of information that

24   he's asking you for?

25   A    Yes.

1    Q    And under two, retiree census data, they ask for a

2    list of retirees as of January 1st, 2002.  And among the

3    information they wish to know about them is which group

4    they're from; is that correct?

5    A    Yes, hourly or salary.

6    Q    Let me hand you Plaintiffs' Exhibit 135.  Can you

7    identify this for the Court, please?

8    A    May I have just a moment --

9    Q    Yes.

10   A    -- to read it?

11        Yes, this was an e-mail I would have sent to Duane Lee

12   and possibly -- well, to Duane Lee, certainly, looking for

13   some help in preparing for the 2003 negotiations.

14   Q    And you're discussing specifically employee benefit

15   costs, pensions and postretirement liability?

16   A    Yes.

17   Q    And you ask, specifically, at the bottom of page --

18   the second page of the document, MGTackett 024306

19   continuing on to MGTackett 024307 specifically about the

20   legacy costs, we'll call them, the postretirement legacy

21   costs, correct?

22   A    Yes.

23   Q    Now, do you reference in this July 22, 2003, inquiry

24   of Duane Lee at Buck Consultants a cap on retiree health

25   liability?

```
 1    A    No, I do not.

 2    Q    Let me hand you Plaintiffs' Exhibit 183.  Do you

 3    recognize this document, sir?

 4    A    Yes.  If you'll give me just a moment to read down

 5    through it.

 6         I believe I do.

 7    Q    What is this document?

 8    A    The first part of this is a response from Marco

 9    Toselli back to myself and Giorgio Pivetta copying Bob

10    Crooks --

11    Q    Sir, excuse me.  Is this a May 31, 2004, e-mail from

12    Marco Toselli to you and others?

13    A    It is.

14    Q    Thank you.  Continue.

15    A    Yeah, the subject is retiree medical, and then on the

16    back of that is an e-mail that I had sent on May 21st.

17    Q    And in your e-mail, you reference at the top of the

18    third page, MGTackett 028570, you say that -- well, I'm

19    sorry.

20         Your Honor, I have to start at the bottom.

21         With respect to hourly employees represented by the

22    USWA --

23            MR. WEALS:  I'm sorry.  Where are you, again?

24            MR. COOK:  The bottom of the second page, MGTackett

25    028569.
```

```
 1              MR. WEALS:  Thank you.
 2      BY MR. COOK:
 3      Q    With respect to hourly employees represented by the
 4      USWA, as part of our negotiations preparations and during
 5      the collective bargaining talks, we engaged our employment
 6      and labor counsel Seyfarth & Shaw, who, by the way,
 7      represents Goodyear, John Deere, Dow Chemical and other
 8      U.S.-based employers with large union-represented
 9      workforces to review our legal risk around our ability to
10      unilaterally change hourly retiree medical benefit plans.
11      The conclusion was that Goodyear, Shell Chemical, and M&G
12      Polymers did not have a clear and unambiguous right to
13      change such retiree plan designs and to do so would very
14      likely create expensive, protracted and tedious litigation.
15              Moreover, during our bargaining with the union, they
16      produced one letter that represents a clear agreement
17      between the company and the union that retiree medical
18      benefits are a mandatory subject of bargaining.
19      Unfortunately, such issues were not identified in the due
20      diligence process prior to M&G's acquisition of Shell's
21      assets which would have been the time to change the deal,
22      in quotes, with the Steelworkers.
23              Is that a correct reading of that?
24      A    Yes, that's what this note says.
25      Q    And you wrote that to your superiors at the
```

 1    corporation on May 31st, 2004?

 2    A    May 21st, 2004, sir.

 3    Q    You're correct.  Your e-mail is May 21st.

 4         Let me hand you Plaintiffs' Exhibit 185.  Would you

 5    please review this and identify it for the Court?

 6    A    This is an e-mail from myself to Duane Lee on Monday,

 7    July the 12th, 2004; subject is additional documents.

 8    Q    And it's addressed to Duane Lee?

 9    A    It is.

10    Q    Now, it's addressed to Duane Lee at Mellon dot-com.

11    Was Buck Consultants a subsidiary of Mellon for a while?

12    A    At one point, they were.

13    Q    They've been around.  Another part of Xerox or

14    something.

15    A    They have had a couple different owners, that's true.

16    Q    You say -- and I'm going to read the first part of the

17    paragraph: Duane, attached are two documents.  The first is

18    Letter H.  This is the letter which discusses, among other

19    things, allocation of costs for retiree medical insurance.

20         Is that correct?

21    A    It does.

22    Q    Mr. Korber, does this refresh your recollection that

23    this is the first time you forwarded Letter H to Duane Lee?

24    A    No, because I know I had forwarded it to Mr. Lee in

25    either December or January 2004.

1    Q    Well, your sentence introduces Letter H, doesn't it?

2    You doesn't say another copy of Letter H.  You don't say an

3    additional copy of Letter H.  You say the first is Letter

4    H, this letter which discussions, among other things,

5    allocation of costs for retiree medical insurance.

6    A    I may have been sending him another copy, but I'm

7    certain of my recollection of transmitting it to Mr. Lee

8    very shortly after we had the meeting on December 13 with

9    the union.

10   Q    In four years of discovery, sir, this is the first

11   document that we can find that you actually physically

12   transmitted a copy of Letter H to Duane Lee.  Are you

13   saying today that there was another transmission which is

14   not recorded?

15   A    I believe that may be the case.

16   Q    You're a pretty meticulous record keeper, Mr. Korber,

17   aren't you?

18   A    I try to be.

19   Q    But you don't have a record of a prior transmission,

20   prior to July 12th of 2004, of Letter H, do you?

21   A    If we had something that was produced as part of

22   discovery, I'm sure you'd have it.

23   Q    Let me hand you Plaintiffs' Exhibit 191.

24        Mr. Korber, is this a November 19th, 2004, e-mail from

25   Duane Lee to Robert Crooks, a copy to you?

1    A    It appears to be.

2    Q    Did you receive a copy of this, sir?

3    A    I'm sure I did since I was CCed on it.

4    Q    Look at the third paragraph, please.  As we discussed,

5    the 2005 FAS 106 expense will depend on whether Letter H is

6    deemed to be enforceable.  Do you see that?

7    A    I do.

8    Q    On November 19th, 2004, the chief financial officer of

9    M&G Polymers USA is writing to the actuary and saying if

10   Letter H is deemed to be enforceable, correct?

11   A    This is what the note says.

12   Q    Is it true, sir, that as of this date, M&G Polymers

13   had not yet determined if Letter H was enforceable?

14   A    That's the opinion of this author, yes.

15   Q    And this author was a principal of the company?

16   A    He was an actuary, yes.

17        MR. WEALS:  I'm sorry, Your Honor.  This is an

18   e-mail from Mr. Lee to Mr. Crooks?  I think the suggestion

19   has been made in the questioning that it's from Mr. Crooks.

20        MR. COOK:  You're right.  It's from Mr. Lee.

21   BY MR. COOK:

22   Q    And Mr. Lee is relating a discussion he had with

23   Mr. Crooks?

24   A    He's conveying information.  I don't know if that is

25   the result of a discussion.

```
 1    Q    Thank you.
 2         Let's look at Plaintiffs' Exhibit 198, please.  This
 3    is a March 3rd, 2005, to Mr. Bob Crooks, controller, M&G
 4    Polymers, from Duane Lee with a copy to you.  Is that
 5    correct?
 6    A    Yes.
 7    Q    Did you receive a copy of this?
 8    A    I'm sure if I was copied on it, I received it.
 9    Q    The reference is final 2004 expense and December 31,
10    2004, OPEB disclosure results.
11    A    That is the subject line.
12    Q    The second paragraph shows a change in numbers, the
13    change is decline in the APBO, or Accumulated
14    Postretirement Benefit Obligation, and the OPEB expense,
15    correct?
16    A    That's what it says.
17    Q    Pretty large drops.  The APBO dropped from $46,516,142
18    to 37,334,135, correct?
19    A    It did.
20    Q    And then the expense, the OPEB expense dropped from
21    3,578,877 to $2,776,655?
22    A    That's what this says.
23    Q    And the next sentence reads:  The reduction is
24    primarily due to the application of Letter H which resulted
25    in a reduction in APBO of $5.2 million.  Correct?
```

```
 1    A     That's correct.

 2    Q     Then he says that he recognized the reduction due to

 3    Letter H as an actuarial gain instead of a plan amendment.

 4    And he did so, according to the next sentence, because his

 5    understanding was Letter H was created under the prior

 6    union contract.  Did I say that correctly?

 7    A     That's what he says in his letter.

 8    Q     And what's the basis of his understanding on the

 9    origins of Letter H?

10    A     That, I don't know.

11    Q     So you did receive this document?

12    A     I was copied, yes.

13    Q     Did you discuss its content with Mr. Crooks?

14    A     I don't recall.

15    Q     Was it considered to be a successful reduction of

16    medical liability costs because the application of Letter

17    H?

18    A     I certainly would say that from the standpoint of the

19    company and certainly the finance people, they certainly

20    would have been interested in the opportunity to reduce

21    liabilities, yes.

22    Q     Wasn't one of the goals going into the 2003

23    negotiations to reduce your legacy costs, to reduce your

24    health care costs and specifically your retiree medical

25    care costs?
```

1    A    My goal, going into the negotiations, was to look at

2    plan designs and costs but, hopeful, ultimately, we were

3    going to get to something that would actually take those

4    costs down below the caps or possibly just slightly above

5    them.

6    Q    So reduction in costs was a factor?

7    A    Certainly.  Every company looks at reducing costs.

8    Q    Let me hand you Plaintiffs' Exhibit 217.

9         Sir, is Plaintiffs' Exhibit 217 a September 27th,

10   2005, e-mail, from Duane Lee to you with a copy to

11   Mr. Crooks?

12   A    It is.

13   Q    Subject M&G Polymer's Letter H?

14   A    Yes.

15   Q    If you look at the next to the last paragraph, does

16   that reference the impact of Letter H, specifically in how

17   medical costs inflation is going to be a factor or not?

18   A    Yes.

19   Q    And the impact -- I'm going to quote -- is a

20   significant reduction in FAS 106 costs to the company.

21        Is that correct?

22   A    I'm sorry.  Where are you at?

23   Q    The second line of that paragraph at the end.

24   A    Okay.  Yes, I see that.

25   Q    And then the last -- next to the last paragraph,

1    without Letter H, the company would have to recognize a

2    cost that assumes it would pay for all future increases in

3    medical costs forever, correct?

4    A    That's what Mr. Lee says.

5    Q    And prior to Mr. Lee becoming aware of your

6    interpretation of Letter H, that last sentence is how they

7    had actually calculated the FAS 106 liability, that M&G

8    would be responsible for the increase in medical inflation

9    for the life of the retirees, correct?

10   A    I think based on some of the documents we had seen

11   before, yes.

12   Q    Let me hand you Plaintiffs' Exhibit 223.  Is this a

13   December 20th, 2005, letter or e-mail, I should say, from

14   Duane Lee to you with a copy to Mr. Crooks?

15   A    It appears to be that, yes.

16   Q    And then you -- what he does is he interlineates

17   responses to certain questions you had posed in a previous

18   e-mail?

19   A    Yes, I believe that's correct.

20   Q    So this is December 20, 2005, number four, and this is

21   number four in your e-mail to Mr. Lee?

22   A    Yes.

23   Q    Assuming the 2001 Letter H caps remain unchanged, but

24   were extended to all bargaining unit retirees, can we

25   confirm that an additional 3 million would be taken off the

1    balance sheet and that this would also provide 600 million

2    in savings on the P&L for 2005?

3        His response is:  If we extended Letter H to post-1996

4    union retirees, there would be an additional reduction in

5    liability of 10 million, and a corresponding reduction in

6    expense of 1.6 million.  If we further applied the cap to

7    all union retirees, there would be an additional reduction

8    in the liability of 2 million, and a $300,000 reduction in

9    expense.  Hence, if we applied the cap to all retirees, the

10   savings on the P&L would be 1.9 million instead of the

11   previous estimate of 600,000.

12       Did I read that correctly?

13   A    I believe that's right.

14   Q    Mr. Korber, on December 20th, 2005, you were engaging

15   in an exchange with the actuary for the company on whether

16   to apply Letter H to all retirees, and you did so in the

17   context of how much it would save on the balance sheet,

18   didn't you?

19   A    I was asking the actuary to tell me what the actuary

20   thinks.

21   Q    And he told you?

22   A    He did.

23   Q    In response to a question you posed?

24   A    Yes.

25   Q    Let me hand you Plaintiffs' Exhibit 341.

```
 1            Mr. Korber, is this an October 23rd, 2008, e-mail from
 2       Duane Lee to Robert Crooks with a copy to you?
 3       A    It is.
 4       Q    Did you receive a copy of it, sir?
 5       A    I'm sure I would have.
 6            MR. COOK:  I don't like to read so much into the
 7       record, Your Honor, but these are important so I'm going to
 8       do a little bit of that here.
 9       BY MR. COOK:
10       Q    The first paragraph is:  Bob, hope all is well.  Been
11       I while since I last sent you one of these e-mails.
12       Luckily this one includes what I think is good news.
13            Second paragraph:  In summary, the FAS 106 expense for
14       2008 is estimated to be an income of $598,000 under the
15       GAAP accounting and an expense of 2,557,000 under the
16       International Accounting Standard, paren, IAS close paren.
17       These numbers compare with the 2008 forecast of an income
18       of 58,000 under GAAP and an expense of 2,936,000 under IAS.
19       The reduction in expense is primarily due to a significant
20       reduction in the retiree medical enrollment from 2007 to
21       2008.  It appears that the number of retirees enrolled for
22       medical coverage dropped from 238 at January 1st, 2007, to
23       150 at January 1st, 2008.  As a result, the total actuarial
24       liability, paren APBO, all caps, close paren, decreased
25       from 25.6 million as of December 31st, 2007, to
```

1    19.9 million as of January 1st, 2008.  These numbers are

2    based on the same actuarial assumptions as used to

3    determine the December 31st, 2007, disclosure results

4    including a 6.25 percent discount rate.

5        Did I read that correctly?

6    A    That's what Mr. Lee says.

7    Q    Mr. Korber, is this the first report after a full year

8    of the contributions required by M&G Polymers for retirees

9    to stay in the benefit plan?

10   A    It may have been.

11   Q    And the result is that about 88 families dropped out,

12   correct?

13   A    That's one of Mr. Lee's statements, yes.

14   Q    Did the company consider that to be good news?

15   A    No.

16   Q    Mr. Lee considered it to be good news?

17   A    That's what he says.

18   Q    And are you familiar with the concept of adverse

19   selection?

20   A    I suppose it depends on the context.

21   Q    In an employee benefit plan, a health plan.  Do you

22   know what that means?

23   A    I can't say that I do.

24   Q    My understanding of adverse selection, sir -- and you

25   can disagree with me if you wish.

```
 1              MR. WEALS:  I object, Your Honor.  He said he

 2    doesn't know anything about it.

 3              MR. COOK:  He said in the context.

 4              THE COURT:  And then you said in the employment

 5    context and he said, "I can't say that I do."

 6    BY MR. COOK:

 7    Q    In the employment benefit health plan context, you've

 8    never heard of that phrase?

 9    A    No.

10    Q    Okay.  I'll move on.

11         Did you testify on direct examination that some of the

12    costs for retiree groups were going up because of fewer

13    people in the plan with higher claims?

14    A    That's one of the things that affected the

15    contribution rates, yes.

16    Q    That, sir, is adverse selection by definition --

17              MR. WEALS:  Objection, Your Honor.  Mr. Cook is not

18    allowed to testify.

19              THE COURT:  Sustained.

20    BY MR. COOK:

21    Q    But you do agree that as the number of participants

22    has dropped, the average cost of the claims has gone up?

23    A    The average contribution rate has gone up, yes.  The

24    claims wouldn't necessarily go up.

25    Q    Let me show you Defendants' Exhibit 210.
```

1      Mr. Korber, Defendants' Exhibit 210 appears to be a

2   November 29th, 2006, e-mail from you to Jeanette Stump

3   regarding the 11-30 meeting; is that correct?

4   A    Yes.

5   Q    Is this a response that you sent to Jeanette Stump at

6   the Steelworkers following up on some inquiries that she

7   made in the November 30th, 2006, meeting?

8   A    Well, I think these were requests she had for

9   information prior to the November --

10  Q    Oh, prior to the meeting.  I apologize.  Right.  She

11  was asking for information before she came to the meeting?

12  A    Yes.

13  Q    She asked you:  Did M&G Polymers publish a P&I booklet

14  prior to the one dated November 6th, 2006?

15       And what was your response?

16  A    I'm sorry.  Which question were you on?

17  Q    The very first request.

18  A    It's reply:  No, M&G bought the business in mid-2000,

19  so the November 2000 booklet is the first P&I booklet that

20  M&G produced.

21  Q    Let's go down to the -- not the next request but the

22  following question.

23       Request:  When a bargaining unit employees retires,

24  does he receive from the company a copy of the P&I

25  Agreement?

1        And what was your reply?

2    A    My rely was:  They have one already.  The P&I

3    Agreement is always available to active employees from

4    either the union or the company, so any new retiree who

5    wants one already has it.  We would certainly provide one

6    on request at any time, as would the union.

7    Q    And the next request that she made was:  Does he have

8    a copy of the SPD?

9        And what's your reply?

10   A    I say I'll have to check on how this has been handled.

11   Most of our active as well as retired employees have

12   probably looked to the P&I booklet for a guide to their

13   retirement, health benefits and plan options.

14   Q    Most of our active as well as retired employees have

15   would probably looked to the P&I booklet for a guide to the

16   retirement health plan options, benefits and plan options,

17   correct?

18   A    Yeah, probably.  That's right.

19   Q    And you told that to Jeanette Stump?

20   A    I did.

21   Q    And that booklet is the eight-and-a-half-by-eleven,

22   spiral bound on the left-hand side that was produced after

23   the 2000 negotiations?

24   A    In 2000, that's the format, yes.

25   Q    Let me hand you Defendants' Exhibit 220.

1          What is this document, sir?

2     A    It appears to be a set of notes from the discussion we

3     had with the Steelworkers on December the 5th, 2006.

4     Q    And whose notes are they?

5     A    They're not mine, I know that.

6     Q    Were they taken by Mr. Long?

7     A    I don't know.

8     Q    And the person who normally types up your notes, Pam

9     Cook, she's not even present, is she?

10    A    That's correct.

11    Q    Did these come from the company's records?

12    A    I would assume not.

13    Q    Then I will ask no questions.

14         Mr. Korber, let me hand you Plaintiffs' Exhibit 178.

15    Do you recognize this document, sir?

16    A    I do.

17    Q    Tell the Court what this is.

18    A    This was a fax I received from a gentleman by the name

19    Dick Hense at Goodyear.  The fax was from 2-6-2004.

20    Q    And this gentleman works for Goodyear?

21    A    Yes.

22    Q    And what is attached to the fax?

23    A    A copy of Letter C from October – it doesn't specify a

24    date – 2000.

25    Q    And who is the letter between or addressed to and

1    from?

2    A    Between Goodyear and -- I'll have to look and see the

3    signature on the bottom line -- and the Steelworkers.

4    Q    So why did you request this letter?

5    A    I don't know that I requested the letter.

6    Q    How did you come to have it?

7    A    I had a conversation with Jim Allen.

8    Q    From Goodyear?

9    A    From Goodyear.

10   Q    And what did Mr. Allen -- don't tell me what he hold

11   you, that's hearsay.  Why did you call him?

12   A    I was wanting to sort of round out my knowledge of

13   Letter H, quite frankly.

14   Q    But this is Letter C.

15   A    Yes.

16   Q    So what does this have to do with Letter H?

17   A    My understanding of it was Letter C talked about plan

18   designs.

19   Q    And is Letter C in the 2000 M&G Polymers Local 644 P&I

20   Agreement, this Letter C?

21   A    This particular Letter C, no.

22   Q    Did you see this particular Letter C in the 1997 Shell

23   Chemical Local 644 P&I Agreement?

24   A    I believe there was a Letter C.

25   Q    Was it this letter?

```
1    A    No, not from 2000.
2         MR. COOK:  May I have a moment, Your Honor, to see
3    if I can wrap this up?
4         THE COURT:  Yes, of course.
5    BY MR. COOK:
6    Q    Mr. Korber, do you maintain records of the number of
7    retirees who continue to participate in the hourly retiree
8    medical plan at M&G?
9    A    I'm sure we do.
10   Q    Do you know the approximate number who continue to
11   participate as of today?
12   A    Not without checking those records.
13   Q    If I suggested to you, sir, that over 50 percent of
14   the original retirees had either died or withdrawn from the
15   program, would you disagree with me?
16   A    I would have no basis of disagreeing with you without
17   checking the records.
18   Q    Can we look at Plaintiffs' Exhibit 102, please?  This
19   is the January 1st, 2001, Letter H, Mr. Korber, that you've
20   referenced and you indicated was referenced also in Letter
21   of Understanding 2003-6.  If we could go down to -- scroll
22   down, please.  I want to look here.
23        Do you see anything in this letter that talks about
24   projection of monthly costs and requirement of monthly
25   contributions?
```

```
1    A    No, not in this letter, specifically.

2    Q    Isn't it true that Letter H, as you've referenced it,

3    always speaks in terms of annual costs and annual averages?

4    A    Letter H does, yes.

5    Q    Thank you very much.

6              THE COURT:  Redirect, if any?

7              Oh, I'm sorry.

8              MR. COOK:  No, you're right, Your Honor.  We are

9    finished with our cross-examination.

10             THE COURT:  Oh, you are?

11             MR. COOK:  Thank you, Mr. Korber.

12             THE WITNESS:  Thank you, Mr. Cook.  Would you like

13   your exhibit?

14             MR. COOK:  I move the admission of the exhibits

15   identified during Mr. Korber's cross-examination.

16             THE COURT:  All right.  Let's go through those.  In

17   order, starting with Plaintiffs, I have Plaintiffs'

18   Exhibit 38, a December 14, 2006, letter to Stuligross from

19   Korber identified by Korber.  Any objection?

20             MR. WEALS:  No objection, Your Honor. I'm sorry.

21   Joint Exhibit, Your Honor?

22             THE COURT:  Is that Joint?  I had it in the wrong

23   column, just a second.

24             Joint Exhibit 38 will be admitted without objection.

25             Again, I'm going to try to start with Plaintiffs'
```

 1   exhibits.  Plaintiffs' Exhibit 100, M&G represented

 2   employees' benefits charts and graphs, identified by

 3   Korber.  Any objection?

 4        MR. WEALS:  Your Honor, I don't believe that exhibit

 5   was offered.

 6        THE COURT:  I'm sorry.  Not identified by Korber.

 7        116.

 8        MR. COOK:  Your Honor, we believe it was.

 9        THE COURT:  No.  I remember distinctly now.

10        MR. COOK:  245?

11        THE COURT:  We're talking about 100.

12        MR. COOK:  Oh, 100.

13        THE COURT:  It sounds like a Laurel-and-Hardy thing

14   going on here.  Who's on first?

15        MR. COOK:  Document intensive case.

16        THE COURT:  I understand that.

17        Let's go with 116, the 11-15-01 e-mail from Lee to

18   Korber and series with assumptions of true-up, identified

19   by Korber.  Any objection?

20        MR. WEALS:  No objection, Your Honor.

21        THE COURT:  116 will be admitted without objection.

22        118, benefits programs strategy for M&G, identified

23   by Korber.  Any objection?

24        MR. WEALS:  No objection, Your Honor.

25        THE COURT:  Plaintiffs' 127, June 3rd, 2002, e-mail

1    from Haas to Korber with outline for discussion, identified

2    by Korber.

3         MR. WEALS:  Your Honor, I show that as already being

4    admitted and have no objection.

5         THE COURT:  Okay.  Good.

6         So it either had been or is now admitted without

7    objection.

8         128, June 14, '02 letter from Lee to Korber

9    involving FAS 106 valuation, identified by Korber.  Any

10   objection?

11        MR. WEALS:  I, likewise, show as being admitted

12   already and no objection.

13        THE COURT:  Do you have that listed as Plaintiffs'

14   Exhibit 128?

15        MR. WEALS:  Yes, I do, Your Honor.

16        MS. FISCHER:  Your Honor, we agree with defense

17   counsel.  These are the exhibits that came in with Duane

18   Lee.

19        THE COURT:  Oh, from the deposition?

20        MS. FISCHER:  Yes, Your Honor.

21        THE COURT:  I don't have those marked off yet.

22        What about 135, 7-22-03 e-mail from Korber to Lee.

23   Has that already been admitted?

24        MR. WEALS:  No, Your Honor.  I don't believe that

25   was offered.

```
 1              THE COURT:  Well, what do you mean not offered?
 2     He's offering it now.
 3              MR. WEALS:  I believe he said he was not going to
 4     offer it because Mr. Korber couldn't identify it.
 5              THE COURT:  I have it identified by Korber, but --
 6     7-22-03 e-mail from Korber to Lee for help in negotiations,
 7     identified by Korber, I thought.
 8              MR. WEALS:  I stand corrected, Your Honor.
 9              THE COURT:  Okay.  Good.  135, any objection?
10              MR. WEALS:  No objection.
11              THE COURT:  Thank you.  135 will be admitted without
12     objection.
13              I may get into some of the deposition ones here.
14     Plaintiffs' Exhibit 193, May 30, '04 e-mail from Marco to
15     Korber.  I'm sure that was in the deposition.  I thought it
16     was.  Wasn't it?  Okay.  Regarding retiree medicals,
17     identified by Korber, any objection?
18              MR. WEALS:  No objection.
19              THE COURT:  Thank you.
20              185, July 12, '04, e-mail from Korber to Lee in
21     regard to Letter H, identified by Korber.
22              MR. WEALS:  No objection.
23              THE COURT:  185 will be admitted without objection.
24              191, November 19, '04 e-mail from Lee to Korber
25     regarding expenses and Letter H, identified by Korber.
```

1          MR. WEALS:  I believe it was from Lee to Crooks.

2          THE COURT:  And copied to Korber.

3          MR. WEALS:  Correct.  No objection.

4          THE COURT:  Thank you.  191 will be admitted without

5     objection.

6          196, e-mail dated 2-9-05 involving 2004 expenses

7     identified by Korber.  Any objection?

8          MR. WEALS:  No objection.

9          THE COURT:  196 will be admitted without objection.

10         March 3, 2005, letter from Lee to Crooks in regard

11    to final 2004 expenses and 12-31-04 OPEB identified by

12    Korber as receiving a copy.

13         MR. WEALS:  Is that Plaintiffs' 198, Your Honor?

14         THE COURT:  Yes.

15         MR. WEALS:  No objection.

16         THE COURT:  198 will be admitted without objection.

17         Plaintiffs' 217, September 27, '05, e-mail from Lee

18    to Korber in regard to Letter H, identified by Korber.  It

19    could have been to Korber and Crooks.

20         MR. WEALS:  No objection.

21         THE COURT:  217 will be admitted without objection.

22         223 is a December 20, 2005, e-mail from Lee to

23    Korber in regard to answers to questions from Korber,

24    identified by Korber.  Any objection?

25         MR. WEALS:  No objection.

```
 1              THE COURT:  223 will be admitted without objection.
 2              Well, I'm not sure, but maybe just for complete
 3      purposes, 277, the Korber declaration identified by Korber,
 4      it's docket number 37-6, and page 1 of 36.  It's on the
 5      docket now, but just because it was discussed, I don't know
 6      whether you want it in or not.
 7              Well, I know plaintiff wants it in.  Do you want it
 8      in?
 9              MR. WEALS:  Your Honor, I believe there was only one
10      portion of it that was read into the record; is that
11      correct?
12              THE COURT:  That's correct.
13              MR. WEALS:  We don't object to the admission of that
14      portion.
15              THE COURT:  Thank you.  That one portion is page 1
16      of 36 on Plaintiffs' Exhibit 277 will be admitted without
17      objection.
18              Next one that I have -- I've got 341, an
19      October 23rd, 2008, I think, e-mail from Lee to Korber,
20      including or involving a 2008 FAS 106.  It might have been
21      to Korber and Crooks.
22              MR. WEALS:  Can I just look at that a second?
23              THE COURT:  Sure.
24              MR. WEALS:  No objection, Your Honor.
25              THE COURT:  341 will be admitted without objection.
```

 1          MR. WEALS:  I'm sorry.  341?

 2          THE COURT:  Yes.

 3          The rest of the exhibits on plaintiffs' side were

 4   not identified by Korber, but I have a 351 -- I've lost my

 5   train of thought here.  351 is a declaration of Chris

 6   Butler authenticating Exhibit 305.

 7          MR. COOK:  That was rejected yesterday, Your Honor.

 8          THE COURT:  Was it?  I couldn't remember why I had

 9   it on there.

10          Then going to joint exhibits, I think anything that

11   Mr. Korber may have identified has already been admitted.

12   I'm going now to defendants' exhibits.

13          April 4, '02, e-mail from Korber to Stewart,

14   Defendants' Exhibit 59.  Any objection?

15          MR. WEALS:  No objection.

16          THE COURT:  178, Defendants' Exhibit 178, fax cover

17   sheet from Dick Hense just recently referred to, identified

18   by Korber.  It has to do with Letter C.  Any objection?

19          MR. WEALS:  No objection.

20          THE COURT:  178 will be admitted without objection.

21          Defendants' 210, a November 29, '06, e-mail from

22   Korber to Stump in regard to information before the

23   November 30 meeting, identified by Korber.  Any objection?

24          MR. WEALS:  No objection.

25          THE COURT:  220 was not identified.

```
 1            If I'm correct, that's all of defendants' exhibits
 2     that were identified.  There may be others.
 3            I'm sorry, you guys keep jumping up and down.
 4            Ms. Fischer.  All right.
 5            MS. FISCHER:  Your Honor, Defense Exhibit 276 was
 6     previously admitted.  I'm not sure if it was in full or
 7     just certain pages by Defendants, I believe on direct.
 8            THE COURT:  On direct?
 9            MS. FISCHER:  I think so, Your Honor.
10            THE COURT:  Well, it could be.  I don't have it
11     listed.
12            Mr. Miller, do you have Defendants' Exhibit -- oh,
13     wait a minute.  I've got plaintiffs pulled up.
14            I do, and it was already admitted and it was certain
15     pages.
16            MS. FISCHER:  Your Honor, we'd like to add page
17     26716 that was used on cross.
18            THE COURT:  26716 has already been admitted.
19            MS. FISCHER:  Your Honor, I'm just kidding.
20            THE COURT:  I knew you were.  It was 26714 through
21     26716.  But thanks for keeping me on my toes.
22            MS. FISCHER:  Thank you, Your Honor.
23            THE COURT:  Anything else from plaintiffs' side?
24            MR. COOK:  One moment, Your Honor.  We're going to
25     do a quality check, if you'll have just a moment of time.
```

```
 1              THE COURT:  Are you trying to say you don't trust
 2     me?
 3              MS. FISCHER:  Thank you, Your Honor.  We just wanted
 4     to check on three plaintiffs' exhibits.  I believe 269 and
 5     271 were admitted during the cross.  So those probably are
 6     already in.
 7              THE COURT:  269 was, and what's the other one?
 8              MS. FISCHER:  271, Your Honor.
 9              THE COURT:  Both of them were, yes.
10              MS. FISCHER:  And then the last one we have is
11     Plaintiffs' 255.
12              THE COURT:  It's an e-mail from Lee to Crooks, and
13     that's all I have.
14              MR. WEALS:  Your Honor, I believe I raised an
15     objection.  I think that Mr. --
16              THE COURT:  I don't think Mr. Korber identified it.
17              MR. COOK:  I don't think I offered it.
18              THE COURT:  Oh, you didn't offer it at all?
19              Well, I know it was mentioned, and then I think you
20     withdrew it or didn't offer it because of the responses
21     received from Mr. Korber.
22              MS. FISCHER:  Okay.  Thank you, Your Honor.
23              THE COURT:  All right.
24              Now, Defendants, before you -- let's just get any
25     other exhibit issues out of the way, if you have any.
```

```
 1              MR. WEALS:  I don't believe so.

 2              THE COURT:  All right.  Good.

 3              Just out of an abundance of caution, Mr. Miller, you

 4    had two and you're not sure why you had them written down.

 5              THE DEPUTY CLERK:  I think maybe they were mentioned

 6    but not offered.  219.

 7              THE COURT:  For Plaintiffs'?

 8              THE DEPUTY CLERK:  Plaintiffs, yes, Judge.

 9              MS. FISCHER:  It was a deposition transcript.

10              THE DEPUTY CLERK:  And the other one I had, I may

11    have mistyped this, 34, Plaintiff's Exhibit 34.  No?  Okay.

12              Everything else I have, Your Honor, matches with

13    what's been admitted.

14              THE COURT:  Thank you, Mr. Miller.

15              All right, then, redirect, Mr. Weals, if any?

16              MR. WEALS:  Yes, Your Honor.

17              I won't make any promises.

18                               - - -

19                      REDIRECT EXAMINATION

20    BY MR. WEALS:

21    Q    If you could pull up, please, Defendants' Exhibit 48.

22         Mr. Korber, I believe that you testified about this on

23    direct examination, and there's been various questioning

24    concerning the P&I Agreement.  Can you just confirm for me

25    who you received this document from?
```

```
 1    A    I received this document from Rex Rousch.

 2    Q    Did you ever talk to Mr. Stewart, who was the union

 3    president, about this document?

 4    A    I did.

 5    Q    And can you relay to me what the substance of that

 6    was?

 7    A    We discussed what the P&I Agreement, how it was going

 8    to be modified for purposes of the Apple Grove plant, and,

 9    in fact, we had taken a look at this document together.

10    Q    So you actually -- the two of you looked at it

11    together?

12    A    We did.

13    Q    If you could pull up Joint Exhibit Number 7.  This is

14    the completion of acquisition of the PET business by M&G

15    Polymers.  If you could turn to page 7246.  And Mr. Cook

16    asked you some questions about the agreements listed here,

17    and I believe you testified that there's no mention of

18    Letter G or Letter H on this page; is that right?

19    A    Not under iii.

20    Q    And you're familiar with the Collective Bargaining

21    Agreement and the P&I Agreement for the Apple Grove

22    facility, aren't you?

23    A    I am.

24    Q    Now, looking at this list of Letters of Agreement and

25    Letters of Understanding, does that look like a complete
```

1    list of all the applicable Letters of Agreement and Letters

2    of Understanding?

3    A    No, it does not.

4    Q    What's missing?

5    A    Well, at this particular point in time, my

6    understanding is -- well, let me put it this way.  Maybe a

7    very simple example would be there was, in the negotiations

8    in 2000, a packet of letters, that, as I understood, it was

9    negotiated out.  And there was probably -- I don't know.

10   It seemed to me at the time, as I understood it, there had

11   to be 25, 30 letters.

12   Q    Did anyone ever contend that the letters that were not

13   listed on this particular page were not applicable?

14   A    No.

15   Q    Now, Mr. Korber, you were shown a series of

16   correspondence with Buck Consultants and others related to

17   the FAS 106 liability and the -- Mr. Cook pointed out the

18   absence of any reference to Letter H in those

19   communications.

20        Now, let me ask you:  At any time prior to

21   January 1st of 2007, did M&G actually collect contributions

22   from retirees for medical benefits?

23   A    No.  We had actually deferred commencement dates a

24   number of times.

25   Q    And based on your understanding of 1997 Letter H,

1    going into the 2003 negotiations, did you have any

2    expectation about whether retiree medical might be a

3    subject of negotiation?

4    A    I assumed it was going to come up, yes.

5    Q    In terms of these communications that you were shown

6    dealing with retiree medical issues that did not make

7    reference to Letter H, let me ask you this:  After you

8    became aware of the 1997 Letter H -- and remind me when

9    that was?

10   A    That would have been probably sometime -- well, the

11   first time I became aware of it was in February of 2001.

12   Q    So, after you became aware of the 1997 Letter H, what

13   was your understanding of how the FAS 106 accounting worked

14   in terms of taking into account retiree contributions?

15   A    I'm not an actuary but, ultimately, as I became more

16   aware of these things, that there was a contribution

17   commencement date that was going to be set out into the

18   future.  And how an actuary would treat that or consider

19   that, I really couldn't speak to.

20   Q    Did you have any understanding as to whether or not

21   contributions that had not yet been collected would be

22   factored into the FAS 106 liability?

23   A    I had a point of view.

24   Q    What was that?

25   A    Well, my thought at the time was that if you had a

1    commencement date that was out in the future, you probably

2    wouldn't want to start taking credit for that until you

3    actually started to commence with the contribution

4    collection.

5            MR. WEALS:  I have no further questions.

6            THE COURT:  Anything further on recross?

7            MR. COOK:  I hope to keep this brief.

8            THE COURT:  So do I.

9            MR. COOK:  I think we're on the same page, Your

10   Honor.

11                        - - -

12                 RECROSS-EXAMINATION

13   BY MR. COOK:

14   Q    Mr. Korber, you weren't present for the principal

15   negotiations of the 2000 M&G Local 644 CBA, were you?

16   A    No, I was not.

17   Q    Isn't it true -- or wasn't it reported to you by

18   Mr. Rousch and others that the packet of letters taken out

19   of that agreement were letters that simply no longer

20   applied?

21   A    Well, they were letters that the parties had worked

22   through.  This was one of the items that they had.  They

23   were letters that the parties had worked through that, in

24   fact, were letters that, to my understanding, had never

25   been put into the CBA.

```
1              THE COURT:  That what?

2              THE WITNESS:  They had never been put into the CBA.

3     But they were side letters, if you will, Your Honor, things

4     that gave meaning --

5              THE COURT:  No, don't say "side letters, if you

6     will, Your Honor."  That doesn't tell me anything.  What

7     are they?

8              THE WITNESS:  They're agreements between the parties

9     that weren't published in the Collective Bargaining

10    Agreement.

11    BY MR. COOK:

12    Q    If they're not published, how do you take them out?

13    A    I think what the parties were trying to accomplish, as

14    I understand it, is the letters were there, the parties

15    would rely on them, they wanted to formally make a

16    decision, a joint decision that those letters were no

17    longer going to be in operation between the parties.

18    Q    Now, there was one letter in the CBA that the parties

19    agreed to take out in the CBA and that was Letter H in the

20    CBA, wasn't it?

21    A    That was in the published CBA, yes.

22    Q    And you testified about what your understanding of FAS

23    106 was, and the effect of this cap commencement date, but

24    you're not an actuary, are you?

25    A    No, I'm not.
```

VOL. V    240

1   Q    And you didn't communicate that information to the

2   actuary to let the actuary make the determination of the

3   effect of such a letter on the FAS 106 liability until some

4   time in 2004, did you?

5   A    Late 2003, 2004, once we had information.

6   Q    The written documentation that's shown to this Court

7   was July of 2004, correct?

8   A    That was one of the documents you showed me, yes.

9             MR. COOK:  I have nothing further.

10            THE COURT:  Mr. Weals, anything further?

11            MR. WEALS:  Nothing further, Your Honor.

12            THE COURT:  Wow.  Mission accomplished.  We got it

13   done today.

14            Thanks, gentlemen, for all your hard work in getting

15   this done.  I mean that.

16            Mr. Korber, you may step down.  Thank you.

17            THE WITNESS:  Thank you, Your Honor.

18            THE COURT:  So, as I understand it, we'll resume on

19   Monday with Mr. Long.

20            MR. COOK:  At 8:30, Your Honor?

21            THE COURT:  Probably 8:30, does that suit as far as

22   getting him on and off, Mr. Long's schedule?

23            MR. MISCIMARRA:  He's not going to be a long witness

24   for us.

25            THE COURT:  Yes, he will be, his name is Long.

```
 1            MR. COOK:  I bit my lip.

 2            THE COURT:  I couldn't help myself.  I'm sorry.

 3            MR. COOK:  Your Honor, I think we're all a little at

 4    this tired stage.

 5            THE COURT:  That wasn't even funny and we're all

 6    laughing at it.

 7            MR. MISCIMARRA:  Your Honor, will we also have

 8    closing argument on Monday?

 9            THE COURT:  Well, I anticipate that, but that's up

10    to you guys.

11            MR. MISCIMARRA:  That would be our request.

12            THE COURT:  I can't imagine you want to come back

13    Tuesday to bore me.

14            MR. COOK:  How many nights in a row?

15            Your Honor, with respect to closing argument, while

16    we understand the need of Mr. Miscimarra to verbalize his

17    arguments, we believe it would be more effective, at least

18    from Plaintiffs' perspective, if the Court had specific

19    issues or areas of the testimony or evidence that it wished

20    to be addressed in closing.

21            If that's the Court's desire, or you found that

22    acceptable, we would appreciate the ability to focus on

23    those issues the Court would like to address.

24            THE COURT:  Well, you know, I appreciate that

25    thought.  Here is my problem.  As soon as I start
```

1    identifying areas that I think I need elucidation on,

2    everybody gets hinkey, they always get hinkey.  Oh, my God,

3    what's he thinking about?  This or that?  Or this or that?

4    Oh, we need to get a rebuttal witness on the stand right

5    away.

6         So I have resisted those efforts in the past and

7    I'll resist them now.

8         MR. COOK:  We understand, Your Honor.

9    Mr. Miscimarra just mentioned closing argument, but we have

10   reserved the right to rebuttal.  We don't anticipate any at

11   this time, but the case is not over.

12        THE COURT:  I understand that and I recognize that,

13   and so does he.

14        Well, there have been times when people just

15   submitted a written closing.  But the problem with that is

16   Plaintiff goes first, Defendant goes second and Plaintiff

17   has a rebuttal, and you would not have the opportunity for

18   rebuttal in that regard.  Do you see what I'm saying?

19        MR. COOK:  Yes.

20        THE COURT:  So I think we'll have to do it

21   traditionally.  Somehow somebody has thought this out a lot

22   more than we have before now, so let's just do it the

23   traditional way and work through it.

24        I mean, as soon as you try to change things around,

25   something gets messed up.  And I appreciate everybody's

1    thoughts about getting it done in a different way or a more

2    effective way but I don't think it's going to work.

3         Let's see everybody on May 16th, '11 at 8:30.  Thank

4    you.

5         Drive carefully.  It's Friday the 13th.

6      (Proceedings concluded at 4:20 p.m.)

7                          – – –

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              – – –

2                        WITNESS INDEX

3                              – – –

4        WITNESSES              DIRECT    CROSS    REDIRECT    RECROSS

5        DEFENDANT'S:

6    Kimm Korber                 46       154        234        238

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

        We, Shawna J. Evans, and Denise Errett, do hereby

certify that the foregoing is a true and correct transcript

of the proceedings before the Honorable Gregory L. Frost,

Judge, in the United States District Court, Southern

District of Ohio, Eastern Division, on the date indicated,

reported by us in shorthand and transcribed by us or under

our supervision.




                              <u>s/Denise Errett</u>
                              Denise Errett, RMR, FCRR
                              Official Federal Court Reporter


                              <u>s/Shawna J. Evans</u>
                              Shawna J. Evans, RMR
                              Official Federal Court Reporter