1              UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF OHIO

3                   EASTERN DIVISION

4    HOBERT FREEL TACKETT, ET AL.,   .
                                      .        CASE NO. 2:07-CV-126
5                   PLAINTIFFS,       .
              VS.                     .        COLUMBUS, OHIO
6                                     .        MAY 16, 2011
                                      .
7    M&G POLYMERS USA, LLC, ET AL., .
                                  .
8                   DEFENDANTS.    .
     . . . . . . . . . . . . . . .
9
                          **VOLUME VI**
10         ***TRANSCRIPT OF BENCH TRIAL PROCEEDINGS***
            BEFORE THE HONORABLE GREGORY L. FROST
11              UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES OF COUNSEL:

14   FOR THE PLAINTIFFS:        DAVID M. COOK, ESQUIRE
                                JENNIE G. ARNOLD, ESQUIRE
15                              LAURA L. FISCHER, ESQUIRE

16   FOR THE DEFENDANTS:        PHILIP MISCIMARRA, ESQUIRE
                                JOHN RICHARDS, ESQUIRE
17                              DEBORAH S. DAVIDSON, ESQUIRE
                                CHRISTOPHER A. WEALS, ESQUIRE

18

19

20                          – – –

21

22

23

24        DENISE N. ERRETT, FEDERAL COURT REPORTER
                 (614) 719-3029

25

```
 1                    Monday Morning Session

 2                    May 16, 2011

 3                    8:30 a.m.

 4                    - - -

 5     IN OPEN COURT:

 6            THE COURT:  May 16, 2011.  This is the sixth day of

 7     Tackett vs. M&G Polymers.  We concluded with the testimony

 8     of Kimm Korber on Friday afternoon.

 9            Defense, your next witness, please?

10            MR. COOK:  Your Honor, before that, I wanted to just

11     make a note to the Court.  The USW Representative Brian

12     Wedge has been called away on business.  And with the

13     Court's permission, the USW would like Ms. Shipley to be

14     their representative today.  Mr. Wedge may be back

15     tomorrow.

16            THE COURT:  Tomorrow?  I wasn't even planning on

17     tomorrow.

18            MR. COOK:  He's prepared if necessary.

19            THE COURT:  I see.  Okay.  Good.

20            Don't mess up my plans here.

21            MR. COOK:  Thank you, Your Honor.

22            THE COURT:  All right.  Ms. Shipley will be

23     designated as a representative for the Steelworkers.

24            Now, Defense, your next witness, please?

25            MR. MISCIMARRA:  We'll call Robert Long as our next
```

```
 1    witness.

 2              THE COURT:  Robert Long, please.

 3              (Whereupon, the witness was sworn in by the

 4    Courtroom Deputy Clerk.)

 5              THE COURT:  All right.  Mr. Long, would you state

 6    your full name?  And spell your last name for the record,

 7    please.

 8              THE WITNESS:  Robert C. Long, L-O-N-G.

 9              THE COURT:  Thank you.

10         Mr. Miscimarra, you may proceed with direct

11    examination.

12              MR. MISCIMARRA:  Thank you, Your Honor.

13                            - - -

14                       ROBERT C. LONG,

15    AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

16                            - - -

17                     DIRECT EXAMINATION

18    BY MR. MISCIMARRA:

19    Q.   Mr. Long, where do you currently work?

20    A.   I'm a shareholder at the law firm of Littler

21    Mendelson.

22    Q.   And how long have you been at Littler Mendelson?

23    A.   Since August of 2003.

24    Q.   And prior to that time, where did you work, Mr. Long?

25    A.   Prior to joining Littler Mendelson, I was an
```

1    associate, and then an equity partner for a number of

2    years, at Seyfarth, Shaw, Fairweather & Geraldson in

3    Chicago, Illinois.

4    Q.   And were you a partner at Seyfarth Shaw?

5    A.   I was from approximately January, 1986, until I

6    resigned at the end of July, 2003.

7    Q.   And how long did you work at Seypharth Shaw, total?

8    A.   It was a total of about 24 years.

9    Q.   And can you explain, generally, what type of work that

10   you do, what type of practice that you maintain?

11   A.   Throughout my career, I've been a labor and employment

12   lawyer representing management exclusively.

13   Q.   And, Mr. Long, what's the total length of time as an

14   attorney that you've participated in labor negotiations on

15   behalf of management?

16   A.   Since approximately 1983-84, a majority of my practice

17   has been engaged in collective bargaining on behalf of

18   management.

19   Q.   And in what city do you maintain your physical office

20   at Littler Mendelson?

21   A.   My home office is here in Columbus, Ohio.

22   Q.   Are you a member of the Ohio Bar?

23   A.   I am.

24   Q.   And can you provide some estimate of the total number

25   of different sets of management labor negotiations in which

1    you have participated over the years?

2    A.   Well over 200, maybe over 300, negotiations.

3    Q.   Have you participated in any set of labor negotiations

4    that involved or resulted in a strike?

5    A.   No.

6    Q.   Have you ever participated in any set of labor

7    negotiations that ended up causing or resulting in any kind

8    of union decertification election?

9    A.   No.

10   Q.   Have you had involvement in a collective bargaining

11   involving a facility owned by M&G Polymers located in Apple

12   Grove, West Virginia?

13   A.   I have.

14   Q.   And approximately when did you first participate in

15   collective bargaining involving M&G's Apple Grove facility?

16   A.   I first began representing M&G Polymers in collective

17   bargaining at the outset of the negotiations that began in

18   the fall of 2003, I think in September of 2003.

19   Q.   And I'd like to direct your attention to an exhibit.

20   It's Plaintiffs' Trial Exhibit 152.  And you have a hard

21   copy next to you.  And there is also -- this is being

22   displayed on the screen.

23        And, Mr. Long, would you identify and describe

24   Plaintiffs' Trial Exhibit 152, please?

25   A.   This was a company proposal presented on November

1    23rd, 2003, dealing with the issue of retiree medical

2    benefits.

3    Q.    And are you generally familiar with Kimm Korber's

4    handwriting?

5    A.    I am.

6    Q.    Whose handwriting is in the upper right-hand corner of

7    Plaintiffs' Trial Exhibit 152?

8    A.    That's Kimm Korber's handwriting.

9    Q.    And, this particular proposal, could you explain what

10    this particular proposal was intended to accomplish had it

11    been accepted by the union?

12    A.    It would have deferred the parties' discussion over

13    the issue of retiree medical benefits, including

14    cost-sharing arrangements and plan redesign issues, to a

15    point after the completion of the parties' negotiations and

16    entering into a contract that we were hoping to conclude

17    imminently.

18    Q.    And where in Plaintiffs' Trial Exhibit 152 does it

19    reflect the proposal to defer the discussion of retiree

20    medical issues?

21    A.    In the second paragraph, first sentence, it says:

22    "The Company and the Union have mutually agreed, during the

23    2003 negotiations, to defer the discussion of reasonable

24    cost- reduction measures concerning benefits for the

25    Company's preexisting retirees ('Retiree Benefits') in

1    order to permit these issues to be addressed in a

2    meaningful way, separate and apart from the other matters

3    that have been the topic of negotiation between the

4    parties."

5    Q.    And, Mr. Long, at the time that this particular

6    proposal was extended, what was the date that you

7    contemplated post-bargaining discussions could occur in

8    relation to retiree medical issues?

9    A.    In the first bullet point on page 1, we proposed that

10   the company and the union meet to discuss retiree benefits

11   commencing on January 31, 2004, or 60 days after the

12   effective date of the Collective Bargaining Agreement

13   succeeding the parties' 2000 through 2003 agreement.  So,

14   it was either January 31, 2004, or 60 days after the

15   conclusion of the negotiations, whichever is later.

16   Q.    And, Mr. Long, was this proposal intended to foreclose

17   the possible collection of contributions from retirees for

18   retiree medical benefits?

19   A.    No.

20         MR. COOK:  Objection.  Leading.

21         THE COURT:  No.  It doesn't suggest the answer.

22         THE WITNESS:  No.

23         THE COURT:  The objection is overruled.

24         THE WITNESS:  No.  This was not intended to

25   foreclose collection of contributions from retirees for

1    retiree medical benefits at all.

2    BY MR. MISCIMARRA:

3    Q.   Is that reflected anywhere in this proposal?

4        Let me ask you this question, Mr. Long:  Does this

5    proposal in any way waive or limit any party with respect

6    to any rights that may exist in relation to retiree medical

7    benefits?

8    A.   No.  Again, the point of this proposal was to defer

9    the whole conversation.  And on page 2, the top bullet

10   point on page 2 is a fairly broad statement that neither

11   party was limiting their rights and options with regard to

12   the discussion of retiree benefits as contemplated by this

13   proposal to take place shortly after the conclusion of this

14   negotiation.

15   Q.   And, Mr. Long, as kind of a more general question, was

16   this proposal intended to encompass discussions about

17   retiree medical benefits involving M&G's preexisting

18   retirees?

19   A.   Oh, yes.  And I think that's clear.  On page 1,

20   Paragraph 2, again, that first sentence:

21       We propose that the Company and Union, again, mutually

22   agreed, during the 2003 negotiations, to defer the

23   discussion of reasonable cost-reduction measures concerning

24   benefits for the Company's preexisting retirees...

25       And then there's -- the defined term "Retiree

1    Benefits" refers to preexisting retirees.  And I believe

2    that term, preexisting retirees, or reference to

3    preexisting retirees, is used elsewhere.

4         Give me a moment.

5         In the second bullet point on this first page, the

6    very last line speaks to -- the last phrase is to the

7    company's preexisting retirees.

8    Q.   And, Mr. Long, was this particular proposal limited to

9    discussions about the cost of retiree medical benefits, or

10   was it broader?

11   A.   It was broader.  Again, we didn't want to foreclose

12   the opportunity for the parties to discuss in a substantive

13   way issues of both plan design, as well as the cost sharing

14   of the expense of retiree medical benefits.  So, I mean, it

15   was intended to address both.

16   Q.   And let me direct your attention to the third bullet.

17   It says:  The parties further agree that the discussions

18   will also include, but not be limited to, potential benefit

19   plan changes or consolidations.

20   A.   Yes.

21   Q.   And then it continues, and it talks about the costs or

22   burdens associated with small insured groups and multiple

23   or overlapping benefits plans.  Do you see that?

24   A.   Yes.

25   Q.   In 2003, was there any M&G retiree medical benefit

1    program that gave rise to potential issues associated with

2    a small insured group?

3    A.   Yes.  There was a plan known as the Medical Necessity

4    Benefits Program that was a small group.  It had been

5    closed to retirees in the late '90s.  There was, as I

6    understood it, about 40 retirees at the time who were

7    participants in that program.  And it was, relatively

8    speaking, a very expensive program, and a very small group

9    of preexisting retirees were participating in that program.

10       There were two other plans in effect, the Catastrophic

11   Plan and a Comprehensive Plan.  Most of the retirees were

12   in the Comprehensive Plan.  But that would be the reference

13   to multiple or overlapping benefit plans.  There were three

14   of them, and there was one, in particular, that was very

15   expensive and relatively small.

16   Q.   And you've indicated, Mr. Long, that this proposal,

17   Plaintiffs' Trial Exhibit 152, encompasses preexisting

18   retirees, generally.  At the top of the first page, there

19   is a caption that makes specific reference to Medical

20   Necessity Benefits Program.  And apart from what you've

21   already described, is there anything about the Medical

22   Necessity Program that made it stand out from the other

23   retiree medical benefit programs that existed at the time

24   for M&G?

25   A.   Well, again, it was very expensive.  It was small.  It

1    was a closed plan that had been closed to retirees in, I

2    believe, in the late '90s.  And it certainly was a plan

3    about which plan design negotiations were going to be a

4    focal point.

5    Q.   Now, was there some point in 2003, Mr. Long -- I'm

6    done with this particular document.  Was there some point

7    in 2003 when somebody for the union stated, in

8    negotiations, that the union was unwilling to discuss

9    existing retiree benefits?

10   A.   Yes.  Karen Shipley made that statement in a

11   bargaining session, I believe on December 12th, in

12   connection with reviewing the company's proposal we've just

13   looked at.

14   Q.   And, in substance, what do you recall Ms. Shipley

15   saying on December 12th, 2003, when this first came up?

16   A.   In substance, she said that she considered the

17   negotiation over retiree medical benefits to be a

18   permissive subject of bargaining about which the union was

19   not obligated to negotiate and that they only wanted to

20   talk about retiree medical programs for active employees

21   that would become effective upon their retirement.

22   Q.   And then what occurred or what exchanges ensued after

23   that subject was first raised by Ms. Shipley?

24   A.   Well, after that statement by her and her general

25   commentary about the union's general position with regard

1    to retiree medical negotiations, there was a union caucus.

2    Actually, I think there were two union caucuses in

3    succession.  And, after that, Ms. Shipley and her

4    bargaining committee returned to the joint session and

5    reversed course on that issue as it related to these

6    negotiations and mentioned that there was a letter that had

7    been entered into by the parties -- she referred to it as a

8    FASB letter -- that was binding on the company.

9         And a gentleman named Sam Stewart, who was on their

10   committee, stated that there was a letter he referred to as

11   Letter H, I think, that had been entered into in the past

12   that was part of the binding agreement between the

13   Steelworkers' Union and M&G Polymers.

14   Q.   Now, Mr. Long, during the M&G bargaining in 2003 and

15   subsequent years, could you please describe your personal

16   practice regarding the taking of notes about what was said

17   in bargaining?

18   A.   My practice was to have a laptop with me at all times,

19   and I would take notes of the negotiations.  I would take

20   notes of our management caucuses, as well.  I would make

21   notes to myself of things to follow up on with my

22   bargaining committee.  I tended not to take very good notes

23   of what I said, because I was talking, but I would take

24   notes of what the union representatives would say as they

25   were speaking.  So, as they were talking, I was taking

1   notes simultaneously.

2   Q.   And did you take your notes in the regular course of

3   your work representing M&G in the bargaining that was

4   taking place?

5   A.   Yes.

6   Q.   I would like to direct your attention to a document

7   we've marked Defendants' Trial Exhibit 315.  Would you

8   please take a look at that document?

9   A.   (Witness complies.)

10  Q.   And, please, after you've had an opportunity to review

11  the document, Mr. Long, could you please identify, and

12  briefly describe, Defendants' Trial Exhibit 315?

13  A.   Defendants' Trial Exhibit 315 is a redacted copy of my

14  personal notes from Bargaining Session No. 35 that was held

15  on December 12, 2003.

16  Q.   And there are some areas that say "Redacted."  At any

17  time during the session that occurred on December 12th,

18  2003, did you write down any instructions to yourself or

19  write in this document advice you provided to the company

20  while away from the bargaining table?

21  A.   Yes.  And those are the portions that would have been

22  redacted here.

23  Q.   And could you point out the first place in these notes

24  for December 12, 2003, where Ms. Shipley stated existing

25  retiree benefits were a permissive bargaining subject that

```
 1     she was unwilling to discuss?
 2          MR. COOK:  Your Honor, I'm going to object at
 3     this --
 4          THE COURT:  You okay?
 5          MR. COOK:  Yeah.  The chair just got me.
 6          I apologize.  Our objection is the same.  They're
 7     proffering these as business records.  They are, in fact,
 8     an attempt to confirm, or corroborate, his testimony, which
 9     is -- the best evidence is his recollection.  He's not
10     shown any evidence of a lack of recollection of these
11     events.
12          Does anyone have a Band-Aid?
13          THE COURT:  I was going to say --
14          COURTROOM DEPUTY CLERK:  I've got some in chambers.
15          THE COURT:  Yeah, we can get one.  We'll send you
16     information on how to file the Workers' Comp claim.
17          MR. COOK:  Federal Tort Claim Act, Your Honor.
18          THE COURT:  Yeah.  Yeah, there you are.
19          You've got a Band-Aid?
20          MR. COOK:  I do.
21          THE COURT:  Who had the Band-Aid?
22          MS. ARNOLD:  (Raises hand.)
23          MR. COOK:  My team came prepared.
24          THE COURT:  Wow!  Pretty amazing.
25          All right.  The objection, Mr. Miscimarra, do you
```

1    wish to respond?

2         MR. MISCIMARRA:  Yeah, Your Honor.  It's the same

3    issues that's come up previously.  Mr. Long was acting as

4    an agent of the company.  These are notes that he prepared

5    in a manner that is similar to the notes, the company

6    notes, that were prepared by a note-taker, except, as Mr.

7    Long has expressed, these were also contemporaneous notes.

8    For that reason, I believe that they are properly

9    admissible.

10        THE COURT:  And they're the same as the union notes

11   that have already been introduced and admitted, right?

12        MR. MISCIMARRA:  Without question.

13        THE COURT:  The objection is overruled.

14   BY MR. MISCIMARRA:

15   Q.   Mr. Long, could you please point to the first place in

16   your notes for the December 12th, 2003, bargaining where

17   Ms. Shipley said the existing retiree benefits were a

18   permissive bargaining subject?

19   A.   Turn to page 8039.  Under the second redacted marker,

20   at the paragraph that follows that second redacted marker,

21   is where my notes reflect her conversation about the

22   union's view that it was a permissive subject of bargaining

23   to address the issues that we had raised in our letter of

24   November 23rd that we just were discussing.

25   Q.   So that the letter of November 23rd was the company's

```
1    earlier proposal regarding retiree medical benefits?

2    A.   Yes.

3    Q.   And then you're referring to where the phrase appears,

4    in your notes "It is permissive" in the third paragraph

5    from the bottom on page 8039?

6    A.   It is, yes.

7    Q.   That was a statement made by Ms. Shipley?

8    A.   It was in substance, yes.

9    Q.   And could you please take a look at the following

10   paragraph?  This is the second paragraph from the bottom of

11   the page.

12   A.   Uh-huh.

13   Q.   It says:  "Only willing to discuss active employees

14   and their current level of benefits when they are up for

15   retirement"?

16   A.   Right.

17   Q.   Who made that statement in the negotiations?

18   A.   These were statements made by Ms. Shipley.

19   Q.   Then your last paragraph contains a notation, -- and

20   I'm referring, here, to page 8039 within Plaintiffs' Trial

21   Exhibit, or -- excuse me -- within Defendants' Trial

22   Exhibit 315 -- it says:  "Two union caucuses in the hall

23   over this issue"?

24   A.   Yes.

25   Q.   What does that relate to?
```

1    A.    Well, after Karen Shipley made the comments that are

2    reflected in the two preceding paragraphs, they had two

3    caucuses, in succession, out in the hall over this issue.

4    Q.    And, then, could you please turn to the next page?

5    And this is page 8040?

6    A.    Yes.

7    Q.    In the second paragraph, there is -- on the left side,

8    it says:  "Karen."

9        And then it says:  "Does the cost not apply to

10    retirees."

11        "No, we have never proposed that retirees pay for

12    their insurance."

13        Then there is a statement:  "FASB Letter H."

14    A.    Right.

15    Q.    What occurred at that point in the discussion on

16    December 12th, 2003?

17    A.    Well, Karen was making reference to a letter she had

18    not previously raised, and that was the FASB Letter H.

19    She -- you know, she said they hadn't -- they weren't

20    proposing that retirees pay for their insurance, but she

21    made reference to the FASB Letter H regarding retiree

22    insurance costs.  And I think, at that point, Sam Stewart

23    jumped in and explained what that letter was, because my

24    supposition is that he is the one that explained it to her

25    in the caucus.  He said that this Letter H provided that,

VOL. VI                    18

1    after a certain date, retirees would be responsible for

2    paying for some of their own insurance expenses, and that

3    that would begin in January, 2004.  And he pointed out that

4    Pittsburgh was aware of it, a reference to the

5    International Union offices, and that it was discussed in

6    the last negotiations.

7         But he -- he unequivocally told us across the table

8    that this did apply to the parties and it did provide for

9    sharing of retiree medical insurance costs beginning

10   January, 2004.

11   Q.   Now, Mr. Long, in the next paragraph, there is a

12   statement they want to extend out the supposed letter re:

13   retirees paying for their insurance January, 2004, for

14   another year.

15   A.   Yes.

16   Q.   What was discussed at that point in the bargaining?

17   A.   Well, once this letter was brought to the floor by,

18   again, I assume, Sam Stewart, Karen said that they

19   wanted -- you know, having acknowledged the application of

20   that letter to the parties, she indicated that she wanted

21   to extend that letter for another year, or, in other words,

22   extend the date on which retirees would start to pay for a

23   portion of their retiree medical insurance, by one year,

24   from January, 2004, to January, 2005.

25   Q.   And, Mr. Long, what role did you understand Ms.

1   Shipley to have in the 2003 bargaining?

2   A.   She was the Steelworkers' chief negotiator.

3   Q.   And after the union first mentioned Letter H, did the

4   union, in bargaining, produce and give to the company

5   across the table a copy of what they regarded as Letter H?

6   A.   Yes.

7        MR. MISCIMARRA:  Your Honor, I move the admission of

8   Defendants' Trial Exhibit 315.

9        THE COURT:  Any objection?  I think there is,

10  because you'd already made it, right?

11       MR. COOK:  Same objection, Your Honor.

12       THE COURT:  The objection is overruled.

13       Did you say "Objection"?  I didn't hear you.

14       MR. COOK:  I'm sorry, Your Honor.  I did say the

15  same objection.

16       THE COURT:  Okay.  Three fifteen will be admitted

17  over objection.

18  BY MR. MISCIMARRA:

19  Q.   Mr. Long, could you please take a look at Defendants'

20  Trial Exhibit 309?

21  A.   I have it.

22  Q.   And could you please identify and describe this

23  document?

24  A.   This is a revised version of the November 23rd

25  proposal that was presented on or about February 6th, 2004,

```
 1    regarding the subject of retiree health care benefits.
 2    Q.   And, Mr. Long, this is a three-page document.  Was
 3    this three-page proposal part of a larger document at the
 4    time that it was presented?
 5    A.   Yes, it was.  You'll see, in the bottom right-hand
 6    corner of the first page of this document, it says:  "Page
 7    104 of 121."  This was part of a -- I think it was a final
 8    offer document that was presented to the union on that
 9    date.  It was 121 pages in length, and this was simply the
10    revised version of Letter of Understanding 2003-6 dealing
11    with retiree medical benefits, which was part of this
12    larger proposal at that time.
13    Q.   And, Mr. Long, let me direct your attention to the
14    second page.  This is MIK-17276.
15         THE COURT:  The second page of revised LOU 2003-6,
16    right?
17         MR. MISCIMARRA:  Correct.
18    BY MR. MISCIMARRA:
19    Q.   And the first new paragraph that appears on page
20    MIK-17276, it contains a reference to the company's
21    preexisting retirees with the defined term "Retiree
22    Benefits."  Was some of this language taken from the
23    company's original retiree medical proposal dated November
24    23rd, 2003?
25    A.   Yeah.  The language you see in the first full
```

1   paragraph on the second page of this document is similar.

2   It's expanded, but it is similar, and it was taken,

3   originally, from Paragraph 2 of Exhibit -- is it Exhibit

4   79, or 152?

5   Q.   It's actually Plaintiffs' Trial Exhibit 152.

6   A.   Yeah.  The first full paragraph on page 2 of

7   Defendants' Exhibit 309 is -- you'll see a lot of parallels

8   to the second paragraph on page 1 of Plaintiffs' 152,

9   including the definition of the defined term "Retiree

10  Benefits" as referring to the company's preexisting

11  retirees.

12  Q.   Now, Mr. Long, let me direct your attention to another

13  sentence in the same paragraph which appears on page

14  MIK-17276.  And the sentence that I have a question about

15  says:  "In particular, the Company and the Union have

16  agreed to discuss whether to continue the Medical Necessity

17  Plan, which is currently provided only to a limited group

18  of retirees."

19  A.   Yes.

20  Q.   Was that particular sentence contained in the prior

21  proposal, or was that added subsequent to the initial

22  proposal being presented?

23  A.   That was an additional sentence that you'll see was

24  inserted from the earlier draft from November 23rd.

25  Q.   And this uses the term "Retirees" without any

1  modifier?

2  A.   Yes.

3  Q.   Is this reference to "Retirees" meant to apply to

4  existing retirees?

5  A.   As the term "Retirees" was used, when it's used

6  without modification in this agreement, or this proposed

7  agreement, it referred to preexisting retirees as well as

8  future retirees.

9  Q.   And, specifically, the word "Retirees" that appears in

10  the sentence that talks about whether to continue the

11  Medical Necessity Plan, as of 2003, was it possible for any

12  future retirees to participate in the Medical Necessity

13  Plan?

14  A.   No, actually.  The Medical Necessity Plan, again, as I

15  understood it, had been closed to retirees in the late

16  1990s.  There were only about 40 participants.  So, in the

17  context of that particular sentence, the term "Retirees"

18  could only have referred to preexisting retirees.

19  Q.   And, Mr. Long, at any time in the bargaining that took

20  place in 2003, 2004 -- let me preface this by asking, did

21  you participate in additional bargaining involving M&G's

22  Apple Grove facility in 2004 and 2005?

23  A.   I did.

24  Q.   At any time in the bargaining that occurred in 2003,

25  2004, and 2005 regarding the Retiree Medical Benefits

1    Proposal LOU 2003-6, did any company representative at any

2    time state or suggest that LOU 2003-6 applied only to

3    future retirees?

4    A.   No.

5    Q.   At any time in the bargaining that occurred during the

6    same time frame -- 2003, 2004 and 2005 -- involving M&G,

7    did any union representative state or indicate in any way

8    that they regarded LOU 2003-6 as a proposal that applied

9    only to future retirees?

10   A.   No.

11   Q.   Now, I'm not going to ask further questions about that

12   particular document, Mr. Long.

13        Mr. Long, you made reference to this exchange with

14   Karen Shipley about whether existing retiree benefits are a

15   permissive or mandatory subject of bargaining.  Could you

16   explain your understanding of the general principle that

17   usually applies about existing retiree benefits in

18   bargaining?

19   A.   As a general proposition, negotiations over retiree

20   medical benefits for preexisting retirees, individuals who

21   are currently retired, is a permissive subject of

22   bargaining.  And negotiations relative to retiree medical

23   benefits for current employees who have yet to retire but

24   who are bargaining with respect to retiree medical benefits

25   they may receive upon retirement is a mandatory subject of

1    bargaining.

2    Q.    And as you understand it, to the extent that a

3    particular topic is a permissive bargaining subject, does

4    that mean that a company and a union are prohibited from

5    entering into an agreement about it?

6    A.    No.  A permissive subject of bargaining is one about

7    which the parties may -- if they mutually agree, they may

8    enter into agreements with regard to that subject, but it's

9    not some -- it's not a topic about which either party can

10   insist to the point of impasse, but it's permissible.  It's

11   legal, and it's permissible for the parties to enter into

12   agreements with respect to permissive subjects of

13   bargaining.

14   Q.    And is there any connection between the terms

15   "permissive subject of bargaining" and "non-mandatory

16   subject of bargaining"?

17   A.    They're synonymous.  A permissive subject of

18   bargaining is not a mandatory subject of bargaining,

19   meaning it's not something about which either party has to

20   bargain or is legally obligated to negotiate.

21   Q.    And, Mr. Long, the Letter H that the union brought up

22   in the bargaining session on December 12th, 2003, what is

23   your understanding about the change that Letter H

24   accomplishes in relation to the normal rule that retiree

25   medical benefits are a permissive or non-mandatory subject

1   of bargaining?

2   A.   Letter H stated that the parties agreed to treat and

3   consider retiree medical issues as a mandatory subject of

4   bargaining notwithstanding any contrary NLRB, Labor Board,

5   or court precedent.  So, they contractually agree to treat

6   it and consider it as a mandatory subject of bargaining as

7   between themselves.

8   Q.   And just one or two other questions along these lines.

9   If something is a mandatory subject of bargaining, is it

10  lawful, as you understand it, for a company to bargain to

11  impasse over that particular subject?

12  A.   It is.

13  Q.   If a particular topic is a non-mandatory subject of

14  bargaining, is it lawful for a company to insist to impasse

15  on the resolution of that particular topic?

16  A.   It's not lawful to do that, no.

17  Q.   Now, was there a point in the 2003-2004 bargaining

18  between M&G and the Steelworkers when negotiations were

19  approaching the point of being deadlocked?

20  A.   Yes.

21  Q.   And approximately when did the negotiations approach

22  the point of being deadlocked?

23  A.   It was early February at or about the time of the

24  February 6th Comprehensive proposal, a part of which is

25  reflected in Defendants' Exhibit 309.

```
 1    Q.   And the legal term for a deadlock as it relates to
 2    bargaining is what?
 3    A.   Impasse.
 4    Q.   And in early February, 2004, when the M&G negotiations
 5    were reaching the point of impasse, was the union
 6    consistent in statements it made about whether Letter H
 7    made existing retiree medical benefits a mandatory subject
 8    of bargaining?
 9    A.   No, they were not consistent.
10    Q.   And can you very briefly explain to the Court what was
11    expressed by the union in early February, 2004, on this
12    topic as the negotiations appeared to be approaching an
13    impasse?
14    A.   I recall the union's representatives making statements
15    to us across the table in early February that they were
16    unsure as to whether or not they were obligated to bargain
17    about retiree medical benefits; whether or not,
18    withstanding the language of Letter H which they had
19    represented to us was binding on M&G and on them, that it
20    was a mandatory subject of bargaining; and they indicated
21    that it was an unclear issue that they were asking the
22    legal department of the International Union in Pittsburgh
23    to research and advise them on.
24    Q.   And, Mr. Long, in your experience participating in
25    labor negotiations, is it unusual, when bargaining appears
```

```
 1    to be approaching an impasse, for the union in negotiations

 2    to make statements that suggest there is no impasse and

 3    that there's a lot of issues that warrant further

 4    discussion?

 5    A.    It's not unusual at all.  The union oftentimes will

 6    want to try to make statements and conduct itself in a

 7    manner to suggest that the parties, in fact, are not

 8    deadlocked.

 9    Q.    And to the extent that there are questions that have

10    been raised or issues that warrant further discussion as

11    bargaining approaches an impasse, does that affect in any

12    way the company's ability to move forward with changes?

13    A.    Yes.  The company's legal ability to unilaterally

14    implement changes consistent with its final offer is

15    dependent upon there being a genuine, lawful impasse, a

16    true deadlock in the bargaining, a point at which neither

17    party is willing to make any meaningful movement on the

18    issues that divide them.  And the other issue that's of

19    critical importance to a company in terms of its ability to

20    lawfully implement some or all of its final offer is that

21    it cannot have conducted itself in a manner inconsistent

22    with its legal obligations to bargain in good faith.  And

23    that includes not including in a final offer anything that

24    would be deemed to be a permissive subject of bargaining.

25    Q.    And as of mid-February or early February, 2004, Mr.
```

1    Long, how many bargaining sessions had taken place between

2    M&G and the Steelworkers as part of the negotiations that

3    commenced in September, 2003?

4    A.   By early February, I think we were probably up to

5    about 45, 46, bargaining sessions.

6    Q.   And I would like to direct your attention to

7    Defendants' Trial Exhibit 106.

8         MR. MISCIMARRA:  Your Honor, I think this document

9    may have been entered as a plaintiffs' trial exhibit.

10        THE COURT:  What number?  Do you know?

11        MR. MISCIMARRA:  That's the question that I have.

12        THE COURT:  Oh!  Is it the one up on the screen?  Is

13   that --

14        MR. MISCIMARRA:  Yes.  This is, actually,

15   Defendants' Trial Exhibit 106.

16        THE COURT:  Yeah.  It's dated 2/9?

17        MR. MISCIMARRA:  It's not actually identical.

18        THE COURT:  Oh!  It's not?

19        MR. MISCIMARRA:  There is a corresponding copy of

20   the same document, which is Plaintiffs' Trial Exhibit 179,

21   but it has different notations that appear on the document.

22   And I'll note that Plaintiffs' Trial Exhibit 179, Your

23   Honor, was produced by the union.  And Defendants' Trial

24   Exhibit 106 is a version of the same letter that is from

25   within the company's records.

1          I would propose to put in Defendants' Trial Exhibit

2     106, but note the parallel nature of the document.

3          MR. COOK:  It's either parallel, Your Honor, or it's

4     different.

5          THE COURT:  Slow down.  Slow down.

6          You can propose to put it in, but until it's

7     identified and, then, whatever differences there are are

8     identified, it's not going to be admitted.

9          MR. MISCIMARRA:  Of course, Your Honor.

10    BY MR. MISCIMARRA:

11    Q.   Mr. Long, would you please identify, and briefly

12    describe, Defendants' Trial Exhibit 106?

13    A.   This is a letter that I authored and signed and gave

14    to Karen Shipley on February 9, 2004, at about 2:50 p.m.

15    The handwriting in the upper right-hand corner is mine.

16    The notation "No. 46" refers to the meeting number, which

17    would have been Bargaining Session No. 46.  And that is my

18    writing where it says:  "Given to Union 2/9/04 at 2:50

19    p.m."

20    Q.   And in very general terms, Mr. Long, can you summarize

21    what this letter expressed to the union?

22    A.   What it expressed is that, if the union was going to

23    take the position that LOU 2003-6 dealt with a permissive

24    subject of bargaining and if it was their legal position

25    that this was a permissive subject, then we were putting

```
 1    them on notice that we would -- we're withdrawing LOU

 2    2003-6 from any last, best and final offer and would not

 3    condition an overall agreement on the union's acceptance of

 4    that proposal.  If, on the other hand, they continued in

 5    their earlier representations that the Letter H meant what

 6    it said and that they considered the topic to be a

 7    mandatory subject of bargaining, that this would -- they

 8    should consider LOU 2003-6 to be a part of our last, best

 9    and final offer.

10    Q.   And I'll note, in the next-to-last paragraph of the

11    letter, it says:  "Pending further notice, if the Union

12    chooses to accept the Company's retiree insurance proposal

13    as set forth in LOU 2003-6," and it says, "(which the Union

14    could do with respect to any permissive subject), our

15    proposal remains available..."?

16    A.   Yes.

17    Q.   Although, again, we did not condition an overall

18    agreement on the union's acceptance of it.  Here is my

19    question:  Did this letter remove from the table any

20    further consideration of LOU 2003-6?

21    A.   Not at all, and that was the point of that sentence.

22    As I said before, the parties, with regard to a permissive

23    subject of bargaining, are legally permitted to enter into

24    agreements with regard to such a matter.  So, whether LOU

25    2003-6 was considered by the union to be permissive or
```

1    mandatory, they were legally privileged, as was the

2    company, to enter into that as part of an agreement.

3        So, we didn't withdraw it from the table.  We simply

4    said, as a technical, legal matter, if that was their view

5    and if they were going to take the position that it was

6    permissive, then we were going to withdraw it as part of

7    our final offer, because we did not want to be in a

8    position of committing an unfair labor practice in

9    connection with approaching an impasse and potentially

10   implementing some or all of that pre and past offer.

11   Q.   And did the union, in bargaining, subsequently make a

12   written proposal about Letter H?

13   A.   Actually, the union did.  In March, I recall the union

14   proposing to delete Letter H.

15   Q.   And did the company accept or reject that proposal?

16   A.   We rejected it out of hand.

17   Q.   And one final question on this particular subject, Mr.

18   Long.  You've indicated that a company and the union have

19   the right to enter into agreements with respect to

20   permissive bargaining subjects.

21   A.   Yes.

22   Q.   Is there a limitation on that to the extent there are

23   preexisting pension rights or other rights that are

24   actually vested?

25   A.   If there are preexisting rights that are vested, the

1   parties can't modify vested benefits; but, if they're not

2   vested, the parties certainly can amend or modify those

3   benefits, including retiree medical benefits that are not

4   vested.

5          MR. MISCIMARRA:  Your Honor, I move the admission of

6   Defendants' Trial Exhibit 106.

7          THE COURT:  All right.  My problem is, I don't know

8   that you identified what the differences were.  Was it just

9   simply the writing at the top right?

10         MR. MISCIMARRA:  That's correct, Your Honor.

11         THE COURT:  Okay.

12         Any objection?

13         MR. COOK:  No.

14         THE COURT:  Defendants' Exhibit 106 will be admitted

15  without objection.

16  BY MR. MISCIMARRA:

17  Q.   And, Mr. Long, was a collective bargaining agreement

18  ultimately entered into between M&G and the United

19  Steelworkers in 2005?

20  A.   It was.

21  Q.   And did that collective bargaining agreement contain a

22  version of LOU 2003-6?

23  A.   It did.

24  Q.   And was the agreed-upon version of LOU 2003-6

25  materially different from the version contained in the

1    company's February 6, 2004, final offer?

2    A.   It wasn't materially different.  I think there was

3    some date changes, because of the passage of time; but, in

4    substance, it was the same.

5    Q.   And those date changes were worked out with what

6    Steelworkers' representative?

7    A.   Randy Moore.

8    Q.   Now, did you participate in any mid-term discussions

9    regarding M&G retiree medical benefits after the 2005

10   Collective Bargaining Agreement was agreed upon?

11   A.   I did.

12   Q.   And when did those mid-term retiree medical

13   discussions take place?

14   A.   I believe the discussions started in August of 2006

15   and went to approximately December 5, 2006, spanning about

16   15 bargaining sessions.

17   Q.   And during those mid-term discussions, did the company

18   and the union exchange different proposed benefit plan

19   changes and retiree contribution amounts?

20   A.   They did.

21   Q.   I would like to direct your attention to a document

22   we've marked Defendants' Trial Exhibit 188, which I believe

23   has already been admitted.  And, Mr. Long, can you briefly

24   identify and describe Defendants' Trial Exhibit 188?

25   A.   This was a three-page proposal from the union that was

1    presented on November 3, 2006.  It was styled "The Union's

2    Modified Proposal No. 3" on the topic that had been under

3    consideration since, I believe, August of that year, and it

4    included proposals to terminate the Retiree Medical

5    Necessity Plan.

6    Q.   Where is that reflected in this document?

7    A.   The first page, Paragraph 1.

8    Q.   And did this proposal involve any other retiree

9    benefit plan design changes for existing retirees?

10   A.   Yes.  In terms of benefit plan design changes,

11   Paragraph 4, on page 1, outlines some changes in the

12   Comprehensive Plan.  And on page 2, Paragraph 5, there are

13   some proposed changes to the Retiree Catastrophic Plan.

14   Q.   And did this proposal involve a requirement of

15   contributions for certain existing retirees?

16   A.   It did.  On page 1, Paragraph 2 provided the Retirees,

17   Surviving Spouses, and their dependents will not be

18   required to make a contribution toward the cost of health

19   coverage before January 1, 2007.

20   Q.   And are there provisions within this proposal that

21   make reference to the continuation of Letter H?

22   A.   Yes, page 2, Paragraph 7.  There are provisions with

23   regard to Letter H and its application to contributions by

24   those who were participating in the Catastrophic Plan.  And

25   some of those proposals with respect to contributions

1   continue on page 3.

2   Q.   Is that Paragraph 8 and following?

3   A.   Yes, eight, nine and ten.

4   Q.   Let me direct your attention to a document that we've

5   marked Defendants' Trial Exhibit 199.

6   A.   Okay.

7   Q.   And, Mr. Long, can you briefly identify and describe

8   this particular document?

9   A.   This was a union counterproposal with respect to the

10  Comprehensive Retiree Medical Plan.

11      What the union actually did was, it took a typed

12  document that the company had provided to them and marked

13  it up and tendered it back, with their edits and

14  handwriting, presented it to us on November 13, 2006.

15  Q.   And this particular proposal, the union

16  counterproposal part of Defendants' Trial Exhibit 199, did

17  it involve any benefit plan design changes for existing

18  retirees?

19  A.   Yes, it did.  The document, itself, had a series of

20  substantive plan provisions.  And you will see some

21  proposed revisions that the union wrote in handwriting as

22  to their suggestions as to how the plan design would be

23  modified to suit their position.

24  Q.   And did the union counterproposal reflected in

25  Defendants' Trial Exhibit 199 contemplate proposed monthly

1    contributions for existing retirees?

2    A.   It did.  On page 1, again in handwriting, the union's

3    counterproposal to the company was that, in Plan Years 2007

4    and 2008, there would be monthly contributions for retirees

5    who were not yet Medicare-eligible, pre-Medicare retirees,

6    there would be a monthly contribution of $250, and for

7    retirees who were Medicare eligible, there would be a

8    monthly contribution of $50 in each of those two plan

9    years.

10   Q.   Let me direct your attention, Mr. Long, to Defendants'

11   Trial Exhibit 319.  And would you briefly identify and

12   describe this particular document?

13   A.   This was a union counterproposal presented to the

14   company, again, on November 13, 2006.  And this was the

15   union's counterproposal with regard to the plan design of

16   the Catastrophic Retiree Plan.  And it includes, on pages 2

17   and succeeding pages, a number of handwritten edits to a

18   document that the company had previously provided to them

19   with their suggested changes for the plan design for the

20   Catastrophic Retiree Medical Plan.

21        And it also included, on page 1, a handwritten

22   proposal with respect to what retirees would pay who were

23   participants in the Catastrophic Retiree Plan.  And, again,

24   those monthly contributions counter-proposed by the union

25   for plan years 2007 and 2008 were $145 a month for retirees

1    who were not yet Medicare eligible and $30 a month for

2    retirees who were Medicare eligible and participating in

3    the Catastrophic Plan.

4    Q.   And, Mr. Long, the plan design changes and the retiree

5    contributions that were contemplated by the union as part

6    of their counterproposal reflected in Defendants' Trial

7    Exhibit 319, were those things applicable to existing

8    retirees, or just future retirees?

9    A.   Existing and future.

10        MR. MISCIMARRA:  I move the admission of Defendants'

11   Trial Exhibit 319, Your Honor.

12        THE COURT:  Any objection to Defendants' Exhibit

13   319?

14        MR. COOK:  None.

15        THE COURT:  Three nineteen will be admitted without

16   objection.

17   BY MR. MISCIMARRA:

18   Q.   And, Mr. Long, could you please briefly take a look at

19   Defendants' Trial Exhibit 213?  And can you briefly

20   identify that?

21   A.   This was a proposal that was presented by the company

22   regarding retiree medical benefits and costs on November

23   30, 2006.  And on page 1, Paragraphs 2 and 3, it makes

24   reference to plan design proposals the company had received

25   from the union on November 15, 2006, with regard to the

 1    Comprehensive Plan, in Paragraph 2, and with regard to the

 2    Catastrophic Plan, in Paragraph 3.

 3         So, I mean, the sequence of events was that, after our

 4    discussions with the union on the 13th of November, the

 5    union had actually sent to Kimm Korber some refined

 6    proposals on plan design on November 15.  And we indicated,

 7    in Paragraphs 2 and 3, that the Comprehensive Plan would

 8    incorporate, in large part, the union's proposals that we

 9    had received from them on the 15th of November with regard

10    to plan design issues.

11    Q.   And those plan design changes, did they apply to

12    existing retirees?

13    A.   Yes.

14    Q.   And on page 2 of Defendants' Trial Exhibit 213,

15    Paragraph 11, there is a reference to some fixed retiree

16    contributions.  Can you describe what is reflected in

17    Paragraph 11?

18    A.   Yes.  We -- you know, we had been bargaining for some

19    time with respect to redesigning the insurance programs for

20    the retirees, and neither party knew for sure what those

21    programs would actually cost.  And, so, we were trying to

22    craft an agreement that would include a redesigned plan for

23    the Catastrophic and Comprehensive Plans and a cost that

24    would be borne by the retirees who were participating in

25    those two programs.

1       We didn't have any experience with either plan. They

2    would be new and different. So, this proposal was the

3    company's suggestion as to what retirees would pay for

4    monthly contributions under these new arrangements. We

5    referred to it as the one-year ramp-up period. We were

6    basically estimating what we would hope their obligation

7    would be under the Letter H scenario, but we didn't know

8    for sure. And, so, we kind of referred to this as sort of

9    the ramp-up year.

10       We had previously discussed -- and I think the union's

11    proposal from November 3rd had actually articulated it in

12    some detail -- sort of the methodology that the parties

13    would use to look back on prior years' experience for

14    purposes of setting the above-cap cost for the upcoming

15    plan year. We didn't have that experience in front of us.

16    So, we were proposing to have the retirees pay these

17    amounts during what would, in effect, be a ramp-up, or a

18    transition period.

19    Q.   Mr. Long, had cost information been shared with the

20    union, during the 2006 discussions, prior to November 30,

21    2006?

22    A.   Oh, yes. Substantial amounts of data were shared.

23    Q.   And as part of that exchange with the union, was it

24    discussed what contributions levels would be like if they

25    were based purely on existing company costs without any

1    plan design changes?

2    A.    Yes.

3    Q.    And the contributions that would result from simply

4    taking existing company costs without any changes, were

5    those contribution levels higher or lower than the levels

6    stated or proposed by the company in Paragraph 11 of

7    Defendants' Trial Exhibit 213?

8    A.    They were substantially higher.

9    Q.    And did the union accept the company's offer of lower

10    retiree contributions in connection with the plan design

11    changes that are reflected in Defendants' Trial Exhibit

12    213?

13    A.    Well, the union didn't accept this proposal.  The

14    union certainly understood that proceeding with a

15    redesigned retiree medical program would be the pathway for

16    reducing the cost obligations on the part of the retirees.

17    And we all understood that those costs would be substantial

18    without some changes.

19    Q.    Now, all of the four proposals we've just asked

20    questions about -- and, for the record, I'll note it's

21    Defendants' Trial Exhibit 188, 199, 319, and 213 -- do

22    these proposals, Mr. Long, have anything in common?

23    A.    Yes.  There is several things in common among these

24    exchanges.  First of all, they all provide for the

25    elimination of the Retiree Medical Necessity Plan, that

1    small plan that was limited to a small group of preexisting

2    retirees.  All of these exchanges provided for the

3    elimination of the Retiree Medical Necessity Plan.  In

4    addition, all of these proposals provided for plan redesign

5    of the Comprehensive Plan and the Catastrophic Plan that

6    would remain for the retirees.  So, there was substantial

7    give and take with regard to how these plans should be

8    redesigned in substance in terms of their substantive

9    terms.

10        And, finally, all of these proposals from the company

11    and the union provided for some measure of retiree premium

12    contributions or cost contributions towards the cost of

13    their medical insurance.  Those three things, I think, are

14    common throughout these exchanges of the parties over the

15    month of November.

16    Q.   And, Mr. Long, taking into account the same four

17    proposals, did you have any personal expectation towards

18    the end of November, 2006, about the ability of the parties

19    to work out a potential agreement that could produce better

20    retiree medical plan designs and lower overall benefit plan

21    costs?

22    A.   Yes.  As of November 30th, I was very confident that

23    the parties would reach an agreement.  In fact, I drafted

24    the summary, a two-page document marked as Defendants'

25    Exhibit 213, with signature lines, because, in my view, the

1    parties were very close to a deal, and I had every

2    expectation that the parties would reach an agreement.

3    Q.   And what was the basis for your expectation, at the

4    time you prepared Defendants' Trial Exhibit 213, that the

5    parties had some ability to potentially reach agreement?

6    A.   My recollection is that, looking over the parties'

7    exchanges over the course of the month of November,

8    beginning with the union's proposal on November 3rd, that

9    there was a growing mutual understanding that the Medical

10   Necessity Plan should be eliminated, that the Comprehensive

11   Plan and Catastrophic Plan should be redesigned, and that

12   retirees should begin making a contribution, and that those

13   contributions could be moderated if plan design changes

14   were implemented.

15        And through a series of exchanges, including the plan

16   design proposal that was submitted to the company on

17   November 15th after the November 13th exchange, my

18   recollection is that the parties were coming closer and

19   closer with respect to an agreement on what all those

20   revisions should be.

21   Q.   And, Mr. Long, did any change occur at any point in

22   2006 regarding the union's willingness to work with the

23   company as far as benefit plan changes and other retiree

24   medical issues were concerned?

25   A.   Yes.  After Defendants' Exhibit 213 was presented and

1    explained to the union, late in the day on November 30th,

2    2006, the union did a bit of an about-face on us.

3    Q.   And can you describe, on November 30th, 2006, where

4    did the meeting take place on that date with the union, if

5    you recall?

6    A.   I believe it was in Apple Grove.

7    Q.   And can you just explain, briefly, what was -- what

8    conduct occurred in the way the meeting was conducted that

9    appeared to you to reflect some about-face on the part of

10   the union?

11   A.   Well, after this proposal marked Defendants' Exhibit

12   213, which, again, I thought was going to bring the parties

13   to an agreement, Randy Moore, who was with us -- I think,

14   perhaps, Jeanette Stump was on the phone; she was a

15   consultant, in-house consultant, with the Steelworkers --

16   one or both of them started making statements to the effect

17   that they were having questions, or somebody in Pittsburgh

18   was having questions, about whether or not they should be

19   doing what we had been doing since August of 2006.  And

20   someone was questioning whether or not they should be

21   entering into substantive agreements with the company with

22   respect to retiree medical plan design and employee premium

23   contributions, or, retiree premium contributions.

24        First time we'd heard anything of that effect in

25   several years.

1    Q.    And was there a subsequent meeting that took place

2    between the parties?

3    A.    There was.  When, I think, Randy Moore was speaking,

4    he said that, you know, this is an issue that perhaps our

5    lawyers or lawyer from Pittsburgh should sit down and

6    discuss with you before we proceed further with these

7    negotiations, that had been going on since August.  And we

8    set a date of December 5th to meet with in-house counsel

9    from the Steelworkers' Union and others.

10   Q.    And was a phone call placed from the meeting itself to

11   the Steelworkers' attorney prior to the end of the meeting?

12   A.    Yes.  Actually, we had Randy Moore call the

13   Steelworkers' attorney at home to find out his

14   availability.  And we picked a date that he was available

15   and set a date on the spot.

16   Q.    And did a meeting occur on August 5 or -- excuse me.

17   When was the next meeting that occurred?

18   A.    The next meeting was on December 5th, 2006.

19   Q.    Okay.  And where did that meeting take place?

20   A.    That took place in my office, Littler Mendelson's

21   office, here in Columbus.

22   Q.    And who participated in that meeting on behalf of the

23   union?

24   A.    Randy Moore was there.  Brian Wedge was there.  Joe

25   Harris was there.  Jeanette Stump, the benefits consultant,

1    in-house, from the Steelworkers' Union was there.  And an

2    attorney named Joe Stuligross, again, in-house counsel with

3    the Steelworkers' Union in Pittsburgh, was present.

4    Q.   And who did most of the talking for the union in the

5    meeting that took place on December 5, 2006?

6    A.   Joe Stuligross did most of the talking.

7    Q.   And did Mr. Stuligross or any other union

8    representatives during that meeting spend any time

9    addressing the alternative plan design proposals that had

10   been the focus of discussions over the preceding four or

11   five months?

12   A.   No.

13   Q.   At any time during the M&G bargaining you attended in

14   2003, 2004 and 2005, did any union representative ever

15   indicate in any way that retirees had some type of vested

16   protection that prevented them from being required to make

17   medical contributions?

18   A.   No.

19   Q.   In the 2006 meetings that you attended prior to late

20   November, 2006, did any union representative dispute the

21   company's right to collect contributions from retirees

22   pursuant to LOU 2003-6 or the other cap agreements that had

23   previously been agreed to by the Steelworkers?

24   A.   No.

25        MR. MISCIMARRA:  No further questions, Your Honor.

VOL. VI    46

```
 1              THE COURT:  Let's take a break.

 2              MR. COOK:  Thank you, Your Honor.  I was going to

 3     ask for a moment to get my act together.

 4              THE COURT:  No problem.

 5              Let's take a short -- well, let's say a 15-minute

 6     break.

 7              COURTROOM DEPUTY CLERK:  This court will stand in

 8     recess.

 9        (Whereupon, a recess was taken at 9:47 a.m., and the

10     proceedings reconvened at 10:05 a.m.)

11                          - - -

12     IN OPEN COURT:

13              THE COURT:  Mr. Cook, you may proceed on

14     cross-examination.

15              MR. COOK:  Thank you, Your Honor.

16                          - - -

17                      CROSS-EXAMINATION

18     BY MR. COOK:

19     Q.   Good morning, Mr. Long.  My name is David Cook.  I'm

20     counsel for the plaintiffs, both the plaintiff class and

21     the United Steelworkers, in this case.  I don't believe

22     we've ever met before.

23     A.   No, we haven't.

24     Q.   Okay.  Have you practiced in Ohio most of your career?

25     A.   No.
```

1    Q.    When did you come to Ohio to practice?

2    A.    Well, I did a lot of work for the City of Columbus,

3    Ohio, between 1992 and '97.  I was the city's chief labor

4    negotiator a number of years under Mayor Lashutka and the

5    City Council at the time.  I was still a partner at

6    Seyfarth Shaw at the time.  And when I joined Littler

7    Mendelson, it was partly to come here to live.

8         I couldn't convince Seyfarth Shaw to open an office in

9    Columbus, and I fell in love with the place.  And, so, that

10   was part of my reason for joining Littler Mendelson,

11   because they, at the time, had an office here in Columbus.

12        So, I split my time between Chicago and Columbus.  I

13   still do split my time between Chicago and Columbus, but

14   this is, administratively, my home office.  This is my

15   principal residence.

16   Q.    Hopefully, the traffic is a little bit better here.

17        THE COURT:  Let me make sure.  You fell in love with

18   the place?

19        THE WITNESS:  I fell in love with Columbus.  It's

20   America's best kept secret, I think.  That's what I tell

21   everybody.

22        MR. COOK:  Your Honor, I'm not sure if that affects

23   his credibility or not.

24        THE COURT:  No.

25        MR. COOK:  If you'd said Cincinnati, we would be on

```
 1    the same wavelength.
 2    BY MR. COOK:
 3    Q.    Are you an Ohio State fan?
 4    A.    When I rule Columbus, I certainly am.
 5    Q.    Well, now we have the kind of answers you're going to
 6    give us on cross-examination.
 7         THE COURT:  Good answer.
 8    BY MR. COOK:
 9    Q.    Okay.  Mr. Long, you consider yourself to be a
10    professional labor negotiator?
11    A.    I do.
12    Q.    Is that primarily what you do:  negotiate contracts?
13    A.    A vast majority of my professional time is probably at
14    the bargaining table or preparing for negotiations.
15    Q.    Do you do any litigation?
16    A.    No.  I do Labor Board litigation; but, in terms of
17    federal or state court litigation, I do very little, or
18    none, of that.
19    Q.    Are you a member of the American College of Labor and
20    Employment Lawyers?
21    A.    Joel D'Alba, who is a distinguished labor lawyer in
22    Chicago who is the president of that college, nominated me,
23    a few months ago, for admission to that college.  And, so,
24    I'm being considered for admission this year.
25    Q.    You're in the process?
```

1   A.   Yes.

2   Q.   Mr. Long, given your number of years of experience in

3   labor negotiations and taking into consideration, or

4   accepting, the fact that you don't do litigation, isn't it

5   correct that a retiree's health benefit may be vested

6   depending upon the terms of the contract under which the

7   retiree retired regardless of whether a union makes a

8   statement in subsequent negotiations about that benefit or

9   not?

10  A.   I'm not certain of that answer.  I think it's -- my

11  normal experience in collective bargaining has been that

12  retiree medical benefits are a subject of bargaining and

13  typically are not vested.  And I've rarely seen contract

14  revisions under which they were, or would be, considered to

15  be vested.  And I've certainly never negotiated one.

16  Q.   Well, are you aware of the line of cases in the Sixth

17  Circuit following the decision in UAW vs. Yard-Man in 1983

18  which sets forth when and under what circumstances

19  retirees' health care benefits may be considered vested?

20  A.   I'm generally familiar with that line of authority.

21  I'm not an expert on it.

22  Q.   And the law of those cases, the decisions of the Sixth

23  Circuit, and the language of the individual contracts would

24  determine whether retirees' benefits are vested; is that

25  correct?

1          MR. MISCIMARRA:  Your Honor, --

2          THE COURT:  Yes.

3          MR. MISCIMARRA:  -- I have an objection.

4          THE COURT:  Basis?

5          MR. MISCIMARRA:  Two grounds.  One is, I believe

6    this actually exceeds the scope of direct.  The only

7    comment about vesting related to the general rule about

8    what happens if you deal with vested benefits.  And I don't

9    believe I made any -- you know, presented any questions to

10   Mr. Long about whether the benefits in this particular case

11   were or were not vested.

12         Also, I think that these are basically legal

13   arguments.  And Mr. Long testified as a fact witness,

14   except as to some legal principles that had a bearing on

15   what he negotiated at the table and why.

16         THE COURT:  Correct, basically correct, in both

17   statements.  He did talk about preexisting rights, vested

18   and not vested.  He did talk about some legal issues, all

19   of which are subject to cross-examination.  And I believe

20   that the objection is not well taken.

21         He can proceed.

22         MR. MISCIMARRA:  Thank you, Your Honor.

23   BY MR. COOK:

24   Q.   In addition, Your Honor, he also specifically

25   testified -- confirm this for me, Mr. Long -- that the

1    union, here, did not raise vesting as an issue concerning

2    retirees' health benefits in 2003, 2004, 2005.

3    A.    That's correct.

4    Q.    But the fact they didn't raise them is not, by itself,

5    determinative of whether or not they're vested, is it?

6    A.    Well, it would be hard for me to imagine a union

7    actively engaged in bargaining over retiree medical

8    benefits having entered into a document such as Letter H,

9    which makes it a mandatory subject of bargaining.  That's

10   completely inconsistent with the notion of vested benefits.

11   So, it would be difficult for me to imagine that the

12   parties' arrangements provided for vested benefits with

13   those circumstances and with that course of conduct.

14        MR. COOK:  May we have the question read again,

15   because I don't believe it was responsive?

16        THE COURT:  Well, it really wasn't a question.

17        MR. COOK:  I guess -- let me rephrase it, Your

18   Honor.

19        THE COURT:  I had overruled his objection.  You

20   wanted to add that they hadn't talked about vesting in

21   2003, 2004 and 2005.

22        And I guess my question was, what part of "yes"

23   don't you understand?

24        I overruled the objection.

25        MR. COOK:  Okay.  I'll come at it a different way,

```
 1    Your Honor.  Thank you.
 2    BY MR. COOK:
 3    Q.   Mr. Long, saying something about vesting or not saying
 4    about vesting doesn't make it so; is that correct?
 5    A.   That's a fair statement in the abstract, certainly.
 6    Q.   All right.  Thank you.  And let's talk about Letter H.
 7    Your testimony was that you first became aware of it in
 8    approximately December, December 12th or so, 2003; is that
 9    correct?
10    A.   December 12th or 13th, yes.
11    Q.   Well, the issue may have come up on December 12, and
12    you actually saw the letter on the 13th?
13    A.   I believe that was the case.
14    Q.   And you had no prior notice of that?
15    A.   I hadn't seen the letter before then, no.
16    Q.   Had you had any conversations with Kimm Korber about
17    it previous to those dates?
18    A.   Not specifically.  I had pretty much left up to Kimm,
19    you know, issues regarding pension and insurance matters.
20    Q.   And when you saw Letter H, didn't you note that it was
21    between Goodyear and the Steelworkers?
22    A.   I noticed the parties to the letter, yes.
23    Q.   And let me ask you about your due diligence concerning
24    its applicability to M&G Polymers and Local 644.  Which
25    document in existence between the Steelworkers and M&G
```

1    Polymers did you identify that adopted the Goodyear 2001

2    Letter H into, and as part of, their agreement?

3    A.   I never did that research.  I relied upon my client

4    and upon representations from the union that that agreement

5    had been adopted and applied to M&G Polymers and the

6    Steelworkers.

7    Q.   Well, you've practiced a long time.  And I am going to

8    assume you're a careful lawyer.  You didn't actually

9    eyeball a document which adopted Letter H?

10   A.   I did not.  I was told, by both the union and by my

11   client, that Shell had assumed the contract from Goodyear

12   and M&G had assumed the contract from Shell and that they

13   were written assumption agreements.

14        I believe I did see, at some point, the transaction

15   documents between M&G and Shell in which M&G assumed the

16   contractual obligations that Shell had with the

17   Steelworkers Union, but I was willing to accept the

18   representations of my client and the union, both of which

19   were emphatic and unequivocal that those, the Agreement

20   Letter H, in particular, had been adopted by M&G and was

21   binding and applicable to the parties.

22   Q.   So, on December the 12th, or -- excuse me -- December

23   13th, 2003, when Karen Shipley says to you -- I guess Mr.

24   Stewart handed you a copy of Letter H and says:  This is

25   the only thing we have; we're looking at it to see what, if

1    anything, it means to us, that's an unequivocal statement

2    of adoption to you, sir?

3    A.    I don't recall those being Sam Stewart's words.  I

4    recall Sam Stewart stating that this applied to us and

5    that, at a date certain, retirees would be obligated to pay

6    above-cap costs.

7    Q.    On January 17th, 2004, didn't Karen Shipley say to

8    you:  Letter H, we don't think it applies the way you do.

9    We think it's only the caps?

10        Do you recall that?

11   A.    I don't recall that, specifically, on that date.

12   Q.    Do you recall her saying anything to that effect?

13   A.    Not specifically.  I'm not saying she didn't say that.

14   Q.    You didn't reference, in your direct examination,

15   something called Letter C.  Do you have a recollection of a

16   Letter C?

17   A.    I do recall seeing a Letter C between --

18   Q.    What was Letter C?

19   A.    It was a letter regarding modifications to plan design

20   that had been entered into.  Again, I think it was a

21   Goodyear/Steelworkers letter.

22   Q.    And what document did you view and determine, from

23   your own legal expertise, between M&G Polymers and the

24   Steelworkers that adopted Letter C into their agreement?

25   A.    Again, the only documents that I actually looked at,

1    and then only fairly briefly, were transaction documents

2    entered into when M&G acquired the facility from Shell

3    under which it assumed Shell's contractual obligations.

4    And I was told that M&G had been provided with a P&I book

5    that included a variety of documents and letters which had

6    been represented to it as being part of Shell's contractual

7    obligations, or commitments, with the Steelworkers, and

8    that Letter C and Letter H were part of that P&I book and

9    part of the contractual commitments and obligations that

10   M&G had assumed.

11   Q.   But you didn't see any specific document, and do you

12   recall from reviewing the transaction documents if the

13   Letter C was specifically listed in there?

14   A.   No.  I wouldn't see any reason for that to be

15   specifically listed.

16   Q.   So, Mr. Long, I just want to make clear that you

17   relied solely on what you understood the union to be

18   telling you at the bargaining table in conjunction with

19   whatever conversations you had with Kimm Korber about the

20   applicability of Letter H and, subsequently, Letter C?

21   A.   Well, they were both telling me the same thing.  So, I

22   didn't see any reason to dispute it.

23   Q.   I've put on the screen for you to review an October

24   17th, 2000, memo, Joint Exhibit 35.  This has been entered

25   into evidence in this proceeding.  Have you ever seen this

1     document before?  I'll direct your attention, sir, to the

2     second paragraph.

3     A.    I think I may have seen a copy of this at some point.

4     Q.    Did Mr. Korber show you a copy of this during the

5     2003-2004 negotiations?

6     A.    I don't recall when I saw it.

7     Q.    Do you see the second paragraph?  By the way, this is

8     a memo from David Dick, the chief negotiator and

9     spokesperson for M&G Polymers in the 2000 contract

10    negotiations, to the union.  And the handwriting at the top

11    has been identified by Randy Moore as Randy Moore's

12    handwriting.

13         Reading the second paragraph, do you see that it says,

14    very clearly, that it's less than clear that Letter H

15    applies to M&G Polymers?

16    A.    I see the wording of the document, absolutely.

17    Q.    And the last sentence reads:  "Letter H is not in our

18    agreement."

19    A.    I see what it says, yes.

20    Q.    Had you seen this in 2003, would it have changed your

21    opinion as to what the applicability of Letter H was?

22    A.    No.

23    Q.    It would not?

24    A.    No.  As I understood it, David Dick was presented with

25    a copy of Letter H in the 2000 negotiations.  He had no

1    familiarity with it, didn't know if it applied or didn't,

2    didn't know whether it applied or not.  And this was his

3    initial response to the question posed to him.  Actually, I

4    think it was represented to him that it did apply, and he

5    was unfamiliar with the transaction and was unfamiliar as

6    to whether it applied or not.

7    Q.   Did you speak to Mr. Dick about this?

8    A.   No.  This was what I was told, by both company and

9    union representatives, as to what happened in October,

10   2000.

11   Q.   Which union representative told you that version of

12   the story?

13   A.   I think Randy Moore raised this with me at one point

14   and said, you know, We had a discussion with Mr. Dick

15   about -- David Dick -- about this issue; and he was

16   confused, initially, about its application; and the parties

17   agreed to have the lawyers look at it.

18   Q.   Have you seen a copy of the 2000 Pension and Insurance

19   Services Award Agreement between M&G and the Steelworkers,

20   the booklet?

21   A.   I've seen the booklet.  I haven't read it.

22   Q.   Did you review it in preparation for your service as

23   negotiator for M&G in 2003 and 2004?

24   A.   No, not in detail.  We had a bit of a division of

25   labor.  I relied upon Kimm Korber to be the primary

```
 1    architect of company proposals with respect to both pension

 2    and health and welfare issues.  And, so, I was focused on

 3    other things in terms of my primary responsibility for

 4    proposal drafting preparations.

 5        So, I saw the booklet.  I never read it cover to

 6    cover, and I never became an expert, certainly, on its

 7    content.

 8    Q.   So, you didn't know then and you do not know now

 9    whether the 2000 P&I agreement in fact contains a copy of

10    any Letter H, do you?

11    A.   Well, again, I was told by both Sam Stewart --

12    Q.   No, sir.  I'm asking you based upon your review of the

13    document.

14    A.   Yeah.  I never reviewed the document cover to cover.

15        MR. COOK:  May we see Plaintiffs' Exhibit 179,

16    please?  It's also Defendants' 105, but let's look at the

17    179 version.

18    BY MR. COOK:

19    Q.   If we could go down to the bottom -- do you recognize

20    this, sir, the February 9th, 2004, letter to Karen Shipley

21    concerning Letter H?

22    A.   Yes.

23    Q.   All right.  You authored this letter?

24    A.   I did.

25    Q.   Let's go down to the bottom of the page, to the
```

1    paragraph "To avoid any confusion..."

2         Do you see that, sir?

3    A.   Yes.

4    Q.   All right.  It's your testimony to the Court today

5    that, as of February 9th, 2004, the union had been

6    absolutely clear that Letter H applied, but you write a

7    letter on February 9th that says, "If the union believes

8    that Letter H is not or might not be applicable to M&G..."

9    Do you see that?

10   A.   Yes.

11   Q.   You wrote this letter in the face of an unequivocal

12   position by the union of Letter H applying?

13   A.   Well, the union's position was clear from the point in

14   time when Sam Stewart represented to us across the table

15   that Letter H applied, and he provided us with a copy of

16   it.  And I believe that was on or about December 13th, and

17   --

18   Q.   Please continue.

19   A.   And between that time and early November -- and

20   really -- my recollection is, until earlier that day, we

21   didn't have any indication that the union was taking a

22   contrary view.  But, certainly, that day, Bob Reynolds, who

23   was one of the union's representatives, started making

24   statements that suggested that either he or someone in

25   Pittsburgh was questioning whether or not Letter H applied

1    and whether or not they would consider the subjects that

2    had been discussed in LOU 2003-6 as a mandatory or

3    permissive subject of bargaining.

4         And I prepared this letter in response to that

5    inconsistency in their position because I saw a potential

6    legal risk to the company if the union was going to do an

7    about-face on us and take the position that this was not a

8    mandatory subject of bargaining notwithstanding what Letter

9    H said and notwithstanding the union's prior

10   representations to us that Letter H applied.

11   Q.   Mr. Long, Sam Stewart was the union's -- what? --

12   president at the time?

13   A.   I think he was the president.  He had been in a

14   leadership position with the local union for quite some

15   time, and he was very knowledgeable about P&I issues,

16   pension and insurance issues.

17   Q.   Well, your knowledge about that statement had to be

18   from someone else, because you were only there in 2003.

19   You didn't come in before 2003, did you?

20   A.   That's correct.

21   Q.   So, you didn't know Mr. Stewart personally?

22   A.   Not before 2003, no.

23   Q.   And you didn't know what his service had been, or his

24   knowledge, before 2003?

25   A.   That is correct.

1   Q.   All right.  Mr. Long, doesn't this letter, Plaintiffs'

2   Exhibit 179, offer to withdraw letter 2003-6?

3   A.   Well, it's to withdraw it from our last, best and

4   final offer.  We made clear, on the next page, that it

5   would continue to be available, and it will continue to be

6   part of our proposal, because, if the union considered it

7   to be a permissive subject, they could always voluntarily

8   agree even if their view was that it was a permissive

9   subject of bargain.  So, we didn't want to withdraw it, but

10  we did not want it to be considered part of a last, best

11  and final offer if the union was going to change its view

12  and take the position that it was a permissive subject of

13  bargaining.

14  Q.   And you say that:  "We hereby withdraw LOU 2003-6 and

15  any other proposal concerning such benefits from our last,

16  best and final offer," correct?

17  A.   Yes.

18  Q.   And after February 9th and until March, like 15th or

19  so, did you have any negotiating sessions?

20  A.   I don't recall, off the top of my head, the sequence

21  of meetings between early February and mid-March.  I don't

22  think there were many.

23  Q.   You said, in Plaintiffs' 179, on the second page,

24  MIK-6111, the first paragraph, that there was no need for

25  this subject to be resolved at the present time.  Did you

1    say that?

2    A.   Yes.

3    Q.   And then, on March 18th --

4         MR. COOK:  May we have Plaintiffs' Exhibit 180 up,

5    please?

6    BY MR. COOK:

7    Q.   Then, on March 18th, the union, in response to your

8    letter of February 9th, accepts your offer and proposes to

9    withdraw Letter H, correct?

10   A.   They propose to delete Letter H from the parties'

11   agreement, yes.

12   Q.   And even though on February 9th you offered to

13   withdraw it, when you got Plaintiffs' Exhibit 180, you

14   rejected it?

15   A.   Well, the proposal that we're looking at right now is

16   a union proposal to delete Letter H.  Our proposal in the

17   letter of February 9, or our offer in the letter of

18   February 9, is, if the union took the position that LOU

19   2003-6 was a permissive subject of bargaining, we would

20   withdraw that as part of our last, best and final offer.

21        What this document addresses is not LOU 2003-6.  By

22   its terms, it just addresses Letter H, which by its terms

23   says that this topic of employee premium contributions is a

24   mandatory subject; and the union was simply proposing to

25   delete Letter H.  It doesn't speak to LOU 2003-6 by its

```
 1    terms.

 2         So, I mean, a mandatory subject of bargaining is one

 3    about which, you know, the parties are free to negotiate.

 4    And it would be fair game, as a legal matter and as a

 5    bargaining position for the union, to argue that they

 6    wouldn't want employees to pay premium contributions.  It

 7    was a topic for negotiation.  And this was the union's

 8    position as articulated.  I think that was March 18th.

 9    Q.   That was a very long answer to whether or not they

10    rejected it.

11         THE COURT:  It was.  What did you expect?  He is an

12    attorney.

13         MR. COOK:  I know.

14    BY MR. COOK:

15    Q.   All right.

16         Mr. Long, let's go back just a little bit.  I just

17    don't want to beat a dead horse.  Do I understand that,

18    today, your testimony is that the company rejected

19    Plaintiffs' Exhibit 180 because it didn't specifically say

20    "Letter 2003-6"?

21    A.   No.  We rejected this, I think on the spot, when it

22    was tendered because we had no interest in deleting Letter

23    H from the body of the parties' agreement.

24    Q.   And who was the chief spokesperson for the United

25    Steelworkers in 2003 and 2004?
```

1    A.    Karen Shipley.

2    Q.    And who had the authority, on behalf of the

3    Steelworkers, to bind them and enter into tentative

4    agreements?

5    A.    Karen Shipley.

6    Q.    And did Mr. Stewart have that authority?

7    A.    No.

8    Q.    At any time during your service as an attorney, have

9    you been a partner with Philip Miscimarra?

10   A.    Yes.

11   Q.    What period of time?

12   A.    From when Mr. Miscimarra joined Seyfarth Shaw -- I

13   forget the date; it was in the mid-'80s, I believe -- until

14   I resigned from Seyfarth Shaw at the end of July, 2003.

15   Q.    And do you still advise or represent M&G Polymers

16   today?

17   A.    I do.

18   Q.    With respect to what matters?

19   A.    Strictly, collective bargaining matters.

20   Q.    And, Mr. Long, are you being paid for your appearance

21   today?

22   A.    I am not.

23   Q.    And were you paid for any time you spent in

24   preparation for this testimony?

25   A.    No.

```
 1          MR. COOK:  Now, could we pull up Defendants' Exhibit

 2     309, please?

 3     BY MR. COOK:

 4     Q.   You testified as to this document earlier.  Do you

 5     recognize it again?

 6     A.   Yes.

 7          MR. COOK:  Let's scroll down, if we may.

 8     BY MR. COOK

 9     Q.   Mr. Long, in the second paragraph, it begins:  "The

10     company and the union have mutually agreed, during the 2003

11     negotiations..."  In fact, this was a company proposal,

12     correct?

13     A.   Correct.

14     Q.   And as of the date you offered this to the union, the

15     company and the union had not mutually agreed on anything

16     contained in this letter, had they?

17     A.   Well, the letter had, certainly, not been agreed to.

18     I'm not sure if there was anything in here that the parties

19     had, you know, independently agreed to.  But, no, you're

20     right.  This is a proposal, not an agreement.

21     Q.   But it's a very carefully phrased proposal to make it

22     sound as if the company and the union have already agreed

23     to something, isn't it?

24     A.   Well, the company's proposal was that the parties

25     enter into this, which, ultimately, the parties did enter
```

1    into this to memorialize certain understandings and

2    agreements with regard to retiree medical benefits and

3    costs.

4    Q.   And they ultimately entered into it on August the 9th,

5    2005, correct?

6    A.   I believe that was the date.

7    Q.   And as part of the last, best and final offer of M&G

8    Polymers in 2004, M&G Polymers unilaterally implemented

9    this as part of its final package, correct?

10   A.   I believe that was part of what was unilaterally

11   implemented, yes.

12   Q.   And who were the parties that the Letter H you

13   reviewed in 2003 were between?

14   A.   I believe Letter H was between Goodyear and the

15   International Steelworkers Union.

16        MR. COOK:  May we see Defendants' Exhibit 199,

17   please?  And then we're going to follow it with 319.

18   BY MR. COOK:

19   Q.   Defendants' 199, Mr. Long, you've testified, was

20   originally a company proposal that was submitted to the

21   union.  The union marked it up and gave it back as a

22   counter.  Did I say that correctly?

23   A.   Yes.

24   Q.   And where on this document does it specify that it

25   would apply to preexisting retirees?

1    A.    Well, on the first page, everywhere the term "Retiree"
2    is used in these exchanges, the parties were talking about
3    and exchanging data about the existing retiree population.
4    There had been a substantial exchange ongoing between the
5    union and the company with regard to the census of the
6    existing retirees.  That was the basis for the union's
7    consultant to look at the existing retiree population and
8    different plan design options that might be offered by
9    Mountain State Blue Cross Blue Shield.
10        And, so, throughout the parties' exchanges during this
11   month and prior to it, the parties used the term "Retiree"
12   to refer to existing retirees.  The cost analysis that this
13   was based upon was based upon voluminous sets of data about
14   claims experience, demographics of the existing retiree
15   population.  And these proposals were born out of analyses
16   of that data of the existing retiree population that
17   consultants and experts from both sides had looked at.
18   Q.    And the answer is, the document, itself, does not
19   refer to preexisting retirees, correct?
20   A.    It uses the term "Retiree."
21   Q.    Thank you.  And let's look at the next document,
22   Defendants' Exhibit 213.
23        Do you see this document, sir?
24   A.    Yes.
25   Q.    And this was 2006.  Now you're in discussions with the

1    union, and the subject is "Retiree Medical Negotiations."

2    And is it your position that the union clearly understood

3    that this would apply to preexisting retirees?

4    A.    Yes.  That was clear from the parties' discussions

5    throughout these months.  And Paragraph Number 1 talks

6    about Medical Necessity, which only applied to preexisting

7    retirees.  It had been closed to new retirees sometime in

8    the late '90s.  So, it was clear, both from Paragraph No. 1

9    and as well as the parties in negotiations in the preceding

10   months, that we were talking about existing retirees of M&G

11   Polymers.

12   Q.    But on the same date that you were giving this

13   proposal, Jeanette Stump said to you, Our legal department

14   is not convinced these letters are applicable, didn't she?

15   A.    Yeah.  That was a complete about-face.

16   Q.    She said that she did not have a Letter C in her

17   possession, correct?

18   A.    I think she or Randy Moore made a statement about not

19   having a copy of Letter C.

20   Q.    Didn't she ask you for SPD's retirees received at

21   retirement?

22   A.    She may have made a request for SPD's, but I don't

23   recall specifically.

24   Q.    And you understood the reason she asked for that was

25   because, if a Letter H applied, something about the right

1    to terminate or modify benefits had to be contained in the

2    Summary Plan Description, correct?

3    A.   I'm not sure that's correct as a legal matter, no.

4    Q.   So, you can terminate or modify retiree health care

5    benefits under an ERISA plan without giving them notice of

6    the circumstances under which they may be terminated or

7    modified?

8    A.   Well, that's a different question than the one you

9    asked before.

10   Q.   I'll ask the second one.

11   A.   Generally, health and welfare plans are subject to

12   change unless there is clear language that reflects the

13   parties' intent that they be vested and not subject to

14   change.

15        Here, the parties had agreed that these would be

16   negotiable issues.  And by the very nature of committing to

17   treat these as mandatory subjects of bargaining, that would

18   be completely inconsistent with the notion of them being

19   vested.  You don't commit to bargain or potentially bargain

20   to impasse over matters about which you assumed would be

21   unchangeable.  You would only commit to bargain about

22   something as a mandatory subject of bargaining if you

23   understood that it was subject to change.

24   Q.   Thank you, sir.  I'm not sure what, if anything, that

25   had to do with the requirements of an SPD, but let me ask

1    you a different question.

2    A.    Okay.

3    Q.    Didn't Mr. Moore tell you, on November 30th, 2006:  In

4    the year 2000, we were clearly told Letter H did not apply

5    to M&G or Shell, and I have a document that reflects that?

6    Did he say that?

7    A.    I don't know if he said it on November 30th, but I do

8    remember Randy making reference to David Dick's confusion

9    about Letter H.

10    Q.    Now, did he say something about David Dick's

11    confusion, or did he say that he was told Letter H did not

12    apply?

13    A.    I think he probably -- you know, I don't recall his

14    exact words, but it was referencing that document from

15    October of 2000 that you had previously shown me.

16    Q.    Now, Letter 2003-6, which, by your testimony, confirms

17    was not adopted by these parties until August 9th, 2005,

18    doesn't Letter 2003-6, as adopted, require the parties to,

19    quote, meet and discuss, close quote, issues related to

20    retiree medical benefits?

21    A.    I believe that was the language used.

22    Q.    And isn't that what the union was doing in 2006:

23    meeting and discussing the issues with M&G Polymers?

24    A.    Yes.

25    Q.    So, you convened a meeting, or you -- I'm sorry.

1    Maybe that's the wrong word.  You hosted a meeting on

2    December 5th, 2006, in your offices in Columbus?

3    A.    Yes.

4    Q.    And Mr. Joe Stuligross attended?

5    A.    He did.

6    Q.    He's from the Steelworkers' legal department?

7    A.    Yes.

8    Q.    Did he leave any doubt in your mind that the United

9    Steelworkers questioned whether Letter H applied and

10   whether it was permissible for the union to negotiate

11   revisions to either the plan design or the contributions

12   required by existing retirees?

13   A.    I had no question that he had questions about that.

14   Wasn't obvious that he'd made a determination.

15   Q.    It was important enough for -- I believe you testified

16   five different union representatives came to that meeting:

17   Randy Moore, Brian Wedge, Joe Harris, Jeanette Stump, and

18   Joe Stuligross, correct?

19   A.    That's correct.

20   Q.    All right.  And at various times, Jeanette Stump had

21   questioned whether Letter H applied, correct?

22   A.    Well, she did on November 30th after we presented our

23   proposal, yes.

24   Q.    And you've already testified Mr. Moore raised the

25   issue of the David Dick memo and questioned the

1    applicability of Letter H, correct?

2    A.    Again, late in the day on November 30th, he did, yes.

3    Q.    And then, at this meeting on December 5th, Joe

4    Stuligross raised the same issues, correct?

5    A.    He did.

6            MR. COOK:  All right.

7            We have nothing further, Your Honor.  Thank you.

8            THE COURT:  Any redirect, Mr. Miscimarra?

9            MR. MISCIMARRA:  Just a date clarification, Your

10   Honor.

11           THE COURT:  All right.

12                        - - -

13                  REDIRECT EXAMINATION

14   BY MR. MISCIMARRA:

15   Q.    Mr. Long, you were discussing the sequence of events

16   from December 12th when Ms. Shipley first brought up the

17   subject of Letter H.  And then we were talking about that

18   February 9th document --

19   A.    Yes.

20   Q.    -- which you indicated the union, at that point, had

21   taken some inconsistent positions.  And during your

22   cross-examination, you were talking about when the union

23   raised some questions.  And you mentioned the name of

24   someone named Bob Reynolds.

25   A.    Yes.

1  Q.   And I believe you said something like he raised some

2  question in November.  And I just want to come back and

3  make sure that the dates are right.

4       So, December was when Ms. Shipley first, you've

5  testified, mentioned Letter H, and Mr. Stewart also talked

6  about Letter H?

7  A.   Yes.

8  Q.   And then when, in relation to the February 9th, 2004,

9  letter, which is Defendants' Trial Exhibit 106, when was it

10  that an individual named Bob Reynolds said anything, one

11  way or the other, about the applicability of Letter H?

12  A.   He made those statements earlier that same day on

13  February 9, 2004.

14  Q.   Okay.  So, if you said "November" before --

15  A.   That was a mistake.  Yeah.  He was not even involved

16  in the negotiations until early 2004.

17            MR. MISCIMARRA:  Okay.  No further questions.

18            THE COURT:  Thank you, Mr. Miscimarra.

19            Anything further on recross?

20            MR. COOK:  One question.

21                         - - -

22                  RECROSS-EXAMINATION

23  BY MR. COOK:

24  Q.   Mr. Long --

25            MR. COOK:  I'm going to get stuck.  There's probably

```
 1        going to be two.

 2                THE COURT:  Who's counting?

 3        BY MR. COOK:

 4        Q.   Mr. Long, did Mr. Korber -- and I don't want to know

 5        the content of any privileged conversation.  During the

 6        period late 2004, from July 12th, 2004, forward, through

 7        the end of 2005 -- if you'll address your memory to that

 8        period -- did Kimm Korber, on behalf of M&G, inform you of

 9        communications between M&G Polymers and Buck Consultants,

10        the actuaries who prepared the FAS 106 reports for M&G,

11        concerning the applicability of Letter H?

12                MR. MISCIMARRA:  Your Honor, objection.

13                THE COURT:  It does exceed the scope, unless you can

14        tell me how it doesn't.

15                MR. COOK:  The scope of redirect?

16                THE COURT:  Of redirect.

17                MR. COOK:  It does.

18                THE COURT:  Thank you.

19                MR. COOK:  I'm not going to lie.

20                THE COURT:  I appreciate that.  I really do.

21                Thank you, Mr. Cook.

22                Anything further, then, Mr. Cook?

23                MR. COOK:  No.

24                THE COURT:  Okay.

25                Is this witness excused, Mr. Miscimarra?
```

1          MR. MISCIMARRA:  He is.  And, Your Honor, I would

2     request just a short break, but the witness is excused.

3          THE COURT:  Mr. Long, you are excused.  Thank you

4     for your time and trouble.  You're not to discuss your

5     testimony with anyone who has testified or who is yet to

6     testify.  Do you understand?

7          THE WITNESS:  I do.

8          THE COURT:  And pull that microphone up before you

9     leave.

10          We're going to get that fixed sooner or later.

11    Thank you.

12          (Whereupon, the witness was excused.)

13          THE COURT:  And, Mr. Miscimarra, you need a short

14    recess to kind of check everything?

15          MR. MISCIMARRA:  Yes, Your Honor.

16          THE COURT:  Yeah.  Well, let me ask you, because

17    maybe it will be more than a short one.

18          Assuming you're finished and exhibits are

19    admitted -- I'm not sure they've got them all -- would you

20    anticipate, Mr. Cook, any rebuttal?

21          MR. COOK:  We wish to discuss that at this time, no,

22    except we need to know which --

23          THE COURT:  Which exhibits?

24          MR. COOK:  Well, no, which depositions will be

25    offered by the defendants, so that we can determine which,

```
 1    if any, we need to offer.

 2              THE COURT:  Okay.  All right.  Good.  All right.

 3              Well, then, let's take a short recess.

 4              Mr. Miscimarra, maybe -- I don't know -- 15 minutes?

 5              MR. MISCIMARRA:  Even shorter than that would be

 6    fine, Your Honor.  Ten minutes?

 7              THE COURT:  All right.  Let's go ten minutes.

 8              Thank you.

 9              (Whereupon, a recess was taken at 10:50 a.m., and

10    the proceedings reconvened at 11:00 a.m.)

11                            - - -

12    IN OPEN COURT:

13              THE COURT:  Mr. Miscimarra.

14              MR. MISCIMARRA:  Yes, Your Honor.

15              At this time, Your Honor, we have some deposition

16    designations for Jim Kruse and Dale Wunder that we would

17    submit as part of the record.  And that includes a number

18    of exhibits --

19              THE COURT:  Okay.

20              MR. MISCIMARRA:  -- but not many.

21              THE COURT:  He adds quickly.

22              All right.  Have those designations been provided to

23    counsel for the plaintiff?

24              MR. MISCIMARRA:  We have exchanged designations.

25    And we also have hard copies available for the Court.
```

1    THE COURT:  And are there cross-designations from

2    the plaintiff?

3    MS. FISCHER:  Your Honor, we have designations for

4    Dale Wunder, James Kruse, and David Dick.  And we do have a

5    few exhibits, Your Honor.  By "a few," I mean four.

6    THE COURT:  Okay.  Let's start with Mr. Miscimarra.

7    Is this going to be something much on the same order

8    as what I did the other night, or not?

9    MR. MISCIMARRA:  I don't think that there are very

10    many, if any, objections to the designations that we would

11    offer.

12    THE COURT:  Good.

13    MR. MISCIMARRA:  And I would defer, actually, with

14    respect to these designations, to Mr. Weals and Ms.

15    Davidson.

16    THE COURT:  Mr. Weals and Ms. Davidson, how long

17    will this take me?

18    MR. WEALS:  I don't think the Kruse will take very

19    long at all.  We have our designations, the plaintiffs'

20    counter-designations, and then our rebuttal.  There were no

21    objections raised by the plaintiffs to our designations.

22    There are five exhibits, two of which have already

23    been admitted in evidence.  And of the remainder, two are

24    plaintiffs' exhibits, and one is a joint exhibit.  So, I

25    don't anticipate there being a problem with that.

VOL. VI 78

```
 1          THE COURT:  And that's with regard to Kruse?

 2          MR. WEALS:  Yes, sir.

 3          MS. FISCHER:  Your Honor, when we exchanged the

 4    deposition designations with the defendants, we reserved

 5    all the objections as initially raised in the depositions.

 6    We don't have any new objections, but we do reserve the

 7    ones we raised during deposition, Your Honor.

 8          THE COURT:  Okay.  So, I'm having a difficult time.

 9    You're saying there were no objections.  And you're saying

10    you reserved objections, but he's saying there weren't any

11    to begin with.  I think that's what you're saying.

12          MR. WEALS:  If I could speak -- maybe I should come

13    up to the podium, Your Honor?

14          THE COURT:  Well, either way, or --

15          MR. WEALS:  All right.

16          THE COURT:  Well, what I'm thinking -- go ahead.

17          MR. WEALS:  When we counter designated, I believe

18    the Court's instructions were that we were to exchange

19    designations, counter-designations, and objections.  We set

20    forth our objections at that time to whatever it was that

21    was being designated by the plaintiffs.  And it was our

22    understanding that they were going to do the same.

23          The absence of any specific objections to particular

24    pieces of testimony we read as being not an objection, not

25    that they had somehow reserved any objections.  And I don't
```

1    believe, other than to the foundation of the question,

2    there were any that were raised at the deposition itself.

3         THE COURT:  Well, but those were raised.  And you're

4    suggesting that those were reserved?

5         MS. FISCHER:  I am, Your Honor, in fact.  And I'll

6    give hard copies to the Court.  And if you need extras, we

7    have them, as well.

8         Your Honor, in our designations and our counter-

9    designations, we've -- in the first paragraph, we

10   immediately state that any objections contained in the

11   portion of the record being designated have been preserved,

12   that we are re-raising, essentially, Your Honor.

13        THE COURT:  Okay.  What I'm going to need is a full

14   copy of the deposition, at least that designated portion,

15   and the counter, and maybe the rebuttal.  I don't know.

16   And you have that.  And it has the objections in them,

17   right?

18        MR. WEALS:  To the extent it was contained within

19   what we were designating or they were counter designating,

20   yes.

21        THE COURT:  Okay.  Good.

22        And it also has in there the identification of those

23   exhibits that you just discussed, although it doesn't sound

24   like that's a big problem, unless, Ms. Fischer, you have

25   some issue there.

1          MS. FISCHER:  We have the deposition exhibits, Your

2     Honor, listed, and what I'm going to offer to the Court,

3     just the four that we mentioned.

4          THE COURT:  Okay.  And those are identified in this

5     deposition?

6          MS. FISCHER:  Yes, Your Honor.

7          THE COURT:  Okay.

8          MS. FISCHER:  Yes.

9          THE COURT:  All right.  And you had some identified,

10    also, in the deposition, Mr. Weals; is that correct?

11         MR. WEALS:  That's correct.  I mean, we designated

12    Mr. Kruse's testimony at the same time that they

13    designated.  So, we were --

14         THE COURT:  Yeah.

15         MR. WEALS:  So, there are three sets of each.

16         THE COURT:  Okay.  All right.  So, that's going to

17    take me a little while, but that's fine.

18         Now, let's talk about Mr. Wunder.

19         MS. DAVIDSON:  Yes, Your Honor.  It's basically the

20    same scenario.  We designated testimony by Mr. Wunder.  We

21    received counter-designations from the plaintiffs.  And

22    then we made rebuttal designations.

23         And then there are five exhibits from Mr. Wunder's

24    deposition that have not yet been admitted.  There are

25    other exhibits referenced in his deposition that have

```
 1    already been admitted elsewhere.  So, it's only those five

 2    from Mr. Wunder's deposition that we're seeking to admit

 3    now.

 4              THE COURT:  Okay.

 5         What I'm going to need -- well, what would be

 6    helpful -- I guess I don't need it, but what would be

 7    helpful is for you, Counsel for the Defense and Counsel for

 8    the Plaintiff, to designate what exhibits have already been

 9    admitted that are made reference to in -- I guess it would

10    simply be what exhibits do you want me to rule on, because

11    some of them have already been ruled on, right?

12              MS. DAVIDSON:  Correct.

13              THE COURT:  So, if you guys can do that, that would

14    be helpful.  That way, I don't have to cross check exhibits

15    with exhibit numbers or deposition numbers and so forth.

16         All right.  And the same response from Ms. Fischer

17    would continue with regard to Wunder as it did with Kruse?

18              MS. FISCHER:  Correct, Your Honor.

19              THE COURT:  All right.  So, I'll need to read those.

20         And then Mr. Dick is -- yes.  Now plaintiff is going

21    to designate portions of the David Dick deposition.  Is

22    that correct?

23              MS. FISCHER:  That's correct, Your Honor.

24              THE COURT:  And did you have counters to that?

25              MS. DAVIDSON:  We provided both written objections
```

1    and counter-designations to the plaintiffs' original

2    designations for Mr. Dick's deposition.

3        THE COURT:  Okay.  And does it have exhibits, also,

4    that have not yet been admitted?

5        MS. FISCHER:  Yes, Your Honor.  We only are offering

6    one from David Dick's that has not been.

7        And if I may, Your Honor, I did, sort of, what

8    defendants did with the Duane Lee deposition transcript:

9    highlighted in yellow the plaintiffs' designations; in

10   blue, defendants' designations; and then green as the

11   combined.

12       THE COURT:  Good.

13       MS. FISCHER:  If that's helpful, I can e-mail to it

14   Mr. Miller.

15       THE COURT:  It's helpful.

16       MS. FISCHER:  I'm going to copy defendants on it

17   just to ensure I didn't miss anything.  Or if you have a

18   similar copy, we can use yours, whatever you prefer.

19       MS. DAVIDSON:  With respect to --

20       MS. FISCHER:  -- the highlighted transcript.

21       MS. DAVIDSON:  Of Mr. Dick?

22       MS. FISCHER:  Yes.

23       MS. DAVIDSON:  That's fine.

24       THE COURT:  That's for the deposition of Mr. Dick?

25       MS. FISCHER:  Yes.  I think that one was a little

VOL. VI    83

1    more extensive.  So, it might be helpful, Your Honor.

2         THE COURT:  Okay.

3         What about the highlighted portions, joint and

4    individual, as to Kruse and Wunder's?  Do you guys have any

5    of that?

6         MR. WEALS:  We do, Your Honor.

7         THE COURT:  That's right.

8         MR. WEALS:  We have a notebook with the designations

9    that we made, counter-designations, and then our rebuttal.

10   And they're identified as such in the transcript.

11        THE COURT:  Good.  Good.

12        All right.  So, you e-mail me, or e-mail Mr. Miller,

13   the Dick deposition with the designations.  You give me

14   those, Mr. Weals, and identify what exhibits you wish to

15   have admitted via the depositions that have not already

16   been admitted.

17        And where are those exhibits?

18        MS. FISCHER:  For ours --

19        THE COURT:  Are they on the disks?

20        MS. FISCHER:  Yes.

21        THE COURT:  All right.

22        Denise, you have those disks still?

23        COURTROOM DEPUTY CLERK:  They're right here, Judge.

24        THE COURT:  Good.  That will take care of that.

25        All right.  Then, Ms. Fischer, anything further on

1    that?

2            MS. FISCHER:  Just one question, Your Honor.

3            THE COURT:  Okay.

4            MS. FISCHER:  Will there be an opportunity for the

5    exhibits to be read into the record so that, if we have any

6    objections, we may raise them?

7            THE COURT:  Sure.

8            MS. FISCHER:  Okay.

9            THE COURT:  I mean, anything you wish to do in that

10   regard is fine.

11           MS. FISCHER:  Thank you, Your Honor.

12           THE COURT:  Yeah.  Then once I get finished with

13   that, it's at that point in time, Mr. Miscimarra, you may

14   want to decide about resting?  Is that it?

15           MR. MISCIMARRA:  Yes, Your Honor.

16           THE COURT:  You guys -- you tell me.  You know

17   better than I do.  How many pages of deposition -- well,

18   how long is it going to take me to run through this?  Have

19   any idea?

20           MR. WEALS:  Your Honor, I do not believe that there

21   are many objections that are raised in the Kruse

22   deposition.  And I don't think that there is going to be

23   much dispute about the exhibits themselves.  So, I think it

24   will be a quick read, with very little, very few, rulings

25   required.

VOL. VI   85

```
 1              THE COURT:  And that's a couple hours, at tops?
 2              MR. WEALS:  An hour, maybe, for Kruse.
 3              THE COURT:  For Kruse.  Well, what about Wunder?
 4              MS. DAVIDSON:  Probably about the same for Wunder.
 5              THE COURT:  Another hour.
 6         Dick.
 7              MS. FISCHER:  Your Honor, probably at least an hour.
 8              THE COURT:  For Dick?
 9              MS. FISCHER:  At least, Your Honor.
10              THE COURT:  At least.  Three hours.
11         All right.  Then, assuming, Mr. Cook, --
12              MR. COOK:  Your Honor, if it helps you any, at
13    present, we do not anticipate additional rebuttal beyond
14    the designations that we're submitting.
15              THE COURT:  That's where I was going with that.
16         All right.  Well, something has come up at lunch,
17    too, for a hearing on a protective order for a hearing next
18    week.  And I don't know how long that's going to take.
19         You know, I think, to be safe, we'd better return
20    back here at, like, 2:30 or three o'clock, is what I'm
21    thinking, for, I am assuming, a motion.  I am assuming
22    that, if I deny the motion, closing arguments, initial
23    closing and rebuttal.  Right?
24              MR. COOK:  (Nodding affirmatively.)
25              THE COURT:  And you guys had all weekend to work on
```

```
 1    it, which is scary, because now they're going to be
 2    lengthy.  I understand.  It is what it is, yeah.  And if we
 3    started around 3:00, would that give you enough time to
 4    finish your closing by 5:00, everybody?
 5              MR. COOK:  Your Honor, we anticipate approximately
 6    an hour, 45 minutes to an hour, for our closing.
 7              THE COURT:  Total?
 8              MR. COOK:  Total.
 9              MR. MISCIMARRA:  The same.
10              THE COURT:  Okay.  All right.
11              Let's return back here -- I don't think we can get
12    done before 3:00.  So, let's return back here at three
13    o'clock.
14              MS. FISCHER:  Your Honor, just one request.  Is
15    there any way we could identify on the record, now, what
16    the deposition exhibits will be that will be offered?
17              MR. WEALS:  Your Honor, we have copies for opposing
18    counsel.
19              THE COURT:  That would be great.
20              MS. FISCHER:  Okay.  Thank you.
21              THE COURT:  All right.
22              MS. FISCHER:  Thank you, Your Honor.
23              THE COURT:  And, Ms. Fischer, with regard to that
24    swearing-in thing, --
25              MS. FISCHER:  Yeah.
```

1          THE COURT:  -- when did you want to do that?

2          MS. FISCHER:  Whenever it's convenient for you, Your

3    Honor.

4          Thank you, by the way, for doing that.

5          THE COURT:  That's okay.

6          Let's go off the record.

7          (Whereupon, discussion was had off the record,

8    following which the lunch recess was taken at 11:16 a.m.)

9                              - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Monday Afternoon Session

 2                        May 16, 2011

 3                         3:03 p.m.

 4                          - - -

 5     IN OPEN COURT:

 6              THE COURT:  All right.  We're back on the record.

 7         The Court has reviewed the testimony, deposition

 8     testimony, the designated portions of the deposition

 9     testimony of Kruse, Wunder and Dick.  Let's start with

10     Kruse.

11         There were a few objections to the Kruse designated

12     portions.  The first one was a request to expand the scope

13     on page 24, Line 8, through 24, Line 15.  And the Court

14     grants that, or sustains that, and will expand the scope.

15         The next objection was concerning page 157, Line 22,

16     through 158, Line 16.  The objection is being made because

17     of hearsay, and the Court sustains that objection.  Those

18     portions of the transcript, or those lines of the

19     transcript, are deleted.

20         There was a foundation objection to page 164, Line 4

21     through 6, and 164, Line 22, through page 165, Line 4.

22     That foundation objection is overruled.

23         Now, with regard to the Exhibit 118, it's Deposition

24     Exhibit 118; it's Trial Exhibit Defendants' 252.  Oh!

25     That's already been admitted, hasn't it?
```

1          Next one is Deposition Exhibit Number 307.  It's

2     Joint Exhibit 15.  And that has not yet been admitted.

3     Part of that exhibit identification is not in the

4     designated portion of the transcript, and that which is in

5     the portion of the designated portion Kruse could not

6     identify.  So, Joint Exhibit 15 is not admitted except for

7     this.  It was a joint exhibit.  And I don't know if you,

8     between the parties, want to agree to it or not.  That was

9     my problem with that joint exhibit.

10          MR. COOK:  Just a moment, Your Honor.

11          THE COURT:  Sure.  Everybody wants to find out what

12     it is.

13          MR. COOK:  We have no objection to Joint Exhibit 15.

14     No objection, Your Honor.

15          THE COURT:  Mr. Weals?

16          MR. WEALS:  No, Your Honor.

17          THE COURT:  Good.  Then Joint Exhibit 15 will be

18     admitted by agreement of the parties.

19          Deposition Exhibit 2, which is Plaintiffs' Trial

20     Exhibit 2, has already been admitted.

21          Deposition Exhibit 138, which is Plaintiffs' Exhibit

22     31, will be admitted.

23          Deposition Exhibit 305, which is Plaintiffs' Exhibit

24     276, will be admitted.

25          All right.  I think that takes care of all of the

1     Kruse deposition.

2          With regard to the Wunder -- oh!  I had these

3     booklets.  Are they yours or mine?

4          MR. WEALS:  You may keep them if you'd like, Your

5     Honor.

6          THE COURT:  I don't like to keep -- I don't like --

7     no.  No.  That's okay.  I'll keep them for my own

8     reference.  I just was worried that you didn't have them.

9          I have a little bit more problems with Wunder's

10    deposition.  I have reviewed the designated and rebuttal

11    designated and other designated portions of that

12    deposition.  Let's go over the objections first.

13         Okay.  There was an objection; and, basically, it

14    requested an expansion of the scope.  That is, expand on

15    page 8, Line 21, through page 9, Line 12.  That's granted.

16         Also, the same as to page 11, Line 6, to page 12,

17    Line 2.  The Court grants that expansion.

18         Page 13, Line 7, through page 13, Line 12, a request

19    for expansion.  That's granted.

20         A request for an expansion on page 14, Line 24,

21    through page 16, Line 2.  That's granted.

22         A request for expansion on page 17, Line 1, through

23    page 19, Line 12.  That's granted.

24         There is an objection to page 19, Lines 14 through

25    22, indicating a misleading -- an objection is that it is

1    misleading as to characterization of the P&I Agreement.

2    That's denied.

3         We go back and forth on this, somewhat, on that same

4    objection.

5         There is a request to expand on page 20, Lines 2,

6    through page 21, Line 9.  That's granted, but then there is

7    the same objection to misleading as to the characterization

8    of the P&I Agreement as existing solely in the form of a

9    booklet.  That's denied.

10        The same objection, then, is contained at page 21,

11   Line 22, through page 22, Line 3.  That's denied, also.

12        There is a request to expand, page 22, Line 13,

13   through 23, Line 22.  That's granted.

14        But, again, there is this misleading as to

15   characterization of P&I Agreement.  That's denied.

16        The same is denied as to page 23, Lines 1 through

17   11.

18        The Court grants the requested expansion of page 32,

19   Lines 4 through 12.

20        The Court grants the requested expansion on page 41,

21   Line 6, through page 43, Line 2.

22        With regard to the objection on lack of foundation,

23   lack of personal knowledge, page 41, Lines 18 through 24,

24   that objection is sustained as to Lines 22, 23 and 24, but

25   it is overruled as it applies to Lines 18, 19, 20 and 21.

1    That is, those lines will come in.  The other lines, 22,

2    23, and 24, will be stricken.

3         A request to expand, page 41, Line 6, through 44,

4    Line 13, that's granted.

5         Request to expand, page 44, Line 22, through page

6    45, Line 8, that's granted.

7         There is another objection as to misleading as to

8    characterization of P&I Agreement.  I disagree.  It does

9    not do that.  The Court denies that objection.

10        Oh, yeah.  This had to do with Exhibit 12.

11        As to page 62, Line 17, through 66, Line 10, it

12   has to do with the contents of the SPD's.  The objection is

13   speculation, foundation, lack of personal knowledge,

14   misleading characterization of documents and relevance.

15   You didn't get hearsay in there, but everything else.  All

16   of that is overruled based upon the witness' expertise and

17   position in the company.

18        There was a request to expand page 77, Line 3,

19   through 78, Line 1.  That's granted.

20        An objection was made concerning relevance,

21   foundation and speculation.  And, again, because of his

22   position, that's denied.  It speaks to what he thinks the

23   agreement is.

24        There was a request to expand page 81, Lines 2

25   through 10.  That's granted.

1    There was an objection calling for legal

2    conclusion, specifically, page 81, Lines 2 through 9.

3    That's denied.  It has to do with his interpretation of the

4    agreement and what qualifies for benefits.

5    That takes care of the objections on Wunder.

6    With regard to the exhibits, Defendants' Exhibit

7    269, which is Deposition Exhibit 146 -- I can't read my

8    notes -- that exhibit is included, with the exception of

9    the following pages:  Bates pages 303815 through 303825.

10   There are problems with those pages.  The rest of the

11   exhibit is okay.

12   Joint Exhibit 16 is admitted.

13   Plaintiffs' Exhibit 31 is admitted.

14   Plaintiffs' Exhibit 32 is admitted.

15   Plaintiffs' Exhibit 278 is admitted.

16   All right.  I think that takes care of Wunder.

17   MS. DAVIDSON:  Your Honor, there was one more,

18   Plaintiffs' 278.

19   THE COURT:  Oh!  I'm sorry.  I missed it.

20   Yes.  That's admitted, too.  Thank you.

21   All right.

22   Now we have the deposition testimony, the designated

23   portions of the deposition testimony, of David Dick.  There

24   were just a few objections.  There was an objection to page

25   16, Lines 1 through 25.  The objection is based on lack of

1     foundation.  That's overruled.

2         There is a lack of foundation objection to page 18,

3     Lines 10 through 20.  That is sustained.  There was not a

4     proper foundation.

5         There is an objection to page 37, Lines 18, through

6     page 38, Line 3.  And that, also, is sustained on the

7     grounds of lack of foundation.

8         There is an objection to lack of foundation and

9     speculation on page 71, Line 17 through 22.  That is

10    sustained only as to Lines 21 and 22.  Seventeen, eighteen,

11    nineteen and twenty will be allowed.

12        There is a request to expand on page 82, Line 18,

13    through page 84, Line 6.  That's granted.

14        A request to expand page 85, Line 2, through page

15    86, Line 5, that's granted.

16        A request to expand page 86, Line 23, through page

17    87, Line 12, that's granted.

18        There was an objection to page 93, Lines 8 through

19    17.  That's overruled.

20        There was an objection based on speculation as to

21    page 94, Lines 4 through 7.  That's overruled.

22        There is an objection as to foundation and

23    speculation on page 96, Lines 18, through page 97, Line 9.

24    That's overruled.

25        And then there was an objection to counsel's

1    characterization of a document which speaks for itself.  If

2    I were to grant that, three quarters of the documents

3    today, or the last six days, would be thrown out.  The

4    Court overrules that.  It's, specifically, at page 103,

5    Line 24, through page 108, Line 9.

6          And then the exhibit -- that's Plaintiffs' Exhibit

7    80.  It's Deposition Exhibit 150.  It was a tortured path,

8    but he finally got to it.  And the Court will admit

9    Plaintiffs' Exhibit 80.

10         All right.  So, with that, as I understand it,

11   Defendant, you have no further testimony to present at this

12   time?

13         MR. MISCIMARRA:  I believe there is one point to

14   address, Your Honor.

15         MS. DAVIDSON:  Just one.  Pure housekeeping.

16         THE COURT:  Okay.

17         Ms. Davidson?

18         MS. DAVIDSON:  The Court may already have these, but

19   we brought copies of the signature pages and the errata

20   sheets, to the extent that the witnesses had signed them,

21   for Wunder, Kruse and Dick.  And we can --

22         THE COURT:  That is a good housekeeping thing that

23   we should take care.

24         I assume there is no objection to the signature

25   pages?

```
 1              MR. COOK:  No, Your Honor.

 2              THE COURT:  Thank you.

 3              The signature pages will be added to the

 4      depositions.

 5              MS. DAVIDSON:  Would you like them now, or we can do

 6      it --

 7              THE COURT:  Yep, now, or we'll forget.

 8              Thank you for catching that.

 9              MS. DAVIDSON:  Sure.

10              THE COURT:  We're off the record, Denise.

11              (Whereupon, an off-the-record discussion was held.)

12              THE COURT:  I'm going to revisit, now that I have

13      these errata sheets, just to make sure.

14              As I looked through them, just briefly, there was

15      only one little issue that I saw.  I don't think it will be

16      a big problem, but I'll check them against that which I've

17      already ruled upon.

18              MR. COOK:  All right.

19              THE COURT:  Okay.  Now, any further testimony that

20      the Defense wishes to present at this time?

21              MR. MISCIMARRA:  No, Your Honor.

22              THE COURT:  Thank you.

23              Mr. Miscimarra, anything further?

24              MR. MISCIMARRA:  No, Your Honor.  The defendants

25      rest.
```

```
1              THE COURT:  Counsel for the plaintiffs, do you have
2       any rebuttal testimony?
3              MR. COOK:  Plaintiffs will offer no rebuttal, Your
4       Honor, --
5              THE COURT:  Mercifully.  Thank you.  I don't mean
6       that --
7              MR. COOK:  -- other than the deposition
8       designations, --
9              THE COURT:  That's right.
10             MR. COOK:  -- which, technically, came in during
11      rebuttal.
12             THE COURT:  That's true.  The Dick deposition.
13             MR. COOK:  Yes.
14             THE COURT:  Okay.
15             Thank you, Mr. Cook.
16             Mr. Miscimarra, anything further before closing?
17             MR. MISCIMARRA:  Excuse me, Your Honor?
18             THE COURT:  Anything further before closing?
19             MR. MISCIMARRA:  There may be one other
20      housekeeping, if I could have a moment, Your Honor?
21             THE COURT:  Okay.
22        (Whereupon, there was a brief interruption.)
23             MR. MISCIMARRA:  Your Honor, --
24             THE COURT:  Yes, sir.
25             MR. MISCIMARRA:  -- we have a motion to make.
```

```
 1            THE COURT:  Yes.
 2            MR. MISCIMARRA:  We'd move for judgment as a matter
 3      of law, again, pursuant to Rule 52.
 4            THE COURT:  I wondered if you were going to forget
 5      that.
 6            The Rule 52 motion is overruled, and the same is
 7      denied.  And, you know, whatever needs to be recorded in an
 8      opinion and order following this will be recorded in an
 9      opinion and order.
10            Thank you.
11            MR. MISCIMARRA:  Thank you, Your Honor.
12            THE COURT:  All right.  Now, closing arguments, I
13      think.
14            Mr. Cook, are you ready to proceed with your closing
15      argument?
16            MR. COOK:  We are, Your Honor.  Thank you.
17            At this time, I will hand a copy of a Power Point
18      presentation which will accompany our closing to my
19      opposing counsel.  And I have one for the Court and Mr.
20      Miller.
21            And, of course, Your Honor, it will appear on your
22      screen.
23            THE COURT:  Gentlemen and ladies, let me say one
24      thing before you start.
25            I can't tell how much I've appreciated this trial
```

1       and your conduct in this trial.  I mean that.  I say it now

2       because I want everybody to hear it, and if we lose some

3       spectators or some parties before you're done with closing,

4       I want them to hear this.

5           All of you have conducted yourself in an extremely

6       professional manner.  It makes it easy for the judge.  I

7       will say that.  All of you are a credit to your profession,

8       and I appreciate it.  I really do.

9           This has been a trial that I did not want to see on

10      my docket, but it's one that, as I was proceeding through

11      it, found it to be not as difficult as I thought it would

12      be.

13          Thank you.

14          MR. COOK:  Thank you, Your Honor.

15          THE COURT:  I really appreciate it.

16          MR. MISCIMARRA:  Thank you, Your Honor.

17          THE COURT:  Okay.  You may proceed, Mr. Cook.

18          MR. COOK:  Thank you.  I'll prop up my notebook a

19      little bit so it's easier to read, Your Honor.

20          THE COURT:  All right.  You still haven't gotten

21      that taken care of, have you?

22                        - - -

23              PLAINTIFFS' CLOSING ARGUMENT

24                        - - -

25          MR. COOK:  Thank you, Your Honor.  As I begin

1  plaintiffs' closing argument, I wish to thank the Court for

2  its attention to this matter.  This has been a trial on

3  complex issues, with a heavy emphasis on lengthy documents

4  and a winding, twisting chronology spanning almost two

5  decades.  We appreciate the focus the Court has had and the

6  diligence with which you have maintained that focus on the

7  core issues in the case.  And we thank you.

8       I also thank plaintiffs' trial team for their

9  undaunted commitment to this case and the cause our clients

10  brought to us to help them in preserving their lifetime

11  health coverage.  We thank the plaintiff class

12  representatives and their wives for their commitment of

13  such time and devotion to seeing this process through when

14  it would have been easier to throw up their hands and go on

15  with their lives.

16       And, Your Honor, I wish to offer my appreciation to

17  opposing counsel for their civility and approach to the

18  trial of this matter.  While we clearly disagree on the

19  facts and, to some extent, even on the law, counsel have

20  been able to do so without being disagreeable.  And, for

21  that, we thank them. Counsel for M&G have conducted

22  themselves in a highly professional manner which has made

23  it possible for us, for them, and for the Court to focus on

24  the issues in the case, instead of personalities and petty

25  differences.  We believe this is how trials should be

1    conducted.  And, for that, we offer our sincere

2    appreciation to Mr. Miscimarra, Ms. Davidson, Mr. Weals,

3    Mr. Richards and Mr. Scroggins.

4         Your Honor, defendants have, in their opening

5    statement and in their Motion for Partial Findings, asked

6    the Court to focus on what they term three core questions

7    in this case.  We will deal with those questions, although

8    we believe they do not properly present the true issues in

9    the case.

10        But, first, before we do so, we pose a question to

11   the Court that, in a slightly different form, we posed to

12   Mr. Korber during his cross-examination.  That is, which of

13   ERISA's requirements that plan participants be given clear

14   notice of the events or circumstances by which their

15   benefits may be modified or terminated permits an employer

16   plan sponsor to significantly modify, then terminate,

17   retiree plan or participants' health coverage based upon an

18   unpublished contract side letter that only allegedly

19   applies to the retiree benefits in question?

20        The answer, Your Honor, as Mr. Korber stated on

21   cross-examination, is none.  There is no such provision,

22   and there is no such document.  And as the evidence in this

23   case has shown, the members of the plaintiff class never

24   received such a notice, at least until December of 2006.

25   No provision of ERISA permits an employer plan sponsor to

1    terminate benefits for retiree plan participants from prior

2    years where no such notice has ever been given.

3         In addition to the plaintiffs' arguments that the

4    contracts at issue here not only grant lifetime vested

5    retiree health care with no contributions to the class,

6    clear violations of ERISA have occurred.  ERISA Section 502

7    (a)(1)(B), 29 United States Code 1132 (a)(1)(B), permits

8    participants to bring claims to enforce the terms of the

9    plan.

10        Here, Your Honor, the terms of the plan have been

11   set forth in the Pension, Insurance and Services Award

12   Agreement Plan booklets.  Those are the documents

13   distributed to these participants.  No unpublished letters

14   ever became a part of those documents, not in 1994, '97, or

15   the year 2000.

16        And as Mr. Korber conceded both in his

17   cross-examination and in his 2007 letter to Mark Underwood,

18   the P&I booklet, in effect, served as the SPD for plan

19   participants, because that was the document participants

20   looked to for their benefits.  And this is precisely the

21   testimony that was given by the two class representatives

22   at the outset of this trial, Woody Pyles and Freel Tackett.

23        Now let me address M&G's three questions.  First,

24   Your Honor, Mr. Miscimarra asked the Court, where is the

25   agreement for lifetime uncapped retiree health care

1    benefits.

2         The answer, Your Honor, is, In the pension and

3    insurance booklets published and distributed to the union

4    members.

5         The second question he asked was, when was this

6    agreement made.  And the agreement was made each time that

7    the parties entered into these P&I booklets.

8         And the third question M&G had asked is, were the

9    actions of the parties consistent with the agreement.  And

10   we respond here, as well, yes, Your Honor, the actions of

11   the parties have been consistent.  The actions of the

12   parties have been consistent in applying lifetime retiree

13   health care with no caps until M&G changed the game in the

14   year 2006.  Goodyear did it, Shell did it, and M&G did it.

15        The only thing that's been inconsistent are the

16   actions of M&G where they attempted to change what was

17   applicable in 2003, moving into 2004, and then, of course,

18   through Letter 2003-6.

19        The plaintiff class of retirees in this matter is

20   entitled to fully vested lifetime health care benefits with

21   no contributions.  On the screen before you, in the Power

22   Point, is the language from your Opinion and Order, Docket

23   Number 163, at page 15, and the case law which underlies

24   the conclusion that tying health care benefits to receipt

25   of pension benefits is evidence of vesting.  It's the

1    contract that created these vested benefits, Your Honor.

2    And that is beyond question, and nothing in this trial has

3    proven otherwise.

4         I was going to address the issue of Reese vs. CNH,

5    but, Your Honor, in reflecting on this in consideration of

6    the remarks made to the Court in opposition to Defendants'

7    Motion for Partial Findings, I think we have addressed how

8    we believe the Court should interpret and apply the Reese

9    vs. CNH decision on remand and what was the issue, in fact,

10   in Reese vs. CNH at the Sixth Circuit.

11        Here, Your Honor, plaintiffs have proven their case

12   on the merits, and the evidence supports a finding that the

13   plaintiff class is entitled to uncapped, employer-paid,

14   lifetime health care benefits.  And this is to the pension

15   insurance booklets.  Testimony of the witnesses,

16   repeatedly, from Ron Hoover, from Randy Moore, from Karen

17   Shipley, from Brian Wedge, and from the class

18   representatives, showed that was the agreement.  And the

19   booklet did not contain a cap letter limiting the liability

20   of the corporations under Financial Accounting Standard

21   106, nor granting them the right to require contributions.

22        The Point Pleasant Polyester Plant has consistently

23   been referred to in testimony as a "me, too, with

24   exceptions" plant.  And I know the Judge has just been

25   exposed to the testimony of Mr. Kruse on deposition, but he

1     clearly testified that even Goodyear considered Point

2     Pleasant to be a "me, too, with exceptions," adopting only

3     portions of the Goodyear master bargaining agreement.  That

4     was confirmed by Mr. Hoover and by Mr. Moore.

5          M&G, through its witnesses, can point to no contract

6     provision such as Letter A of the 1991 Goodyear CBA with

7     Local 644 specifically and directly adopting into the terms

8     of the Local 644 agreement terms of the master agreement.

9     And this is particularly important because, as the years

10    went on and the plant changed ownership, all of the

11    agreements that the defendants point to are letters between

12    the Rubber Workers and, subsequently, the Steelworkers and

13    Goodyear.  None of those letters, until 2003-6, were ever

14    letters negotiated between M&G and Shell and the union at

15    the plant.

16         Retirees Woody Pyles and Freel Tackett testified

17    that the P&I booklet was the complete agreement in place,

18    as did Ron Hoover, Brian Wedge, and Randy Moore.  While

19    defendants maintain that the cap letters limit their

20    liability to pay retiree health care costs, Letter of

21    Understanding 2003-6 is the first written evidence of that

22    as an agreement between these parties.

23         I think it's important to point out that, today,

24    Robert Long, in his testimony, while he asserted to the

25    Court that Letter H had been adopted by the parties, he

1    didn't do any due diligence to determine where that was

2    adopted and how it was to become in effect at this plant.

3    He accepted the representation of Mr. Korber, and Mr.

4    Korber's testimony has been shown to be completely

5    inconsistent with respect to the application of Letter H.

6    And, in particular, we point to the inconsistencies between

7    his testimony concerning when he learned of Letter H and

8    his communications with the actuaries calculating the FAS

9    106 liabilities for the corporation.

10         This infamous Letter H was never collectively

11   bargained into the P&I agreements at Point Pleasant.  I

12   guess a way to term what M&G is asking the Court to do is

13   to present the Court with an oral modification to the

14   written P&I agreement, that somehow a representation of a

15   local official that there is a letter out there that may

16   apply orally modifies what was in writing and, most

17   importantly, what was distributed to the plan participants,

18   the retirees.

19         We assert that it's a well established rule of

20   contract law that an oral modification is not acceptable.

21   The company's conduct was consistent in one respect.  And

22   that's, until January of 2007, M&G Polymers continued to

23   pay the health care benefits for the retirees without

24   requiring contributions.

25         We believe the evidence has shown, Your Honor, that

```
1    if a contribution could have been required under Letter H,

2    given Mr. Korber's testimony about the importance of cost

3    control, legacy costs, health care costs, and getting them

4    reduced, that the Letter H, if it applied, was a principal

5    vehicle for doing so and was never utilized.  It was never

6    utilized because, in our opinion, the evidence shows it did

7    not apply.

8         We have pointed out, consistently, throughout the

9    testimony, Your Honor, that, under Letter H and under

10   letter 2003-6, contribution requirements, if they even

11   applied, would be on an annual basis, and not monthly.  And

12   nothing in those letters serves to permit the company -- in

13   this instance, it's any of the companies:  Goodyear, Shell,

14   Chemical or M&G Polymers -- to divest participants of what

15   the pension and insurance booklet vested in them when they

16   retired with 95 points.  And that was a full company

17   contribution.  They cannot take steps to require

18   contributions and then divest them permanently.  And we

19   addressed that in our opening statement and showed evidence

20   throughout that that's how that has been applied.

21        We think it's important, Your Honor, to consider the

22   purchase documents in this case.  Joint Exhibit 2 shows

23   that Shell did not assume all the Goodyear agreements, but

24   only those contained within the 1991 contract, where

25   neither the contract or the pension and insurance booklet
```

1    referenced the caps.  Plaintiffs demonstrated through Joint

2    Exhibit 2 that that Letter H was not a part of the

3    agreement and did not pass to Shell.  And then,

4    subsequently, we have shown that Letter H did not pass from

5    Shell to M&G.  And that was through the transaction

6    documents, in particular, that Exhibit 2-B, which listed

7    the documents.

8            This slide shows you sort of a chronology, Your

9    Honor, that M&G was never a party to any CBA which

10   incorporated the Goodyear P&I agreements and cap letters.

11   There was a specific incorporation letter in the 1991 Point

12   Pleasant CBA, but it does not list the Letter H.

13           The 1994 Shell Point Pleasant contract does not

14   incorporate the Goodyear P&I in any form.  In 1997, Shell

15   entered into its own P&I agreement specifically with the

16   Point Pleasant plant, and it does not contain Letter H.

17   And, in 2000 -- that brings us up to Joint Exhibit 35.

18           Let's put Joint Exhibit 35 up.

19           We believe that this is a seminal document in this

20   case, Your Honor.  Mr. Moore is at the table.  He is

21   bargaining, and the issue of whether a cap letter applies

22   comes up.  And he questions it.  And he asks the company

23   what their position is.  And he's told, in several

24   instances, That is Goodyear.  We're not Shell, and we're

25   not Goodyear.  Letter H does not apply.

1        He asked for it in writing.  And David Dick, an

2    attorney and the chief spokesperson, the one vested with

3    the authority to bind M&G Polymers, gave him Joint Exhibit

4    35.

5        Retiree health benefit contributions are set out on

6    page 115 of our P&I agreement.  Letter H is not in our

7    agreement.

8        None of the unions discussed in this case, Your

9    Honor, the URW, the USW, Local 644 of each, have ever

10   represented the retirees at Point Pleasant.  The law

11   dealing with representation of retirees has been in place

12   since 1971 in the Allied Chemical Workers vs. Pittsburgh

13   Plate Glass decision from the Supreme Court.  And every

14   witness who testified for the company and for the

15   plaintiffs consistently recited that existing retirees'

16   benefits are permissive subjects of bargaining.

17       Mr. Korber conceded on cross-examination that, but

18   for Letter H and its statement that this would be a

19   mandatory subject, but for Letter H, negotiations over

20   existing retiree health care benefits at Point Pleasant was

21   permissive.

22       We've shown you, through the evidence pointed out in

23   our closing today, Letter H did not apply.  On that basis,

24   there can be no question in this case that it was a

25   permissive subject of bargaining, and the union repeatedly

1    presented that.  And the only way that this ever became,

2    any issue of retirees' benefits became the subject of later

3    discussions, was Letter 2003-6, not adopted until August

4    9th, 2005.

5         We also think it's important to note that the mere

6    use of the word "mandatory" in an unprinted letter alleged

7    to apply to this plant can in no way manifest the retirees'

8    consent to have their vested retiree benefits bargained

9    away from them and place caps on their contributions which

10   will apply retroactively.

11        We want to address, Your Honor, M&G's actuarial

12   accounting records which show that retiree benefits were

13   lifetime and required no retiree contribution.

14        Other than Joint Exhibit 35, the David Dick memo, we

15   believe that this evidence is perhaps most damaging to

16   M&G's defense.  The interaction between M&G and, in

17   particular, Mr. Korber and the actuaries from Buck

18   Consultants show that, consistently, from the period 2000

19   through 2005, Letter H was not considered to be applicable

20   and did not form a basis for the calculation of M&G

21   Polymers' FAS 106 liability.

22        Buck Consultants calculated liabilities according to

23   information provided to them by M&G.  And at all times

24   prior to 2005, Duane Lee calculated lifetime

25   contribution-free benefits for these retirees.  Mr. Lee was

1     not informed of the discovery of Letter H until July, 2004,

2     eight months after the initial exchanges between M&G and

3     Ms. Shipley in negotiations.

4          Mr. Korber's testimony to an earlier date of notice

5     finds absolutely no support in this record and is, in fact,

6     belied by Mr. Lee's July, 2004, e-mail on the point.

7     Moreover, Your Honor, Mr. Korber's testimony on this point

8     is in total -- he is in totally -- I'm sorry.  I need a

9     drink --

10         THE COURT:  That's all right.  Take a drink of

11    water.

12         MR. COOK:  -- of water.

13         THE COURT:  I didn't get that.

14         MR. COOK:  Moreover, Your Honor, --

15         THE COURT:  Yes, water.

16         MR. COOK:  -- Mr. Korber's testimony on this point,

17    in total, is completely undermined by the documentary

18    evidence.  Where his direct testimony was that he knew of

19    Letter H shortly after he came to M&G in 2001, the

20    documents in this case show, instead, that he did not know

21    of or understand Letter H worked to cap retiree benefit

22    health costs until December of 2003 when he received a copy

23    from Karen Shipley.

24         In M&G bargaining notes, their own notes of that

25    session, if you will take a look at them, Your Honor, look

1   at Mr. Korber's response to Ms. Shipley.  He references

2   Cindy Jones and talks about a $175 deductible.  He doesn't

3   say anything about a cap.

4         Mr. Lee's communications with M&G prove the

5   attorneys for M&G worked to scramble backwards to decide,

6   retroactively, to implement the cap letter in an effort to

7   cut costs.  The company was looking to trim costs and to

8   create an ad hoc approach on how to do so even after their

9   attorneys warned them it could result in protracted

10  litigation.

11        The documents show that, as of December 2005, M&G

12  was still in the process of deciding whether and to whom

13  Letter H applied.  And, Your Honor, we note that the

14  decision on this critical issue coincided directly with

15  explanations provided to M&G by the actuaries on the huge

16  cost savings M&G would incur by retroactive application of

17  that Letter H to existing retirees for whom M&G was

18  responsible.

19        Mr. Korber authenticated Joint Exhibit 7, which is

20  on the screen in front of you.  It's a business record of

21  the completion of the sale of the Point Pleasant plant to

22  M&G.  The actuarial assumptions provided to Mr. Lee by M&G

23  clearly stated that retiree benefits are lifetime with no

24  retiree contribution.

25        Mr. Korber further acknowledged that he told the

VOL. VI    113

1    actuaries the assumptions for these calculations were to be

2    no contribution and benefits for life.  He acknowledged

3    that M&G adopted the Shell assumptions, and Shell also

4    calculated no cost for life.

5        Sixth Circuit case law supports plaintiffs'

6    assertions that Financial Accounting Standard 106 reports

7    from M&G support plaintiffs' claims of lifetime

8    employer-paid, fully funded, no-contribution retiree health

9    care benefits.

10       The Sixth Circuit decision in Wood vs. Detroit

11   Diesel, as we noted in our opening, held a little bit the

12   opposite on the FAS 106.  Whereas the plaintiffs were

13   arguing it was merely an accounting letter, the defendant

14   argued that, no, that that formed the basis for official

15   government reports.

16       And the Sixth Circuit found the company

17   substantially reduced the financial liability it reported

18   under FAS 106 on the basis of the cap agreements.

19       If those agreements had no binding effect, then this

20   was plainly deceptive accounting.  As explained above, no

21   creative reading of FAS 106 presumption rules could allow

22   the company to report capped future liabilities if retirees

23   were entitled to vested uncapped benefits.

24       Change the wording, and you see that nothing in FAS

25   106 would permit the company to report uncapped, no-cost

1      future liabilities if there was a cap that applied and

2      should be in place.  That would be improper and illegal

3      reporting to the United States Government.

4              Your Honor, I watched a fascinating video clip last

5      night on CNN, some conference called "TED."  Never heard of

6      it before.  And a remarkably intelligent young woman was

7      giving a talk to a room full of CEO's, CFO's and corporate

8      officers.  And the title of the video was "What If You're

9      Wrong?"  And she spent 15 minutes talking about how the

10     world view of people assumes we're right.  And throughout

11     the presentation we've made to the Court this week and last

12     and our arguments to you today, we have assumed we're

13     right, but I'm going to address now that, if the Court were

14     to find a cap applied, which we do not believe it does,

15     but, if it applies, we believe it cannot be applied to all

16     the retirees.

17             First, the retirees in plaintiff class obtained the

18     requisite years of service with Goodyear or 95 points as

19     they moved forward with Shell and M&G to ensure a full

20     company contribution toward the cost of health care

21     benefits.  And as noted by Ron Hoover in his testimony and

22     standing uncontradicted in the record, a contribution may

23     only be required under the applicable 95-point language for

24     those who retired with less than 95 points.

25             The Sixth Circuit has noted that, in this case, upon

1    attaining the requisite years of service, the retirees were

2    entitled to employer-paid health care benefit, a full

3    company contribution.

4          Now, if a cap were applicable and contributions were

5    required, M&G's method of requiring and calculating

6    contributions and requiring up-front payments do not

7    comport with the plain language of Letter H or with the

8    incorporation of Letter H into the process set forth in LOU

9    2003-6.

10          M&G implemented the caps on retirees in what can

11   only be described as an unconscionable manner by charging

12   the contributions that they required, and the net result

13   was described by Duane Lee as good news.  Eighty-eight

14   families dropped out in the first year, saving $5.2 million

15   from future liability and over $1.7 million in the next

16   year's expense.

17          The monthly caps, we argue, are not allowable even

18   under the terms of LOU 2003-6.  An example of some of the

19   premiums charged to these retirees is on the screen before

20   you.

21          Let's look at Joint Exhibit 34, please.

22          You can't?  We can't get that up right now.

23          THE COURT:  That's all right.

24          MR. COOK:  Okay.

25          Your Honor, we believe that M&G's implementation of

```
 1     these caps is unlawful.

 2            THE COURT:  Thirty six was the December 8, 2006,

 3     notice from M&G informing of payments for medical benefits,

 4     --

 5            MR. COOK:  Yes, --

 6            THE COURT:  -- what you referred to?

 7            MR. COOK:  -- but we were going to look at Joint

 8     Exhibit 34, which was a version of 2003-6.

 9            THE COURT:  Oh, yes.  Okay.

10            MR. COOK:  Okay.  And we'll just ask the Court to

11     review that.

12            THE COURT:  I'm familiar.

13            MR. COOK:  Right.

14            We addressed the hardships caused by the

15     implementation and the manner of implementation in our

16     opening statement.

17            M&G, Your Honor, argues it had no choice but to

18     implement these contribution requirements.  Defendants

19     claim they've been more than fair; they've tried to do the

20     right thing.  And I'll leave that for the Court to decide.

21            The net effect, and the one the actuaries made

22     absolutely clear, is that the effect was both intended and

23     welcomed; that M&G's premium requirements have now forced

24     over fifty percent of the retirees out of the health care

25     plan, permanently divesting them of what this Court has
```

1    already found to be vested retiree health care benefits.

2         The evidence in the case shows that M&G's decisions

3    as to whether and to whom Letter H might apply has been

4    driven almost entirely by the cost savings to be generated

5    by its application.

6         Plaintiffs have shown the Court what happens to the

7    men and women of the retiree class who gave their very

8    lives to this plant when they're forced to pay these

9    premiums.  Their hard earned pensions are sucked dry by the

10   imposition of these premiums, or they're forced to forego

11   much needed health care altogether.

12        Some, like Mr. Clendenen, barely make it through

13   after having been pushed out of the health care plan that

14   he worked so hard to secure.  Some, like Iva and Bob

15   Sisson, have lost everything, everything, due to the

16   conduct exhibited by M&G.

17        Freel Tackett and Woody Pyles and Harlan Conley, the

18   class representatives, have devoted themselves tirelessly

19   to this cause and this case, and they work to communicate

20   with their fellow retirees, to arrange transportation so

21   that, each day, members of the class can attend these

22   proceedings and see the American system of justice at work.

23        In conclusion, Your Honor, plaintiff class members

24   are entitled to receive contribution-free retiree health

25   care as promised in collectively bargained contracts

1    executed between these parties and applied across the

2    years.

3         M&G has violated LMRA Section 301(a) by breaching

4    the terms of the P&I agreements granting vested lifetime

5    retiree health benefits to the class with no contributions.

6         In addition, M&G has violated ERISA by significantly

7    modifying and terminating benefits to retired plan

8    participants without ever giving them notice of the

9    circumstances under which those events could occur.

10        M&G further violated the terms of the plan which is

11   shown to consist of the P&I booklet, itself, by

12   unilaterally and without justification imposing exorbitant

13   premium requirements and by terminating vested participants

14   without proper notice.

15        The class members here are entitled to have their

16   benefits restored and to be made whole as is necessary for

17   the losses that they've incurred and as a result of M&G's

18   contractual breaches, violations of ERISA, and a failure to

19   provide them the benefits that vested in them.

20        Thank you, Your Honor.

21        THE COURT:  Thank you for your closing argument.

22   Thank you, Mr. Cook.

23        Mr. Miscimarra, your closing.

24                       – – –

25              DEFENDANTS' CLOSING ARGUMENT

VOL. VI    119

```
 1                              - - -

 2              MR. MISCIMARRA:  Your Honor, I would like to begin,

 3      as well, by expressing appreciation for the Court's

 4      consideration, and everybody in the court, given to the

 5      parties in the course of this litigation.  And similar to

 6      Mr. Cook's sentiments, I appreciate the manner in which

 7      this trial has been conducted.  And I also appreciate the

 8      civility of Plaintiffs' Counsel, Mr. Cook, Ms. Arnold and

 9      Ms. Fischer.  And, you know, this trial has provided the

10      opportunity for both sides to present their best evidence.

11      And this is a significant dispute that has importance to

12      all sides, and they're very difficult, difficult issues.

13      If one thing is made clear by the evidence, it's that.

14              Now, the defendants' position in this case is very

15      different, in a number of respects, from the arguments that

16      have been presented by Mr. Cook.  One difference involves

17      the overwhelming amount of record evidence that we believe

18      supports what I indicated the defendants would prove in

19      this trial even though the defendants don't bear the burden

20      of proof.

21              There is one other significant difference.  As

22      reflected in Mr. Cook's closing, the plaintiffs urge

23      multiple theories and multiple scenarios on the Court in

24      this case almost in relation to just about every

25      significant element that has been addressed in this trial.
```

1          For example, the plaintiffs argue that the 95-points

2     language in the Goodyear P&I Agreement applied to the Apple

3     Grove plant.  However, the plaintiffs argue that the 1994

4     Goodyear P&I Agreement did not apply to the Apple Grove

5     plant, because they argue the caps agreement, contained in

6     the same agreement where the 95-points language was added,

7     never applied to Apple Grove.

8          The plaintiffs also argue, for example, even if the

9     1991 caps agreement was applied by Goodyear to Apple Grove,

10    well, then, the caps agreements became inapplicable in 1992

11    when Shell acquired the Apple Grove facility; they became

12    inapplicable in 1994, or 1997, when there were Shell

13    negotiations; they became inapplicable in 2000 when M&G and

14    the Steelworkers first engaged in bargaining for a new

15    collective bargaining agreement; and the plaintiffs also

16    argue, Well, they became inapplicable during 2003 to 2005

17    in part based on this accountant theory that M&G could not

18    possibly have been party to a collectively bargained

19    commitment if its actuaries didn't account for those

20    commitments aggressively enough.

21         Now, the defendants' case does not involve nearly so

22    many multiple theories or scenarios, and there is a reason

23    for this.  The facts that came out in this trial

24    established what actually occurred in the treatment of

25    retiree medical benefits at the Apple Grove facility in the

1    18 years that elapsed from 1991 to 2007.

2          What actually occurred is supported by the evidence

3    that's now part of the record.  What actually occurred is

4    evident from the testimony and the documentation provided

5    by the company and union representatives in the trial.

6          What actually occurred is reflected in the record

7    evidence, which also establishes that all of the elements

8    reflected in the timeline I showed during my opening have

9    actually now been supported by the evidence of record.  And

10   I would like to put that up, Your Honor.

11         As you can see, we have already in evidence the 1991

12   Goodyear P&I Agreement.  And, in 1991, the Goodyear P&I

13   Agreement applied to the Apple Grove facility.  Goodyear

14   owned the Apple Grove facility.  And, most significantly,

15   as I indicated in the opening -- and it's been unrebutted

16   in the course of the trial -- the 1991 caps agreement

17   applied to the facility, and Goodyear was part of the

18   agreement at a time before any of the class or subclass

19   members attained the status of retirement.

20         We have in the record as Plaintiffs' Trial Exhibit 2

21   the 1991 Summary Plan Description, which is specific to the

22   Apple Grove facility and which also specifically provides

23   for the cap agreements.  And I'll make reference to that a

24   little bit later in my closing.

25         The record includes the testimony of Ron Hoover

1    regarding the 1991 caps agreement, and we also have the

2    designated transcript testimony of Goodyear representative

3    Jim Kruse regarding the 1991 caps agreement.  And it's

4    clear the union regarded the caps agreement as providing

5    for retiree contributions.

6         The parties devoted significant attention to the

7    structure of the caps agreement, to the operation of the

8    caps agreement, because it provided for retiree

9    contributions.  The caps agreement was adopted by Local

10   Union 644 at Apple Grove, which was a "me, too" facility.

11   And you may recall Ron Hoover indicated that he was unaware

12   of any evidence that contradicted the notion that the Apple

13   Grove facility was a "me, too" facility.

14        And we also have testimony by Jim Kruse, designated

15   deposition testimony, to the effect that the Apple Grove

16   facility was a "me, too" facility that followed the pattern

17   agreement.

18        Mr. Hoover also indicated in his testimony that the

19   cap agreement was part of the industry pattern.  And one

20   other thing is clear:  With or without the cap agreements,

21   Ron Hoover and Jim Kruse mutually understood in the 1990s

22   that retirees in the future could be required to pay

23   monthly premiums for their medical benefits.

24        And you may recall when I was asking questions of

25   Ron Hoover, and I said, Isn't it true that Mr. Kruse

1    specifically told you retirees some day may have to pay

2    monthly premiums, he couldn't remember the word "monthly."

3    Went back, and we played his deposition.

4         And he said, Yeah, he must have said "monthly,"

5    because that's the way he characterized it in his

6    deposition.

7         Now, the record also includes, if we take a look at

8    the timeline that was presented at the outset of the trial,

9    evidence concerning the 1994 caps agreement and the 1997

10   caps agreement, both of which were adopted by Shell.  And

11   what we now have as evidence in this trial is the

12   unrebutted testimony of Dale Wunder.

13        Dale Wunder was the Shell chief spokesperson in the

14   1994 and 1997 bargaining.  He testified, without

15   contradiction by any other witness in this case, that the

16   Shell bargaining in both years involved specific discussion

17   of the Goodyear cap agreements.  The cap agreements were

18   physically present in the room.  Mr. Wunder specifically

19   relied on the cap agreements when he recommended that Shell

20   continue to apply the preexisting Goodyear pattern benefits

21   at Apple Grove, rather than applying the very dissimilar

22   Shell benefit programs that were in existence at the time.

23        The one other thing that we have in the record --

24   and I'll fast forward to the 1997 to 2003 P&I Agreement,

25   and I'd like to show the Court Plaintiffs' Trial Exhibit

1     45.

2           Your Honor, you might remember this.  This is a

3     document that was the subject of testimony by Brian Wedge.

4           Now, Mr. Wedge was addressing, when he discussed

5     Plaintiffs' Trial Exhibit 45 -- and take a look at the

6     front cover -- it says:  "USWA Local 644 1997 Pension and

7     Insurance Agreement."  And, there, you can see "Wedge," the

8     name "Wedge" there on that label.

9           Mr. Wedge testified that, after the 2000 bargaining

10    when there was some further discussion after 2000 about

11    certain P&I Agreement issues -- and you've seen, and we

12    will see again, the notes that reflect this -- Sam Stewart,

13    who was on the union bargaining committee and union

14    president back in 1997, gave Brian Wedge a copy of what Mr.

15    Stewart regarded as the 1997 Local 644 Pension and

16    Insurance Agreement.  Local 644 -- and Mr. Wedge testified

17    to this effect -- does not represent any facilities other

18    than the facility in Apple Grove, West Virginia.

19          Now, it's true that Mr. Wedge, after 2000, looked at

20    Plaintiffs' Trial Exhibit 45, and he indicated that the

21    union at that point adopted an objective -- at least some

22    people of the union adopted an objective of trying to

23    remove the cap letter, but the significant thing is that,

24    Union President Stewart, when he gave Mr. Wedge what Mr.

25    Stewart was using as the 1997 Local 644 Pension & Insurance

1    Agreement, this is it; we're looking at it; and it contains

2    the cap letter.

3         Now, I would like to go back to the timeline and

4    point out two other things.

5         We also have undisputed evidence in the trial that

6    not only did Mr. Wedge get a copy of the 1997 P&I

7    Agreement, including the cap letter, as applicable to the

8    Apple Grove facility, Mr. Stewart's P&I Agreement, in a

9    marked-up form, was also given to Mr. Korber.  And Mr.

10   Korber physically held the agreement, and we've seen it

11   here in this trial as well.  It contains a cap letter.  Mr.

12   Korber indicated that he actually, personally, reviewed

13   that document, that compilation, with Mr. Stewart.

14        And we also had the testimony of Ron Hoover, who

15   said that he had the same compilation that he received at

16   one point from Sam Stewart minus the penciled-in markings,

17   but it contained the cap letter, the cap agreement, as part

18   of the 1997 collective bargaining, or collectively

19   bargained, P&I Agreement.

20        There is also extensive evidence, and it's depicted

21   in these little bars on our timeline, there has been

22   extensive evidence about the 2000-to-2002 period where

23   there were post-bargaining discussions of P&I issues,

24   including the cap agreements, which at the time, you may

25   recall, was referred to as the FASB letter.

1          And then, of course, we've also had extensive

2     testimony in this case by Randy Moore and Brian Wedge for

3     the union and by Kimm Korber and, this morning, Robert

4     Long, about the 2003-to-2005 bargaining.  And we've had

5     further testimony about the 2006 post-bargaining retiree

6     medical discussions that Mr. Long, in particular, devoted

7     some time in his testimony this morning.

8          Now, plaintiff has spent a great deal of time

9     talking about certain contentions that have been advanced

10    by Mr. Cook.  We suggest the Court give those contentions

11    even more attention, because we submit, with all respect

12    towards the plaintiffs and their counsel, those contentions

13    cannot withstand scrutiny against the record.  And we'll

14    turn to some of those at this point in time.

15         One of the contentions that has surfaced in some of

16    the questioning in the trial has been a question about

17    whether or not the cap agreements were actually meant to

18    contemplate retiree contributions.  And that's an issue

19    that's very clear in the evidence.  We have a number of

20    different admissions that deal with that precise issue.

21         And I'd just say, Your Honor, if one thing is made

22    clear from the evidence, it's this:  It was understood,

23    both in the negotiation of the cap agreements and, as Mr.

24    Hoover testified, separate from the cap agreements, it was

25    understood throughout the period of time relevant to this

1    case that retirees might be required to pay contributions

2    in the future.

3         A second issue that has been the subject of argument

4    by the plaintiffs deals with this question of union

5    representation of existing retirees and the status of

6    existing retiree benefits as a permissive subject of

7    bargaining.  And Mr. Long addressed that, to some degree,

8    in his testimony.

9         And I'll just say this:  The plaintiffs completely

10   get wrong the Supreme Court decision in Pittsburgh Plate

11   Glass.  The decision indicates that existing retiree

12   benefits are a permissive, not a prohibited, a permissive

13   subject of bargaining.

14        The term "permissive," in that context, doesn't mean

15   you need permission from retirees.  And you know, the one

16   thing that's clear in this case is, if anything is clear --

17   I was almost amazed when Mr. Cook said no union has ever

18   negotiated on behalf of existing retirees during any of the

19   time period or applicable to Apple Grove in this case,

20   because you've seen, in just about every set of bargaining,

21   negotiations on behalf of the union party in this case on

22   behalf of existing retirees.  And even if you fast forward

23   to 2006, we've put into the evidence multiple proposals

24   from the union which specifically pertained to existing

25   retirees.  It was a union proposal to eliminate the Medical

1    Necessity Plan.  The only participants in the Medical

2    Necessity Plan were existing retirees.

3         With respect to the Pittsburgh Plate Glass issue and

4    whether the union has authority to bargain on behalf of

5    existing retirees, it's clear as a matter of law the union

6    does unless the Court were to find that the retirees had a

7    pre- existing vested benefit.  And all of the arguments

8    along these lines that have been advanced by the plaintiffs

9    beg that question; but, otherwise, they do nothing to

10   advance the plaintiffs' case.

11        The one other successive series of arguments that

12   the plaintiffs have advanced in this case was that the cap

13   agreements never applied to Apple Grove.  First of all,

14   with respect to 1991, this is, again, the period of time

15   when Goodyear actually owned the Apple Grove facility.

16   There can't be any serious question about the cap

17   agreement's applicability to the Apple Grove facility, but

18   we have an SPD, as I mentioned, that is specific to the

19   Apple Grove facility, and that's Plaintiffs' Trial Exhibit

20   3.  We'll show it to the Court.

21        And this -- again, you can see, this is a Summary

22   Plan Description that specifically relates to hourly-rated

23   employees of the Point Pleasant Plant as in effect May 15,

24   1991, Goodyear Tire and Rubber Company, Point Pleasant

25   Plant.  And there's been significant testimony to this

1    effect:  This is, in fact, the Apple Grove Plant that used

2    to be referred to by a different name.

3        And then if we go to one of the interior pages, you

4    can see on page 72, in the middle, "Limit on Company Cost

5    for Retiree Medical Plan."  And, there, you have it.  You

6    have, in a Summary Plan Description that's specific to the

7    Apple Grove facility, a reference to the caps.  And those

8    references are completely consistent with the 1991 caps

9    agreement contained in the 1991 Goodyear master P&I

10   agreement.

11       If we go forward to 1994 -- and, in 1994, again, we

12   don't believe there can be any serious question about the

13   ongoing application of the cap agreement during the period

14   of time that Shell owned the facility.  I indicated in my

15   opening -- and this was borne out by the testimony of Ron

16   Hoover -- that when Shell bought the Apple Grove facility,

17   the existing Collective Bargaining Agreement and P&I

18   Agreement had two years to run.  And there is no

19   evidence -- Mr. Hoover is not aware of any gap between 1992

20   and 1994 involving any participants in the Steelworkers

21   benefit plans.

22       Dale Wunder has provided testimony indicating there

23   was an agreement that Shell would become a successor with

24   respect to the Goodyear plans.

25       The one thing that we haven't previously pointed out

1    in this case, but it's in the evidence, if you look at the

2    preexisting P&I agreements, both the 1991 agreement, which

3    was in effect at the time of the Shell transaction, and the

4    1997 P&I Agreement, which was in effect at the time of the

5    M&G transaction, both agreements have specific

6    successorship provisions that provide for the ongoing

7    application of the agreement in the event of a merger,

8    acquisition, or sale.

9        And I'll mention again the testimony of Dale Wunder

10   is extensive with respect to his specific evaluation and

11   reliance on the Apple Grove cap agreements when he ended up

12   recommending that Shell adopt the entire Goodyear Pension

13   and Insurance Agreement package, because, in his view,

14   Goodyear had made significant progress and had a balanced

15   package that he thought would be fair, and he recommended

16   the continuation of in comparison to the alternative, which

17   was the attempt to assimilate this single facility into the

18   Shell very different, dissimilar benefit plans.

19       And you may recall the testimony of Ron Hoover.  He

20   said that would have been a big deal, that would have been

21   a very complicated undertaking, and it never went anywhere.

22       If we end up going to 1997, again, we have

23   unrebutted and very clear and straightforward testimony

24   from Dale Wunder, the chief spokesperson in the Shell

25   bargaining, who indicates that Shell and the union

1    discussed Goodyear Letter H at the bargaining table.  It

2    was physically present there.  He relied on it.  They made

3    a conscious agreement that it would have continued

4    application to the Apple Grove facility.

5         And, Your Honor, this is something like "Roots."

6    You know, we go from the beginning of time.  We move

7    forward, and then we go backwards.  We find out there is

8    Sam Stewart, who, after the 2000 bargaining, he has the

9    1997 P&I Agreement, and there it is.  It contains the caps

10    agreement, the same one that Mr. Wunder testified about in

11    his own deposition testimony.

12         There is no credible evidence in this case that the

13    1997-to-2003 cap agreement was inapplicable to the Apple

14    Grove facility.

15         If we take the 2000-to-2002 time period, once again,

16    we have two local union representatives.  And Mr. Moore

17    testified that, in his experience, -- I should say, in his

18    deposition, he testified, in his experience, local union

19    representatives had the most familiarity with the details

20    associated with what benefit plans applied to their

21    members.  And, in fact, we have two local union

22    representatives in the 2000 bargaining who advised Randy

23    Moore, during negotiations or in relation to negotiations,

24    There is this cap letter, and you've got to talk to Ron

25    Hoover.

1           And then what occurs subsequently is, Randy Moore

2       makes a proposal to extend the retiree contribution

3       commencement dates.  And Brian Wedge, you may recall, he

4       said, How can you propose to remove a letter if it's not

5       there?

6           Well, the question can also be raised, How can you

7       propose to change a letter if it doesn't have application

8       at the facility that's the subject of the bargaining that's

9       in progress?

10          Obviously, the union believed that the cap

11      agreements in the 2000 bargaining applied to the Apple

12      Grove facility.

13          Now, we have taken a look at, many times, this

14      response that was provided by Mr. Dick, the outside lawyer,

15      that expressed some question, and then expressed a belief

16      that the cap agreement didn't apply.

17          We also have heard the explanation that Mr. Dick did

18      not have any preexisting familiarity with the cap

19      agreements.  He had not represented the Apple Grove

20      facility in past bargaining, and what we also know is, the

21      cap agreement was applicable during the period of time that

22      Shell owned the Apple Grove facility.  And Mr. Dick got

23      that wrong as well.

24          But that particular issue, at one point, Mr. Wedge,

25      you may recall, he said it was conclusively resolved on

 1   August 17th, although he later said it was conclusively

 2   resolved on August 17th through the end of negotiations.

 3   And then it turned out that it wasn't so conclusively

 4   resolved, because Mr. Wedge's own notes showed that there's

 5   ongoing discussion of the FASB letter not only through the

 6   end of negotiations but through the ensuing 18 months after

 7   negotiations concluded.

 8        The fact of the matter is, and the evidence is

 9   uniform, the parties agreed, as part of the 2000

10   bargaining, that, after negotiations were concluded, they

11   would work out what was in and was not in their P&I

12   agreement.  And it turned out, in the course of that

13   discussion, the FASB letter continued to be the subject of

14   attention.  And, ultimately, it was one of the things that

15   was considered in.  And we know that because of the

16   agreement that was given to Kimm Korber.  We know that

17   because of the way that the FASB letter ended up being

18   handled by local union representatives in the next set of

19   negotiations.

20        And I would like to just point out to the Court some

21   of the notes that we've already got in evidence concerning

22   the conclusion of the 2000 bargaining.  And one of the

23   documents that we have is -- I believe it's Defendants'

24   Trial Exhibit 277.

25        And, Your Honor, this is the first page in

1    Defendants' Trial Exhibit 277.

2         THE COURT:  You say Defendants'?

3         MR. MISCIMARRA:  Yes, Your Honor.

4         And these are Brian Wedge's notes.  And if we go

5    to -- if we go to his notes for 10/31/00, this is the day

6    before the parties ended up reaching a tentative agreement.

7    In those notes, if we go a little bit further down, there

8    is a reference to the FASB letter and the fact that lawyers

9    are continuing to have discussion.

10        If we go to the next page, please -- this is, of

11   course, Your Honor, where my perfect recall sometimes fails

12   me.

13        THE COURT:  You've done pretty good throughout the

14   trial.

15        MR. MISCIMARRA:  Yeah.

16        If we go directly under the 10/31 reference, above

17   where it says -- and this is page MIK-5978 -- we end up

18   having, above where it says "Dave subfunds," there is a

19   reference to "FASB letters, lawyers will talk," and it's

20   right above the "Dave subfunds" reference on page MIK-5978.

21        So, it says:  "FASB letters, lawyers will talk."

22        Now, if you go to another document, which is

23   Defendants' Trial Exhibit 52, we have seen this document,

24   which is part of the record.  This is an e-mail.  And the

25   e-mail exchange -- it was originally between Pam Cook and

1    Rex Roush as of February 20th.  It started out in November

2    16th, 2000.  And then if you go up to the top of the page,

3    there is a reference to Tuesday, February 27th, 2001.

4         Mr. Korber ended up also having this e-mail.  He

5    printed it out, and then there is an attachment, and this

6    is, on the next page of the exhibit, "2000 Negotiations

7    Follow Up Issues."  And, again, a tentative agreement, the

8    evidence shows, was reached on November 1st.  And this is a

9    list of follow-up issues that were addressed by company

10   representatives, including Mr. Korber after he arrived on

11   the scene.

12        And if we go to the next page, there is an Item 18.

13   It says:  "FASBY Date Change in P&I Agreement.  Rex," which

14   is reference to Rex Roush, "and Cindy Jones," who is the

15   Steptoe & Johnson attorney, "is working on it."

16        And then one more document that ends up completing

17   this.  I'll make reference to Defendants' Trial Exhibit 57.

18   And these are, again, notes from Brian Wedge.  The notes

19   from Brian Wedge pertain to February 7th, 2002.  Mr. Wedge

20   indicated, This was actually kind of an agenda or itinerary

21   I put together for the meeting.

22        And if you look down at the Item 2, it says:  "P&I,

23   Korber to contact Cindy Jones, Terrell Smith."

24        Terrell Smith is the Steelworker attorney whose name

25   and phone number had been given out at the end of the 2000

1    bargaining specifically so they could end up addressing the

2    FASB issue.

3         So, if one thing is clear from the record, there was

4    no definitive resolution, at all, of the FASB letter issue

5    during the 2000 bargaining.  And as you can see, there was

6    certainly no mutual understanding in the period of time

7    after the 2000 bargaining was concluded that the FASB

8    letter would not be contained in the P&I Agreement.

9         And what we now know, based on the record evidence

10   that's uniform, the FASB letter ended up actually being

11   contained in the P&I Agreement that resulted from this

12   period of activities from 2000 to 2001.

13        I would like to go back to the other issues that

14   we're addressing, Your Honor.  If we go to 2000 and 2002,

15   you know, we believe that the evidence is clear that the

16   cap agreements, or the FASB letter, however you

17   characterize them, by mutual agreement, were considered

18   applicable to the Apple Grove facility, and that agreement

19   actually was connected all the way back to the time that

20   the Collective Bargaining Agreement became effective in

21   2000.

22        And as you can see from the booklet that actually

23   went out, the parties mutually considered the agreement to

24   be the 1997 agreement that was carried forward to 2003 and

25   subject to the changes that were agreed upon by the parties

1    in connection with the P&I Agreement post bargaining work

2    that was conducted.

3        Now, Your Honor, the next time period that we're

4    taking a look at is the bargaining that commenced in 2003

5    and continued to 2005.  We have a repeat of the same type

6    of issue that ended up arising during the 2000 bargaining.

7        Once again, Sam Stewart and Roger Sutphin inform a

8    different Steelworkers chief spokesperson, Karen Shipley:

9    There is this Letter H, and you've got to talk to Ron

10   Hoover.

11       And the testimony is that Mr. Sutphin, Mr. Stewart,

12   and Ms. Shipley, in succession, talked to Ron Hoover.  And

13   Mr. Hoover said, Karen, if they brought the letter up, you

14   can't deny it; you need to talk about it; but the only

15   thing, you need to talk about the date if it applies.

16       And then what Ms. Shipley very quickly did is, she

17   went into bargaining.  Mr. Stewart provided an explanation

18   of what the letter was and indicated that it applied.  And

19   Ms. Shipley then proposed to move out in time, to move

20   later in time, the retiree contribution commencement date.

21       You know, once again, the only conclusion that can

22   be drawn from this conduct is the fact that the cap

23   agreement applied to the Apple Grove facility and was

24   considered to apply to the Apple Grove facility by the

25   union itself.

1          And what we know is, at the conclusion of the 2005

2     bargaining, LOU 2003-6, this Letter of Understanding,

3     independently provided for retiree contributions, all

4     existing retirees.

5          And you heard Bob Long, today, go through the

6     language, and you've seen how the language evolved from a

7     time when the company's initial proposal, which also dealt

8     with existing retiree benefits, the progression makes clear

9     that there is no plausible way you can look at any of the

10    proposals in the progression, and certainly not the one

11    that ended up in the Collective Bargaining Agreement, and

12    suggest it was only intended to apply to future retirees.

13         And, of course, the agreement, itself, was not only

14    signed by Ms. Shipley, but the Collective Bargaining

15    Agreement that ended up containing LOU 2003-6 was signed by

16    11 Steelworker representatives, including the International

17    President, Leo Gerard, and all four of the union's primary

18    local union representatives or International

19    representatives from the 2000 bargaining.

20         The next item that the plaintiffs have devoted a

21    great deal of attention to, Your Honor, deals with the 95

22    points and the P&I Agreement language that deals with 95

23    points.  And no pun intended, in connection with the

24    95-point argument, I would like to make two preliminary

25    points.

1          Your Honor, first, the cases make clear that the P&I

2    Agreement, which includes the 95-points provision, must be

3    interpreted in conjunction with the cap agreements

4    contained in the same agreement as part of an integrated

5    whole.  And that's Detroit Diesel; Yolton; ultimately,

6    Yard-Man.  All of those go to the same place.  Especially

7    when you have multiple provisions, or parts, of the same

8    agreement, they must be read in conjunction with one

9    another.

10         And the second thing is, it doesn't -- it is not

11   appropriate, when looking at agreement provisions, to adopt

12   an interpretation of one provision that either does

13   violence to the other provisions or renders them absurd in

14   operation.  And with that as background, you know, if you

15   take this in stages, let's first address the language of

16   the 95-points provision.

17         If you look at the language of the 95-points

18   provision, it talks about a full company contribution

19   towards the cost of the benefits.  You know from the

20   outset, you're not talking about a provision that says the

21   company will pay all of the costs.  It talks about a full

22   company contribution.  And if you ask, Where does the term

23   "full company contribution" come from, well, you can see

24   from the 95-point language, itself, if people have fewer

25   than 95 points, they have a reduced contribution.  So, it's

1    understandable, if you have 95 points and you take into

2    account that people with less than 95 points have a reduced

3    contribution, then people with 95 points who have a full

4    company contribution, that can reasonably be interpreted as

5    an indication that people with 95 points are simply not

6    among those who have a contribution that is smaller or

7    reduced.

8         The other language that is relevant when you just

9    look at this provision on its face, it says:  "Full company

10   contribution towards the cost."  Now, it doesn't say "the

11   cost."  It says:  "Full company contribution towards the

12   cost."  The only reasonable interpretation of that language

13   is, the company contribution, in this context, is less than

14   the entire cost.

15        Now, the second thing is, you can ask, What did the

16   parties actually intend when they negotiated the 95-point

17   language.  And we had the testimony from Mr. Hoover who

18   said, when the 95-point language was adopted in 1994 in the

19   P&I Agreement, it did not modify the cap agreements.  In

20   fact, the cap agreement had been in existence in 1991.  It

21   remained in the 1994 P&I Agreement.  It continued to be in

22   subsequent agreements without any change in language.

23        And remember what Mr. Hoover stated in 2006.  And to

24   give you the context, Your Honor, remember, M&G had these

25   retiree medical discussions in 2006.  And you may remember

1     that there is testimony that Randy Moore and Brian Wedge

2     and another union representative drove all the way to

3     Cincinnati so they could meet with Mr. Hoover specifically

4     to talk about retiree medical benefits.  There is a

5     document that ended up being produced by Mr. Moore.  It was

6     created by Mr. Moore, but it was testified about by Brian

7     Wedge, and they specifically asked Mr. Hoover, in this

8     meeting, These 95-points people, how does that interact

9     with the caps agreement?

10        And the answer was, The caps letter still applies,

11     from the person who played such a significant role for the

12     union in the negotiation of the 95-points language and the

13     cap agreement.

14        The last thing, Your Honor, that I'll point out

15     relative to the 95-point argument is, if you take a look at

16     the cap letter, itself -- and I'll show you Joint Exhibit

17     14 -- this is the cap letter from 1991.  And if you end up

18     taking a look at Paragraph 1, Paragraph 1 is the part of

19     the cap agreement that talks about the cap amounts.  And it

20     describes the cap amounts by reference to retirees who are

21     either under age 65, and there is a separate group of

22     retirees that are over age 64.

23        There is no exclusion in this language -- and this

24     is from 1991.  There is no exclusion in subsequent versions

25     of the caps agreement for those retirees who had 95 points.

1     And then this becomes clearer.  The problem caused by

2     suggesting 95-points retirees are not subject to the caps,

3     if you take a look at Paragraph 4, Paragraph 4 in this

4     particular letter -- and the same structure follows in all

5     of the subsequent letters -- this is where the methodology

6     that underlies these letters is laid out.  And it says the

7     average annual cost of health care benefits for each group

8     shall be determined by taking the total annual health care

9     payments made by the company for each group separately, and

10    you divide it by the number of retired employees.  Again,

11    no exclusion for 95-point retirees.  And if you excluded

12    95-point retirees from the people who pay above-cap costs,

13    then the entire mechanism by which this letter operates

14    will not balance.  So, you end up having a letter which, in

15    effect, says the company's cost for retiree medical

16    benefits will not rise above a certain level, but then the

17    methodology for calculating individual retiree calculations

18    will be different and will then end up causing the company

19    contributions to rise above the levels described in

20    Paragraph 1.

21         Said more simply, Your Honor, if you adopt the

22    interpretation of the 95-points language that's urged upon

23    the Court by the plaintiffs, it renders absurd and

24    inoperative the caps agreements which Goodyear and other

25    employers, including M&G, continued to apply to the Apple

1    Grove facility.  And on that basis, alone, the

2    interpretation that the plaintiffs urge cannot reasonably

3    be adopted.

4         In relation to this issue, there is other evidence

5    that was presented in the trial.  And, Your Honor, in

6    particular, I would point out the evidence that came out

7    from Mr. Hoover concerning the Goodyear VEBA.  And Mr.

8    Hoover testified that the Goodyear retirees were retired

9    under the Goodyear 1991, under the Goodyear 1994, and

10   subsequent Goodyear agreements.

11        And keep in mind these are not just similar

12   agreements.  This is the same language, this is the same

13   party, it's the same union, and it's the same documents

14   that end up governing the rights and entitlements, to the

15   extent they exist, of the class and subclass retirees in

16   this case.  But the Steelworkers party in this litigation

17   has already agreed, with a much larger employer and larger

18   number of retirees, that 95-points retirees can pay, can be

19   required to pay, contributions.  And, in fact, we know,

20   from Mr. Hoover, they are being required to pay

21   contributions as we sit here today.

22        Your Honor, the 95-point language that we've just

23   gone through, also, is very dissimilar and not nearly as

24   explicit as the type of language that has been found

25   necessary in other cases to establish a lifetime right to

1    contribution-free benefits, or vested benefits.  And I'll

2    note that in Helwig vs. Kelsey-Hayes Company, the language

3    was "For the rest of your life without cost to you."  In

4    Kerns vs. Caterpillar, the language was "For the remainder

5    of the surviving spouse's life without cost."  You will be

6    eligible for the Retired Medical Benefit Plan, continued at

7    no cost to you.

8            So, Your Honor, given the sophistication and the

9    legal resources and other resources available to the

10   Steelworkers, if the parties mutually intended for the

11   95-points language to represent a vested lifetime guarantee

12   of lifetime retiree medical benefits without contributions,

13   certainly the parties would have used language that was

14   clearer and more specific than that that we see in any of

15   the P&I agreements that are currently a part of the record

16   of this case.

17           Your Honor, I would like to now just show you one

18   document, which is Defendants' Trial Exhibit 290.  And this

19   is, in fact, the document that Randy Moore prepared prior

20   to going to Cincinnati in 2006 and having a meeting that

21   specifically related to M&G.  And you can see, in Item 2,

22   the question was specifically posed to Mr. Hoover:  If an

23   employee retires with a full pension with 95 points, he

24   will retire full benefits.  How does this fit with Letter

25   H?

1           And Mr. Wedge indicated -- the response was:  Letter

2      H still applies.

3           And I won't do this right now, Your Honor, but if

4      you go through Deposition Trial Exhibit 290 and the rest of

5      this document, this is not the type of document -- this is

6      an internal document.  It wasn't exchanged with the

7      company.  These are union representatives talking to one

8      another.  This is not the type of document that people

9      would create, or the type of discussion they would have, if

10     anyone in the room believed that retirees had a lifetime

11     vested right to contribution-free benefits.  And that's a

12     stark aspect of this particular document and virtually

13     every other document in this case.

14          Now, Your Honor, I would like to address the issue

15     of notice.  And, you know, the cap letters are not printed

16     in booklets, but the cap letters themselves, of course,

17     reflect a mutual understanding, including the union's

18     understanding that they were not to be printed in the

19     booklets.

20          There is a 1991 Goodyear SPD that's part of the

21     evidence which specifically applied to Apple Grove.  And

22     I'll note that the SPD that related to the caps had been

23     distributed and promulgated in an appropriate way, and that

24     was at a time when class and subclass retirees were active

25     employees at the Apple Grove facility.

1          The cap letters reflect the union agreement that

2     they're not to be printed in the booklet.  And, of course,

3     when M&G acquired the Apple Grove facility, we already know

4     the P&I benefits were under negotiation and reconsideration

5     virtually the entire time from 2000 up through 2002.  And

6     then the Collective Bargaining Agreement at M&G ended up

7     being subject to renegotiation in 2003, 2004, and 2005.

8     And then what M&G actually did as part of the 2005

9     Collective Bargaining Agreement is it put LOU 2003-6 right

10    in the Collective Bargaining Agreement itself.

11         Now, I'll note, Your Honor, that it is true the

12    record does not reflect the issuance of formal Summary Plan

13    Descriptions by M&G between 2000 and 2006.  But what the

14    record also shows, Your Honor, is that M&G voluntarily

15    deferred retiree contributions for all of 2006.  And the

16    record reflects that that involved an above-cap cost of

17    $1.3 million that the company has already incurred and has

18    refrained from collecting from any of the class members or

19    subclass members in this case.

20         The one other thing, Your Honor, on this issue of

21    notice, let's assume a situation -- and I'll go back to the

22    timeline -- assume a situation where retirees don't have a

23    vested right to lifetime retiree medical benefits without

24    contributions.  So, in this chart, we're in the space of no

25    guarantees.  If you assumed such a retiree ended up

VOL. VI    147

1    retiring in 1992 or 1994, it's perfectly lawful and

2    appropriate for that retiree to remain retired all the way

3    until 1/1 of 2007 without any type of notice and for the

4    company, in that circumstance, to commence retiree

5    contributions on 1/1, 2007.  Or to put it differently, Your

6    Honor, that if, as we believe the record shows, there is

7    not a vested right to lifetime no-contribution benefits,

8    there is no legal requirement that retirees receive notice

9    of a vested right that does not exist.

10         So, in this case, the way that these issues operate

11   and, we submit, the way that they functioned in this

12   particular case is that the retirees did not have a

13   lifetime vested right to retiree medical benefits without

14   contributions.  And the retirees in this case are not

15   unlike any other retirees who enjoy the benefit of retiree

16   medical benefits for a length of time, and, at some time,

17   it becomes necessary to collect contributions from them.

18         And in this particular case it's clearer because, as

19   opposed to the no-guarantee space, we're talking about the

20   existence of cap agreements that were negotiated and agreed

21   to and renegotiated over a period of 18 years which

22   explicitly had the objective of limiting the employer's

23   costs and making retirees responsible for above-cap costs.

24         Your Honor, I will not devote significant time to

25   the suggestion that LOU 2003-6 only applies to future

1    retirees, but we think the evidence in this case really

2    permits no other conclusion but that LOU 2003-6 applies to

3    existing retirees as well as future retirees.

4         Also, the evidence in this case is very consistent

5    that the collection of monthly contributions is permissible

6    and, in fact, the only reasonable way to give force and

7    effect to the cap agreements that have been in place and

8    that have applied to the Apple Grove facility from 1991 all

9    the way until 1/1 of 2007 when contributions commenced.

10   And you may recall -- in particular, I'll direct your

11   attention to the second bullet here -- Mr. Hoover said, "I

12   don't know how you'd pay a premium otherwise." He said

13   monthly premiums are the norm because it would be pretty

14   hard for a retiree to manage an annual premium, pay it once

15   a year; so, monthly just makes sense.

16        Now, Your Honor, one other point that I would like

17   to briefly address is on the question of SPD's. The U.S.

18   Supreme Court, this morning, issued a new decision in a

19   case called Cigna vs. Amara. And that decision confirms

20   that, under ERISA Section 502 (a)(1)(B), which is the only

21   provision under which the plaintiffs sue in this case,

22   ERISA does not provide a mechanism to change the terms of

23   the master P&I agreements in this case and the cap letters

24   even if those cap letter agreements were not reflected in

25   the P&I booklets.

1          And, Your Honor, I'm not going to take the time to

2     give a more thorough or exhaustive description of the Cigna

3     vs. Amara case, but I do have a copy of the case and will

4     be happy to make it available to the Court at the

5     conclusion.

6          THE COURT:  I'll get a copy this afternoon.

7          MR. MISCIMARRA:  Okay.  Thank you, Your Honor.

8          Another theory that the plaintiffs have articulated

9     is this kind of accounting conspiracy theory.  And I'll

10    simply note, with respect to that, collective bargaining

11    agreements exist or don't exist depending on what happens

12    in bargaining.

13         Regarding what happens in bargaining, in this

14    particular case, we believe the evidence is clear, Mr.

15    Korber has also provided his own explanation concerning how

16    these accounting issues were handled.  And he indicated

17    that his focus --

18         THE COURT:  You mean actuarial accounting?

19         MR. MISCIMARRA:  Yes.  Yes, Your Honor.

20         THE COURT:  Okay.

21         MR. MISCIMARRA:  And Mr. Korber explained that, in

22    dealing with these particular issues, his focus was on when

23    retiree contributions would actually commence.

24         Now, Mr. Korber is not an actuary.  He doesn't

25    purport to be an actuary, but his explanation for why there

1    are these various communications at different times with

2    the actuaries was simply that, the retiree contribution

3    commencement date in this case, it originally was 1/1 of

4    '04 when the Collective Bargaining Agreement at M&G was

5    going to expire on November 6th of '03.  That date ended up

6    changing to 1/1 of '05.

7        The union requested a postponement of that date,

8    which the company agreed to, and then the new date became

9    1/1  of '06.  And, as you know, M&G agreed to a voluntary

10   deferral of contributions for an additional year.

11       The reality was, as those contributions became more

12   closer to a reality, then Mr. Korber and other people

13   within the company began to focus on them to a greater

14   degree.  And there is nothing that says collectively

15   bargained rights can't exist or can only exist if a

16   company's outside actuarial firm ends up utilizing the most

17   aggressive accounting possible when they end up accounting

18   for them.

19       Now, Your Honor, the what I would like to really

20   move into at this point is to return to the framework that

21   I ended up posing in my opening statement.  It seems like

22   such a long time ago.

23       THE COURT:  It does, doesn't it?

24       MR. MISCIMARRA:  Not so many days ago.

25       You know, first, where is an agreement expressed

1    that confers upon the class and subclass members a lifetime

2    vested right to retiree medical benefits without paying

3    contributions?

4         As I've indicated, we don't believe that a

5    no-contribution guarantee can reasonably be interpreted

6    based on the 95-point language in the P&I agreements.  It

7    can't reasonably be interpreted from the booklets in no

8    small part because all of the union representatives in this

9    case at various times consistently treated the P&I

10   Agreement cap agreements as applying to M&G and the Apple

11   Grove facility.

12        The second element in the framework that I suggested

13   was, precisely when was any no-contribution guarantee

14   mutually agreed upon.  And, once again, in 1994 when the

15   95-points language was adopted is not a plausible time when

16   a lifetime no-contribution guarantee arose in part because

17   Ron Hoover, the union's witness, the plaintiffs' witness,

18   indicated that 95- point language did not amend or modify

19   the cap agreements.  And he confirmed again, in 2006, if

20   you have 95 points, the cap agreements still apply.

21        And there is one other thing.  When you're asking

22   the question "When did a mutual understanding arise that

23   retirees would end up having a lifetime right to no

24   contributions, protection from contributions," you could

25   ask a related question, which is, "Precisely at what point

1    in time is there evidence that any union representative

2    even requested that type of extraordinary commitment?"

3         And the evidence is, there is nothing in this record

4    that suggests any union representative at any particular

5    time requested a lifetime commitment that retirees would

6    never pay contributions.  And, in fact, the evidence is

7    exactly to the contrary.

8         And the last thing in terms of the framework that I

9    suggested would assist the Court in the evaluation of the

10   evidence is the conduct of union representatives.  Is it

11   consistent with the notion that anyone believed retirees

12   had lifetime protection from ever paying contributions in

13   any amount?

14        And not only does the record show that union

15   representatives repeatedly treated retiree medical benefits

16   as something that could result in contributions, if we

17   turn, again, to the Goodyear VEBA, it's the same party.

18   It's the same union that's a party to this case.  It's the

19   same plan documents that apply to M&G Polymers.  It's the

20   same 95-points language.

21        And remember what Ron Hoover described in his

22   testimony:  Number one, the Goodyear VEBA was agreed upon

23   by the Steelworkers in December, 2006, the very same month

24   that Steelworkers representatives advised M&G that they

25   wouldn't tolerate having retirees pay any contributions,

1    ever, in any amount.

2         It turned out that the Goodyear VEBA arrangement

3    completely eliminated all Goodyear liabilities

4    prospectively for retiree medical contributions, all of

5    them; and Goodyear was only required to contribute into the

6    VEBA from which future benefits would be paid the Goodyear

7    forward-looking liability up to, but not in excess of, the

8    caps.

9         And Mr. Hoover also testified here when he testified

10   at the fairness hearing.  The last question that the judge

11   asked him is, Are you confident that all retirees

12   understand they would be required to make contributions?

13        And his answer was, Yes, I am.

14        It's simply not consistent with the notion that the

15   retiree benefits in this case are lifetime invested when

16   the same union in the same month agreed that they were not.

17        Now, Your Honor, the one other thing that I'll

18   direct your attention to, there is an e-mail from Randy

19   Moore.  It's Plaintiffs' Trial Exhibit 248.  And I just

20   point you to the top page.

21        You know, I asked Mr. Moore about this particular

22   e-mail.  And it states, in Paragraph 2, it says:  "My

23   opinion is that we have come to the crossroads on any

24   proposals that the Union can agree to as it relates to

25   future cost containment of retiree medical insurance.  We

1    certainly do not want to lose any opportunity to erase the

2    $1.3 million 2005 cap overrun cost.  However, I'm in a

3    quandary on how to reasonably address reducing the 2006 cap

4    overrun cost of $860 per month that the retirees will be

5    facing beginning January 1, 2007."

6         There is nothing in this e-mail that can reasonably

7    be interpreted as indicative of some belief by Mr. Moore

8    that retirees at this point in time have a vested lifetime

9    guarantee they will never pay contributions.  And, in fact,

10   if that right existed and if Mr. Moore believed that right

11   existed, there wouldn't have been a quandary.  Mr. Moore

12   could have expressed to the company, to Ms. Stump, to

13   anybody, you know, this is a simple situation.  The

14   retirees have a lifetime vested right to make no

15   contributions.  Period.  End of story.  We don't have to

16   devote 18 months of bargaining between 2003 and 2005, or

17   two and a half years of bargaining about that issue, or 15

18   bargaining sessions in 2006.

19        The conduct of the union's own representative in

20   this case negates the suggestion that anyone viewed these

21   benefits as being lifetime invested in nature.

22        Your Honor, a few final points.

23        First, we certainly hope that the Court will

24   reconsider the broader question of vesting in this case.

25   We submit that the evidence not only demonstrates the

1    absence of any no-contribution guarantee, but the facts

2    establish retiree medical benefits were not vested as a

3    general matter.  And this is really the first opportunity

4    this Court would have to evaluate that issue in the context

5    of a fully developed record.

6         Second, I would just point out that the overwhelming

7    majority of facts relied upon by the defendants in this

8    case are really uncontroverted or undisputed.

9         Third is, the Steelworkers, as I have indicated

10   before, are a large and powerful union with very extensive

11   resources.  And the evidence is clear that there were

12   Steelworker attorneys that were actively involved and/or

13   available at every juncture when these matters were

14   discussed in 2000, in 2001 and '02, in 2003 to 2005, and in

15   2006.

16        Prior to November of 2006, the Steelworkers

17   certainly had the capacity to issue a letter, to make a

18   statement, to explain, in writing or otherwise, that we

19   can't go down this road because these retirees have a

20   lifetime vested right to retiree medical benefits without

21   ever paying contributions in any amount.  The fact that

22   there is no document to that effect or along those lines in

23   this case is perhaps the most compelling evidence that

24   nobody on either side reasonably believed that retirees had

25   that type of right.

1          The final thing, Your Honor, is, you know, the

2     record shows not only that the cap agreements applied to

3     Shell and M&G; the record shows that union representatives,

4     including Mr. Hoover and the Local Union Representatives

5     Sam Stewart and Roger Sutphin, repeatedly reaffirmed the

6     notion that these cap agreements applied.  They went into

7     bargaining, and they said, You have to mention these cap

8     agreements.

9          Mr. Sutphin and Mr. Stewart, in two successive

10    rounds of bargaining, ended up advising the chief

11    spokesperson, You have to talk to Ron Hoover.  We have to

12    have these cap agreements on the table.

13         And here is the question:  Why would Ron Hoover and

14    why would Mr. Sutphin and why would Sam Stewart take such

15    care to remind people over and over again that these cap

16    agreements apply and they're on the table?

17         Ron Hoover provided the answer to this question in

18    his own testimony.  Mr. Hoover indicated, "You have to, got

19    to, move the damn dates out or your retirees are going to

20    get hit with a premium."  He indicated, in relation to

21    Randy Moore:  "I was somewhat paranoid over the Letter H,

22    and I would have told Moore, If you have some form of that

23    letter, be certain you move the bite date so your retirees

24    don't get caught."

25         He indicated to Ms. Shipley, or would have indicated

```
 1        to Ms. Shipley:  Be certain you move the bite date, or the

 2        implementation date, because, if you don't, your retirees

 3        will get caught.

 4              So, if you ask the question why would Ron Hoover and

 5        these other representatives want the cap letters to apply

 6        to M&G, the answer is, they understood what the plaintiffs

 7        do not in this case.  Mr. Hoover and Mr. Sutphin and Mr.

 8        Stewart understood that, if the cap letters don't apply,

 9        then the company has an unrestricted right to collect

10        contributions from retirees.  That's the only plausible

11        interpretation or explanation for the events that we know

12        transpired in 2000 and 2003 and 2004.

13              And let me state this differently.  If the

14        plaintiffs prove in this case the cap letters at some point

15        did not apply to M&G, this further undermines the

16        plaintiffs' claims in this litigation.  It doesn't further

17        those claims.

18              And if the cap letters at some point did not apply

19        to M&G, this would mean M&G then had unfettered discretion

20        to collect contributions from existing retirees and future

21        retirees.  And the reason for that is what we've talked

22        about throughout my closing:  There is no evidence that

23        supports the existence of a right, a vested right, for

24        retirees to have lifetime protection from paying

25        contributions.
```

VOL. VI                                                           158

1          I appreciate the Court's attention throughout the

2     trial, throughout my closing, and we request that the Court

3     evaluate the record evidence and enter judgment in favor of

4     the defendants.

5          Thank you, Your Honor.

6          THE COURT:  Thank you, Mr. Miscimarra.

7          Mr. Cook, final closing rebuttal?

8                         - - -

9          PLAINTIFFS' REBUTTAL ARGUMENT

10                        - - -

11         MR. COOK:  Thank you, Your Honor.

12         I give credit to Mr. Miscimarra for the volume of

13    content in the period of time he spoke.  It requires some

14    detailed response.

15         Let me posit a theme, Your Honor.  If you took

16    everything plaintiffs argued today in their closing as true

17    and you took everything Mr. Miscimarra and the defendants

18    argued in their closing as true, could this Court reach a

19    conclusion that, as a matter of law, the parties had a

20    meeting of the minds to apply Letter H to Apple Grove,

21    because, if the Court cannot reach that conclusion that

22    there was a meeting of the minds, there is no agreement.

23    That's a simple matter of fundamental contract law.  Now,

24    we believe we're correct and the evidence is completely the

25    opposite of what Mr. Miscimarra just said, but if you took

1    everything that each party said at face value, we believe

2    the Court would have to reach the conclusion there is no

3    meeting of the minds.

4         The Court has already found that these benefits are

5    vested, and that disposes of Mr. Miscimarra's final point

6    that, absent Letter H and its content in Letter of

7    Understanding 2003-6, M&G would have unfettered discretion

8    to apply any amount of contribution to retirees for their

9    health benefits.

10        Your Honor, as I page through here, I realize that I

11   left out something.  And that was, in my compliment on the

12   professionalism and conduct of the trial, I did not conduct

13   Simon Torres, a member of the defendants' team, and he has

14   been particularly kind, given the personal circumstance I

15   described to the Court earlier.  He has asked me, every

16   day, about that issue.  And I apologize to Simon for not

17   mentioning him.

18        Your Honor, that 1991 SPD, there is no evidence it

19   was ever distributed to the participants, to the employees,

20   in Apple Grove.  I ask you to take a very careful look at

21   Jim Kruse's deposition, and then review the testimony of

22   Woody Pyles.

23        And we never say that the 1994 Goodyear agreement

24   never applied.  We say that it applied as printed in the

25   booklet that was distributed to the employees, and that

1    booklet did not contain Letter H.

2        Mr. Miscimarra pointed out that the testimony of

3    Dale Wunder showed that Letter H was adopted and was

4    bargained by the parties in 1997.  But if that's true,

5    where is the agreement adopting it?  Where is that

6    document?

7            Mr. Miscimarra and defendants have pointed out,

8    at least argued, that the Steelworkers never presented

9    anything that said that these benefits were vested.  Well,

10   I'm going to turn that around and ask, Where did Mr. Wunder

11   or the defendants in this case ever show where Shell

12   adopted Letter H and applied it to the agreement, because

13   the actuarial assumptions that Shell's accountants and

14   actuaries used did not reflect the application of caps in

15   Letter H.

16           And it's not that the plaintiffs in this case --

17   and I don't want to mischaracterize defendants' closing.

18   It's not that the plaintiffs have argued that cap letters

19   didn't exist.  We're just saying that the cap letters

20   didn't exist in the agreements applied to Apple Grove.

21   Yes, they existed, but they existed between Goodyear.

22           We asserted in the opposition to the Motion for

23   Summary Judgment and we raised the issue in our opening

24   statement that defendants continually conflate agreements

25   between Goodyear and the Rubber Workers and, subsequently,

1    the Steelworkers with agreements between the unions and

2    Apple Grove facility, and particularly the later owners,

3    Shell and M&G, and they do so again throughout the closing

4    argument.  They continually conflate Mr. Hoover's testimony

5    about what happened with Goodyear.

6              The best example of that conflation is, they

7    attempt to apply how the ultimate resolution of the

8    Reddington lawsuit involving the Goodyear VEBA might apply

9    here.  That was between Goodyear and the Steelworkers.  The

10   retirees here are not part of that agreement.  They weren't

11   part of the Reddington class.  They weren't part of the

12   VEBA.  If they were, Your Honor, we wouldn't be here today.

13             So, what Mr. Hoover testified about the

14   applicability of caps, the calculation of the VEBA

15   liability, that was for Goodyear and the Steelworkers, not

16   Shell, and not M&G.

17             I keep coming back to how defendants refer to

18   what they call the working copy of the 1997 Pension &

19   Insurance Services Agreement.  In Mr. Hoover's testimony,

20   we showed that the one document that was being circulated

21   was completely bogus.  It was a document that had been

22   marked up.  And, yes, it said it was between Shell and the

23   union, but it was a document that contained the signatures

24   of Goodyear labor relations and human resources officials.

25   Nobody from Shell was signatory to that document.

1     And Mr. Wedge's testimony was very clear that the

2     copy of the document he received was the P&I booklet with

3     eight-and-a-half-by-11 letters attached to the back.  And

4     the testimony developed that that was received by the union

5     from Mr. Hoover, who testified he never told anybody that

6     applied at Apple Grove.

7          Your Honor, I'm amazed -- and I can only say it

8     that way -- of how M&G, in this defense, attempts to deal

9     with the conduct of David Dick.  He was confused.  He was

10    unaware.  He was new.

11         I'm sorry to be flip.  So what?  He was the chief

12    company spokesman.  He was a lawyer.  It was his job to

13    find out whether Letter H applied, and he gave the union a

14    document which says, We're not Shell; this doesn't apply to

15    us.  And the union, Your Honor, was entitled to, and did,

16    rely on that.

17         Defendants, in their closing, talked about the

18    post-2000 cleanup of the Pension & Insurance Agreement and

19    alluded to the fact that the cleanup resulted in that

20    document containing Letter H, but the evidence shows

21    otherwise.  The evidence shows that Letter H never became a

22    part of that booklet.

23         Look at Mr. Korber's letter to Mark Underwood --

24    can we pull that up -- in the year 2000.  While this is a

25    draft, Mr. Korber indicated that he would have sent this

```
 1    letter.  And if we could scroll down towards the bottom --
 2    go back up to number 4.
 3              You can see, right here, that while the
 4    Steelworkers ratified a successor labor agreement for the
 5    period August 9th, 2005, through November 5, 2008, certain
 6    matters remained unresolved until the 2005 P&I Agreement.
 7    And, therefore, the most current published P&I Agreement is
 8    the 2000 P&I Agreement.
 9              And he also says in this letter, Your Honor, that
10    that's the document that persons referred to in determining
11    what their benefits are.
12              Two final points, Your Honor.  One is, defendants
13    have suggested that, somehow, the union had responsibility
14    to notify the participants of the effect of the caps, the
15    existence of the caps.  We don't find any support for that
16    in case law or regulations.
17              As the sponsor of these plans, the obligation
18    with respect to notice lies exclusively with the plan
19    sponsor.  And the United Steelworkers, Your Honor are not
20    the plan sponsor.  You heard Mr. Korber testify that M&G
21    Polymers is.
22              Now, with respect to Cigna vs. Amara, while we
23    haven't had a chance to thoroughly analyze that case, we
24    want to point out that that decision says, in addition to
25    other things, that the terms of an SPD may be enforced as
```

 1     understood by the plan participants.  And, in our case, the

 2     P&I agreements were the SPD's.

 3          With that, Your Honor, we conclude our

 4     presentation.  We respectfully request that the Court take

 5     this under advisement and, after consideration of the

 6     evidence and the arguments here, render a judgment finding

 7     liability against M&G Polymers and in favor of the

 8     plaintiffs and the plaintiff class as requested in the

 9     amended complaint.

10          Thank you, Your Honor.

11          THE COURT:  Thank you, Mr. Cook.

12          And, again, gentlemen and ladies, thank you for your

13     professionalism and civility during this trial.  It has

14     made it a lot easier.

15          The matter will be taken under advisement.  The

16     parties will be notified at a later date, taking into

17     consideration other issues in this case.

18          To everybody in the courtroom, don't contact your

19     counsel, Defendants' Counsel, Plaintiffs' Counsel, or

20     anything else, and want to know what's going on.  They

21     won't know anything until they get my order.  And I'm not

22     telling you when my order will get out.  I don't know.

23     It's just one of those things.  There is a lot of testimony

24     I have to take into consideration.

25          The parties have helped me out a little bit.  I have

1    four extra days to work on it that I was not planning on

2    working on it.  So, that does help a little bit, but don't

3    count on it any time soon.  If you get it sooner, that

4    would be great.  That would be great for all of us.

5            I think we are adjourned.

6            Thank you.

7            MR. COOK:  Thank you, Your Honor.

8            MR. MISCIMARRA:  Thank you, Your Honor.

9            (Whereupon, the proceedings were concluded at 5:22

10   p.m.)

11                            - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        I-N-D-E-X

3

4        WITNESS:              DIRECT   CROSS   REDIRECT    RECROSS

5        ROBERT LONG             3       46        72          73

6

7                            – – –

8

9

10   PLAINTIFF'S CLOSING ARGUMENT................  Page   99

11   DEFENDANT'S CLOSING ARGUMENT................  Page  119

12   PLAINTIFF'S REBUTTAL ARGUMENTOPEN...........  Page  158

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                       C E R T I F I C A T E

3    United States of America

4    Southern District of Ohio

5            I, Denise N. Errett, Official Court Reporter of

6    the United States District Court for the Southern District

7    of Ohio, do hereby certify that the foregoing 165 pages

8    constitute a true and complete transcription of my

9    stenographic notes taken of the proceedings held in the

10   afore-captioned matter on the 16th day of May, 2011.

11           In testimony whereof, I hereunto set my hand on

12   the 16th day of May, 2011.

13

14

15                          S/Denise N. Errett, FCRR
                            Denise N. Errett, FCRR
16                          Official Court Reporter
                            Southern District of Ohio
17

18

19

20

21

22

23

24

25