**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**HOBERT FREEL TACKETT, et al.,**

        **Plaintiffs,**                **Case No. 2:07-cv-126**
                                    **JUDGE GREGORY L. FROST**
    **v.**                         **Magistrate Judge Norah McCann King**

**M&G POLYMERS USA, LLC, et al.,**

        **Defendants.**

<u>**OPINION AND ORDER**</u>

This is a class action ERISA case involving the contractual right to lifetime contribution-free health care benefits for retirees who worked for M&G Polymers USA, LLC and its predecessors.  The matter came on for a bench trial in May 2011 on the issue of liability.  The Court found in favor of those plaintiffs in Subclasses One through Four and against Defendants, but in favor of Defendants and against those plaintiffs in Subclass Five.  The Subclass One through Four Plaintiffs then filed a motion for a permanent injunction, seeking the reinstatement of lifetime contribution-free health care benefits for the plaintiff retirees and their surviving spouses or dependents.  (ECF No. 196.)  For the reasons that follow, this Court **GRANTS** the motion.

**I.**

**A.  Background**

The class (retirees, their spouses, and surviving spouses or other dependents of individuals who worked for the named defendant company) assert that although they have a right to lifetime retiree health care benefits, the company is requiring them to pay for those benefits in

violation of various collective bargaining agreement ("CBA") provisions.[1]  Plaintiffs Hobert

---

[1]  The parties have agreed on the class and subclasses involved, which are as follows:

Class:

All retired employees of M&G Polymers USA, LLC ("M&G") and/or its predecessor company, the Shell Chemical Company ("Shell"), who worked at the Point Pleasant Polyester Plant ("Plant") in Apple Grove, West Virginia and were represented by the USW or its predecessor  unions ("Union") in collective bargaining, and who retired or left service from the Plant having met the eligibility requirements for retiree health care benefits specified in the applicable collective bargaining agreements ("CBAs") and P&I Agreements, as well as the spouses and surviving spouses and other dependents of those retired former employees who also claim a right to such benefits, and the surviving spouses of Union-represented Plant employees who died while employed at the Plant who also claim a right to such benefits (the "Class").

Subclass 1: Members of the Class who retired, left service or died while employed at the Plant having met the eligibility requirements for retiree health care benefits specified in the P&I Agreement dated May 15, 1991 through May 15, 1994, as adopted by the CBA between Goodyear Tire & Rubber Company ("Goodyear") and the Union for the Plant effective November 6, 1991 through November 6, 1994, and as adopted by Shell, and their eligible surviving spouses and dependents.

Subclass 2: Members of the Class who retired, left service or died while employed at the Plant having met the eligibility requirements for retiree health care benefits specified in the P&I Agreement dated July 20, 1994 through July 20, 1997, as adopted by the CBA between Shell and the Union for the Plant effective November 6, 1994 through November 6, 1997, and their eligible spouses and dependents.

Subclass 3: Members of the Class who retired, left service or died while employed at the Plant having met the eligibility requirements for retiree health care benefits specified in the P&I Agreement dated May 9, 1997 through May 9, 2003, as adopted by the CBA between Shell and the Union for the Plant effective November 6, 1997 through November 6, 2000, and their eligible spouses and dependents.

Subclass 4: Members of the Class who retired, left service or died while employed at the Plant having met the eligibility requirements for retiree health care benefits specified in the P&I Agreement dated November 6, 2000 through November 6, 2003, as adopted by the CBA between M&G and the Union for the Plant effective November 6, 2000 through November 6, 2003 and applicable until August 8, 2005, and their eligible spouses and dependents.

Freel Tackett, Woodrow K. Pyles, and Harland B. Conley are all Ohio residents and retirees

from the Point Pleasant Polyester Plant in Apple Grove, West Virginia. They and similarly

situated retirees belong to a labor union, Plaintiff United Steel, Paper and Forestry, Rubber,

Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-

CLC ("USW"), which represented (or at least one of its predecessor unions represented) them as

employees of Defendant M&G Polymers USA, LLC ("M&G") (which bought the plant in 2000),

or one of its predecessor companies, such as the Shell Chemical Company (which owned the

plant from 1992 to 2000) and The Goodyear Tire & Rubber Company (which owned the plant

until 1992). Plaintiffs' theory of the case is that the CBA provides vested retiree health care

benefits as a result of the following language, which appears in various agreements:

> Employees who retire on or after January 1, 1996 and who are eligible for and receiving a monthly pension under the 1993 Pension Plan . . . whose full years of attained age and full years of attained continuous service . . . at the time of retirement equals 95 or more points will receive a full Company contribution towards the cost of [health-care] benefits . . . . Employees who have less than 95 points at the time of retirement will receive a reduced Company contribution. The Company contribution will be reduced by 2% for every point less than 95. Employees will be required to pay the balance of the health care contribution, as estimated by the Company annually in advance, for the [health care] benefits . . . . Failure to pay the required medical contribution will result in cancellation of coverage.

> In addition to a series of main agreements, a number of side letters are involved in this

litigation. The Sixth Circuit previously explained these documents as follows, before remanding

---

> Subclass 5: Members of the Class who retired, left service or died while employed at the Plant having met the eligibility requirements for retiree health care benefits specified in the CBA between M&G and the Union for the Plant effective August 9, 2005 through November 6, 2008 or any subsequent CBA between M&G and the Union for the Plant, and their eligible spouses and dependents.

(ECF No. 103, at 2-7.)

the action to this Court for additional factual development:

> A series of collective bargaining agreements has been in force at the Plant, with each typically lasting around three years before renegotiation. The first letter agreement, signed contemporaneously with the 1991-1994 collective bargaining agreement, was adopted "for purposes of conforming with the new Financial Accounting Standard Board (FASB) accounting requirement" that required accrual accounting of healthcare benefits. This new requirement hurt a company's balance sheet performance if the company had no cap on its health-care costs. While signed in 1991, the caps were not to take effect until July 1, 1997. Concurrent with the 1994-1997 collective bargaining agreement, another cap letter postponed the effective date of the caps to 2004.

*Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 483 n.1 (6th Cir. 2009).

Plaintiffs claim that on or about January 1, 2007, Defendant M&G acted contrary to the agreements by unilaterally modifying the health care benefits by shifting a large part of the health care costs onto the class members. The other named defendants are M&G-sponsored health plans through which the class members receive health care benefits: the M&G Comprehensive Medical Benefits Program for Employees and Their Dependents ("Comprehensive Plan"), the M&G Catastrophic Medical Plan, the M&G Medical Necessity Benefits Program of Hospital, Surgical, Medical, and Prescription Drug Benefits for Employees and Their Dependents ("Medical Necessity Plan"), and the M&G Major Medical Benefits Plan ("Major Medical Plan").

Plaintiffs filed the instant action on behalf of the named retirees and their surviving spouses or dependents, as well as other similarly situated retirees and their surviving spouses or dependents, on February 9, 2007. (ECF No. 1.) Via their amended complaint, Plaintiffs originally asserted three claims: violation of labor agreements, actionable under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) (Count I); violation of employee welfare benefit plan, actionable under Sections 502(a)(1)(B) and (a)(3) of the

4

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3) (Count II); and breach of fiduciary duty under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3) (Count III). (ECF No. 14 ¶¶ 26-31.)

Defendants then filed a motion to dismiss the amended complaint (ECF No. 19), and this Court granted that motion (ECF No. 63). On appeal, the Sixth Circuit Court of Appeals affirmed the dismissal of the § 502(a)(3) claim constituting Count III, but reversed and remanded the remaining Count I § 301 claim and Count II §§ 502(a)(1)(B) and (a)(3) claim (ECF No. 68). Defendants unsuccessfully sought summary judgment on Counts I and II, and the matter progressed to a bench trial held from May 9, 2011, to May 16, 2011. This Court filed an August 5, 2011 Opinion and Order in which the Court found in favor of Plaintiffs in Subclasses One through Four and against Defendants on the issue of liability as described herein on Plaintiffs' Count I and II claims. (ECF No. 177.) The Court also found in favor of Defendants and against Plaintiffs in Subclass Five on those claims. This left for resolution the issue of damages, which the Court had previously bifurcated from the liability issue and upon which the parties are currently working. (ECF No. 207.)

Also in need of disposition is the remaining plaintiffs' pursuit of the reinstatement of their lifetime contribution-free health care benefits. That issue is before the Court by way of Plaintiffs' motion for a permanent injunction (ECF No. 196), Defendants' memorandum in opposition (ECF No. 205), and Plaintiffs' reply memorandum (ECF No. 206). The motion came on for an in-court hearing on February 13, 2012, and the Court took the injunctive relief issue under advisement at the conclusion of that proceeding.

**B. Agreed Facts**

5

The Final Pretrial Order set forth the parties' agreed facts, providing:

The following facts are established by admissions in the pleadings or by stipulation of counsel:

1. M&G Polymers USA, LLC ("M&G") is a producer of polymer and related chemical products with a facility located in Apple Grove, West Virginia ("the Apple Grove facility," also known as the "Point Pleasant Plant").

2. The Goodyear Tire & Rubber Company ("Goodyear") owned the Apple Grove facility until November 20, 1992, when Shell Chemical Company, an affiliate of Shell Oil Company ("Shell"), purchased it.

3. Production, laboratory, and maintenance employees at the Apple Grove facility are represented by the United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union, AFL-CIO ("USW") and its Local 644L.

4. Prior to 1995, production, laboratory, and maintenance employees at the Apple Grove facility were represented by the United Rubber Workers ("URW"). The URW merged with the USW in 1995.

5. Retiree Plaintiff Class Representatives H. Freel Tackett, Woodrow Pyles, and Harlan Conley (together with the Class members, the "Retiree Plaintiffs") were employed at the Apple Grove facility and were members of the collective bargaining unit represented by the Union.

6. Mr. Tackett retired on or about March 1, 1996. Mr. Pyles retired on or about January 1, 1996. Mr. Conley retired on or about August 1, 1998.

7. On November 6, 1991, Goodyear and Local 644 of the URW entered into a collective bargaining agreement ("CBA") effective November 6, 1991 to November 6, 1994.

8. On May 15, 1991, Goodyear and the URW and certain URW locals entered into a collectively bargained Pension, Insurance and Service Award Agreement effective May 15, 1991 to May 15, 1994 ("1991 Master P&I Agreement").

9. The 1991 Master P&I Agreement between Goodyear and the URW and certain URW locals included a side letter, "Letter G," dated May

6

15, 1991, dealing with retiree medical benefits ("1991 Letter G").

10.    Goodyear created a Summary Plan Description ("SPD") that described the employee benefit programs applicable to hourly rated employees at the Apple Grove facility as of May 15, 1991.

11.    Goodyear and Shell entered into an agreement dated December 18, 1992, pertaining to the employment by Shell of certain employees of Goodyear at the Apple Grove Facility (the "Employee Agreement").

12.    On December 29, 1993, Shell formally adopted those Goodyear benefit plans that were previously in effect at Apple Grove for represented employees at the Apple Grove facility.

13.    On July 20, 1994, Goodyear and the URW and certain URW locals entered into a collectively bargained Pension, Insurance and Service Award Agreement effective July 20, 1994 to July 20, 1997 ("1994 Master P&I Agreement")."

14.    The 1994 Master P&I Agreement between Goodyear and the URW and certain URW locals contained a side letter, Letter G, dated July 20, 1994 ("1994 Letter G") dealing with retiree medical benefits.

15.    On November 6, 1994, Shell and Local 644 of the URW entered into a CBA effective November 6, 1994 to November 6, 1997.

16.    On May 9, 1997, Goodyear and the USW and certain USW locals entered into a collectively bargained Pension, Insurance and Service Award Agreement effective May 9, 1997 to May 9, 2003 ("1997 Goodyear Master P&I Agreement").

17.    The 1997 Goodyear Master P&I Agreement between Goodyear and the USW and certain USW locals included a side letter, Letter H, dated May 9, 1997, dealing with retiree medical benefits ("1997 Letter H").

18.    On November 6, 1997, Shell and the USW and Local Union 644 entered into a CBA effective November 6, 1997 to November 6, 2000 ("1997 CBA").

19.    M&G purchased the Apple Grove facility from Shell effective June 1, 2000.

20.    In connection with the purchase, M&G and Shell entered into a

Human Resources Agreement dated June 1, 2000 ("HR Agreement").

21. In September 2000, M&G and the USW on behalf of Local 644L began bargaining for a potential extension of the 1997 CBA, which by its terms expired on November 6, 2000, and subsequently engaged in bargaining for a successor to the 1997 CBA.

22. On November 6, 2000, M&G and the USW and Local Union 644L entered into a CBA effective November 6, 2000 through November 6, 2003 ("2000-2003 CBA").

23. In September 2003, M&G and the USW on behalf of Local 644L commenced bargaining for a successor to the 2000-2003 CBA which was due to expire November 6, 2003. This bargaining encompassed more than 60 days of negotiations from September 2003 through August 2005 (the "2003-2005 Bargaining").

24. On August 9, 2005, M&G and the USW on behalf of Local Union 644L reached agreement on a new CBA effective August 9, 2005 to November 5, 2008 ("2005 CBA").

25. The 2005 CBA included LOU 2003-6, dealing with retiree medical benefits, which was signed by Union chief spokesperson Karen Shipley and Company representative Kimm A. Korber.

(ECF No. 165, at 4-6.)

## C. May 2011 Trial Testimony

In addition to introducing testimony via deposition transcripts, the parties presented live trial testimony by select witnesses. The Court briefly summarizes the key points of each such witness' testimony below. For ease of reference, much of the following content is taken verbatim from this Court's August 5, 2011 Opinion and Order, a decision that the Court incorporates fully herein by reference. (ECF No. 177.)

### 1. Woodrow Pyles

Retiree Woodrow Pyles was the first witness to testify. Pyles testified that he had begun working at the Apple Grove facility on May 1, 1959. In December 1992, Shell bought the plant

8

from Goodyear, which Shell later sold to M&G.  He retired on January 1, 1996.  A union

member, Pyles testified that he held a number of positions in the union, including that of union

steward and that of liaison.  He stated that he would attend P&I conferences and would study the

P&I booklet.  After a new pension and insurance agreement ("P&I agreement") had been

reached, Pyles testified, the union would hold a conference to explain the changes.  He also

testified that the local CBA governs working conditions and would be negotiated locally by the

union.

Notably, Pyles testified several times that it is the local's position and unwritten policy

that letters that are not printed in the booklet distributed to the local union members do not apply

to the local union.  He stated that no cap letters applied to the Apple Grove agreements.

Although he had obtained a copy of Letter G at a conference regarding the 1991 agreement,

Pyles testified, he did not distribute the letter to the local members because it was not part of the

booklet.  Pyles explained that the summary plan description described the plan as non-

contributory, with the company paying the entire cost of the plan.  He testified that he has not

paid union dues since his retirement and that he never gave the union permission to represent

him now.  Pyles also testified how he has paid the premium for himself and his spouse since its

implementation, which he protested in a series of letters to M&G's Kimm Korber that he

discussed.

### 2. *Hobert Freel Tackett*

Retiree Hobert Freel Tackett testified that he began working at the Apple Grove facility

on February 7,1966, and retired from that facility on March 1, 1996.  He stated that he had held a

number of local union positions, including president and vice-president, and was a member of

9

the local bargaining unit.  Similar to Pyles, Tackett identified various agreements and testified

that the CBA covers working conditions while the P&I agreement governs benefits.  He testified

that he was never aware of any employer contribution limit or cap under the agreement and that

he first saw a cap letter only after this litigation had commenced.  Tackett testified that he

understood the applicable plans to provide retirees who had 95 points with contribution-free

medical care for life; they had to pay only if they had less than 95 points.  He also testified that

he did not believe that letters not printed in the booklet controlled retiree benefits.  Tackett stated

that he relied on the booklet for medical and pension benefits information.  Similar to Pyles,

Tackett testified that he had never granted anyone the right to bargain on his behalf since retired.

### 3. Ron Hoover

Ron Hoover testified next on behalf of Plaintiffs.  Hoover explained that prior to his

retirement–he is now a union consultant–he worked for the international union with the primary

responsibility of working with the master bargaining agreement.  He explained that a master

bargaining agreement would be negotiated typically every three years, and after that agreement

was secured, another agreement would be negotiated in an approach termed "pattern

bargaining."  Locals would ratify the master agreement and then would negotiate supplemental

agreements focused on their specific issues.  Not all locals were part of the Goodyear master

bargaining, Hoover testified, and Local 644 was not.   Some locals not under the master

agreement had "me too" agreements in which their own CBA language incorporated some or all

of the master agreement provisions.  Hoover testified that he believed that the Apple Grove plant

stood on its own.

Hoover stated that he was never the lead spokesman at the Apple Grove plant, that the

plant was not part of the master agreement, that he was not certain how they even got the pattern agreement, and that he did not know for certain whether Apple Grove adopted the P&I insurance agreement. He also testified that he had never negotiated Local 644 agreements with Shell or M&G. He indicated that he had attended bargaining sessions where benefits had been discussed.

Hoover explained the 1991 cap letter as a union compromise to help Goodyear control or minimize its liabilities; he explained that the letter was a way to avoid showing the extent of projected liability for retiree medical benefits due to FASB considerations. In other words, Hoover explained, the cap letter was a mechanism by which a company could minimize numbers to attract investors. He explained how the letter worked and the importance of what he called the "bite date," or the date on which retirees would have to actually begin contributions toward their medical insurance. Hoover emphasized the importance of always moving the bite date out so that it could always be subject to further movement by negotiation.

According to Hoover, he has no knowledge that the Letter G cap letter was ever adopted at the Apple Grove plant. He explained that the letter was not part of the 1994 agreement between Shell and Local 644. Although he may have participated in 1997 negotiations, Hoover testified, his role was to explain how the Goodyear master agreement worked. Hoover stated that he lacked the authority to bind Local 644 to anything and that only the head negotiator had such authority. He testified that he did not know whether the cap letter labeled as Letter H automatically applied to M&G. Thus, Hoover testified, when he spoke with Randy Moore, he told Moore that if the cap letter applied, Moore should be certain to move the bite date out so that it did not impact retirees. Hoover also testified that he told Karen Shipley the same thing in 2003. Hoover disagreed with the contention that there was a link between the 95-point rule and

11

the cap letter.

Hoover stated on cross-examination that by agreement not all letters were printed in the booklets. As an example, he explained that the 1991 Letter G was part of the master agreement even though it was not in the printed booklet. Hoover stated that a general understanding existed between the union and company representatives that the bite date would always be moved. He stated that the union never intended to have retirees pay a premium and that he understood that the company representatives could not say publically that there would never be retiree contributions because the accountants would then not certify the FASB statements.

Hoover explained that the Apple Grove plant appeared to be some sort of "me too." He stated that he could not identify well a marked-up copy of the 2000 agreement, and Hoover indicated that he could not say for a fact whether cap letters were part of the adopted agreement. Such letters were not printed in booklets, Hoover again explained. He testified that if the letter information was not presented to the local members, then the local representatives were not doing their jobs. Hoover also testified that a "me too" local could adopt the P&I agreement but not letters and again stated that he did not know what Local 644 had done. He stated that he did not know whether the letters were ever presented to the local members. Hoover did state that if the cap letters were not renewed, then they were gone. Hoover testified that he had been careful to never interpret the Apple Grove agreement for Local 644.

### 4. *Randall Moore*

Randall Moore is currently the Sub-District Director of the international union and was previously a staff representative. He was assigned to Apple Grove negotiations in late summer 2000. Moore testified that he relied on the local committee in these negotiations and explained

that after he was unsuccessful at negotiating a two-year extension of the existing agreement,

negotiations for a new P&I agreement continued.

Moore testified that based on his experience, the issue of retiree benefits is typically a

subject of forward-looking negotiations in which future retirees' benefits are discussed, but

existing retiree benefits remain fixed.  He stated several times that it was his understanding that

Local 644 is a "me too" that accepted only parts of the "Big Rubber" master agreement.  Moore

stated that, to his knowledge, Shell was not a part of the "Big Rubber" negotiations.

He also testified that the 1997 P&I agreement for the Apple Grove plant did not reference

Letter H.  Moore stated that when local individuals such as Sam Stewart brought the cap letter to

Moore's attention, Moore spoke to Hoover.  Hoover provided Moore with a copy of Letter H

because the local committee did not have a copy, Moore testified, and Hoover explained that the

cap letter is a FASB accounting letter.  Moore testified that Hoover never told him that Letter H

applied and only suggested that Moore push back the contribution date if the letter were

applicable to Apple Grove.  Moore also testified that he looked for and never found any

document indicating that Letter H applied.

Moore stated that it was less than clear whether the cap letter applied.  He testified that

the local committee proposed pushing the effective contribution date out, but that the company

denied the proposal.  The company was also bewildered by Letter H, Moore explained, and on

October 17, 2000, the company's chief negotiator, David Dick, responded to Moore's request for

written clarification by providing a document stating the company's position that Letter H did

not apply.

Moore also testified that the Apple Grove booklet needed cleaned up because it contained

13

provisions that did not apply to the local plant.  He explained that the parties agreed to remove these provisions while abiding by the agreement they had reached.  Thus, Moore testified, Letter H was removed, and the 2000 P&I agreement that resulted does not contain Letter H.

He stated that for a period of time, Karen Shipley had been assigned to Local 644 until he was reassigned back to the local.  Shipley had asked Moore about Letter H during the subsequent negotiations between the local and M&G, he testified, and Moore explained that Letter H did not apply.  Moore testified that he was confused when presented with Letter of Understanding 2003-6 because the union had not agreed to its contents or that Letter H applied.  M&G's new chief negotiator, Robert Long, was given a copy of Dick's October 2000 disavowal of the cap letter's application, Moore testified, but this did not change M&G's position.  Moore testified that he stated to M&G in negotiations that he lacked the authority to bargain away benefits for existing retirees.

Moore testified that negotiations over Letter of Understanding 2003-6 went nowhere.  He enlisted the aid of the international union's attorney, but the result was still the same.  Moore testified that the union saw the handwriting on the wall as to what M&G was going to do, and that when Shipley signed Letter of Understanding 2003-6 on August 9, 2005, it was a simple formality because her name was already on the company-provided signature line.  Moore explained that the union knew that future retirees would be covered differently than existing retirees.  Although the union contested the lawfulness of M&G's actions, Moore stated, the company went ahead and implemented retiree contributions.

### 5. *Karen Shipley*

Karen Shipley is a staff representative for the international.  She testified that she was

14

part of the 2003 Apple Grove negotiations and acted as the union's chief negotiator. She therefore had the authority to bind the union, she explained, and that the local committee assists the chief negotiator. After M&G's Long and Korber approached her with Letter H, Shipley spoke with Hoover. The parties disagreed over whether the letter applied, she explained, and she states that she informed the company that the union could not bargain over existing retiree benefits, which was a permissive subject of bargaining. The union disagreed that Letter H applied, Shipley testified, and took the position that given the company's disagreement, the letter should then be deleted.

Shipley testified that after offering to withdraw Letter of Understanding 2003-6, M&G reversed course and refused such withdrawal. M&G then implemented its last, best, and final offer, she testified, which included Letter of Understanding 2003-6. Shipley testified that the union never agreed to Letter of Understanding 2003-6 while she was negotiating.

### 6. Brian Wedge

Brian Wedge is currently on leave from the Apple Grove plant while he serves as a staff representative for the international. He testified as to his involvement in numerous Local 644 negotiations in numerous union positions. Throughout the ratification of these agreements, Wedge explained, no cap letters had ever been presented as part of the agreements to be ratified by local members. He discussed the 1997 agreement negotiations specifically and testified that M&G had taken the position that it had separated from the master agreement. M&G's Dick stated that Shell had separated from the master agreement, Wedge testified, because Shell did not belong to the larger negotiating group responsible for that agreement.

In preparing for the 2000 negotiations, Wedge explained, he had heard of Letter H.

15

Because he did not know whether the letter applied or what it was, Wedge testified, he spoke with Hoover and obtained a copy of the letter.  Wedge testified that Letter H was not part of the agreement with which they had started.  Since the time he began working at the Apple Grove plant in 1987, Wedge testified, such a cap letter had never been included in the booklets local members received.

Wedge testified that M&G took the position that the cap letter did not apply to M&G or Shell.  He also testified that the union regarded the October 2000 Dick document as conclusive. The parties proceeded to adopt the 1997 booklet with some changes, Wedge explained, and produced the actual P&I agreement at a later date.  Wedge testified that the parties knew they would have to remove content from the booklet that did not apply to Apple Grove.  He stated that this was why he had made a handwritten notation on a union copy of Letter H indicating that the letter was to be removed.  Wedge testified that the final copy of the P&I agreement distributed to union members did not contain Letter H.

When he was next part of the negotiating team in 2005, Wedge testified, the cap letter issue arose in conjunction with Letter of Understanding 2003-6.  He indicated that Moore had questioned the applicability of a cap letter, and Wedge testified that no retirees had agreed that the union could negotiate benefits on their behalf.  Wedge testified that the union attorney had informed the negotiators that the union had no right to bargain for the existing retirees.  He repeated that the union was not legally permitted to bargain on behalf of the retirees.  Wedge testified that the company nonetheless implemented its plan and that retirees have suffered as a result.  Some people, he explained, won't speak to him as a result.

On cross-examination, Wedge testified that the union proposed in 2000 negotiations to

16

move the cap letter effective date of retiree contributions because there was uncertainty over whether the letter applied.  He stated that the Dick letter on behalf of M&G resolved the issue and that by the end of negotiations, it was settled that Letter H did not apply.

Wedge also explained the inapplicability of the master agreement.  He provided the example of when Moore asserted during negotiations that the master agreement's pension multipliers automatically applied and M&G responded by adopting the position that the master agreement did not control.  Wedge also testified that the union was responsible for distributing for local ratification the agreement information.  He indicated that there was never an agreement between the company and the union as to what would go into the booklet.

### 7. Kimm Korber

Defendants' first witness was Kimm Korber, M&G's Human Resources Director. Korber testified that he had been hired in 2001 as Human Resources Manager for the Apple Grove plant and that his duties had included general human resources work as well as labor responsibilities.  He stated that he had first become aware of issues with the P&I Agreement in the 2000 negotiations.  Korber testified that because the Letter H effective date for contributions was after the next negotiations, he assessed that the letter would be discussed in the 2003 negotiations.

During those negotiations, Korber testified, Shipley had told him that the retiree benefits was a permissive subject of bargaining, that the parties could not reach an impasse over this issue, and that she was not interested in discussing the issue.  He indicated that Shipley had proposed deleting Letter H.  He also summarized the history of negotiations, stating that the union changed its position after it learned of Dick's October 2000 document.

Korber testified that he was not trained in benefits administration and that he has only a basic understanding of ERISA requirements.  He stated that M&G is the plan sponsor and the named fiduciary and that the plan had never sent an ERISA notice to retirees of their being subject to the cap or of the possible termination of benefits.

Korber also testified regarding meeting with Rex Rousch.  He denied that Rousch told him that Letter H was a Goodyear document and not a Shell document, but stated that he obtained the letter from Rousch.  When presented with various exhibits, Korber indicated that Letter H had not been part of local booklets and could not point to where the 2000 CBA or P&I agreements adopted the Goodyear Letter H.

When questioned regarding the October 2000 Dick response that disavowed cap letter application, Korber testified that he had not discussed the document with Dick.  Korber stated that a chief negotiator has the authority to bind a company.  When asked whether the union could rely on Dick's response, Korber essentially avoided the question and responded by discussing proposals.

Korber reviewed exhibits related to M&G's acquisition of the Apple Grove facility from Shell and various emails regarding Letter H.  He denied that it was left to counsel to determine the effective date of Letter H, but confirmed that he was part of the decision to apply a cap to all retirees.  Korber stated that this was not an actuary decision.  He disagreed with the position of Moore and Shipley that they did not have the authority to bargain for retirees, but stated that without Letter H, bargaining for retirees would be a permissive subject of bargaining.

Korber also testified regarding M&G's due diligence in the plant purchase.  He further stated that he was aware of Letter H in 2001, although he did not mention the application of caps

in a strategy memorandum he wrote on M&G's benefits program.  This failure to mention Letter H continued throughout other documents and communications Korber sent involving benefits. In a July 12, 2004 email from Korber to Duane Lee, Korber testified, he did address Letter H, but he denied that this was the first time he sent Lee the letter.  Korber testified regarding subsequent emails that noted that Letter H may not be deemed enforceable to Apple Grove and that discussed the possible impact of Letter H.  He acknowledged his December 2005 email to Lee that concerned the topic of how much M&G would save if Letter H were applied to all retirees.  Korber also acknowledged subsequent emails that tracked the effect of the cap letters, which was that retirees were being dropped from the benefits plan.  In subsequent testimony, Korber did not disagree that over half of all retirees had died or been dropped from the benefits plan.  In another email that Korber acknowledged, he stated that most retirees look to the booklet for a guide to retirement health plans.

### 8. Robert Long

The final witness to testify was attorney Robert Long.  He explained that he routinely represents management in labor negotiations and that he has participated in between 200 and 300 negotiations.  One such negotiation was the Apple Grove bargaining that began in the fall of 2003.  He testified that during these negotiations, Shipley stated that the union was not willing to discuss retiree medical benefits and that it was a permissive subject of bargaining.  Long testified that generally speaking, retiree bargaining is a permissive, or non-mandatory, subject of bargaining and that a company and union can by mutual agreement enter into agreements on this topic.  He later stated that the parties cannot modify vested benefits, but can modify non-vested benefits.

19

Long testified that following two union caucuses, the union returned to the table and mentioned Letter H, a cap letter, and that Sam Stewart had indicated that it was part of the binding agreement.  He stated that no union representative suggested that Letter of Understanding 2003-6 applied only to future retirees.  Long testified as to the circumstances surrounding his negotiation offer that, if the union took the position that Letter of Understanding 2003-6 implicated a permissive subject, then the company would withdraw it from the last, best, final offer.  He testified that the company ultimately rejected the union's proposal to delete Letter H.

Long also testified that he never did any research as to whether Letter C or Letter H applied, but instead simply accepted the propositions that Shell had adopted Goodyear letters and that M&G had assumed Shell's contractual obligations.  He had been told that M&G had a P&I book with Letters C and H in it.  Long testified that he may have seen the Dick response disavowing cap letter applicability, but he stated that he could not recall when.  He testified that he relied upon Korber to be the primary architect for P&I proposals and stated that he had never read the 2000 P&I agreement cover to cover and that he did not know whether Letter H was part of that agreement.  In subsequent testimony, Long stated that Stewart did not have the authority to bind the union, as opposed to Shipley, who held such authority.

**D.  February 2012 Hearing**

In lieu of presenting additional testimony, the parties elected to proceed at the February 14, 2012 hearing on their previously filed briefs and accompanying declarations, with counsel making oral argument.

**II.**

20

**A. Standard Involved**

In considering whether entry of a permanent injunction is warranted, this Court must consider (1) whether Plaintiffs have succeeded on the merits of the case, (2) whether Plaintiffs will suffer irreparable injury in the absence of equitable relief, (3) whether the balance of hardships to the respective parties favors injunctive relief, and (4) whether entry of injunctive relief is in the public interest.  *Duer Constr. Co., Inc. v. Tri-County Bldg. Trades Health Fund*, 132 F. App'x 39, 45 (6th Cir. 2005) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004)).  *See also eBay, Inc. v. MerExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (setting forth similar test for permanent injunction); *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

**B.  Discussion**

The central issue in this litigation has been whether Plaintiffs–the qualifying retirees, their spouses, and their dependants–have a vested right to lifetime, uncapped (or contribution-free) medical benefits.  It is settled that those plaintiffs in the first four subclasses do.  The extant issues are now what that right encompasses and whether Plaintiffs are entitled to an injunction ordering the implementation of that right at this juncture.

Plaintiffs are entitled to a permanent inunction.  They have prevailed on the merits of their claims, with only the issue of damages remaining.  The absence of an injunction now would essentially transform the liability determination into a Pyrrhic victory, at least in the short term. This would be an unacceptable result, especially in light of the consequent irreparable harm.

Lack of a permanent injunction at this point would continue to inflict irreparable injuries on Plaintiffs. Money will of course remedy some of the damages Plaintiffs have incurred. In the absence of equitable relief, however, Plaintiffs will suffer irreparable injury regardless of any money ultimately awarded. The submitted declarations detail various anecdotal evidence of the type of injuries that many if not most of the plaintiffs have incurred and will continue to incur. It is not an illogical leap to extrapolate from such anecdotal evidence recognition of the harm facing the greater class. Money simply cannot remedy many of these injuries, such as the ongoing quality of life concerns. The apparent potentially shortened life spans or lives of lesser quality marked by ongoing anxiety and undue strife are clear. Moreover, the balance of hardships to the respective parties favors entry of the injunction, with Plaintiffs suffering far greater hardship should this Court further delay reinstatement to coverage for those dropped from the plans and forestall stopping Defendants from collecting the improper 2012 premium that M&G indicates it will continue to impose. (ECF No. 206-3.)

The enforcement of contractual obligations and the judgment of this Court are also unquestionably in the public interest. Plaintiffs have presented this Court with numerous cases in the briefing supporting this point. Additionally, as Plaintiffs argue, it is in the public interest to transfer the burden of coverage to the private company that included such coverage in its bargaining and not to keep much of the burden of providing health care coverage on the public by forcing numerous retirees and their dependants to rely upon public assistance programs.

Defendants devote much time to arguing minor points to the contrary on these factors, but much of the arguments presented are simply red herrings that warrant little discussion. For example, waiting for a conclusive damages determination before stopping premium collection

and before reinstating those dropped from coverage would wholly fail to alleviate the irreparable harm many plaintiffs would incur.  Such an approach would contravene logic by conflating measurable damages–out of pockets expenses–with intangible damages, such as the quality of life issues addressed above.

Contrary to Defendants' arguments, the fact that this litigation has been ongoing for five years does not weigh against a stay.  Five years of impropriety on the part of M&G does not mean that a few more months or even years does not matter.  Five years of unnecessary ongoing medical issues and financial hardship that cannot fully be undone matter.  Defendants may characterize their opposition to the permanent injunction motion as seeking to maintain the status quo, but the status quo here is a company wrongfully denying individuals critical benefits to which the individuals are lawfully entitled.

Equally unpersuasive is Defendants' dubious paternalistic concern for the retirees.  Defendants argue that should they prevail on appeal, many of the retirees may end up without health care coverage.  Because it is M&G's actions that have already divested numerous retirees of such benefits, the Court is skeptical of the depth of Defendants' concern.  In any event, such an issue is of little weight in the injunction inquiry.  Any loss of coverage that might result should the Court enter a permanent injunction now and Defendants then subsequently prevail on appeal does not weigh against entering the relief requested.  As the Court has previously noted, it doubts that Defendants will prevail on appeal.  More important for today's issue is that any loss of coverage that would result if the Court is wrong would be Plaintiffs' own fault.  They has asked for the Court to place them on such a possible path, and even if unlikely to be realized, the path Plaintiffs request presents a possible self-inflicted wound.  In other words, because

Plaintiffs are rolling the dice even if they do not see themselves as necessarily gambling, Defendants should not benefit from protecting Plaintiffs from hypothetical harm to which Plaintiffs ask to expose themselves.

This Court therefore rejects Defendants' arguments, which again and again return to the underlying premise that delay is fine because money can function as an overarching salve. This oversimplification ignores the realities involved here.

Defendants then argue that, in the event that the Court elects to enter a permanent injunction, this Court should require a bond. Both sides direct this Court to cases involving bonds related to Federal Rule of Civil Procedure 65, and these cases recognize the well-settled proposition that whether to require a bond is within the discretion of the Court. *Moltan Co. v. Eagle–Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). The circumstances of this case weigh against imposition of such a requirement. The age of Plaintiffs and their financial means outweighs the notably limited possibility that Defendants will prevail on appeal. Defendants in turn have prospered from their impropriety for years and have presented testimony to this Court in support of their liability arguments that the Court recognized as simply false. Plaintiff have prevailed on the merits and have generally suffered financial hardships while pursuing what lawfully belongs to them. Defendants have enjoyed a financial windfall for years as a result of their improper conduct, even if the subsequent damages portion of this action will serve to divest Defendants of a portion of that ill-gotten gain. Requiring any bond, much less one of the sort contemplated by Defendants, would only work to further effectuate another injustice on Plaintiffs. This Court in its discretion declines to require a bond.

Having made the threshold determinations that entry of a permanent injunction is

24

warranted and that no bond would be appropriate, this Court turns to the issue of the proper

scope of that injunction.  This raises the core issue of what precisely vested.

Plaintiff argue that the right to the health care plans as they existed pre-2007 is what

vested.  They suggest that this Court has already recognized that fact, and, failing that, urge the

Court to accept that such vesting occurred.  Defendants of course disagree and argue that at best,

only the right to health care vested without such specific plan details having vested.  Thus,

Defendants argue, any reinstatement to health care benefits should be only to the plans as they

exist now.

Contrary to Plaintiffs' contention, this Court did not previously hold that the prior plan

details vested.  To explain this point, it is necessary to review the Court's prior vesting

discussions, however repetitious that review may be.  As in the summary of the facts above,

much of the following is often taken verbatim from this Court's incorporated August 5, 2011

Opinion and Order.  (ECF No. 177.)  That decision answered whether contribution-free benefits

vested.  Today's decision answers whether specific plans or plan details were within the scope of

what vested.

The Sixth Circuit has held that "[r]etiree health benefit plans . . . are welfare benefit

plans; thus, vesting only occurs if the parties so intended when they executed the applicable

labor agreements."  *Noe v. PolyOne Corp.*, 520 F.3d 548, 552 (6th Cir. 2008).  *See also Tackett*,

561 F.3d at 489.  The presence or absence of such intent is again critical here because, as the

court of appeals has explained, "[i]f the parties do not intend to vest the benefits, the former

employer can modify the retiree benefits without breaching a collective bargaining agreement."

*Tackett*, 561 F.3d at 489.  The appellate court has also explained that "[a] court may find vested

rights 'under a CBA even if the intent to vest has not been explicitly set out in the agreement.' "

*Id.* (quoting *Maurer v. Joy Technologies, Inc.*, 212 F.3d 907, 915 (6th Cir. 2000).

The Sixth Circuit has described the "broad analytical framework" that this Court must

apply to the vesting issue as follows:

> The seminal case for determining whether the parties to a CBA intended benefits to vest is *UAW v. Yard-Man*, 716 F.2d 1476, 1479 (6th Cir. 1983). Under *Yard-Man*, basic rules of contract interpretation apply, meaning that courts must first examine the CBA language for clear manifestations of an intent to vest. *Id.* Furthermore, each provision of the CBA is to be construed consistently with the entire CBA and "the relative positions and purposes of the parties." *Id.* The terms of the CBA should be interpreted so as to avoid illusory promises and superfluous provisions. *Id.* at 1480. Our decision in *Yard-Man* also explained that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Id.* at 1482. With regard to the "*Yard-Man* inference," later decisions of this court have clarified that *Yard-Man* does not create a legal presumption that retiree benefits are interminable. *Yolton*, 435 F.3d at 579. Rather, *Yard-Man* is properly understood as creating an inference only if the context and other available evidence indicate an intent to vest. *Id.*
>
> When an ambiguity exists in the provisions of the CBA, then resort to extrinsic evidence may be had to ascertain whether the parties intended for the benefits to vest. *Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 774 (6th Cir. 1999). If an examination of the available extrinsic evidence fails to conclusively resolve the issue and a question of intent remains, then summary judgment is improper. *Int'l Union, United Mine Workers of Am. v. Apogee Coal Co.*, 330 F.3d 740, 744 (6th Cir. 2003).

*Noe*, 520 F.3d at 552. The court of appeals has further clarified:

> Courts reviewing a collective bargaining agreement must also keep in mind the context of labor-management negotiations on retiree health-care benefits: "because retirement health care benefits are not mandatory or required to be included in an agreement, and because they are 'typically understood as a form of delayed compensation or reward for past services' it is unlikely that they would be 'left to the contingencies of future negotiations.' " *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 580 (6th Cir. 2006) (quoting *Yard-Man*, 716 F.2d at 1481-82).

*Tackett*, 561 F.3d at 489. Application of these directions to this case led this Court to the

conclusion that Plaintiffs obtained vested medical benefits.

That conclusion does not conflict with the Sixth Circuit's prior discussion of the issue of vesting.  Citing the November 6, 2000 CBA language set forth above, the court of appeals previously made several critical points:

> First, the "full Company contribution" language suggests that the parties intended the employer to cover the full cost of health-care benefits for those employees meeting the age and term-of-service requirements.  Keeping in mind the context of the labor-management negotiations identified in *Yard-Man,* we find it unlikely that Plaintiff USW would agree to language that ensures its members a "full Company contribution," if the company could unilaterally change the level of contribution.  The CBA has no limitation on the amount of a company contribution and if the Defendants' argument were accepted, the company presumably could lower the contribution to zero without violating this language.  Such a promise would be illusory.

> Second, the limiting language, "[e]mployees will be required to pay the balance of the health care contribution," follows the provision requiring contributions by those retirees who had not attained the requisite seniority points.  From the placement of this language, we can reasonably infer that it did not apply to all retirees, but only to those retirees who had not attained the requisite seniority points.

> Third, the collective bargaining agreement tied eligibility for health-care benefits to pension benefits.  This is another factor indicating that the parties intended the health care benefits to vest upon retirement.

*Tackett*, 561 F.3d at 490.  This Court previously noted that, on its face, the court of appeals' language appears to present a controlling interpretation of the CBA that proves dispositive of at least the vesting issue, if not the issue of capped versus uncapped benefits.

This Court recognized, however, that the next sentence of the court of appeals' opinion suggests that perhaps the Sixth Circuit was not handing down an opinion that proves dispositive outside the Rule 12 context.  Following the third point, the *Tackett* panel stated that "[w]e hold that the Plaintiffs' Complaint presented a plausible claim that the parties intended to vest health-

27

care benefits.  Accordingly, we hold that the district court erred in granting the Defendants' Rule 12(b)(6) motion on the § 301 claim."  *Id.*  This language might cast the otherwise essentially conclusory language of the three points (noting that the appeals court did use some qualified language such as "suggests") into a qualified light and presents the issue of whether the Sixth Circuit was interpreting the language as a matter of law or simply saying that it presented a plausible claim for Rule 12(b)(6) purposes and that the vesting issue was left open upon remand.

The Court continues to find the answer to the vesting issue in the next portion of the appellate decision.  There, the *Tackett* panel moved from Count I, the § 301 claim, to Count II, the § 502(a)(1)(B) claim.  After outlining the considerations relevant to deciding the vesting issue, the Sixth Circuit stated that "[t]he determination above that *the parties intended health-care benefits to vest* carries over to the ERISA § 502(a)(1)(B) claim.  The Plaintiffs have therefore presented a plausible claim under ERISA § 501(a)(1)(B)."  *Tackett*, 561 F.3d at 490 (emphasis added).  Notably, the court of appeals phrased its summary of its prior discussion as an unqualified declaration–"the parties intended health-care benefits to vest"–without linking that summary statement to a mere finding of a plausible claim.  By presenting the intended vesting as a fact leading to the result that Plaintiffs had presented a plausible claim, the appellate court pointedly issued a conclusion instead of merely recognizing a credible possibility.

In other words, had the Sixth Circuit said that based on the factual allegations that it must accept as true, it concludes that Plaintiffs have stated a plausible claim for Rule 12(b)(6) purposes, this Court would perhaps consider the vesting issue open on remand.  But what the court of appeals did was conclude that the parties intended vesting, which meant that Plaintiffs had of course stated a plausible claim, which meant that they should have survived the Rule

12(b)(6) attack.  The distinction is important; it is the difference between saying that the facts *likely* present a viable claim and saying that the facts *do* present a viable claim.  This Court therefore stands by its prior conclusion that the Sixth Circuit answered the threshold vesting issue.

As noted in the bench trial decision, however, even if this Court is incorrect in its interpretation of the appellate precedent and the court of appeals did not intend to be dispositive on the issue and reasonably only intended to reach the issue of plausibility of the claim presented, the Court recognizes that there are no facts that would defeat the same conclusions.  The linking of eligibility for health care benefits to pension benefits indicates the parties' intent that health care benefits vested upon retirement.  *See Reese v. CNH America LLC*, 574 F.3d 315, 322 (6th Cir. 2009) (noting cases in which the tying of eligibility for pension benefits to eligibility for health-care benefits  "played a 'key' role in a vesting-of-health-benefits determination").  Regardless of the analytic path, the end result is still the same because, in light of the meaning of the CBA language, this Court must conclude that vesting occurred.  Whether the appellate path or this Court' own analysis leads to this conclusion is ultimately irrelevant.

As also noted, however, *what is significant is that the Sixth Circuit did not conclusively state the precise nature of the right to health care benefits that vested* in light of the fact that the appellate panel left the door open for further related factual development and analysis on remand.  After summarizing the cap letters and the postponement of the effective date of the caps, the Sixth Circuit stated that "[t]he import of this perpetual postponement and the applicability of these cap letters to the current parties are fact issues that must be resolved by the district court outside of the Rule 12(b)(1) determination."  *Tackett*, 561 F.3d at 482 n.1.  Thus, as

in *Reese*, the core issue in this case is ultimately not "did the benefits 'vest,' " but rather "what does vesting mean in this context." *Reese*, 574 F.3d at 321. The bench trial answered *what* vested–the right to lifetime contribution-free health care benefits–and today the Court is called upon to explain whether what vested includes specific benefits.

What vested for those plaintiffs in Subclasses One through Four was a right to contribution-free lifetime health benefits. What vested for those plaintiffs in Subclass Five was a right to capped lifetime health benefits, contingent on the qualifying plaintiffs paying the above-cap premiums. The Court has not previously explained whether these rights encompass a right to the particular benefits in place at the point of retirement. This Court concludes that they do not, which means that those plaintiffs in Subclasses One through Four should be reinstated into the current versions of the health care plans involved.

While disagreeing with the Court's vesting analysis, Defendants have taken the position that the health care benefits agreements condition exercise of any vested right to benefits on satisfaction of the cost-sharing precondition. Defendants' theory of the case is that there has been continuity in the wholesale assumption of contractual obligations by each owner of the Apple Grove plant, an unbroken line of side agreements that provide contextual meaning to the language of the main agreements. They posit that the side agreements apply to the plant and its retirees either expressly or under a "me too" arrangement. Thus, Defendants reason, the right to the contingent benefits is clear provided a retiree satisfies the condition of making his or her contribution. This is a permissible scheme; a plan may contemplate fully funded, lifetime health care benefits *or* defined-contribution health care benefits. *Wood v. Detroit Diesel Corp.*, 607 F.3d 427, 432 (6th Cir. 2010). The scheme Defendants assert is not, however, the scheme that

exists here.

The factual history that the parties present could not be more different.  On one side, Defendants have presented largely dubious testimony to support the theory that an unbroken chain of cap letters informs agreements resulting in at most lifetime health care benefits that are contingent on satisfaction of a cost-sharing arrangement.  On the other side, Plaintiffs have presented notably more compelling evidence that Defendants have engaged in after-the-fact company scrambling to find a way to impose unilaterally application of cap letters as a cost-savings measure that defies the agreements the caps puncture.

This Court untangled which agreements do in fact apply to the Apple Grove plant and concluded that Defendants have conflated companies and agreements.  The pre-August 5, 2005 side agreements to the master agreements do not apply to Apple Grove.  Rather, the intent and effect of the applicable operative documents governing Subclasses One through Four present a lifetime benefits scheme for qualifying retirees and beneficiaries without the cost-sharing Defendants wrongly imposed.  The cap letters were not part of these agreements, and even if they were, they were wholly abandoned.

Thus, contrary to Defendants' assertions, there is no unbroken chain of cap letter applicability.  The evidence indicates that Apple Grove is a partial "me too" plant, or a "me too with exceptions" plant, with the ability to accept or reject such side agreements.  The evidence also indicates that Local 644 rejected application of these unpublished agreements.  Additionally, chief company negotiator Dick expressly rejected cap letter applicability, and when union negotiator Moore attempted to pull a master agreement's pension multipliers into the negotiation, M&G took the position that the master agreement did not control–a position that

31

undercuts reliance on side agreements that the evidence indicates ultimately applied only to the master agreements.

The first cap letter at issue was in 1991. The evidence does not support that this letter was part of the P&I booklet adopted by Local 644. Testimony indicated that the booklets are prepared after the local's vote. There is no testimony that the agreement terms ratified by the local included cap letters, regardless of the subsequent booklet content. The testimony of Wedge, Moore, Hoover, Pyles, and Tackett indicates that the booklet as published set forth the total benefits agreement and that it was both permissible and the unwritten policy and practice of Local 644 to adhere to only that which was published in the booklet. Pyles did not testify to knowledge of a cap obtained from a summary plan description; rather, he testified that he did not know of the cap letter and consequently did not ratify it as part of the local agreement. Hoover made clear that a "me too" local could indeed decline to adopt the side agreement letters, and the testimony of Pyles and Tackett indicate that this was the unwritten policy and practice of Local 644. Even James Kruse, whose deposition testimony generally weighed against Plaintiffs in many respects, recognized the divergent nature of the Apple Grove plant. Absent cap letter incorporation into the local P&I agreement, Shell (and consequently, M&G) could not have assumed the cap letter agreement as a successor as part of its purchase of the plant. There is no basis to conclude that the 1991 summary plan description was presented to local members; in any event, a summary cannot itself constitute the terms of the agreement for § 502(a)(1)(B) purposes. Additionally, as Joint Exhibit No. 2 reflects, the express incorporation of specified Goodyear agreements did not include all Goodyear side agreements, pointing to the conclusion that Shell never initially adopted a cap letter.

Neither the 1994 nor 1997 dealings implemented cap letter applicability to the Apple

Grove facility.  Although deposition testimony by Dale Wunder supports adoption of Letter H in

1997, this conflicts with the Shell documentary evidence and the more credible testimony of

Local 644 members as to what they saw, what they ratified, and how the local approached the

incorporation issue.  The cap letters at issue were Goodyear cap letters that were not negotiated

into the local P&I agreements.

The Court also notes expressly that the evidence concerning the 1997 agreement working

copy is not the smoking guns Defendants contend.  Instead, as Plaintiffs accurately targeted

during trial, this was a Goodyear agreement signed by Goodyear officials who were unable to

sign for Shell.  The working copy cannot provide a logical basis for cap letter incorporation

because when placed in context it is apparent that it was simply that: a copy of an agreement

from which the parties could begin their work, with not all parts applicable to the relevant

negotiating parties.

In 2000, when Shell sold the Apple Grove plant to M&G, M&G assumed CBA and P&I

agreement obligations from Shell.  The company's own accountants recognized the retiree

benefits as involving no retiree contribution, and there was no booklet incorporation of the cap

letter.

It is significant that even if there were at one point cap letter applicability for pre-August

5, 2005 retirees, the parties' dealings extinguished invocation of such retiree contributions.  At

one point, the union took the position in negotiations that the cap issue was at least potentially

relevant, and the union's negotiator recognized the potential applicability of the cap letter.

Testimony explained the prophylactic context of Moore's actions and points to strategic

maneuvering that removed any possibility of cap letter applicability.  M&G disavowed cap letter applications, the effective contribution date of the relevant hypothetically applicable cap letter expired, and the parties proceeded without the possibility retiree contributions for existing retirees.  Even assuming *arguendo* earlier cap letter applicability, the 2000 P&I agreement cut off any chain of cap letters.

Letter of Understanding 2003-6, dated August 9, 2005, and made part of the 2005-2008 agreement that applies to those plaintiffs in Subclass Five, permits implementation of above-cap retiree contributions.  The issue is whether that document looks only forward from August 9, 2005, or indeed presents a permissible, memorialized understanding of existing if previously unimplemented side agreements.  Defendants would have this Court accept the proposition that the parties continually kicked the can of retiree contributions down the road until it was no longer economically feasible for the company.  The evidence is to the contrary.

Letter of Understanding 2003-6 contemplates caps on employer contributions to retiree health benefits and provides that "premium cost sharing charged to retirees will be based on the amount by which total cost for all retiree insurances (medical, life, etc.) exceed the caps set forth in Letter H dated January 1, 2001."  The unilaterally implemented letter also states that retirees would not be required to contribute to their premiums until January 1, 2006, and that the retiree premium contribution rates would become effective on that date.  Defendants argue that Letter of Understanding 2003-6 and the union's history of attempting to negotiate the effective date of caps and to eliminate the application of Letter H point to the application of the caps to M&G.  Defendants posit that Letter of Understanding 2003-6 unambiguously supports the unbroken application of caps to retirees (including preexisting retirees).  That document explicitly

34

references the prior 2001 cap letter and provides that "[r]etiree benefits" means "benefits for the Company's preexisting retirees."  The trial testimony undercuts deeming Letter of Understanding 2003-6 dispositive in Defendants' favor for pre-August 9, 2005 retirees, spouses, and dependents.

This Court concluded that Letter of Understanding 2003-6 does not rehabilitate broken or reaffirm longstanding cap letter applicability in regard to those plaintiffs in Subclasses One through Four.  Despite Defendants' best efforts at rewriting history, the trial evidence places the previously ambiguous Letter of Understanding 2003-6 into its proper context as a going-forward document applicable to individuals in Subclass Five and not a document that also speaks to and clarifies the meaning of the prior agreements governing Subclasses One though Four.  The actual context of Letter of Understanding 2003-6 does not include a shared intent to vest only partially funded (*i.e.*, capped employer contributions for) lifetime health care benefits to retirees in the first four subclasses.  Rather, the document's context teaches this Court that application of Letter of Understanding 2003-6 to the plaintiffs in the first four subclasses was a unilateral move by M&G to unlawfully circumvent binding agreements to obtain economic advantages.  The addition of Letter of Understanding 2003-6 to the 2005-2008 agreement changes the meaning of what constitutes a "full company contribution" from prior agreements so that the clause no longer means the full cost of health-care benefits for qualifying employees, but rather a capped company contribution to the health-care benefits.

To be certain, the parties' decade-plus history of dealing with the cap letters and contributions does not present a model of negotiating clarity, much less competence.  On one side, the union's own negotiator once questioned cap letter application, and at least one if not

more Local 644 individuals who lacked binding authority appeared not to understand what was involved in the negotiations and the agreements reached.  Defendants fare no better.  During the 2000 CBA negotiations, attorney David Dick was the lead or chief negotiator for M&G and stated clearly and unequivocally that the cap letter did not apply.  The testimony Defendants intend to explain away Dick's purported "confusion" is simply not credible.

Nor is the testimony of Long helpful in regard to applicability.  The curiously under-informed Long expressly relied on Korber, whose testimony this Court found to be incredible time and again, in accepting cap letter applicability.  Having had ample opportunity to observe the witness and to consider his testimony, this Court expressly rejects as simply not credible the testimony of Korber, M&G's Human Resources Director, which indicated that M&G had assumed cap letters as part of the preexisting obligations as a successor to Shell.  Korber's actions, particularly his communications with the consultant actuaries for M&G, are not consistent with an individual or a company that knew or believed that any cap letter applied.  It does not appear to this Court that Korber knew of Letter H until at least 2003, despite his contention that he knew of the cap letter years earlier.  Additionally, M&G's own reporting of contribution-free retiree health care benefits (tracking Shell) contradicts the company's post-hoc position that the cap letters always applied and undercuts Korber's self-serving testimony.

In contrast to Korber's testimony, the Court found credible the testimony of Hoover and Moore, who together explained that confusion existed because various locals had different approaches.  Potential cap letter application does not equal actual application, and the Court finds that Local 644 never adopted cap letters prior to August 9, 2005, even if union leadership was uncertain about that position at times and had to check in with the home office for assistance

during negotiations.

It is also notable that the union lacked the ability to negotiate the vested retiree benefits, a point to which the Court will return below. Previously, this Court noted the examples that Pyles and Tackett did not consent to the parties addressing this permissive subject of bargaining. *There is no evidence any retiree did.* But there is evidence that union negotiators such as Shipley routinely adopted the position that retiree contributions were not on the table. Only individual union members not in the know apparently believed that the cap letters applied, and they lacked authority to bind the union and the retirees.

As the Court has previously noted, the significant confusion by the parties is odd. It appears that various individuals' efforts to circumvent clarity and full disclosure to the public of self-serving arrangements got a bit too clever for nearly all involved until even key actors were confused by what essentially hidden agreements applied in what context. Goodyear master agreement shenanigans did not necessarily filter down to the me too with exceptions plant involved here, but the various actors in the history of the Apple Grove plant appear to have been rarely well informed. This is no way to run a business or a union. Companies should know what they are buying (obligations and all), investors should know what company liabilities exist, unions at all levels should be clear on what they are negotiating, and retirees should know what agreements they are ratifying.

Plaintiffs have presented ample evidence involving M&G's counsel, actuaries, and human resources personnel that no one thought that there was a cost-sharing plan in place for Apple Grove retirees for years until it became advantageous to the company. Multiple M&G actors appear at best uncertain of what benefits liabilities they assumed when they purchased the

37

plant and another expressed a position wholly adverse to cap letter applicability.  Those who

testified supporting cap letter applicability wholly lacked veracity.  Ultimately, this litigation

presents a scenario in which a company faced with ballooning benefits costs uncovered a

longshot means by which it could attempt to retroactively rewrite agreements to reduce

costs–and then the company turned to actuaries to inform the purported scope of the cap letter,

apparently basing the claimed scope on the amount of money that could be saved if the company

prevailed.  This is unlawful.

The issue of liability that once appeared complicated during summary judgment

proceedings became far more clear as a result of the trial.  And despite real conflicts in evidence,

including each party's own at times contradictory evidence, the greater weight of the evidence

favors Plaintiffs.  For example, the evidence indicates that Dick, the company's chief negotiator

and someone with the clear authority to bind the company, rejected cap letter applicability.  The

company attempts to insulate itself by dubiously disowning his comments and authority, while

concurrently pointing to Long's testimony as supporting applicability.  Defendants cannot reject

one of their negotiators as misinformed and turn to another uninformed negotiator to achieve the

continuity of applicability that they seek to prove.

In contrast, the evidence indicates that those with the authority to bind the union disputed

cap letter applicability.  The company insists that the Court should credit instead those local

members who lacked such binding authority.  The evidence indicates that there were no ERISA

notices given here, that the retiree benefits issue was not a subject of bargaining, and that the

retirees did not consent to negotiations on the issue.  The company asks this Court to ignore

these facts.  The evidence indicates, however, that Defendants developed the contribution

scheme as a self-serving response to economic realities and in contravention of the negotiations conducted and applicable agreement reached. This is impermissible under the controlling law.

The plan participants' understanding of what they ratified reflects the benefits agreements reached. This Court therefore concluded: (1) the relevant agreements set forth a scheme in which the employer is responsible for covering the full cost of health-care benefits for those employees meeting the age and term-of-service requirements in Subclasses One through Four; (2) qualifying individuals in Subclasses One through Four are entitled for the company to cover the full cost of the health benefits, without these plaintiffs being required to pay premium contributions; (3) the contribution-free health benefits for individuals in Subclasses One through Four exist despite the fact that various inapplicable side agreements between other parties deferred the eventual collection of retiree contributions; (4) for the plaintiffs in Subclasses One through Four, Defendants have had no right to collect the premiums charged and have impermissibly terminated benefits for the failure to make such a contribution; and (5) the cap letter applied to Subclass Five, the members of which Defendants could permissibly require to make above-cap contributions. These conclusions speak to the vesting of the right to benefits and not to the benefits themselves.

Having summarized how it determined both that vesting occurred and that the right to lifetime contribution-free health care benefits is what vested, this Court turns to the only real issue that remains after deciding that a permanent injunction is warranted: Should Plaintiffs be reinstated to the pre-2007 versions of the plans? The answer to this question defines part of the scope of the injunction.

There is no real dispute involving two of the three plans involved. The parties apparently

39

agree that the Medical Necessity Plan has remained either unchanged or essentially unchanged so that Plaintiffs do not object to the reinstatement of those dropped from Medical Necessity Plan coverage back into the existing Medical Necessity Plan.  Nor do Plaintiffs object to the reinstatement of anyone dropped from the no-longer-existing Catastrophic Plan into the Comprehensive Plan.  At the February 15, 2012 hearing, counsel for Plaintiffs indicated that it appears that only one plaintiff falls within this category and that Plaintiffs have no objection to that individual being placed into the Comprehensive Plan.

The issue is into what version of the Comprehensive Plan does the former Catastrophic Plan member and anyone dropped from or currently in the Comprehensive Plan fit.  To support their respective positions, both sides direct this Court's attention to the aforementioned *Reese v. CNH America LLC*, 574 F.3d 315, although Plaintiffs emphasize the subsequent district court proceedings that grew out of the Sixth Circuit's remand.  Plaintiffs argue that vesting fixed in time at retirement with irreducible benefits, which would mean that reinstatement only into the pre-2007 Comprehensive Plan is proper.  Defendants counter that assuming *arguendo* that a right to lifetime contribution-free health care benefits vested, no right to the pre-2007 version of the plan vested.

Curiously, neither side presented much in the way of a substantive case on this issue.[2] For example, when this Court asked Plaintiffs' counsel where in the CBA was there language

---

[2]  The parties devoted oral argument to whether reinstatement into the prior plans was problematic or even possible.  This issue is ultimately a red herring.  Any administrative or financial difficulty that would accompany such reinstatement cannot inform the predicate question of whether such reinstatement is called for under the agreements and law involved.  If a right to these plans vested, then this Court does not care in this context whether the fulfillment of that right would be difficult.

vesting specific benefits, counsel answered that there was not and only generally directed this Court to the P&I agreements.  The P&I agreements set out *some but not all* coverage, and counsel did not identify for the Court *any* specific language in those documents.  This approach presents a problem for Plaintiffs for two reasons.

First, the Court is not obligated to guess at what a party's argument is, guess at what an opposing argument is, and then rule on the merits of arguments that the parties have not actually presented.  *Cooey v. Kasich*, Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, & 2:10-cv-27, 2011 WL 5326141, at *12 n.5 (S.D. Ohio Nov. 4, 2011) (cautioning counsel that "given that this Court is in the business of resolving disputes and not charged with fashioning arguments from nearly random asides, some might argue that informing the Court of the specific arguments asserted and providing supporting authority for the positions taken would be a more prudent litigation strategy"); *Cooey v. Strickland*, No. 2:04-cv-1156, 2009 WL 4842393, at *99 (S.D. Ohio Dec. 7, 2009) (explaining that "this Court cannot fashion an argument that has not been presented to it and then consider that argument as the basis for [injunctive relief]"); *Lyon v. Yellow Transp., Inc.*, No. 2:08-cv-464, 2009 WL 1604807, at *15 (S.D. Ohio June 8, 2009) ("This Court is in the business of resolving the legal arguments presented to it, not in creating a party's inferred argument for him and then passing judgment on it.").

Second, Plaintiffs' strategy does not readily or necessarily align the instant case with the case on which they apparently primarily rely, *Reese v. CNH Global N.V.*, No. 04-70592, 2011 WL 824585 (E.D. Mich. Mar. 3, 2011).  In that district court opinion, the trial judge had before it multiple summary judgment motions and other filings, all of which involved an extensive record consisting of documents that it appears the parties actually discussed.  Despite facts strikingly

similar to the instant case, the post-remand *Reese* is perhaps of limited value in resolving today's

dispute.  The language of the agreements at issue in *Reese* was important, as was the parties'

course-of-dealing related to benefit plan modifications.  The parties in the case *sub judice* have

failed to argue the specifics of similar evidence in regard to the motion for a permanent

injunction.

There is nevertheless value in the *Reese* proceedings to the instant case.  Following the

Sixth Circuit's remand in *Reese v. CNH America LLC*, 574 F.3d 315, the retirees seeking

benefits filed a petition for rehearing with the court of appeals.  The appellate court denied

rehearing in *Reese v. CNH America LLC*, 583 F.3d 955 (6th Cir. 2009).  One circuit judge, the

author of the prior *Reese* appellate opinion, wrote a separate concurrence in which he made

several notable points.  First, he explained that in regard to the fixed versus changeable benefits

debate in *Reese*, "there was evidence that both sets of parties had treated the benefits as

changeable with respect to individuals who had retired under prior CBAs."  *Id.* at 955 (Sutton, J.,

concurring).  The judge also explained that "it blinked reality to say that the 'vested' benefits

were forever unchangeable, given that the parties had allowed them to change, even in some

ways that did not favor prior retirees."  *Id.* at 956.  Finally, in discussing the state of the record in

regard to whether the prior retirees had approved benefits changes, the appellate judge opined

that under the panel's remand,

> the parties are free to develop evidence on this point.  That evidence may show that
> plaintiffs should win as a matter of law because the prior retirees either approved the
> changes or they did not diminish the nature of the benefits package that existed upon
> retirement.  Or it may show that CNH should be allowed to make reasonable
> modifications to the health-care benefits of retirees, consistent with the way the
> parties have interpreted and implemented prior CBAs containing similar language.

*Id.*  This interpretation of the remand and relevant law indicates that modifications are

42

appropriate when (1) retirees approve of the changes, (2) the changes do not diminish the *nature* of the benefits (as opposed to any particular benefit itself), or (3) a company makes reasonable changes under a prior course of dealing approach.

On remand, the *Reese* district court treated this construction of the appellate panel's decision as definitive, despite no other panel judge joining the author of the concurrence. 2011 WL 824585, at *7 n.8 (stating that the concurrence shall be treated as clarifying the panel's original decision). This approach was perhaps necessitated by the wording of the panel's remand, which simply provided that "we leave it to the district court to decide how and in what circumstances [the company] may alter such benefits–and to decide whether it is a matter amendable to judgment as matter of law or not." *Reese*, 574 F.3d at 327. The important point here is that the Sixth Circuit did not remand for a determination of *whether* modifications could occur, but rather for inquiry into *how* and *under what circumstances* modifications could occur. Off the table was the vesting of irreducible benefits. That possible modifications were permitted was now established.

The instance case is similar to but not the same as *Reese*. The Sixth Circuit found that the *Reese* CBA did not provide fixed and irreducible benefits, although it did provide a vested right to contribution-free benefits. The CBA language at issue here tracks these conclusions. If the CBA in *Reese* did not accomplish such comprehensive vesting, then the essentially analogous CBA here cannot. The extrinsic evidence here, as in the *Reese* trilogy of cases, thus provides the next step in ascertaining the parties' intent.

Although questioning some of the appellate court's conclusions, the *Reese* district judge proceeded on remand to analyze the specific provisions of the relevant agreements in light of the

parties' past dealings.  That judicial officer concluded that the only circumstances under which the Reese parties allowed modifications to employee health care benefits to occur was through a collectively bargained agreement.  2011 WL 824585, at *10.  Thus, the company could only change benefits through an agreement with the union.[3]  *Id.*

Plaintiffs have not put forth evidence to a similar conclusion here.  The parties submitted declarations at the hearing that addressed essentially the irreparable harm issue and what benefits plan permutations provided.  At trial, evidence repeatedly indicated that the union could not negotiate retiree benefits (even if some union individuals were at times unclear on this point).  But modifications to the benefits plan details occurred over time.  This indicates no vesting of fixed plan benefits and that the plan was susceptible to reasonable changes.  *See Reese*, 574 F.3d at 326 ("We know that the contracting parties viewed the 1995 CBA's benefits as subject to some changes because they changed them.").  Because the union lacked the ability to negotiate over the vested retiree benefits, the fact that modifications occurred places this case into a context where changes could and did occur absent company-union negotiation.

There is no evidence that the retirees actively approved of any changes; at best they evinced silent acquiescence to positive modifications or pass-throughs during the course of the me-too relationship.  A change that benefits retirees is still a change, even if "[t]hat sort of change would not break any promises to provide irreducible benefits for life."  *Reese*, 574 F.3d at 325.  Not all of the modifications at issue here are such upgrades, but the takeaways are nonetheless that the details of the benefits were not fixed and that no individualized negotiations

---

[3]  The district judge also explained that a shutdown agreement explicitly addressed the ability to modify select retirees' benefits, but no such agreement is involved in the instant case. *Reese*, 2011 WL 284585, at *10.

controlled the modifications.

The changes about which Plaintiffs now complain do not diminish the *nature* of the benefits, even if the changes alter the *implementation* of the benefits. Plaintiffs come close to conceding a portion of this proposition when they characterize the change of a $1.00 copay to a $2.00 copay as a pass-through that presents a *de minimus* change that does not constitute s reduction in benefits. (ECF No. 206, at 10.) But that *is* a reduction, even if it may be meager to some individuals. The key point is not the limited effect of the reduction, but that the reasonable reduction does not disturb the essential nature of the benefit provided.[4] A nominal copay is a nominal copay–and its implementation here worked a reduction in benefits that the retirees accepted.

Prior particularized benefits have evolved post-2006 without abandoning the core nature of the benefits. For example, the fact that a covered individual still gets a limited copay for prescription drugs, even if the copay has evolved from $4 to $10, means that the nature of the core benefit is left untouched while the specific implementation of that benefit now costs those covered more. This is an acceptable result under the law. Of course, the key is the reasonableness of any modification.

Despite the premiums issue, however, M&G to its credit has made reasonable changes implemented under a prior course of dealings approach. In *Reese*, the Sixth Circuit explained that "[c]onsistent with the parties' practices, nothing in the text of [the CBA] said that health-care coverage would be fixed and irreducible into perpetuity for all employees who retired under

---

[4] Reasonableness is key. For example, an increase from a $1.00 copay to a $10,000.00 copay would reveal the modification to be nothing more than an improper end-run around providing a meaningful benefit.

45

it." 574 F.3d at 325. This Court invited Plaintiffs' counsel to direct this Court to where the CBA indicates fixed and irreducible coverage into perpetuity and was told in response that the CBA does not. Telling the Court to search the P&I agreements for possible support in that regard is insufficient proof of Plaintiffs' position. As in *Reese*, the context here indicates that "the CBA–unless it says otherwise–should be construed to permit modifications to benefits plans that are 'reasonably commensurate' with the benefits provided in the [CBA]." *Id.* at 326.

Also here, as in *Reese*, "[n]or did the statements of company representatives to retirees show that these benefits were unalterable as a matter of law." *Id.* Plaintiffs should have directed this Court to such statements and no doubt would have if they could have. They did not.

Ultimately, then, this case echoes the Sixth Circuit's summary of the *Reese* context in which "the retirees have a vested right to receive health care benefits for life." *Id.* at 327. As in *Reese*, the proposition that "these benefits must be maintained precisely at the level provided for in the [CBA], . . . is not supported by the [CBA], extrinsic evidence provided by the parties or common sense. [The company], in short, cannot terminate all health-care benefits for retirees, but it may reasonably alter them." *Id.* Earlier in its opinion, the Sixth Circuit explained the rationale underlying the changeable nature of a vested right to benefits:

> The language of health-care provisions, as the 1998 CBA illustrates, generally does not contain the kind of precision that characterizes a pension plan. "Employees," it says, "who retire under the Case Corporation Pension Plan for Hourly Paid Employees after 7/1/94, or their surviving spouses eligible to receive a spouse's pension under the provisions of that Plan, shall be eligible for" health-care benefits. JA 1288. It is one thing to say that this kind of language, when tied to eligibility for a pension plan, prevents an employer from *terminating* the benefits-which we have held here. It is quite another to say that an employer may not *alter* the benefits in any way, particularly when the parties have a history of doing just that and when common experience suggests that health-care plans invariably change over time, if not from year to year. *See Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 309 (7th Cir. 1996) (distinguishing a promise to provide "lifetime insurance benefits" from

"decid[ing] precisely what those benefits are").

*Id.* at 324.  Such guidance informs today's decision.

Plaintiffs' right to contribution-free benefits vested, but as *Reese* teaches in construing similar contractual language, no specific benefit plan details vested.  The parties' course of dealing reveals that the specific details of the health care benefits were and are changeable and that retirees accepted modifications in the past.  The past informs the present, so that this Court must conclude that reinstatement into the current version of the health care plans is appropriate, subject to any concession on the part of Plaintiffs such as in regard to the Catastrophic Plan member who will be reinstated into the Comprehensive Plan without Plaintiffs' objection.

### III.

For the foregoing reasons, the Court **GRANTS** Plaintiffs' motion for a permanent injunction, but declines to adopt the exact scope of the injunction requested.  (ECF No. 196.) The Court therefore **ORDERS**:

(1) within forty-five days following the filing of this Opinion and Order, Defendants shall reinstate all retirees, their spouses, and surviving spouses or other dependents who were enrolled in the Medical Necessity Plan back into the Medical Necessity Plan;

(2) within forty-five days following the filing of this Opinion and Order, Defendants shall reinstate all retirees, their spouses, and surviving spouses or other dependents who were enrolled in the Catastrophic Plan into the current Comprehensive Plan;

(3) within forty-five days following the filing of this Opinion and Order, Defendants shall reinstate all retirees, their spouses, and surviving spouses or other dependents who were enrolled in the Comprehensive Plan into the current Comprehensive Plan;

(4) Defendants shall maintain plan membership for all retirees, their spouses, and surviving spouses or other dependents who are currently enrolled in either the Medical Necessity Plan or the Comprehensive Plan; and

(5) as of the date of the filing of this Opinion and Order, Defendants shall cease collecting from and charging any premiums to Plaintiffs.

**IT IS SO ORDERED**.

_____/s/ Gregory L. Frost_____
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE

48